09 CV 00134

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PACIFIC WEST HEALTH MEDICAL CENTER
INC. EMPLOYEES RETIREMENT TRUST, On
Behalf of Itself and All Others Similarly Situated,

                Plaintiff,

    vs.

FAIRFIELD GREENWICH GROUP,
FAIRFIELD GREENWICH LIMITED,
FAIRFIELD GREENWICH (BERMUDA) LTD.,
FAIRFIELD GREENWICH ADVISORS LLC,
WALTER M. NOEL, JR., ANDRES
PIEDRAHITA, JEFFREY TUCKER, BRIAN
FRANCOUER, AMIT VIJVERGIYA, YANKO
DELLAW SCHIAVA, PHILIP TOUB,
LOURDES BARRENECHE, CORNELIS
BOELE, MATTHEW C. BROWN, VIANNEY
D'HENDECOURT, HAROLD GREISMAN,
JACQUELINE HARARY, DAVID HORN,
RICHARD LANDSBERGER, DAVID LIPTON,
JULIA LUONGO,  MARK MCKEEFRY,
MARIA TERESA PULIDO MENDOZO,
CHARLES MURPHY, SANTIAGO REYES, and
ANDREW SMITH,

                Defendants.

Civil Action No.

**VERIFIED CLASS
ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
JAN 08 2009
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, individually and on behalf of all others similarly situated, by its attorneys,

alleges the following upon information and belief, except for those allegations as to itself, which

are alleged upon personal knowledge.  Plaintiff's information and belief is based on the

investigation of its counsel, including a review of Fairfield Greenwich Group's publicly issued

press releases; the Private Placement Memorandum for Fairfield Sentry Limited; and news

stories.

Doc. 162607

## NATURE OF THE ACTION

1.      Plaintiff brings this action as a class action on behalf of itself and all other persons or entities who entrusted Defendants with the management and protection of their investment assets.  This is a class action for breaches of fiduciary duty, gross negligence, unjust enrichment, breach of contract, promissory estoppel, mutual mistake and for the creation of a constructive trust arising out of Defendants' mismanagement of the investments of Plaintiff and other members of the proposed Class (defined below).  Defendants owed Plaintiff and the Class a fiduciary duty to protect and manage these assets with care, diligence and the highest degree of good faith.  Defendants breached this duty.  Defendants were further obligated by contractual terms in the August 14, 2006 Private Placement Memorandum to perform due diligence on potential fund managers and perform ongoing monitoring of existing relationships with fund managers.  Defendants violated those obligations. As a direct result of Defendants' unlawful conduct alleged herein, Plaintiff and the Class suffered avoidable losses and Defendants were unjustly enriched.

2.      Plaintiff, individually and on behalf of the Class, seeks to recover both its economic damages as well as all fees and other amounts wrongfully paid to the Defendants. Those fees, were paid in error to the Defendants under the mistaken belief that assets and profits reported to Defendants by Bernard L. Madoff and Bernard L. Madoff Investment Securities LLC (collectively "Madoff") actually existed.  Those fees paid in error, based on mistaken beliefs, should be returned to Plaintiff and the Class.  Plaintiff estimates, based on public reports, that those amounts paid to Defendants and recoverable in this action exceed $1,000,000,000 (one billion dollars).

Doc. 162607                                    - 2 -

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2).  The matter in controversy exceeds the jurisdictional amount and there are members of the Class that are citizens of States different from the Defendants.

4.    Defendants are all affiliated with, owned by or principals of Defendant Fairfield Greenwich Group, which is headquartered in this District.

5.    Venue is proper in this District because many of the acts and transactions constituting the violations of law herein complained of occurred within this District, one or more of the individual Defendants reside in this District, and the principal place of business of one or more Defendants is in this District.

## PARTIES

6.    Plaintiff, Pacific West Health Medical Center Inc. Employees Retirement Trust, is located in Los Angeles, California, and is the owner of Shares in the Fairfield Sentry Limited Fund (the "Fairfield Sentry Fund"), which it purchased in or about January 2008 pursuant to the August 14, 2006 Fairfield Sentry Private Placement Memorandum (the "PPM").

7.    Defendant Fairfield Greenwich Limited ("FG Placement Agent") serves as Fairfield Sentry's placement agent.  FG Placement Agent is a company organized under the laws of the Cayman Islands.  According to the PPM, FG Placement Agent oversees the marketing of the Shares and is the parent of defendant Fairfield Greenwich (Bermuda) Ltd. (the Fairfield Sentry Fund's investment manager).  FG Placement Agent was paid the management fee and performance fee in connection with the management of Fairfield Sentry.  According to the

Private Placement Memorandum, FG Placement Agent also received a placement fee of up to 3%
of each new investment into the Sentry Greenwich Fund. According to the Private Placement
Memorandum, Defendants Jeffrey H. Tucker, Walter M. Noel, Jr., and Andres Piedrahita are the
main principals of FG Placement Agent.

8.      Defendant Fairfield Greenwich (Bermuda) Ltd. ("FG Investment Manager") was
organized as a corporation under the laws of Bermuda on June 13, 2003. FG Investment
Manager is registered as an investment advisor under the Investment Advisors Act of 1940, as
amended, effective April 20, 2006. FG Investment Manager serves as the investment manager
for Fairfield Sentry. FG Investment Manager is the wholly owned subsidiary of FG Placement
Agent.

9.      Defendant Fairfield Greenwich Advisors LLC ("FG Advisors") is an affiliate of
FG Placement Agent and FG Investment Manager, and has its principal offices at 55 East 52nd
Street, New York, New York. FG Advisors provides Fairfield Sentry with certain administrative
services and back-office support. According to publicly available information, FG Advisors is a
U.S. SEC registered investment advisor.

10.     Defendant Fairfield Greenwich Group ("Fairfield Greenwich Group" or "FGG")
is, according, to information available on its website (www.fggus.com) "a global family of
companies with offices in New York, London, and Bermuda." According to the website, FG
Placement Agent, FG Investment Manager and FG Advisors are all member companies of
Fairfield Greenwich Group. Fairfield Greenwich Group was founded in 1983 and has its
principal place of business in New York, New York. Fairfield Greenwich Group is an asset
manager that manages its own hedge funds as well as certain externally managed funds.

