**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| PACIFIC WEST HEALTH MEDICAL CENTER INC. EMPLOYEES RETIREMENT TRUST, On Behalf of Itself and All Others Similarly Situated,<br><br>        Plaintiff,<br><br>   vs.<br><br>FAIRFIELD GREENWICH GROUP, FAIRFIELD GREENWICH LIMITED, FAIRFIELD GREENWICH (BERMUDA) LTD., FAIRFIELD GREENWICH ADVISORS LLC, WALTER M. NOEL, JR., ANDRES PIEDRAHITA, JEFFREY TUCKER, BRIAN FRANCOUER, AMIT VIJAYVERGIYA, YANKO DELLAW SCHIAVA, PHILIP TOUB, LOURDES BARRENECHE, CORNELIS BOELE, MATTHEW C. BROWN, VIANNEY D'HENDECOURT, HAROLD GREISMAN, JACQUELINE HARAY, DAVID HORN, RICHARD LANDSBERGER, DAVID LIPTON, JULIA LUONGO, MARK MCKEEFRY, MARIA TERESA PULIDO MENDOZO, CHARLES MURPHY, SANTIAGO REYES, and ANDREW SMITH,<br><br>        Defendants. | Case No.: 09 Civ. 00134 (UA)<br><br>**MICHAEL THORNE**<br>**DECLARATION** |

MICHAEL THORNE, under penalty of perjury, declares the following is true and correct:

1.  I am an attorney duly admitted in New York and currently serve as Managing Director and Associate General Counsel of Fairfield Greenwich Advisors LLC ("FG"). I submit this declaration in opposition to Plaintiff's Motion for a TRO and Preliminary Injunction in the above-captioned case. I am fully familiar with the facts contained in this declaration based on my personal knowledge and the review of information and documents in the possession of FG.

2. Pacific West Health Medical Center Inc. Employees Retirement Trust, the named plaintiff ("Plaintiff") in the above-captioned matter, is an account held by Pacific West Health Medical Center, an institutional investor located in Los Angeles, California. As of January 1, 2009, Pacific West Health Medical Center Inc. Employees Retirement Trust held 154.8452 shares of Fairfield Sentry Limited ("Fairfield Sentry Fund") that at one time was worth US $200,000. *See* Pacific West Health Medical Center Subscription Report dated 1/8/09, annexed hereto as Exhibit 1.

3. Fairfield Greenwich (Bermuda) Ltd. ("FG Investment Manager") is the Investment Manager and Fairfield Greenwich Limited ("FG Placement Agent") is the Placement Agent for Fairfield Sentry Fund. FG is an affiliate of the FG Investment Manager and FG Placement Agent and receives a portion of the management fee paid to FG Investment Manager for certain internal accounting and operational services. The "Fairfield Greenwich Group" ("FGG") is an informal collective name for FG, FG Investment Manager, FG Placement Agent and other associated entities and is not itself an independent entity.

4. Plaintiff seeks to freeze any and all property derived from payment of fees to defendants in this case ("Defendants") from monies invested with Madoff. These fees have been among Defendants' earnings for several years, and I am presently unaware of any practical way to disentangle property derived from them from Defendants' other property. Entry of the order requested by Plaintiff would appear to effectively freeze virtually all of Defendants' assets.

5. Plaintiff's proposed temporary restraining order would freeze millions of dollars of assets of the Fairfield Greenwich management companies and would cause enormous hardship to the management companies and their employees and trade creditors for the reasons stated in FG's memorandum in opposition to Plaintiff's application for a restraining order.

- 2 -

6. On or before January 5, 2009, investors with FGG funds with accounts at Madoff, including the Fairfield Sentry Fund, were advised that no money had been paid out by the funds since December 11, 2008 and that the funds were taking steps to ensure that no money would be paid without their consent. Investors were also notified that the FGG management companies had voluntarily suspended the receipt of management fees and performance fees until further notice. *See* January 5, 2009 Letter to Investors attached hereto as Exhibit 2.

7. The individually named Defendants in the above-captioned matter who are partners of the Fairfield Greenwich management companies collectively have suffered losses from the Madoff fraud far exceeding the amount of Pacific West Health Center's $200,000 investment.

8. An almost identical application for a temporary restraining order freezing a defendant manager's assets in a Madoff fraud related case was not granted last month by Judge Sullivan in *The Calibre Fund, LLC, et al. v. J. Ezra Merkin,* United States District Court for the SDNY, 08 CV 11002 (RSJ). *See* Transcript of Merkin TRO hearing attached hereto as Exhibit 3.


DATED: January 12, 2009

_____
Michael Thorne

**Exhibit 1**



**C I T C O**

*Citco Fund Services*
*(Europe) B.V.*

PACIFIC WEST HEALTH MEDICAL CENTER INT.
DR. LAURENCE WIENER TRUSTEE
C/O PACIFIC WEST HEALTH MEDICAL CENTER
11540 SANTA MONICA BL #203
LOS ANGELES, CA 90035

Fund ID     : 03302
Holder ID   : 11460602
Account ID  : 11460602
Contract No. : 64601602
Date       : Jan-13-2009
Order No.   : 28383902
FAX Number : 001 310 914 76
Email      : LWDC123@YAHOO.COM

Account name: PACIFIC WEST HEALTH MEDICAL CENTER INT EMPLOYEES RETIREMENT TRUST

## FAIRFIELD SENTRY LIMITED

In accordance with your instructions we confirm having ISSUED the following voting shares in FAIRFIELD SENTRY LIMITED

| | | |
|---|---|---|
| Valuation/NAV Date | | Dec-31-2007 |
| Trade Date | | Jan-01-2008 |
| Value/Cash Date | | Dec-19-2007 |
| | | |
| Total Consideration | USD | 200,000.00 |
| | | |
| Net Proceeds | USD | 200,000.00 |
| Subscription Price | | 1,291.6127 |
| No. of voting shares Issued | | 154.8452 |
| | | |
| Total Consideration Received to Date | USD | 200,000.00 |

Your balance following this transaction will be 154.8452 voting shares .

