# Exhibit 10

Dockets.Justia.com

GREENWICH SENTRY, L.P.
2 Soundview Drive
Greenwich, Connecticut 06830
(203) 629-8494

_____

CONFIDENTIAL OFFERING MEMORANDUM

_____

GREENWICH SENTRY, L.P., is a private investment limited partnership which seeks capital appreciation through the allocation of its assets to a securities trading account which employs an options trading strategy described as "split strike conversion". This Confidential Offering Memorandum relates to the offering of limited partnership interests. Prospective Limited Partners should carefully read and retain this Confidential Memorandum.

THE LIMITED PARTNERSHIP INTERESTS OF GREENWICH SENTRY, L.P. HAVE NOT BEEN FILED WITH OR APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER STATE OR FEDERAL GOVERNMENTAL AGENCY OR ANY NATIONAL SECURITIES EXCHANGE. NEITHER THE COMMISSION NOR ANY SUCH AGENCY OR EXCHANGE HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM OR THE MERITS OF AN INVESTMENT IN THE INTERESTS OFFERED HEREBY.

Dated: July 30, 1994,
as amended
February 15, 1995,
February 15, 1996,
March 31, 1997
and July 1, 1998

## SECURITIES RISK DISCLOSURE

PROSPECTIVE INVESTORS SHOULD NOTE THAT THE INVESTMENT STRATEGY
EMPLOYED ON BEHALF OF THE PARTNERSHIP INVOLVES SIGNIFICANT RISKS
AS DESCRIBED UNDER "RISK FACTORS" IN THIS OFFERING MEMORANDUM.

Greenwich Sentry, L.P. (the "Partnership") is organized as a Delaware limited partnership and operates as a private investment partnership. The Partnership's investment objective is to achieve capital appreciation by allocating its assets to an account at Bernard L. Madoff Investment Securities, a broker-dealer registered with the Securities and Exchange Commission in New York, New York, which employs an options trading strategy described as "split strike conversion."

The Partnership commenced operations on January 1, 1993 with the sale of $839,970 of Limited Partnership Interests (the "Interests"). As of December 31, 1997, the Net Asset Value of the Partnership was $43,934,250 of which $39,370,425 was owned by the Limited Partners not affiliated with the General Partner.

THE INTERESTS ARE SUITABLE ONLY FOR SOPHISTICATED INVESTORS FOR WHOM AN INVESTMENT IN THE PARTNERSHIP DOES NOT CONSTITUTE A COMPLETE INVESTMENT PROGRAM AND WHO FULLY UNDERSTAND AND ARE WILLING TO ASSUME THE RISKS INVOLVED IN THE PARTNERSHIP'S SPECIALIZED INVESTMENT PROGRAM. (SEE "CERTAIN RISK FACTORS" AND "LIMITATIONS ON TRANSFERABILITY; SUITABILITY REQUIREMENTS".) THE PARTNERSHIP'S INVESTMENT PRACTICES BY THEIR NATURE MAY BE CONSIDERED TO INVOLVE A SUBSTANTIAL DEGREE OF RISK. (SEE "INVESTMENT PROGRAM".)

The minimum capital contribution of a Limited Partner is $100,000 (subject to the discretion of the General Partner to accept lesser amounts). The General Partner and/or its principals intend to make aggregate capital contributions of not less than 1% of the aggregate capital raised by the Partnership through the offering of its Interests. There will be no sales charges upon subscriptions for the Interests.

Interests will be offered on a continuous basis. Interests will be sold only to "accredited investors," as that term is defined in Regulation §230.501 under the Securities Act of 1933. Additional capital contributions shall be accepted as of the first business day of each calendar month. The maximum amount of capital contributions which may be accepted by the Partnership is $500,000,000.

A Limited Partner, upon 30 days' prior written notice, may at the end of any calendar month, withdraw all or any portion of his or its capital account or withdraw from the Partnership. (See "OUTLINE OF PARTNERSHIP AGREEMENT - Limited Partner Withdrawals of Capital".)

There will be no redemption charges upon withdrawal. The General Partner may, in its

sole discretion, require any Partner to terminate its entire interest in the Partnership. (See "OUTLINE OF PARTNERSHIP AGREEMENT - Required Withdrawals".)

Prospective Limited Partners should carefully read this Memorandum. However, the contents of this Memorandum should not be considered to be legal or tax advice and each prospective Limited Partner should consult with its own counsel and advisers as to all matters concerning an investment in the Partnership.

There will be no public offering of the Interests. No offer to sell (or solicitation of an offer to buy) is being made in any jurisdiction in which such offer or solicitation would be unlawful.

This Memorandum has been prepared solely for the information of the person to whom it has been delivered by or on behalf of the Partnership, and should not be reproduced or used for any other purpose.

The Partnership is not presently, and does not intend in the future to become, registered as an investment company under the Investment Company Act of 1940, as amended. (See "PARTNERSHIP POLICIES; COMPARISON TO CERTAIN POLICIES OF INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940".) The General Partner does not presently intend to, but may in the future, register as an investment adviser under the Investment Advisers Act of 1940, as amended. (See "STATUS OF GENERAL PARTNER UNDER THE INVESTMENT ADVISERS ACT OF 1940".)

NO OFFERING LITERATURE OR ADVERTISING IN WHATEVER FORM SHALL BE EMPLOYED IN THE OFFERING OF THE INTERESTS EXCEPT FOR THIS MEMORANDUM. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION, OR GIVE ANY INFORMATION, WITH RESPECT TO THE INTERESTS, EXCEPT THE INFORMATION CONTAINED HEREIN OR IN THE SUPPLEMENT.

EACH PROSPECTIVE LIMITED PARTNER IS INVITED TO MEET WITH REPRESENTATIVES OF THE GENERAL PARTNER TO DISCUSS WITH AND ASK QUESTIONS OF THEM REGARDING THE PARTNERSHIP AND THE TERMS AND CONDITIONS OF THIS OFFERING OF THE INTERESTS, AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT THE PARTNERSHIP POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE INFORMATION CONTAINED HEREIN.

**FOR CONNECTICUT RESIDENTS ONLY:**

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE CONNECTICUT SECURITIES LAW NOR HAS THE COMMISSIONER OF BANKING OF THE STATE OF CONNECTICUT APPROVED OR DISAPPROVED THESE SECURITIES OR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND SALE.

**FOR FLORIDA RESIDENTS ONLY:**

THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT.

IF SALES ARE MADE TO FIVE (5) OR MORE INVESTORS IN FLORIDA, ANY OFFEREE WHO IS A RESIDENT OF FLORIDA MAY, AT SUCH OFFEREE'S OPTION, VOID ANY PURCHASES HEREUNDER WITHIN A PERIOD OF THREE (3) DAYS AFTER HE (A) FIRST TENDERS OR PAYS THE CONSIDERATION TO THE PARTNERSHIP REQUIRED HEREUNDER OR (B) DELIVERS HIS EXECUTED SUBSCRIPTION AGREEMENT, WHICHEVER OCCURS LATER. TO ACCOMPLISH THIS, IT IS SUFFICIENT FOR A FLORIDA OFFEREE TO SEND A LETTER OR TELEGRAM TO THE PARTNERSHIP WITHIN SUCH THREE (3) DAY PERIOD, STATING THAT HE IS VOIDING AND RESCINDING THE PURCHASE. IF AN OFFEREE SENDS A LETTER, IT IS PRUDENT TO DO SO BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO INSURE THAT IT IS RECEIVED AND TO EVIDENCE THE TIME OF MAILING.

**FOR MICHIGAN RESIDENTS ONLY:**

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES LAWS OF MICHIGAN AND ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND SALE.

**FOR NEW MEXICO RESIDENTS ONLY:**

THE SECURITIES DESCRIBED HEREIN ARE OFFERED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF NEW MEXICO. ACCORDINGLY, THE NEW MEXICO SECURITIES BUREAU HAS NOT REVIEWED THE OFFERING OF THESE SECURITIES AND HAS NOT APPROVED OR DISAPPROVED THIS OFFERING. THE NEW MEXICO SECURITIES BUREAU HAS NOT PASSED UPON THE VALUE OF THESE SECURITIES OR UPON THE ADEQUACY OR ACCURACY OF THE INFORMATION CONTAINED IN THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

**FOR PENNSYLVANIA RESIDENTS:**

PURSUANT TO SECTION 207(m) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, EACH PERSON WHO ACCEPTS AN OFFER TO PURCHASE THESE SECURITIES SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE AND RECEIVE THE FULL REFUND OF ALL MONIES PAID, WITHOUT INCURRING ANY LIABILITY TO THE SELLING AGENT OR ISSUER, WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE ISSUER OF HIS WRITTEN BINDING

CONTRACT OF PURCHASE, EVIDENCED BY HIS SUBSCRIPTION AGREEMENT. TO ACCOMPLISH THIS WITHDRAWAL, A PURCHASER NEED ONLY SEND A LETTER OR TELEGRAM TO THE ISSUER INDICATING HIS INTENTION TO WITHDRAW. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IT IS PRUDENT TO SEND SUCH LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO INSURE THAT IT IS RECEIVED. IF THE REQUEST IS MADE ORALLY, A WRITTEN CONFIRMATION THAT THE REQUEST WAS RECEIVED SHOULD BE REQUESTED.

THESE SECURITIES MAY NOT BE SOLD BY THE INVESTOR FOR A PERIOD OF TWELVE (12) MONTHS AFTER THE DATE OF PURCHASE.

THESE SECURITIES MAY NOT BE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS OF SECTION 203(d) OF THE PENNSYLVANIA SECURITIES ACT OF 1972 AND REGULATION 203.041 PROMULGATED THEREUNDER.

**FOR INVESTORS IN OTHER STATES:**

IN MAKING INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INDICATING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

# GREENWICH SENTRY, L.P.

## TABLE OF CONTENTS

Page

SUMMARY .................................................................................... viii

USE OF PROCEEDS............................................................................ 5

INVESTMENT PROGRAM ...................................................................... 6

GENERAL PARTNER............................................................................ 7

ALLOCATION OF GAINS AND LOSSES ...................................................... 9

CERTAIN RISK FACTORS..................................................................... 10

EXPENSES ...................................................................................... 14

POTENTIAL CONFLICTS OF INTEREST..................................................... 15

PRIOR TRADING RESULTS ................................................................... 15

PARTNERSHIP POLICIES; COMPARISON TO CERTAIN
   POLICIES OF INVESTMENT COMPANIES REGISTERED
   UNDER THE INVESTMENT COMPANY ACT OF 1940............................. 19

STATUS OF GENERAL PARTNER UNDER THE
   INVESTMENT ADVISERS ACT OF 1940 ................................................ 21

TAX ASPECTS.................................................................................. 22

OUTLINE OF PARTNERSHIP AGREEMENT ................................................. 34
   Limited Liability .......................................................................... 34
   Term ........................................................................................ 34
   Capital Accounts ......................................................................... 34
   Additional Capital Contributions ...................................................... 34
   Management ............................................................................... 34
   Salaries or Other Payments or Allocations
      to the General Partner............................................................ 34
   Valuation of Partnership Assets ....................................................... 35
   Partners' Withdrawal of Capital ....................................................... 35
   Withdrawals in General ................................................................. 35
   Required Withdrawals ................................................................... 35

Withdrawal, Death, etc.
of a Limited Partner.................................................................. 35
Withdrawal of a General Partner................................................. 36
Limitations on Withdrawals ....................................................... 36
Transfers of Interests of Partners.............................................. 36
Admission of New Partners........................................................ 36
Amendments to Partnership Agreement..................................... 36
Arbitration ................................................................................ 37
Reports to Partners .................................................................. 37
Exculpation............................................................................... 37
Indemnification of General Partner ............................................ 37

LIMITATIONS ON TRANSFERABILITY SUITABILITY
REQUIREMENTS ..................................................................... 38

PURCHASES BY EMPLOYEE-BENEFIT PLANS -
ERISA CONSIDERATIONS ........................................................ 39

COUNSEL ................................................................................ 42

ADDITIONAL INFORMATION ..................................................... 42

SUBSCRIPTION FOR INTERESTS ............................................. 42

EXHIBITS

EXHIBIT 1 - Form of Limited Partnership Agreement

EXHIBIT 2 - Financial Statements

EXHIBIT 3 - Subscription Documents

## SUMMARY

**THE PARTNERSHIP**

Greenwich Sentry, L.P. (the "Partnership") is a Delaware limited partnership which was organized on December 27, 1990 under the name Aspen/Greenwich Limited Partnership. Its name was changed to Greenwich Sentry, L.P. on December 4, 1992. The office of the Partnership is located at 2 Soundview Drive, Greenwich, Connecticut 06830. Its telephone number is (203) 661-2595.

**INVESTMENT OBJECTIVE**

The Partnership's investment objective is to achieve capital appreciation through the allocation of its assets to an account at Bernard L. Madoff Investment Securities ("BLM"), a registered broker-dealer in New York, New York, which employs an options trading strategy described as "split strike conversion," a non-traditional strategy which has defined risk and profit parameters which may be ascertained when a particular position is established. BLM is employed solely as the Partnership's agent. BLM does not share in the profits of the Partnership and while it has sole authority for the investments made by the Partnership, it otherwise has no role in the management of the Partnership. (See, "INVESTMENT PROGRAM").

The Partnership commenced operations in January 1993 after the sale of $839,970 of Limited Partnership Interests (the "Interests"). As of December 31, 1997, the net asset value of the Partnership was $43,934,250, of which $39,370,425 was owned by the Limited Partners not affiliated with the General Partner.

**General Partner**

Fairfield Greenwich Limited, a corporation organized under the laws of Ireland on October 23, 1997, is the general partner of the Partnership (the "General Partner"). Walter M.

Noel, Jr. and Jeffrey H. Tucker are the officers and directors of the General Partner. They served as the Partnership's general partners until January 1998. The third principal of the General Partner is Andres Piedrahita.

The General Partner and/or its principals will make aggregate capital contributions to the Partnership of not less than 1% of the amount raised from the sale of the Interests.

### TERM

Through December 31, 2112. However, the General Partner may terminate the Partnership at any time and for any reason.

### INITIAL CAPITAL CONTRIBUTIONS

our fee

$100,000 minimum, subject to the discretion of the General Partner to accept lesser amounts.

### SALES COMMISSIONS

There will be no sales commissions charged or paid on sales of Interests to the Limited Partners.

### ADMISSION OF NEW PARTNERS; ADDITIONAL CAPITAL

The Partnership will offer its interests on a continuous basis. Subscriptions or additional capital contributions by Partners received during any monthly period will ordinarily be accepted as of the first day of the following month, i.e., subscriptions or additional capital contributions received between January 1 and January 31 will be accepted as of February 1. The General Partner may, in its discretion, accept any subscription or additional capital contribution prior to such first day of the month. Additional capital contributions may be made in increments of $25,000. The maximum amount of capital contributions which may be accepted by the Partnership is $500,000,000.

### FISCAL YEAR

December 31 of each year.

### WITHDRAWALS

At the end of each calendar month, a Limited Partner may withdraw any or all of its capital account or withdraw from the Partnership upon

30 days' prior written notice. The General Partner may withdraw any or all of its capital account or withdraw from the Partnership at the end of any calendar month upon 30 days' prior written notice. The General Partner has the right to require any Limited Partner to withdraw from the Partnership at any time and for any reason.

## ALLOCATION OF GAINS AND LOSSES

At the end of each calendar quarter, 20% of the Partnership's net capital appreciation from the account maintained at BLM will be allocated to the General Partner as provided by the Partnership Agreement (the "Incentive Allocation"). The remaining 80% of the Partnership's net capital appreciation from the account maintained at BLM and 100% of the Partnership's net capital depreciation will be allocated to all of the Partners (including the General Partner and/or its principals) in proportion to their respective capital accounts. If a Limited Partner makes capital contributions or withdraws capital during a calendar quarter, the above allocations shall be adjusted to account for such interim event.

Allocations for income tax purposes generally will be made among the Partners so as to reflect equitably amounts credited or debited to each Partner's capital account for the current and prior fiscal years. (See "TAX ASPECTS".)

## RISK FACTORS

The specialized investment program of the Partnership involves significant risks. In addition, the Partnership has a limited operating history and the Partnership Agreement contains limitations on withdrawals. (See "CERTAIN RISK FACTORS" and "COMMODITY MARKETS APPENDIX".)

## CONFLICTS OF INTEREST

The General Partner and Messrs. Noel and Tucker are affiliates of other investment funds with similar investment objectives and policies

as the Partnership. Certain inherent conflicts of interest will arise from the fact that the General Partner and its principals will carry on substantial investment activities through other investment funds of which they are principals and/or their own accounts in which the Partnership has no interest. In addition, BLM will have a conflict of interest in its management of the Partnership's account. See "CERTAIN RISK FACTORS".

## REGULATORY MATTERS

The Partnership is not presently, and does not intend in the future to become, registered as an investment company under the Investment Company Act of 1940, as amended and, therefore, will not be required to adhere to certain investment policies under that act (see "PARTNERSHIP POLICIES; COMPARISON TO CERTAIN POLICIES OF INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940".) The General Partner does not presently intend to, but may in the future, register as an investment adviser under the Investment Advisers Act of 1940, as amended. (See "STATUS OF GENERAL PARTNERS UNDER THE INVESTMENT ADVISERS ACT OF 1940".)

## OPERATING EXPENSES

The General Partner will bear all of the Partnership's normal and recurring operating expenses. The Partnership will bear, for each calendar quarter, all other expenses incurred in the operation of the Partnership, if any, including, any administration fees, all ordinary and necessary expenses directly related to the Partnership's investment activities and any legal and auditing fees, including fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Partnership, but excluding any legal fees incurred in connection with the continuation of this offering. Transactional costs (i.e., brokerage spreads and commissions) will also be borne by

the Partnership. (See "EXPENSES"). The Partnership incurred approximately $5,000 in organization fees in connection with the formation of the Partnership and the initial offering of the Interests. Such expenses were amortized among the Partners during a period of five years from January 1, 1993.

**SUITABILITY**

Investors in the Partnership must be "accredited investors" and must meet other suitability requirements. The General Partner, in its sole discretion, may decline to admit any investor. (See "LIMITATIONS ON TRANSFERABILITY; SUITABILITY REQUIREMENTS".)

**LIMITED PARTNER REPORTS**

The Partnership's certified public accountants will prepare, and the Partnership will mail to each Partner, following the end of each fiscal year, a financial report setting forth a balance sheet of the Partnership, a profit and loss statement showing the results of operations of the Partnership and its net capital appreciation or net capital depreciation, a statement of such Partner's closing capital account and the manner of its calculation and the Partner's opening capital account and partnership percentage for the then current fiscal year. At the end of each fiscal year, each Partner will be furnished with the required tax information for preparation of their respective tax returns. Within 30 days following the end of each calendar quarter, each Limited Partner shall receive unaudited financial information setting forth, inter alia, a statement of its net capital appreciation of net capital depreciation.

## USE OF PROCEEDS

The entire net proceeds from the sale of the interests will be available to the Partnership. The Partnership incurred approximately $5,000 in connection with the initial offering of Interests for the admission of Limited Partners (such costs consisting primarily of legal fees and blue sky filing fees). The General Partner does not intend to pay any

commissions or fees to broker-dealers in connection with the offering. However, in the event any fees or commissions are paid, they will be paid by the General Partner rather than the Partnership.

The Partnership's funds are allocated to an account at Bernard L. Madoff Investment Securities (see "INVESTMENT PROGRAM"). Funds not so allocated will be maintained in cash. Bernard L. Madoff Securities is employed solely as an agent of the Partnership. It has no ownership interest in the Partnership and no role in the overall management of the Partnership.

The Partnership will not make any loans to affiliated entities nor will it invest in any foreign government securities.

## INVESTMENT PROGRAM

The Partnership seeks to obtain capital appreciation of its assets through the utilization of a nontraditional options trading strategy. A discretionary account has been established for the Partnership at Bernard L. Madoff Investment Securities ("BLM"), a registered broker-dealer in New York, New York, which utilizes a strategy described as "split strike conversion". This strategy has defined risk and profit parameters which may be ascertained when a particular position is established. All investment decisions in the account at BLM are effected by persons associated with BLM. The firm, which employs approximately 200 people, acts primarily as a market maker in stocks and convertible securities. Most of the stocks for which it acts as a market maker are also listed on the New York Stock Exchange. Set forth below is a description of the "split strike conversion" strategy.

The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that together will highly correlate to the S&P 100 Index (the "OEX"), (ii) the sale of out of the money OEX call options in an equivalent contract value dollar amount to the basket of equity securities, and (iii) the purchase of an equivalent number of out of the money OEX put options. A call option is out of the money when its strike price is greater than the current price of OEX; a put option is out of the money when the strike price is lower than the current price of OEX. The basket typically consists of approximately 35 stocks in the S&P 100 Index.

The logic of this strategy is that once a long stock position has been established, selling a call against such long position will increase the standstill rate of return, while allowing upward movement to the short call strike price. The purchase of an out of the money put, funded with part or all of the call premium, protects the equity position from downside risk.

A bullish or bearish bias of the positions can be achieved by adjustment of the strike

prices in the OEX puts and calls. The further away the strike prices are from the price of the S&P 100 Index, the more bullish the strategy. However, the dollar value underlying the put options always approximates the value of the basket of stocks because the strike prices of the put options are rarely more than 3% out of the money.

The Partnership bears the cost of all brokerage spreads and commissions charged in connection with the account at BLM. All interest earned on credit balances is credited to the Partnership.

BLM acts as a principal in connection with its sale of securities to the Partnership, and the purchase of securities from the Partnership. BLM acts as a market-maker in the stocks purchased and sold by the Partnership. These market making activities enable BLM to trade with the Partnership as principal. See "CERTAIN RISK FACTORS".

The options transactions executed for the benefit of the Partnership are effected in the over-the-counter market and on a registered options exchange.

There can be no assurance that the investment objectives of the Partnership will be achieved. THE PARTNERSHIP'S INVESTMENT PROGRAM IS SPECULATIVE AND ENTAILS SUBSTANTIAL RISKS. MARKET RISKS ARE INHERENT IN ALL SECURITIES TO VARYING DEGREES. NO ASSURANCE CAN BE GIVEN THAT THE PARTNERSHIP'S INVESTMENT OBJECTIVE WILL BE REALIZED. (SEE "CERTAIN RISK FACTORS".)

