# Tab 1

Dockets.Justia.com

<u>**CURRICULUM VITAE**</u>

**Gerard St. Clair Farara, QC**
**P.O. Box 144**
**Road Town, Tortola**
**British Virgin Islands**

- **Personal Details**

| | |
|---|---|
| Date of Birth | 31st August 1954 |
| Place of Birth | Tortola, British Virgin Islands |
| National Status | Citizen of the United Kingdom and Belonger of the British Virgin Islands |

- **Education**

| | |
|---|---|
| 1971 | British Virgin Islands Secondary School and British Virgin Islands High School |
| 1975 | University of the West Indies LL.B. (Hons) Second Class Honours, Upper Division |
| 1977 | Norman Manley Law School (Jamaica, W.I.) Legal Education Certificate (LEC) |

- **Admissions**

| | |
|---|---|
| October 3, 1977 | Called to the Bar as Barrister at Law |
| 23rd December, 1996 | Elevated to rank of Queen's Counsel |

- **Work Experience**

| | |
|---|---|
| 1977 to 1978 | Crown Counsel, Attorney General's Chambers, Tortola, British Virgin Islands |
| 1978 to 1985 | Associate lawyer at Chambers of J. S. Archibald & Co. Tortola, British Virgin Islands |
| 1985 to Present | Started own law practice (24 years ago), now known as Farara Kerins |

- **Legal Practice**

Extensive practice and experience in multiple areas of law (contentious and non-contentious matters) including civil, commercial, corporate and criminal litigations before all Courts of British Virgin Islands and other Caribbean countries. Has appeared as counsel or co-counsel in many reported and unreported cases before the High Court and Court of Appeal of the Eastern Caribbean Supreme Court, and the Privy Council in England.

Represents major international and local clients including professional, banking and financial institutions and investors.

Is currently a legal adviser to several statutory corporations in BVI.

- **Previous Positions Held**

| | |
|---|---|
| Chairman | BVI Recreation Trust |
| Member | Public Service Commission, Library Committee, Public Transport Commission and BVI Electricity Corporation |
| Secretary | BVI Bar Association |
| President | Rotary Club of Tortola |
| Assistant Governor | Rotary District 7020 for the British Virgin Islands (2004-2007) |
| Chairman | Social Security Board Appeals Tribunal from 1st November, 1998 to January 2008 |
| Chairman | Constitutional Review Commission 2005 |
| Member | BVI Constitutional Negotiating Team 2006 to 2007 |
| Chairman | Ad hoc Committee to Review Immigration and Passport Act 1977 |
| Member | Governor's Committee and Chief Justice's Focus Committee to look into the feasibility of establishing a Commercial Court in the British Virgin Islands |
| Member | Committee to draft rules for new Commercial Court Division |
| Chairman | St. George's Secondary School Expansion Committee |
| Chairman pro tem | Main Street Focus Group to draft constitution for Main Street Association. |
| Member | Board of Cedar School |

- **Current Positions Held**

  Deputy Chairman                  Law Reform Commission from April 2002  to  present

  Trustee and Chairman         Henry Osmond Creque Educational Trust established April, 2002

  Founding Chairman            St. George's Secondary School.

  Founding President             Main Street Association.

- **Judicial Appointments**

  Served as Justice (High Court Judge) of Eastern Caribbean Supreme Court (acting appointments), assigned to St. Lucia in 1997 and Grenada in 2001

- **Membership - Legal Bodies**

  British Virgin Islands Bar Association
  World Jurist Association
  International Bar Association
  Commonwealth Bar Association

- **Membership - Civic Organizations**

  Member                       Rotary Club of Tortola (over 25 years) and the Main Street Association

- **Awards**

  Paul Harris Fellow – highest award in Rotary.

  Most Outstanding Past President – Rotary Club of Tortola 2002-2003

- **Major Speeches**

  Address "Legal Aspects of Police Duties and Powers and the Rights of the Citizen" at Briercliffe Hall as panellist during Police Week 1992

  Featured Speaker at the Banquet marking the 21st Anniversary Reunion of 1977 Graduating Class of the Norman Manley Law School in Jamaica in 1998

Address "The current relationship between the British Virgin Islands and the United Kingdom" at ceremony in BVI marking 50th Anniversary of the University of the West Indies

Lecture "Recent Constitutional Changes in the British Virgin Islands" delivered to inaugurate the McW. Todman Public Lecture Series of the BVI Bar Association October 2000

Delivered the featured address at the 2001 Matriculation Ceremony at the Cave Hill Campus of the University of the West Indies

- Research Papers

"Enhancing Good Governance by Curbing Corruption" presented at Conference of the Caribbean, the Americas and the Atlantic Region of the Commonwealth Parliamentary Association held July 2002 in British Virgin Islands

"Constitutional and Political Development in the British Virgin Islands 1950 to 2000" published in book commemorating 50th Anniversary of Ministerial Government in BVI



**Tab 2**



[2000] 1 W.L.R. 594                                                                                     Page 1
[2000] 1 W.L.R. 594 (2000) 144 S.J.L.B. 81 [2000] 1 W.L.R. 594 (2000) 144 S.J.L.B. 81 **(Cite as: [2000] 1 W.L.R. 594)**

### Arklow Investments Ltd v Maclean

Privy Council

Lord Steyn, Lord Lloyd, Lord Hobhouse, Sir Andrew
Leggatt, and Henry J.

1999 Oct. 11, 12, 13, 14; Dec. 1

Confidential Information—Breach of confidence—
Recipient's duty—Potential client disclosing to mer-
chant bankers confidential information concerning
proposed scheme for purchasing island—Bankers not
retained to assist in raising finance—Bankers broker-
ing acquisition by other purchasers—Whether breach
of fiduciary duty—Whether breach of duty not to
misuse confidential information

The second plaintiff was interested in purchasing an
island, intending to develop the land for residential,
recreational and resort uses. He formed the first
plaintiff company for that purpose. On behalf of the
plaintiffs F., a group of companies which operated a
merchant banking business, was approached with a
view to it giving possible assistance in obtaining
finance for the project. Confidential information
about the project was disclosed to F. A proposal was
sent by F. to the plaintiffs setting out the terms on
which F. would provide services for them. Those
terms were not acceptable and the plaintiffs tried to
find alternative sources of financial assistance. F.
subsequently withdrew its offer and negotiated ar-
rangements with others for the purchase of the island
leading to its eventual sale. The plaintiffs instituted
proceedings against F. and others involved in the
subsequent acquisition of part of the assets. On trial
of preliminary issues the judge held that F. had acted
in breach of a fiduciary duty owed to the plaintiffs,
and in breach of its duty not to misuse confidential
information received from the plaintiffs. The Court of
Appeal of New Zealand, by a majority, reversed that
decision holding that no actionable breach of either
duty had been established.

On the plaintiff's appeal to the Judicial Committee:-

*Held*, dismissing the appeal, (1) that the only

relationship between the plaintiffs and F. was that
created by the giving and receipt of confidential in-
formation, which the plaintiffs had not relied upon as
being sufficient by itself to create a relationship of
trust and confidence; and that, since F. had not ex-
pressly or impliedly undertaken any obligation to act
on behalf of the plaintiffs and had no authority to do
so, and since there had been no informal arrangement
or continuing course of conduct between them, there
was no mutuality which could give rise to the under-
taking or imposition of a fiduciary duty of loyalty to
the plaintiffs not to promote or become involved in a
competitive acquisition of the island (post, p. 600A–
D ).

Dicta of Millett L.J. in .

(2) That the plaintiffs had failed to prove that
F. had used confidential information received from
the plaintiffs and such use could not be inferred; that,
even if F.'s knowledge that the plaintiff's scheme was
at a relatively advanced stage had stimulated F. into
negotiating the arrangements which had resulted in
the eventual sale of the island, the plaintiff's pros-
pects **\*595** of purchasing the island had
not been shown to have been adversely affected by
F.'s use of that knowledge, and so the plaintiff's claim
for misuse of confidential information failed (post,
pp. 601H–602A ).

Decision of the . The following
cases are referred to in the judgment of their Lord-
ships:

.

The following additional cases were cited in argu-
ment:

; sub nom.

**\*596**

Appeal (No. 17 of 1999) with leave of the Court
of Appeal of New Zealand by the plaintiffs, Arklow
Investments Ltd. and Christopher Mark Wingate,
from the judgment of the (Richardson P.,

Copr. © West 2009 No Claim to Orig. Govt. Works

[2000] 1 W.L.R. 594

Page 2

[2000] 1 W.L.R. 594 (2000) 144 S.J.L.B. 81 [2000] 1 W.L.R. 594 (2000) 144 S.J.L.B. 81 **(Cite as: [2000] 1 W.L.R. 594)**

Gault, Keith and Blanchard JJ., Thomas J. dissenting) given on 16 July 1998 allowing an appeal by the defendants, Ian Duart Maclean, Ian Wilson Smith, Frank Clifford Graham, Donald Edmund Walkington, Murray Charles Radford, FAR Financial Consultants Ltd., Finance and Resources Ltd., FAR Forestry Investments Ltd., Ernslaw One Ltd., ITT Rayonier Ltd., Caldora Holdings Ltd., Ngai Terangi Iwi Inc. Society, Te Kotukutuku Corporation Ltd., Matakana Island Trust Inc., Matakana Island Ltd., Minuteman Holdings Ltd. and Blakely Pacific Ltd., from the judgment of Temm J. delivered on 5 May 1997 in the High Court of New Zealand on trial of preliminary issues. Temm J. had ruled that (1) the sixth defendant, FAR Financial Consultants Ltd., owed a fiduciary duty to the plaintiffs and had breached that duty; and (2) the sixth defendant had received the information which the plaintiffs claimed to have conveyed, that information was confidential, the sixth defendant was in breach of an obligation not to use the information other than for the purposes for which it had been conveyed, and the plaintiffs had suffered loss or damage and hence detriment as a result of the actions of the sixth defendant.

At the close of the hearing Lord Steyn announced that their Lordships would recommend that the appeal should be dismissed for reasons to be delivered later.

The facts are stated in the judgment of their Lordships.

Nicholas Underhill Q.C. , Jim Evans (of the New Zealand Bar) and Philippa Hamilton for the plaintiffs. John Eichelbaum (of the New Zealand Bar) for the second, third and sixth to eighth defendants. John Moody (of the New Zealand Bar) for the tenth defendant. Alan Galbraith Q.C. , Julie Maxton and David Abbott (all of the New Zealand Bar) for the eleventh to fourteenth and sixteenth defendants. The other defendants did not appear and were not represented.

*Cur. adv. vult.* Henry J.

1 December. The judgment of their Lordships was delivered by

On 14 October 1999 at the conclusion of the hearing their Lordships agreed humbly to advise Her Majesty that the appeal should be dismissed and that they would give their reasons later. This they now do.

The appeal is from a judgment of the . It raises issues relating to the concept of fiduciary duty, and results from the sale of Matakana Island, which lies across the entrance to Tauranga Harbour on the eastern coast of the North Island of New Zealand. A forest, consisting mainly of radiata pine, extends over much of the area of the island, which approximates 4,300 hectares. The vendor of the sale in question was Matakana Forest Ltd., which had been placed in receivership in October 1990. The receivers put the island up for sale in February 1991, and it remained on the market until the sale was negotiated in late 1992. During that year milling of the mature trees was in operation. **\*597**

The relevant facts are fully set out in the majority judgment of Richardson P., Gault and Keith JJ. delivered by Gault J., and need not be repeated in detail. They are also reviewed comprehensively by Thomas J. in his dissenting judgment. The background to the proceedings can be stated quite briefly. The appellant plaintiff Mr. Wingate had become interested in the purchase of Matakana Island in July 1991, his intention being to develop the land for residential, recreational and resort uses. Arklow Investments Ltd. was to be the vehicle for this venture. On 15 June 1992, the FAR group of companies, which operated a merchant banking business, were approached on behalf of Mr. Wingate with a view to obtaining the group's assistance in raising finance to enable the proposal to proceed. Mr. Wingate had previously employed another merchant banker, Fay Richwhite & Co. Ltd., for that purpose but their relationship had been terminated. On 16 June 1992, in response to that approach FAR made a written proposal setting out the terms on which it would accept appointment. Those terms were not acceptable to Mr. Wingate, and on 15 July 1992 FAR gave written notice of withdrawal of its mandate offer. FAR proceeded to broker arrangements with other parties for the purchase of the island, which ultimately led to the February 1993 sale now in question. The transaction initially comprised a composite arrangement, under which ITT Rayonier Ltd. had acquired the forestry right to the mature standing timber, Ernslaw One Ltd. acquired the land,

Copr. © West 2009 No Claim to Orig. Govt. Works

[2000] 1 W.L.R. 594

Page 3

[2000] 1 W.L.R. 594 (2000) 144 S.J.L.B. 81 [2000] 1 W.L.R. 594 (2000) 144 S.J.L.B. 81 **(Cite as: [2000] 1 W.L.R. 594)**

the remaining timber and some associated assets, and a FAR group member company acquired the balance of the assets, particularly the mill and the mill land. The total purchase price was $20.7m., of which $50,000 was paid by the FAR interests. This transaction, originally negotiated in November 1992, was restructured to overcome statutory requirements governing acquisition by overseas interests. There has also been a subsequent re-arrangement of interests which are not relevant to matters now in issue. In broad terms the plaintiffs, for convenience referred to as Arklow, contend that in taking the actions it did leading to the November 1992 transaction, FAR breached its fiduciary duties to Arklow. Two separate causes of action were pleaded in that respect.

In an interim judgment delivered in the High Court on 5 May 1997, Temm J. answered a series of specific questions governing the issue of liability. They were framed:  "1.

In relation to the cause of action of breach of fiduciary duty owed by FAR to Arklow/Wingate: (a) whether the FAR interests owed a fiduciary duty to the plaintiffs and (b) if there was a fiduciary duty, did FAR breach any fiduciary duties."2.

In relation to the cause of action of misuse of confidential information: (a) as to whether FAR Financial and/or other of the FAR interests received confidential information: (i) whether those defendants received the information which the plaintiffs claim to have conveyed; (ii) whether such information as they did receive was confidential; (b) whether the FAR interests were under an obligation not to use the information received by them other than for the purposes for which it was conveyed; (c) if the FAR interests received confidential information, and were under an obligation not to use it other than for the purposes for which it was conveyed, whether they did use it other than for the purposes for which it was conveyed; (d) if detriment to the plaintiff is a relevant ingredient of a cause of action founded in breach of confidence—w h e t h e r   o r   n o t   Arklow/Wingate **\*598** suffered any loss or damage, and hence any detriment, as a result of the FAR actions."

Temm J. answered all questions in the affirmative. In the Court of Appeal, the majority judgment delivered by Gault J. considered the separate issues of breach

of fiduciary duty not to promote or become involved in a competitive acquisition of Matakana Island, and of breach of the duty not to misuse confidential information. They held that the evidence did not establish that there was an actionable breach of either duty. Blanchard J. held that there were breaches of those or similar duties, but that they were relatively minor and not causative of any loss to Arklow. In his dissenting judgment, Thomas J. took the view that FAR owed Arklow a duty not to act contrary to Arklow's interests, that it had done so in breach of that duty, and further that FAR had misused information which was confidential to Arklow.