11.     Defendant Walter M. Noel, Jr., is a founding partner of Fairfield Greenwich Group who, according to Fairfield Greenwich Group, continues to oversee all of the firm's activities.  Defendant Noel is a member of Fairfield Greenwich Group's Board of Directors and has a residence in New York, New York.  Defendant Noel also serves as a director of Fairfield Sentry and FG Placement Agent.  According to the Uniform Application for Investment Advisor Registration filed by FG Investment Manager in or around February 2005, Defendant Noel is a control person of FG Investment Manager.  Four of Noel's sons-in-law work for Fairfield Greenwich Group.  Upon information and belief, Noel was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.

12.     According to a *The New York Times* news article dated December 22, 2008, "Mr. Noel, whose primary residence and office remain in Greenwich, has at least five luxury homes. Along with his Greenwich house, whose value has been estimated at $4.2 million, he has homes in Southampton and Palm Beach.  And since 2000, the Noels have also maintained a pied-a-terre at 812 Park Avenue.  The combined value of those homes is more than $20 million."

13.     Defendant Andres Piedrahita is a founding partner of Fairfield Greenwich Group and a member of Fairfield Greenwich Group's Executive Committee.  According to Fairfield Greenwich Group, he is currently responsible for Fairfield Greenwich Group's European and Latin American activities.  Defendant Piedrahita is based out of Fairfield Greenwich Group's London and Madrid offices.  Defendant Piedrahita is also the son-in-law of Defendant Noel. Defendant Piedrahita has a residence in New York, New York.  Upon information and belief, Piedrahita was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.

14.     According to a December 27, 2008 *The Wall Street Journal* article, "Mr. Piedrahita in recent years displayed ever-greater signs of wealth. He commuted between London and Madrid in his Gulfstream private jet.... [He and his wife] had an estate in the Spanish Mediterranean island of Majorca, and a yacht."

15.     Defendant Jeffrey Tucker is a founding partner of Fairfield Greenwich Group and a member of Fairfield Greenwich Group's Board of Directors. Defendant Tucker directs FGG's business and operations activity. Defendant Tucker has a residence in New York, New York. According to the Uniform Application for Investment Advisor Registration filed by FG Investment Manager in or around February 2005, Defendant Tucker is a control person of FG Investment Manager. Upon information and belief, Tucker was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.

16.     According to *The Wall Street Journal* (December 27, 2008), "Tucker lives "in a Fifth Avenue apartment with views of Central Park. [I]n 2004 Mr. Tucker purchase Stone Bridge Farm in Schuylerville, New York.... Mr. Tucker was invested millions of dollars at Stonebridge Farm...."

17.     Defendant Brian Francouer is a director of FG Investment Manager. Upon information and belief, Francouer was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.

18.     Defendant Amit Vijayvergiya is a partner in Fairfield Greenwich Group and serves as the firm's Chief Risk Officer and President of FG Investment Manager. Defendant Vijayvergiya is based in the Bermuda office of Fairfield Greenwich Group. Upon information and belief, Vijayvergiya was paid portions of the management and incentive fees from Fairfield

Sentry's investments with Madoff.

19.     Defendant Yanko Dellaw Schiava is one of defendant Noel's sons-in-law. According to published reports, Schiava helped raised funds for Fairfield in southern Europe from bases in Milan and Lugano.  Upon information and belief, Schiava was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.

20.     Defendant Philip Toub is a third Noel son-in-law.  Toub markets the Fairfield Greenwich Group's funds in Brazil and the Middle East.  Upon information and belief, Toub was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.

21.     Defendant Lourdes Barreneche, according to information available on Fairfield Greenwich Group's website, is a partner in Fairfield Greenwich Group.  Barreneche coordinates FGG's sales efforts and plays a leading role in developing "best practices" for marketing and business development of FGG funds to offshore clients.  Barreneche has a Master's degree in Politics and Economics from New York University and holds FINRA Series 7 and 62 licenses, and is based in FGG's New York office.  Upon information and belief, Barreneche was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.

22.     Defendant Cornelis Boele, according to information available on Fairfield Greenwich Group's website, is a partner in Fairfield Greenwich Group.  Boele oversees the marketing efforts of the offshore funds of FGG in the Benelux region and markets throughout Europe.  Boele received his Bachelor of Arts degree from Clark University.  He holds FINRA Series 7 and 63 licenses, and is based in FGG's New York office.  Upon information and belief, Boele was paid portions of the management and incentive fees from Fairfield Sentry's

investments with Madoff.

23.      Defendant Matthew C. Brown, according to information available on Fairfield Greenwich Group's website, is a partner in Fairfield Greenwich Group.  Brown heads the Fairfield Antara team and has responsibilities which primarily include managing third party platform and global business development.  Brown holds a FINRA Series 7 license, and is based in FGG's New York office.  Upon information and belief, Brown was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.

24.      Defendant Vianney d'Hendecourt, according to information available on Fairfield Greenwich Group's website, is a partner in Fairfield Greenwich Group.  d'Hendecourt markets FGG's offshore funds throughout Europe, concentrating on France, Belgium, and Luxembourg.  d'Hendecourt is based in FGG's London office.  Upon information and belief, d'Hendecourt was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.

25.      Defendant Harold Greisman, according to information available on FGG's website, is a partner in FGG.  Greisman focuses on evaluating alternative asset investments and managers.  Greisman is based in FGG's New York and London offices.  Upon information and belief, Greisman was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.

26.      Defendant Jacqueline Harary, according to information available on FGG's website, is a partner in FGG.  Harary markets FGG funds worldwide, with a focus on Latin America.  Harary's role combines sales responsibilities with manager selection/product development projects.  Harary holds FINRA Series 7 and 63 licenses and is based in FGG's New

York offices.  Upon information and belief, Harary was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.

27.     David Horn, according to information available on FGG's website, is a partner in FGG.  Horn is also FGG's Chief Global Strategist and also serves on the firm's Board of Directors.  Upon information and belief, Horn was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.  Horn holds FINRA Series 7, 63, and 65 licenses and is based in FGG's New York office.

28.     Richard Landsberger, according to information available on FGG's website, is a partner in FGG.  Landsberger is responsible for business development and general management issues in Europe and Asia and directly markets products to a global institutional client base.  Upon information and belief, Landsberger was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.  Landsberger is based in FGG's London office.