For more information or any inquiries, please contact Citco Investor Relations Group
Tel: (31-20) 572 2850 Fax: (31-20) 572 2610 E-mail: amsterdamweb@citco.com

*Citco Building*
*Telestone - Teleport*
*Naritaweg 165*
*1043 BW Amsterdam*
*The Netherlands*

*www.citco.com*

*Phone: (31-20) 5722100*
*Fax:   (31-20) 5722610*
*Chamber of Commerce 33205112*

# Exhibit 2

FAIRFIELD SENTRY LIMITED
Romasco Place, Wickhams Cay 1
Road Town, Tortola
British Virgin Islands, VG 1110

January 5, 2009

Dear Shareholder,

We are writing to apprise you of further developments concerning Fairfield Sentry Limited (the "Company") and the matter of Bernard Madoff and Bernard L. Madoff Investment Securities LLC ("BMIS").

As a preliminary matter, we can assure shareholders that no money has been paid out by the Company since December 11, 2008 and the directors are taking steps to ensure that no money is paid out without their consent. In this regard and as previously advised, the manager to the Company, Fairfield Greenwich (Bermuda) Limited (the "Manager"), has suspended the payment of its management fee and performance fee until further notice.

In addition, the directors and the Manager are taking steps to realise to the greatest extent possible any assets of the Company. On December 15, 2008, the Honorable Louis L. Stanton, a Federal Judge in the United States District Court for the Southern District of New York, appointed Irving Picard, Esq. as Securities Investor Protection Corporation ("SIPC") Trustee for the liquidation of BMIS. Mr. Picard, the SIPC Trustee, has engaged Lazard Frères & Co LLC to assist in the sale of the trading operations of BMIS. Also, Lee S. Richards, Esq., has been appointed Receiver for Madoff Securities International Ltd.

The Manager is liaising with the SIPC Trustee on behalf of the Company to ensure the interests of the Company are represented with SIPC and to seek to retrieve any available assets of the Company as promptly as possible. As we previously wrote to you, the Company has retained counsel in the British Virgin Islands (Conyers Dill & Pearman) where the Company is incorporated, as well as counsel in the U.S. (Seward & Kissel LLP). The Company, with the advice of counsel, will analyze the Company's rights and remedies and consider potential claims.

In addition, the U.S. Securities and Exchange Commission ("SEC") is reviewing the vast amount of records and information involving Madoff and BMIS. The SEC has issued a statement that "those records are increasingly exposing the complicated steps that Mr. Madoff took to deceive investors, the public and regulators" and that "progress to date indicates that Mr. Madoff kept several sets of books and false documents, and provided false information involving his advisory activities to investors and regulators."

We know that shareholders are anxious to learn whatever they can about the status of their investments and the assets of the Madoff companies. Please be assured that all of those involved are working diligently to investigate this matter and to locate and preserve assets that can be used for restitution to investors.

We will continue to endeavor to keep you advised of developments with respect to the Company.

Yours faithfully,


The Board of Directors

**Exhibit 3**

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF NEW YORK
   -------------------------------x
3  THE CALIBRE FUND, LLC., et
   al.,
4
                   Plaintiffs,
5
6          v.                            08 CV 11002 (RJS)

7  J. EZRA MERKIN,

8                  Defendant.

   -------------------------------x
9                                        New York, N.Y.
                                         December 18, 2008
10                                       5:40 p.m.

11 Before:

12               HON. RICHARD J. SULLIVAN,

13                                       District Judge

14                    APPEARANCES

15 SUSMAN, GODFREY, LLP
        654 Madison Avenue, 5th Floor
16      New York, NY 10065
        Attorneys for Plaintiffs
17 JACOB W. BUCHDAHL
   ARUN SUBRAMANIAN
18

19 DECHERT, LLP
        1095 Avenue of the Americas
20      New York, NY 10036-6797
        Attorneys for Defendant
21 GARY J. MENNITT
   NEIL A. STEINER
22

23

24

25

1       (In open court)

2       THE COURT:  Calibre Fund, LLC v. J. Ezra Merkin, 08 CV

3  11002.  First of all, I'm sorry that this is a later

4  lifting-off than I had told you.  We had an interesting one

5  right before this, but nonetheless this is important.  So I

6  appreciate your patience.  I don't like to have lawyers waiting

7  around.  It is one of the things I hated when I was general

8  counsel because I still had to write the checks, and I try to

9  be very careful about not having lawyers just sitting cooling

10  their heels in a courtroom.  So I don't ever do cattle calls.

11  I just thought we'd be done by 5:00 with the last one.  Hard to

12  get lawyers to be quiet.

13       Anyway, let me get appearances for plaintiffs.

14       MR. BUCHDAHL:  Your Honor, Jacob Buchdahl and Arun

15  Subramanian from Susman, Godfrey for the plaintiff The Calibre

16  Fund.

17       THE COURT:  Mr. Buchdahl and Mr. Subramanian.

18       MR. SUBRAMANIAN:  That's correct, your Honor.

19       THE COURT:  Good afternoon.

20       MR. MENNITT:  Your Honor, Gary Mennitt of Dechert,

21  LLP.  And with me from Dechert is Neil Steiner.

22       THE COURT:  Steiner.

23       MR STEINER:  Steiner, yes, your Honor.

24       THE COURT:  Mr. Steiner and Mr. Mennitt.

25       MR. MENNITT:  Mennitt.

1          THE COURT:  No R.

2          MR. MENNITT:  Correct.

3          THE COURT: All right.  First of all, I'll tell you

4   what I have.  I have the application for a TRO and order to

5   show cause for a preliminary injunction, as well as the

6   original complaint and attachments filed by plaintiffs, and I

7   have declarations in support of it as well as a proposed TRO.