## GENERAL PARTNER

Fairfield Greenwich Limited, a corporation organized under the laws of Ireland on October 23, 1997, serves as the Partnership's General Partner (the "General Partner"). It maintains offices at 2 Soundview Drive, Greenwich, Connecticut 06830; telephone number: (203)629-8494. Its officers, directors and principal shareholders are Walter M. Noel, Jr. and Jeffrey H. Tucker, who served as the Partnership's general partners until January 1998. Andres Piedrahita is the beneficial owner of the third shareholder of the General Partner and serves as a consultant to the General Partner. The General Partner also serves as the general partner of GOF Partners (Limited Partnership), a Connecticut limited partnership ("GOF"), and Greenwich Strategies, L.P., a Delaware limited partnership ("Greenwich Strategies"). It serves as the investment manager of Fairfield International Limited ("FIL"), Fairfield Sentry Limited ("Sentry") and Sentry Select Limited ("Sentry Select"), and as the administrative manager of Glickenhaus International Limited ("GIL") and Monroe Investors Limited ("MIL"), each of which are British Virgin Islands corporations (the "BVI"). The General Partner and/or its principals intend to make capital contributions which at all times shall constitute at least 1% of the aggregate capital contributions of all partners. The General Partner, its principals and their affiliates own an aggregate of 12.33% of the Partnership.     Monroe Prize?    CTA.

The backgrounds of the General Partner's principals are set forth below.

**Walter M. Noel, Jr.,** age 68, is the President and a Director of the General Partner. He graduated from Vanderbilt University in 1952, received a Master of Arts in Economics from Harvard University in 1953 and graduated from Harvard Law School in 1959. From 1959 to 1972 he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking, Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Mr. Noel has been a self-employed investment consultant since 1983 and until January 1992 was associated with Fahnestock & Co., Inc., a member firm of the New York Stock Exchange. From 1993 to 1996, Mr. Noel was a general partner of Fred Kolber & Co. ("Fred Kolber & Co."), a broker-dealer registered with the Securities and Exchange Commission, and a member of the National Association of Securities Dealers, Inc. and various securities exchanges and clearing organizations. Mr. Noel was a general partner of GOF, and Greenwich Strategies, L.P. until January 1998. He is an officer and director of Fairfield International Managers, Inc. ("FIM"), a Delaware corporation which is registered as a commodity pool operator and which directed the activities of FIL, Sentry and Sentry Select, and was the administrative manager of GIL and MIL until January 1998. Mr. Noel serves as a director of FIL, GIL, Sentry, MJM International Limited, Advanced Strategies Limited and Advanced Pacific Strategies Limited, which are also organized under the laws of the BVI, and of The Navigation Fund Limited, a Liberian corporation. Mr. Noel resides in Greenwich, Connecticut. He and his affiliates own approximately 10.47% of the Partnership.

**Jeffrey H. Tucker,** age 52, is the Vice President and a Director of the General Partner. He was a general partner of the GOF and Greenwich Strategies from the inception of those entities until January 1998. He was a general partner of Fred Kolber & Co. from 1987 to 1996. Mr. Tucker is a graduate of Syracuse University and Brooklyn Law School and practiced law for over 16 years. Prior to becoming a general partner of GOF and Fred Kolber & Co. in September 1987, Mr. Tucker was a member of the law firm of Tucker, Globerman & Feinsand, P.C. Mr. Tucker is also an officer and director of FIM and an officer of The Navigation Fund Limited. Mr. Tucker resides in New York City. He owns approximately 1.86% of the Partnership.

**Andres Piedrahita,** age 37, graduated from Boston University's School of Communications in 1981. Upon graduation from college, Mr. Piedrahita became employed as a financial consultant with Prudential Bache Securities Inc. in New York. From 1987 to 1990, He was a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals. From 1991 to

1997, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc., a New York corporation, which until December 31, 1997, was the investment manager of Advanced Strategies Limited, Advanced Latin Fund, Ltd., Advanced Pacific Strategies Limited, Dynamic Alternative Strategies Limited and Dynamic Leveraged Strategies Limited, which are British Virgin Islands corporations.

## ALLOCATION OF GAINS AND LOSSES

"Net Capital Appreciation" means the increase in the value of the Partnership's net assets from the beginning of each fiscal quarter to the end of such fiscal quarter. "Net Capital Depreciation" means the decrease in the value of the Partnership's net assets from the beginning of each fiscal quarter to the end of such fiscal quarter.

At the end of each calendar quarter of the Partnership, any Net Capital Appreciation earned by the Partnership's account at BLM will be tentatively allocated to all Partners (including the General Partners) in proportion to each Partner's opening capital account (the "Capital Account") for such quarter. Thereafter, 20% of any Net Capital Appreciation from the Partnership's account at BLM tentatively allocated to the Capital Accounts of the Limited Partners for such quarterly period will be reallocated to the Capital Accounts of the General Partner (the "Incentive Allocation".) In the event a Limited Partner makes a capital contribution to or withdraws capital from the Partnership during a calendar quarter, the above allocations shall be adjusted for such interim event.

For purposes of determining the Incentive Allocation for each quarterly period, the Net Capital Appreciation from the Partnership's account at BLM will be deemed reduced by the unrecovered balance, if any, in his or its loss recovery account (the "Loss Recovery Account"). The Loss Recovery Account is a memorandum account, established for each Limited Partner upon his or its admission to the Partnership, the opening balance of which will be zero. At the end of each quarter, the balance in each Limited Partner's Loss Recovery Account will be charged with any Net Capital Depreciation or credited with any Net Capital Appreciation from the Partnership's account at BLM. In the event that a Limited Partner with an unrecovered balance in his or its Loss Recovery Account withdraws all or a portion of his or its capital in the Partnership, the unrecovered balance in such Limited Partner's Loss Recovery Account will be proportionately reduced. Additional capital contributions will not affect any Limited Partner's Loss Recovery Account.

The General Partner will have no obligation to pay to or otherwise compensate a Limited Partner for the amount of the unrecovered balance (if any) in his or its Loss Recovery Account, but shall receive no additional Incentive Allocation with respect to such Limited Partner's Capital Account until the unrecovered balance in such Limited Partner's Loss Recovery Account is recovered. Since the General Partner's incentive allocation is

---

\*     The Partnership's allocations to its General Partner may result in substantially higher payments than alternative compensatory arrangements with other managers. As the Securities and Exchange Commission (the "SEC") noted in its Institutional Investor Study Report (1971), "... In most instances the compensation arrangements provided by unregistered hedge funds are far more favorable to the investment manager per dollar of assets managed than the compensation provided for similar services by registered investment companies or other classes of accounts."

calculated on a basis which includes unrealized appreciation of the Partnership's assets, such allocation may be greater than if it was based solely on realized gains. (See "EXPENSES".)

## CERTAIN RISK FACTORS

Among the substantial risk factors involved in a purchase of Interests in the Partnership are the following:

1.  **Trading Risks.** Substantial risks are involved in the trading of equity securities and options. Market movements can be volatile and are difficult to predict. U.S. Government activities, particularly those of the Federal Reserve Board, can have a profound effect on interest rates which, in turn, substantially affect securities and options prices as well as the liquidity of such markets. Politics, recession, inflation, employment levels, trade policies, international events, war and other unforeseen events can also have significant impact upon the prices of securities. A variety of possible actions by various government agencies also can inhibit the profitability of the Partnership's business or can result in losses. Such events, which can result in huge market movements and volatile market conditions, create the risk of catastrophic losses for the Partnership.

    Various techniques are employed to attempt to reduce a portion of the risks inherent in the trading strategy utilized on behalf of the Partnership. The ability to achieve the desired effect through a particular technique is dependent upon many factors, including the liquidity of the market at the desired time of execution. Thus, substantial risk remains that the techniques employed on behalf of the Partnership cannot always be implemented or effective in reducing losses. At various times, the markets for exchange-listed equity securities and options and/or other securities may be "thin" or illiquid, making purchases or sales of securities or options at desired prices or in desired quantities difficult or impossible. In addition, options prices are extremely volatile. The volume and volatility of trading in the market depend in part on general public interest and public opinion concerning economic conditions as well as the liquidity provided by market-makers and specialists. The liquidity of the market may also be affected by a halt in trading on a particular securities exchange or exchanges. Illiquid markets may make it difficult to get an order executed at a desired price.

2.  **Securities Trading is Speculative.** Options, and sometimes, stock prices, are highly volatile. Price movements are influenced by, among other things, changing supply and demand relationships, governmental and trade programs and policies, and national and international political and economic events. The value of an option depends largely upon the likelihood of favorable price movements in the underlying interest in relation to the exercise price during the life of the option.

3. <u>Trading Strategies May Not be Successful</u>. There can be no assurance that any trading method employed on behalf of the Partnership will produce profitable results, and the past performance of the Partnership and the other funds managed by the General Partners are not necessarily indicative of the future profitability of the Partnership.

Profitable trading is often dependent on anticipating trends or trading patterns. In addition, markets experiencing random price fluctuations, rather than defined trends or patterns, may generate a series of losing trades. There have been periods in the past when the markets have been subject to limited and ill-defined price movements, and such periods may recur. Any factor which may lessen major price trends (such as governmental controls affecting the markets) may reduce the prospect for future trading profitability. Any factor which would make it difficult to execute trades, such as reduced liquidity or extreme market developments resulting in prices moving the maximum amount allowed in a single day, could also be detrimental to profits or cause losses. Increases in margin levels on futures contracts or securities (including options) may occur in the future. Such increased margin and other potential regulatory changes may adversely impact the trading strategies. No assurance can be given that the trading techniques and strategies employed on behalf of the Partnership will be profitable in the future.

4. <u>Dependence Upon Principals and Bernard L. Madoff Investment Securities</u>. The services of Messrs. Tucker and Noel and Bernard L. Madoff Investment Securities are essential to the continued operations of the Partnership. If any of their services were no longer available, their absence would have an adverse impact upon an investment in the Partnership. The General Partner has delegated all investment management decisions to Bernard L. Madoff Investment Securities. As a result, the Partnership is subject to the judgment, decision and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities.

5. <u>Conflicts of Interest</u>. The General Partner and Bernard L. Madoff Investment Securities and their respective principals, are presently affiliated with and may in the future form and manage other investment entities (including, without limitation, investment partnerships, investment companies and mutual funds) with substantially the same or different objectives as those of the Partnership. They may also make investments in securities for their own accounts. In addition, the General Partner is the investment manager for unregistered foreign investment companies. Such activities could detract from the time that the General Partner and Bernard L. Madoff Investment Securities and their respective principals allocate to

the affairs of the Partnership.

6. **Conflicts of Interest-Transaction Executions.** Bernard L. Madoff Investment Securities, in its role as a market-maker, trades with the Partnership as principal. The firm also makes the investment decisions on behalf of the Partnership through a grant of discretionary authority over the Partnership's account at Bernard L. Madoff Investment Securities. As a result of this discretionary authority, Bernard L. Madoff Investment Securities has the ability to use the Partnership's assets to enhance its market making function and no arm's-length relationship exists between the Company and Bernard L. Madoff Investment Securities in the execution of stock and options transactions for the Partnership's account.

7. **Competition.** The securities industry is highly competitive in the United States. Competition from other persons or entities involved in activities similar to those of the Partnership can restrict the ability of the Partnership to acquire positions at the prices deemed most beneficial to its overall trading strategies. Many such competing persons or entities are better capitalized and have more experience in trading than the Partnership. Moreover, the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or affect execution of trades to the detriment of the Partnership.

8. **Regulated Industries.** The securities industry is highly regulated. The Partnership will not be directly subject to regulation by the SEC, national securities exchanges, or the Federal Reserve Board. However, the SEC regularly reviews the practices and procedures of the securities industry and the marketplace in general, and from time to time revises rules and regulations pertaining thereto. The exchanges engage in similar reviews and at times revise their rules. There can be no assurance whatsoever that any rules and regulations promulgated by the SEC, the Federal Reserve Board, the Commodity Futures Trading Commission or the various securities exchanges or statutory amendments to the Securities Exchange Act of 1934 will not adversely impact the Partnership.

9. **Option Buyer's Risk of Loss of Entire Investment.** An option is a wasting asset which becomes worthless when the option expires. As the remaining life of an option shortens with the passage of time, its value is reduced until it reaches zero upon expiration. This means that the option buyer who neither sells it in the secondary market nor exercises it prior to expiration will lose his entire investment in the option.

10. **Arbitrage Transactions.** Among the many risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction. Also, the transaction

costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination. Consequently, a substantial favorable price movement may be required before a profit can be realized.

11.  **Over-the-Counter Options Transactions.** A portion of the options transactions effected on behalf of the Partnership utilizes the over-the-counter market for their execution. Trading equity and index options in the over-the-market is subject to contra-party risk and is without the protections afforded by transactions effected through the Options Clearing Corporation, a registered clearing facility.

12.  **Assignment of Puts or Calls.** Substantial losses may result under certain circumstances if a hedged position becomes a long or short position due to the assignment of a short put or short call portion of the hedged position. Under normal market conditions, the remaining portion of the previously hedged position may be liquidated or otherwise adjusted to limit exposure to price changes. Suspension of trading of the option class or underlying securities followed by a price gap at the reopening of trading might result in substantial losses. The same would be true given an illiquid market such as that of October 1987.

13.  **Prohibition of Exercise Rights.** The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option has also been halted, holders and writers of that option will be locked into their positions until one of the two restrictions has been lifted.

14.  **Restrictions on Transfers and Withdrawals.** An investment in the Partnership provides limited liquidity since the Interests are not freely transferable and the Limited Partners have limited rights of withdrawal. A Limited Partner may, at the end of any month withdraw some or all of its capital account or withdraw from the Partnership, upon 30 days' prior written notice to the General Partner. In light of these restrictions, an investment in the Partnership is suitable only for sophisticated investors who have no need for more immediate liquidity in this investment. (See "LIMITATIONS ON TRANSFERABILITY; SUITABILITY REQUIREMENTS.")

The right of any partner to withdraw monies from the Partnership is subject to the provision by the General Partner for (i) Partnership liabilities in accordance with generally accepted accounting principles and (ii) reserves for contingencies.

15.  **Absence of Regulatory Oversight.** While the Partnership may be considered similar to an investment company, it does not intend to register as such under the Investment Company Act of 1940 (in reliance upon an

exemption available to privately offered investment companies), and, accordingly, the provisions of that Act (which, among other matters, require investment companies to have a majority of disinterested directors, require securities held in custody to at all times be individually segregated from the securities which are the property of such investment company and regulate the relationship between the adviser and the investment company) will not be applicable. The General Partner does not presently intend to, but may in the future, register with the SEC as Investment advisers pursuant to the Investment Advisers Act of 1940, as amended. (See "PARTNERSHIP POLICIES; COMPARISON TO CERTAIN POLICIES OF INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940" and "STATUS OF GENERAL PARTNER UNDER THE INVESTMENT ADVISORS ACT OF 1940".)

THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE EXPLANATION OF THE RISKS INVOLVED IN THIS OFFERING. POTENTIAL INVESTORS SHOULD READ THE ENTIRE MEMORANDUM BEFORE DETERMINING TO INVEST IN THE PARTNERSHIP.

## EXPENSES

The General Partner bears all of the Partnership's normal and recurring operating expenses or "Offering and Office Expenses" as characterized in the Partnership Agreement, which includes all direct expenses of the Partnership, i.e., rent, salaries, data transmission expenses, office supplies and telephones. It also includes expenses associated with the continuation of the offering of the Partnership's Interests. The term "Offering and Office Expenses" does not include, and, accordingly, the Partnership is responsible for paying the General Partner's allocation of Net Capital Appreciation, taxes, accounting and auditing fees and expenses, investment expenses (e.g., expenses which the General Partner reasonably determines to be directly related to the investment of the Partnership's assets, such as interest expenses, brokerage spreads and commissions, clearing fees and custodial fees) paid to BLM, litigation expenses and other extraordinary expenses which the General Partner reasonably determines should not properly be considered normal and recurring operating expenses of the Partnership.

The Partnership Agreement provides that the General Partner may elect to have the Partnership pay any normal and recurring operating expenses required to be borne by the General Partner and to charge such amounts to the General Partner's Capital Accounts. No such expenses have been paid by the Partnership and the General Partner does not contemplate having the Partnership pay such expenses.

As noted under "ALLOCATION OF GAINS AND LOSSES" the General Partner receives an Incentive Allocation on a quarterly basis in an amount equal to 20% of any Net Capital Appreciation allocated to the Capital Accounts of the Limited Partners for such quarterly period. Investors should note that any such allocation will result in the General Partner

receiving an amount of Net Capital Appreciation which may be greater than its proportionate share thereof and may thereby result in the General Partner receiving a disproportionate share of the Partnership's profits (the "Disproportionate Profits"). The Incentive Allocation (or Disproportionate Profits) was $874,258 for 1995, $1,312,616 for 1996 and $1,186,076 in 1997 (subject to audit). Since the amount of the Incentive Allocation is based entirely on the quarterly Net Capital Appreciation of the Partnership and the performance of the Partnership, the General Partner is unable to estimate the amount of the Incentive Allocation for calendar 1998.

The General Partner receives no compensation, directly or indirectly, with respect to the brokerage and clearance charges incurred in connection with the Partnership's account at BLM.

## POTENTIAL CONFLICTS OF INTEREST

The General Partner and BLM and their respective principals are presently affiliated with and may in the future form and manage other investment entities (including, without limitation, investment partnerships, investment companies, mutual funds and offshore funds) with substantially the same or different objectives as those of the Partnership. They may also make investments in securities for their own accounts. Such activities could detract from the time they allocate to the affairs of the Partnership. Investors in the Partnership will not acquire an interest in BLM or in any other investment entity with which the General Partner may be affiliated.

## PRIOR TRADING RESULTS

Set forth below are the prior trading results for the Partnership. Prior trading results for the other entities managed by the General Partner and their affiliate, Fairfield International Managers, Inc. ("FIM") are available upon request.

### The Partnership

The Partnership's performance from inception (January 1993) through December 31, 1997 is set forth on a monthly basis.

| Period | Beginning Net Asset Value (1) | Additions (2) | With- Drawals (3) | Gross Profits (4) | Incentive Fee (5) | Net Profit/ (Loss) (6) | Ending Equity (7) | Rate of Return(8) |
|---|---|---|---|---|---|---|---|---|
| 1993 | | | | | | | | |
| Jan. | $ 839,970 | $ 428,000 | $ -0- | $ (1,192) | $ -0- | $ (1,192) | $1,266,778 | - 0.14% |
| Feb. | 1,266,778 | -0- | -0- | 26,220 | 5,006 | 21,214 | 1,287,992 | + 1.67% |
| Mar. | 1,287,992 | 1,139,637 | 41,274 | 26,221 | 5,244 | 20,977 | 2,407,332 | + 1.63% |
| Apr. | 2,407,332 | -0- | -0- | 4,628 | 926 | 3,702 | 2,411,035 | + 0.15% |
| May. | 2,411,035 | -0- | -0- | 49,918 | 9,984 | 39,934 | 2,450,969 | + 1.66% |
| Jun. | 2,450,969 | 832,331 | -0- | 24,589 | 4,918 | 19,671 | 3,302,971 | + 0.80% |
| Jul. | 3,302,971 | -0- | -0- | (8,352) | -0- | (8,352) | 3,294,619 | - 0.25% |