Although their Lordships heard extensive argument on both the nature and extent of fiduciary duties and the facts of the case, they have reached the conclusion that the real issues on appeal fall within a rather narrow compass which can be resolved without the need for either a comprehensive or detailed consideration of the law or a close review of the evidence. In the course of his argument, Mr. Underhill for Arklow stressed that in this case there was a considerable overlap between the duty "not to be disloyal" and the duty to respect confidence. It was clear however, that as in the Court of Appeal and in the High Court, a major plank in Arklow's case was that FAR did have a fiduciary duty which was wider than the duty not to misuse confidential information, and extended in the circumstances to that described by Gault J. as one not to promote or become involved in a competitive acquisition of Matakana Island whether or not confidential information had been used. It is immediately apparent that protection of confidential information may be involved in or form an integral part of such a duty, and misuse may be evidence of a breach of that duty. But as the case was pleaded and argued on the basis that there was a duty which was actionable for breach in the absence of any misuse of confidential information, it is necessary to consider that contention. The first issue therefore is whether FAR owed a fiduciary duty of that nature to Arklow.Duty of loyalty

The description of the duty under consideration as being one of loyalty was not seen by Mr. Underhill as being the most appropriate one, but for present purposes it is convenient to label it in that way. In the present context, the concept encaptures a situation where one person is in a relationship with another which gives rise to a legitimate expectation, which

[2000] 1 W.L.R. 594

Page 4

[2000] 1 W.L.R. 594 (2000) 144 S.J.L.B. 81 [2000] 1 W.L.R. 594 (2000) 144 S.J.L.B. 81 **(Cite as: [2000] 1 W.L.R. 594)**

equity will recognise, that the fiduciary will not utilise his or her position in such a way which is adverse to the interests of the principal. An example of the obligation relevant to the present case is not to exploit or take advantage of the position of fiduciary at the expense of the principal. The existence and the extent of the duty will be governed by the particular circumstances. It is therefore essential at the outset to turn to the circumstances which it is said gave rise to FAR's duty of loyalty. The basic facts are not in dispute. They do not require any critical consideration of Temm J.'s findings on any of the primary facts, and can be summarised quite briefly.**\*599**

The first communication between FAR and Arklow was at a meeting held in Wellington on 15 June 1992. A Mr. Bailey was chief executive of the Economic Development Office for the Western Bay of Plenty, an entity established by local authorities in the region which includes Matakana Island. By that time he had become closely associated with Mr. Wingate and his plans to purchase and develop the island. Mr. Bailey had previously had dealings with Mr. Graham, one of the FAR directors. At the meeting Mr. Bailey told Mr. Graham he wished to discuss a confidential project in which he, Mr. Bailey, was involved. The proposal which by then Mr. Wingate had drawn up was outlined. Two other FAR directors joined the meeting, which lasted at the most 1½ hours, probably less. Mr. Wingate's (Arklow's) proposal was to purchase the island for $20-$20.5m., being the price believed to be acceptable to the receivers, by pre-selling the rights to the mature forest to a Japanese corporation (Kanematsu) which would provide most of the purchase money, with a balance of $4–$5m. being required by way of funding. Assets included in the purchase would be the mill, the immature pine forest, and the eucalyptus trees which if disposed of at their estimated value would result in Arklow being left owning the land, at no cost to it and available for development. At the meeting a copy of the investment document prepared by Fay Richwhite was made available to and left with the FAR directors.

On 16 June FAR wrote to Mr. Bailey enclosing its "Letter of Mandate" setting out the terms of an agreement for services to be provided by FAR to Arklow for the purposes of implementing the proposed purchase. The terms included an immediate payment by Arklow of a commitment fee of $5,000 plus GST (Goods and Services Tax). Although as Mr.

Wingate made clear in his evidence the proposal was not acceptable to Arklow, with one exception there was no further communication of substance between FAR and Arklow until 15 July 1992 when FAR wrote to Mr. Bailey formally withdrawing its mandate offer. The exception concerns an investment brochure compiled by Arklow, based in part on the Fay Richwhite document, which was distributed by Arklow over a short period commencing at the end of June to some 24 parties, including FAR. This brochure sought participation in the scheme by way of investment. It is clear that between 16 June and 15 July 1992 Arklow was taking steps to pursue avenues of possible financial assistance or involvement from sources other than FAR.

In these circumstances did FAR owe a duty of loyalty to Arklow? The dictum of Millett L.J. in            , 18 is apposite:

"A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations. They are the defining characteristics of the fiduciary. As Dr. Finn pointed out in his classic work       *Fiduciary Obligations*      (1977), p. 2, he is not subject to         **\*600**         fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary"

Their Lordships are unable to see an evidential basis for finding that a relationship of trust and confidence, in this sense of undertaking an obligation of loyalty, arose in these circumstances. In considering this question it is essential not to confuse the claimed duty with the separate duty to respect confidential information. This distinction does not appear to have been made sufficiently clear in the High Court, and has probably led to what was described as Temm J.'s

[2000] 1 W.L.R. 594                                                                      Page 5

[2000] 1 W.L.R. 594 (2000) 144 S.J.L.B. 81 [2000] 1 W.L.R. 594 (2000) 144 S.J.L.B. 81 **(Cite as: [2000] 1 W.L.R. 594)**

conflation of the two issues. Here FAR did not undertake any obligation, either expressly or impliedly, to act on behalf of Arklow. It had made an offer to do so, which from its receipt was effectively treated by Arklow as unacceptable. FAR had no authority, actual or ostensible, to act on behalf of Arklow. Arklow never accepted the existence of a relationship, the benefits of which it now claims for itself. Neither had the stage been reached whereby it could be said that either an informal arrangement had come into existence or a continuing course of conduct between the parties had been undertaken which could give rise to the fiduciary relationship. Put shortly, there was no mutuality giving rise to the undertaking or imposition of a duty of loyalty. The relationship of these parties never extended beyond one created by and limited to the giving and receipt of confidential information.

In reaching this conclusion, their Lordships have not overlooked the evidence of Mr. Pryke, an experienced economist and financial adviser, whose opinion as to standard practice in this field supported the duty of loyalty claim. Evidence of practice and accepted standards of professional conduct may be of assistance in determining what is essentially a question of law, but it cannot be determinative. It must be said however that the obligations defined by Mr. Pryke as applying in this case were expressed in surprisingly wide terms and do not in their Lordship's respectful view equate to the law.

Whether or not the obligation not to misuse confidential information is properly classed as a fiduciary duty (                  , 454;                  ) does not require consideration. Recognition by equity of the existence of a particular obligation, such as the obligation of loyalty which Arklow relies upon in the present case, will depend upon the particular facts. To repeat the words of Millett L.J. in                  , 18, it is the obligation and duty which makes the obligor a fiduciary. Characterising the duty to respect confidential information as fiduciary does not create particular duties of loyalty, which are imposed as a result of the nature of the particular relationship and the circumstances giving rise to it. It is not the label which defines the duty. Misuse of confidential information

The second issue is whether FAR breached its obligation of confidentiality.

It is common ground that the obligation not to use confidential information attaches only to information which has the necessary element of confidentiality and continues only so long as the information remains confidential:
;                  Temm J. identified six items of information which he held were confidential and had wrongly been used by FAR. They were:

"(                  *a*                  ) That all the assets available for sale by the receivers could be bought for $20m. (                  *b*                  ) That the mature forest (aged 17 years and over) could be sold for $13m. (and maybe more if [an] estimate of value at $15.75m. could be sustained). (                  *c*                  ) That the immature forest could be sold for $3m. to $4m. for the radiata trees, and the eucalyptus trees could fetch up to $3m. in addition depending on market forces. (                  *d*                  ) That the mill had a break up value of $1m. to $1.5m. (                  *e*                  ) That [Arklow] had a buyer for the mature forest which was willing to provide $15.75m. in cash. (                  *f*                  ) That [Arklow's] scheme was practicable and feasible if suitable financial arrangements could be made"

The sources of the information were the discussion Mr. Bailey had with the FAR directors on 15 June, the Fay Richwhite document, and the Arklow brochure distributed as from the end of June. The scheme referred to was described by Temm J. as one by which Arklow could acquire the whole of the assets without putting up cash of its own, providing approximately $5m. could be raised on the security of assets other than the mature forest. Some observations as to the confidential nature of this information can be made.

First, the price of $20m. This was the figure set by the receivers in March 1992 as the minimum acceptable, and as such originally would have been confidential to them. Whether this information was received by Arklow in confidence is unclear, but what the evidence did show was: the receivers were prepared to disclose it to parties believed to be in serious negotiation to purchase (it was in fact disclosed by them to FAR by August 1992); $21m. was seen by Mr. Olsen, a forestry consultant, as a price likely to be acceptable to the receivers, and he had told FAR shortly before the meeting of 15 June that the value

[2000] 1 W.L.R. 594

Page 6

[2000] 1 W.L.R. 594 (2000) 144 S.J.L.B. 81 [2000] 1 W.L.R. 594 (2000) 144 S.J.L.B. 81 **(Cite as: [2000] 1 W.L.R. 594)**

of all assets was in the range of $21–$27m.; and Arklow's own brochure of June 1992 disclosed to all recipients the contemplated purchase price of approximately $20m. Secondly, the forest valuation. As Temm J. expressly recognised, the value of the forest (and the mill) may well have been known to other experts if appraisals had been undertaken by them. That must be so. As an example Mr. Olsen, with whom FAR had had previous dealings, had been involved with Matakana Island since 1971. In 1991 his company had been consulted concerning the establishment of a joint venture between a real estate developer and a forestry partner, and his then estimate of $21m. as a likely acceptable price for land and trees obviously required an assessment of the value of the forest. Nothing unique or unusual in the valuations made available by Arklow was identified. Thirdly, the scheme. Mr. Wingate's interest in Matakana Island and its development was public knowledge. Development of this nature obviously involved disposal of the mature forest, which in 1992 was in the process of being milled. The perceived value placed on the assets by the receivers, and the availability of a purchaser (Kanematsu) for the mature forest would seem to be the only possibly significant features of the scheme.

Accepting there was a receipt by FAR of confidential information, the crucial issue is whether Temm J.'s conclusion that FAR misused it is supported by the evidence. That conclusion was expressed very shortly in general terms, but without any specific findings as to how or when the use occurred. The relevant evidence possibly going to use has been comprehensively analysed in the judgment delivered by Gault J. The **\*602** analysis revealed that there was neither evidence of actual use of the identified items of information, whether individually or in combination, nor that there was any basis for the inference that there had been use. It was not suggested that the two participants in the FAR transaction (ITT Rayonier and Ernslaw) had been given or used information received by FAR. Both these parties had had previous dealings with FAR, the former had already undertaken its own research into Matakana Island in 1991. In essence the evidence showed that the transaction which FAR had put together resulting in the purchase did not utilise the Arklow forest valuation, did not involve Kanematsu, did not involve any resort development of the island, and did not result in FAR obtaining ownership of the land without expenditure of its own. Even if FAR

was "galvanised" into other action by reason of its knowledge that Arklow was in a relatively advanced stage of implementing its scheme, it is not possible to translate that into actionable misuse, particularly when regard is had to the considerable time lapse down to November 1992 when the FAR transaction was finally negotiated. As the majority of the Court of Appeal held, supported by Blanchard J., there is no basis upon which Arklow could be entitled to relief. Its prospects of successfully concluding an agreement with the receivers was not shown to have been adversely affected by FAR's use of that knowledge. Any possible advantage it may have obtained had dissipated by November 1992. Without further elaboration or unnecessary repetition, their Lordships would respectfully adopt the reasoning of the majority in concluding that no actionable misuse of confidential information was established. On this head too, the claim must therefore fail.

END OF DOCUMENT



**Tab 3**

A

# CASES

determined by the

# CHANCERY DIVISION

B

and the

# COURT OF PROTECTION

and on appeal therefrom in the

C

# COURT OF APPEAL

———

D

[COURT OF APPEAL]

## BRISTOL AND WEST BUILDING SOCIETY v. MOTHEW

1996  May 21, 22;  Staughton, Millett and Otton L.JJ.
July 24

E  *Solicitor—Negligence—Incorrect advice or information—Mortgage*
*transaction—Solicitor acting for borrowers and lender—Solicitor*
*negligently giving lender incorrect information—Lender suffering*
*loss—Whether lender merely having to prove reliance on*
*information—Whether necessary to show loss attributable to*
*negligence—Whether breach of trust or fiduciary duty*

In 1988 the defendant solicitor acted for a husband and wife
F  in the purchase of a house for £73,000 and also for the plaintiff
to whom the purchasers had applied for a loan of £59,000 to
finance the purchase. The plaintiff offered to advance the money
on the express condition that the balance of the purchase price
was provided by the purchasers without resort to further
borrowing, and it instructed the solicitor to report, prior to
completion, any proposal that the purchasers might create a
second mortgage or otherwise borrow in order to finance part of
G  the purchase price. The solicitor knew that the purchasers were
arranging for an existing bank debt of £3,350 to be secured by a
second charge on the new property but, due to an oversight, he
stated in his report to the plaintiff that the balance of the
purchase price was being provided by the purchasers without
resort to further borrowing. The plaintiff advanced the loan and
the purchase was completed. When the purchasers defaulted on
H  their mortgage repayments the plaintiff enforced its security and
the house was sold at a loss. The plaintiff sought to recover the
whole of its loss on the transaction from the solicitor, alleging
breach of contract, negligence and breach of trust. The district
judge gave the plaintiff summary judgment for damages to be

assessed for breach of contract and negligence and for damages    A
of £59,000 less the amount received on the sale of the property
for breach of trust. The judge affirmed those decisions.

On appeal by the solicitor:—

*Held,* allowing the appeal, (1) that, where a client sued his
solicitor for negligently giving him incorrect advice or information,
the client did not have to show that he would not have acted as
he did if he had been given the proper advice or correct
information but merely that he had relied on the incorrect advice    B
or information; that the evidence showed that the plaintiff had
relied on the solicitor's report in advancing the loan and,
therefore, the necessary causal link between the solicitor's
negligence and the loan was proved; but that the plaintiff had still
to establish what, if any, loss was attributable to the solicitor's
negligence and, as there was an issue as to what loss was
occasioned by the existence of the second charge and the    C
purchasers' indebtedness to the bank, damages remained to be
assessed (post, pp. 11D–E, F–H, 13B–C, 24E–F, 25E–F, 28A).

*Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co.
Ltd.* [1997] A.C. 191, H.L.(E.) and *Downs v. Chappell* [1997]
1 W.L.R. 426, C.A. applied.

(2) That the solicitor's conduct in providing the plaintiff with
the wrong information, although a breach of duty, was neither
dishonest nor intentional but due to an oversight and was    D
unconnected to the fact that he was also acting for the purchasers;
that, accordingly, his conduct and subsequent application of the
money advanced by the plaintiff to complete the purchase was
not a breach of trust or fiduciary duty; and that the order for
damages for breach of trust would therefore be set aside (post,
pp. 15H–16A, 19E, 20G, 22A–C, 24E–F, 25E–F, 26C–E, 28A).