29.     David Lipton, according to information available on FGG's website, is a partner in FGG.  Lipton is also FGG's Chief Financial Officer and assists in managing FGG's operations.  Upon information and belief, Lipton was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.  Lipton is believed to be based in FGG's New York office.

30.     Julia Luongo, according to information available on FGG's website, is a partner in FGG.  Luongo is FGG's Assistant General Counsel – Tax Director.  Upon information and belief, Luongo was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff.  Luongo is based in FGG's New York office.

31.     Mark McKeefry, according to information available on FGG's website, is a partner in FGG. McKeefry is FGG's Chief Operating Officer and General Counsel. Upon information and belief, McKeefry was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff. McKeefry holds FINRA Series 7, 24, 63, 3, and 65 licenses, is admitted to the bars of California and New York, and is based in FGG's New York office.

32.     Maria Teresa Pulido Mendozo, according to information available on FGG's website, is a partner in FGG. Mendozo is FGG's head of Global Sales. Upon information and belief, Mendozo was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff. Mendozo is based in FGG's Madrid office. Mendozo was educated in the United States (college and graduate business school).

33.     Charles Murphy, according to information available on FGG's website, is a partner in FGG. Murphy is a member of FGG's Executive Committee and is responsible for strategy and capital markets business for FGG. Upon information and belief, Murphy was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff. Murphy is based in FGG's New York office.

34.     Santiago Reyes, according to information available on FGG's website, is a partner in FGG. Reyes is head of FGG's Miami office and markets FGG's offshore funds worldwide. Upon information and belief, Reyes was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff. Reyes holds FINRA Series 7 and 63 licenses, and is based in FGG's Miami office.

35.     Andrew Smith, according to information available on FGG's website, is a partner

Doc. 162607

in FGG. Smith is FGG's Chief Risk Officer and President of FG Bermuda Ltd. Upon information and belief, Smith was paid portions of the management and incentive fees from Fairfield Sentry's investments with Madoff. Smith holds FINRA Series 7 and 63 licenses, and is based in FGG's New York office.

36.     Each of the Individual Defendants are named herein as partners in FGG, as officers and/or directors of the other Fairfield Greenwich defendant entities, and as recipients in the management and incentive fees paid from Fairfield Sentry's investments with Madoff. According to an article in *The New York Times* dated December 22, 2008, "nearly all [FGG's] profits were distributed among the firm's 21 partners. Fairfield's employees were also lavishly compensated, with at least four receiving more than $5 million in pay."

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), on behalf of all persons or entities who owned shares of Fairfield Sentry as of December 10, 2008 and were damaged thereby (the "Class"). Excluded from the Class are the Defendants herein, and any entity in which the Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

38.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members of the Class.

39.     Plaintiff will fairly and adequately protect the interests of the members of the

Class.  Plaintiff has retained competent counsel experienced in class action litigation under the laws of New York; it is a member of the Class; its claims are typical of the claims of all Class members; and it does not have interests antagonistic to, or in conflict with, those of the Class.

40.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the Court system and could create the possibility of inconsistent judgments. Moreover, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually.  There will be no difficulty in the management of this action as a class action.

41.     There are numerous questions of law and fact which are common to the Class and which predominate over any questions affecting individual members of the Class, including:

a.     whether the Defendants breached their fiduciary duties to Plaintiff and the Class by failing to properly manage their investments and to perform necessary due diligence that would have uncovered the massive Ponzi scheme carried out by Bernard L. Madoff, and his company, Bernard L. Madoff Investment Securities ("BMIS" or "BLM") and the wrongful dissipation of the assets of Plaintiff and the Class;

b.     whether and to what extent Plaintiff and the Class were damaged by the Defendants' breaches of fiduciary duty;

c.     whether the Defendants were grossly negligent in failing to perform necessary due diligence that would have uncovered the massive Ponzi scheme carried out by Madoff and BMIS;

d.     whether and to what extent Plaintiff and members of the Class were

Doc. 162607                                            - 12 -

damaged by the Defendants' gross negligence;

       e.     whether the Defendants breached their contract with Plaintiff and members of the Class by failing to perform due diligence that would have uncovered the massive Ponzi scheme carried out by Madoff;

       f.     whether and to what extent Plaintiff and members of the Class were damaged by the Defendants' breaches of contract;

       g.     whether it is appropriate to create a constructive trust to hold fees paid to Defendants;

       h.     whether the Defendants were unjustly enriched at the expense of Plaintiff and the members of the Class; and

       i.     whether management and performance fees were paid based on a mutual mistake of the parties.

## SUBSTANTIVE ALLEGATIONS

      42.     On December 11, 2008, Bernard L. Madoff was arrested and charged with a criminal complaint after admitting to his sons that his money management operations were "all just one big lie" and "basically, a giant Ponzi scheme."

      43.     On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Bernard L. Madoff and his company, BMIS. *SEC v. Bernard L. Madoff*, 08 Civ. 10791 (S.D.N.Y. Dec. 11, 2008).

      44.     On December 12, 2008 Fairfield Greenwich Group issued a press release in response to Bernard Madoff's arrest. In the press release Defendant Tucker claimed that the

Defendants had no idea that Fairfield Sentry was exposed to such a "sophisticated" scheme: "We have worked with Madoff for nearly 20 years, investing alongside our clients. We had no indication that we and many other firms and private investors were the victims of such a highly sophisticated, massive fraudulent scheme."

45.    The December 12, 2008 Fairfield Greenwich Group press release went on to disclose that it had approximately $7.5 billion invested with Madoff: "As of November 1, 2008, assets under management at Fairfield Greenwich Group totaled approximately $14.1 billion, of which approximately $7.5 billion was invested in vehicles connected to Bernard L. Madoff Investment Securities." According to an article in *The New York Times* on December 12, 2008, Fairfield Sentry had reported approximately $7.3 billion of investment exposure.  Plaintiff believes that nearly all or substantially all of Fairfield Sentry's assets invested with BMIS have been lost.