8   That's what I have.  Did I fail to mention something?  A

9   memorandum of law, of course.  That's what I've gotten,

10  Mr. Buchdahl?

11         MR. BUCHDAHL:  Yes, sir, that's all.

12         THE COURT:  Have you seen this, Mr. Mennitt?

13         MR. MENNITT:  Yes, your Honor.  We were served with

14  this late this morning.

15         THE COURT:  Let's talk about what you want to do in

16  the first instance.  The parties have had a chance to talk now.

17  So what do the parties want to do at this point?

18         MR. MENNITT:  Your Honor, we are prepared to address

19  this.  We think that it can be dealt with today.  If the Court

20  felt that additional briefing was required, obviously we'd be

21  happy to provide that.  We think it can be dealt with.

22         THE COURT:  OK, if that's what you think.  I am never

23  a fan of unnecessary extra briefing.  If you don't think so,

24  then I don't think so.  Mr. Buchdahl, do you agree?

25         MR. BUCHDAHL:  That's fine with the plaintiff, your

1  Honor.

2      THE COURT:  So, I obviously know what Mr. Buchdahl

3  thinks because I've seen his papers.  Maybe I should start with

4  you, Mr. Mennitt.

5      MR. MENNITT:  Your Honor, Mr. Merkin is not

6  Mr. Madoff.

7      THE COURT:  That much I think we can take judicial

8  notice of.

9      Mr. Buchdahl, do you agree they're different people?

10     MR. BUCHDAHL:  We do.  That's the essence of the fraud

11  in this case, your Honor.

12     THE COURT:  The essence of the fraud is that they're

13  different people?

14     MR. BUCHDAHL:  Is that Mr. Merkin claimed to be the

15  sole manager and decision-maker for the Ascot Fund, and

16  instead, not only in derogation of his fiduciary duty, but as a

17  fraud, he handed over entire responsibility for making

18  investment decisions to Mr. Madoff in a way that was not

19  disclosed to the limited partners of the Calibre Fund.

20     THE COURT:  Mr. Mennitt, I don't know whether you

21  disagree with that point, but you were making a different

22  point.

23     MR. MENNITT:  I actually do disagree with that point,

24  and I will address that shortly.  The confidential offering

25  memorandum for Ascot Partners LLP, which I have copies of --

1          THE COURT:  It's not attached, is it?  It's not

2     attached to what you gave me, Mr. Buchdahl, is it?

3          MR. BUCHDAHL:  It is not.

4          MR. MENNITT:  Your Honor, that offering memorandum

5     discloses in a number of places that the Madoff firm is at that

6     point in time one of the prime brokers that Ascot Partners LLP

7     is using.  That's disclosed in a number of places.

8          THE COURT:  The prime broker.

9          MR. MENNITT:  Correct.  In addition, on the very first

10    page of the offering memorandum, it's disclosed that the

11    partnership will make investments through third-party managers

12    including managed accounts, and then there are other types of

13    investments listed, but clearly that is one of the types of

14    investments that is listed, so it's not true to say that it was

15    not disclosed that he would be using -- that he would be

16    investing through other -- relying on other managers.

17         THE COURT:  Let me just stop you.  You are focused now

18    on likelihood of success on the merits.  Is that what you're

19    talking about?

20         MR. MENNITT:  Your Honor, I wanted to make just a

21    couple of these points up front.  Really, the focus and the

22    reason I think this motion can be resolved here without further

23    briefing or affidavits is that as Judge Kaplan has held in 2004

24    in the *OSRecovery, Inc. v. One Group International, Inc.* case

25    305 F.Supp. 2d 340, an attempt to get an order freezing a

1    defendant's assets in a case where a money judgment is sought

2    is not something that this Court can do.

3         THE COURT:  That's what I always thought,

4    Mr. Buchdahl.  We'll come to you in a minute.  But it seems to

5    me that this is all about money.  The irreparable harm is that

6    the firm or individual may be insolvent, but that happens all

7    the time too, doesn't it?  It can't be that there gets to be

8    TROs every time somebody looks like they might be going into

9    bankruptcy.

10         MR. MENNITT:  Your Honor, here, the only way

11    Mr. Merkin is insolvent is if he loses these lawsuits.

12         THE COURT:  Lawsuits against?

13         MR. MENNITT:  Against Mr. Merkin -- this is the third

14    lawsuit that we're aware of that names Mr. Merkin as a

15    defendant.

16         THE COURT:  He might be insolvent for any variety of

17    reasons.

18         MR. MENNITT:  He could be.  That's correct, your

19    Honor.  But there is no evidence of that.  There is nothing in

20    the record that suggests that.  What the cases hold, including

21    the Supreme Court case, *Grupo Mexicano*.  Then there's New York

22    Court of Appeals case *Credit Agricole*.  What those cases say is

23    that in these circumstances you cannot at the outset of a case

24    simply freeze a defendant's assets because you're suing him on

25    a money judgment.  It's as simple as that.  Those cases, the

8ciQca1C

1   *Credit Agricole* and *Grupo Mexicano* case are both cited in the

2   Judge Kaplan decision that I reference.

3             So I wanted to make a couple of these points up front

4   about, you know, if you get into the facts, we dispute that the

5   claims are what Mr. Buchdahl says they are, but really to us

6   the dispositive issue is just at the very threshold level the

7   Supreme Court has held -- and I am reading directly from Judge

8   Kaplan's decision:  "The Supreme Court has held that a Federal

9   Court does not have the power in the exercise of it showing

10  equitable jurisdiction to issue a preliminary injunction in an

11  action for money damages to prevent the defendant from

12  transferring assets in which the plaintiff claims no lien or

13  equitable interest."