| Period | Beginning Net Asset Value (1) | Additions (2) | With-Drawals (3) | Gross Profits (4) | Incentive Fee (5) | Net Profit/(Loss) (6) | Ending Equity (7) | Rate of Return (8) |
|---|---|---|---|---|---|---|---|---|
| Aug. | 3,294,819 | -0- | -0- | 93,627 | 17,055 | 76,572 | 3,371,191 | + 2.32% |
| Sep. | 3,371,191 | 1,623,387 | -0- | 10,790 | 2,158 | 8,632 | 5,003,210 | + 0.25% |
| Oct. | 5,003,210 | -0- | -0- | 107,970 | 21,594 | 86,376 | 5,089,586 | + 1.73% |
| Nov. | 5,089,586 | -0- | -0- | 19,708 | 3,942 | 15,766 | 5,105,353 | + 0.31% |
| Dec. | 5,105,353 | 3,074,953 | 330,151 | 33,308 | 6,682 | 26,647 | 7,878,802 | + 0.52% |
| | | | | | Rate of Return +11.15% | | | |
| **1994** | | | | | | | | |
| Jan. | 7,878,802 | 1,072,678 | -0- | 198,561 | 39,712 | 158,849 | 9,108,328 | +2.02% |
| Feb. | 9,108,328 | -0- | -0- | (42,125) | (8,425) | (33,700) | 9,074,628 | -0.37% |
| Mar. | 9,074,628 | 2,179,300 | 29,725 | 191,784 | 38,357 | 153,427 | 11,377,631 | +1.69% |
| Apr. | 11,377,631 | -0- | -0- | 250,977 | 50,195 | 200,782 | 11,578,412 | +1.76% |
| May. | 11,578,412 | -0- | -0- | 81,374 | 16,275 | 65,099 | 11,643,512 | +0.56% |
| Jun. | 11,643,512 | 1,338,406 | 374,228 | 41,172 | 8,234 | 32,937 | 12,640,627 | +0.26% |
| Jul. | 12,640,627 | -0- | -0- | 289,359 | 57,872 | 231,487 | 12,872,114 | +1.83% |
| Aug. | 12,872,114 | -0- | -0- | 76,796 | 15,359 | 61,437 | 12,933,551 | +0.48% |
| Sep. | 12,933,551 | 2,336,235 | 495,365 | 125,576 | 25,115 | 100,461 | 14,874,882 | +0.78% |
| Oct. | 14,874,882 | -0- | -0- | 164,684 | 32,937 | 131,747 | 15,006,629 | +0.89% |
| Nov. | 15,006,629 | 363,900 | 92,500 | 81,883 | 16,377 | 65,506 | 15,343,535 | +0.44% |
| Dec. | 15,343,535 | 6,038,650 | 582,395 | 155,558 | 31,112 | 124,446 | 20,924,237 | 0.81% |
| | | | | | Rate of Return +11.72 | | | |
| **1995** | | | | | | | | |
| Jan. | 20,924,237 | 483,000 | -0- | 390,466 | 78,093 | 312,373 | 21,719,610 | + 1.49% |
| Feb. | 21,719,610 | 1,580,664 | -0- | 206,766 | 41,353 | 165,413 | 23,465,686 | + 0.76% |
| Mar. | 23,465,686 | 2,749,991 | 456,772 | 232,540 | 46,508 | 186,032 | 25,942,937 | + 0.79% |
| Apr. | 25,942,937 | 56,137 | -0- | 563,483 | 112,697 | 450,786 | 26,449,861 | + 1.74% |
| May. | 26,449,861 | -0- | -0- | 569,913 | 113,983 | 455,930 | 26,905,791 | + 1.72% |
| Jun. | 26,905,791 | 999,057 | 262,494 | 195,966 | 39,193 | 156,773 | 27,799,127 | + 0.56% |
| July | 27,799,127 | 1,096,000 | 242,117 | 363,034 | 72,607 | 290,427 | 28,943,437 | + 1.04% |
| Aug. | 28,943,437 | 316,784 | 329,984 | 1,397 | 279 | 1,118 | 28,931,355 | 0.00% |
| Sept. | 28,931,355 | 596,090 | 3,697,766 | 681,209 | 136,242 | 544,967 | 26,374,648 | + 1.88% |
| Oct. | 26,374,648 | 3,840,775 | 2,263,563 | 516,854 | 103,371 | 413,483 | 28,165,351 | + 1.57% |
| Nov. | 28,165,351 | 1,503,000 | 1,227 | 239,375 | 47,875 | 191,500 | 29,858,624 | + 0.68% |
| Dec. | 29,858,624 | 7,585,549 | 5,769,015 | 399,334 | 79,867 | 319,467 | 31,994,625 | + 1.07% |
| | | | | | Rate of Return +14.17% | | | |
| **1996** | | | | | | | | |
| Jan. | 31,994,625 | 3,462,236 | | 593,712 | 118,742 | 474,970 | 35,931,831 | + 1.48% |
| Feb. | 35,931,831 | 710,500 | 36,265 | 313,309 | 62,662 | 250,647 | 36,856,713 | + 0.70% |
| Mar. | 36,856,713 | 501,673 | 1,812,833 | 574,660 | 114,932 | 459,728 | 36,005,281 | + 1.25% |
| Apr. | 36,005,281 | 1,876,467 | 317,884 | 326,740 | 65,348 | 261,392 | 37,825,256 | + 0.73% |
| May | 37,825,256 | 910,000 | 264,200 | 923,999 | 184,800 | 739,199 | 39,210,253 | + 1.95% |
| Jun. | 39,210,253 | 2,393,112 | 971,864 | 229,753 | 45,951 | 183,802 | 40,815,306 | + 0.47% |
| Jul. | 40,815,306 | 160,594 | 7,000 | 1,028,403 | 205,681 | 822,722 | 41,791,622 | + 2.02% |
| Aug. | 41,791,622 | 2,926,887 | 3,500,563 | 157,839 | 31,568 | 126,271 | 41,344,017 | + 0.30% |
| Sept. | 41,344,017 | 2,565,500 | 2,710,028 | 662,447 | 132,489 | 529,958 | 41,804,806 | + 1.28% |
| Oct. | 41,804,806 | 217,588 | 4,000 | 598,841 | 119,768 | 479,073 | 42,497,464 | + 1.15% |
| Nov. | 42,497,465 | -0- | 1,744,016 | 846,185 | 169,237 | 676,948 | 41,430,397 | + 1.59% |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Dec. | 41,430,397 | 2,285,578 | 15,227,495 | 307,190 | 51,436 | 245,752 | 28,734,232 | +0.59% |
| Rate of Return +14.57% | | | | | | | | |
| **1997** | | | | | | | | |
| Jan. | 28,734,232 | 1,710,500 | 1,218,158 | 898,818 | 179,764 | 719,054 | 29,945,628 | +2.50% |
| Feb. | 29,945,628 | 318,000 | 2,643,107 | 268,885 | 53,777 | 215,108 | 27,835,629 | +0.72% |
| Mar. | 27,835,629 | 1,174,342 | 696,164 | 399,756 | 79,951 | 319,805 | 28,633,612 | +1.15% |
| Apr. | 28,633,612 | 931,345 | 329,000 | 882,697 | 176,539 | 706,158 | 29,942,115 | +2.47% |
| May | 29,942,115 | 3,156,916 | 335,527 | 479,155 | 95,831 | 383,324 | 33,146,828 | +1.29% |
| Jun. | 33,146,828 | 202,801 | 3,206,188 | 652,096 | 130,419 | 521,677 | 30,665,118 | +1.57% |
| Jul. | 30,665,118 | 2,235,461 | 1,411,361 | 300,641 | 60,128 | 240,513 | 31,729,730 | +0.78% |
| Aug. | 31,729,730 | 3,786,844 | 1,740,467 | 182,993 | 32,599 | 130,394 | 33,908,502 | +0.41% |
| Sept. | 33,908,502 | 201,000 | 192,897 | 736,670 | 147,334 | 589,338 | 34,505,941 | +1.74% |
| Oct. | 34,505,941 | 1,595,334 | 107,250 | 247,805 | 49,561 | 198,244 | 36,192,269 | +0.57% |
| Nov. | 36,192,269 | 820,000 | 97,000 | 703,012 | 140,602 | 562,410 | 37,477,678 | +1.55% |
| Dec. | 37,477,678 | 5,192,197 | 3,457,733 | 197,855 | 39,571 | 158,284 | 39,370,426 | +0.42% |
| Rate of Return +16.24% | | | | | | | | |

I:\DATA\WPDOCS\AG_\GREENSEN\98005769

## NOTES TO TABLE

1) Beginning Net Asset Value represents the limited partners' share of the sum of cash, cash equivalents and equity balances in trading accounts accounted for at market value. Beginning Net Asset Value is the same as the previous month's Ending Equity.

2) Additions are the sum of capital contributed by limited partners as of the last day of the month.

3) Withdrawals are the sum of partial or total withdrawals by limited partners as of the last day of the month.

4) Gross Profit/(Loss) is the limited partners' share of the sum of the monthly profits and losses realized from trading activities before deduction of the Incentive Allocation.

5) Incentive Fee is the quarterly Incentive Allocation received by the General PaValue as of the

year, not by adding the monthly rate of return.

## PARTNERSHIP POLICIES; COMPARISON TO CERTAIN POLICIES OF INVESTMENT COMPANIES REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940

The Partnership does not currently or in the future propose to be registered as an investment company under the Investment Company Act of 1940 (the "1940 Act"). The Partnership will not be an investment company for purposes of the 1940 Act, since the Interests will be beneficially owned by less than 100 persons and since it will not make a public offering of the Interests. Nevertheless, for discussion purposes the Partnership may be compared with an investment company. Since Limited Partners may generally withdraw from the Partnership at the end of any month, the Partnership may be regarded as similar to a "non-diversified open-end investment company" i.e., a mutual fund, although such a company is usually prepared to redeem its securities at any time upon demand at net asset value.

Registered investment companies are required, under applicable SEC forms relating to the registration of their shares, to state definite policies with respect to certain enumerated types of activities, some of which may not be changed without shareholder approval.[*] The following discussion summarizes the Partnership's currently anticipated policies with respect to such activities through its allocation of assets to money managers and joint accounts, but it is important to note that changes in the Partnership's policies set forth below may be made by the General Partners, without the consent of the Limited Partners, to the extent consistent with the Partnership Agreement. (See "INVESTMENT PROGRAM" and "CERTAIN RISK FACTORS".)

(a) **The types of investments which the Partnership may make**. The Partnership Agreement authorizes the Partnership to allocate its assets to money managers who invest and trade on margin or otherwise, in capital stock of U.S. or foreign corporations, preorganization certificates and subscriptions, warrants, bonds, notes, debentures, whether subordinated, convertible or otherwise, rights, options, money market funds, commercial paper, certificates of deposit, brokers' acceptances, trust receipts, obligations of the United States, or any state thereof and instrumentalities of any of them, obligations of foreign governments, and other obligations and instruments or evidences of indebtedness commonly referenced to as securities. As part of its investment program, the Partnership may also allocate its assets to money managers who write or buy options, purchase forward and futures contracts relating to stock indices or other indices, financial instruments and commodities and commodity contracts and other securities and instruments and invest in fixed income securities and, as

---

[*] Such policies are considered to be "fundamental" policies with respect to security investments, i.e., policies which the registered investment company deems to be fundamental or policies which may not be changed without the approval of a majority of the registered investment company's shareholders.

opportunities are available, engage in convertible arbitrage transactions in merger and tender arbitrage.

(b) **The issuance of senior securities**. The Partnership will not issue classes of senior debt securities, except to the extent that it may be deemed to do so if its money managers engage in short selling, options writing and repurchase transactions.*

(c) **The use of leverage**. The Partnership may utilize money managers who trade in securities on margin or borrow, pledge, mortgage, lend or hypothecate securities or other assets. (See "TAX ASPECTS".) The Partnership may utilize money managers who use leverage by borrowing funds from banks and brokerage firms. The Partnership maintains no policy limiting the amount of borrowing in which it will permit a money manager to engage to any fixed percentage of the assets allocated to a money manager. Under market conditions deemed appropriate by the General Partner, the Partnership may borrow up to the limit of the applicable margin requirements and applicable regulations relating to bank loans.

(d) **The underwriting of securities of other issuers**. The Partnership will not underwrite securities of other issuers (except to the extent it may technically be deemed an "Underwriter" in connection with distributions of securities).

(e) **The making of loans to other persons**. The money managers utilized by the Partnership may lend their portfolio securities on terms customary to the securities industry, provided that cash collateral at least equal in value to the market value of the loaned securities is deposited by the borrower with

---

\* Effecting short sales, writing put and call options and engaging in repurchase transactions may be deemed to give rise to indebtedness of, and the issuance of a senior security by, a registered investment company. With respect to short sales, a registered investment company is required to collateralize such sales by depositing in a segregated account cash in an amount, or United States Government securities having a value equal to, the difference between (i) the greater of (a) the market value of the securities sold short at the time of the short sale, or (b) the market value of the securities sold short (marked to market daily) and (ii) the amount of cash or United States Government securities deposited with the broker to collateralize the obligation to replace the borrowed securities. Similar requirements exist with respect to collateralizing uncovered options and the SEC has indicated that such requirements may also apply when a registered investment company engages in repurchase transactions. The Partnership is not required to follow such requirements, and will not collateralize such obligations, except to the extent of applicable margin and bank regulations and creditors' practices. Registered investment companies can borrow only from banks and must maintain 300% asset coverage for such borrowings. However, the Partnership may borrow from brokers, banks and others that have no such asset coverage requirements

such money manager. The interest received on such loans is typically a percentage of the broker's call rate.

(f) **The purchase and sale of real estate.** The Partnership does not intend to purchase or sell interests in real estate or real estate mortgage loans nor does it intend to utilize money managers engaging in such loans transactions.

(g) **The purchase and sale of commodities or commodity contracts.** The Partnership Agreement authorizes the Partnership to engage in transactions involving forward and futures contracts (and options thereon) relating to stock indices and other indices, financial instruments and commodities and commodity contracts. However, such transactions would not be effected without compliance with the applicable regulatory requirement.

(h) **Investment in companies for the purpose of exercising control of management.** The Partnership will not ordinarily invest in companies for the purpose of exercising control of management but may do so in situations in which it believes it appropriate as an investment.

(i) **Policy with respect to portfolio turnover.** The Partnership has no definite policy with respect to portfolio turnover. The Partnership expects that its portfolio turnover will exceed the portfolio turnover of other types of investment vehicles, since the Partnership's investment strategies include active trading of the portfolio and short sales.

## STATUS OF GENERAL PARTNER UNDER
## THE INVESTMENT ADVISERS ACT OF 1940

The General Partner is exempt from registration as an investment adviser under the Investment Advisers Act of 1940 (the "Advisers Act").** The General Partner does not presently intend to register but may in the future register as an investment adviser under the Advisers Act.

---

** Section 203(b)(3) of the Advisers Act exempts from its registration requirements

"Any investment adviser who during the course of the preceding twelve months has had fewer than fifteen clients and who neither holds himself out generally to the public as an investment adviser nor acts as an investment adviser to any investment company registered under Title I of this Act."

## TAX ASPECTS

The following is a summary of certain aspects of the income taxation of the Partnership and its partners which should be considered by a prospective Limited Partner. Except as indicated below, it applies only to limited partners who are citizens or residents of the United States for federal income tax purposes, and who are taxed as individuals. The Partnership has not sought a ruling from the Internal Revenue Service (the "Service") or any other Federal, state or local agency with respect to any of the tax issues. Each prospective Limited Partner is urged to consult his own counsel regarding the acquisition of interests.

This summary of certain aspects of the Federal income tax treatment of the Partnership is based upon the Internal Revenue Code of 1986, as amended (the "Code") or regulations promulgated thereunder, judicial decisions, Treasury Regulations (the "Regulations") and rulings in existence on the date hereof, all of which are subject to change.

EACH PROSPECTIVE LIMITED PARTNER SHOULD CONSULT WITH ITS OWN TAX ADVISER IN ORDER TO FULLY UNDERSTAND THE FEDERAL, STATE AND LOCAL INCOME TAX CONSEQUENCES OF AN INVESTMENT IN THE PARTNERSHIP.

### 1. Tax Treatment of Partnership Operations

**Classification of the Partnership.** Pursuant to Regulation §301.07701-3, the Partnership will elect to treated as a partnership for federal income tax purposes. As a partnership, the Partnership will not itself be subject to Federal income tax. The Partnership files an annual partnership information return with the Service which reports the results of operations. Each partner is required to report separately on his income tax return his distributive share of the Partnership's net long-term capital gain or loss, net short-term capital gain or loss and all other items of ordinary income or loss. Each partner will be taxed on his distributive share of the Partnership's taxable income and gain regardless of whether he has received or will receive a distribution of assets from the Partnership.

**Partnership Taxation.** Publicly traded partnerships are treated as corporations unless their income is primarily passive. Publicly traded partnerships that satisfy the passive income test of Section 7704(c) are nevertheless subject to special treatment under the passive loss rules of Section 469. A tax-exempt organization's share of its income is treated as derived from an unrelated trade or business under Section 512(c) regardless of the nature of the partnership's activities.

A "publicly traded partnership" is a partnership the interests of which are (1) traded on an established securities market or (2) readily tradeable on a secondary market (or the substantial equivalent thereof). A secondary market is generally indicated by the existence of a person standing ready to make a market in the partnership interests. Under the House Report to the Revenue Act of 1987, a partnership

interest is readily tradeable on such a market if the interest is regularly quoted by such persons.

Generally, the substantial equivalent of a secondary market exists where, although there is not an identifiable market-maker for the interest, (1) a holder of the partnership interest has a readily available, regular ongoing opportunity to sell or exchange the interest through a public means, or (2) a prospective buyer or seller has the opportunity to buy, sell or exchange the interest in a time frame and with the regularity and continuity that a market-maker would provide. A regular plan of redemptions, repurchases or similar acquisitions of interests by the partnership is indicative that the interests are readily tradeable on the substantial equivalent of a secondary market. It is unlikely, however, that the Partnership will stand ready to redeem its interests in a time frame comparable to that available on a secondary market. The Partnership's redemption plan is available quarterly. This time period is unlike the daily trading activity normally associated with a secondary market.

The Service has issued Regulation §1.7704-1 dealing with publicly traded partnerships. Regulation §1.7704-1 provides that interests in a partnership will not be considered tradeable on a secondary market or the substantial equivalent thereof within the meaning of sections 469(k)(2), 512(c)(2), and 7704(b) of the Code if: (i) all interests in such partnerships were issued in a transaction (or transactions) that was not registered under the Securities Act of 1933; and (ii) the partnership does not have more than 100 partners. The Partnership's interests are issued under an exemption from registration under the 1933 Act. In addition, the Partnership will not have more than 100 partners. Under these facts, counsel has advised the General Partner that the Partnership will not be considered a publicly traded partnership.

If the Partnership were considered, a "publicly traded" partnership, the Partnership would be classified as an association taxable as a corporation. In this event, income or loss of the Partnership would not be passed through to the Partners and the Partnership would be subject to tax on its income, without deduction for any distributions to the Partners, at the rate applicable to corporations. In addition, all or a portion of any distributions by the Partnership to the Partners could be taxable to them as dividends or capital gains.

No assurance can be given that administrative, judicial or legislative changes will not occur to make the statements made herein incomplete or incorrect. The form of any legislative or administrative amendments that may be proposed or adopted in the future, the date as of which any such amendments would be effective, if adopted, and the effects of any such amendments upon the Partnership cannot be predicted. Additionally, the Service might not enforce or permit retroactive allocations in any regulations adopted in the future, this making it impossible to give assurances as to the treatment that might ultimately be accorded to the Partnership.

**Allocation of Profits and Losses.** Under the Partnership Agreement, the Partnership's net capital appreciation or net capital depreciation for each fiscal year will be allocated among the partners and to their capital accounts without regard to the amount of income or loss actually realized by the Partnership for Federal income tax purposes. For each fiscal year, under the Partnership Agreement, items of income, deduction, gain, loss or credit actually realized by the Partnership are to be allocated for income tax purposes in such a manner so as to reflect the amount so allocated to each partner's capital account for the current and prior fiscal years unless an allocation under the Partnership Agreement does not have "substantial economic effect." The General Partner believes that the allocations provided by the Partnership Agreement comply with the regulations under the Code defining substantial economic effect. If the allocations provided by the Partnership Agreement were determined not to have "substantial economic effect", and therefore, were not recognized for federal income tax purposes, the amount of income or loss allocated to Partners under the Partnership Agreement might be increased or reduced. A Limited Partner admitted to the Partnership on a date other than as of January 1 of a fiscal year will be allocated its distributive share of Partnership tax items at the end of its year of admission based in its pro rata share of the Partnership's Capital.

Regulations issued with respect to Section 704(b) of the Code provide rules to govern a situation, like the Partnership, where capital accounts of partners are adjusted to reflect changes in the fair market value of a partnership's assets without regard to the actual tax results for the year. Under these Regulations, gain recognized for tax purposes upon the sale of securities held during more than one fiscal year generally would be allocated among those partners who were partners during each of the fiscal years in question, based on the actual allocation to the capital accounts of such partners of the changes in the fair market value of such securities each fiscal year. However, the Regulations also provide for a "ceiling rule" which requires that the partners should not report gains or losses which are not actually realized by the Partnership. Under this rule of the Regulations, it is possible under certain circumstances (e.g., the contribution of new capital after Partnership securities have appreciated in value, and a subsequent decline in the value of such securities) that the allocations of the Partnership's tax result among the partners will not reflect allocations of net capital appreciation and net capital depreciation which have been made to the partner's capital accounts.

**Tax Elections; Returns; Tax Audits.** The Code provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death) provided that a partnership election has been made pursuant to Section 754. Under the Partnership Agreement, at the request of a partner, the General Partners, in their sole discretion, may cause the Partnership to make such election. Any such election, once made, cannot be revoked without the Service's consent.

The General Partner is designated as the "Tax Matters Partner" and it decides how to report the Partnership items on the Partnership's tax returns, and all partners will be required under the Code to treat the items consistently on their own returns, unless they file a statement with the Service disclosing the inconsistency. In the event the income tax returns of the Partnership are audited by the Service, the tax treatment of Partnership income and deductions generally are determined at the Partnership level in a single proceeding rather than by individual audits of the partners. The "Tax Matters Partner" will have considerable authority to make decisions affecting the tax treatment and procedural rights of all partners. In addition, the "Tax Matters Partner" has the right on behalf of all partners to extend the statute of limitations relating to the partners' tax liabilities with respect to partnership items.

2.    **Tax Treatment of Partnership Investments**

**In General.** The Partnership expects to act as a trader or investor, and not as a dealer, with respect to its securities transactions. A trader and an investor are persons who buy and sell securities for their own accounts. A dealer, on the other hand, is a person who purchases securities for resale to customers rather than for investment or speculation.

Generally, the gains and losses realized by a trader or investor on the sale of securities are capital gains and losses. Thus, the Partnership expects that its gains and losses from its securities transactions typically will be capital gains and capital losses. These capital gains and losses may be long-term or short-term depending, in general, upon the length of time the Partnership maintains a particular investment position and, in some cases, upon the nature of the transaction. Property held for more than one year generally will be long-term capital gain or loss. The application of certain rules relating to short sales, to so-called "straddle" and "wash sale" transactions and to "Section 1256 Contracts" may serve to alter the manner in which the Partnership's holding period for a security is determined or may otherwise affect the characterization as long-term or short-term, and also the timing of the realization of certain gains or losses.

Long-term capital gains are taxed at a 20% rate for property held for more than 12 months. The excess of capital losses over capital gains may be offset against the ordinary income of a noncorporate taxpayer, subject to an annual deduction limitation of $3,000. For corporate taxpayers, capital losses may be offset only against capital gains, but unused capital losses may be carried back three years (subject to certain limitations) and carried forward five years.

**Section 1256 Contracts.** Under the Code, all positions in "Section 1256 contracts" held by the Partnership at the end of its taxable year will be marked to their market value, and any unrealized gain or loss on those positions will be included in the income of the partners as if each position had been sold for its fair market value on the last day of the Partnership's taxable year. A "Section 1256

contract" includes a "regulated futures contract," a "foreign currency contract," a "nonequity option" and a "dealer equity option". A "regulated futures contract" is a futures contract which is traded on or subject to the rules of a "qualified board or exchange" (that is, a national securities exchange which is registered with the SEC, a domestic board of trade designated as a contract market by the CFTC or any other board of trade, exchange or other market designated by the Secretary of the Treasury) and which is "marked-to-market" to determine the amount which must be deposited as margin or may be withdrawn. A "foreign currency contract" is a contract which requires delivery of, or the settlement of which depends upon the value of, a foreign currency which is a currency in which positions are also traded through regulated futures contracts, which are traded in the interbank market and which are entered into at arms' length at a price determined by reference to the price in the interbank market. (The Secretary of the Treasury is authorized to issue regulations excluding certain currency forward contracts from marked-to-market treatment). A "nonequity option" means an option which is traded on a qualified board or exchange and the value of which is not determined directly or indirectly by reference to any stock (or group of stocks) or stock index unless there is in effect a designation by the CFTC of a contract market for a contract based on such group of stock or stock index. A "dealer equity option" means, with respect to an options dealer, any listed option which is an equity option, is purchased or granted by such options dealer in the normal course of his activity of dealing in options, and is listed on the qualified board or exchange on which such options dealer is registered.