Decision of Chadwick J. reversed.
                                                                     E

The following cases are referred to in the judgments:

*Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997]
   A.C. 191; [1996] 3 W.L.R. 87; [1996] 3 All E.R. 365, H.L.(E.)
*Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R.
   801
*Clark Boyce v. Mouat* [1994] 1 A.C. 428; [1993] 3 W.L.R. 1021; [1993] 4 All    F
   E.R. 268, P.C.
*Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453
*Coomber, In re; Coomber v. Coomber* [1911] 1 Ch. 723, C.A.
*Downs v. Chappell* [1997] 1 W.L.R. 426; [1996] 3 All E.R. 344, C.A.
*El Ajou v. Dollar Land Holdings Plc.* [1993] 3 All E.R. 717
*Girardet v. Crease & Co.* (1987) 11 B.C.L.R. (2d) 361
*Henderson v. Merrett Syndicates Ltd.* [1995] 2 A.C. 145; [1994] 3 W.L.R. 761;    G
   [1994] 3 All E.R. 506, H.L.(E.)
*Kelly v. Cooper* [1993] A.C. 205; [1992] 3 W.L.R. 936, P.C.
*LAC Minerals Ltd. v. International Corona Resources Ltd.* (1989) 61 D.L.R.
   (4th) 14
*Lewis v. Hillman* (1852) 3 H.L.Cas. 607, H.L.(E.)
*Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548; [1991] 3 W.L.R. 10; [1992]
   4 All E.R. 512, H.L.(E.)                                                       H
*Moody v. Cox and Hatt* [1917] 2 Ch. 71, C.A.
*Mortgage Express Ltd. v. Bowerman & Partners* [1996] 2 All E.R. 836, C.A.
*Nocton v. Lord Ashburton* [1914] A.C. 932, H.L.(E.)
*Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109

A    *Sykes v. Midland Bank Executor and Trustee Co. Ltd.* [1971] 1 Q.B. 113;
        [1970] 3 W.L.R. 273; [1970] 2 All E.R. 471, C.A.
    *Target Holdings Ltd. v. Redferns* [1996] A.C. 421; [1995] 3 W.L.R. 352; [1995]
        3 All E.R. 785, H.L.(E.)
    *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council*
        [1996] A.C. 669; [1996] 2 W.L.R. 802; [1996] 2 All E.R. 961, H.L.(E.)


B    The following additional cases were cited in argument:

    *Alliance & Leicester Building Society v. Edgestop Ltd.* (unreported), 18 January
        1991, Hoffmann J.
    *Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R. 465, P.C.
    *Canson Enterprises Ltd. v. Boughton & Co.* (1991) 85 D.L.R. (4th) 129
    *Gemstone Corporation of Australia Ltd. v. Grasso* (1994) 12 A.C.L.C. 653
    *Gray v. New Augarita Porcupine Mines Ltd.* [1952] 3 D.L.R. 1
C    *Sinclair v. Brougham* [1914] A.C. 398, H.L.(E.)
    *Wan v. McDonald* (1992) 105 A.L.R. 473
    *Witten-Hannah v. Davis* [1995] 2 N.Z.L.R. 141


    The following cases, although not cited, were referred to in the skeleton
arguments:

D    *Attorney-General for Hong Kong v. Reid* [1994] 1 A.C. 324; [1993] 3 W.L.R.
        1143; [1994] 1 All E.R. 1, P.C.
    *Bishopsgate Investment Management Ltd. v. Maxwell (No. 2)* [1994] 1 All
        E.R. 261, C.A.
    *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981]
        Ch. 105; [1980] 2 W.L.R. 202; [1979] 3 All E.R. 1025
    *Dawson, decd., In re; Union Fidelity Trustee Co. Ltd. v. Perpetual Trustee Co.
        Ltd.* [1966] 2 N.S.W.R. 211
E    *Farrington v. Rowe McBride & Partners* [1985] 1 N.Z.L.R. 83
    *McPherson v. Watt* (1877) 3 App.Cas. 254, H.L.(Sc.)
    *Miller's Deed Trusts, In re* (1978) 75 L.S.G. 454
    *Nelson v. Rye* [1996] 1 W.L.R. 1378; [1996] 2 All E.R. 186
    *Nestlé v. National Westminster Bank Plc.* [1993] 1 W.L.R. 1260; [1994] 1 All
        E.R. 118, C.A.


F    INTERLOCUTORY APPEAL from Chadwick J.
        On 21 June 1995 Deputy District Judge Raskin granted the plaintiff,
    Bristol and West Building Society, summary judgment pursuant to R.S.C.,
    Ord. 14 of its claims against the defendant solicitor, Anthony Paul
    Mothew (trading as Stapley & Co.), for damages to be assessed for breach
    of contract and negligence and damages for breach of trust. On 27 July
G    1995 Chadwick J. dismissed the defendant's appeal against that order.
        Pursuant to leave granted by Nourse L.J. on 29 December 1995 and
    by a notice of appeal dated 5 January 1996 the defendant sought to set
    aside the orders and be granted unconditional leave to defend on the
    grounds that the judge had erred in holding (1) that money paid to the
    defendant by the plaintiff was impressed with a constructive trust in
    favour of the plaintiff; (2) that the money was paid to the defendant under
H    a mistake of fact or had been induced by the defendant's misrepresentation,
    when no such allegations were made in the statement of claim; (3) that it
    was not necessary for the plaintiff to establish that it had sustained loss
    and damage as a result of the defendant's alleged breach of trust; (4) that

the defendant had no arguable defence to the claim for breach of trust          A
based upon acquiescence or affirmation by the plaintiff; and (5) that the
defendant had no arguable defence to the allegation that the plaintiff had
sustained loss and damage as a result of the breach of contract and
negligence.

By a respondent's notice dated 25 January 1996 the plaintiff contended
that it was entitled to judgment for the sum claimed in respect of its
claims for breach of contract and negligence.          B

The facts are stated in the judgment of Millett L.J.


*Jonathan Sumption Q.C.* and *Glenn Campbell* for the defendant.
A breach of a solicitor's conveyancing duty which makes no difference to
the lender's decision and has no impact on the value of the security cannot
result in the solicitor becoming the underwriter of the transaction when          C
the security is later sold at a loss: see *Target Holdings Ltd. v. Redferns*
[1996] A.C. 421. Although a solicitor has a number of fiduciary obligations
to his client, not every duty which is owed in the context of a fiduciary
relationship is a fiduciary duty: see *Girardet v. Crease & Co.* (1987)
11 B.C.L.R. (2d) 361, 362; *LAC Minerals Ltd. v. International Corona
Resources Ltd.* (1989) 61 D.L.R. (4th) 14, 28 and *In re Coomber; Coomber          D
v. Coomber* [1911] 1 Ch. 723, 728. A solicitor's duty to report to his client
the outcome of conveyancing and allied inquiries is the ordinary
contractual duty of a professional to comply with his instructions and to
do so with reasonable skill.

*Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R. 465 does
not assist the plaintiff as it was concerned only with a breach by a
fiduciary of his obligation to disclose to his principal his own personal          E
interest in the transaction. [Reference was also made to *Nocton v. Lord
Ashburton* [1914] A.C. 932.] The principle that relief is granted for such a
breach, without regard to what the plaintiff would have done if disclosure
had been made reflects the rule of equity that where a fiduciary has dealt
personally with the plaintiff without full disclosure to him the latter's
relief is not compensatory at all. He has, irrespective of his loss, an          F
absolute right to set aside the transaction or to claim an account of
profits. The compensation awarded to him is simply the financial
equivalent of setting aside: see *Gray v. New Augarita Porcupine Mines Ltd.*
[1952] 3 D.L.R. 1, 12–15. Compensation cannot be awarded for breach of
a duty as to the manner in which work should be carried out: see
*Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109, 164–165.
[Reference was also made to *Canson Enterprises Ltd. v. Boughton & Co.*          G
(1991) 85 D.L.R. (4th) 129; *Wan v. McDonald* (1992) 105 A.L.R. 473;
*Witten-Hannah v. Davis* [1995] 2 N.Z.L.R. 141 and *Target Holdings Ltd.
v. Redferns* [1996] A.C. 421.]

There is no distinction between a solicitor who breaches his duty by
failing to report in accordance with his instructions before the mortgage
advance cheque is received and a solicitor who fails to deal with the
advance in accordance with his instructions after it is received. In neither          H
case does the breach of duty have the effect of terminating the solicitor's
retainer and his authority to complete the transaction. Equally, the
argument that the solicitor held the advance as soon as it was received on

A   a constructive trust to return it forthwith to the plaintiff cannot be
supported. There cannot be a constructive trust inconsistent with the
existing express trust to apply the loan moneys in completing the
transaction, unless the solicitor's authority and obligation to complete
the transaction are first brought to an end. [Reference was made to
*Westdeutsche Landesbank Girozentrale v. Islington London Borough Council*
[1996] A.C. 669; *Sinclair v. Brougham* [1914] A.C. 398 and *Lipkin Gorman*
B   *v. Karpnale Ltd.* [1991] 2 A.C. 548.]

If the plaintiff is to be awarded the amount of the advance money (less
actual recoveries) it must be on the basis that that money has been
misapplied. If the defendant had no authority to pay out the money to the
vendor the payment was a breach of trust: see *Target Holdings Ltd. v.
Redferns* [1996] A.C. 421 and *Alliance & Leicester Building Society v.
C   Edgestop Ltd.* (unreported), 18 January 1991.

The plaintiff's loss on the loan transaction is due to the default of the
purchasers and the fact that the security was not sufficient to cover the
loan when it came to be realised, neither of which is the responsibility of
the solicitor. The loss is not due to the existence or non-disclosure of a
second mortgage.

*Nicholas Patten Q.C.* and *Timothy Higginson* for the plaintiff. The
D   relationship between a solicitor and his client gives rise to fiduciary
obligations on the part of the solicitor in the handling of his client's
affairs. A failure to perform those obligations gives rise to a remedy in
equity regardless of whether the acts complained of also constitute a
breach of contract with a right to damages: see *Nocton v. Lord Ashburton*
[1914] A.C. 932, 956–957. The underlying contractual relationship between
E   the parties cannot dictate or limit the scope of the concurrent fiduciary
duties, as the defendant was expressly required to report any proposal for
further borrowing before releasing the plaintiff's mortgage advance: see
*Henderson v. Merrett Syndicates Ltd.* [1995] 2 A.C. 145, 205–206.

A solicitor who acts for both lender and borrower in the same
transaction has an unrestricted obligation to each client to act in his own
best interests, including an obligation to disclose to the lender information
F   about the borrower which is material to the transaction: see *Clark Boyce
v. Mouat* [1994] 1 A.C. 428, 437. [Reference was also made to *Lewis v.
Hillman* (1852) 3 H.L.Cas. 607; *Kelly v. Cooper* [1993] A.C. 205; *Moody v.
Cox and Hatt* [1917] 2 Ch. 71 and *Bristol and West Building Society
v. May May & Merrimans* [1996] 2 All E.R. 801, 817–818.]

The non-disclosure of the proposed further borrowing was a breach of
G   trust. In addition, the release of the advance by the defendant when he
had failed to disclose the proposed further borrowing in breach of his
express instructions was made without authority and was itself a breach
of trust. The right of the plaintiff to recover its advance is unaffected by
*Target Holdings Ltd. v. Redferns* [1996] A.C. 421 because the payment of
the advance to the defendant (and therefore the creation of his agency to
hold the money for the purpose of the intended transaction) was the direct
H   result of the reliance by the plaintiff upon the contents of the defendant's
report on title. Therefore the defendant's ability to utilise the payment for
the benefit of the borrowers in breach of trust was caused by the report
on title.

Breaches of trust or fiduciary duty must cause the loss complained of   A
but the test of causation is not the common law test. The inquiry is not to
determine what position the plaintiff would have been in had the contract
been performed but rather whether the loss would have been sustained
but for the breach of trust. The non-disclosure in the report on title caused
the loss because it induced the plaintiff to advance the funds in reliance
on the report. To inquire as to what the plaintiff would have done had
disclosure been made is to apply the common law test and is wrong in   B
principle: see *Brickenden v. London Loan & Savings Co.* [1934] 3 D.L.R.
465, 469; *Gray v. New Augarita Porcupine Mines Ltd.* [1952] 3 D.L.R. 1,
15; *Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453 and
*Gemstone Corporation of Australia Ltd. v. Grasso* (1994) 12 A.C.L.C. 653.

*Sumption Q.C.* replied.

C

*Cur. adv. vult.*

July 24.   The following judgments were handed down.

MILLETT L.J.   This is an appeal brought by the defendant with the
leave of the single Lord Justice from an order for summary judgment
given initially by the district judge and affirmed (for different reasons) by   D
Chadwick J. It raises important questions of principle in relation to a
claim by a mortgagee to recover from the solicitor who was acting for
both mortgagor and mortgagee the loss arising from the mortgagor's
subsequent default.

The collapse in the property market which accompanied the recession
at the beginning of the present decade caused mortgage lenders to suffer   E
serious losses. Unable to recover their advances from the borrowers or by
the enforcement of their security they have sought to recover them from
the valuers or solicitors on whose valuations or advice they have relied. In
some cases they have been the victims of a fraud to which the valuers and
solicitors have been parties. In other cases, such as the present, they have
been unable to accuse their solicitor of anything more serious than
negligence. Believing that the common law rules of causation and   F
remoteness of damage might not enable them to recover the whole amount
of their loss they have turned to equity and alleged breach of trust or
fiduciary duty. We have thus been concerned to decide just what is
involved in these concepts.

*The facts*

G

The facts are not in dispute. The defendant is a solicitor. In August
1988 he acted for a Mr. and Mrs. Towers in the purchase of 17, Thameshill
Avenue, Romford for £73,000. In accordance with the usual practice he
also acted for the Bristol and West Building Society ("the society") to
which the purchasers had applied for an advance of £59,000 in order to
finance the purchase. (This was the Cheshunt Building Society, but its
rights have since vested in the society.) In their application form the   H
purchasers had stated that the balance of the purchase price of £14,000
was being provided by them personally and that they were not applying
elsewhere for financial assistance towards the purchase price.

7

Ch.     Bristol and West Building Society v. Mothew (C.A.)     Millett L.J.

A    The society offered to advance to the purchasers £59,000 on the security of a first mortgage of the property on the express condition that unless otherwise agreed in writing the balance of the purchase price was to be provided by the purchasers personally without resort to further borrowing and that no second mortgage or other loan was being arranged or contemplated in connection with the purchase. The defendant was provided with the offer of advance (but not with the purchasers' application).

B    The society's standing instructions to solicitors acting for the society required them to report to the society prior to completion, inter alia:

"(viii) Any proposal that the applicant may create a second mortgage or enter into a promissory note or otherwise borrow in order to finance part of the purchase price. (ix) Any incorrect information given in the solicitor's instructions. (x) Any other matters which ought to be brought to the notice of the society . . ."