46.    Mid-day on December 18, 2008, Fairfield Sentry issued an announcement that funds under the management of the Fairfield Greenwich Group's affiliates would suspend the determination of its Net Asset Value: "Effective 18 December 2008, the directors have determined that it is in the best interests of [Fairfield Sentry] to suspend the determination of the Net Asset Value pursuant to [Fairfield Sentry]'s Articles of Association, in view of the arrest of Bernard Madoff in connection with securities fraud on Bernard L. Madoff Investment Securities LLC with which Fairfield Sentry has accounts."

47.    For more than twenty years, Defendant Noel had a business relationship with Bernard Madoff and BMIS that helped earn Noel's investment firm, Fairfield Greenwich Group, hundreds of millions of dollars (and possibly greater than one billion dollars) in fees.  According

Doc. 162607

- 14 -

to a December 19, 2008 article in *The Wall Street Journal*, Fairfield Greenwich Group "touted its close relationship with Mr. Madoff" to raise large sums of money from Class members to invest with Madoff/BMIS.

48.     Despite this long-standing relationship with Madoff and BMIS, Defendants claimed to be caught unaware of this massive Ponzi scheme.  As discussed more fully below, had the Defendants properly performed the necessary due diligence, red flag warnings would have alerted them to this scheme much earlier.

49.     The Fairfield Sentry Private Placement Memorandum dated August 14, 2006, governs the terms of Plaintiff's and the Class's investment in the Fairfield Sentry Fund.

50.     The Private Placement Memorandum is a binding contract between the Plaintiff, as well as other Class members, and Defendants.

51.     According to the Private Placement Memorandum, Fairfield Sentry followed a split-strike conversion strategy that "is implemented by Bernard L. Madoff Investment Securities LLC ("BLM") a broker-dealer registered with the Securities and Exchange Commission, through accounts maintained by the Fund at that firm:"

> The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities. An index call option is out-of-the- money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index. The basket typically consists of between 35 to 50 stocks in the S&P 100 Index.

> The primary purpose of the long put options is to limit the market risk of the stock basket at the strike price of the long puts. The primary purpose of the short call options is to largely finance the cost of the put hedge and to increase the stand-still

rate of return. This position in its entirety could be characterized as a bull spread which, presuming the stock basket highly correlates to the S&P 100 Index, is intended to work as follows: (i) it sets a floor value below which further declines in the value of the stock basket is offset by gains in the put options, (ii) it sets a ceiling value beyond which further gains in the stock basket are offset by increasing liability of the short calls, and (iii) defines a range of potential market gain or loss, depending on how tightly the options collar is struck.

The degree of bullishness of the strategy can be expressed at implementation by the selection of the strike prices in the S&P 100 Index put and call options. The farther away the strike prices are from the price of the S&P 100 Index, the more bullish the strategy.

52.     A split-strike conversion strategy is a strategy also known as a "collar" which places a floor on the potential losses of a stock through the purchase of a put then offsets the cost of the put with the sale of a call which places a ceiling on the potential gains of a stock.

53.     The PPM further stated with respect to Madoff and BLM that "BLM is authorized to determine the price and timing of stock and option transactions in the account."

54.     According to the Private Placement Memorandum, FG Investment Manager was "responsible for the management of [Fairfield Sentry]'s investment activities, the selection of [Fairfield Sentry]'s investments, monitoring its investments and maintaining the relationship between [Fairfield Sentry] and its custodian, administrator, registrar and transfer agent."

55.     The Private Placement Memorandum established a management fee and performance fee paid by Fairfield Sentry to FG Placement Agent.  According to the Private Placement Memorandum, FG Placement Agent received a monthly management fee of 0.0833% (approximately 1% per annum) of the Net Asset Value of the Fund.  FG Placement Agent also received quarterly performance fees of 20% of the net realized and net unrealized appreciation in the Net Asset Value of each Share.  According to a *The Wall Street Journal* news article dated December 19, 2008, the "20% share of profits on investments" were "about double the norm for

firms that farm our clients' money to a variety of fund managers."

56.     *Bloomberg News* reported on December 15, 2008 that if not for the revelation of

Madoff's fraud, the Fairfield Greenwich Group would have collected about $135 million in fees

in 2008.

57.     According to the Uniform Application For Investment Advisor Registration

completed by FG Investment Manager and attached to the Private Placement Memorandum, FG

Investment Manager delegates to Fairfield Greenwich Group's risk management team the

responsibility to perform due diligence with respect to hedge fund managers (emphasis added):

> FGG's Risk Management team conducts both the pre- and post-investment
> quantitative analyses of hedge fund managers, monitors the market risk and
> investment compliance of these managers, and provides the quantitative analyses
> supporting the asset allocation decisions across the firm's multi-strategy funds.
> The risk infrastructure at FGG supporting these activities incorporates a number
> of systems and tools – including internally developed systems, off the shelf
> vendor solutions, and some customized applications built to meet FGG's business
> needs. **An important component of the FGG product platform is the full
> position level transparency that we receive from all single managers which
> are included in our multistrategy funds. FGG generally receives full daily
> portfolio transparency via independent access to the managers' prime
> brokerage or administrator accounts. Position information is transmitted via
> secure channels to our systems.**
>
> FGG's core risk management engine utilizes the flexible ASP version of the
> RiskManager product from RiskMetrics. This system is populated by detailed
> position information collected directly from the prime brokers used by FGG's
> underlying single managers and further supplemented by an extensive market and
> terms and conditions database. The Risk Management team at FGG regularly
> evaluates the market risk of its single and multi-strategy funds by producing
> strategy and fund specific risk reports. These reports are customizable to present
> risk measures and tests most appropriate to each portfolio's strategy. The FGG
> Risk Management team prepares a monthly suite of reports using RiskManager
> that are carefully reviewed and discussed by FGG's Investment Group at a formal
> monthly risk meeting. The reports organized along the following dimensions:
> Exposures, Sensitivities, Scenarios and Stress Tests, VaR, Correlations Analysis
> and Attribution Analysis. The review includes the full suite of VaR analytics
> (including marginal, incremental and relative VaR) and careful evaluation of the

sensitivity of our managers to important risk factors (such as increasing or decreasing equity markets, volatilities, interest rate shocks/twists, FX movements and other factors).