14            THE COURT:  Well, I figured you'd say something like

15  that.  So let me hear from you, Mr. Buchdahl.

16            MR. BUCHDAHL:  Your Honor --

17            THE COURT:  Your memorandum is a little light on law

18  for the proposition that you get to get a TRO on somebody where

19  you're seeking money damages just because that person is

20  connected to a front-page story.

21            MR. BUCHDAHL:  We certainly would not try to support

22  the proposition that you just stated, your Honor.  We are

23  seeking a limited TRO in this case, three forms of relief.

24  First of all, the rather uncontroversial remedy that the

25  defendant be enjoined from destroying or concealing documents

8ciQcalC

1  in this case.

2  THE COURT: Wait a minute. I haven't heard

3  Mr. Mennitt talk about that one. I assume he is going to

4  preserve any documents. Right, Mr. Mennitt?

5  MR. MENNITT: Yes, your Honor. The individual

6  defendant here is represented by Mr. Levander and the

7  litigation department at Dechert and Schulte, Roth & Zabel is

8  representing the funds, and we are all very well aware of what

9  the preservation obligations are here.

10  THE COURT: All right.

11  MR. BUCHDAHL: Having said that, your Honor, I don't

12  know if he's agreeing to the imposition of an order from this

13  Court, but obviously a Court order enjoining him from

14  concealing or destroying documents would have a lot more teeth

15  than simply --

16  THE COURT: Than a criminal statute? He would be

17  subject to criminal penalties if he destroyed documents at this

18  point.

19  MR. BUCHDAHL: The likelihood of a criminal

20  prosecution in a civil lawsuit is rather remote whereas having

21  the Court order imposed at this stage, we believe, would add

22  some teeth to what's otherwise more of a litigation obligation.

23  Your Honor, that's the first form of relief we're seeking.

24  The second would be what's been called a freeze on

25  assets. We'd like to enjoin Mr. Merkin from distributing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  assets other than for ordinary living expenses and reasonable
2  legal fees.

3         And the third, and perhaps the most important, is that
4  Mr. Merkin be called upon to provide an accounting of assets
5  that are available. Turning to the two-part standard for a
6  TRO, the law requires that plaintiff show both irreparable harm
7  and likelihood of success on the merits. I'm going to first
8  address the second point only briefly to respond to what
9  counsel for the defendant said. He mentioned that the Madoff
10 firm is the prime broker. That's obviously not the same thing
11 as making investment decisions. He also pointed out in saying
12 that the offering memorandum disclosed that third-party
13 managers would be used, he essentially disclosed by omission --
14 conceded by omission that Mr. Madoff's name was never listed as
15 someone who would be given discretionary management authority
16 over the funds invested by the limited partners in the Ascot
17 Partners Fund.

18         That's the crux of this case on the merit side, your
19 Honor. It's that people could have given money to Mr. Madoff
20 had they wanted to. Instead, they entrusted their money to
21 Mr. Merkin, and Mr. Merkin wrote glowing reports on a quarterly
22 basis explaining the care which he was treating their assets.
23 And, instead, he literally took all of the money and gave it to
24 Mr. Madoff. For that lack of services, your Honor, he charged
25 a 1.5 percent management fee and took a percentage of the

1   returns. Hundreds of millions of dollars over the years.

2       Our client put in over $10 million at the beginning of

3   this year, your Honor, entrusting that to Mr. Merkin's care.

4   What he did, as disclosed only in December of this year in a

5   letter that they received to their horror last Thursday, was

6   say that they had given all of it to the perpetrator of the

7   greatest Ponzi scheme in history.

8       Now, obviously, the Court's attention is focused on

9   irreparable harm, and we believe we've met that standard, your

10  Honor. While given the time constraints, we didn't bother to

11  cite dozens of cases to the Court, we believe that we've cited

12  two cases that both establish the proposition that in a case

13  where a defendant is facing insolvency, in Judge Posner's words

14  in the *American Hospital Supply*, that is "a standard ground for

15  concluding that harm cannot be cured afterwards by a damages

16  award."

17      That makes perfect sense, your Honor, because as Judge

18  Posner explained in that decision, he emphasized that what

19  you're trying to do is minimize the cost of being mistaken at

20  this point in making a decision on a TRO. In other words, you

21  weigh the harm to the plaintiff if the relief is denied against

22  the harm to defendant if relief is granted. And what would

23  happen here, there would be irreparable harm to the plaintiff

24  if this defendant is permitted to transfer assets or dissipate

25  the only source of recovery. Because what we now know is that

1    Ascot Partners is completely devoid of recoverable assets.

2              We have been informed now by counsel for Ascot that

3    there are only $9 or 10 million remaining out of a $1.8 billion

4    fund.   That is not remotely close to satisfying the claims that

5    will be made against Mr. Merkin.   I would emphasize here that

6    Mr. Merkin is not only facing $1.8 billion in claims based on

7    Ascot Fund alone, but the Court can take judicial notice of the

8    fact that Mr. Merkin is responsible for the Gabriel Fund which

9    suffered huge losses by transferring funds to Mr. Madoff.   The

10   Ariel Fund, a very similar situation.   He was also responsible

11   for investment decisions at various charitable organizations

12   and schools, including Yeshiva University which has suffered

13   massive losses.   In many of these cases, Mr. Merkin is the only

14   conceivable source of recovery for these huge losses that he

15   caused by delivering all this money to Mr. Madoff.   What

16   *American Hospital Supply* said, as I quoted before, insolvency

17   is a standard ground for concluding --

18              THE COURT:   A standard ground.   What are the Second

19   Circuit cases and Southern District cases like this one where

20   somebody who is accused of the kind of fraud that Mr. Merkin is

21   being accused of here where the Court has stepped in and

22   granted a TRO over their assets?