After positions in Section 1256 contracts held by the Partnership at the end of its taxable year are marked to market, the resulting gain or loss will be combined with any gain or loss realized by the Partnership from positions in Section 1256 contracts closed during that year. Provided such positions were held as capital assets and were not part of a "hedging transaction", nor part of a "straddle" (see below), 60% of the resulting net gain or loss will be treated as a long-term capital gain or loss and 40% of such net gain or loss will be treated as a short-term gain or loss, regardless of the period of time particular positions were actually held by the Partnership. (However, gain or loss from positions treated as Section 1256 contracts under the Code Section 988 election provisions would be treated entirely as a short-term capital gain or loss). In addition, gain or loss in dealer equity options allocable to the limited partners are treated as short-term gains or losses and are not subject to the "60-40" rule. Section 1256(a) provides that gains or losses from transactions in nonequity options, dealer equity options, regulated futures and foreign currency contracts shall be treated as short-term capital gain or loss, to the extent of 40 percent of the gain or loss, and 60 percent of the gain or loss shall be treated as long-term capital gain or loss. However, Section 1256(f)(4) provides that gain or loss from transactions in dealer equity options allocable to limited partners shall be treated as short-term capital gains or losses. Consequently, limited partners will not be subject to the "60-40" rule in dealer equity options.

**Straddles.** If the Partnership incurs a loss upon the disposition of any position which is part of a "straddle" (i.e., two or more offsetting positions), recognition of that loss for tax purposes will be deferred until the Partnership recognizes the gain in the offsetting position of the straddle. This rule would apply to all of the positions in a straddle which includes one or more Section 1256 contracts but which does not consist entirely of Section 1256 contracts (a "mixed straddle"), but not to a straddle all of the positions of which are Section 1256 contracts. (Depending upon whether the Partnership makes certain elections, the Section 1256 contract components of a mixed straddle may be treated as not subject to the mark-to-market rules). This provision would also apply to the Partnership's positions in futures contracts on most foreign exchanges and in forward contracts on foreign currency (other than interbank contracts), which could result in the deferral of deductions for losses resulting from the disposition of such positions or from the disposition of Section 1256 contracts which offset those positions. The Partnership can specifically identify particular positions as being components of a straddle, in which case a realized loss would be allowable only upon the liquidation of all of the components of the identified straddle. The Partnership's trading strategies may include the use of spreads or straddles, with or without making such identifications.

Interest and other carrying charges allocable to positions which are part of a straddle must be capitalized, rather than deducted currently.

**Wash and Short Sale Rules.** The "short-sale" rules may apply to positions held by the Partnership so that what might otherwise be characterized as long-term capital gain would be characterized as short-term capital gain or potential short-term capital loss as long-term capital loss. Furthermore, "wash sale" rules, which prevent the recognition of a loss from the sale of a security where a substantially identical security is (or has been) acquired within a prescribed time period, also apply where certain offsetting positions (other than identified straddle positions) are entered into within the prescribed period.

**Section 988.** Currency gain or loss from transactions in (i) bank forward contracts not traded in the interbank market, (ii) currency futures contracts traded on a foreign exchange and (iii) other futures contracts traded on a foreign exchange may be treated as ordinary income or loss under Code Section 988. Partners in the Partnership may elect on an individual basis, in effect, to recognize gain or loss from instruments described in clauses (i) and (ii) of the preceding sentence under the mark-to-market rules of Code Section 1256. Pursuant to that election gain or loss from such positions would be treated entirely as short-term capital gain or loss. Such an election would cause a partner's share of foreign currency gain or loss from the Partnership's Section 1256 contracts to be treated as ordinary income or loss, rather than 60% long-term and 40% short-term capital gain or loss. (A form of such election is included in the Subscription Documents)

**Partner-Partnership Positions.** It is unclear to what extent the loss deferred, short sale, capitalization and wash sale rules would apply to straddles consisting of Partnership transactions and transactions by a partner in his individual capacity. Each prospective limited partner should review the application of these rules to his own particular tax situation, with special regard to the potential interaction between Partnership operations and commodities transactions entered into by the prospective limited partner in his individual capacity.

**Short Sales.** Gain or loss from a short sale of property is generally considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset in the hands of the money manager or joint account trader utilized by the Partnership. Except with respect to certain situations where the property used by the money manager or joint account trader to close a short sale has a long-term holding period on the date of the short sale, special rules would generally treat the gains on short sales as short-term capital gains. These rules may also terminate the running of the holding period of "substantially identical property" held by the money manager or joint account trader. Moreover, a loss on a short sale will be treated as a long-term capital loss if, on the date of the short sale, "substantially identical property" has been held by the money manager or joint account trader for more than one year.

**Effect of Straddle Rules on Partners' Securities Positions.** The Service may treat certain positions in securities held (directly or indirectly) by a partner and its indirect interest in similar securities held by the money manager as "straddles" for Federal income tax purposes. The application of the "straddle" rules in such a case could affect a partner's holding period for the securities involved and may defer the recognition of losses with respect to such securities.

**Limitation on Deductibility of Interest.** For noncorporate taxpayers, Section 163(d) of the Code limits the deduction for "investment interest" (i.e., interest or shortsale expenses for "indebtedness incurred or continued to purchase or carry property held for investment"). Pursuant to amendments to the Code enacted by the Tax Reform Act of 1986, investment interest is not deductible to the extent that it exceeds the taxpayer's net gain and ordinary income derived from investments.

**Conversion Transactions.** Pursuant to the Omnibus Budget Reconciliation Act of 1993, new Section 1258 was added to the Code, the effect of which is to recharacterize what was capital gain from a "conversion transaction" as ordinary income, with certain limitations. Conversion transactions are defined as transactions in which substand as a capital gain; or (iv) is

described as a conversion transaction in Treasury regulations. The amount of gain recharacterized as ordinary income will not exceed the amount of interest that would have accrued on the taxpayer's net investment for the relevant period at a yield equal to 12% of the "applicable rate" prescribed by the Code.

For purposes of this provision, the Partnership's activities will be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a Limited Partner's share of the interest and short sale expenses attributable to the Partnership's operation. In such case, a Limited Partner would be denied a deduction for all or part of that portion of its distributive share of the Partnership's ordinary losses attributable to interest expense unless it had sufficient investment income from all sources including the Partnership. A Limited Partner who could not deduct losses currently as a result of the application of Section 163(d) would be entitled to carry forward such losses to future years, subject to the same limitation. The investment interest limitation would also apply to interest paid by a partner on money borrowed to finance its investment in the Partnership. Potential investors are advised to consult with their own tax advisers with respect to the application of the investment interest limitation in their particular tax situations.

**Deductibility of Partnership Investment Expenditures by Individual Partners.** Under the Tax Reform Act of 1986, investment expenses (e.g., investment advisory fees) of an individual are deductible only to the extent they exceed 2% of his adjusted gross income. Pursuant to Temporary Regulations issued by the Treasury Department, this limitation on deductibility may apply to an individual Limited Partner's share of the investment expenses of the Partnership. Although the Partnership intends to treat the Incentive Allocation to the General Partner as not being subject to the foregoing rule, there can be no assurance that the Service may not treat such allocations as investment expenses which are subject to this rule.

The consequences of this limitation will vary depending upon the personal tax situation of each taxpayer. Accordingly, individual Limited Partners would consult their tax advisers with respect to the application of this limitation.

**Application of Rules for Income and Losses from Passive Activities.** The Tax Reform Act of 1986 restricts the deductibility of losses from a "passive activity" against certain income which is not derived from a passive activity. This restriction applies to individuals, personal service corporations and closely held corporations.

Pursuant to Temporary Regulations issued by the Treasury Department, income or loss from the Partnership generally will not constitute income or loss from a passive activity. Therefore, passive losses from other sources generally could not be deducted against a Limited Partner's share of income and gain from the Partnership.

3. **Alternative Minimum Tax**

The alternative minimum tax for individuals is imposed on "alternative minimum taxable income" in excess of $33,750 ($45,000 if filing jointly and $22,500 for married individuals filing separately). However, the exemption amount is phased out at a rate of 25 cents on the dollar for alternative minimum taxable income in excess of $112,500 ($150,000 if filing jointly and $75,000 for married individuals filing separately). A two-tiered graduated rate schedule is applicable. The lower tier consists of a 26% rate applicable to the first $175,000 of alternative minimum taxable income ("AMTI") in excess of the exemption and an upper tier of 28% applicable to AMTI that is greater than $175,000 above the exemption amount. For married individuals filing separately, the 28% rate applies to AMTI that is greater than $87,500 above the exemption amount. Alternative minimum taxable income consists of adjusted gross income plus certain preference items less certain itemized deductions. Alternative minimum taxable income may not be offset by certain interest deductions, including, generally, interest incurred to purchase or carry interests in the Partnership. Corporations are also subject to an alternative minimum tax.

4. **Broker Reporting and Backup Withholding**

The subscription documents require each prospective investor in the Partnership to furnish the investor's "taxpayer identification number." If the number furnished is not correct, the investor may be subject to penalties imposed by the Service and payments to the investor in redemption of interests (and, possibly, other Partnership distributions) may become subject to 20% backup withholding.

Under currently proposed regulations, the Partnership is not required to treat either its securities transactions or redemptions of interests as requiring separate reporting to investors under Code section 6045, since the information required to be furnished by that section is identical to that furnished to each investor on Schedule K-1 of Form 1065. The same information will be furnished to the Service on Form 1065. Accordingly, investors will not receive separate Forms 1099-B with respect to such transactions.

5. **Unrelated Business Taxable Income**

Generally, an exempt organization is exempt from Federal income tax on its passive investment income, such as dividends, interest and capital gains, whether realized by the organization directly or indirectly through a partnership in which it is a partner.

---

\* With certain exceptions, tax-exempt organizations which are private foundations are subject to a 2% Federal excise tax on their "net investment income". The rate of the

This general exemption from tax does not apply to the "unrelated business taxable income" ("UBTI") of an exempt organization. UBTI includes "unrelated debt-financed income," which generally consists of (i) income derived by an exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year and (ii) gains derived by an exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness" at any time during the twelve-month period ending with the date of such disposition.

While it is not presently anticipated, the Partnership may incur "acquisition indebtedness" with respect to certain of its transactions, such as the purchase of securities on margin. In addition short sale transactions engaged in by the Partnership may be treated by the Service as involving "acquisition indebtedness"." To the extent the Partnership recognizes income (i.e., dividends and interest) from securities with respect to which there is "acquisition indebtedness" during a taxable year, the percentage of such income which will be treated as UBTI generally will be based on the percentage which the "average acquisition indebtedness" incurred with respect to such securities is of the "average amount of the adjusted basis" of such securities during the taxable year.

In determining the unrelated debt-financed income of the Partnership, an allocable portion of deduction directly connected with the Partnership's debt financed property is taken into account. Thus, for instance, a percentage of capital losses from debt-financed securities (based on the debt/basis percentage calculation described above) would offset gains treated as UBTI.

Since the calculation of the Partnership's "unrelated debt-financed income" is complex and will depend in large part on the amount of leverage used by the Partnership from time to time, it is impossible to predict what percentage of the Partnership's income and gains will be treated as UBTI for a Limited Partner which

---

excise tax for any taxable year may be reduced to 1% if the private foundation meets certain distribution requirements for the taxable year. Under the Tax Reform Act of 1986, a private foundation will be required to make payments of estimated tax with respect to this excise tax.

** The General Partners are of the opinion that generally, income realized by the Partnership from option writing and futures contract transactions would not constitute UBTI.

* The calculation of a particular exempt organization's UBTI would also be affected if it incurs indebtedness to finance its investment in the Partnership. In addition, it should be noted that the Tax Reform Act of 1986 requires an exempt organization to make estimated tax payments with respect to its UBTI.

is an exempt organization. An exempt organization's share of the income or gains of the Partnership which is treated as UBTI may not be offset by losses of the exempt organization either from the Partnership or otherwise, unless such losses are treated as attributable to unrelated trade or business (e.g., losses from securities for which there is acquisition indebtedness).

To the extent that the Partnership generates UBTI, the applicable Federal tax rate for such a Limited Partner generally would be either the corporate or trust tax rate depending upon the nature of the particular exempt organization. An exempt organization may be required to support, to the satisfaction of the Service, the method used to calculate its UBTI. The Partnership will be required to report to the Partner which is an exempt organization information as to the portion of its income and gains from the Partnership for each year which will be treated as UBTI. The calculation of such amount with respect to transactions entered into by the Partnership is highly complex, and there is no assurance that the Partnership's calculation of UBTI will be accepted by the Service.

In general, if UBTI is allocated to an exempt organization such as a qualified retirement plan or a private foundation, the portion of the Partnership's income and gains which is not treated as UBTI will continue to be exempt from tax, as will the organization's income and gains from other investments which are not treated as UBTI. Therefore, the possibility of realizing UBTI from its investment in the Partnership generally should not affect the tax-exempt status of such an exempt organization. However, a charitable remainder trust will not be exempt from Federal income tax under Section 664(c) of the Code for any year in which it has UBTI. Moreover, the charitable contribution deduction for a trust under Section 642(c) of the Code may be limited for any year in which the trust has UBTI.

6. **Certain Issues Pertaining to Specific Exempt Organizations**

   **Private Foundations.** Private foundations and their managers are subject to excise taxes if they invest "any amount in such a manner as to jeopardize the carrying out of any of the foundation's exempt purposes." This rule requires a foundation manager, in making an investment, to exercise "ordinary business care and prudence" under the facts and circumstances prevailing at the time of making the investment, in providing for the short-term and long-term needs of the foundation to carry out its exempt purposes. The factors which a foundation manager may take into account in assessing an investment include the expected rate of return (both income and capital appreciation), the risks of rising and falling price levels, and the needs for diversification within the foundations's portfolio.

---

\*  Certain exempt organizations which realize UBTI in a taxable year will not constitute "qualified organizations" for purposes of Section 514(d)(9)(B)(vi)(I) of the Code, pursuant to which, in limited circumstances, income from certain real estate partnerships in which such organizations invest might be treated as UBTI. A prospective tax-exempt Limited Partner should consult its tax adviser in this regard.

In order to avoid the imposition of an excise tax, a private foundation may be required to distribute on an annual basis its "distributable amount," which includes, among other things, the private foundation's "minimum investment return," defined as 5% of the excess of the fair market value of its non-functionally related assets (assets not used or held for use in carrying out the foundation's exempt purposes), over certain indebtedness incurred by the foundation in connection with such assets. It appears that a foundation's investment in the Partnership would most probably be classified as a nonfunctionally related asset. A determination that an interest in the Partnership is a nonfunctionally related asset could conceivable cause cash flow problems for a prospective Limited Partner which is a private foundation. Such an organization could be required to make distributions in an amount determined by reference to unrealized appreciation in the value of its interest in the Partnership. Of course, this factor would create less of a problem to the extent that the value of the investment in the Partnership is not significant in relation to the value of other assets held by a foundation.

In some instances, an investment in the Partnership by a private foundation may be prohibited by the "excess business holding" provisions of the Code. For example, if a private foundation (either directly or together with a "disqualified person") acquires more than 20% of the capital interest or profits interest of the Partnership, the private foundation may be considered to have "excess business holdings". If this occurs, such foundation may be required to divest itself of its interest in the Partnership in order to avoid the imposition of an excise tax.

A substantial percentage of investments of certain "private operating foundations" may be restricted to assets directly devoted to their tax-exempt purposes. Otherwise, generally, rules similar to those discussed above govern their operations.

**Endowment Funds.** Investment managers of endowment funds should consider whether the acquisition of an interest is legally permissible. This is not a matter of federal law, but is determined under state statutes. It should be noted, however, that under the Uniform Management of Institutional Funds Act, which has been adopted, in various forms, by a large number of states, participation in investment partnership or similar organizations in which funds are commingled and investment determinations are made by persons other than the governing board of the endowment fund is allowed.

### 7.    State and Local Taxation

In addition to the Federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in the Partnership. State and local laws often differ from Federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or

loss of the Partnership will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which he is a resident.

## OUTLINE OF PARTNERSHIP AGREEMENT

The following outline summarizes the material provisions of the Partnership Agreement which are not discussed elsewhere in this Memorandum. This outline is not definitive, and each prospective Limited Partner should carefully read the Partnership Agreement in its entirety. References herein to "Partners" unless otherwise indicated refer to the General Partner and the Limited Partners.

**Limited Liability.** A Limited Partner will be liable for debts and obligations of the Partnership only to the extent of its interest in the Partnership in the fiscal year (or portion thereof) to which such debts and obligations are attributable. In order to meet a particular debt or obligation, a Limited Partner or former Limited Partner shall, in the discretion of the General Partner, be required to make additional contributions or payments up to, but in no event in excess of, the aggregate amount of returns of capital and other amounts actually received by it from the Partnership during or after the fiscal year to which such debt or obligation is attributable.

**Term.** The Partnership will terminate on the earlier of a) December 31, 2012; or (b) a determination by the General Partner that the Partnership should be dissolved or (c) upon the withdrawal from Partnership by the General Partner, or (d) death, insolvency, adjudication of incompetency or bankruptcy of Walter M. Noel, Jr. and Jeffrey Tucker. In the event that the Partnership is dissolved, one or more persons selected by a majority in interest of the Limited Partners shall terminate and wind up the affairs of the Partnership.

**Capital Accounts.** Each Partner will have a capital account established on the books of the Partnership which will be credited with its capital contributions. A "Partnership Percentage" will be determined for each Partner for each fiscal quarter, by dividing its capital account as of the beginning of such fiscal quarter by the aggregate capital accounts of all Partners as of the beginning of such fiscal quarter. The Partnership Percentages will be subject to adjustment by the General Partner to reflect interim quarter additions and withdrawals, if any.

Each Partner's capital account will be increased to reflect any additional capital contributions made by it and its share of the Partnership's Net Capital Appreciation, and will be decreased to reflect withdrawals of capital, distributions and such Partner's share of Net Capital Depreciation.

**Additional Capital Contributions.** Additional contributions may be made by Partners as of the first day of any month, subject to the approval of the General Partner.

**Management.** The management of the Partnership will be vested exclusively in the General Partner. The Limited Partners will have no part in the management of the

Partnership and will have no authority or right to act on behalf of the Partnership in connection with any matter. Nothing will preclude the affiliates of the General Partner from exercising investment responsibility for their own accounts, or for the accounts of individual members of their family, friends, or other business relationships. Neither the Partnership nor the Partners shall have any first refusal, co-investment or other rights in respect of the investments for such accounts or in any fees, profits or other income earned otherwise derived therefrom.

**Salaries or Other Payments or Allocations to the General Partner.** The Partnership will make no payments to the General Partner other than the allocation of Net Capital Appreciation (if any) to the General Partner in respect of their Partnership Percentage and the Incentive Allocation.

**Valuation of Partnership Assets.** The Partnership's interests being managed in the account with BLM, will be valued by the General Partner in accordance with the terms of the Partnership Agreement. All matters concerning valuation of assets, as well as allocation among the Partners and accounting procedures not expressly provided by the Partnership Agreement, may be determined by the General Partner, whose determination will be final and conclusive as to all Partners. The General Partner may, from time to time, also establish or abolish reserves for estimated or accrued expenses and for unknown or contingent liabilities.

**Withdrawals in General.** No Partner shall be entitled to (i) receive distributions from the Partnership, except as provided in the Partnership Agreement; or (ii) withdraw any amount from his capital account other than upon his withdrawal from the Partnership except as provided in the Partnership Agreement.

**Required Withdrawals.** The General Partner may, at the end of any calendar month and for any reason, terminate the interest of any Limited Partner in the Partnership, upon at least 10 days' prior written notice. If the General Partner determines that the continued participation of any Limited Partner would cause the Partnership or any Partner to violate any law, or any litigation is commenced or threatened against the Partnership or any of its Partners arising out of such Limited Partner's participation in the Partnership, such Limited Partner's interest may be discontinued at any time upon five days' prior notice.

**Withdrawal, Death, etc. of a Limited Partner.** Each Limited Partner has the right to withdraw any or all of its capital account or from the Partnership at the end of a calendar month, upon 30 days' prior written notice. In the event of the death, disability, incompetency, termination, bankruptcy, insolvency or dissolution of a Limited Partner, the interest of such Limited Partner will continue at the risk of the Partnership business until (i) the last day of the calendar month in which such event takes place (herein called the "month of determination") or (ii) the earlier termination of the Partnership.

A Limited Partner who withdraws from the Partnership will be paid approximately 97% of his estimated capital account within 20 business days after the last day of the month of determination. The balance of such Limited Partner's capital account will be paid (subject

to audit adjustments) to such Limited Partner (without interest) within 30 days after completion of the Partnership's annual audit.

**Withdrawal of a General Partner.** The General Partner may withdraw any or all of its capital account, or from the Partnership, at the end of any calendar month upon 30 days' prior written notice from the end of such calendar month.

**Limitations on Withdrawals.** The right of any Partner to receive amounts withdrawn is subject to the provision by the General Partner for all Partnership liabilities in accordance with generally accepted accounting principles and for reserves for contingencies.

**Transfers of Interests of Partners.** No mortgage, hypothecation, transfer, sale, assignment or other disposition, whether voluntary or otherwise, of all or a part of the Partners Interest in the Partnership may be effected except with the consent of the General Partner.

**Admission of New Partners.** Partners may, with the consent of the General Partner, be admitted as of the beginning of each calendar month. Each new Partner will be required to execute an agreement pursuant to which it becomes bound by the terms of the Partnership Agreement.

**Amendments to Partnership Agreement.** The Partnership Agreement may be modified or amended at any time with the written consent of the Partners having in excess of 50% of the Partnership Percentages of the Partners and the written consent of the General Partner insofar as is consistent with the laws governing the Partnership Agreement, provided, however, that without the specific consent of each Partner affected thereby, no such modification or amendment shall (i) reduce its capital account or rights of contribution or withdrawal; or (ii) amend provisions of the Partnership Agreement relating to amendments; or (iii) amend Sec. 3.05 of the Partnership Agreement. However, without the consent of the Partners, the General Partner may (i) amend the Partnership Agreement or Schedule thereto to reflect changes validly made in the membership of the Partnership and the capital contributions and Partnership Percentages of the Partners; (ii) reflect a change in the name of the Partnership or the effective date of the Partnership; (iii) make a change that is necessary or, in the opinion of the General Partner, advisable to qualify the Partnership as a limited partnership or a partnership in which the Limited Partners have limited liability under the laws of any state, or ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; (iv) make a change that does not adversely affect the Partners in any material respect or that is necessary or desirable to cure any ambiguity, to correct or supplement any provision in the Partnership Agreement that would be inconsistent with any other provision in the Partnership Agreement, in each case so long as such change does not adversely affect the Limited Partners, (v) make a change that is necessary or desirable to satisfy any requirement, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state statute, so long as such change is made in a manner which minimizes any adverse effect on the Partners, or that is required or contemplated by this Agreement; (vi) make a change in any provision of the Partnership

Agreement that requires any action to be taken by or on behalf of the General Partner or the Partnership pursuant to the requirements of applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required; or (vii) make any other amendments similar to the foregoing.