C

The solicitor was required to submit a report on title and request for advance cheque to the society at least five clear working days before the cheque was required. This was done on a form by which the solicitor was asked to confirm, inter alia, that the title was good and marketable and might safely be accepted by the society, that to the best of his knowledge and belief the balance of the purchase money was being provided by the applicant personally without resort to further borrowing, and that the special conditions attached to the offer of advance had been, or would be, complied with.

D

Mr. and Mrs. Towers intended to provide the balance of the purchase price from the net proceeds of sale of their existing property after discharging a subsisting mortgage. As it happens, they owed money to Barclays Bank which was secured by a second charge on that property. They arranged with the bank to allow a small part of the debt (£3,350) to remain outstanding after the sale of the existing property and to be secured by a second charge on the new property. The defendant was informed of these arrangements and gave an undertaking to the bank to hold the title deeds to its order pending registration. Unfortunately, he either failed to appreciate that, although they related to old borrowing, they were a matter which he was required to report to the society, or he had forgotten or overlooked them when he made his report.

E

F

By his report dated 2 August 1988 the defendant confirmed that to the best of his knowledge and belief the balance of the purchase money was being provided by the applicants personally without resort to further borrowing and that the special conditions attached to the offer of advance had been or would be complied with. He failed to disclose the fact that Mr. and Mrs. Towers were making arrangements for a second mortgage in connection with the purchase.

G

It is conceded by the defendant that his statements were untrue and that his failure to report the purchasers' arrangements for a second mortgage was a breach of his instructions. The society alleges that the defendant acted negligently and in breach of contract, and this is admitted. There is no allegation of dishonesty or bad faith, and if any such allegation were made it would be strongly resisted. The society does not allege that

H

the defendant made the statements in question knowing them to be untrue. It alleges only that he "knew or ought to have known" that they were untrue, and this is consistent with oversight.

Following the receipt of the report the society forwarded a cheque for the amount of the advance to the defendant in readiness for completion on 30 August. Completion took place on that date when the mortgage advance was released to the vendor's solicitors as part of the purchase price for the property. Mr. and Mrs. Towers executed a first charge in favour of the society and a second charge in favour of the bank. On 25 November the defendant applied to the society for its consent to the registration of the second charge in favour of the bank. The society granted its consent on 10 March 1989. It does not appear that the society was aware of the date of the bank's charge (and so was aware that it constituted a breach of the conditions of the advance) when it gave its consent, but it is alleged that the society must have learnt of it shortly afterwards and nevertheless took no action.

The purchasers defaulted after making only small repayments and the society enforced its security. The property was sold on 6 February 1991 and realised net proceeds of a little under £53,000. The society claimed to recover the whole of its net loss on the transaction from the defendant, alleging breach of contract, negligence and breach of trust. As I have already indicated, breach of contract and negligence are admitted; breach of trust is denied.

It has always been the defendant's case that the society would not have been concerned by the purchasers' proposal to grant a second charge to the bank if this had been disclosed to it in August 1988, that it would still have proceeded with the transaction and that it would have suffered precisely the same loss in that event. It is alleged that, in the heady days of 1988, when the property market was at its height and mortgage lenders were falling over themselves to advance money to house purchasers, the society would not have been concerned by a proposal to grant a second charge to secure a relatively trivial indebtedness which did not even represent fresh borrowing; and it is contended that this is demonstrated by the lack of concern shown by the society when it was asked to give its consent to the registration of a second charge in March 1989. Despite the submissions of the society to the contrary, I am satisfied that, if legally relevant, these allegations raise a triable issue.

*The course of the proceedings below*

It was common ground below that no damages would be recoverable at common law for breach of contract or tort unless the society could show that it would not have proceeded with the transaction if it had been informed of the facts. The society, however, submitted that the position was different in equity. It alleged that the defendant had committed a breach of trust or fiduciary duty, and submitted that common law principles of causation and remoteness of damage have no application in such a case so that it was not necessary for the society to show that it would not have proceeded with the transaction if it had been informed of the facts.

9

Ch.        Bristol and West Building Society v. Mothew (C.A.)        Millett L.J.

A    The district judge accepted these arguments. In respect of the common law claims for breach of contract and negligence she gave summary judgment for damages to be assessed. This was apparently on the basis that the judgment would leave it open to the defendant to contend that no loss was caused by the breach.

The district judge also gave summary judgment for the society for breach of trust for the sum of £59,000 less the sums received by the society B    on the sale of the property, and this was affirmed by the judge, who was satisfied that there was no question or issue to be tried in the action and dismissed the appeal.

*The course of the appeal*

C    In the course of the appeal the defendant submitted that, by consenting to the registration of the second charge, the society waived the breaches of which complaint is made; and that this raises a triable issue on liability which entitles him to unconditional leave to defend in relation to all the pleaded causes of action. In the absence of any evidence or reason to suppose that the society was aware of the date of the second charge when it gave its consent to its registration, I am not persuaded that there is a D    triable issue on waiver, and I would not disturb the order below on this ground.

When the appeal was first argued before us it was still conceded by the society that it could not recover damages at common law for breach of contract or negligence unless it could show that it would not have proceeded with the mortgage advance if it had been informed of the facts. E    The society, however, maintained that it could escape this principle because the defendant was also guilty of a breach of trust and that common law rules of causation and remoteness of damage have no application in such a case. The critical questions, therefore, appeared to be whether the defendant was guilty of a breach of trust or fiduciary duty and if so whether the society needed to prove that it would not still have proceeded with the transaction if it had been told of the facts.

F    After we had reserved judgment on the appeal, however, the society informed us that it wished to resile from its concession. Relying on the recent decision of this court in *Downs v. Chappell* [1997] 1 W.L.R. 426, the society submitted that it was entitled to recover the whole of its net loss on the transaction by way of damages for negligence at common law without having to establish that it would not have proceeded with the G    transaction if it had been informed of the facts. If correct, it submitted, this would be determinative of the case, and it would not be necessary for the society to rely on any breach of trust or fiduciary duty. Before the defendant's advisers could respond to this, speeches were delivered in the House of Lords in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191. These were relevant to the common law position. For the reasons given by Staughton L.J., however, we decided that it was H    not necessary to restore the appeal for further argument. This was because the assessment of damages at common law is still pending. They will have to be assessed in conformity with the decision of the House of Lords in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* and not

with any gloss which, in the absence of argument, we may inadvertently  A
have put upon that decision.

*The claims at common law*

The society has served a respondent's notice, in which it contends that
it is entitled to judgment for the sum claimed, and not merely for damages
to be assessed, in respect of its common law claims. If this is correct, then  B
the society does not need to establish that the defendant was guilty of a
breach of trust or fiduciary duty.

This question depends upon an alleged difference between the tests of
causation and remoteness of damage at common law and in equity. In a
case of the present kind, however, two different questions of causation are
involved and it is necessary to distinguish between them. Where a plaintiff
claims that he has suffered loss by entering into a transaction as a result  C
of negligent advice or information provided by the defendant, the first
question is whether the plaintiff can establish that the defendant's
negligence caused him to enter into the transaction. If he cannot his claim
must fail. But even if he can, it is not sufficient for him to establish that
the transaction caused him loss. He must still show what (if any) part of
his loss is attributable to the defendant's negligence. This is usually treated  D
as a question of the measure of damages rather than causation, and for
convenience I shall so treat it in this judgment, but it must be
acknowledged that it involves questions of causation.

In *Downs v. Chappell* [1997] 1 W.L.R. 426 the plaintiffs bought a small
business in reliance on trading figures contained in a letter from
the vendor's accountants which was forwarded to them by the vendor.
The vendor knew that the figures contained in the letter were false. The  E
plaintiffs sued the vendor for deceit and the accountants for negligence.
The judge accepted the plaintiffs' evidence that they would not have
contracted to purchase the business without verification of the figures by
the accountants. But he was not satisfied that they would not still have
bought the business even if the correct figures had been supplied, and
dismissed the action against both defendants.

This court allowed the plaintiffs' appeal against both defendants.  F
Hobhouse L.J. gave the only reasoned judgment. In relation to the vendor,
he pointed out that for a plaintiff to succeed in the tort of deceit it was
necessary for him to prove (1) a fraudulent representation, (2) materiality
and (3) inducement. All three elements had been proved. The judge had
found that the representations did induce the plaintiffs to enter into the
transaction: they would not have done so without them. This was sufficient  G
proof of causation. Whether the plaintiffs would have entered into the
transaction if they had been told the truth was irrelevant.

We are not concerned with this part of the decision, since the present
case is not one of fraud. But Hobhouse L.J. held that the position was the
same in relation to the accountants, who were charged with negligence
only. Here the question was not inducement but reliance. The relevant
question was simply whether the plaintiffs had entered into the contract  H
in reliance upon the figures contained in the accountants' letter. The judge
had answered that question in the affirmative: the plaintiffs would not
have entered into the contract if they had not been provided with the

11

Ch.          **Bristol and West Building Society v. Mothew (C.A.)**          Millett L.J.

A    letter. The causal relationship between the accountants' negligence and the plaintiffs' purchase was established. It was not necessary to consider whether the plaintiffs would have purchased the business if they had been supplied with the correct figures.

In the present case the society's claim is not for misrepresentation. Accordingly, questions of inducement and materiality are not relevant. Its claim lies in negligence, and the relevant concept is reliance. In considering
B    the issue of causation in an action for negligence brought by a client against his solicitor it appears from *Downs v. Chappell* that it is necessary to distinguish between two different kinds of case.

Where a client sues his solicitor for having negligently failed to give him proper advice, he must show what advice should have been given and (on a balance of probabilities) that if such advice had been given he would
C    not have entered into the relevant transaction or would not have entered into it on the terms he did. The same applies where the client's complaint is that the solicitor failed in his duty to give him material information. In *Sykes v. Midland Bank Executor and Trustee Co. Ltd.* [1971] 1 Q.B. 113, which was concerned with a failure to give proper advice, the plaintiff was unable to establish this and his claim to damages for negligence failed. In *Mortgage Express Ltd. v. Bowerman & Partners* [1996] 2 All E.R. 836,
D    which was concerned with a failure to convey information, the plaintiff was able to establish that if it had been given the information it would have withdrawn from the transaction and its claim succeeded.

Where, however, a client sues his solicitor for having negligently given him incorrect advice or for having negligently given him incorrect information, the position appears to be different. In such a case it is
E    sufficient for the plaintiff to prove that he relied on the advice or information, that is to say, that he would not have acted as he did if he had not been given such advice or information. It is not necessary for him to prove that he would not have acted as he did if he had been given the proper advice or the correct information. This was the position in *Downs v. Chappell* [1997] 1 W.L.R. 426.

In the present case the society makes complaints of both kinds. It
F    alleges that the defendant negligently and in breach of his instructions failed to report the purchasers' proposed arrangements with the bank prior to completion. This is a claim of the first kind, and if it were all the society would have to establish that if it had been informed of those arrangements it would not have proceeded with the mortgage advance. But the defendant went further than this. He did not merely fail to report
G    the arrangements to the society; he expressly represented to the society that no such arrangements existed. That brings the case within the second category. It follows from the decision of this court in *Downs v. Chappell* that it is sufficient for the society to prove that it relied on the representations in the report. Although the judge spoke in terms of inducement, he plainly found reliance. The society's procedures were designed to ensure that no cheque would be issued in the absence of a
H    satisfactory report from its solicitor.

In my judgment we are bound by the decision in *Downs v. Chappell* to hold that the necessary causal link between the defendant's negligence and the mortgage advance was proved.

*Measure of damages*                                                          A

It does not, however, follow from the fact that the defendant's negligent statements caused the society to make the mortgage advance that the whole of the society's loss is attributable to his negligence. Having regard to the date of the advance, some part at least of the society's loss may well be attributable to the fall in property values which had occurred by the time that it was able to sell the property.                                B

In *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191 the House of Lords ruled definitively on the correct measure of damages for the negligent provision of information on which the plaintiff relied in entering into a transaction from which loss resulted. The only speech was delivered by Lord Hoffmann. He distinguished between the measure of damages for (1) breach of a contractual warranty and (2) breach of a duty (whether contractual or tortious) to take care  C (i) to give proper advice and (ii) to provide accurate information.

In the case of breach of warranty, the comparison is between the plaintiff's position as a result of entering into the transaction and what it would have been if the facts had been as warranted. The measure of damages is the extent to which the plaintiff would have been better off if the information had been right. In the case of a breach of duty to take  D care the measure of damages is the extent to which the plaintiff is worse off because the information was wrong. Since he entered into the transaction in reliance on the advice or information given to him by the defendant, the starting point is to compare his position as a result of entering into the transaction with what it would have been if he had not entered into the transaction at all.

But that is only the starting point. Lord Hoffmann distinguished  E between a duty to advise someone as to what course of action he should take and a duty to provide information for the purpose of enabling someone else to decide upon his course of action. In the former case, the defendant is liable for all the foreseeable consequences of the action being taken. In the latter case, however, he is responsible only for the consequences of the information being wrong. The measure of damages is  F not necessarily the full amount of the loss which the plaintiff has suffered by having entered into the transaction but only that part if any of such loss as is properly attributable to the inaccuracy of the information. If the plaintiff would have suffered the same loss even if the facts had actually been as represented the defendant is not liable.

Accordingly, in this class of case the plaintiff must prove two things: first, that he has suffered loss; and, secondly, that the loss fell within the  G scope of the duty he was owed. In the present case the society must prove what (if any) loss was occasioned by the arrangements which the purchasers had made with the bank.

The society was told that Mr. and Mrs. Towers had no other indebtedness and that no second charge was contemplated. The existence of the second charge did not affect the society's security. The absence of any indebtedness to the bank would not have put money in the purchasers'  H pocket; it would merely have reduced their liabilities. Whether their liability to the bank affected their ability to make mortgage repayments to the society has yet to be established, but given the smallness of the liability

13

Ch.          **Bristol and West Building Society v. Mothew (C.A.)**          Millett L.J.

A  its effect on the purchasers' ability to meet their obligations to the society may have been negligible. It may even be, for example, that the purchasers made no payments at all to the bank at the relevant time, and if so it is difficult to see how any part of the loss suffered by the society can be attributable to the inaccuracy of the information supplied to it by the defendant. It would have occurred even if the information had been correct.

B

*Conclusion*

The society has proved the causal link between the defendant's negligence and the making of the mortgage advance but it has not yet established the amount of its loss (if any) which is properly attributable

C  to the defendant's negligence. Damages remain to be assessed. We are bound by the decision of this court in *Downs v. Chappell* [1997] 1 W.L.R. 426 to hold that the society will not have to prove that it would not have made the mortgage advance if it had known the true facts; but it will be required to establish what it has lost as a result of the existence of the second charge and the purchasers' indebtedness to the bank. It can maintain the money judgment which it has obtained below only if it can

D  invoke equitable principles.

*The claims in equity*

*The judge's reasoning*

The judge found that, in the events which happened, the defendant

E  committed a breach of trust by applying the mortgage advance in the purchase of the property, that he was accordingly liable to restore the trust property, viz. the £59,000 with interest less receipts, that no question of damages at common law or of compensation for loss arose, and that it was irrelevant whether, had it been told of the position, the society might still have chosen to make the advance notwithstanding the arrangements

F  which had been made with the bank. Accordingly the judge concluded that there was no question or issue to be tried in the action and gave summary judgment for the whole of the society's claim.