FGG utilizes a variety of tools and resources to conduct daily portfolio monitoring and investment compliance. The compliance process is structured to complement the more sophisticated monthly risk analyses conducted by the Risk Management team with intra-month, daily portfolio analyses. On a daily basis the investment team can inspect key portfolio statistics, exposures at different levels of aggregation (for example, gross, long, short, net by instrument type, market cap, sector etc.), and monitor portfolio composition and activity against pre-agreed yellow and red limit levels. The overall objective is to spot potentially worrisome trends regarding exposures, liquidity, concentrations, or other important deviations from the parameters agreed to for each fund.

58.     The Defendants did not perform the continuing risk monitoring and oversight required pursuant to the written terms of the Private Placement Memorandum.

59.     The management fees paid to FG Placement Agent were to compensate the Defendants for performing the due diligence described in the PPM.

60.     Beyond the Private Placement Memorandum, the Fairfield Greenwich Group claimed in its marketing brochure disseminated to Class members to perform due diligence that was "deeper and broader" than other firms. However, the Defendants did not perform the necessary due diligence with respect to Madoff and BMIS as fund managers.

61.     Fairfield Greenwich Group issued statements through its brochure and its website claiming it had a higher level of due diligence and continued monitoring than its competitors. According to a brochure issued by Fairfield Greenwich Group, once a relationship with a fund manager is established the "due diligence process evolves into a similarly multi-faceted risk monitoring function." The Fairfield Greenwich Group brochure goes on to say that "the purpose of this ongoing activity is to ensure that the fund continues to follow its investment methodology - and constraints - and otherwise acts in accordance with the operational and risk framework that

was approved during the due diligence phase."

62.    According to the Fairfield Greenwich Group website, as part of Fairfield

Greenwich Group's ongoing oversight it reviews the individual securities in each portfolio and

has discussions with the fund managers: "Portfolios are reviewed at the individual security level

from independent sources and discussed with manager personnel several times each month."

63.    Fairfield Greenwich Group also claims, on its website, that in its due diligence

and risk monitoring it "probe[s] deeply into all key elements of risk" and "employs a

significantly higher level of due diligence work than typically performed by most fund of funds

and consulting firms." Fairfield Greenwich Group goes on to describe some of the procedures it

uses to monitor certain risks including manager style, market risk, operational risk, credit risk

and legal risk.

64.    In detailing the procedures Fairfield Greenwich Group performs to monitor

operational risk it describes reviewing not only audited financials but also the auditor's

management letter comments.  It further describes reviewing accounting controls and broker

reconciliations in an effort to ensure the existence of the securities.  Some of the procedures

Fairfield Greenwich Group details include the following (emphasis added):

> - Review audited financials and auditor's management letter comments;
> look for affiliated party loans and pledged assets or collateralized loans.
>
> - Review accounting controls: from trade execution; to trade capture; to
> trade reconciliation with the Street, administrator, and fund; to funds
> books and records.
>
> *                    *                    *
>
> - *Review broker reconciliations to ensure completeness and **existence of
> all securities.***

- Infrastructure Adequacy Evaluation and disaster recovery plans.

65.      In monitoring legal risk, Fairfield Greenwich Group claims to review "client complaints and litigation" as well as "soft dollars and directed brokerage/best execution."

66.      The management fees and performance fees paid to Fairfield Greenwich Group, or its constituent entities, were calculated on false assets and gains with respect to the portion of the Fund invested with Madoff and BMIS.

67.      The Defendants had responsibilities to establish due diligence procedures and performance guidelines for all fund managers with whom it invested client assets.  These procedures were to be applied in creating general oversight and transparency regarding how Fairfield Sentry Fund assets were being invested.  Defendants were also responsible for seeing that these procedures and guidelines, if any, were in fact being performed.

68.      Defendants' letter to shareholders created the materially false and misleading impression that Defendants were actively monitoring Fairfield Sentry's investments.  Thus, for example, the Fairfield Greenwich Group posted on its website a "monthly strategy review" for Fairfield Sentry for October 2008, identifying Fairfield Greenwich (Bermuda) Ltd. (FG Investment Manager) as the fund "manager."  The October 2008 "monthly strategy review" misstated that "Sentry's split-strike conversion ('SSC') strategy was able to substantially avoid [October's] deep decline [in the equity markets] and protect investors' capital by remaining invested for the entire month in a laddered portfolio of short-dated U.S. Treasury Bills."   In fact, as subsequent events revealed, FG Investment Manager had no actual first-hand knowledge of the investments being made on behalf of the Fund.

69.      Defendants failed to perform even a minimum level of due diligence regarding the

Doc. 162607                          - 20 -

activities of Madoff and BMIS to safeguard the investments of Plaintiff and the Class.  Further, they failed to follow up with due diligence procedures in response to many "red flag" warnings.

70.     Brad Alford, who runs Alpha Capital Management LLC in Atlanta, which helps clients choose hedge funds, was quoted by *Bloomberg News* on December 15, 2008 as saying: "It's mind-boggling that people like ... Fairfield Greenwich had been doing this for so long.... It's the job of these funds of funds to be doing due diligence.  That's why they get paid."

71.     Defendants failed to investigate refusals to allow account transparency.  If investors questioned Madoff's opaque and undisclosed investment methodology, Madoff would threaten them with removal from the Madoff programs.  Such troubling refusals to disclose information in the face of a supposedly transparent trading strategy meant the Defendants should have been performing even greater due diligence.

72.     An article appearing in the December 19, 2008 issue of *The Wall Street Journal* told of a 2007 attempt by Fairfield Greenwich Group to capitalize on its successes by selling a stake in the firm.  However, in conducting due diligence on the Fairfield Greenwich Group "several" private-investment firms requested access to BMIS' trading records and "were told that Mr. Madoff wouldn't allow prospective investors to view his books."

73.     Madoff's trading through an affiliate rather than an independent broker was also a red flag.  Defendants failed to identify inherent conflicts of interest in the transaction execution model used by Madoff and the potential for distorting records.  In many well-managed investment programs, in order to create an independent basis for confirming transaction executions and compliance with program criteria, the fund manager processes transactions through an independent broker.  However, contrary to the standard industry practice, Madoff self-

cleared all fund activities through his wholly owned company, BMIS. Further, Madoff refused to clarify the transactional details surrounding such activities.  By refusing to shine light on this transactional model Madoff created the potential for conflicts of interest and self-dealing.  In fact, it appears that the positions in securities represented by BMIS to its customers, including Fairfield Sentry, simply do not exist.  As required by the terms of the Private Placement Memorandum and their fiduciary duties, the Defendants should have conducted extensive due diligence to clarify these activities but failed to do so.