23              MR. BUCHDAHL:   Your Honor, we cannot identify a case

24   that involved the exact facts as this.

25              THE COURT:   Well, exact facts.   Similar facts.

1    MR. BUCHDAHL: Even where we're asserting a similar
2  kind of Ponzi scheme fraud, I have not seen that. We do cite
3  *Brenntag International* case that Judge Winter decided, and,
4  again, the basis for his finding of irreparable harm was
5  insolvency. In that case, he affirmed the decision by Judge
6  Sweet granting a TRO, and the standard, as he articulated it,
7  was that is there a substantial chance that the parties cannot
8  be returned to their positions ex ante. And he recognized that
9  in the insolvency context, you have a situation where the
10  parties cannot be assured of any form of recovery, and this,
11  your Honor, we submit, is a sufficient basis for meeting the
12  standard and for seeking the limited relief that we're asking
13  here.

14    As counsel has already pointed out, they are already
15  facing many of these obligations just by virtue of the fact
16  that they are named in civil lawsuits. What we are asking is
17  the non-controversial request that this defendant be enjoined
18  from, for example, transferring assets overseas, selling
19  assets. We understand that he has an art collection worth
20  hundreds of millions of dollars. He should be enjoined at this
21  stage of the litigation, your Honor, from transferring assets
22  that are the only likely recoverable source for plaintiffs such
23  as our client, and dissipating those assets, transferring them,
24  doing whatever he might decide to do with them before these
25  cases get resolved. Your Honor, as far as --

1        THE COURT:  You say it's non-controversial, but then

2   you only cited two cases, one of which is a Seventh Circuit

3   case.  So it's non-controversial in the sense that, what?  That

4   there are two cases that you found?

5        MR. BUCHDAHL:  Non-controversial in the sense that no

6   one would suggest that this defendant has the right to begin

7   transferring assets overseas or taking other steps to conceal

8   assets.  In our discussions with counsel, counsel's first

9   objection to me about why no order is necessary, he said, well,

10  if we did that sort of thing, that would be a fraudulent

11  conveyance in all events.  That may be true, your Honor, but an

12  order at this stage would add some teeth to that, would provide

13  some assurances to our client and to other similarly situated

14  individuals who are seeking to recover from Mr. Merkin that he

15  will not take steps to hide the wealth that he amassed at their

16  expense.

17       THE COURT:  Am I literally going to get a TRO request

18  every time somebody wants to basically send a letter to

19  opposing counsel saying preserve documents and don't

20  fraudulently convey remaining assets?  I really need to be

21  dropping everything, put it on the top of my pile, and do this

22  sort of TRO work?

23       MR. BUCHDAHL:  Your Honor, we believe that would not

24  be the case.  First of all, we think the fact that these

25  requests are unusual shows that this is an unusual case.  And

1    the fact that this is a case with the overwhelming possibility

2    of losses here, and, as we said, just in the Ascot Fund alone

3    $1.8 billion worth of losses, this is a highly unusual

4    situation, and one in which perhaps an unusual remedy is

5    appropriate.

6         THE COURT:  But, look, an unusual situation in the

7    sense that it's part of the Madoff scheme, which is, let's be

8    honest, it's tabloid fodder and on a scale it's nothing like

9    anyone has ever seen.  I get that.  In terms of insolvency, as

10   a motive for someone fraudulently conveying assets or

11   deep-sixing documents?  I mean, that's not terribly out of the

12   ordinary, is it?

13        MR. BUCHDAHL:  Your Honor, I can't answer the question

14   of how many perpetrators of fraudulent schemes are likely to be

15   insolvent.  In my experience, having prosecuted fraud cases,

16   very often they're not insolvent.

17        THE COURT:  How many TROs can you cite me where

18   basically what's being sought is what is normally achieved by a

19   letter from counsel to counsel?

20        MR. BUCHDAHL:  Your Honor, I cannot cite a case that

21   is on all fours with this or I would have done so.  I would

22   submit, it's not altogether different from what the SEC did in

23   this case with respect to Mr. Madoff.  While it is true that

24   Mr. Merkin is not Mr. Madoff --

25        THE COURT:  Well, the SEC is -- you're not the SEC

8ciQcalC

1    either, right?

2              MR. BUCHDAHL:   Pardon?

3              THE COURT:   You're not the SEC either.

4              MR. BUCHDAHL:   Absolutely not.   But for the same

5    reasons it's justified there and for the exigencies that they

6    cite, and the fact they recognize that this was necessary to

7    protect people with claims, those same arguments, your Honor --

8    my only suggestion here is that those same arguments support

9    the finding of irreparable harm, just as Judge Winter found in

10   the *Brenntag* case.

11             Now, I don't think that the defendant can dodge the

12   import of these two decisions which plainly cite insolvency as

13   the "common standard ground" for a finding of irreparable harm.

14   So, I think the fact that these applications are perhaps

15   uncommon by plaintiffs does not mean that in the right case

16   they are not appropriate or supported by the law.

17             And given that the absence of recoverable assets and

18   the fact that there is a substantial likelihood that a

19   plaintiff may not be able to get full recovery from a situation

20   with overwhelming liability hanging over Mr. Merkin's head, we

21   believe is a proper basis for the limited relief that we seek.

22   Again, we are not -- this would not enjoin Mr. Merkin from

23   anything that he should be doing or likely would be permitted

24   to do under various laws, your Honor.