**Arbitration.** The Partnership Agreement provides that all controversies arising in connection with the Partnership Agreement will be submitted to arbitration in New York City in accordance with the rules of American Arbitration Association. The Partnership Agreement empowers the arbitrators to provide for specific performance or other injunctive or equitable relief.

**Reports to Partners.** The Partnership's independent certified accountants (selected by the General Partner) will audit the Partnership's books and records as of the end of each fiscal year. Within 90 days after the end of each fiscal year the Partnership will mail to the Limited Partners the Annual Report prepared by its independent certified public accountants setting forth a balance sheet of the Partnership, a profit and loss statement showing the results of operations of the Partnership and its Net Capital Appreciation or Net Capital Depreciation, a statement of such Partner's capital account and the manner of its calculation and the Partnership Percentage as of the end of the prior fiscal year. At the end of each fiscal year, each Partner will be furnished the required tax information for preparation of their respective tax returns. Within 30 days following the end of each calendar quarter in each fiscal year, each Partner will be mailed unaudited financial information setting forth, inter alia, a statement of its Net Capital Appreciation or Net Capital Depreciation.

**Exculpation.** The Partnership Agreement provides that neither the General Partner nor any Affiliates of the General Partner (defined below) will be liable to any Partner or the Partnership for honest mistakes of judgment or for action or inaction which the General Partner or any Affiliates of the General Partner reasonably believed to be in the best interests of the Partnership, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any employee, broker or other agent of the Partnership, provided that such employee, broker or agent was selected, engaged or retained by the Partnership with reasonable care. The General Partner and any Affiliates of the General Partner may consult with counsel and accountants in respect of Partnership affairs and shall be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected with reasonable care. The foregoing provisions (as well as the indemnification provisions described below), however, shall not be construed to relieve the General Partner or any Affiliates of the General Partner of any liability to the extent that such liability may not be waived, modified or limited under applicable law.

**Indemnification of General Partner.** The Partnership Agreement provides that the Partnership is to indemnify and hold harmless each General Partner, former General Partner, and any officer, director, employee or agent of the General Partner and/or the legal representatives of any of them (the "Affiliates of the General Partners"), from and against any loss or expense suffered or sustained by him in connection with the business

of the Partnership including without limitation any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding, provided, such loss or expense resulted from a mistake of judgment or from action or inaction reasonable believed to be in the best interest of the Partnership. The Partnership Agreement also provides that the Partnership will, in the sole discretion of the General Partner, advance to any General Partner and to any Affiliates of the General Partner reasonable attorney's fees and other costs and expenses incurred in connection with the defense of any action or proceeding which arises out of such conduct. In the event that such an advance is made by the Partnership, the General Partner will agree to reimburse the Partnership to the extent that it is determined that it or he was not entitled to indemnification.

## LIMITATIONS ON TRANSFERABILITY; SUITABILITY REQUIREMENTS

Each purchaser of an Interest must bear the economic risk of its investment for an indefinite period of time (subject to its right to withdraw capital from the Partnership) because the Interests have not been registered under the Securities Act of 1933, as amended, and, therefore, cannot be sold unless they are subsequently registered under that Act or an exemption from such registration is available. It is not contemplated that any such registration will ever be effected and that certain exemptions provided by rules promulgated under that Act (such as Rule 144) will be available. The Partnership Agreement provides that a Partner may not assign or pledge its Interest (except by operation of law), nor substitute another person as a Partner, without prior consent of the General Partner, which may be withheld for any reason. Limited Partners may withdraw from the Partnership without the consent of the General Partner upon 30 days prior written notice, at the end of any month. The foregoing restrictions on transferability must be regarded as substantial and will be clearly reflected in the Partnership's record.

Each purchaser of an Interest will be required to represent that the Interest is being acquired for its own account, for investment, and not with a view to resale or distribution. The Interests are suitable investments only for sophisticated investors and financial institutions for which an investment in the Partnership does not constitute a complete investment program and who fully understand, are willing to assume, and who have the financial resources necessary to withstand, the risks involved in the Partnership's specialized investment program and to bear the potential loss of their entire investment in the Interest (See "CERTAIN RISK FACTORS" and "TAX ASPECTS".)

Each prospective purchaser is urged to consult with its own advisers to determine the suitability of an investment in the Partnership and the relationship of such an investment to the purchaser's overall investment program and financial and tax position. Each purchaser of an Interest will be required to further represent that after all necessary advice and analysis, its investment in an Interest is suitable and appropriate, in light of the foregoing considerations.

## PURCHASES BY EMPLOYEE-BENEFIT PLANS - ERISA CONSIDERATIONS

The phrase "employee-benefit plan" refers to plans of various types including corporate pension and profit-sharing plans, "simplified employee pension plans," so-called "Keogh" plans for self-employed individuals, including partners, and "Individual Retirement Accounts" (or "IRAs") for persons (including employees, self-employed persons and members of employee associations.

Interests may not be purchased by an employee-benefit plan if the General Partner or its affiliates (a) exercise any discretionary authority or discretionary control respecting management of such employee-benefit plan, (b) exercise any authority or control respecting management or disposition of the assets of such employee-benefit plan, (c) render investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such employee-benefit plan, (d) have any authority or responsibility to render investment advice with respect to any moneys or other property of such employee-benefit plan, or (e) have any discretionary authority or discretionary responsibility in the administration of such employee-benefit plan. For the purposes of this paragraph, "investment advice" shall mean (i) rendering investment advice as to the value of securities or other property, or making recommendations as to the advisability of investing in, directly or indirectly (ii) having discretionary authority or control, whether or not pursuant to an agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan, or (iii) rendering any advice described in (i) above, on a regular basis to the employee-benefit plan, pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the employee-benefit plan or a fiduciary with respect to such employee-benefit plan, that such services will serve as a primary basis for investment decisions with respect to assets of the employee-benefit plan, and that such person will render individualized investment advice to the employee-benefit plan based on the particular needs of the employee-benefit plan regarding such matters, as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

Under ERISA, a fiduciary of an employee-benefit plan is required, among other things, to discharge his duties toward such plan with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. In considering an investment in the Partnership of a portion of the assets of an employee-benefit plan, a fiduciary should give appropriate consideration to those facts and circumstances that, given the scope of his or her investment duties, he or she knows or should know are relevant to investment in the Partnership, including the role the investment in the Partnership plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties. A fiduciary having investment responsibilities with respect to an employee-benefit plan should consult regulations of the Department of Labor to determine whether he or she has made appropriate consideration of relevant factors in investing in the Partnership. In addition to any factors which must be

considered by a fiduciary with respect to investment of assets of an employee-benefit plan in the Partnership under the above regulation, a fiduciary should also consider (i) whether the investment is in accordance with the documents and instruments governing said plan, (ii) whether the investment satisfies the diversification rules of Section 404(a)(1)(C) of ERISA, if applicable, (iii) whether the investment will result in unrelated business taxable income to the Plan, (iv) whether the investment provides sufficient liquidity, (v) the need to value the assets of the plan annually, and (vi) whether the investment is prudent.

Assets of employee-benefit plans ("plan assets") are generally subject to the fiduciary duty provisions of ERISA and the prohibited transaction provisions of ERISA and the Code. ERISA does not define "plan assets"; however, the Department of Labor has published a final regulation defining the term "plan assets" (the "Final Regulation") for purposes of Title I of ERISA and Code section 4975. Under the Final Regulation, generally, when an employee-benefit plan makes an equity investment in another entity (an "investment entity"), the underlying assets of the investment entity will not be considered plan assets. If an employee-benefit plan invests in an investment entity's equity interest which is neither (i) a "publicly-offered" security", nor (ii) a security issued by an investment company registered under the Investment Company Act of 1940, both the employee-benefit plan's equity interest in the investment entity and an undivided interest in the underlying assets of the investment entity will be considered plan assets. However, if an employee-benefit plan invests in a security which is not publicly-offered or which is not issued by a registered investment company, the underlying assets of the investment entity will not be considered plan assets if (a) the investment entity is an "operating company," or (b) equity participation by employee-benefit plan investors in the investment entity is not "significant.""

The Interests will not be deemed to be "publicly offered" securities for purposes of the Final Regulation. In addition, the Partnership is not an "operating company" within the meaning of the Final Regulation, which defines an operating company as a company engaged primarily in the production or sale of a product or service other than the investment of capital.

The final exception from the "plan assets" rules is for investment entities in which there is not "significant" investment by "benefit plan investors." "Benefit plan investors" include employee-benefit plans subject to ERISA as well as plans not subject to ERISA, such as governmental plans and IRA's. Investment by benefit plan investors is not "significant," as defined in the Final Regulation, if the aggregate investment by benefit plan investors in any class of securities of the investment entity is less than 25%. Determinations of the percentage of participation by benefit plan investors must be made after each such investment, and investments held by the investment entity's managers, investment advisers and their affiliates must be disregarded.

The Partnership intends to qualify under the significant plan investment exception in the Final Regulation by monitoring the percentage investment by benefit plan investors and maintaining it below 25%. In order to accomplish this, the Subscription Agreement

requires that an employee-benefit plan must redeem its interests upon notice from the General Partner.

Given this, the General Partner believes it is unlikely that the Partnership's assets will be deemed to be plan assets. However, in the unlikely event that the Partnership is deemed to hold plan assets; additional issues relating to the "plan assets" and "prohibited transactions" concepts of ERISA and the Code arise by virtue of the General Partner's ownership of interests in the Partnership and the possible relationship between an affiliate of the General Partner and any employee-benefit plan which may purchase interests. Additionally, certain transactions between the Partnership and the General Partner and certain affiliates of the General Partner could be prohibited transactions.

If the Partnership's assets are plan assets and it is determined by the Department of Labor that the acquisition of an interest by an employee-benefit plan constitutes a prohibited transaction, then the General Partners and any other fiduciary that has engaged in any such prohibited transaction would be required to (i) restore to the employee-benefit plan any profits realized on the transaction and (ii) make good to the employee-benefit plan any losses suffered by the employee-benefit plan as a result of such investment. In addition, the party in interest involved would be liable to pay an excise tax equal to 5% of the amount involved (i.e., the amount invested in the Partnership) for each year during which the investment is in place, and be required to eliminate the prohibited transaction by reversing the transaction and making good to the plan any losses resulting from the prohibited transaction. Moreover, if the transaction is not corrected within a certain time period, the party in interest involved could also be liable for an additional excise tax in an amount equal to 100% of the amount involved. Plan fiduciaries who make the decision to invest in Interests could, under certain circumstances, be liable as co-fiduciaries for actions taken by the Partnership or the General Partners.

With respect to investing in IRA's, the tax-exempt status of the account could be lost if the investment constituted a prohibited transaction under Section 408(e)(2) of the Code by reason of the Partnership engaging in a prohibited transaction with the individual who established the IRA or his beneficiary. If the IRA were to lose its tax-exempt status, the restoration and excise tax penalties for prohibited transactions would not apply.

It should be noted that even if the Partnership's assets are not deemed to be plan assets, the Department of Labor has stated in Interpretive Bulletin 75-2, 29 C.F.R. §2509.75-2, as amended by the Final Regulation, that it would consider a fiduciary who makes or retains an investment in a partnership for the purpose of avoiding the application of the fiduciary responsibility provisions of ERISA to be in contravention of the fiduciary provisions of ERISA. The Interpretive Bulletin further states that if a plan invests in or retains its investment in a partnership and as part of the arrangement it is expected that the partnership will enter into a transaction with a party in interest to the plan (within the meaning of ERISA) which involves a direct or indirect transfer to or by use by the party in interest of any assets of the plan, the plan's investment in the partnership would be a prohibited transaction under ERISA.

The Subscription Agreement requires that in the event that the General Partner determines that the Partnership's assets constitute "plan assets" within the meaning of ERISA or that the transactions contemplated in this Memorandum constitute "prohibited transactions," and no exemption from the prohibited transactions penalties has been obtained, then each employee-benefit plan must redeem its interest upon notice from the General Partner.

Each Limited Partner will be furnished with quarterly statements and annual reports which include the Net Asset Value per Interest. The General Partner believes that these statements will be sufficient to permit plan fiduciaries to provide an annual valuation of plan investments as required by ERISA; however, fiduciaries should note that they have the ultimate responsibility for providing such valuation. Accordingly, plan fiduciaries should consult with their attorneys or other advisors regarding their obligations under ERISA with respect to making such valuations.

## COUNSEL

Andrew E. Goldstein, Esq., 909 Third Avenue, New York, New York 10022, has acted as counsel to the Partnership in connection with this offering of the Interests. Mr. Goldstein and certain of his family members are limited partners of the Partnership and certain of its affiliates.

## ADDITIONAL INFORMATION

The Partnership will make available to any proposed Limited Partner any additional information, which the Partnership possesses, or which it can acquire without unreasonable effort or expense, necessary to verify or supplement the information set forth herein.

## SUBSCRIPTION FOR INTERESTS

Persons interested in becoming Limited Partners will be furnished signature pages of the Partnership Agreement, a Subscription and Investment Representation Agreement, and a Confidential Investor Suitability Questionnaire to be completed by them and returned to the General Partner.

**EXHIBIT 1**

**FORM OF LIMITED PARTNERSHIP AGREEMENT**

# LIMITED PARTNER SIGNATURE PAGE

## GREENWICH SENTRY, L.P.

**GREENWICH SENTRY, L.P.**

**FOURTH AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT**

**Dated as of January 15, 1998**

# GREENWICH SENTRY, L.P.
## AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT
### INDEX

Page

**ARTICLE I: GENERAL PROVISIONS** ............................................................... 1
Sec. 1.01. Partnership Name ....................................................................... 1
Sec. 1.02. Fiscal Year .................................................................................. 1
Sec 1.03. Liability of Partners ..................................................................... 1
Sec. 1.04. Purposes of Partnership ............................................................. 2
Sec. 1.05. Assignability of Interest ............................................................. 4

**ARTICLE II: MANAGEMENT OF PARTNERSHIP** ......................................... 4
Sec. 2.01. Management Generally ............................................................... 4
Sec. 2.02. Authority of General Partner ...................................................... 4
Sec. 2.03. Reliance by Third Parties ........................................................... 4
Sec. 2.04. Activity of the General Partner ................................................... 6
Sec. 2.05. Exculpation .................................................................................. 6
Sec. 2.06. Indemnification of General Partner ............................................ 6
Sec. 2.07. Payment of Costs and Expenses ............................................... 7

**ARTICLE III: CAPITAL ACCOUNTS OF PARTNERS AND
OPERATIONS THEREOF** ........................................................ 7
Sec. 3.01. Definitions .................................................................................. 7
Sec. 3.02. Capital Contributions ................................................................. 8
Sec. 3.03. Capital Accounts ........................................................................ 8
Sec 3.04. Partnership Percentages ........................................................... 8
Sec. 3.05. Allocation of Net Capital Appreciation or Net Capital Depreciation ............. 8
Sec. 3.06. Loss Recovery Account .............................................................. 9
Sec. 3.07. Valuation of Assets ..................................................................... 9
Sec. 3.08. Liabilities ................................................................................... 10
Sec. 3.09. Allocation for Tax Purposes ..................................................... 10
Sec. 3.10. Determination by General Partner of Certain Matters ............. 11
Sec. 3.11. Adjustments to Take Account of Interim Accounting Period Events .......... 11

**ARTICLE IV: WITHDRAWALS AND DISTRIBUTIONS OF CAPITAL** ............... 11
Sec. 4.01. Withdrawals and Distributions in General ............................... 11
Sec. 4.02. Withdrawals .............................................................................. 11
Sec. 4.03. Limitations on Withdrawals ..................................................... 12
Sec. 4.04. Salaries and Other Payments or Allocations to the General Partners ........ 12

**ARTICLE V: ADMISSION OF NEW PARTNERS** ....................................... 12
Sec. 5.01. New Partners ............................................................................ 12

**ARTICLE VI: WITHDRAWAL, DEATH OR INSANITY OF PARTNERS** ............. 13
Sec. 6.01. Withdrawal, Death, etc. of a General Partner .......................... 13

i

Sec. 6.02. Withdrawal, Death, etc. of a Limited Partner ................................................ 13
Sec. 6.03. Required Withdrawals ................................................................................... 14
Sec. 6.04. Effective Date of Withdrawal ........................................................................ 14
Sec. 6.05. Limitations on Withdrawal of Capital Account.............................................. 15

**ARTICLE VII: DURATION AND TERMINATION OF PARTNERSHIP** ........................ 15
Sec. 7.01. Duration........................................................................................................ 15
Sec. 7.02. Termination .................................................................................................. 15
Sec. 7.03. Method of Distribution ................................................................................. 15

**ARTICLE VIII: REPORTS TO PARTNERS**.................................................................. 16
Sec. 8.01. Independent Auditors.................................................................................... 16
Sec. 8.02. Filing of Tax Returns .................................................................................... 16
Sec. 8.03. Reports to Partners ...................................................................................... 16
Sec. 8.04. Reports to Partners and Former Partners .................................................... 16
Sec. 8.05. Tax Matters Partner ..................................................................................... 16

**ARTICLE IX: MISCELLANEOUS**............................................................................... 17
Sec. 9.01. General.......................................................................................................... 17
Sec. 9.02. Power of Attorney.......................................................................................... 17
Sec. 9.03. Amendments to Partnership Agreement....................................................... 18
Sec. 9.04. Adjustment of Basis of Partnership Property................................................ 18
Sec. 9.05. Choice of Law ............................................................................................... 18
Sec. 9.06. Inspection of Books and Records ................................................................. 19
Sec. 9.07. Notices .......................................................................................................... 19
Sec. 9.08. Goodwill......................................................................................................... 19
Sec. 9.09. Headings ....................................................................................................... 19

I:\DATA\WPDOCS\AG_\GREENBEN\98005166                                    10/14/98 2:45PM

# GREENWICH SENTRY, L.P.

## FOURTH AMENDED AND RESTATED
## LIMITED PARTNERSHIP AGREEMENT

### Dated as of January 15, 1998

---

This FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP dated as of January 15, 1998 (herein called the "Agreement") among the undersigned (herein called the "Partners", which term shall include any persons hereafter admitted to the Partnership pursuant to Article V of this Agreement and shall exclude any persons who cease to be Partners pursuant to Article VI of this Agreement) pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act (6 Del. C. Sec. 17101, et seq.) (the "Act").

## ARTICLE I

## GENERAL PROVISIONS

Sec. 1.01.  **Partnership Name.**  The Partnership shall do business under the name of Greenwich Sentry, L.P. (herein called the "Partnership").

Sec. 1.02.  **Fiscal Year.**  The fiscal year of the Partnership (herein called the "fiscal year") shall end on December 31 of each year or on such other date as the General Partner of the Partnership shall from time to time determine.

Sec. 1.03.  **Liability of Partners.**  The names and addresses of all of the Partners and the amounts of their respective contributions to the Partnership (herein called "Capital Contributions") are set forth in a schedule entitled "Schedule of Capital Contributions" (herein called the "Schedule") which shall be filed with the books and records of the Partnership and is hereby incorporated by reference and made a part of this Agreement.

Those Partners who are designated in Part I of the Schedule as General Partners (herein called the "General Partner" or "General Partners") and former General Partners shall have unlimited liability for the repayment and discharge of all debts and obligations of the Partnership attributable to any fiscal year during which they are or were General Partners of the

Partnership.

Those Partners who are designated in Part II of the Schedule as Limited Partners and former Limited Partners shall be liable for the repayment and discharge of all debts and obligations of the Partnership attributable to any fiscal year (or relevant portion thereof) during which they are or were Limited Partners of the Partnership to the extent of their respective interests in the Partnership in the fiscal year (or relevant portion thereof) to which any such debts and obligations are attributable.

The Partners and all former Partners shall share all losses, liabilities or expenses suffered or incurred by virtue of the operation of the preceding paragraphs of this Sec. 1.03 in the proportions of their respective Partnership Percentages (determined as provided in Sec. 3.04 hereof, as adjusted pursuant to Sec. 3.11, if appropriate) for the fiscal year (or relevant portion thereof) to which any debts or obligations of the Partnership are attributable. A Limited Partner's or former Limited Partner's share of all losses, liabilities or expenses shall not be greater than its respective interests in the Partnership for such fiscal year (or relevant portion thereof). The General Partner and all former General Partners shall share all losses, liabilities or expenses suffered or incurred by virtue of the operation of the second paragraph of this Sec. 1.03 in excess of their respective interests in the Partnership in the fiscal year (or relevant portion thereof) to which any debts or obligations are attributable either in the proportions of their respective Partnership Percentages for such fiscal year (or relevant portion thereof) or in such proportions as have been agreed to by such General Partners.

As used in this Sec. 1.03, the terms "interests in the Partnership" and "interest in the Partnership" shall mean with respect to any fiscal year (or relevant portion thereof) and with respect to each Partner (or former Partner) the amount in the Capital Account of such Partner on the last day of such fiscal year (or relevant portion thereof) as determined under Article III hereof; provided, however, that if such Partner (or former Partner) shall have ceased to be a Partner of the Partnership pursuant to Article VI hereof as of the end of or during such fiscal year, the terms "interests in the Partnership" and "interest in the Partnership" shall mean the Capital Account of such Partner (or former Partner), prior to any adjustments to the Capital Account of such Partner for such fiscal year (or relevant portion thereof) pursuant to Article III hereof.

Notwithstanding any other provision in this Agreement, in no event shall any Limited Partner (or former Limited Partner) be obligated to make any additional contribution or payment, respectively, whatsoever to the Partnership, or have any liability for the repayment and discharge of the

debts and obligations of the Partnership (apart from his or its interest in the Partnership), except that a Limited Partner (or former Limited Partner) may be required, for purposes of meeting his obligations under this Sec. 1.03, to make additional contributions or payments, respectively, up to, but in no event in excess of, the aggregate amount of returns of capital and other amounts actually received by him from the Partnership during or after the fiscal year to which any debt or obligation is attributable.

As used in this Agreement, the terms "former General Partners," "former Limited Partners," and "former Partners" refer to such persons or entities as hereafter from time to time cease to be General Partners, Limited Partners and Partners respectively pursuant to the terms and provisions of this Agreement.