The judge's conclusion that the defendant had committed a breach of trust in applying the mortgage advance in the purchase of the property was based on the fact that he had obtained payment of the mortgage advance by misrepresentation. The judge said:

G

"it seems to me beyond argument that [the defendant] received the cheque . . . for £59,000 as a direct result of the misleading report which he had supplied to the society on 2 August 1988. The money was paid to the defendant . . . as a result of a misrepresentation made to the society by the defendant. . . . *The effect, in my judgment, was that from the moment when [the] cheque for £59,000 was received*

H  *by [the defendant] he held it upon a constructive trust to return it forthwith to the society, unless authorised by the society to retain, or dispose of, it after a full knowledge of the facts had been disclosed.*" (My emphasis.)

In the judge's opinion it necessarily followed that the defendant's    A
subsequent application of the mortgage money in the purchase of the
property constituted a breach of trust. He said:

> "In making that payment there is, in my view, no doubt that the
> defendant acted in breach of the trust which had been imposed upon
> him by the circumstances in which he had received the society's
> cheque. That trust required him to return the £59,000 to the society.    B
> Any payment of that £59,000 to a third party, albeit to the vendors
> of the property, was a breach of that trust."

The judge dismissed the submission that the society had to establish that
it would not have made the advance if it had known the facts. He said:

> "But that point affords no defence to the [society]'s claim. It is
> nihil ad rem that if the true position had been disclosed to the society,    C
> the society might or might not have issued an amended offer of
> advance. Liability to repay arises in this case because [the defendant]
> received money from the society as a result of his own
> misrepresentation. He cannot be heard to say that he could retain
> that money against the society, or dispose of it to the vendors,
> because, in other circumstances, the society might have chosen to
> make the advance notwithstanding the borrowing from [the bank]."    D

The judge did not explain why the consequence of the defendant's
misrepresentation was that he held the mortgage advance on a constructive
trust for the society, or why the defendant's authority to apply the money
in accordance with the society's instructions was determined, but he took
the opportunity to do so when he revisited these questions a few months
later in *Bristol and West Building Society v. May May & Merrimans* [1996]    E
2 All E.R. 801 after two county court judges had declined to follow his
decision in the present case. The later case involved a number of
transactions in which the same society had made mortgage advances and
suffered loss when the borrowers defaulted which it sought to recover
from the solicitors who had acted for both parties to the lending
transactions. In some cases the solicitor knew nothing, prior to the receipt
of the cheque for the mortgage advance, which ought to have led him to    F
qualify his report, though he discovered the facts afterwards and before
he disbursed the money on completion. In other cases the solicitor's
breach of his instructions preceded his receipt of the mortgage advance,
as it did in the present case.

The judge distinguished between the two groups of cases. In relation
to the first group he reluctantly felt compelled by the decision in *Target*    G
*Holdings Ltd. v. Redferns* [1996] A.C. 421 to conclude that, at least for the
purpose of an application for summary judgment, it was necessary for the
society to show that it would not have proceeded with the transaction if it
had known the facts. In relation to the second group, however, where the
society paid the cheque for the mortgage advance to the solicitor in
response to a request based upon a warranty or representation which (as
the judge put it) the solicitor "knew or must be taken to have known" to    H
be misleading, he confirmed his previous decision in the present case. He
held that the society was entitled to succeed in such cases whether or not
it would have still made the advance if it had known the facts.

15

Ch.        Bristol and West Building Society v. Mothew (C.A.)        Millett L.J.

A    In the course of his judgment the judge explained how the constructive trust in question arose. It was, he said, because the solicitor had given misleading information to his client. This constituted a breach of fiduciary duty which enabled the court to impose a constructive trust on the property acquired as a result of the breach of duty. He said [1996] 2 All E.R. 801, 818:

B    "where moneys have been received by the solicitor from the society following a request based upon a warranty or representation which he knew, or must be taken to have known, to be misleading in some material respect, equity will give a remedy in respect of any loss which the society may suffer as a result of its payment in reliance upon that request. That will be a remedy based upon breach of fiduciary duty and may, where necessary, take the form of the

C    imposition of a constructive trust on those moneys to enforce the solicitor's obligation to return them to the society forthwith. The constructive trust imposed by equity to enforce the obligation to make immediate restitution overrides any express or implied trust which might otherwise arise out of any instructions given by [the society] when the money is paid to the solicitor. No reliance can be

D    placed on ... those instructions, because they are vitiated by the breach of duty by which they were obtained.... In the absence of some fresh instructions, given by the society after full disclosure of the matters in respect of which it has been misled, the only course properly open to the solicitor is to repay the moneys to the society with interest."

E    The judge evidently considered himself to be imposing a remedial constructive trust as the appropriate remedy for a prior breach of fiduciary duty.

The judge's references to the solicitor having made a representation which "he knew, or must be taken as having known" to be misleading is not an accurate description of the facts of the present case. It is not alleged that the defendant "knew or must be taken to have known" the

F    facts, but only that he "knew or ought to have known" them, which is a very different matter. In explaining his decision in the present case the judge said that the defendant's misrepresentation could not be described as innocent because he "clearly had the knowledge which made the representation false:" see [1996] 2 All E.R. 801, 832. That confuses knowledge with the means of knowledge. On the society's pleaded case

G    the defendant must be taken to have known the facts at one time but to have forgotten or overlooked them so that they were not present to his mind when he came to complete his report to the society.

It is not alleged that the defendant deliberately concealed the arrangements which the purchasers had made with their bank from the society or that he consciously intended to mislead it. Nothing in this judgment is intended to apply to such a case. My observations are

H    confined to the case like the present where the provision of incorrect information by a solicitor to his client must be taken to have been due to an oversight. In such a case his breach of duty is unconscious; he will ex hypothesi be unaware of the fact that he has committed a breach of his

instructions; and if this means that his subsequent application of the          A
mortgage money constitutes a breach of trust then it will be a breach of a
trust of which he is unaware. I would not willingly treat such conduct as
involving a breach of trust or misapplication of trust money unless
compelled by authority to do so, and in my judgment neither principle
nor authority compels such a conclusion.

Before us the defendant submits that, while he was guilty of negligence
and breach of contract, he was not guilty of a breach of trust or fiduciary          B
duty. It is convenient to take first the question of fiduciary duty, and then
to consider the question of breach of trust.

*Breach of fiduciary duty*

Despite the warning given by Fletcher Moulton L.J. in *In re Coomber;*
*Coomber v. Coomber* [1911] 1 Ch. 723, 728, this branch of the law has          C
been bedevilled by unthinking resort to verbal formulae. It is therefore
necessary to begin by defining one's terms. The expression "fiduciary
duty" is properly confined to those duties which are peculiar to fiduciaries
and the breach of which attracts legal consequences differing from those
consequent upon the breach of other duties. Unless the expression is so
limited it is lacking in practical utility. In this sense it is obvious that not          D
every breach of duty by a fiduciary is a breach of fiduciary duty. I would
endorse the observations of Southin J. in *Girardet v. Crease & Co.* (1987)
11 B.C.L.R. (2d) 361, 362:

> "The word 'fiduciary' is flung around now as if it applied to all
> breaches of duty by solicitors, directors of companies and so
> forth. . . . That a lawyer can commit a breach of the special duty [of
> a fiduciary] . . . by entering into a contract with the client without          E
> full disclosure . . . and so forth is clear. But to say that simple
> carelessness in giving advice is such a breach is a perversion of
> words."

These remarks were approved by La Forest J. in *LAC Minerals Ltd. v.*
*International Corona Resources Ltd.* (1989) 61 D.L.R. (4th) 14, 28 where
he said: "not every legal claim arising out of a relationship with fiduciary          F
incidents will give rise to a claim for breach of fiduciary duty."

It is similarly inappropriate to apply the expression to the obligation
of a trustee or other fiduciary to use proper skill and care in the discharge
of his duties. If it is confined to cases where the fiduciary nature of the
duty has special legal consequences, then the fact that the source of the
duty is to be found in equity rather than the common law does not make          G
it a fiduciary duty. The common law and equity each developed the duty
of care, but they did so independently of each other and the standard of
care required is not always the same. But they influenced each other, and
today the substance of the resulting obligations is more significant than
their particular historic origin. In *Henderson v. Merrett Syndicates Ltd.*
[1995] 2 A.C. 145, 205 Lord Browne-Wilkinson said:

> "The liability of a fiduciary for the negligent transaction of his duties          H
> is not a separate head of liability but the paradigm of the general
> duty to act with care imposed by law on those who take it upon
> themselves to act for or advise others. Although the historical

17

Ch.        **Bristol and West Building Society v. Mothew (C.A.)**        Millett L.J.

A    development of the rules of law and equity have, in the past, caused different labels to be stuck on different manifestations of the duty, in truth the duty of care imposed on bailees, carriers, trustees, directors, agents and others is the same duty: it arises from the circumstances in which the defendants were acting, not from their status or description. It is the fact that they have all assumed responsibility for the property or affairs of others which renders them liable for the careless performance of what they have undertaken to do, not the description of the trade or position which they hold."

B

I respectfully agree, and endorse the comment of Ipp J. in *Permanent Building Society v. Wheeler* (1994) 14 A.C.S.R. 109, 157:

C    "It is essential to bear in mind that the existence of a fiduciary relationship does not mean that every duty owed by a fiduciary to the beneficiary is a fiduciary duty. In particular, a trustee's duty to exercise reasonable care, though equitable, is not specifically a fiduciary duty . . ."

Ipp J. explained, at p. 158:

D    "The director's duty to exercise care and skill has nothing to do with any position of disadvantage or vulnerability on the part of the company. It is not a duty that stems from the requirements of trust and confidence imposed on a fiduciary. In my opinion, that duty is not a fiduciary duty, although it is a duty actionable in the equitable jurisdiction of this court. . . . I consider that Hamilton owed P.B.S. a duty, both in law and in equity, to exercise reasonable care and skill, and P.B.S. was able to mount a claim against him for breach of the legal duty, and, in the alternative, breach of the equitable duty. For the reasons I have expressed, in my view the equitable duty is not to be equated with or termed a 'fiduciary' duty."

E

I agree. Historical support for this analysis may be found in Viscount Haldane L.C.'s speech in *Nocton v. Lord Ashburton* [1914] A.C. 932, 956. Discussing the old bill in Chancery for equitable compensation for breach of fiduciary duty, he said that he thought it probable that a demurrer for want of equity would always have lain to a bill which did no more than seek to enforce a claim for damages for negligence against a solicitor.

F

In my judgment this is not just a question of semantics. It goes to the very heart of the concept of breach of fiduciary duty and the availability of equitable remedies.

G    Although the remedy which equity makes available for breach of the equitable duty of skill and care is equitable compensation rather than damages, this is merely the product of history and in this context is in my opinion a distinction without a difference. Equitable compensation for breach of the duty of skill and care resembles common law damages in that it is awarded by way of compensation to the plaintiff for his loss. There is no reason in principle why the common law rules of causation, remoteness of damage and measure of damages should not be applied by analogy in such a case. It should not be confused with equitable compensation for breach of fiduciary duty, which may be awarded in lieu of rescission or specific restitution.

H

This leaves those duties which are special to fiduciaries and which    A
attract those remedies which are peculiar to the equitable jurisdiction and
are primarily restitutionary or restorative rather than compensatory.
A fiduciary is someone who has undertaken to act for or on behalf of
another in a particular matter in circumstances which give rise to a
relationship of trust and confidence. The distinguishing obligation of a
fiduciary is the obligation of loyalty. The principal is entitled to the single-
minded loyalty of his fiduciary. This core liability has several facets.    B
A fiduciary must act in good faith; he must not make a profit out of his
trust; he must not place himself in a position where his duty and his
interest may conflict; he may not act for his own benefit or the benefit of
a third person without the informed consent of his principal. This is not
intended to be an exhaustive list, but it is sufficient to indicate the nature
of fiduciary obligations. They are the defining characteristics of the    C
fiduciary. As Dr. Finn pointed out in his classic work *Fiduciary Obligations*
(1977), p. 2, he is not subject to fiduciary obligations because he is a
fiduciary; it is because he is subject to them that he is a fiduciary.

(In this survey I have left out of account the situation where the
fiduciary deals with his principal. In such a case he must prove
affirmatively that the transaction is fair and that in the course of the
negotiations he made full disclosure of all facts material to the transaction.    D
Even inadvertent failure to disclose will entitle the principal to rescind the
transaction. The rule is the same whether the fiduciary is acting on his
own behalf or on behalf of another. The principle need not be further
considered because it does not arise in the present case. The mortgage
advance was negotiated directly between the society and the purchasers.
The defendant had nothing to do with the negotiations. He was instructed    E
by the society to carry out on its behalf a transaction which had already
been agreed.)

The nature of the obligation determines the nature of the breach. The
various obligations of a fiduciary merely reflect different aspects of his
core duties of loyalty and fidelity. Breach of fiduciary obligation, therefore,
connotes disloyalty or infidelity. Mere incompetence is not enough.
A servant who loyally does his incompetent best for his master is not    F
unfaithful and is not guilty of a breach of fiduciary duty.

In the present case it is clear that, if the defendant had been acting for
the society alone, his admitted negligence would not have exposed him to
a charge of breach of fiduciary duty. Before us counsel for the society
accepted as much, but insisted that the fact that he also acted for the
purchasers made all the difference. So it is necessary to ask: "Why did the    G
fact that the defendant was acting for the purchasers as well as for
the society convert the defendant's admitted breach of his duty of skill
and care into a breach of fiduciary duty?" To answer this question it is
necessary to identify the fiduciary obligation of which he is alleged to have
been in breach.

It is at this point, in my judgment, that the society's argument runs
into difficulty. A fiduciary who acts for two principals with potentially    H
conflicting interests without the informed consent of both is in breach of
the obligation of undivided loyalty; he puts himself in a position where
his duty to one principal *may* conflict with his duty to the other: see *Clark*

19

Ch.        **Bristol and West Building Society v. Mothew (C.A.)**        Millett L.J.

A   *Boyce v. Mouat* [1994] 1 A.C. 428 and the cases there cited. This is sometimes described as "the double employment rule." Breach of the rule automatically constitutes a breach of fiduciary duty. But this is not something of which the society can complain. It knew that the defendant was acting for the purchasers when it instructed him. Indeed, that was the very reason why it chose the defendant to act for it. The potential conflict was of the society's own making: see *Finn, Fiduciary Obligations*, p. 254
B   and *Kelly v. Cooper* [1993] A.C. 205.

It was submitted on behalf of the society that this is irrelevant because the defendant misled the society. It did not know of the arrangements which the purchasers had made with their bank, and so could not be said to be "fully informed" for the purpose of absolving the defendant from the operation of the double employment rule. The submission is
C   misconceived. The society knew all the facts relevant to its choice of solicitor. Its decision to forward the cheque for the mortgage advance to the defendant and to instruct him to proceed was based on false information, but its earlier decision to employ the defendant despite the potentially conflicting interest of his other clients was a fully informed decision.