74.     Defendants failed to investigate the obvious inadequacy of BMIS's company auditors. The audit firm which performed the internal audit function was Friehling & Horowitz in New City, New York. This firm had only three employees - a retired partner living in Florida, a secretary and one active accountant.

75.     Defendants failed to investigate reports of irregularities at BMIS.  From time to time, public reports raised questions about the business practices of BMIS and Madoff.  For example, in May 2001, *Barron's* reported in the article "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum" that certain option strategists for major investment banks could not understand how BMIS and Madoff achieved the results that they claimed from using the split strike conversion strategy.  Madoff responded to *Barron's* questions regarding how he achieved consistently high returns stating that "It's a proprietary strategy. I can't go into great detail." When *Barron's* asked Defendant Tucker about the returns Fairfield Sentry had received he stated "It's a private fund. And so our inclination has been not to discuss its returns." At the time of the *Barron's* article Fairfield Sentry had assets of $3.3 billion which were placed with Madoff.

76.    Similarly, in May 2001, MAR/Hedge – a hedge fund newsletter – reported that the Fairfield Sentry Fund had "reported losses of no more than 55 basis points in just four of the past 139 consecutive months, while generating highly consistent gross returns of slightly more than 1.5% a month and net annual returns roughly in the range of 15%."  MAR/Hedge reported that "expert skeptics ... express[ed] bewilderment and indicated they were ... grappling to understand how such results had been achieved for so long."

77.    As far back as December 16, 1992, an article appeared in *The Wall Street Journal* describing the SEC's investigation of two accountants who had illegally raised money in Florida for BMIS and Madoff promising guaranteed returns of 13.5% to 20%.  These two accountants sold unregistered securities to unsophisticated investors raising $440 million.  The accountants told the investors that the money would be managed by an unnamed broker, who was in fact Madoff.  According to the article, Bernard Madoff had told investors that he was not aware that the funds were raised illegally. These public reports put the Defendants, in their fiduciary role as protectors of their clients' investment assets, on notice to perform heightened due diligence to determine how BMIS and Madoff, in fact, were "investing."

78.    Defendants failed to identify the structural impossibilities of the split-strike conversion trading model employed by BMIS.  According to the Private Placement Memorandum, Madoff followed a split-strike conversion strategy.  However, the total volume of the trades necessary to implement this strategy exceeded the publicly reported volume in the market for those options on any trading day.  This operational impossibility was an obvious red flag warning that Defendants ignored.

79.    Defendants failed to investigate when the results achieved by Madoff were

contrary to the split-strike conversion strategy. Madoff's split-strike conversion strategy might

tend to reduce volatility, but it would not produce gains in a declining stock market. However,

BMIS's reporting of small, steady gains each month, including gains in a declining market could

not have been reconciled with this strategy.

80.    According to a December 19, 2008 article in *The Wall Street Journal*, an

additional red flag, which should have been apparent to Defendants was that BMIS "didn't

charge additional fees but instead said he charged a commission on trades he allegedly executed."

According to *The Wall Street Journal*, "[t]his is an unusual arrangement that raised suspicions

among rival money managers, some of whom doubted that could generate sufficient fee income."

81.    While Defendants failed to recognize the red flag warnings by conducting

necessary due diligence, other investment professionals who advised investors about potential

investments with Madoff or BMIS warned clients away from investing with Madoff. In a letter

issued to clients on December 15, 2008, Aksia, LLC, an independent hedge fund research and

advisory firm, discussed the red flags it had previously identified as early as 2007, which

prompted Aksia to advise its clients against investing with Madoff or any of his "feeder" funds,

such as Fairfield Sentry. Aksia's December 15, 2008 letter included the following comments

(emphasis added):

   a.    The Madoff feeder funds marketed a purported "Split-strike Conversion"
         strategy that is remarkably simple; however, **its returns could not be
         nearly replicated by our quant analyst.**

   b.    **It seemed implausible that the S&P100 options market that Madoff
         purported to trade could handle the size of the combined feeder
         funds' assets which we estimated to be $13 billion.**

   c.    The feeder funds had recognized administrators and auditors but
         substantially all of the assets were custodied with Madoff Securities. This

necessitated Aksia checking the auditor of Madoff Securities, Friehling & Horowitz (not a fictitious audit firm). After some investigating, **we concluded that Friehling & Horowitz had three employees, of which one was 78 years old and living in Florida, one was a secretary, and one was an active 47 year old accountant** (and the office in Rockland County, NY was only 13ft x 18ft large). This operation appeared small given the scale and scope of Madoff's activities.

d.    There was at least $13 billion in all the feeder funds, but our standard 13F review showed scatterings of small positions in small (non-S&P100) equities. The explanation provided by the feeder fund managers was that the strategy is 100% cash at every quarter end.

e.    Madoff's website claimed that the firm was technologically advanced ("the clearing and settlement process is rooted in advanced technology") and the feeder managers claimed 100% transparency. But when we asked to see the transparency during our onsite visits, we were shown paper tickets that were sent via U.S. mail daily to the managers. **The managers had no demonstrated electronic access to their funds accounts at Madoff. Paper copies provide a hedge fund manager with the end of the day ability to manufacture trade tickets that confirm the investment results.**

f.    **Conversations with former employees indicated a high degree of secrecy surrounding the trading of these feeder fund accounts.** Key Madoff family members (brother, daughter, two sons) seemed to control all the key positions at the firm. Aksia is consistently negative on firms where key and control positions are held by family members.

g.    **Madoff Securities, through discretionary brokerage agreements, initiated trades in the accounts, executed the trades, and custodied and administered the assets. This seemed to be a clear conflict of interest and a lack of segregation of duties is high on our list of red flags.**

82.    According to the December 19, 2008, *The Wall Street Journal* article, Defendants had actual knowledge that other investors were equally skeptical of Madoff's ability to consistently outperform the Standard and Poor's stock index. According to *The Wall Street Journal*, David Giampaolo, chief executive of Pi Capital, a money-management firm, attended a meeting with defendant Piedrahita about 18 months earlier in London. According to the *Journal*, defendant

Piedrahita "stressed [at the meeting] the fund's years of steady and attractive performance." According to Giampaolo, as reported by the *Journal,* "the performance was thin on details about the investment strategy." Piedrahita's answers, according to the news story, were "fluff." "When pressed to articulate how the fund generated the performance '[t]here was no deep scientific or intellectual response.'"