25             THE COURT:   Let me interrupt you, and just say, while

8ciQcalC

1    I am smacking Mr. Buchdahl around, the reality -- the question,

2    I guess, for you, Mr. Mennitt, is:  Why aren't you just

3    agreeing to these relatively modest requests, which are, I

4    think, the reason why we don't have a lot of case law on this

5    typically is that parties agree to this at the early stages of

6    litigation, right?

7        MR. MENNITT:  I don't think that's correct, your

8    Honor.

9        THE COURT:  No?

10       MR. MENNITT:  I mean, perhaps in the context of if

11   they had called and said, we won't sue you, and we'll enter

12   into a tolling agreement, we would have --

13       THE COURT:  With respect to documents.  All it

14   generally requires is a letter to you saying, you are on notice

15   Do not destroy any documents.

16       MR. MENNITT:  We would send back a letter saying we

17   are not going to destroy documents.

18       THE COURT:  The next request is to not fraudulently

19   convey assets; and, ultimately, they want an accounting of the

20   assets, which they're going to be entitled to, right?

21       MR. MENNITT:  Well, if they win the case, they'll be

22   entitled to an accounting of the assets.  At the present time,

23   they're not entitled -- this lawsuit is only against Mr. Merkin

24   individually.  They're not entitled to an accounting of

25   Mr. Merkin's personal assets.

8ciQcalC

1        And, your Honor, Mr. Buchdahl sort of challenged me to

2    try to dodge the *American Hospital* and the *Brenntag* case, I

3    would like to try to dodge those cases.  The *American Hospital*

4    case, which is the Seventh Circuit case which Judge Posner

5    decided, enjoined the defendant from wrongful termination of a

6    distribution contract.  It didn't have anything to do with the

7    facts in this case.  The *Brenntag* case, which is the Second

8    Circuit case, was an injunction against payment under a letter

9    of credit where the goods weren't delivered under the supply

10   contract.  So, those cases have nothing to do with this.

11       In fact, the Judge Kaplan case that I cited is an a

12   fortiori case because in that case the defendants were the

13   primary bad guys in a Ponzi scheme.  They were the guys who ran

14   a Ponzi scheme.  Even under the allegations in the complaint

15   here, there's no allegation even of that.

16       THE COURT:  Of what?  Allegation that your client ran

17   a Ponzi scheme?

18       MR. MENNITT:  Right, that Mr. Merkin was running a

19   fraud.  He was a major victim of this fraud, personally.

20       So, you know, it's just simply relief that he's not

21   entitled to -- he has no legal basis to seek.

22       With respect to the related relief that he seeks, I

23   think your Honor's reaction is exactly correct; that those are

24   discovery matters, and, in fact, in Judge Kaplan's decision,

25   the plaintiff there sought similar relief, and Judge Kaplan

8ciQcalC

1    footnote 37 said, "plaintiffs seek a grab bag of other

2    purported injunctive relief, such as an accounting" - which is

3    exactly what they're seeking here - "and disclosure of various

4    sorts of information.  These matters are better dealt with in

5    discovery."

6              And, your Honor, to come back to the question that you

7    started with, in addition to all of that, the fact that there

8    is no factual basis, there is no legal basis for this relief.

9    In addition, the entry of such an order seems to suggest that

10   there has been some sort of a wrongdoing, and there hasn't

11   been.  There's nothing in the record that suggests that.

12             THE COURT:  Well, I mean, the complaint alleges a

13   wrongdoing, doesn't it?

14             MR. MENNITT:  The complaint alleges a wrongdoing, but

15   they haven't alleged that Mr. Merkin is attempting to secret

16   his assets.  They say they suspect that he might be, but there

17   is absolutely no shred of -- they don't submit an affidavit

18   that says that, much less admissible facts to support that.

19   There is no indication that he's doing anything to destroy

20   documents or that his counsel are not behaving in an

21   appropriate manner.

22             THE COURT:  You didn't, Mr. Buchdahl, address, I

23   think, the Judge Kaplan case which Mr. Mennitt mentioned.  Have

24   you seen it?

25             MR. BUCHDAHL:  I have not seen it.  Mr. Mennitt did

1  not provide that to me prior to this proceeding, your Honor.

2  So I'm not prepared to address that at this time.

3      I will say going back to *Brenntag* for a minute, the

4  Second Circuit authority, that they enjoined the defendant from

5  making payment on a letter of credit. That does nothing but

6  retain assets for the defendant the plaintiff asserted he would

7  be entitled to down the road.

8      So, it's really a very similar effect in that it was

9  trying to make sure that this potentially insolvent defendant

10  would not dissipate assets. I think that -- I'll wait for a

11  question before I continue.

12      THE COURT: No, go ahead.

13      MR. BUCHDAHL: As far as wrongdoing, of course, we

14  have alleged wrongdoing. We've alleged fraud. We've alleged

15  breach of fiduciary duty, gross negligence, and breach of

16  contract. We think that we've overwhelmingly demonstrated a

17  likelihood of success on the merits. And in light of the

18  limited relief we're seeking, it's hard to find a sound basis

19  for objecting to most of what we're asking given that the

20  defendant can't claim an ability to do most of the things we're

21  enjoining him from doing.

22      THE COURT: My concern is that if insolvency or

23  suspected insolvency is enough of a basis to get a TRO, who

24  wouldn't be able to get a TRO in virtually every case, right,

25  especially in times like this where there's always the prospect

8ciQcalC

1    of some insolvency on the part of a defendant?  So, I'm not

2    sure that those cases stand for the blanket and broad

3    proposition that insolvency alone is enough of a basis to

4    demonstrate irreparable harm.