Sec. 1.04. **Purposes of Partnership**. The Partnership is organized for the purposes of realizing capital appreciation by allocating its assets between and among trading accounts managed by a select group of money managers and engaging in all activities and transactions the General Partner may deem necessary or advisable in connection therewith, including, without limitation:

(1) to enter into agreements with one or more money managers for the purpose of such money managers investing certain of the assets of the Partnership;

(b) to invest and trade through accounts maintained at or interests purchased in various money managers, on margin or otherwise, in capital stock of U.S. or foreign corporations, preorganization certificates and subscriptions, warrants, bonds, notes, debentures (whether subordinated, convertible or otherwise), rights, options, money market funds, commercial paper, certificates of deposit, bankers' acceptances, trust receipts, obligations of the United States, or any State thereof, and instrumentalities of any of them, and any other obligations and instruments or evidences of indebtedness commonly referred to as securities of whatever kind or nature of any person, corporation, government or entity whatsoever, whether readily marketable or not, in rights and options relating thereto including forward and futures contracts (and options thereon) relating to stock indices or other indices, financial instruments and commodities and commodity contracts, and put and call options written by the Partnership or by others (all such items being called herein a "Security" or "Securities"), to sell Securities short and cover such sales, and to lend funds or properties of the Partnership, either with or without security; and

(c) to enter into, make and perform, all contracts and other undertakings, and engage in all activities and transactions, as the General Partner may deem necessary or advisable to the carrying out of the foregoing objects and purposes, including without limitation:

      (i)      to purchase, hold, sell, exchange, transfer, mortgage, pledge and otherwise acquire and dispose of and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Securities or interests in money managers owned by the Partnership;

      (ii)     to borrow or raise moneys, and, from time to time without limit as to amount or manner and time of repayment, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any thereof (and of the interest thereon) by mortgage upon, or pledge, conveyance or assignment in trust of, the whole or any part of the property or funds of the Partnership, whether at the time owned or thereafter acquired and to sell, pledge or otherwise dispose of promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other instruments or evidences of indebtedness of the Partnership;

      (iii)    to lend any of its Securities, provided that collateral at least equal in value to the market value of such Securities is deposited by the borrower thereof with the Partnership or its Agent;

      (iv)    to maintain for the conduct of Partnership affairs one or more offices and in connection therewith rent or acquire office space, engage personnel, whether part-time or full-time, and do such other acts as the General Partner may deem necessary or advisable in accordance with the maintenance and administration of such office or offices; and

      (v)     to engage attorneys, independent accountants, other investment advisers, management companies or such other persons as the General Partner may deem necessary or advisable.

Sec. 1.05:   **Assignability of Interest.** Without the prior written consent of the General Partner, a Partner may not (i) pledge or assign its interest in whole or in part to any person except by operation of law, or (ii) substitute for itself as a Partner any other person. Any attempted pledge, assignment or substitution not made in accordance with the preceding sentence shall be void.

## MANAGEMENT OF PARTNERSHIP

Sec. 2.01.   **Management Generally**. The power to make all decisions with regard to the management of the Partnership, unless otherwise specified, shall be vested exclusively in the General Partner. The Limited Partners shall have no part in the management of the Partnership, and shall have no authority or right to act on behalf of the Partnership in connection with any matter.

Sec. 2.02.   **Authority of the General Partner**. Except as otherwise expressly provided in this Agreement, the General Partner shall have full, exclusive and complete discretion in the management of the Partnership and the power on behalf and in the name of the Partnership to take any action on behalf of the Partnership hereunder, to carry out any and all of the purposes of the Partnership set forth in Sec. 1.04, and to perform all acts and enter into and perform all contracts and other undertakings which it may deem necessary or advisable or incidental thereto, including, without limitation, the power to:

(a)   allocate the assets of the Partnership among various money managers, including affiliates of the General Partner, to be selected in the sole and exclusive discretion of the General Partner, in such proportions, utilizing such investment strategies and techniques, and in such number as shall be determined by the General Partner;

(b)   open, conduct and close accounts, including margin accounts, with brokers, members of various options exchanges and money managers for the purposes of investing with one or more money managers and purchasing interests in various entities for the purpose of investing with one or more money managers; which powers shall include, without limitation, the authority to pay, or authorize the payment of, brokerage commissions, management and incentive and/or performance fees (which may be in excess of the lowest commission rates or fee schedules available) and a portion of the Partnership's trading profits to, respectively (i) brokers which execute transactions for the account of the Partnership are, (ii) money managers receiving allocations of the Partnership's assets;

(c)   open, maintain and close bank accounts and draw checks or other orders for the payment of moneys;

(d)   lend, with or without security, any of the funds or properties of the Partnership and, from time to time without limit as to amount, borrow or raise funds and secure the payment of obligations of the Partnership by

mortgage upon, or pledge or hypothecation of, all or any part of the property of the Partnership;

(e) do any and all acts on behalf of the Partnership, and exercise all rights of the Partnership, with respect to its interest in any person, firm, corporation or other entity, including without limitation the voting of Securities, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters;

(f) organize one or more corporations to hold record title, as nominee for the Partnership, to Securities or funds of the Partnership;

(g) act for and on behalf of the Partnership, and authorize any General Partner, employee or other agent of the Partnership to act in all matters incidental to the foregoing;

(h) act as investment adviser to the Partnership and provide research and analysis and direct the formulation of investment policies and strategies for the Partnership;

(i) to represent the Partnership and to make decisions affecting tax treatment of the Partnership, and the General Partner is hereby designated as the Tax Matters Partner; and

(j) to exercise its discretion to waive for any Limited Partner any provision of this Partnership Agreement which imposes a requirement on a Limited Partner, whether it be for making an investment, withdrawing capital or otherwise, if and so long as such waiver does not adversely affect the rights of any other Limited Partner.

Sec. 2.03. **Reliance by Third Parties.** Persons dealing with the Partnership are entitled to rely conclusively upon the certificate or representation of the General Partner to the effect that they are then acting as General Partner and upon the power and authority of the General Partner as herein set forth.

Sec. 2.04. **Activity of the General Partner.** The General Partner shall devote so much of its time to the affairs of the Partnership as in the judgment of the General Partner the conduct of the Partnership's business shall reasonably require, and the General Partner shall not be obligated to do or perform any act or thing in connection with the business of the Partnership not expressly set forth herein. Nothing herein contained shall be deemed to preclude the General Partner, or its affiliates, from engaging directly or indirectly, in any other business, irrespective of whether any such business is similar to the business of the Partnership or shall otherwise involve purchasing, selling or

holding securities or allocating assets to money managers; and nothing herein contained shall be deemed to preclude the General Partner or its affiliates from directly or indirectly purchasing, selling and holding securities or investing with money managers for the account of any such other business, or for its or their own accounts irrespective of whether any securities or interests in money managers are purchased, sold or held for the account of the Partnership, either directly or through an investment in a money manager. No Limited Partner shall by reason of being a Partner in the Partnership have any right to participate in any manner in any profits or income earned or derived by or accruing to any General Partner from the conduct of any business other than the business of the Partnership, from any transaction in Securities or any interest purchased in a money manager effected by any General Partner or an affiliate thereof for any account other than that of the Partnership.

Sec. 2.05.  **Exculpation.** No General Partner or any officer, director, employee or other agent of any of them ("Affiliates of the General Partner") shall be liable to any Partner or the Partnership for mistakes of judgment or for action or inaction which said person reasonably believed to be in the best interests of the Partnership, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any employee, broker, money manager or other agent of the Partnership, provided that such employee, broker, money manager or agent was selected, engaged or retained by the Partnership with reasonable care. The General Partner and the Affiliates of the General Partner may consult with counsel, advisers (investment and otherwise), and accountants in respect of Partnership affairs and shall be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel, advisers or accountants, provided that they shall have been selected with reasonable care. Notwithstanding any of the foregoing to the contrary, the provisions of this Sec. 2.05 shall not be construed so as to relieve (or attempt to relieve) any General Partner or any Affiliates of the General Partner of any liability, to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Sec. 2.05 to the fullest extent permitted by law.

Sec. 2.06.  **Indemnification of General Partner.** To the fullest extent permitted by law, the Partnership shall indemnify and hold harmless each General Partner and former General Partners, Affiliates of the General Partner and/or their legal representatives, of any of them from and against any loss or expense suffered or sustained by him, by reason of the fact that he is or was a General Partner of the Partnership or an Affiliate of the General Partner, including without limitation any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of

any actual or threatened action or proceeding provided, such loss or expense resulted from a mistake of judgment on the part of such person, or from action or inaction taken in good faith for a purpose which said person reasonably believed to be in the best interests of the Partnership. The Partnership shall, in the sole discretion of the General Partner, advance to any General Partner and to any of the Affiliates of the General Partner, and/or the legal representatives of any of them, reasonable attorney's fees and other costs and expenses incurred in connection with the defense of any action or proceeding which arises out of such conduct. The General Partner and the Affiliates of the General Partner, and the legal representative of any of them, shall agree, that in the event that he or it receives any such advance, such person shall reimburse the Partnership for such fees, costs and expenses to the extent it shall be determined that he or it was not entitled to indemnification under this section.

Sec. 2.07.     **Payment of Costs and Expenses.** The Partnership shall be responsible for all legal, accounting and other organizational fees and expenses incurred in connection with the formation of the Partnership and the offering and sale of the limited partnership interests, such amounts will be amortized among the Partners during the period of five years after the Partnership commences operations; provided that offering expenses in excess of $25,000 will be borne by the General Partner.

The General Partner shall bear all continuing offering costs and all expenses in maintaining the Partnership's offices (collectively, the "Offering and Office Expenses"). The Partnership shall bear, for each Accounting Period, all other expenses incurred in the operation of the Partnership, if any, including, taxes, the ordinary and necessary expenses directly related to the Partnership's investment and trading activities, including transactional costs (e.g., brokerage commissions and interest expense), escrow and custodial fees, registrar, transfer agent and administration fees, all legal, accounting and auditing fees, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Partnership; but excluding (x) fees charged to the Partnership by the various money managers receiving allocations of the Partnership's assets, and (y) any legal fees incurred in the continuation of the offering of interests in the Partnership.

The General Partner may elect to have the Partnership pay any operating expenses required to be borne by the General Partner and to charge the amount paid to the General Partner's Capital Account (as defined in Sec. 3.03).

## Capital Accounts of Partners
## and Operations Thereof

Sec. 3.01.  **Definitions.**  For the purposes of this Agreement, unless the context otherwise requires:

    (a)    The term "Accounting Period" shall mean a fiscal quarter of the Partnership.

    (b)    The term "Beginning Value" shall, with respect to any Accounting Period or month, mean the value of the Partnership's Net Assets at the beginning of such Accounting Period or month.

    (c)    The term "Ending Value" shall, with respect to any Accounting Period or month, mean the value of the Partnership's Net Assets at the end of such Accounting Period or month (before giving effect to withdrawals).

    (d)    The term "Quarterly Average Value" shall mean the sum of the Net Assets of the Partnership at (i) the opening of business on the first business day of a calendar quarter and (ii) the close of business on the last business day of such calendar quarter divided by two.  The term "Monthly Average Value" shall mean the sum of the Net Assets of the Partnership at the opening of business on the first business day of any month and the close of business on the last business day of said month divided by two.

    (e)    The term "Net Assets" shall mean the excess of the Partnership's assets over its liabilities.

    (f)    The term "Net Capital Appreciation" shall, with respect to any Accounting Period, mean the excess, if any, of the Ending Value over the Beginning Value;

    (g)    The term "Net Capital Depreciation" shall, with respect to any Accounting Period, mean the excess, if any, of the Beginning Value over the Ending Value.

Sec. 3.02.  **Capital Contributions.**  Each Partner has made an initial cash contribution to the Partnership in the amount set forth opposite such Partner's name in

Parts I or II of the Schedule (the "Initial Capital Contribution"). The General Partner has made Initial Capital Contributions and may make such additional Capital Contributions in the future and each Limited Partner's Initial Capital Contribution has been in an amount not less than $100,000, subject to authority of the General Partner, in its sole discretion, to accept Initial Capital Contributions of less than $100,000. Additional capital contributions may be made by Partners only in accordance with provisions of Sec. 3.03. Capital Contributions to the Partnership shall not bear interest.

Sec. 3.03.  **Capital Accounts.** A capital account (herein called the "Capital Account") shall be established on the books of the Partnership for each Partner. The Capital Account of each Partner shall be in an amount equal to such Partner's Initial Capital Contribution, adjusted as hereinafter provided. At the beginning of each Accounting Period, the Capital Account of each Partner shall be increased or decreased by the amount of any capital contribution to, or withdrawal from, the Partnership made by such Partner as of the first day of such Accounting Period. At the end of each Accounting Period, the Capital Account of each Partner shall be increased or decreased by the amount credited or debited to the Capital Account of such Partner pursuant to Sec. 3.05. In the event a Partner has either contributed or withdrawn capital during an Accounting Period, the adjustments and allocations set forth in Secs. 3.03 and 3.05 shall be made in accordance with Sec. 3.11.

Additional contributions to the Partnership may be made by Partners as of the first day of any calendar month, by notifying the General Partner of his or its desire to do so. The General Partner shall have the right to accept or decline any such additional contributions.

Sec. 3.04.  **Partnership Percentages.** A partnership percentage (herein called the "Partnership Percentage") shall be determined for each Partner for each Accounting Period by dividing the amount of each Partner's Capital Account at the beginning of such Accounting Period by the sum of the aggregate Capital Accounts of all Partners at the beginning of such Accounting Period. The sum of the Partnership Percentages shall equal 100 percent. The Partnership Percentages shall be set forth in the Schedule.

Sec. 3.05.  **Allocation of Net Capital Appreciation or Net Capital Depreciation.**

(a)  At the end of each Accounting Period, the Capital Account of each Partner (including the General Partners) for such Accounting Period shall be adjusted by crediting (in the case of Net Capital Appreciation) or debiting (in the case of Net Capital Depreciation) all Net Capital Appreciation or all Net Capital Depreciation (including the General Partner) in proportion to their respective Partnership

Percentages. Such allocations shall be tentative and subject to readjustment as provided in Sec. 3.05(b).

(b)    At the end of each Accounting Period, 20% of the Net Capital Appreciation allocated to a Limited Partner's Capital Account for such Accounting Period pursuant to Sec. 3.05(a) shall be reallocated to the Capital Accounts of the General Partner (the "Incentive Allocation"); provided, however, that such reallocation shall only be made to the extent that aggregate Net Capital Appreciation for the Accounting Period exceeds the unrecovered balance remaining in the Loss Recovery Account (defined below) maintained on the books and records of the Partnership for such Limited Partner.

Sec. 3.06.    **Loss Recovery Account.** There shall be established on the books of the Partnership for each Limited Partner a memorandum account (herein called the "Loss Recovery Account"), the opening balance of which shall be zero. At the end of each Accounting Period, the balance in each Limited Partner's Loss Recovery Account shall be adjusted as follows: (i) if there is Net Capital Depreciation for such Accounting Period, an amount equal to the Net Capital Depreciation allocated to such Limited Partner's Capital Account shall be charged to and increase such Limited Partner's Loss Recovery Account; or (ii) if there is Net Capital Appreciation for such Accounting Period, an amount equal to the Net Capital Appreciation before any Incentive Allocation to the General Partner, allocated to such Limited Partner's Capital account shall be credited to and reduce any unrecovered balance in such Limited Partner's Loss Recovery Account, but not below zero.

In the event that a Limited Partner with an unrecovered balance in his or its Loss Recovery Account withdraws all or a portion of his or its capital in the Partnership, the unrecovered balance in such Limited Partner's Loss Recovery Account shall be reduced as of the beginning of the next Accounting Period by an amount equal to the product obtained by multiplying the balance in such Limited Partner's Loss Recovery Account by a fraction, the numerator of which is the amount of the withdrawal made by such Limited Partner as of the last day of the prior Accounting Period and the denominator of which is the balance in such Limited Partner's Capital Account on the last day of the prior Accounting Period (prior to the withdrawal made by the Limited Partner as of the last day of the Accounting Period). Additional capital contributions shall not affect any Limited Partner's Loss Recovery Account.

Sec. 3.07.    **Valuation of Assets.**

(a)    Securities which are listed on a national securities exchange shall be valued

at their last sales prices on the date of determination on the largest national securities exchange on which such securities shall have traded on such date, or if trading in such Securities on the largest national securities exchange on which such Securities shall have traded on such date was reported on the consolidated tape, their last sales prices on the consolidated tape (or, in the event that the date of determination is not a date upon which a national securities exchange was open for trading, on the last prior date on which such securities was open not more than 10 days prior to the date of determination). If no such sales of Securities occurred on either of the foregoing dates, such Securities shall be valued at the "bid" price for long positions and "asked" price for short positions on the largest national securities exchange on which such securities are traded, on the date of determination, or, if "bid" prices for long positions and "asked" prices for short positions in such Securities on the largest national securities exchange on which such Securities shall have traded on such date were reported on the consolidated tape, the "bid" price for long positions and "asked" price for short positions on the consolidated tape (or, if the date of determination is not a date upon which such securities exchange was open for trading, on the last prior date on which such a national securities exchange was so open not more than 10 days prior to the date of determination). Securities which are not listed shall be valued at representative "bid" quotations if held long by the Partnership and representative "asked" quotations if held short by the Partnership, unless included in the NASDAQ National Market System, in which case they shall be valued based upon their last sales prices (if such prices are available). Securities for which no such market prices are available shall be valued at such value as the General Partners may reasonably determine.

(b)     Interests purchased in money manager entities shall be valued in accordance with the governing instruments of such entities at the end of the Partnership's fiscal year end date and based on estimates received from such entities if interim withdrawals or distributions are made.

(c)     All other assets of the Partnership including any investments with money managers not capable of valuation pursuant to subparagraphs (a) and (b) of this Sec. 3.07 (except good will, which shall not be taken into account), shall be assigned such value as the General Partner may reasonably determine.

(d)     If the General Partner determines that the valuation of any Securities or other property pursuant to Sec. 3.07 (a) or (b) does not fairly represent market value, the General Partner shall value such Securities or other property as they reasonably determine and shall set forth the basis of such valuation in writing in the Partnership's records.

(e)     All values assigned to Securities and other assets by the General Partner

pursuant to this Article III shall be final and conclusive as to all of the Partners.

Sec. 3.08.   **Liabilities.**   Liabilities shall be determined in accordance with generally accepted accounting principles, applied on a consistent basis, provided, however, that the General Partners in their discretion may provide reserves for contingencies.

Sec. 3.09.   **Allocation for Tax Purposes**.   For each fiscal year, items of income, deduction, gain, loss or credit shall be allocated for income tax purposes among the Partners in such manner as to reflect equitably amounts credited or debited to each Partner's Capital Account pursuant to Sec. 3.05 for the current and prior fiscal years. Such allocations shall be made pursuant to the principles of Section 704(c) of the Internal Revenue Code of 1986, as amended (the "Code"), and in conformity with Regulations Secs. 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(4)(i) promulgated thereunder, or the successor provisions to such Section and Regulations. Notwithstanding anything to the contrary in this Agreement, there shall be allocated to the Partners such gain or income as shall be necessary to satisfy the "qualified income offset" requirements of Regulation Sec. 1.704-1(b)(2)(ii)(d).

Sec. 3.10.   **Determination by General Partner of Certain Matters**.   All matters concerning the valuation of Securities and other assets of the Partnership, the allocation of profits, gains and losses among the Partners including taxes thereon, and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the General Partner, whose determination shall be final and conclusive as to all of the Partners.

Sec. 3.11.   **Adjustments to Take Account of Interim Accounting Period Events**. If a Partner shall make additional capital contributions to the Partnership, withdraw from the Partnership or make a withdrawal from his or its Capital Account as of a date other than the last day of an Accounting Period, the General Partners shall make such adjustments in the determination and allocation among the Partners of Net Capital Appreciation, Net Capital Depreciation, Capital Accounts, Partnership Percentages, items of income, deduction, gain, loss or credit for tax purposes and accounting procedures as shall equitably take into account such interim Accounting Period event and applicable provisions of law, and the determination thereof by the General Partner shall be final and conclusive as of all of the Partners.

### Withdrawals and Distributions
### of Capital

Sec. 4.01.

**Withdrawals and Distributions in General.** No Partner shall be entitled (i) to receive distributions from the Partnership, except as provided in Sec. 7.02; or (ii) to withdraw any amount from his or its Capital Account other than upon his or its withdrawal from the Partnership, except as provided in Sec. 4.02.

Sec. 4.02.

**Withdrawals.**

(a) Subject to Secs. 4.02(b), (c) and (d), at the end of each calendar month a Partner will have the right, upon 30 days' prior written notice to the General Partner, to withdraw all or any portion of his or its Capital Account. The Capital Account of a withdrawing Limited Partner shall be determined as of the effective date of his or its withdrawal, including deductions for accrued expenses and any accrued Incentive Allocation. Payment of any amount withdrawn at the end of any accounting period pursuant to this Sec. 4.02 shall be made within 20 business days after the end of the calendar month in which such withdrawal is made.

(b) With respect to the Capital Account of any foreign Partner, and notwithstanding any provision of this Agreement to the contrary, the General Partner shall withhold and pay over to the Internal Revenue Service, pursuant to Section 1441 of the Code, or any successor provision, at such times as required by such Section, such amounts as the Partnership is required to withhold under such Section 1441, as from time to time in effect, on account of such foreign Partner's distributive share of the Partnership's items of gross income which are subject to withholding tax pursuant to such Section. To the extent that a foreign claims to be entitled to a reduced rate of, or exemption from, U.S. withholding tax pursuant to an applicable income tax treaty, or otherwise, the foreign Partner shall furnish the General Partner with such information and forms as it may require and are necessary to comply with the regulations governing the obligations of withholding tax agents. Each foreign Partner represents and warrants that any such information and forms furnished by it shall be true and accurate and agrees to indemnify the Partnership and each of the Partners from any and all damages, costs and expenses resulting from the filing of inaccurate or

incomplete information or forms relating to such withholding taxes.

Any amount of withholding taxes withheld and paid over by the General Partner with respect to a foreign Partner's distributive share of the Partnership's gross income shall be treated as a distribution to such foreign Partner and shall be charged against the Capital Account of such foreign Partner.