D   That, of course, is not the end of the matter. Even if a fiduciary is properly acting for two principals with potentially conflicting interests he must act in good faith in the interests of each and must not act with the intention of furthering the interests of one principal to the prejudice of those of the other: see *Finn*, p. 48. I shall call this "the duty of good faith." But it goes further than this. He must not allow the performance of his obligations to one principal to be influenced by his relationship with
E   the other. He must serve each as faithfully and loyally as if he were his only principal.

Conduct which is in breach of this duty need not be dishonest but it must be intentional. An unconscious omission which happens to benefit one principal at the expense of the other does not constitute a breach of fiduciary duty, though it may constitute a breach of the duty of skill and
F   care. This is because the principle which is in play is that the fiduciary must not be inhibited by the existence of his other employment from serving the interests of his principal as faithfully and effectively as if he were the only employer. I shall call this "the no inhibition principle." Unless the fiduciary is inhibited or believes (whether rightly or wrongly) that he is inhibited in the performance of his duties to one principal by reason of his employment by the other his failure to act is not attributable
G   to the double employment.

Finally, the fiduciary must take care not to find himself in a position where there is an *actual* conflict of duty so that he cannot fulfil his obligations to one principal without failing in his obligations to the other: see *Moody v. Cox and Hatt* [1917] 2 Ch. 71; *Commonwealth Bank of Australia v. Smith* (1991) 102 A.L.R. 453. If he does, he may have no
H   alternative but to cease to act for at least one and preferably both. The fact that he cannot fulfil his obligations to one principal without being in breach of his obligations to the other will not absolve him from liability. I shall call this "the actual conflict rule."

In the present case the judge evidently thought that the defendant was      A
in breach of both the duty of good faith and the actual conflict rule. In
*Bristol and West Building Society v. May May & Merrimans* [1996] 2 All
E.R. 801, 817–818 he said:

> "there can be no doubt that the requirement of unconscionable
> conduct is present where a solicitor who is acting for both borrower
> and lender misrepresents to the lender some fact *which he knows, or*      B
> *must be taken to know,* will or may affect the lender's decision to
> proceed with the loan. In those circumstances the solicitor *is abusing*
> *his fiduciary relationship with one client, the lender, to obtain an*
> *advantage for his other client, the borrower.* It is as much 'against the
> dictates of conscience' for a solicitor *knowingly to prefer the interests*
> *of one client over those of another client* as it is for him to prefer his
> own interests over those of his client." (My emphasis.)                    C

I respectfully agree; but no such allegation is made in the present case.
    As to the actual conflict rule, the judge said, at p. 832:

> "First, in *Mothew,* the 'agent' was a fiduciary who had put himself in
> a position in which his duty to the lender *was* in conflict with the
> interests of his other client, the borrower." (My emphasis.)              D

I do not accept this. By instructing him to act for them, the purchasers
must be taken to have authorised the defendant to complete the report
without which the mortgage advance would not have been forthcoming;
and to complete it truthfully. The defendant was required by the society
to report on the purchasers' title as well as to confirm the absence of any
further borrowing. The two stood in exactly the same case. The defendant   E
would not have been in breach of his duty to the purchasers if he had
disclosed the facts to the society any more than if he had reported a defect
in their title.
    This proposition can be tested by considering what the defendant's
position would have been if he had acted for the purchasers and another
solicitor had been instructed to act for the society. He would have been
required to deduce the purchasers' title to the satisfaction of the society's  F
solicitor, and to confirm to him that no further borrowing or second
charge was in contemplation. His duty to the purchasers would have
required him to ascertain the facts from them and to report them to
the society. Unless they told him the facts and instructed him to lie to the
society, instructions which he would be bound to refuse, his duty to the
purchasers would not inhibit him in providing full and truthful information  G
to the solicitor acting for the society.
    In my judgment, the defendant was never in breach of the actual
conflict rule. It is not alleged that he acted in bad faith or that he
deliberately withheld information because he wrongly believed that his
duty to the purchasers required him to do so. He was not guilty of a
breach of fiduciary duty.
    The judge relied on *Nocton v. Lord Ashburton* [1914] A.C. 932 and    H
*Commonwealth Bank of Australia v. Smith,* 102 A.L.R. 453 to hold that a
party who pays money to his solicitor in reliance on a representation
*known* by the solicitor to be false has a remedy for breach of fiduciary

21

Ch.          Bristol and West Building Society v. Mothew (C.A.)          Millett L.J.

A     duty. Neither case is authority for the proposition (though its correctness is not in issue); certainly neither is authority for the proposition that a party who pays money to a solicitor in reliance on a representation which the solicitor *ought to have known* to be false has such a remedy.

In *Nocton v. Lord Ashburton* [1914] A.C. 932 a solicitor had an undisclosed personal interest in a transaction on which he gave his client

B     advice which was to his own advantage and the disadvantage of his client. The plaintiff pleaded breach of the duty of good faith. In fact this was unnecessary; the existence of the defendant's undisclosed interest was enough: see *Lewis v. Hillman* (1852) 3 H.L.Cas. 607. The plaintiff was entitled to receive, and thought that he was receiving, the disinterested advice of a solicitor with no other interest in the transaction. *Commonwealth Bank of Australia v. Smith*, 102 A.L.R. 453 involved a

C     breach of the actual conflict rule. The defendant, who was acting for both parties to a proposed transaction, placed himself in an impossible position by undertaking to advise one of them on the merits of the transaction.

In *Moody v. Cox and Hatt* [1917] 2 Ch. 71 a solicitor, who was acting for both vendor and purchaser, was in possession of valuations which showed that the property was not worth the price which the purchaser

D     had agreed to pay. He did not disclose them to the purchaser, and claimed that his duty to the vendor precluded him from doing so. The purchaser was allowed to rescind. The case bears a superficial resemblance to the present but there are two crucial differences: (i) the vendor was under no obligation to disclose the valuations to the purchaser and did not wish his solicitor do so; and (ii) the vendor and the solicitor tacitly agreed to

E     conceal the valuations from the purchaser. The solicitor was in breach of both the duty of good faith and the actual conflict rule; his defence fell foul of the no inhibition principle.

That was a case of deliberate concealment. Non-disclosure and concealment are two very different things. This has been a truism of the law from the time of Cicero (De Officiis, lib. 3, c. 12, 13 citing Diogenes

F     of Babylon). It is even enshrined, like other such truisms, in a Latin tag: aliud est celare, aliud tacere.

The society placed much reliance on a dictum by Lord Jauncey of Tullichettle in *Clark Boyce v. Mouat* [1994] 1 A.C. 428, 437 where he said:

> "Another case of breach [of fiduciary duty] is where a solicitor
G     acts for both parties to a transaction without disclosing this to one of them *or where having disclosed it he fails, unbeknown to one party, to disclose to that party material facts relative to the other party of which he is aware.*" (My emphasis.)

But I do not think that Lord Jauncey meant to include an inadvertent failure which owes nothing to the double employment. Where such failure

H     is to the advantage of the other party, the court will jealously scrutinise the facts to ensure that there has been nothing more than inadvertence, but there can be no justification for treating an unconscious failure as demonstrating a want of fidelity.

A

In my judgment the distinction drawn by Ipp J. in *Permanent Building Society v. Wheeler*, 14 A.C.S.R. 109 is sound in principle and is decisive of the present case. On the society's pleaded case the fact that the defendant was acting for the purchasers played no part in his failure to report the true state of affairs to the society. It did not inhibit him from fulfilling his obligations to the society. It is consistent with its pleaded case that the defendant would have done so but for a negligent oversight. It would have been exactly the same if he had failed to notice and report the existence of a defect in the purchasers' title. To characterise either such failure as a breach of fiduciary duty because he was acting for both parties in a situation where that fact did not contribute to his failure is, in my opinion, to substitute a verbal formula for principle.

B

In my judgment the judge's conclusion that the defendant was in breach of fiduciary duty cannot be supported. It follows that it cannot be sustained as a ground for holding the defendant in breach of a constructive trust of the mortgage money.

C

### Breach of trust

It is not disputed that from the time of its receipt by the defendant the mortgage money was trust money. It was client's money which belonged to the society and was properly paid into a client account. The defendant never claimed any beneficial interest in the money which remained throughout the property of the society in equity. The defendant held it in trust for the society but with the society's authority (and instructions) to apply it in the completion of the transaction of purchase and mortgage of the property. Those instructions were revocable but, unless previously revoked, the defendant was entitled and bound to act in accordance with them.

D

E

The society's instructions were not revoked before the defendant acted on them, and in my judgment there was no ground upon which the judge could properly conclude that his authority to apply the money in completing the transaction had determined.

If his judgment in the present case is considered without the benefit of his later explanation in *Bristol and West Building Society v. May May & Merrimans* [1996] 2 All E.R. 801, it would appear that the judge was of opinion that the defendant's authority to deal with the money was automatically vitiated by the fact that it (and the cheque itself) was obtained by misrepresentation. But that is contrary to principle. Misrepresentation makes a transaction voidable not void. It gives the representee the right to elect whether to rescind or affirm the transaction. The representor cannot anticipate his decision. Unless and until the representee elects to rescind the representor remains fully bound. The defendant's misrepresentations merely gave the society the right to elect to withdraw from the transaction on discovering the truth. Since its instructions to the defendant were revocable in any case, this did not materially alter the position so far as he was concerned, though it may have strengthened the society's position in relation to the purchasers.

F

G

H

The right to rescind for misrepresentation is an equity. Until it is exercised the beneficial interest in any property transferred in reliance on the representation remains vested in the transferee. In *El Ajou v. Dollar*

23

Ch.         **Bristol and West Building Society v. Mothew (C.A.)**        Millett L.J.

**A**   *Land Holdings Plc.* [1993] 3 All E.R. 717, 734 I suggested that on rescission the equitable title might revest in the representee retrospectively at least to the extent necessary to support an equitable tracing claim. I was concerned to circumvent the supposed rule that there must be a fiduciary relationship or retained beneficial interest before resort may be had to the equitable tracing rules. The rule would have been productive of the most extraordinary anomalies in that case, and its existence continually threatens

**B**   to frustrate attempts to develop a coherent law of restitution. Until the equitable tracing rules are made available in support of the ordinary common law claim for money had and received some problems will remain incapable of sensible resolution.

But all that is by the way. Whether or not there is a retrospective vesting for tracing purposes it is clear that on rescission the equitable title

**C**   does not revest retrospectively *so as to cause an application of trust money which was properly authorised when made to be afterwards treated as a breach of trust.* In *Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548 Lord Goff of Chieveley said, at p. 573:

> "Of course, 'tracing' or 'following' property into its product involves a decision by the owner of the original property to assert his title to
> 
> **D**   the product in place of his original property. This is sometimes referred to as ratification. I myself would not so describe it, but it has, in my opinion, at least one feature in common with ratification, that it cannot be relied upon so as to render an innocent recipient a wrongdoer (cf. *Bolton Partners v. Lambert* (1889) 41 Ch.D. 295, 307, *per* Cotton L.J.: 'an act lawful at the time of its performance [cannot] be rendered unlawful, by the application of the doctrine of
> 
> **E**   ratification.')"

In *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council* [1996] A.C. 669 Lord Browne-Wilkinson expressly rejected the possibility that a recipient of trust money could be personally liable, regardless of fault, for any subsequent payment away of the moneys to third parties even though, at the date of such payment, he was ignorant

**F**   of the existence of any trust. He said, at p. 705:

> "Since the equitable jurisdiction to enforce trusts depends upon the conscience of the holder of the legal interest being affected, he cannot be a trustee of the property if and so long as he is ignorant of the facts alleged to affect his conscience, i.e. until he is aware that he is intended to hold the property for the benefit of others in the case
> 
> **G**   of an express or implied trust or, in the case of a constructive trust, of the factors which are alleged to affect his conscience."

Mutatis mutandis that passage is directly applicable in the present case. The defendant knew that he was a trustee of the money for the society; but he did not realise that he had misled the society and could not know that his authority to complete had determined (if indeed it had). He could

**H**   not be bound to repay the money to the society so long as he was ignorant of the facts which had brought his authority to an end, for those are the facts which are alleged to affect his conscience and subject him to an obligation to return the money to the society.

Before us the society put forward a more sophisticated argument. The defendant's instructions, it pointed out, expressly required him to report the arrangements in question "to the society prior to completion." This, it was submitted, made it a condition of the defendant's authority to complete that he had complied with his obligation. Whether he knew it or not, he had no authority to complete. It was not necessary for the society to revoke his authority or withdraw from the transaction. I do not accept this. The society's standing instructions did not clearly make the defendant's authority to complete conditional on having complied with his instructions. Whether they did so or not is, of course, a question of construction, and it is possible that the society could adopt instructions which would have this effect. But it would in my judgment require very clear wording to produce so inconvenient and impractical a result. No solicitor could safely accept such instructions, for he could never be certain that he was entitled to complete.

In my judgment the defendant's authority to apply the mortgage money in the completion of the purchase was not conditional on his having first complied with his contractual obligations to the society, was not vitiated by the misrepresentations for which he was responsible but of which he was unaware, had not been revoked, and was effective to prevent his payment being a breach of trust. Given his state of knowledge (and, more importantly, that his authority had not been revoked), he had no choice but to complete.

### Conclusion

In my judgment the defendant was not guilty of breach of trust or fiduciary duty. This makes it unnecessary to consider what the consequences of such a breach would have been. I would allow the appeal and set aside the money judgment. I would leave undisturbed the judgments for damages to be assessed for breach of contract and negligence, but make it clear that it does not follow that the society will establish any recoverable loss.

OTTON L.J.    I have read with advantage the judgments of Staughton and Millett L.JJ. I agree with the analysis and reasoning regarding breach of trust and of fiduciary duty. I wish only to add a few words on the extant common law claims.

I am satisfied that there was sufficient evidence before the judge to establish negligence on the part of the defendant. There was the requisite proximity between the parties, and there was foreseeability of damage. Thus a duty of care arose. This duty included answering correctly such questions as were posed by the proposed lender and which it was reasonable for him to be required to answer. The answer sought was one of fact and not opinion. The fact sought could have been supplied accurately by information which was within his knowledge. If it was not at his fingertips the information was either on file or could easily have been obtained by direct inquiry of the intending purchaser. His breach of duty occurred when he conveyed the inaccurate information to the plaintiff. The duty was not simply a duty not to act carelessly; it was a duty not to inflict damage carelessly. Damage is the gist of the action.

A    The more complex issues are whether the inaccurate information given was causative of damage, and if so what measure. To my mind it is not necessary to adopt a particular procedural path to find the answer. I appreciate that Lord Hoffmann suggests that it is first necessary to decide the kind of loss to which the plaintiff is entitled. This may be appropriate in most cases where negligence/causation is involved. From a practical point of view in some cases it may be more expedient to establish

B    the causal link between the negligent act or omission and the reliance by the plaintiff or the course of action which he was induced to take. The judge may find as a fact that there was no reliance or that the plaintiff would have behaved in the same or substantially the same manner if he had been given accurate information; in either event the negligence had no causative potency. That is the end of the matter. The chain is broken,

C    there is no loss at all and there is no need to consider or determine the kind of loss.