83.     Defendants had further indication of Madoff's misconduct by virtue of a meeting that FGG representatives attended in 2000. According to a news account published by *Bloomberg News* on January 7, 2009, representatives of Fairfield Greenwich Group were present at a meeting in 2000 with Bernard Madoff and representatives of Credit Suisse Group AG, including Oswald Gruebel, who at the time headed Credit Suisse's private-banking unit. According to *Bloomberg,* "Gruebel ... and two other Credit Suisse executives at the meeting with Madoff raised concern about his use of a little-known auditor who had just one client.... The bank also worried about why Madoff served as the custodian of his clients' assets.... Madoff wouldn't tell Gruebel how much money he managed, saying only that he had 12 people working with him to manage the strategy, along with six senior traders...." Based on that meeting, *Bloomberg* reported, Credit Suisse "urged customers ... to withdraw cash from his firm because the bank couldn't determine how he made money." The article stated that the Credit Suisse clients "proceeded to redeem about $250 million from Madoff-run funds" (presumably Fairfield Sentry).

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

84.     Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

85.     Plaintiff and the Class entrusted their assets to Defendants and the Defendants owed

fiduciary duties to Plaintiff and the Class.

86.     As investment management professionals, Defendants knew or should have known

precisely how to perform their fiduciary role in monitoring the safety and performance of Plaintiff's

and the Class' assets in a prudent and professional manner.

87.     The Defendants breached their fiduciary duties to Plaintiff and all Class members.

This includes, but is not limited to, the foregoing specifically alleged breaches of their duties.

88.     Defendants owed the following duties:

a.     As investment managers with discretionary control over the assets entrusted

to them by Plaintiff and the Class, to act with loyalty and in good faith towards Plaintiff and the

Class;

b.     To take all possible steps to oversee that the investment of the assets of

Plaintiff and the Class were made and maintained in a prudent and professional manner;

c.     To take reasonable steps and observe the strictest of formalities in seeking to

preserve for Plaintiff and the Class the value of their investments;

d.     To refrain from entrusting the assets of Plaintiff and the Class to any fund

manager whose interests were diametrically opposed to or otherwise in conflict with the interests of

Plaintiff and the Class;

e.     To perform all necessary due diligence and to remain ever vigilant to ensure

that the performance results of any fund in which the assets of Plaintiff and the Class were placed

were being accurately and timely reported, and to maintain oversight and transparency as to the

activities of any fund manager that is investing any of the assets of Plaintiff and the Class; and

f.     To exercise generally that degree of prudence, caution and good business

practices that would be expected of reasonable investment professionals overseeing client funds.

89.     Defendants breached each and every one of these duties.

90.     As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Plaintiff and the Class have suffered damages and are entitled to such damages from Defendants, jointly and severally, as well as a return of all fees paid to Defendants.

## COUNT II

### Against All Defendants for Gross Negligence

91.     Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

92.     As investment managers with discretionary control over the assets entrusted to them by Plaintiff and the Class, Defendants owed Plaintiff and the Class a duty to manage and monitor the investments of Plaintiff and the Class with reasonable care as previously alleged herein.

93.     Defendants breached this duty of care as alleged herein.

94.     By failing to carry out the following duties, the Defendants further breached their duty of care:

a.     To take all reasonable steps to ensure that the investment of the assets of Plaintiff and the Class were made and maintained in a prudent and professional manner;

b.     To take reasonable steps in seeking to preserve for Plaintiff and the Class the value of their investments;

c.     To refrain from entrusting the assets of Plaintiff and the Class to any fund manager whose interests were diametrically opposed to or otherwise in conflict with the interests of Plaintiff and the Class;

d.     To perform all necessary due diligence and to remain ever vigilant to ensure

that the performance results of any fund in which the assets of Plaintiff and the Class were invested were being accurately and timely reported, and to maintain oversight and transparency as to the activities of any fund manager that is investing any of the assets of Plaintiff and the Class; and

        e.     To exercise generally that degree of prudence, caution and good business practice that would be expected of any investment professional.

95.     As a direct and proximate result of the Defendants' gross negligence, Plaintiff and the Class have suffered damages and are entitled to such damages from Defendants, jointly and severally, as well as a return of all fees paid to Defendants.

## COUNT III

### Against All Defendants for Unjust Enrichment

96.     Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

97.     Defendants financially benefitted from their unlawful acts. These unlawful acts caused Plaintiff and other members of the Class to suffer injury and monetary loss.

98.     As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner.

99.     Each defendant should pay its own unjust enrichment to Plaintiff and members of the Class.

100.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## COUNT IV

### Against All Defendants for Breach of Contract

101.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein. This Count is asserted for breach of contract.

102.    The Private Placement Memorandum represents a valid and binding contract between Plaintiff and Defendants that governs the terms of the Plaintiff's investment in Fairfield Sentry.  Defendants' conduct, as described above, breached their contractual duties under the Private Placement Memorandum by, *inter alia*, failing to perform detailed due diligence on a fund manager's investment performance.

103.    Fairfield Greenwich Group repeatedly represented that it would perform detailed due diligence in a manner that was "deeper and broader than a typical fund of funds, resembling that of an asset manager acquiring another asset manager, rather than a passive investor entering a disposable investment."

104.    Fairfield Greenwich Group further promised to perform ongoing risk monitoring and oversight once Fairfield Greenwich Group began a relationship with a fund manager.

105.    Plaintiff is not in breach of any obligation under the Private Placement Memorandum.

106.    The Defendants breached the agreement by failing to perform detailed due diligence with respect to Madoff and BMIS as a fund manager.

107.    As described above, Plaintiff and other members of the Class have suffered substantial damages in connection with Defendants' failure to perform their obligations in the Private Placement Memorandum, and are entitled to seek damages from Defendants, jointly and

severally, as well as a return of all fees paid to Defendants.