5        I think the point Mr. Mennitt was making before with

6    respect to the allegations of wrongdoing was that there is no

7    specific allegation of him engaging in the types of conduct

8    that would perhaps otherwise merit the injunctive relief you're

9    seeking, i.e, the destruction of documents or the squirreling

10   away of assets overseas or elsewhere.  You don't have any

11   specific information about that.

12       MR. BUCHDAHL:  Your Honor, all I would point to in

13   that regard is that yesterday when we were discussing these

14   things, we couldn't reach an agreement on these very simple

15   requests, and if the defendant is not willing to say to us, oh,

16   sure, no problem, we won't send assets overseas, we won't

17   destroy documents.  He kept relying on other sources of an

18   obligation, saying, well, that would be a fraudulent

19   conveyance.  Well, informing me that it would be a fraudulent

20   conveyance is very different from saying this defendant agrees

21   not to transfer assets overseas.  So it doesn't provide a lot

22   of comfort.

23       This is a defendant who had no problem defrauding all

24   the limited partners of Ascot by transferring $1.8 billion to

25   Mr. Madoff.  So he hasn't demonstrated an overwhelming

8ciQcalC

1    indication that he will comport with legal obligations.

2          So, your Honor, we think that in a situation where --

3    I think your Honor put your finger on it when you said the

4    reason you don't see this a lot of times is because the parties

5    agree to it.  Where is the agreement?  Why don't we hear

6    counsel for Mr. Merkin saying, sure, we agree that we won't

7    destroy documents and we're willing to have the Court enter an

8    order to that.  We agree that we won't transfer assets

9    overseas, and we're willing to have a court order to that

10   because none of that is anything that our client would ever do.

11   And in an accounting this would seem to be an appropriate

12   remedy that we're seeking in the extreme circumstances of this

13   case where there are billions missing, and probably only

14   hundreds of millions available from Mr. Merkin.

15         So, this is a situation where your Honor is

16   appropriately concerned about a rash of similar requests, and

17   the guard against that is to tailor the relief sought to the

18   circumstances of the case.  There may be many times when it

19   would be inappropriate to enjoin a corporation from taking

20   certain actions in the normal course that would totally disrupt

21   its business simply because it threatened lawsuit or threatened

22   insolvency.

23         We're not trying to do that here.  We're not trying to

24   disrupt Mr. Merkin's life in a way that makes it onerous for

25   him, which is why if you return to Judge Posner's balancing

1  test, and say, what would the harm be to the plaintiffs and
2  what would the possible harm be to the defendant if I award
3  this relief? And, here, what harm can Mr. Merkin point to?
4  How does it prejudice him in the slightest if he is prohibited
5  from transferring assets overseas, from selling off his art
6  collection, from destroying documents? There is no harm
7  whatsoever because, as counsel forthrightly concedes, in large
8  part he's prohibited from doing all these things anyway.

9           THE COURT: I think the issue is not what harm would
10  it do to him to impose such an obligation or an order. The
11  issue is what irreparable harm would we fall your client if I
12  didn't do that? I guess the response is, I'm not sure any. I
13  mean, there are other safeguards against that kind of activity,
14  which I think that's the reason why we don't see these that
15  often.

16           MR. BUCHDAHL: Respectfully, the irreparable harm here
17  is the inability to fully collect on what's owed. And that is
18  recognized in the decisions that we've cited, the fact that
19  insolvency presents an irreparable harm.

20           THE COURT: Let's start with the first one you asked
21  for, which is an order enjoining him from the destruction of
22  documents. If I don't grant you that, the irreparable harm
23  will be he'll destroy documents?

24           MR. BUCHDAHL: Potentially, your Honor.

25           THE COURT: But there are other safeguards against the

8ciQcalC

1  destruction of documents, aren't there?

2          MR. BUCHDAHL:   There may be --

3          THE COURT:  Do I just need to duplicate everything

4  that's in the Criminal and Civil Codes and the Code of

5  Judicial -- Code of Ethics, and I guess New York now has a new

6  one.

7          MR. BUCHDAHL:  Of course Mr. Merkin, your Honor, is

8  not subject to the Code of Ethics.

9          THE COURT:  Mr. Mennitt is.

10         MR. BUCHDAHL:  Mr. Mennitt -- unfortunately, if it

11  were Mr. Mennitt who were responsible for preserving these

12  documents, I would not be here, your Honor.  We have no doubt

13  that Mr. Mennitt will adhere to all of his ethical

14  responsibilities.

15         THE COURT:  My point is:  Why do I need to issue

16  orders that are basically suspenders when there's already a

17  belt?  I don't think that's what TROs are supposed to be for.

18  They're supposed to be for really the extraordinary

19  circumstances where some harm is going to befall a plaintiff if

20  the Court doesn't take action.  I don't think you've made the

21  case that some irreparable harm is going to befall your client

22  if I don't enter the order of the relief that you're asking

23  for.

24         MR. BUCHDAHL:  The idea in the case law is that harm

25  is not irreparable if you can be made whole afterward with a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8ciQcalC

1    money judgment. That's the fundamental idea. The rejoinder to

2    that, your Honor, is that if you cannot be made whole because

3    there are insufficient assets available, then the irreparable

4    harm is irreparable. It's as simple as that. Because where

5    there is not a likely prospect for full recovery, you cannot be

6    made whole. You cannot be returned to where you were before

7    this happened.

8           THE COURT: But there's an entire section of law about

9    assets that have been dissipated after the initiation of a

10   suit, right? Happens all the time. Mr. Merkin may have

11   creditors all over the place for all I know. Some of them may

12   be standing way ahead of your clients.