Sec. 4.03.    **Limitation on Withdrawals**.  The right of any Partner to withdraw any amount from his or its Capital Account pursuant to the provisions of Sec. 4.02 is subject to the provision by the General Partner for (i) Partnership liabilities in accordance with generally accepted accounting principles, and (ii) reserves for contingencies, all in accordance with Sec. 3.08.  The unused portion of any reserve shall be distributed, with interest at the prevailing savings bank rate for unrestricted deposits from time to time in effect in New York, New York, as determined by the General Partner, after the General Partner has determined that the need therefor shall have ceased.

Sec. 4.04.    **Salaries or Other Payments or Allocations to the General Partner.**  Except for the Incentive Allocation, the Partnership shall not make any payments or allocations to the General Partner other than the allocation of Net Capital Appreciation (if any) to the General Partner in respect of its Partnership Percentage pursuant to Sec. 3.05(a), and reimbursement for certain allocable expenses.

## ARTICLE V

## Admission of New Partners

Sec. 5.01.    **New Partners**.  Partners may, with the consent of the General Partner, be admitted to the Partnership as of the beginning of each calendar month. Each new partner will be required to execute an agreement pursuant to which he or it becomes bound by the terms of this Agreement.  Admission of a new Partner shall not be cause for dissolution of the Partnership.

## Withdrawal, Death or Insanity of Partners

Sec. 6.01.     Withdrawal, Death, etc. of a General Partner.  The General
Partner may, upon 30 days' prior written notice to the Partnership,
withdraw from the Partnership at the end of any calendar month.
Upon the withdrawal of the General Partner from the Partnership, or
the death, disability, adjudication of incompetency, bankruptcy or
insolvency of Walter Noel, Jr. and Jeffrey Tucker, the Partnership
shall dissolve.  In the event that the Partnership is dissolved, one or
more persons selected by a majority in interest of the Limited
Partners shall terminate and wind up the affairs of the Partnership in
accordance with Sec. 7.02.

In the event of the death, disability, adjudication of incompetency,
bankruptcy or insolvency of Walter M. Noel, Jr. and Jeffrey Tucker,
or the giving of notice of withdrawal by the General Partner, the
interest of the General Partner shall continue at the risk of the
Partnership business until (i) the last day of the fiscal year in which
such event takes place (or such earlier date as shall be determined
by the General Partner) (herein called the "determination date") or,
(ii) the earlier termination of the Partnership.  If the Partnership is
continued after the expiration of the determination date, the General
Partner shall be entitled to receive within 90 days of the
determination date, in accordance with Sec. 6.02, the Capital
Account of the General Partner as of the effective date of the
General Partner's withdrawal as determined pursuant to Sec. 6.04
hereof.  The General Partner may withhold from such balance an
amount equal to the legal, accounting and administrative costs
associated with the General Partner's withdrawal, if it determines that
such costs should not be borne by the Partnership.  A General
Partner who serves notice of withdrawal, or a General Partner's legal
representative who serves such notice, shall have no right to take
part in the management of the business of the Partnership and the
interest or Partnership Percentage of such General Partner shall not
be included in calculating the interests of the Partners or General
Partners, respectively, required to take action under any provision of
this Agreement.

Sec. 6.02.     Withdrawal, Death, etc. of Limited Partner. A Limited Partner may,
upon 30 days' prior notice, withdraw from the Partnership at the end
of any Calendar Month of the Partnership. The aforementioned prior
notice and timing restrictions shall not apply to the withdrawal of

Andrew Goldstein as a Limited Partner, as provided in the Schedule to this Agreement. The withdrawal, death, disability, incompetency, bankruptcy, insolvency, termination or dissolution of a Limited Partner shall not dissolve the Partnership. Naustious

In the event of the death, disability, incompetency, bankruptcy, insolvency, termination or dissolution of a Limited Partner or the giving of notice of withdrawal by a Limited Partner, the interest of such Limited Partner shall continue at the risk of the Partnership business until (i) the last day of the calendar month in which such event takes place (or such earlier date as shall be determined by the General Partners) (herein called the "month of determination") or (ii) the earlier termination of the Partnership. If the Partnership is continued after the expiration of the month of determination, such Limited Partner or his legal representatives shall be entitled to receive within 90 days of the end of such Calendar Month (or earlier withdrawal date), the amount of the Capital Account of such Limited Partner as of the effective date of withdrawal as determined under Sec. 6.04. The interest of a Limited Partner who serves notice of withdrawal, dies or becomes disabled, incompetent, bankrupt, insolvent or is terminated or dissolved, or a Limited Partner's legal representative who serves such notice shall have no right to be included in calculating the Partnership Percentages of the Limited Partners required to take any action under this Agreement.

A Limited Partner who withdraws from the Partnership shall be paid 97% of his estimated Capital Account within 20 business days after the last day of the month of determination. The balance of such Limited Partner's Capital Account shall be paid (subject to audit adjustments and without interest) within 30 days after completion of the audit of the Partnership's books for the fiscal year of the quarter of determination pursuant to Sec. 8.01. The interest of a Limited Partner withdrawing pursuant to this paragraph shall not be included in calculating Partnership Percentages of the Limited partners required to take any action under this Agreement.

Sec. 6.03.  Required Withdrawals. The General Partner may (i) terminate the interest of any Limited Partner in the Partnership at the end of any calendar month, upon at least 10 days' prior written notice and (ii) terminate the interest of any Limited Partner at any time upon at least five days' prior written notice, if, among other reasons, the General Partner determines that the continued participation of such Limited Partner in the Partnership might cause the Partnership or any Partner to violate any law, or if any litigation is commenced or threatened against the Partnership or any Partner arising out of, or

relating to, the participation of such Limited Partner in the Partnership. A notice of termination pursuant to this Sec. 6.03 shall have the same effect as a notice of withdrawal by such Limited Partner pursuant to Sec. 6.02 and the Limited Partner receiving such notice shall be treated for all purposes and in all respects as a Limited Partner who has given notice of withdrawal.

Sec. 6.04.     **Effective Date of Withdrawal.**     The Capital Account of a withdrawing Limited partner shall be determined as of the effective date of his or its withdrawal, including deductions for accrued expenses and any accrued Incentive Allocation. For purposes of this Sec. 6.04, the effective date of a Limited Partner's withdrawal shall mean (as the case may be): (i) the last day of the calendar month in which such Partner shall cease to be a Partner pursuant to Sec. 6.02 or clause (i) of Sec. 6.03; or (ii) the date specified in the written notice referred to in clause (ii) of Sec. 6.03 if such Partner shall be required to withdraw from the Partnership pursuant to such clause. In the event the effective date of a Limited Partner's withdrawal shall be a date other than the last day of a calendar month of the Partnership, the effective date of such Limited Partner's withdrawal shall be deemed to be the last day of a calendar month for purposes of adjusting the Capital Account of the withdrawing Limited Partner pursuant to Sec. 3.05.

Sec. 6.05.     **Limitations on Withdrawal of Capital Account.**  The right of any withdrawn, deceased, disabled, incompetent, bankrupt, insolvent, terminated or dissolved partner or his legal representative to have distributed the Capital Account of such Partner pursuant to this Article VI is subject to the provision by the General Partner for all Partnership liabilities and for reserves for contingencies.    The unused portion of any reserve shall be distributed, with interest at the prevailing savings bank rate for unrestricted deposits from time to time in effect in New York City, as determined by the General Partner, after the General Partner shall have determined that the need therefor shall have ceased.

## ARTICLE VII

## Duration and Termination of Partnership

Sec. 7.01. **Duration.** The Partnership shall continue until December 31, 2112, unless sooner terminated pursuant to Sec. 6.01 or at any time, by decision of the General Partner.

Sec. 7.02. **Termination.** On termination of the business of the Partnership, the General Partner, or in the event of a termination pursuant to Sec. 6.01, the persons representing the Limited Partners shall, promptly after completion of a final audit of the Partnership's books and records (which shall be performed within 90 days of such termination) make distributions out of the Partnership assets, in the following manner and order:

(a) to payment and discharge of the claims of all creditors of the Partnership who are not Partners;

(b) . to payment and discharge pro rata of the claims of all creditors of the Partnership who are Partners; and

(c) to the Partners in the relative proportions that their respective Liquidating Shares bear to each other.

In the event that the Partnership is terminated on a date other than the last day of a fiscal year, the date of such termination shall be deemed to be the last day of an Accounting Period for purposes of adjusting the Capital Accounts of the Partners pursuant to Sec. 3.05. For purposes of distributing the assets of the Partnership upon termination, the General Partner shall be entitled to a return, on a pari passu basis with the Limited Partners, of the amounts standing to their credit its Capital Account, and, with respect to their share of profits, based upon their Partnership Percentages.

Sec. 7.03. **Method of Distribution.** Distributions made pursuant to subparagraphs (a) and (b) of Sec. 7.02 shall be made solely in cash.

## ARTICLE VIII

## Reports to Partners

Sec. 8.01.    **Independent Auditors.** The Partnership shall maintain true and complete books of account and records which shall be audited as of the end of each fiscal year by independent certified public accountants selected by the General Partner.

Sec. 8.02.    **Filing of Tax Returns.** The General Partner shall prepare and file, or cause the accountants of the Partnership to prepare and file, a federal information tax return in compliance with Section 6031 of the Code and any required state and local income tax and information returns for each tax year of the Partnership.

Sec. 8.03.    **Reports to Partners.** Within 90 days after the end of each fiscal year, the Partnership shall prepare, or cause to be prepared, and mail to each Partner, together with the report thereon of the independent certified public accountants selected by the General Partner, a financial report setting forth as of the end of each fiscal year:

    (a)    a profit and loss statement showing the results of operations of the Partnership together with the Net Capital Appreciation or Net Capital Depreciation of the Partnership;

    (b)    such Partner's Capital Account and the manner of its calculation; and

    (c)    such Partner's Partnership Percentage as of the end of such fiscal year.

Within 30 days following the end of each of the first Accounting Periods in each fiscal year, the Partnership shall prepare and mail to each Partner a report setting forth, as of the end of such Accounting Period, the information described in sub-paragraphs (a) and (b) above for such Accounting Period.

Sec. 8.04.    **Reports to Partners and Former Partners.** In addition, the independent certified public accountants selected by the General Partner shall prepare and mail (i) to each Partner and (ii) to each former Partner (or his legal representatives) to the extent necessary a report setting forth in sufficient detail such transactions effected by the Partnership during such fiscal year as shall enable such partner or former Partner (or his legal representatives) to prepare their respective federal income tax returns in accordance with the laws, rule and regulations then prevailing.

Sec. 8.05.    **Tax Matters Partner.** The General Partner shall at all times constitute, and have full powers and responsibilities as, the Tax Matters Partner of the Partnership with respect to such return for purposes of Section 6231(a)(7) of the Code. Each person (herein called a "Pass-Thru Partner") that holds or controls an interest as a Limited Partner on behalf of, or for the benefit of

another person or persons, or which Pass-Thru Partner is beneficially owned (directly or indirectly) by another person or persons shall" within 30 days following receipt from the Tax Matters Partner of any notice, demand, request for information or similar document, convey such notice or other document in writing to all holders of beneficial interests in the partnership holding such interests through such Pass-Thru Partner. In the event the Partnership shall be the subject of an income tax audit by any federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership.

## ARTICLE IX

### Miscellaneous

Sec. 9.01.   **General.**    This Agreement: (i) shall be binding on the executors, administrators, estates, heirs, and legal successors and representatives of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the State of Delaware; and (iii) may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart as of the day and year first above written, provided, however, that each separate counterpart shall have been executed by at least one of the General Partners and that the several counterparts, in the aggregate, shall have been signed by all the Partners. Except as otherwise provided herein, whenever any action is to be taken by the General Partners, it shall be authorized by a majority of the General Partners.

Sec. 9.02.   **Power of Attorney.** Each of the undersigned does hereby constitute and appoint Jeffrey H. Tucker and Walter M. Noel, Jr., acting individually; as his true and lawful representative and attorney-in-fact, in his name, place and stead to make, execute, sign and file:

   (a)   a Certificate of Limited Partnership of the Partnership and all amendments thereto as may be required under the Act or otherwise including, without limitation, any such filing for the purpose of admitting the undersigned and others as Limited Partners and describing their initial or any increased Capital Contributions;

   (b)   all amendments or modifications to the Partnership Agreement to the extent

provided in the last paragraph of this Sec. 9.02;

(c)    any and all instruments, certificates, and other documents which may be deemed necessary or desirable to effect the winding-up and termination of the Partnership (including, but not limited to, a Certificate of Cancellation of the Certificate of Limited Partnership); and

(d)    any business certificate, fictitious name certificate, amendment thereto, or other instrument or document of any kind necessary or desirable to accomplish the business, purpose and objectives of the Partnership, or required by any applicable federal, state or local law.

The power of attorney hereby granted by each of the Partners is coupled with an interest, is irrevocable, and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of such Limited Partner.

Such representative and attorney-in-fact shall not have any right, power or authority to amend or modify this Agreement when acting in such capacity, except in the case of an amendment or modification permitted without the approval of the Partners pursuant to Sec. 9.03 or approved by the requisite Partnership Percentages of the Partners.

Sec. 9.03.    <u>Amendments to Partnership Agreement</u>. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the written consent of Partners having in excess of 50% of the Partnership Percentages of the Partners and the written consent of the General Partner insofar as is consistent with the laws governing this Agreement, provided, however, that, without the specific consent of each Partner affected thereby, no such modification or amendment shall (i) reduce the Capital of any Partner or his rights of contribution or withdrawal with respect thereto; (ii) amend Sec. 3.05; or (iii) amend this Sec. 9.03, and provided, further, that without the consent of the Partners the General Partner may (i) amend the Agreement or Schedule hereto to reflect changes validly made in the membership of the Partnership and the Capital Contributions and Partnership Percentages of the partners; (ii) reflect a change in the name of the Partnership or the effective date of the Partnership; (iii) make a change that is necessary or, in the opinion of the General Partner, qualify the Partnership as a limited partnership or a partnership in which the Limited Partners have limited liability under the laws of any state, or ensure that the Partnership will not be treated as an association taxable as a corporation for federal income tax purposes; (iv) make a change that does not adversely affect the Partners in any material respect, or that is necessary or desirable to cure any ambiguity, to correct or supplement any provision in this Agreement that would be inconsistent with any other provision in this Agreement, or to make any other provision with respect to matters or questions arising under this Agreement that will

not be inconsistent with any other provisions of this Agreement, in each case so long as such change does not adversely affect the Partners; (vii) make a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any federal or state statute, so long as such change is made in a manner which minimizes any adverse effect on the Partners, or that is required or contemplated by this Agreement; (viii) make a change in any provision of this Agreement that requires any action to be taken by or on behalf of the General Partner or the Partnership pursuant to the requirements of applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required; or (ix) make any other amendments similar to the foregoing.

Sec. 9.04.    **Adjustment of Basis of Partnership Property.**    In the event of a distribution of Partnership property to a Partner or an assignment or other transfer (including by reason of death) of all or part of the interest of a Limited Partner in the Partnership, the General Partner, in their discretion, may cause the Partnership to elect, pursuant to Section 754 of the Code, or the corresponding provision of subsequent law, to adjust the basis of the Partnership property as provided by Sections 734 and 743 of the Code.

Sec. 9.05.    **Choice of Law.**    Notwithstanding the place where the Agreement may be executed by any of the parties thereto, the parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the State of Delaware and, without limitation thereof, that the Act as now adopted or as may be hereafter mended shall govern the partnership aspects of this Agreement.

Sec. 9.06.    **Inspection of Books and Records.**    The Partnership's books of account and records shall be available for inspection by any Partner during reasonable business hours at the office of the Partnership.

Sec. 9.07.    **Notices.**    Each notice relating to this Agreement shall be in writing and delivered in person or by registered or certified mail. All notices to the Partnership shall be addressed to its principal office and place of business. All notices addressed to a Partner shall be addressed to such Partner at the address set forth in the Schedule. Any Partner may designate a new address by notice to that effect given to the Partnership. Unless otherwise specifically provided in this Agreement, a notice shall be deemed to have been effectively given when mailed by registered or certified mail to the proper address or delivered in person.

Sec. 9.08.    **Goodwill.**    No value shall be placed on the name or goodwill of the Partnership, which shall belong exclusively to the General Partners.

Sec. 9.09.    **Headings**. The titles of the Articles and the headings of the Sections of this Agreement are for convenience of reference only and are not to be considered in construing terms and provisions of this Agreement.

IN WITNESS WHEREOF, the undersigned have hereto set their hands and seals as of the day and year first above written.

GENERAL PARTNER:                                    LIMITED PARTNERS:
FAIRFIELD GREENWICH LIMITED


By:_____                        _____
    Jeffrey H. Tucker, Vice President                Jeffrey H. Tucker,
                                                     Attorney-in-Fact,
                                                     pursuant to Power of
                                                     Attorney in Sec. 9.02
                                                     of the Amended and ·
                                                     Restated Limited
                                                     Partnership Agreement
                                                     dated January 1, 1995

**EXHIBIT 2**

**FINANCIAL STATEMENTS**

GREENWICH SENTRY, L.P.

FINANCIAL STATEMENTS

FOR THE YEAR ENDED DECEMBER 31, 1998

GREENWICH SENTRY, L.P.
FINANCIAL STATEMENTS
FOR THE YEAR ENDED DECEMBER 31, 1998

## CONTENTS

|  | Page |
|---|---|
| Independent Certified Public Accountant's Report | 1 |
| Balance Sheet | 2 |
| Statement of Income | 3 |
| Statement of Partners' Capital | 4 |
| Statement of Cash Flows | 5 |
| Notes to Financial Statements | 6-7 |

# Berkow, Schechter & Company
Certified Public Accountants
350 Bedford Street, Stamford, Connecticut 06901
Tel 203-356-1061      Fax 203-356-1283

Of Counsel
Harry Wilkov, CPA

## INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT'S REPORT

To the Partners of Greenwich Sentry, L.P.

We have audited the accompanying balance sheet of Greenwich Sentry, L.P. as of December 31, 1998 and the related statements of income, partners' capital and cash flows for the year then ended. These financial statements are the responsibility of the general partner. Our responsibility is to express an opinion on these financial statements based on our audit.

We have conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Greenwich Sentry, L.P. as of December 31, 1998, and the results of its operations and cash flows for the year then ended in conformity with generally accepted accounting principles.

*Berkow, Schechter & Company*

Berkow, Schechter & Company

February 22, 1999

## ASSETS

| | |
|---|---:|
| Cash in bank | $ 2,847,219 |
| Investment account - securities, at market value | 53,784,659 |
| TOTAL ASSETS | $56,631,878 |

## LIABILITIES AND PARTNERS' CAPITAL

| | |
|---|---:|
| Accrued expenses | $    6,000 |
| Partner subscriptions payable | 550,678 |
| Partners' capital | 56,075,200 |
| TOTAL LIABILITIES AND PARTNERS' CAPITAL | $56,631,878 |

GREENWICH SENTRY, L.P.
STATEMENT OF INCOME
FOR THE YEAR ENDED DECEMBER 31, 1998

| | |
|---|---:|
| Trading income | $ 6,353,816 |
| Treasury bill interest income | 1,323,628 |
| Dividend income | 258,820 |
| Interest income | 333 |
| | 7,936,597 |
| Professional fees | 6,300 |
| NET INCOME | $ 7,930,297 |

See notes to financial statements

### GREENWICH SENTRY, L.P.
### STATEMENT OF PARTNERS' CAPITAL
### FOR THE YEAR ENDED DECEMBER 31, 1998

| | Limited Partners | General Partner | Total |
|---|---|---|---|
| Partners' capital at December 31, 1997 | $37,635,959 | $ 4,313,825 | $41,949,784 |
| Cash contributions | 18,203,885 | 1,050,000 | 19,253,885 |
| Cash withdrawals | (12,129,036) | (929,730) | (13,058,766) |
| Net income allocated | 5,695,837 | 2,234,460 | 7,930,297 |
| Partners' capital at December 31, 1998 | $49,406,645 | $ 6,668,555 | $56,075,200 |

See notes to financial statements

4

CASH FLOWS FROM OPERATING ACTIVITIES

| | |
|---|---:|
| Net income | $ 7,930,297 |
| Net Cash Provided By Operating Activities | 7,930,297 |

CASH FLOWS FROM INVESTING ACTIVITIES

| | |
|---|---:|
| Cash Used For Investments | (12,036,448) |

CASH FLOWS FROM FINANCING ACTIVITIES

| | |
|---|---:|
| Partner contributions | 19,253,885 |
| 1999 Partner contributions received in 1998 | 550,678 |
| 1998 Partner contributions received in 1997 | (1,150,000) |
| Partner withdrawals | (13,058,766) |
| 1998 Partner withdrawals distributed in 1997 | 70,000 |
| Net Cash Provided By Financing Activities | 5,665,797 |
| Decrease in cash | 1,559,646 |
| Cash - Beginning of Year | 1,287,573 |
| CASH - END OF YEAR | $ 2,847,219 |

Supplemental Information
Cash paid during the year for:

| | |
|---|---:|
| Interest | $           - |
| Income taxes | - |

See notes to financial statements

### NOTE 1 - ORGANIZATION AND BUSINESS

The Partnership was organized as a limited partnership under the laws of the State of Delaware in November, 1992 and began operations on January 1, 1993.

The Partnership is managed by its general partner and is engaged in securities trading. The Partnership's investment objective is to achieve capital appreciation through the purchase and sale of these securities.

### NOTE 2 - ACCOUNTING POLICIES

Gains and losses from trading activity and valuations of securities and options are computed by marking to the market the value of all securities at the close of business. Cost of investments are determined on a specific identification basis.

Income and expenses are recorded on the accrual basis.

Income taxes are not levied against the Partnership. Each partner must include their share of the Partnership's taxable income or loss on their income tax return.

#### Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

### NOTE 3 - INVESTMENT ACCOUNT - SECURITIES

At December 31, 1998, securities owned by the Partnership were United States Treasury Bills, due March/April 1999, purchased on December 31, 1998 at a cost of $53,776,240. In addition, the investment account included United States Treasury money market funds of $8,419.

## NOTE 4 – ALLOCATION OF INCOME (LOSS) TO PARTNERS

Income (loss) of the Partnership is allocated to the
Partners at the end of each month in proportion to their
capital accounts (sum of cash contributions plus or minus
income or loss allocated through the end of the
immediately preceding month less redemptions and
distributions through the same date) at the beginning of
the allocation month.

## NOTE 5 – ALLOCATION OF NET CAPITAL APPRECIATION

At the end of each month, 20% of the capital appreciation
after expenses allocated to a limited partner's capital
account, is reallocated to the general partner. If there
is no capital appreciation in a given month, no reallocation
is made until there is net capital appreciation on a
cumulative basis, starting with the first month that no
reallocation was made.