In other cases it may be appropriate to identify the type or particular head of damage claimed. This may identify damage which is too remote and for which no remedy lies (e.g. economic loss), and the claim in respect of it fails in limine. As I concur that the damages award must now be set aside the issue of the measure of damage, if any, is now at large. I regard

D    the evidence (in particular the hearsay evidence of Ms Samantha Bennett at paragraph 29 of Mr. Prees's affidavit) as falling short of resolving the issues of causation or damage. It does not (for example) address the possibility of a revised offer if the accurate and full position had been explained to the plaintiff.

I do not think it necessary to conclude whether there was a breach of

E    contract. This cause of action probably adds nothing to the case in negligence. It is unlikely that there is any practical difference between a breach of the duty of care and a breach of contract, or in the issues arising on causation, or the measure of damages. If there is any issue it can be determined by the trial judge. I also consider that there was no waiver.

For these reasons I consider that there are triable issues and they should be determined by a judge at first instance.

F    I would therefore allow the appeal and remit the assessment of damages as proposed by Staughton L.J. and dismiss the respondent's notice.

STAUGHTON L.J. Mr. Mothew made his report to the Cheshunt

G    Building Society on 2 August 1988. In it he answered one of the questions asked as follows:

"Q. Please confirm that (to the best of your knowledge and belief) the balance of the purchase money is being provided by the applicant(s) personally without resort to further borrowing. If not please give details. A. Confirmed."

H    That was untrue. There were other aspects of the same error, but I need not go into them in detail. Although Mr. Mothew had the means of knowledge in his possession, which could have brought the error to his attention, it is not said that he acted fraudulently or in bad faith.

The ordinary remedy of a client who has received wrong information A or advice from his solicitor is to claim damages for negligence, whether as a breach of contract or as a tort. For such a claim to give rise to substantial damages the building society would have to show that the breach of contract or negligence caused them loss. By their respondent's notice they seek to say that, if they had known the true facts, they would not have lent any money to Mr. and Mrs. Towers.

The judge regarded that point as immaterial, since the building society B succeeded on other grounds. If it is material, in my opinion it raises a triable issue. According to Samantha Bennett of the society's advances department, the offer of advance would have immediately been withdrawn if the society had known that even £3,350 was being borrowed elsewhere. In the nature of things Mr. Mothew is unlikely to have evidence which directly controverts that statement. But there are grounds for supposing C that it may be open to question. I would not give judgment under R.S.C., Ord. 14 on the basis that it is true. If it is critical, the case must go to trial, perhaps with the aid of interrogatories and discovery of documents.

However in this particular case the building society were not the sole clients of Mr. Mothew; he was also the solicitor acting for Mr. and Mrs. Towers. That is said to make all the difference, because Mr. Mothew D then became under a fiduciary duty to the building society. And the argument is that for breach of fiduciary duty the remedy does not depend on causation or remoteness; all that is necessary is that the loss would not have occurred *but for* the breach of duty.

It seems to me wrong that a breach of contract or tort should become a breach of fiduciary duty in that way. I am glad to find that the authorities relied on by Millett L.J. show that it is wrong. In my judgment E Mr. Mothew was in breach of a duty of care and nothing more. True he was in a situation where he owed duties to two clients, and those duties might conflict with each other. But he did not prefer the interest of one client to that of another; at most he was guilty of negligence which had that unintended effect.

Alternatively it is said that Mr. Mothew was in breach of trust because F he paid away the trust fund contrary to his instructions. He did indeed hold the £59,000 in trust; it was not his own money. There was in my opinion an express or implied trust, and not (as the judge held) a constructive trust. But he did not pay it away contrary to the society's instructions. The cheque reached Mr. Mothew with a letter dated 23 August 1988, which in effect instructed him to use it for completion of G the proposed purchase. That was what he did.

There being in my opinion no breach of fiduciary duty or breach of trust, it is unnecessary to consider what remedy such a breach might have afforded.

Thus far the appeal succeeds, but there remains judgment on the cause of action at common law for damages to be assessed. Mr. Sumption says that even that must go, since there is a triable issue as to waiver by the H building society. The problem that he faces is that, although the building society readily agreed when they were asked to consent to the registration of the second charge, they are not shown to have known that the second

A     charge was contemplated and intended at the time of Mr. Mothew's report. There has been ample opportunity to produce evidence that they knew, if indeed they did. In my judgment there was no waiver.

When the argument before us was concluded on 21 May that was all that we had to decide. But we have since been asked to consider the judgment of Hobhouse L.J. in *Downs v. Chappell* [1997] 1 W.L.R. 426 and

B     the speech of Lord Hoffmann in *Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191. Such has been the volume of litigation on the topic of loss to lenders following negligent professional advice and the collapse of the property market that judges risk being overtaken by new authority.

The Court of Appeal in the *Banque Bruxelles* case began with a reference to the well known principle that damages should be as nearly as

C     possible the sum which would put the plaintiff in the position in which he would have been if he had not been injured. That would lead to two possible answers in the present case. (1) If there had been no report from Mr. Mothew to the building society, the money would not have been lent; the society would still have their £59,000. There would have been no transaction, a phrase which I use not as a label for anything but as a

D     description of the fact. (2) If Mr. Mothew had provided an accurate report to the building society, then they might have been content to proceed on the terms previously proposed, or they might have made a revised offer, or they might have proceeded as in (1) above. There is a triable issue as to that. Left to myself, I would have ruled that (2) was the appropriate situation for the judge to consider in assessing the damages.

E     But I have to acknowledge that Hobhouse L.J. in *Downs v. Chappell* [1997] 1 W.L.R. 426, with the agreement of Butler-Sloss and Roch L.JJ., preferred method (1), both for fraudulent misrepresentation and for negligence.

Lord Hoffmann, in the *Banque Bruxelles* case [1997] A.C. 191, 211, as it seems to me, considered that either method was the wrong place to

F     begin:

> "Before one can consider the principle on which one should calculate the damages to which a plaintiff is entitled as compensation for loss, it is necessary to decide for what kind of loss he is entitled to compensation."

G     There follows an exposition of the problem and the answer to it, as set out in the judgment of Millett L.J.

For my part I feel that we should not at this stage purport to instruct the judge who has to assess the damages by a paraphrase or interpretation of that decision, for a number of reasons. First, we have not heard argument on it, and our judgment is already long delayed by intervening

H     material. I am told it would be impractical for us to have a further hearing before October. Secondly, the judge has yet to find the facts relating to the assessment of damages. Thirdly, the judge must be guided by what Lord Hoffmann has said and not by any gloss of ours.

I would allow the appeal and remit the assessment of damages, either      A
to Chadwick J. or to another judge of the Chancery Division as the
exigencies of business may require. The cross-appeal should be dismissed.

*Appeal allowed.*
*Cross-appeal dismissed.*

                                                                          B
*Solicitors: Wansbroughs Willey Hargrave; Osborne Clarke, Bristol.*

[Reported by JILL SUTHERLAND, Barrister]

                                                                          C
—————

[COURT OF APPEAL]

# TURNER v. STEVENAGE BOROUGH COUNCIL      D

1997  March 6                                Staughton, Pill and Mummery L.JJ.

*Arbitration—Arbitrator—Misconduct—Application to remove arbitra-*
*tor—Lengthy correspondence and preliminary proceedings—Arbitra-*
*tor proposing interim payment of fees and expenses—Payment*
*by one party only—Subsequent return of payment—Whether*      E
*misconduct—Whether arbitrator to be removed—Arbitration Act*
*1950 (14 & 15 Geo. 6, c. 27), s. 23*

In February 1993 an arbitrator was appointed to conduct
arbitration proceedings relating to a rent review between the
council, as landlords of a shop, and the tenant. The arbitrator's
terms of appointment contained no express provision for payment
of interim fees or expenses. The parties contemplated that the      F
arbitration would be concluded within about three months and
the arbitrator stated that the award would be made by 30 June
1993. In May 1994, after lengthy correspondence and five
preliminary hearings, the arbitration had still not concluded and
the arbitrator wrote to both parties suggesting a timetable for the
hearing and requesting payment by each party of half his interim
fees and expenses. The tenant objected and asked whether, if
payment were not made, the arbitrator would not hear the      G
arbitration. The arbitrator replied that the first priority was to fix
the hearing and to resolve the dispute, but that he hoped the
parties would agree that it was reasonable that he should receive
interim payment for time expended on the matter. The council
paid the sum to the arbitrator, but three months later, after
taking legal advice, he returned it. The tenant applied for the
arbitrator to be removed for misconduct under section 23 of the      H
Arbitration Act 1950[1] on the ground that he had no power to

---

[1] Arbitration Act 1950, s. 23: "(1) Where an arbitrator or umpire has misconducted
himself or the proceedings, the High Court may remove him."



**Tab 4**

BRITISH VIRGIN ISLANDS

EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
(CIVIL)

Claim No:  BVIHCV 2009/0020A

In the Matter of the Insolvency Act 2003 and the Insolvency Rules 2005
And in the Matter of Y2K Finance Inc.

BETWEEN:

CITCO GLOBAL CUSTODY NV

Applicant

and

Y2K FINANCE INC

Respondent

Appearances:
 Ms. Barbara Dohmann QC; Mr. Jack Husbands of Walkers; and Mr. Robert Weekes for the
 Respondent Y2K Finance Inc
 Mr Simon Browne-Wilkinson QC; and Ms Arabella di Iorio of Maples & Calder for the Applicant Citco
 Global Custody NV

JUDGMENT

[2009:  18 September]

[Member's application for appointment of liquidators;  whether to be struck out as an abuse of process;  whether to be struck out as disclosing no reasonable cause of action;  right of member to bring liquidation proceedings based upon allegations that company has actionable claims against directors and others;  whether member can bring liquidation proceedings based upon need to investigate conduct of directors]

[1] **Bannister J [ag]:**  On Friday 18 September 2009 I heard an application by Y2K Finance Inc ('the Company') to strike out an originating application issued by Citco Global Custody NV ('Citco') on 16 January 2008 seeking the appointment by the Court of a liquidator over the Company pursuant to section 162(1)(b) of the Insolvency Act, 2003 ('the Act').  The grounds upon which the strike out application was made were (a) that the application for the appointment of a liquidator had no reasonable prospect of success and/or (b) that the application involved an abuse of the process.

[2] At the conclusion of the hearing I gave my decision and short oral reasons. I ordered that certain of the grounds set out in the originating application be struck out as having no reasonable prospect of success but allowed the originating application to proceed upon the remaining ground alleged, that (in short) it was just and equitable that the Company be wound up because it had ceased all commercial operation. On giving my decision I indicated that if either party wished me to supply written reasons, I would do so. On Monday 21 September 2009 I was asked by representatives of Citco to give my reasons in writing and this written judgment is given in response to that request.

## Background

[3] The Company is a BVI incorporated company and operated as a Professional Fund within the meaning of the British Virgin Islands Mutual Funds Act, 1996, as amended. It used a typical hedge fund corporate structure, with investors subscribing for shares in the Company and being entitled to redeem those shares in accordance with the provisions of the Company's Articles of Association. Redemptions were paid out on the familiar Net Asset Value ('NAV') basis and there were common form provisions in the Articles permitting the directors of the Company to suspend the calculation of NAV in certain specified circumstances. Such suspensions, if validly made, would prevent the making of applications to redeem or the further processing of such applications if not completed before the suspension was declared. Citco is a nominee shareholder for various different beneficial owners of shares in the Company.

[4] Between 25 and 27 July 2007 the Company received six redemption notices. Five were from the holders of Class A shares in the capital of the Company and one was from a holder of Class X shares. There is no dispute between the parties that the Articles of the Company provide (somewhat ungrammatically) for A shares to be redeemed on the basis of a calculation of NAV made at the end of the calendar month which first occurs after the expiry of 30 days from the giving of the redemption notice. In the case of the A shares the subject of these late July redemption notices, there is again no dispute that the Company, instead of redeeming them on the basis of NAV calculated at the end of August 2007, as envisaged by the terms of the Articles which I have summarised above, paid them out between 10 and 16 August 2007 on the basis of NAV calculated as at 31 July 2007. The amounts so paid out amounted in aggregate to some US $41 million. The amount paid out in respect of the X shares referred to above was some US$9.8 million – making a total paid out between 10 and 16 August 2007 of some US$51 million. I pause to mention that

2

there is a dispute between the parties whether the X shares are redeemable at all. For reasons which will become obvious, it is not necessary for me to resolve this dispute for present purposes.

[5]     These redemptions were made out of cash available to the Company at the relevant time. Subsequently, the Company realised assets and unwound its positions. On 10 September 2007 NAV was suspended. It was common ground at the hearing before me that after these events there remains available to the Company for distribution some US$6 million only.

[6]     On 22 November 2007 a company called Headstart Class F Holdings Limited ('Headstart') commenced proceedings in the High Court claiming that the events very shortly summarized above amounted to conduct of the affairs of the Company in a manner unfairly prejudicial to Headstart. Following the realization that Headstart was not a member of the Company, the claim was amended to join Citco as a claimant. Citco undoubtedly is a member of the Company and it and Headstart alleged and continue to allege that it holds the 8,000 A shares in the capital of the Company which are in issue in these proceedings for Headstart beneficially. An enormous amount of energy and costs have been expended in the course of this dispute in an effort on the part of the Company to show that Headstart is not in truth the beneficial owner of the 8,000 shares. It seems to me that whether Citco holds the shares for itself, for Headstart or for some other person is beside the point. There is no doubt, in my judgment, that Citco, as the registered shareholder, has *locus standi* to bring either unfair prejudice or liquidator proceedings against the Company, whether it holds the 8,000 shares beneficially or for another. If it holds for another, the identity of that other is irrelevant.

[7]     In May 2008 the Company applied to strike out the unfair prejudice proceedings. It said that Headstart, not being a registered holder of shares in the Company, had no *locus* to bring the proceedings; that Citco did not complain of any unfair prejudice; that parts of the claim were contradictory and should be struck out for that reason; and that the claims for relief advanced by Headstart/Citco were bad as amounting to a claim by a member for loss recoverable in its own right by the Company and therefore fell foul of the rule against claims by members for loss that is merely reflective of loss suffered by a company. The Company's application was heard by Hariprashad-Charles J on May 19 2008. She gave judgment on 4 November 2008.

[8]     The learned Judge struck out Headstart as a claimant. She held that a beneficial owner of shares had *locus* to bring unfair prejudice proceedings, but that Headstart had failed to show that Citco was nominee

3

for Headstart in respect of the 8,000 shares and so had no right to bring the proceedings. She further held that Citco had failed to complain in the amended statement of claim of unfair prejudice. She rejected the claim based on contradictory allegations but struck out those parts of the prayer which she held to infringe the rule against reflective loss. She refused the Company a declaration that it was entitled to distribute its remaining assets according to its members respective entitlements (it is alleged by the Company that it has no creditors) on the grounds that such relief was unnecessary.

[9]     Citco has appealed this decision. At the time of writing the Court of Appeal has yet to give its judgment.