## COUNT V

### Against All Defendants For Imposition of a Constructive
### Trust and an Order of Conveyance

108.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

109.    Defendants had a fiduciary relationship with Plaintiff and with the members of the Class.

110.    Defendants promised Plaintiff and members of the Class that they would perform due diligence and continuing oversight on the funds that it managed.  Plaintiff and the Class compensated Defendants with management fees and performance fees and entrusted their investment assets with Defendants relying on their performing due diligence and continuing oversight.

111.    Defendants wrongly retained and retains such money paid for performing due diligence and continuing oversight.

112.    Defendants have been unjustly enriched as a result of Defendants' retention of such money and investment assets in an amount to be determined and presently estimated by Plaintiff to be equal to not less than $1.0 billion.

113.    Plaintiff is entitled to have a constructive trust imposed on all money and other property within the possession, custody or control of Defendants, including without limitation on (i) all money collected and/or received by Defendants as management fees, (ii) all money collected and/or received by Defendants as performance fees, and (iii) all assets otherwise available to pay Plaintiff and the Class damages.

## COUNT VI

### Against All Defendants For Mutual Mistake

114.   Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

115.   Under the Private Placement Memorandum, the Placement Agent and Defendants were entitled to fees equivalent to 1% of the value of Fairfield Sentry's net assets on an annualized basis payable monthly, plus 20% of profits payable quarterly.

116.   The Placement Agent and Defendants were paid those fees under a mutual mistake of the parties as to the net assets under management and the amount of profits.

117.   Accordingly, each year the Placement Agent was compensated in amounts estimated to range from approximately $100 million to $200 million.

118.   Those payments were paid under a mutual mistake of the parties.

119.   Plaintiff, individually and on behalf of the Class, demands recovery of those payments made pursuant to a mutual mistake.

## COUNT VII

### Against All Defendants For A Third Party
### Beneficiary Claim For Breach Of Contract

120.   Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted on behalf of Plaintiff and the Class as third-party beneficiaries to the contract between Fairfield Sentry, FG Investment Manager and FGG.

121.   Fairfield Sentry entered into an investment management contract with FG Investment Manager, a subsidiary of FG Placement Agent, and assigned certain due diligence obligations to FGG.

Doc. 162607

- 32 -

122.   Plaintiff and the Class were third party beneficiaries of those contracts and undertakings.

123.   The PPM describes Fairfield Sentry's objective to "obtain capital appreciation of its assets." FG Investment Manager, serving as the investment manager, at the direction of the Individual Defendants, and FGG were retained by the Fund or delegated the responsibility to execute that objective.

124.   The Defendants' conduct (including the conduct of FG Investment Manager and FGG), as described above, deviated from Fairfield Sentry's investment policy in that, as detailed above, the Fund failed to engage in a strategy that would "obtain capital appreciation of its assets."

125.   The above-noted investments made in violation of a stated fundamental investment policy caused significant losses to the Fund's shareholders, as alleged above. As described above, Plaintiff and other members of the Class have suffered substantial damages in connection with losses in the Funds' value that resulted from the Funds' deviation from their stated fundamental investment policy.

126.   Further, FG Investment Manager and FGG departed from, or altogether ignored, its stated monitoring practices in the Uniform Application for Investment Advisor Registration attached to the PPM. By failing to perform these due diligence and monitoring procedures FG Investment Manager and FGG breached its contract with Fairfield Sentry and thereby damaged Plaintiff and members of the Class.

Doc. 162607

## COUNT VIII

### Against All Defendants for Promissory Estoppel

127.   Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein. This Count is asserted for promissory estoppel.

128.   Defendants made a clear and unambiguous promise through the Private Placement Memorandum and the statements it made on its website and on its brochure to perform due diligence and continued monitoring of the fund managers with which it placed its clients' investments.

129.   Plaintiff and members of the Class reasonably and foreseeably relied upon this promise by Defendants in choosing to place their assets in Fairfield Sentry.

130.   As described above, Plaintiff and other members of the Class have suffered substantial damages in connection with Defendants failure to perform their promises in the Private Placement Memorandum, on their website, and in their brochure.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the other members of the Class, prays for judgment as follows:

a.   Declaring this action to be a proper class action maintainable pursuant to Rule 23(b)(3) of the Fed.R.Civ.P. and declaring Plaintiff to be a proper Class representative;

b.   Declaring that Defendants have unjustly enriched themselves and imposing a constructive trust to recoup the Defendants' fees, unjust benefits and other assets for the benefit of Plaintiff and the Class;

c.   Enjoining the Defendants from using Fund assets to defend this action or to

otherwise seek indemnification from the Fund for their wrongful, deceitful, and reckless conduct as alleged herein;

      d.     Awarding Plaintiff and the other members of the Class damages suffered as a result of the wrongs complained of herein together with appropriate interest;

      e.     Awarding Plaintiff and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

      f.     Awarding Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all issues so triable.

Dated: January 8, 2009

                              · Respectfully submitted,

                              WOLF POPPER LLP

                              By: _____
                              Robert C. Finkel (RF 2373)
                              Chet B. Waldman (CW 1133)
                              Carl L. Stine (CS 3000)
                              James A. Harrod (JH 4400)
                              845 Third Avenue
                              New York, NY 10022
                              Telephone:  212.759.4600
                              Facsimile:  212.486.2093

GUSRAE, KAPLAN, BRUNO
  & NUSBAUM PLLC
David A. Gehn (DG 8236)
120 Wall Street
New York, New York 10005
Phone: 212.269.1400
Fax: 212.809.5449

***Attorneys for Plaintiff***

## VERIFICATION

I, Dr. Laurence Wiener, hereby verify, on behalf of Plaintiff, the Pacific West Health Medical Center Inc. Employees Retirement Trust, that I have read the foregoing VERIFIED CLASS ACTION COMPLAINT ("Complaint"). The Complaint is based on the investigation of counsel, and, in reliance on that investigation, as well as my own knowledge, information and belief, I verify that the factual information contained therein is true to the best of my knowledge, information and belief.

Dated: January 7, 2009

_____
Dr. Laurence Wiener

*Trustee and on Behalf of Pacific West Health*
*Medical Center Inc. Employees Retirement Trust*

Doc. 162622