13          MR. BUCHDAHL: That is precisely the point, your

14   Honor, that Judge Winter made in the *Brenntag* decision, and he

15   addressed the fact that potentially this would be intention

16   with the bankruptcy laws, but he still said that because of the

17   insolvency, the plaintiff had demonstrated an irreparable harm,

18   and he affirmed Judge Sweet's TRO.

19          So, your Honor, I'm not trying to convince the Court

20   that this happens every day or that it should happen every day.

21   I'm just saying in this instance where we have talked to the

22   other side, and we have not been able to get agreements for

23   this; where we have overwhelming evidence of a fraud and

24   overwhelming likelihood that Mr. Merkin will not be able to

25   satisfy all the plaintiffs resulting from the Ascot Fund, let

8ciQcalC

1    alone our client, who has lost over $10 million according to a

2    letter he received last week, that in this case the irreparable

3    harm to my client is that he's not going to get a full

4    recovery, the Calibre Fund will not get a full recovery of its

5    $10 million from Mr. Merkin.  And seeking the relief that

6    Mr. Merkin be enjoined from transactions or dissipation of

7    assets outside his ordinary course of life imposes little to no

8    burden on this defendant.

9            THE COURT:  Again, that's part of the analysis, but I

10   think it's sort of tail wagging the dog.

11           MR. BUCHDAHL:  Your Honor, if the Court is not

12   persuaded by the argument with respect to insolvency, then we

13   do not have an alternative basis for arguing irreparable harm.

14   The real danger here is that an already subpar recovery by our

15   client will be reduced further by actions that are taken.  We

16   simply want things held in the status quo.

17           THE COURT:  All right.  I mean, Ms. Giovanola, who is

18   my law clerk, who is the brains of this operation, handed me a

19   note indicating that *Brenntag* deals with a case -- is a case

20   and it cites other cases in which there was actual insolvency

21   and not merely the threat of insolvency.  Is that a distinction

22   that's worth discussing?

23           MR. BUCHDAHL:  I think there is a scale, your Honor.

24   I think where in solvency is a merely speculative event, then

25   you would be on very weak ground.  I think that the case law

1    does not suggest that there must be insolvency.  I think the

2    Court can look at the situation here, recognize the destruction

3    that Mr. Merkin has left in his wake with regard to the Ascot

4    Fund, the other funds I mentioned and other places where he was

5    entrusted with assets, and say there is no doubt but that

6    insolvency will follow here.  Assuming, again, we have to

7    demonstrate a likelihood of success on the merits, but if he

8    has to make whole $1.8 billion worth of claims, there has been

9    no suggestion Mr. Merkin can do that.  That's insolvency, your

10   Honor, where your liabilities outweigh your assets by that

11   extent.

12          So we are looking at a situation where insolvency is

13   not a remote or speculative event, but is the necessary

14   consequence.  I don't even hear counsel to argue that that's

15   not what would result if plaintiff is successful and other

16   plaintiffs in the other lawsuits that he faces.  I think that

17   all of counsel for the defendant's arguments are premised on

18   the fact that he'll somehow overcome the allegations of fraud.

19          But, your Honor, we believe that, first of all, there

20   are three separate requests here, and they can be looked at

21   separately.

22          THE COURT:  Well, destroying documents, freeze on

23   assets, and an accounting of assets.

24          MR. BUCHDAHL:  We believe that we have demonstrated

25   the basis for all of those to the Court.  We do not think this

8ciQcalC

1   is a situation that is going to present itself that frequently,

2   and one reason is because of what the Court just identified in

3   terms of whether insolvency is just some remote speculative

4   event or whether just looking at the raw numbers, it appears no

5   way for a defendant to possibly avoid it. Again, in a

6   situation that has been described by the Courts as a standard

7   right for finding irreparable harm, in a situation that is --

8            THE COURT:  You keep saying that.  Then I ask you, do

9   you have any cases, and you've cited me exactly one Second

10  Circuit case.

11           MR. BUCHDAHL:  It's that standard.

12           THE COURT:  It's that standards.

13           MR. BUCHDAHL:  There are certain propositions that

14  perhaps do not bear repeating that often.

15           THE COURT:  All right.  Let me suggest this:  I am not

16  inclined to grant summary judgment -- summary judgment.  It's

17  late.  I'm not inclined to grant the TRO in this case.  I don't

18  find that there's been irreparable harm.  I'm going to reserve

19  simply I can take a closer look at *Brenntag*.  Judge Posner I

20  admire, but he doesn't pound on my head, whereas Judge Winter

21  and his friends may.  So I will take a closer look at that, and

22  I am going to look at the Kaplan case that you mentioned as

23  well.

24           MR. BUCHDAHL:  Your Honor.

25           THE COURT:  Yes.

8ciQcalC

1        MR. BUCHDAHL:  May we have until midday tomorrow to
2    put in a letter to respond to Kaplan?

3        THE COURT:  That's fine.  I don't want to insist on it
4    because I don't want anybody to feel they need to spend time
5    unnecessarily if they think it's not necessary.  I'm not
6    ordering it, but if you'd like to, I'll give you till noon.

7        MR. BUCHDAHL:  Since I haven't read it, your Honor,
8    we'd appreciate that opportunity.

9        THE COURT:  All right.

10       MR. MENNITT:  Your Honor, we'll do the same.  We'll
11   keep it short.

12       THE COURT:  That's fine.  I don't want to play this
13   out.  I want to get this resolved, as do you.

14       MR. MENNITT:  Yes.

15       THE COURT:  Good.  This was interesting.  Good to see
16   you all.  And thank you for your patience.  I again apologize
17   for making you wait.  Anything else we should cover now?

18       MR. MENNITT:  No.

19       MR. BUCHDAHL:  Thank you, your Honor.

20       (Adjourned)

21

22

23

24

25