## NOTE 6 – SUBSEQUENT EVENTS – PARTNERS' CAPITAL

In addition to the $550,678 limited partner capital
contributions reported on the December 31, 1998 balance
sheet as subscriptions payable, in January 1999, the
limited partners made capital contributions of $3,556,629.

In January 1999, the limited partners made capital
withdrawals of $2,692,500.

# GREENWICH SENTRY, L.P.

## SUBSCRIPTION DOCUMENTS

## GREENWICH SENTRY, L.P.
## INSTRUCTIONS FOR EXECUTION OF DOCUMENTS

Attached hereto are the subscription documents required to be executed by each subscriber for a limited partnership interest in Greenwich Sentry, L.P.

All documents should be completed and executed as set forth below.

### LIMITED PARTNER SIGNATURE PAGE

— Investor and spouse (if applicable) should sign, print name, address and social security number, and have their signature notarized.

### SUBSCRIPTION AGREEMENT AND SUITABILITY QUESTIONNAIRES

— Fill in name of investment advisor and affiliation on Page 1 (if applicable).

— Fill in compensation of investment advisor on page 2 (if applicable)

— Individual, corporate, partnership and trust investors should complete the information requested on pages 8, 9, 10 and 11 respectively, and sign and have their signatures notarized.

— Schedule A - Net Worth Statement and Miscellaneous Information should completed and signed by the Investor and spouse (if applicable).

### CHECK

— Investors who subscribe by check should make the check payable to "Greenwich Sentry, L.P."

### WIRE

— Investors may wire their subscription funds to the Greenwich Sentry, L.P. at: ABA No. 031-100-238;

> Morgan Guaranty Trust Company, 616 Madison Avenue,
> New York, New York, 10153; ABA No. 031-100-238; for account of Greenwich
> Sentry, L.P. Account No. 001-51804

### MAILING INSTRUCTIONS

After completion, all documents together with your check (if you subscribe by check) should be sent to: Mr. Jeffrey Tucker, c/o Fairfield Greenwich Group, 399 Park Avenue, New York, New York 10022

LIMITED PARTNER SIGNATURE PAGE

GREENWICH SENTRY, L.P.

# LIMITED PARTNER SIGNATURE PAGE

_____
Signature

_____
Name (please print)

_____
Joint Tenant, if any

_____
Print Joint Tenant, if any

_____
Address

_____
City, State and Zip Code

_____
Social Security Number or
Tax I.D. Number

_____
Joint Tenant S.S. #

SUBSCRIBED AND SWORN TO BEFORE ME

By _____

this _____ day of _____, 19__.

_____
Notary Public

My Commission Expires:

_____

# SUBSCRIPTION AGREEMENT AND SUITABILITY QUESTIONNAIRES

## GREENWICH SENTRY, L.P.

# GREENWICH SENTRY, L.P.

## SUBSCRIPTION AGREEMENT

### AND

## INVESTMENT REPRESENTATIONS OF LIMITED PARTNERS

Greenwich Sentry, L.P.

Gentlemen:

The undersigned recognizes that the purchase of Partnership Interests (the "Units") in Greenwich Sentry, L.P. (the "Partnership") involves a high degree of risk. He also acknowledges that there is no present public market for the Units, therefore (i) he may not be able to immediately liquidate his investment in the event of emergency, (ii) transferability is extremely limited, and (iii) in the event of a disposition he could sustain a loss. He acknowledges that he must be a qualified investor, as defined herein, to qualify for the purchase of the Units, that he must be able to fend for himself, and that he must be able to bear the economic risk of this investment.

The undersigned acknowledges that he has been provided with sufficient information to evaluate the merits and risks of a purchase of Units in the Partnership; that he has previously purchased unregistered securities; and that he recognizes the highly speculative nature of this investment and is able to bear the economic risk he hereby assumes and is able to find for himself.

In the event that the undersigned has employed the services of an investment advisor, attorney or accountant ("purchaser representative"), the undersigned hereby represents that his purchaser representative has been provided with sufficient information to evaluate the merits and risks of a purchase of Units in the Partnership and is qualified by training and experience in business and financial matters to evaluate the merits and risks of such an investment.

The name of my investor advisor, if any, is _____
_____. He is affiliated with _____
_____.

Further, the undersigned has been advised by his purchaser representative, if any, that no material relationship exists between the General Partner and said purchaser representative, nor has any material relationship existed between such parties for at least the past two years, nor will any compensation be paid to said advisor except as follows:

I understand that my execution of this Subscription Agreement is an express acknowledgement that my purchaser representative, if any, is receiving the compensation described above.

The undersigned hereby represents that he and his purchaser representative, attorney or accountant, if any, have been furnished, during the course of this transaction, by the General Partner of the Partnership with all information regarding the Partnership, which they have requested or desire to know; that all documents which could be reasonably provided have been made available for their inspection and review; and that such information and documents have, in their opinion, afforded the undersigned and his advisers, if any, with all of the same information that would be provided them in a registration statement filed under the Securities Act of 1933, that they have been afforded the opportunity to ask questions of and receive answers from the General Partner of the Partnership concerning the terms and conditions of the offering, and any additional information they requested.

This interest is being purchased for my own account for investment and not for distribution or resale to others. I agree that I will not sell or otherwise transfer these securities unless they are registered under the Securities Act of 1933, as amended, or unless an exemption from such registration is available. I represent that I have adequate means of provided for my current needs and possible personal contingencies, and that I have no need for liquidity of this investment.

It is understood that all documents, records and books pertaining to this investment have been made available for inspection to my attorney and/or my accountant and/or my purchaser representative and/or myself, and that the books and records of the issuer will be available upon reasonable notice for inspection by investors during reasonable business hours at its principal place of business.

I understand that the Units have not been registered under the Securities Act of 1933, as amended, by reason of a claimed exemption under the provisions of that Act which depends, in part, upon my investment intention. In this connection, I understand that it is the position of the Securities and Exchange Commission (the "Commission") that the statutory basis for such exemption would not be present if my representation merely meant that my present intention was to hold such Units for a short period and thereafter redeem or sell the Units. I realize that, in the view of the Commission, a purchase now with an intent to resell or redeem would represent a purchase with an intent inconsistent with my representation to you, and the Commission might regard such a disposition as a transaction to which the exemption is not available.

I consent that you may, if you desire, permit the transfer of the Units received out of my name only when my request for transfer is accompanied by an opinion of counsel for the Partnership or counsel for the General Partner that neither the sale nor the proposed transfer results in a violation of the Securities Act of 1933, as amended, or any applicable state "Blue Sky" Laws and that you may, in your discretion, deny permission for any such transfer if, in your opinion, such transfer would result in the Partnership being deemed a "publicly traded" limited partnership under the Internal Revenue Code of 1986, as amended.

The undersigned further represents and warrants that:

(a) he is acquiring the Units for investment and not with a view to resale, distribution, fractionalization or redemption;

(b) he can bear the economic risk of losing his entire investment;

(c) he meets any of the following conditions:

(i) if he is an individual, he (x) has a net worth, or joint net worth with his spouse, of at least $1,000,000 or (y) had an individual income in excess of $200,000 the two most recent years, or joint income with that person's spouse in excess of $300,000 in each of those years and reasonably expects to reach the same income level in the current year; (ii) if it is a corporation, partnership, trust or other entity, not formed for the specific purpose of acquiring an interest in the Partnership, it has assets in excess of $5,000,000; or (iii) if such investor is an entity, all of its equity owners are "accredited investors" as described above;

(d) his overall commitment to investments which are not readily marketable is not disproportionate to his net worth, and his investment in the Units will not cause such overall commitment to become excessive;

(e) he has adequate means of providing for his current needs and personal contingencies and has no need for liquidity in his investment in the Units;

(f) he has substantial experience in making investment decisions of this type or is relying on his own tax advisor and a purchaser representative (as hereinafter defined) in making this investment decision; and

(g) (if the subscriber is an Employee-Benefit Plan) in the event that the General Partner determines that the Partnership's assets constitute "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA") or that the transactions contemplated in the Memorandum constitute "prohibited transactions" under ERISA or the Internal Revenue Code and no exemption with respect thereto has been obtained, then upon notice from the General Partner, the plan agrees to redeem the Units.

I consent to the placement of a legend on any certificate or other document evidencing the Units that I have purchased stating that they have not been registered under the Securities Act of 1933 and setting forth or referring to the restrictions of transferability and sale thereof.

I am aware that you will make a notation in your appropriate records with respect to the restriction on the transferability of the Units.

It is understood that the General Partner will review this Subscription Agreement and are hereby

given authority by the undersigned to call his (its) bank or place of employment or otherwise review the financial standing of the undersigned; and it is further agreed that the General Partner reserves the unrestricted right to agree, to reject, or limit any subscription and to close the offer at any time.

The undersigned agrees to purchase from the Partnership the number of Units of limited partnership interests for a price of $100,000 per Unit as indicated on the signature page hereof on the terms and conditions set forth herein and in the Partnership Agreement and hereby tenders $100,000 per Unit as full payment of the subscription price. If the General Partner declines to accept this subscription, it will forthwith return such deposit to the undersigned without interest.

The undersigned agrees that the General Partner, on behalf of the Partnership, may, but shall not be obligated to, accept additional funds tendered by the undersigned for the purchase of Units. The undersigned hereby agrees that any such tender shall be on the same terms as contained in this Subscription Agreement, as though the undersigned executed and delivered to the Partnership with such tender an additional Subscription Agreement deemed to be the date of such tender and the amount of funds referred to in the Subscription Agreement Signature Page shall be deemed to be the amount of funds so tendered. Without limiting the generality of the foregoing, the undersigned hereby agrees that by so tendering additional funds, the undersigned will be affirming, as of the date of such tender, the truth and accuracy of each of the representations and warranties set forth herein.

The undersigned acknowledges that he is aware of the fact that the General Partner is relying upon his (its) representations relating to his (its) net worth and other information supplied to it including the information set forth in Schedule A attached hereto in order to determine his (its) suitability as an investor. He (it) further acknowledges that Schedule A was provided to the General Partner for review and approval prior to the offer made therein to him (it) as an investor. In view thereof, the undersigned represents and covenants that the information, supplied on Schedule A and otherwise supplied to the General Partner, does not omit any material item and is true, accurate and correct.

The undersigned (and each of them, if more than one) hereby gives to the General Partner the power of attorney contained in this paragraph and constitutes and appoints it, with full power of substitution and resubstitution, as his, its or their attorney-in-fact with full power and authority to act in the execution, completion and/or correction, in a manner consistent with the Memorandum, Subscription Documents executed and delivered by the undersigned in connection with the purchase of a limited partnership interest and with respect to the execution, acknowledgement, swearing to and filing of the following documents, subject to all of the provisions of the Partnership Agreement:

      (i)    The Partnership Agreement and any amendment thereto in accordance with the terms thereof, including without limitation, any amendment to cure any error, ambiguity or inconsistency therein, and in such form as shall be necessary under the laws of Connecticut to give effect to the provisions of the Partnership Agreement and to preserve the character of the Partnership a limited partnership, and any amended certificate of limited partnership

which complies with the Partnership Agreement, including any amendment to the certificate of limited partnership to reflect the admission of Additional Limited Partners (as that term is defined in the P rtnership Agreement or the substitution of a Limited Partner or General Partner in accordance with the provisions of the Partnership Agreement and to cause the withdrawal of any defaulting Limited Partner as described in the Partnership Agreement and under any security agreement entered into by the Partnership or its Partners.

(ii) Any instrument which the General Partner deems to be in the best interests of the Partnership to file and which is not inconsistent with the Partnership Agreement.

(iii) Any document which may be required to effect any amendment to the Partnership Agreement or any continuation, dissolution or termination of the Partnership which is in accordance with the terms of the Partnership Agreement.

(iv) Any document which may be required in connection with borrowings by the Partnership, including, without limitation, documents required by any financial institution.

(v) Any document which may be required in connection with any filings with state securities commissions or other state authorities.

(vi) Any document to withdraw the undersigned as a Limited Partner and transfer the undersigned's Units together with any other interest the undersigned may have in the Partnership to any person or entity (including the Partnership) which acquired such Units and interest following (1) the discovery by the General Partner that the undersigned has misrepresented
• his financial worth in this Agreement or any Subscription Document, or (2) the failure by the undersigned to fully complete this Agreement and the Subscription Documents.

(vii) Any amendments or modifications of the documents and instruments described in this power of attorney.

This power of attorney is a special power of attorney coupled with an interest which is irrevocable and shall survive the death or incapacity of the undersigned. Further, it may be exercised by any of the General Partners, as attorney-in-fact. This power of attorney shall survive the delivery of an assignment by the undersigned of the whole or any portion of his Unit; except that where the assignee thereof has been approved by the General Partners for admission to the Partnership as a substituted Limited Partner, this power of attorney given by the assignor shall survive the delivery of such assignment for the sole purpose of enabling the General Partner to execute, acknowledge, swear to and file any instrument necessary to effect such substitution.

No document or amendment executed by the General Partners pursuant to this power of attorney shall, in the absence of the prior consent of all of the Limited Partners, (i) reduce the obligations of the General Partner, (ii) affect the rights or restrictions regarding the assignability of Units, (iii) modify the term of the Partnership, (iv) amend this power of attorney, or (v) except as specifically provided in this power of attorney, reduce the Units or enlarge the monetary obligations of the undersigned.

**FOR RESIDENTS OF ALL STATES:** The Units offered hereby have not been registered under the Securities Act of 1933, as amended or the securities laws of certain states and are being offered and sold in reliance on exemptions from the registration requirements of said act and such laws. The interests are subject to restriction on transferability and resale and may not be transferred or resold except as permitted under said act and such laws pursuant to registration or exemption therefrom. The interests have not been approved or disapproved by the Securities and Exchange Commission, any state securities commission or other regulatory authority, nor have any of the foregoing authorities passed upon or endorsed the merits of this offering or the accuracy or adequacy of the memorandum. Any representation to the contrary is unlawful.

**FOR FLORIDA RESIDENTS ONLY:** The Units referred to in this Agreement will be sold to, and acquire by, the holder in a transaction exempt under Section 517.061 of the Florida Securities Act. The Units have not been registered under said Act in the State of Florida. In addition, all Florida Residents shall have the privilege of voiding the purchase within three (3) days after the first tender of consideration is made by such purchaser to the issuer, an agent of the issuer or an escrow agent, or within 3 days after the availability of this privilege is communicated to such purchaser, whichever occurs later.

**FOR NEW YORK RESIDENTS ONLY:** This interest is being purchased for my own account for investment and not for distribution or resale to others. I agree that I will not sell or otherwise transfer these securities unless they are registered under the Securities Act of 1933 or unless an exemption from such registration is available. I represent that I have adequate means of providing for my current needs and possible personal contingencies, and that I have no need for liquidity of this investment.

**PENNSYLVANIA SUBSCRIBERS.** If the undersigned subscribes to purchase the Units within the Commonwealth of Pennsylvania, he is advised that, pursuant to Setion 207(m) of the Pennsylvania Securities Act of 1972, he shall have the rights to withdraw his subscription and receive a full refund of any consideration paid, without incurring any liability, within two business days after he delivers this Agreement. If the Pennsylvania subscriber wishes to exercise such right of withdrawal, he should notify Jeffrey H. Tucker (203-661-2595) by telephone of his intention to withdraw and he must confirm this oral notification in writing by sending a letter or telegram to Greenwich Sentry, L.P., 2 Soundview Drive, Greenwich, Connecticut 06830. If such a letter is sent, it should be by certified mail, return receipt requested, to ensure that it is received and to evidence the time it is mailed. _If the undersigned is a resident of the Commonwealth of Pennsylvania, he hereby agrees not to sell the interest for a period of 12 months commencing with the Closing Date._

## SUBSCRIPTION AGREEMENT SIGNATURE PAGE
## FOR INDIVIDUAL INVESTORS

Executed this _____ day of _____, 19_____ at _____.

Number of Units Subscribed For:

_____ Units at $100,000 per Unit: $ _____ Total

_____
(Signature of Subscriber)

_____
(Printed Name of Subscriber)

_____
(Signature of Spouse, or other
joint tenant, if any)

_____
(Printed Name of Spouse, or
other joint tenant, if any)

| | |
|---|---|
| SUBSCRIBED and SWORN to before me this _____ day of _____, 19___.<br><br><br>_____<br>Notary Public in and for the State of _____,<br>County of _____. | Check Appropriate Space<br><br>☐ Individual Ownership<br><br>☐ Joint Tenants with<br>   Right of Survivorship<br><br>☐ Tenants in Common<br><br>☐ Community Property<br><br>☐ Other: _____ |

Approved and accepted as of this _____ day of _____, 19_____.

GREENWICH SENTRY, L.P.
a Delaware limited partnership

By:     Fairfield Greenwich Limited,
         General Partner

By: _____
     Vice President

## SUBSCRIPTION AGREEMENT SIGNATURE PAGE
## FOR CORPORATE INVESTORS

Executed this _____ day of _____, 19 ___ at _____.

Number of Units Subscribed For:

_____ Units at $100,000 per Unit: $_____ Total

_____
Name of corporation (please print or type)

_____
Date corporation was formed

By: _____
    Signature of authorized agent

Title:_____

Taxpayer Identification No.: _____

### NOTARIZATION

State of          )
                 ) ss.:
County of       )

On this ___ day of _____, 19 ___, before, me the undersigned, a Notary Public of said State, duly commissioned and sworn, personally appeared _____, known to me to be the _____ _____ of the corporation that executed the within instrument, and who, being sworn by me, did acknowledge that said corporation executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public in and for said State

Approved and accepted as of this ____ day of _____, 19 __.

                    GREENWICH SENTRY, L.P.
                    a Delaware limited partnership

        By:    Fairfield Greenwich Limited
                  General Partner

        By:    _____
                  Vice President

## SUBSCRIPTION AGREEMENT SIGNATURE PAGE
## FOR PARTNERSHIP INVESTORS

Executed this _____ day of _____, 19___ at _____.

Number of Units Subscribed For:

_____ Units at $100,000 per Unit: $_____ Total

_____
Name of partnership (please print or type)

_____
Date partnership was formed

By: _____
   Signature of authorized agent

Title:_____

Taxpayer Identification No.: _____

### NOTARIZATION

State of          )
                  ) ss.:
County of       )

On this _____ day of _____, 19___, before, me the undersigned, a Notary Public of said State, duly commissioned and sworn, personally appeared _____, known to me to be a partner of the partnership that executed the within instrument, and who, being sworn by me, did acknowledge that he had the authority to execute such document and that said partnership executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public in and for said State

Approved and accepted as of this _____ day of _____, 19 __.

                         GREENWICH SENTRY, L.P.
                         a Delaware limited partnership

          By:    Fairfield Greenwich Limited
                    General Partner

          By:   _____
                    Vice President

## SUBSCRIPTION AGREEMENT SIGNATURE PAGE
## FOR TRUST INVESTORS

Executed this _____ day of _____, 19___ at _____.

Number of Units Subscribed For:

_____ Units at $100,000 per Unit: $_____ Total

_____
Name of Trust (please print or type)

_____
Date Trust was formed

By: _____
    Signature of authorized agent

Title: _____

Taxpayer Identification No.: _____

### NOTARIZATION

State of            )
                ) ss.:
County of        )

On this ___ day of _____, 19_____, before, me the undersigned, a Notary Public of said State, duly commissioned and sworn, personally appeared _____, known to me to be the trustee(s) of the Trust that executed the within instrument, and who, being sworn by me, did acknowledge that said Trust executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public in and for said State

Approved and accepted as of this _____ day of _____, 19 __.

                         GREENWICH SENTRY, L.P.
                         a Delaware limited partnership

         By:    Fairfield Greenwich Limited
                     General Partner

         By:    _____
                     Vice President

## NET WORTH STATEMENT AND MISCELLANEOUS
## INFORMATION RELATING TO:

### MISCELLANEOUS INFORMATION

Name(s):

Present Address:

Mailing Address (if different):

So. Sec. or Tax Identification No.:

So. Sec. No. of Joint Tenant, if any:

Date of Birth:

Place of Employment:

     Business Name:
     Address:
     Tel. No.:
     Type of Business:

Position Held at Place of Employment:

Bank or Banks at Which Checking Accounts are Located:
     Name or names of Banks:

     Branch Address or Addresses:

     Persons at Bank or Banks to
     Contact and Telephone No.:

Banks or Banks at Which Savings Accounts are located:
     Name or Names of Banks:

     Branch Address or Addresses:

     Persons at Bank or Banks to
     Contact and Telephone No.:

Previous Partnerships in Which Investments (in unregistered private placements) Have Been Made: (Note: These may include real estate, oil, mineral or any other kind or type of partnership business conducted by a partnership):

| Sponsor | Type of Business | Amount of Investment |
|---|---|---|

Corporate Entities in Which Investments (in unregistered private placements) Have Been Made:

| Type of Business | Amounts of Investment |
|---|---|

## NET WORTH, ASSETS AND NET INCOME

Net Worth (for individuals):

The net worth of the undersigned individual (except where noted, excluding home, home furnishings or automobiles)

Exceeds $1,000,000                      $500,000 or more
        $500,000 or more
        (including home,                                                □

home furnishings                □
and automobiles)

$750,000 or more                        Less than $500,000
                                                                □
                        □

The above net worth takes into account my current assets, other assets diminished by my current liabilities and other liabilities including contingent liabilities such as threatened or pending lawsuits and proceedings.

Assets (For corporation, partnerships, trusts and other entities):

The undersigned corporation, partnership, trust or other entity has assets in excess of $5,000,000.

YES ☐        NO ☐

---

All assets included in the computations represents either (i) real estate, shares of stocks, other securities or other personal property to which legal and equitable title is solely in the name of the undersigned or represents my proportionate interest therein or (ii) my joint net worth with my spouse.

All values are taken in at current market value.

My individual income or joint income with my spouse (from business, wages and investments) for the past two complete years was as follows:

## INDIVIDUAL

| Last Year | Two Years Ago |
|---|---|
| / /  in excess of $200,000 | / / in excess of $200,000 |
| or | or |
| / /  in excess of $100,000 | / /  in excess of $100,000 |
| or | or |
| / /  less than $100,000 | / /  less than $100,000 |

I anticipate that my income for the current year ended December 31 will be as follows:

/ /  in excess of $200,000
or
/ /  in excess of $100,000
or
/ /  less than $100,000

A-3