[10]   Meanwhile, on 21 May 2008, three days after argument on the strike out in the unfair prejudice proceedings had taken place and well before the Court gave its judgment on that strike out application, Citco issued an originating application for the appointment of a liquidator to the Company. I had better set out the material parts of the originating application in full:

"The grounds upon which [Citco] seek[s] the order are summarized below and are further set out in the first affidavit of Helen Mulcahy sworn on 21 May 2008:

1.  The Company is a BVI company operating as a Professional Fund within the meaning of the British Virgin Islands Mutual Fund Act 1996, as amended. The Applicant is, in its capacity as custodian for Headstart Class F Holdings Limited, an investor in, and member of, the Company.

2.  The Company was incorporated as a fixed income performance mutual fund, however, the Company has itself expressed that its life has come to an end and it no longer has any reasonable expectation of meeting its objects as a mutual fund. It is the Company's intention to realize the last of its assets and to distribute those assets between the remaining members.

3.  In July and August 2007, the Company purported to accept and pay out substantial redemptions in excess of US$50 million notwithstanding the Company's own admission the redemptions failed to comply with the notice requirement contained in Article 10 of the Company's Articles of Association.

4.  The Company has indicated that it will distribute its remaining assets to its members and no longer has any prospect of meeting its objectives. Should the Company be put into voluntary liquidation, it is likely that the

4

Company's claims in respect of 27 July 2007 redemption will never be investigated or pursued to the detriment of the Company and accordingly, its members.

5. In all the circumstances, it is just and equitable that a liquidator be appointed over the Company."

[11] On 11 November 2008 the Company issued an application to strike out Citco's liquidator application.

[12] On 23 January 2009 Hariprashad-Charles J held that the liquidator application had been deemed dismissed on 22 November 2008 pursuant to the provisions of section 168 of the Act. Meanwhile, on 15 January 2009 Citco had issued an almost identical liquidator application. Apart from its date, the only material difference between this and the first liquidator application was the addition of a new paragraph 1, in the following terms:

"The application is made as a protective measure in the event that, contrary to the Applicant's primary position, the First Liquidator Application is deemed to have been dismissed pursuant to section 168 of the Insolvency Act 2003."

[13] On 16 January 2009 a consent order was made by Hariprashad-Charles J in this second liquidator application. Shortly, it was ordered by consent that the second liquidator application be treated as a 'continuation' of the first; that the Company's application to strike out the first liquidator application be treated as an application to strike out the second; that that strike out application be heard after the decision of the Court of Appeal in Citco's appeal against the dismissal by Hariprashad-Charles J of Citco's unfair prejudice claim; and that the substantive hearing of the liquidator application (if not struck out) be heard over 5 days beginning not before 1 June 2009.

[14] As a result of two orders which I made on, respectively, 10 July and 7 August 2009, the hearing of the Company's strike out application was, as I have said, heard and decided by me on 18 September 2009, despite the fact that the decision of the Court of Appeal in Citco's appeal in the unfair prejudice proceedings has yet to be handed down.

## The strike out application in the liquidator proceedings

[15]    The Company's strike out application asks that Citco's liquidator application be struck out or dismissed in its entirety as disclosing no reasonable grounds and/or as an abuse of process. The specific grounds which follow are:

"1. By claim made in this Court under Claim No. BVIHCV2007/0278, Citco alleged that the affairs of Y2K Finance Inc. had been conducted in a manner which was unfairly prejudicial to the interests of Citco by permitting shareholders in Y2K to redeem their shareholdings in July 2007 ("the July Redemptions") On Y2K's application, that claim was struck out in its entirely by Hariprashad-Charles J (Judgment, 4 November 2008). By the [liquidator] Application, Citco applies for a liquidator to be appointed over Y2K for the purpose of investigating the making of July Redemptions and/or the bringing of proceeding on Y2K's behalf in respect of those Redemptions. Citco is not entitled to the relief sought because:

   a) For the reasons given in the Judgment, there has been no unfair prejudice.
   b) The appointment of an external liquidator is not required in order to liquidate the estate.
   c) In light, in particular, of the findings made in the judgment, the appointment of an external liquidator would serve no good purpose.
   d) A class remedy is plainly not appropriate.
   e) The appointment of an external liquidator (and the continuation of Citco's application) will simply diminish the assets available for distribution.
   f) Citco's attempt to press for the relief sought is in substance and purpose an attempt to relitigate the unfair prejudice claim that has failed."

## Abuse of Process

[16]    This was put in two ways at the hearing; it was said by Miss Dohmann QC, who appeared together with Mr. Jack Husbands and Mr. Robert Weeks for the Company, that by its originating application Citco was either re-litigating, or attempting to relitigate, the unfair prejudice proceedings, the decision in which stood

in the absence of any decision of the Court of Appeal to the contrary and operated as an estoppel against Citco's originating application; or that Citco should and could have included its application for the appointment of a liquidator as an alternative to its claim for relief for unfair prejudice and that its prosecution of separate liquidator proceedings was bad as offending against the principle in *Henderson v Henderson*[1].

[17]    I am wholly unpersuaded that the bringing of liquidator proceedings is barred by any sort of estoppel resulting from the strike out by Hariprashad-Charles J of the unfair prejudice proceedings. Hariprashad-Charles J did not have to consider and expressed no view on the question whether or not Citco was in a position to apply for the appointment of a liquidator over the Company and I do not think that her dismissal of the unfair prejudice proceedings involved an implied but unspoken rejection of any right of Citco to bring liquidator proceedings. Indeed, as I shall attempt to make clear later in this judgment, the juridical basis for the bringing of unfair prejudice proceedings on the one hand and that for the making of an application for the appointment of a liquidator on the other are quite distinct.

[18]    As for the suggestion that an application for the appointment of liquidators should have been joined to the application based upon unfair prejudice and that Citco's failure to do so somehow brings the *Henderson v Henderson* principle into play, that seems to me unreal in light of the fact that Citco brought the original liquidation application before the unfair prejudice proceedings were struck out and that the liquidation application was continued under the umbrella of the second liquidator application by consent (although still subject to the Company's application to strike out). It seems to me, applying the test identified in a passage from *Johnson v Gore Wood & Co*[2] to which I was referred in the course of argument, that I cannot hold, in the light of the public and private interests involved and the facts surrounding these proceedings, that the making and prosecution of the liquidator application in this case amounts to a misuse or abuse of the process of the court.

## No reasonable prospect of success

[19]    Miss Dohmann QC also argues that the application for the appointment of a liquidator stands no reasonable prospect of success, or, put another way, is bound to fail. I say immediately that in light of the evidence, which shows to my current satisfaction that the Company has no further commercial purpose other than to distribute its remaining assets to members who have yet to redeem, it is impossible for me to

---

[1] (1843) 3 Hare 100
[2] [2002] 2 AC 1 at 31D

hold that Citco has no reasonable prospect of succeeding on its originating application so far as it relies upon the grounds in paragraph 3 and the first sentence of paragraph 5 of the current originating application, (which are in identical terms to those set out and numbered as paragraphs 2 and 4 in the first originating application and which I have set out in paragraph 10 of this judgment) and which seek the winding up of the Company on the grounds that its commercial life is at an end. Whether, on the hearing of the originating application, members of the Company other than Citco may appear to oppose the application and, if they do, whether they may persuade the Court at that hearing not to order that the Company be wound up by a court-appointed liquidator, but that instead some other machinery should be employed for putting the Company to bed, is not relevant to the question whether the Court should hold *at this stage* that the ground set out in paragraph 3 and the first sentence of paragraph 5 of the current originating application has no reasonable prospect of success.

[20]    I turn to the other grounds relied upon in the liquidator application.

[21]    Paragraph 4 (identical to the original paragraph 3) refers to the admitted fact that in July of 2007, as I have mentioned, the Company paid out redemptions of more than US$51 million and states that it did so notwithstanding the admitted fact that these redemptions failed to comply with the notice period contained in Article 10. Strictly speaking, I think it is correct to say that the Company's admission applies only to the redemptions of the Class A shares, but I do not think that that is significant for present purposes. The final sentence of paragraph 5 of the originating application alleges that if the Company is put into voluntary liquidation it is likely that its claims in respect of the July 2007 redemptions will never be investigated or pursued and that the Company and its members will suffer accordingly.

[22]    I should say at once that the reference in the originating application to the Company's 'claims' in respect of the July redemptions begs a large question – whether the Company has any claims in that regard at all. In an affidavit made in support of the originating application on 21 May 2008 Helen Mulcahy, an English Solicitor acting for Citco in this matter, says merely that the July redemptions involved a 'breach' of the Company's Articles and that the redemption payments were 'wrongful'. She goes on to say that 'there remains a question' as to why NAV or payment was not suspended sooner and that there similarly remains a question whether the Company's board acted in breach of fiduciary duty in failing to do so. Ms Mulcahy adds that 'there is a question' as to whether the payment of the July redemptions triggered a series of margin calls and whether the Company's trading of assets was manipulated to produce sufficient to enable it to pay the July redemptions. Ms Mulcahy says that she believes that 'there is a cause for investigation'

as to the circumstances in which the redemptions were made and a 'necessity' that the Company should 'reconstitute' the cash assets and make a redistribution to all shareholders or seek to recover the shortfall between the 31 July 2007 NAV and the NAV post suspension, either from the directors or from the recipients, either as 'knowing recipients' or as recipients of money paid under a mistake. She ends by alleging that she believes that the Company's opposition to the now (but not at the time when Ms Mulcahy swore her affidavit) struck out unfair prejudice claim is fuelled, at least in part, by the directors' own interests.

[23]   It seems to me that none of this supports the existence of even a prima facie claim available to the Company. Ms Mulcahy's affidavit is a mixture of 'questions' as to whether or not actionable breaches have occurred, coupled with assertions that that certain steps by way of repayment 'need' to be made, the whole being said to give rise to a 'cause for investigation'.

[24]   In his oral submissions, Mr Browne-Wilkinson QC, who appeared together with Ms Arabella di Iorio for Citco, seemed to me to be going well beyond the cautious evidence given by Ms Mulcahy and to be suggesting that the Company had identifiable prima facie claims against directors, the recipients of the July 2007 redemptions and, even, certain advisers to the Company. It is only fair to say that in doing so he relied upon further evidence than that contained in Ms Mulcahy's affidavit. For reasons which will appear, I do not think that it is necessary for me to recite the facts to which all of that further evidence was directed, other than to say that Mr. Browne-Wilkinson QC was able to show that at least one of the directors who were concerned in authorising the July 2007 redemptions was also on the board of one of the immediate recipients of the proceeds and that the fund suffered negative monthly returns in June and July 2007. Even with the benefit of that and the other additional evidence, to which Mr. Browne-Wilkinson referred me I have to say that I was not persuaded that all the necessary elements of any of the claims which he canvassed was sufficiently evidenced to enable the Company to plead claims against any of the targets which he identified, but that seems to me to be beside the point. Even if Mr. Browne-Wilkinson QC had established to the complete satisfaction of the Court that the Company had a cast iron claim against the directors, the recipients of the redemption monies or, indeed, any other person, that would not, in my judgment, have assisted him. Mr. Browne-Wilkinson's submissions on this part of his case amounted to an assertion that, provided a member can identify wrongs (particularly wrongs committed by members of its board of directors) actionable at the suit of a company, that gives him grounds for seeking to have the company wound up. In my judgment, there is no such principle. Mr. Browne-Wilkinson QC was unable to cite

authority for the proposition. The decision upon which he relied, *Loch v John Blackwood Ltd*[3] is a classic example of a quasi-partnership case dealing with the position of a family shareholder trapped within a company that was being maladministered on a continuing basis. Quite apart from the fact that the background to that case was about as far removed as it is possible to be from that of a hedge fund whose membership was restricted to professional investors, it is not an authority that a member can wind up a company if he can once establish that the company has an actionable complaint against its directors for breach of fiduciary duty. It is for the company to decide what steps, if any, to take in such circumstances. If it were right that such a set of facts gave a minority shareholder the right to have the company wound up, it would, in my judgment, make serious inroads into the *Foss v Harbottle*[4] principle of majority rule.

[25] At one point I understood Mr. Browne-Wilkinson QC to be submitting that because section 11 of the Business Companies Act, 2004 makes the memorandum and articles of association of a company binding between the company and each of its members, that in some way entitled Citco to take proceedings, such a winding up proceedings, with the object of ultimately bringing about redress against a board of directors which had acted contrary to provisions in the articles. If Mr. Browne-Wilkinson QC was indeed going that far, he was, in my judgment, in error. A member's right to enforce provisions in the articles of association of a company is restricted to breaches which affect his rights as a member. In the present case, Citco's rights *as a member* were the same after as they had been immediately before the payment out of the July 2007 redemptions. There is authority to the effect that the 'articles as a contract' principle cannot be used to short-circuit the rule in *Foss v Harbottle*[5]. In my judgment the same principle applies to prevent a minority shareholder taking indirect action (such as by way of the presentation of an application for the appointment of a liquidator) on the grounds that the board has flouted the provisions of the articles (in some manner not directly impinging on his rights *qua* member).

[26] For these reasons, none of the matters on which Mr Browne-Wilkinson QC relies, even if the Company does have an actionable complaint against the directors or other persons arising out of them, provides Citco with any basis at all to apply for the appointment of a liquidator on just and equitable grounds. Not only is there no authority in support of such a proposition there is, as I have endeavoured to demonstrate, if not direct authority, then well established principle to the contrary.

---

[3] [1924] AC 783
[4] (1843) 2 Hare 461
[5] See Gore-Browne on Companies at para 6[30] (Update 51)

[27]    It may be that Citco is saying that even if no actionable complaint has so far been established, then at the lowest it has been able to point to circumstances which cry out for investigation. Assuming, without deciding, that that position has been reached, it does not, in my judgment, mean that Citco has grounds for seeking the appointment of a liquidator on just and equitable grounds. This follows *a fortiori* from the reasoning set out in the preceding paragraphs. Unless an applicant for the appointment of a liquidator can rely upon an established ground for asking the court to make the appointment, his application will fail. In my judgment, paragraph 3 and the last sentence of paragraph 5 of Citco's originating application disclose no such grounds. Unless they are struck out, their continued inclusion in the application is likely to result in waste of the parties' money and the Court's time in the canvassing of irrelevant and thus inadmissible material.

[28]    At the hearing on 18 September 2009, I ordered that paragraphs 3 and 5 of Citco's originating application be struck out. I rejected a submission by Mr. Browne-Wilkinson Q.C. that there was no reason why the first sentence of paragraph 5 should not stand. I consider that I was wrong to do so, and the order as perfected will strike out the last sentence of paragraph 5 leaving the first in place. I also ordered that paragraphs 3 to 12 of the affidavit of Ms Mulcahy, to which I have made reference above, be not relied upon in support of Citco's application. It goes without saying that I also disallow reliance at the hearing upon any evidence going to the events which are there dealt with, although I do not think that the formal order needs to deal with that. Otherwise, the Company's application was dismissed. It was agreed that questions of costs should be dealt with when Citco's liquidator application comes on for hearing on 9 November 2009. I should add that I also made an order pursuant to section 168 of the Insolvency Act, 2003 extending the time for determination of Citco's liquidator application until 15 January 2010 or such earlier time as that application has been determined.

Commercial Court Judge
24 September 2009