# Tab 5

Dockets.Justia.com

TERRITORY OF THE VIRGIN ISLANDS

IN THE COURT OF APPEAL

HCVAP 2008/022

BETWEEN:

## CITCO GLOBAL CUSTODY NV

Appellant/Claimant

and

## Y2K FINANCE INC

Respondent/Defendant

**Before:**
    The Hon. Mr. Hugh A. Rawlins                       Chief Justice
    The Hon. Mde. Ola Mae Edwards               Justice of Appeal
    The Hon. Mde. Janice George-Creque          Justice of Appeal

**Appearances:**
    Mr. Simon Browne-Wilkinson Q.C. and Mr. Jeffrey Chapman for the
    appellant/claimant
    Ms. Barbara Dohmann Q.C., Mr. Samuel Jackson Husbands and Mr. Robert
    Weekes for the respondent/defendant.

---

    2009:   January 15;
                  October 19.

---

*Civil Appeal - whether judge applied correct principles for striking out amended statement
of case under CPR26.3(1)(b) - assumption that facts stated in the pleadings are true -
whether test for summary judgment under CPR 15.2 applicable - whether pleadings
sufficiently disclosed that one of the claimants was beneficial owner of shares - whether
judge erred in striking out the claimant who was beneficial owner of shares as having no
locus standi to pursue a claim under section 1841 - whether pleadings disclose reasonable
grounds for bringing unfair prejudice claim under section 1841 of the BVI Business
Companies Act - whether the rule against reflective loss imposes a bar to the relief sought
in paragraph 2 of the prayer - statutory interpretation of section 1841 - court's discretion to
make different types of orders under section 1841 - whether judge erred in striking out
paragraph 2 of the relief sought.*

By an Amended Statement of Claim for unfair prejudice brought under section 1841 of the **BVI Business Companies Act**, Headstart Class Holdings Limited ("Headstart") as 1st claimant alleged at paragraphs 3 and 13 that it invested US$8,000,000.00 in the hedge fund of the respondent Y2K Finance Inc., a BVI Business company ('the Fund") in April 2006, by using Citco Global Custody NV ("Citco") who is the appellant and 2nd claimant as its nominee. The claimants alleged that the representatives of the Fund between 1st June 2007 to 15th November 2007 had depleted the Net Asset Value of the Fund by acting in breach of its equitable obligations of good faith. The pleadings alleged further that this depletion resulted because the representatives of the Fund had allowed redemptions of Class A and Class X shares which were not in accordance with the Fund's Memorandum and Articles of Association. The particulars of breach of equitable obligation of good faith were pleaded in detail at paragraph 21 of the amended statement of claim. The relief sought by the claimants included at paragraph 2 of the prayer that the Court order the repayment of all sums withdrawn from the Fund in breach of the Memorandum and Articles of Association as pleaded in paragraph 21.

The Fund made an application to the Court on 5th May 2008 for the Amended Statement of Claim to be struck out. The grounds of this application included: (1) that Headstart was not a registered shareholder and lacked standing to pursue a claim under section 1841 of the **BVI Business Companies Act**; and (2) that the Amended Statement of Claim disclosed no complaint of unfair prejudice, or ground for relief; and was in conflict with the rule against reflective loss. In determining the application the learned judge applied principles applicable to a summary judgment application under CPR 15.2 and made factual findings from affidavit evidence adduced by the claimants instead of assuming, as the law required, that the relevant facts pleaded in the amended statement of case were true; and thereafter identifying any pleaded inferences from those facts before striking out the statement of case. The judge found that the claimants had failed to prove that Citco was Headstart's nominee; that Citco has not made any complaint of unfair prejudice against Y2K. She concluded that the pleadings did not disclose reasonable grounds for bringing the claim; and that paragraph 2 of the relief sought would be struck out for offending the rule against reflective loss. The learned judge ordered that Headstart be struck out as a claimant in these proceedings and that the claim be struck out in its entirety with costs to the defendant to be assessed in accordance with CPR 65.12 if not agreed. The appellant appealed the judge's decision and the respondent also filed a counter notice.

**Held:** allowing the appeal, dismissing the counter-notice, setting aside the order that the learned judge made on 4th November 2008; ordering that the matter be remitted to the court below for case management and a trial date to be set; and awarding costs to the appellant in the court below to be agreed or otherwise assessed; and costs in this appeal which is to be 2/3 of the costs below pursuant to CPR 65.13(b).

1. The application to strike out was obviously an application under CPR 26.3(1)(b) and the learned judge would be obliged to assume that the facts alleged in the amended statement of claim were true and she would not be entitled to make use of the powers contained in CPR 15.2 in the absence of any application for summary judgment before her. The summary judgment test - whether the claimants had any real prospect of succeeding on the claim

was not an option in considering the respondent's application to strike out the amended statement of claim.

**Morgan Crucible Co. plc v Hill Samuel & Co. Ltd** [1991] Ch 295; **Swain v Hilman and another** [2001] 1 All E.R. 91 followed.

2.  That the judge erroneously concluded that the claimants had the burden to prove that the appellant was the nominee of Headstart, and she failed to apply the correct test and consider whether the relevant pleaded facts were primary facts or inferences. Paragraphs 2 and 13 of the amended statement of claim contain primary facts which should be taken at face value to be true for the purposes of the application and the judge erred in striking out Headstart as a claimant.

    **Diamantis Diamantides v JP Morgan Chase Bank** [2005] EWCA Civ. 1612 at paragraph 23 to 26 followed and distinguished.

3.  An accurate summary of the case for the claimants as pleaded in paragraph 21 of the amended statement of claim is that by making certain redemptions in breach of its Memorandum and Articles of Association, Y2K's actions were unfairly prejudicial to the interests of the appellant, whose interests for these purposes include the interests of Headstart on whose behalf it holds the shares in Y2K; and had the judge applied the correct principles in considering the application, she should have concluded that the appellant and Headstart had pleaded reasonable grounds for bringing the claim. The learned judge therefore erred in striking out the claim brought by Headstart and Citco for the reasons that she gave.

4.  Having regard to the law on reflective loss and the relief prescribed in section 1841(2)(a) to (h) of the **BVI Business Companies Act** any decision of the court as to whether to grant relief under paragraph 2 of the prayer in the amended statement of claim depends on the view that a court will take of the appellant's case in light of the pleaded facts, the evidence and law; and the learned trial judge therefore acted prematurely and unreasonably in striking out paragraph 2 of the prayer.

    **Atlas Ltd & Others v Brightview & Others** [2004] BCC 542 at paras. 58 – 63 considered and followed

## JUDGMENT

[1]    **EDWARDS, J.A.:** This is an appeal against the decision to strike out the appellant's claim against the respondent for unfair prejudice on the basis that it disclosed no reasonable grounds for bringing the claim. The appellant seeks to

set aside the decision in its entirety and also seeks an order that the respondent do pay the appellant's costs below and in the Court of Appeal.

**Background Facts**

[2]     The appellant Citco Global Custody NV ("Citco") is the nominee of Headstart Class Holdings Limited ("Headstart") and is a registered shareholder in the professional hedge fund of the respondent Y2K Finance Inc. ("the Fund"). The Fund is an international business company incorporated under the **International Business Companies Act** of the Virgin Islands and continued under the **BVI Business Companies Act** No 16 of 2004[1] with its registered office in Tortola, Virgin Islands. The authorized capital of the Fund is US$50,000.00 divided into 5 classes including 1,500,000 Class A shares of US$0.01 par value each, further divided into 30 series of 50,000 shares in each series.

[3]     The Fund's Memorandum and Articles of Association provided, among other things, that the redemption price for each share was the Net Asset Value per share (NAV) of the applicable class or series as at the close of business on the valuation day immediately preceding the dealing day on which such redemption is effected.  The dealing day for the Class A shares will follow after 30 days prior notice; the redemption or purchase price of shares will be effected at the redemption price, and payment shall be made to the applicant in the base currency in respect of the redemption or purchase of shares based on unaudited data.

[4]     By an Amended Statement of Claim filed on 23rd April 2008 Headstart alleged as 1st claimant that it invested US$8,000,000.00 in the Fund in April 2006 using the appellant Citco (2nd claimant/appellant) as its nominee; and that the representatives of the Fund between 1st June 2007 to 15th November 2007 had depleted the Net Asset Value of the Fund by acting in breach of its equitable obligations of good faith.

---

[1] As amended by 26 of 2005

4

[5]     Section 1841 of the **BVI Business Companies Act** 2004 provides:

"1841(1)    A member of a company who considers that the affairs of the company have been, are being or are likely to be, conducted in a manner that is, or any act or acts of the company have been, or are, likely to be oppressive, unfairly discriminatory, or unfairly prejudicial to him in that capacity, may apply to the Court for an order under this section.

(2)    If, on an application under this section, the Court considers that it is just and equitable to do so, it may make such order as it thinks fit, including, without limiting the generality of this subsection, one or more of the following orders:

(a) in the case of a shareholder, requiring the company or any other person to acquire the shareholder's shares;

(b) requiring the company or any other person to pay compensation to the member;

(c) regulating the future conduct of the company's affairs;

(d) amending the memorandum or articles of the company;

(e) appointing a receiver of the company;

(f) appointing a liquidator of the company under section 159(1) of the Insolvency Act on the grounds specified in section 162(1)(b) of that Act;

(g) directing the rectification of the records of the company;

(h) setting aside any decision made or action taken by the company or its directors in breach of this Act or the memorandum or articles of the company.

(3)    No order may be made against the company or any other person under this section unless the company or that person is a party to the proceedings in which the application is made."

[6]     The substance of the allegations in the claimants' Amended Statement of Claim is that following the Fund's monthly performance report for the month of July 2007, and subsequent telephone communications between the parties through their representatives concerning the value of the Fund, the representatives of Headstart and the appellant received other documents and information provided by the Fund which apparently reveal that the NAV of the Fund has been depleted. They alleged that this depletion resulted because the representatives of the Fund have

5

acted in a manner which equity would regard as contrary to good faith by allowing redemptions of Class A and Class X shares which were not in accordance with the Fund's Memorandum and Articles. The particulars of breach of equitable obligation of good faith will be considered later. The relief sought by Headstart and the appellant was:

> "(1) That the Fund pay such compensation to them as the Court may determine after (if necessary) an account and inquiry.
> (2) That the Court order the repayment of all sums withdrawn from the Fund in breach of the Memorandum and Articles of Association as pleaded in paragraph 21.
> (3) That the Fund do instruct investigating accountants to prepare an independent business review to be addressed to the Fund ("the Accountant Report") with a copy to the appellant and Headstart and all other shareholders commenting on the reasons for the decline in the NAV of the Fund between the 1st June 2007 and 15th November 2007 or such other date(s) as the Court may order.
> (4) That the investigating accountants preparing the Accountant's Report be provided by the Fund with all documents and information necessary in the view of the investigating Accountants to prepare the Accountant's Report.
> (5) That the Fund be restrained from determining a Net Asset Value until 28 days after the Auditor's Report has been provided to the Court and the appellant and Headstart.
> (6) That such other order(s) may be made as the Court thinks fit."

[7] The Fund made an application to the Court on 5th May 2008 for the Amended Statement of Claim to be struck out and filed its Defence on 9th May 2008. The grounds of this application included: (1) that Headstart was not a registered shareholder and lacked standing to pursue a claim under section 184I of the **BVI Business Companies Act**; and (2) that the Amended Statement of Claim disclosed no complaint of unfair prejudice, or ground for relief; and was in conflict with the rule against reflective loss.

[8] The learned judge on 4th November 2008 ordered that:

> (1) Headstart Class F Holdings be struck out as a claimant in these proceedings.
> (2) Claim number 278 of 2008 be struck out in its entirety.
> (3) Costs be awarded to the defendant against the claimants, such costs

to be assessed in accordance with CPR 65.12 if not agreed.

(4) The defendant/applicant is to submit a bill of costs complying with CPR 65.12(4) by 4th December 2008.

### Grounds of Appeal

[9]     Ground of appeal 3(a) complains about the finding of the learned trial judge that the appellant was not a nominee shareholder of Headstart.  This ground contends that the judge was wrong in law and in fact to find that the appellant had not provided sufficient evidence to support the allegation that the appellant is the nominee of  Headstart, and that Headstart is the beneficial owner of the shares in the Fund.  Ground 3(b) addresses the finding that the appellant Citco did not make any complaint of unfair prejudice against the Fund and asserts that the learned judge was wrong in law and in fact to make such a finding in light of the pleadings. The contention in ground 3(c) relates to the learned judge's finding that paragraph 2 of the prayer in the Amended Statement of Claim is a claim for more than the appellant has lost and should be struck out for offending the rule against reflective loss.  I note that extensive arguments have been included in the Notice of Appeal on each ground of appeal; and these arguments have been repeated and/or amplified by counsel for the appellant in their skeleton arguments and the oral submissions of Mr. Browne-Wilkinson, Q.C.  A timely reminder is appropriate, having regard to CPR 62.4(5) which states that the grounds on which the appellant relies must be set out without any argument or narrative.

[10]    The respondent by its counter-notice contends that the judgment and the decision to strike out the appellant's claim should be upheld because: (a) The appellant has not alleged that Headstart Class F Holdings Ltd, and the appellant, relied on any of the representations pleaded in paragraph 22 of the amended statement of claim (b) The conversations pleaded in paragraph 22 allegedly took place in August 2007, when no shareholder could redeem any longer (c) If the appellant was a nominee shareholder as it alleges, it could not complain of any prejudice to its own (as opposed to Headstart's) economic interests and therefore cannot complain of

unfair prejudice under section 1841 of the **BVI Business Companies Act** 2004 (as amended). The learned Judge erred in law insofar as she made any finding to the contrary in paragraph 38 of her Judgment.

**The Principles Governing CPR 26.3 (1)(b) Applications to Strike Out a Claim**

[11]   By CPR 26.3(1):

> "... the court may strike out a statement of case or part of a statement of case if it appears to the court that –
> (a) ...
> (b)  the statement of case or the part to be struck out does not disclose any reasonable ground for bringing or defending a claim;
> (c ) the statement of case or the part to be struck out is an abuse of the process of the court or is likely to obstruct the just disposal of the proceedings."

[12]   Striking out under the English CPR, r 3.4(2)(a) which is the equivalent of our CPR 26.3(1)(b), is appropriate in the following instances: where the claim sets out no facts indicating what the claim is about or if it is incoherent and makes no sense, or if the facts it states, even if true, do not disclose a legally recognisable claim against the defendant.[2]

[13]   On hearing an application made pursuant to CPR 26.3(1)(b) the trial judge should assume that the facts alleged in the statement of case are true.[3] "Despite this general approach, however, care should be taken to distinguish between primary facts and conclusions or inferences from those facts. Such conclusions or inferences may require to be subjected to closer scrutiny."[4]

[14]   Among the governing principles stated in **Blackstone's Civil Practice 2009**[5] the

---

[2] See **Blackstone's Civil Practice 2009** at page 431.

[3] See **Morgan Crucible Co. plc v Hill Samuel & Co. Ltd** [1991] Ch 295 per Slade L.J .: " On an application to strike out a pleading under  RSC, O 18, r 19(1)(a) [ comparable to  rule 26.3 (1) of our CPR 2000], no evidence is admissible and since it is only the pleading itself which is being examined, the court is required to assume that each and every one of the facts pleaded (unless manifestly incapable of proof) is true and will be capable of proof at the trial . In some instances the court may regard the assumption as somewhat unrealistic, but it nevertheless has to be made."

[4] See **Bank of Credit and Commerce International (Overseas) Ltd (in liq.) & Ors v Price Waterhouse and another** [1988] B.C.C. 617 at 620

[5] At page 432 paragraphs 33.9 and 33.10

following circumstances are identified as providing reasons for not striking out a statement of case: where the argument involves a substantial point of law which does not admit of a plain and obvious answer; or the law is in a state of development;[6] or where the strength of the case may not be clear because it has not been fully investigated. It is also well settled that the jurisdiction to strike out is to be used sparingly since the exercise of the jurisdiction deprives a party of its right to a fair trial, and its ability to strengthen its case through the process of disclosure and other court procedures such as requests for information; and the examination and cross–examination of witnesses often change the complexion of a case. Also, before using CPR 26.3(1) to dispose of 'side issues', care should be taken to ensure that a party is not deprived of the right to trial on issues essential to its case.[7] Finally, in deciding whether to strike out, the judge should consider the effect of the order on any parallel proceedings[8] and the power of the court in every application must be exercised in accordance with the overriding objective of dealing with cases justly.

[15]    The learned judge at paragraphs 16 to 23 of her judgment considered the court's power to strike out and the principles that she was applying to the application to strike out. She identified the power under CPR 26.3(1)(b) and (c), and though it was unnecessary, she also mentioned the power under CPR 15 to enter summary judgment against a claimant who has no real prospect of succeeding on the claim. The learned judge referred to the substantial overlap between the two powers and recited the learning expressed in the **Supreme Court Civil Practice White Book** that an application can be made under both rules. At paragraph 18 the learned judge stated:

> "If a party believes he can show without a trial that an opponent's case has no real prospect of success on the facts, or that his case is bound to succeed or the opponent's fail because of a point of law, he can apply either under CPR 26 or CPR 15 or both as he thinks appropriate. When

---

[6] See also The Caribbean Civil Court Practice 2008 , page 231: " …a case should not be struck out where the claim is in an area of developing jurisprudence and the facts need to be investigated before conclusions can be drawn about the law: *Farah v British Airways plc and the Home Office* (2000) Times, 26 January CA."

[7] Op, cit. at page 429 – 430: paragraph 33.6.

[8] Op..Cit. at page 431 paragraph 33.7.

deciding whether or not to strike out, the court takes into account all relevant circumstances and "makes a broad judgment after considering the available possibilities."

See **Caribbean Civil Court Practice**, 2008, page 230, Note 23.22.

[16]    Thereafter the learned judge recited the observations of the Court of Appeal in **Bank of Bermuda Ltd v Pentium (BVI) Ltd and Landcleve Ltd** concerning a summary judgment application.[9]

[17]    CPR 15.2 governs summary judgments and provides that "The court may give summary judgment on the claim on a particular issue if it considers that the - (a) claimant has no real prospect of succeeding on the claim or the issue."   CPR 15.5(2) allows a respondent to prove that the claim has a real prospect of success at the hearing by filing and relying on affidavit evidence.

[18]    The powers of the court under CPR 15.2 are seemingly wider than those contained in CPR 26.3(1).  In **Swain v Hilman and another**[10] Lord Woolf MR contrasted the court's power under rule 3.4 (the English CPR equivalent of our CPR 26.3 (1)(b))  and rule 24.2 the English summary judgment rule which is similar to our CPR 15.2. Lord Woolf said at page 92:

> "Rule 3.4 makes provision for the Court to strike out a statement of case or part of a statement of case, if it appears that it discloses no reasonable grounds for bringing or defending a claim. Clearly there is a relationship between r. 3.4 and r. 24.2.  However the power of the court under Pt 24, the grounds are set out in r. 24.2, are wider than those contained in r. 3.4. The reason for the contrast in language between r. 3.4 and r.24.2 is because under r. 3.4, unlike 24.2, the Court  generally is only concerned with the statement of case which it is alleged discloses no reasonable grounds for bringing or defending the claim.   Under r. 24.2 the Court now has a very salutary power, both to be exercised in a claimant's favour or, where appropriate, in a defendant's favour."

---

[9] BVI Civil Appeal No. 14 of 2003 – See Caribbean Civil Court Practice, 2008 page 232: This was a case in which the companies alleged in their claim that the Bank had acted unlawfully in breach of the mandate given to it, by paying out the companies monies on unauthorized instructions; and there was an application for summary judgement  against the Bank on grounds that the Bank's defence disclosed that there was no real prospect of successfully defending the claim.

[10] [2001] 1 All E.R. 91

[19]     Looking at the application that was before the learned judge, this was not an application for summary judgment. It was obviously an application under CPR 26.3(1)(b) though it did not expressly say so. Consequently, the learned judge would be obliged to assume that the facts alleged in the amended statement of claim were true, and she would not be entitled to make use of the powers contained in CPR 15.2 in the absence of any application for summary judgment before her. The summary judgment test - whether the claimants had any real prospect of succeeding on the claim - was not an option in considering the respondent's application to strike out the amended statement of claim.

### Ground 3(a) – Citco as Nominee Shareholder of Headstart

[20]     At paragraph 2 of the amended statement of claim it is pleaded:

> "The first Claimant is a shareholder in the Defendant ("the Fund") through the Second Claimant which acts as the First Claimant's nominee and is the registered shareholder of the shares in the Fund referred to in paragraph 13 below."

Paragraph 13 of the amended statement of claim pleaded:

> "The first Claimant invested US$8,000,000.00 in the Fund by buying Class A shares in April 2006 using the Second Claimant as its nominee as pleaded in paragraph 2 above. It did this in reliance on assurances received by Henry Watkinson (a director of Headstart) from Maurice Salem of Wharton UK (acting then and at all material times on behalf of the Fund) that he personally had invested US$30 million in the Fund. Mr. Salem agreed in principle that he would keep Mr. Watkinson informed as to the status of his investment in the Fund (through whatever vehicle that investment might be made)."

[21]     The learned judge came to her conclusion that the appellant was not a nominee shareholder of Headstart in the following manner. At paragraph 33 of her judgment she stated:

> "Headstart, not being a member of Y2K, alleges that Citco acted as its nominee at the material times in question. It is not in contention, that if Citco did act as the nominee for Headstart then Headstart will be the beneficial owner of the shares in Y2K and thereby, have locus standi in this matter. Thus, the burden is upon the claimants to show whether there is a nominee relationship between them, which gives Headstart the locus standi, with beneficial interest, to make this claim against Y2K for unfair

prejudice."

[22] The judge thereafter resorted to the common law to determine whether the beneficial owner has the same right to bring such an action as Citco, "assuming for a moment that Headstart is in fact the beneficial owner of the shares". She concluded at paragraph 38 that section 1841 of the **BVI Business Companies Act** can be interpreted to include applications made by both nominee shareholders and beneficial owners of shares.

[23] She next identified as an issue for her determination:

> "whether the evidence put forward by the claimants showed the relationship of Citco being a nominee shareholder of Headstart and Headstart being a beneficial owner of the shares in Y2K."

She continued at paragraphs 39-41:

> "This is a question of fact. In this case, the evidence which was adduced by the Claimants to prove such a relationship existed between them was as follows. 1. A Notice dated 10th April 2008... 2. A letter headed 'Consent' from Citco Nederland...3. A further notice from Citco Nederland.... [40] In my judgment, the Claimants have not provided sufficient evidence to support the allegation that Citco is the nominee for Headstart, and that Headstart is in fact the beneficial owner of the shares in Y2K. None of the above-mentioned documents state the crucial facts which include, among other things: (a) when did the alleged relationship between the Claimants commence; (b) for what reason was this relationship formed; (c ) for how long did this relationship continue; and (d) what is the significance of Lyxor and how is it that Headstart is instead now the underlying investor of the account? [41] Since there is no documentary evidence disclosed by the Claimant to clearly explain their relationship, I find that the Claimants failed to prove that such a relationship existed. I am therefore constrained to find that Headstart has no locus standi to bring this claim."

[24] Learned Queen's Counsel Mr. Browne-Wilkinson submitted that the learned judge applied the wrong legal test in light of paragraphs 2 and 13 of the amended statement of claim and the well settled law that applications to strike out should be considered on the assumption that the facts stated in the pleadings are true.

[25] Learned Queen's Counsel Ms. Dohmann submitted that Citco adduced evidence with a view to the learned judge making such a finding; and having not taken this

point below, Citco should not be permitted to make this volte-face and advance this ground of appeal. She argued further that the court should consider whether the pleaded facts are primary facts and conclusions or inferences from those facts and if they were conclusions or inferences they should be subjected to scrutiny.[11] Ms. Dohmann Q.C. relied on the case **Diamantis Diamantides v JP Morgan Chase Bank**[12] to advance her submission. However, the judge in **Diamantis,** unlike the learned judge in the instant case, on several occasions referred to the primary facts pleaded and to the inferences that could and could not properly be drawn from them; and having posed the question whether a credible case was being advanced that Mr. Diamantides was in a contractual relationship with the Bank, clearly set out to answer it by reference to the pleaded facts only. So, having concluded that the facts pleaded showed clearly that Pollux Holding Ltd. was the customer of the Bank, and not Mr. Diamantides, the judge struck out the claim form and particulars of claim, which was upheld by the Court of Appeal.

[26] This was not the approach of the learned judge in the present case, who, unfortunately, did not resist the inducement from counsel to consider the affidavit evidence placed before her in deciding the application to strike out. Having erroneously concluded that the claimants had the burden to prove that the appellant was the nominee of Headstart, she failed to apply the correct test and consider whether the relevant pleaded facts were primary facts or inferences. I therefore hold that the appellant's complaint in ground 3(a) is justified.

[27] In my view, paragraphs 2 and 13 of the amended statement of claim contain primary facts which should be taken at face value to be true for the purposes of the application. The challenges mounted by counsel for the respondent were premature. The judge erred in striking out Headstart as a claimant.

**Ground 3(b) - The Unfair Prejudice Pleadings**

---

[11] See paragraph 12 of this judgment

[12] [2005] EWCA Civ. 1612 at paragraph 23 to 26.

[28]    Queen's Counsel for the appellant contends that the reasons given by the learned judge to support her finding that the appellant did not make a complaint of unfair prejudice are unsupportable and wrong and demonstrate a misunderstanding of the appellant's pleaded case.  It appears from the judgment that the judge thought the appellant's case was that it was unfairly denied the opportunity to redeem its shares and that, because it had never made a request for redemption, it could not have been unfairly prejudiced. In particular the learned judge held:

> "[46] Nowhere in the ASC does Citco complain of unfair prejudice...
> [47] ....for the purposes of this Application, Y2K needs only rely on the fact (which is agreed ) that Citco has never made a request for redemption.
> [48] Citco was therefore not prejudiced by the making of these redemptions. This is not a case in which other shareholders of Y2K were permitted to redeem and Citco was not...
> [49] At the end of the day, Citco has not made any complaint of unfair prejudice against Y2K.  Such a complaint ought to be properly pleaded with particulars.  In the event that I am wrong to come to this conclusion, in any event Citco never submitted a redemption request."

[29]    The pleadings at paragraph 21 appear not to have been given any weight by the learned judge in arriving at her conclusion that there was no complaint of prejudice.   Though she did not consider the paragraph 21 pleadings to be contradictory (as counsel for the Fund urged) she obviously did not take them into account  and apparently did not determine whether  the claimants pleaded case could fit squarely into a claim under section 1841 of the     **BVI Business Companies Act.**[13]

[30]    Paragraph 20 alleged  that following a conference call on 26th September, 2007 Headstart requested and received from the Fund's administrators (Bank of Bermuda) an historical spreadsheet of the Assets Under Management ("AUM") calculations  which showed that on 31st July 2007 the Fund had assets with an NAV of $119,491,788.00.  The email accompanying the AUM said that as at 1st August 2007 the NAV was only $64 million, a reduction of US$55 million in one

---

[13] See paragraph 5 above.

day.

[31]     Paragraph 21 pleaded:

> "In the course of and as a result of these proceedings the Fund has provided certain documents and affidavits from Paul Cook of Wharton UK [Wharton UK was pleaded at paragraph 10 as entering into an advisory agreement with the Fund dated 21st April 2004 pursuant to which Wharton UK was appointed to provide investment advice to Wharton Bermuda an investment manager of the Fund.] and Mr. Dave Shastri (purportedly of a Bermuda company called "Tankard Lane Holdings Company Limited) but not from Mr. Salem. The documents and information are incomplete but from the material provided to date it appears that the Defendant has acted in breach of the Fund's Memorandum and Articles of Association alternatively the Fund has acted in a manner which equity would regard as contrary to good faith.
>
> PARTICULARS OF BREACH/BREACH OF EQUITABLE OBLIGATION OF GOOD FAITH
> (1) The Fund allowed redemption at a Valuation Date of 31 July 2007 of :
>   (a) 35, 488 Class A Shares pursuant to a purported redemption notice dated 25 July 2007 for a value of $49,615.06;
>   (b) 996 Class A shares pursuant to a purported redemption notice dated 26 July 2007 for a value of $799,588.92;
>   (c) 1231 Class A shares pursuant to a purported redemption notice dated 25 July 2007 for a value of $989,205.59;
>   (d) 29233.5 Class X shares pursuant to a purported redemption notice on behalf of Mr. Salem dated 25 July 2007 for a value of $9,787,375.80;
>   (e) 7152,666514 Class A shares pursuant to a purported redemption notice dated 25 July 2007 for a value of $10,000,000;
>   (f) 20980,849 Class shares pursuant to a purported redemption notice on behalf of investors in a Goldman Sachs fund dated 26 July 2007 for a value of $29,332,905.37.
>
> (2) Neither the affidavit of Mr. Cook nor the affidavit of Mr. Shastri provide any explanation of how, why and when the above redemptions were allowed to take place when no proper notice had been given to the Fund in accordance with the Fund's Memorandum and Articles.
>
> (3) Neither the affidavit of Mr. Cook nor the affidavit of Mr. Shastri identify the individuals who purported to allow the above redemptions to take place or the reason why those redemptions were allowed (notwithstanding the lack of proper notice) but a

redemption request from another (unidentified) party apparently received on 2 July 2007 by Fax was not permitted on 31 July 2007.

(4) Save as set out in sub-paragraph (1) above, neither the affidavit of Mr. Cook nor the affidavit of Mr. Shastri identify any connection (direct or indirect) between the entities who were allowed to redeem in breach of Article 10 and any individuals or persons connected with the Fund, Mr. Salem, Wharton UK, Wharton Bermuda or Mr. Shastri.

(5) The Fund has favoured the interests of some shareholders (including in particular Mr. Salem) who have been permitted to redeem (pursuant to the redemption notices identified in sub-paragraph (1) after the Fund should have suspended the determination of NAV pursuant to Article 11(6).

(6) The Fund paid out inrespect of the redemption notices identified in sub-paragraph (1) above on or about 15 August 2007: the date when according to Mr. Shastri's affidavit dated 14 February 2007 the Fund's NAV was determined.

(7) The payments made by the Fund in respect of the redemption notices identified in sub-paragraph (1) above on or about 15 August 2007 were an effective cause of the Fund having to dispose of assets at a discount and its collapse shortly thereafter.

(8) The Fund failed to suspend the determination of NAV in accordance with Article 11(6) but instead allowed the redemptions set out in sub-paragraph (1) above to take place on or about 15 August 2007 even though by that time
  (a) It was not reasonably practicable for the Fund to dispose of investments comprised in the Fund or as a result of which any such disposal would be materially prejudicial to Members; and/or
  (b) A breakdown had occurred in the means normally employed in ascertaining the value of any of the investments or other assets of the Fund could not reasonably or fairly be ascertained.

(9) The Fund had calculated an NAV and allowed shareholders to redeem shares as set out in sub-paragraph (1) above even though (if those redemption requests were allowed) no true NAV could be determined pursuant to Article 11.

(10) Further or alternatively, some of the payments identified in sub-paragraph (1) above (and in particular the $29,332,905.37

referred to in sub-paragraph 1(f) were made in breach of Article 10(1)(d) powers properly or at all then at least the $29,332,905.37 payment would not have been made before the Fund was suspended pursuant to Article 11(6). The Claimant reserves the right to supplement the above Particulars after proper disclosure and exchange of witness statements and (if the Court should permit) expert reports."

[32]     Summing up these pleadings, as Mr. Browne-Wilkinson Q.C. stated:

"The case is, in short, that by making certain redemptions in breach of its Memorandum and Articles of Association as pleaded in paragraph 21 of the Amended Statement of Claim Y2K's actions were unfairly prejudicial to the interests of the Appellant, whose 'interests' for these purposes include the interests of Headstart, on whose behalf it holds the shares in Y2K."

This is an accurate summary, in my view.

[33]     On the other hand, I am also of the view that the submissions of Ms. Dohmann Q.C. reflect the erroneous approach taken by the learned judge in not assuming that the facts alleged in the amended statement of claim are true; and her submissions obviously contributed to and shaped the conclusions of the learned judge. Ms. Dohmann stated among other things that it is impossible for the Court to determine whether or not the interests of Citco are consistent with the interests of Headstart, in the absence of disclosure of any nominee agreement between them; and that since Citco bears the burden of establishing that its interest are consistent with those of Headstart, the failure to disclose that nominee agreement is fatal to its complaint under section 1841.[14] I cannot endorse these submissions in light of the law governing the application to strike out.

[34]     Had the learned judge applied the correct principles in considering the application, in my view, she should have concluded that the appellant and Headstart had pleaded reasonable grounds for bringing the claim. The learned judge therefore erred in striking out the claim brought by Headstart and Citco for the reasons that she gave, which are challenged by ground 3(b) of the appeal. I would therefore allow this ground of appeal.

---

[14] See paragraph 5 above

**Ground 3(c) - Was Reflective Loss sought in the Prayer?**

[35]    The learned judge examined at length the rule against reflective loss at paragraph 61 of her judgment as argued by learned Queen's Counsel Ms Dohmann. The judge stated that this rule provides "that a shareholder may not bring proceedings to recover loss which is merely reflective of loss suffered by his company. The following principles apply: (a) Four conditions can be identified for the rule to be engaged (adopting the analysis of counsel for the petitioner in **Shaker v Mohammed Al-Bedrawl** [2002] EWCA Civ 1452 at [37]:

> "1. A claim is brought by or on behalf of a shareholder in a company;
> 2. The claim is for damages for loss to the shareholder;
> 3. The loss, through diminution in value of shares or in distributable assets, is reflective of loss to the company; and
> 4. The company has its own cause of action to recover the loss.
> (b) The paradigm situation for application of the rule is where the shareholder complains of loss of dividends payable in respect of that shareholding"

[36]    Having considered statements of Lord Bingham in **Johnson v Gore Wood & Co**[15] the learned judge continued :

> "(c) The fact that the company omits to take action (even any action at all) in respect of the alleged wrongdoing does not justify any exception to the rule in **Johnson,** Lord Bingham said at p. 35F: "A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss." Moreover, as Lord Millet said at P. 66D-E: "[I]f the company chooses not to exercise its remedy, the loss to the shareholder is caused by the company's decision not to pursue its remedy and not by the defendant's wrongdoing"."

[37]    At paragraph 63 of her judgment the judge considered the claimant's submission that paragraph 2 of their prayer in the amended statement of claim (set out at paragraph 5 of this judgment) should not be struck out  for the following reasons:

> "1. On account of the possibility that in the future the Claimants or either of

---

[15] [2002] 2A.C 1, 62E

them are "...likely to seek an order from the Court in due course that shareholders be entitled to bring derivative proceedings in the name of the Fund to recover the loss suffered by the Fund as a result of the short notice transfers pleaded in paragraph 21". 2. "The question of the appropriate relief is a matter for the Court after it has determined that there has been unfair prejudice pursuant to Section 1841 of the 2004 Act". 3. The Court could somehow and in any event order the relief that is sought by paragraph 2 of the Prayer under paragraph 6 thereof, which seeks "That such other Order or Orders may be made as the Court thinks fit"."

[38] The claimants also contended that the court has the power to make any order it considers to be just and equitable including the power to grant leave to commence a derivative action given the court's broad discretion under section 1841.[16] At paragraphs 71 to 73 of her judgment the judge stated:

> "[71] In my view, for the purposes of this Application to strike out the Claim, attention must be paid to the specific subsection under which Y2K seeks to strike out under this ground, rather than looking at the court's wide discretion under section 1841 of the BCA.
> [72] Applying the law as outlined above, the relief sought from the Claimants in paragraph 2 of the prayer in the Claim is exorbitant and, if granted, would be prejudicial and unfair to Y2K.
> [73] As I see it, paragraph 2 of the Prayer in the ASC ought to be struck out."

[39] Mr. Browne-Wilkinson Q.C. submitted that the rule against reflective loss is not engaged by paragraph 2 of the prayer because as a matter of law, the rule does not apply to petitions of unfair prejudice under section 1841 of the 2004 Act. He relied on the authority **Atlas Ltd & Others v Brightview & Others** [17].

[40] It was argued in **Atlas Ltd.,** on an application to strike out a petition under section 459 of the **Companies Act** 1985 alleging unfairly prejudicial conduct of a company's affairs, that the damages claimed could not be recovered because of the rule against reflective loss. The deputy judge of the High Court Jonothan Crow noted, at paragraph 60 of his judgment:

> "By contrast, the law reports are full of cases in which petitioners have complained successfully under s. 459[18] about unfairly prejudicial conduct

---

[16] See paragraph 5 of this judgement.
[17] [2004] BCC 542 at paras. 58 - 63
[18] This is the English equivalent of section 1841 of the BVI Business Companies Act 2004

which has involved a majority shareholder stripping out the company's assets. Indeed, the director applicants cited one such case themselves, albeit for a different proposition, namely <u>Supreme Travels Ltd v Little Olympian Each-ways Ltd. Re a Company No. 005287 of 1985 (1985)</u> 1 <u>BCC 99, 586, at p. 99, 589; [1986] 1 WLR 281,</u> at p. 284 D-H, Hoffman J held in terms that a petition could properly be brought so as to recover for shareholders loss that had been sustained by the company. In <u>Saul D Harrison (1994) BCC 475,</u> at p. 489A, the same judge (then in the Court of Appeal) made the point even more clearly, by saying that one of the purposes of <u>s 459</u> was to outflank the rule in **Foss v Harbottle**. If the reflective loss argument was well founded, it is difficult to see how these cases could have been decided as they were 61. Treating the matter as one of statutory interpretation, rather than authority, there is no justification for reading into <u>s459</u> a restriction to the effect that a petitioner can only complain if the unfairly prejudicial conduct does not involve a breach by any directors of their duties to the company. Equally, as a matter of interpretation, there is no justification for imposing an absolute bar on the types of relief that the court might award at trial in relation to unfairly prejudicial conduct which happens also to involve a breach by directors of their duties to the company. Indeed, any such interpretation of <u>s459</u> would appear to run counter to its express wording, which refers to unfair prejudice 'to the interests of its members generally' or of some part of its members ."

[41]    Consequently, the judge held that the reflective loss argument could not provide a bar to any of the relief sought in the petition and the petition cannot be struck out on the basis that it seeks to recover reflective loss.

[42]    Having regard to the law that has been reviewed and particularly the relief prescribed in section 1841(2)(a) to (h) of the **BVI Business Companies Act**, it seems to me that any decision of the court as to whether to grant the relief sought under paragraph 2 of the prayer in the amended statement of claim depends on the view that a court will take of the appellant's case, in light of the pleaded facts, and the evidence, and law. I therefore conclude that the learned trial judge acted prematurely and unreasonably in striking out paragraph 2 of the prayer on the application to strike out. I would therefore allow the appeal on ground 3(c). Consequently, the appeal by Citco succeeds on all grounds, and based this finding, it follows that the grounds in the counter-notice of the respondent fail.

[43]     I would therefore allow the appeal, dismiss the counter-notice, set aside the order that the learned judge made on 4th November, 2008 and order that the matter be remitted to the court below for case management and a trial date to be set. I would also award costs to the appellant in the court below to be agreed or otherwise assessed; and costs in this appeal, which is to be 2/3 of the costs below pursuant to CPR 65.13(b).

**Ola Mae Edwards**
Justice of Appeal

I concur.                                                                                      **Hugh A. Rawlins**
Chief Justice

I concur.                                                                              **Janice George-Creque**
Justice of Appeal

**Tab 6**



[1978] Ch. 406                                                              Page 1

[1978] Ch. 406 [1978] 2 W.L.R. 73 [1978] 2 All E.R. 89 (1977) 121 S.J. 605 [1978] Ch. 406 [1978] 2 W.L.R. 73
[1978] 2 All E.R. 89 (1977) 121 S.J. 605 (**Cite as: [1978] Ch. 406**)

**C**

**Daniels v Daniels**

[1976 D. No. 3193]; [1978] 2 W.L.R. 73

Chancery Division

Templeman J.

1977 July 20, 21

Company—Shareholder—Rights against company or shareholders—Minority shareholders' action—Directors with majority shareholding causing company to sell land to one director at undervalue—Director making large profit on resale—Whether minority shareholders entitled to bring action against company

The plaintiffs, minority shareholders of a company, brought an action against the two directors and the company. By their statement of claim they alleged that in October 1970 the company, on the instructions of the two directors, who were the majority shareholders, sold the company's land to one of the directors, who was the wife of the other, for £4,250 and that the directors knew, or ought to have known, that that sale was at an undervalue. In 1974 she sold the land for £120,000.

On the directors' summons to strike out the statement of claim as disclosing no reasonable cause of action or otherwise as an abuse of the process of the court:-

dismissing the summons, that the exception to the rule in Foss v. Harbottle, enabling a minority shareholder to bring an action against a company for fraud where no other remedy was available, should include cases where, although there was no fraud alleged, there was a breach of duty by directors and majority shareholders to the detriment of the company and the benefit of the directors; accordingly, on the facts alleged, the minority shareholders had a cause of action (post, pp. 413H - 414A, D-F).

Foss v. Harbottle (1843) 2 Hare 461 ; Alexander v. Automatic Telephone Co. [1900] 2 Ch. 56 , C.A.; Cook v. Deeks [1916] 1 A.C. 554 , P.C. and dictum of Danckwerts J. in Pavlides v. Jensen [1956] Ch. 565 , 576 applied.

Turquand v. Marshall (1869) L.R. 4 Ch.App. 376 distinguished.

The following cases are referred to in the judgment:

Alexander v. Automatic Telephone Co. [1900] 2 Ch. 56, C.A. .
Atwool v. Merryweather (1867) L.R. 5 Eq. 464n .
**\*407** Birch v. Sullivan [1957] 1 W.L.R. 1247; [1958] 1 All E.R. 56 .
Burland v. Earle [1902] A.C. 83, P.C. .
Clinch v. Financial Corporation (1868) L.R. 5 Eq. 450 .
Cook v. Deeks [1916] 1 A.C. 554, P.C. .
Foss v. Harbottle (1843) 2 Hare 461 .
Gray v. Lewis (1873) L.R. 8 Ch.App. 1035 .
Heyting v. Dupont [1963] 1 W.L.R. 1192; [1963] 3 All E.R. 97 ; [1964] 1 W.L.R. 843; [1964] 2 All E.R. 273, C.A. .
MacDougall v. Gardiner (1875) L.R. 20 Eq. 383 .
Mason v. Harris (1879) 11 Ch.D. 97, C.A. .
Denier v. Hooper's Telegraph Works (1874) L.R. 9 Ch.App. 350 .
Pavlides v. Jensen [1956] Ch. 565; [1956] 3 W.L.R. 224; [1956] 2 All E.R. 518 .
Turquand v. Marshall (1869) L.R. 4 Ch.App. 376 .

The following additional cases were cited in argument:

Campbell v. Australian Mutual Provident Society (1908) 24 T.L.R. 623, P.C. .
Dominion Cotton Mills Co. Ltd. v. Amyot [1912] A.C. 546, P.C. .
Harris v. A. Harris Ltd., 1936 S.C. 183 .
North-West Transportation Co. Ltd. v. Beatty (1887) 12 App Cas. 589, P.C. .
Russell v. Wakefield Waterworks Co. (1875) L.R.

[1978] Ch. 406 [1978] 2 W.L.R. 73 [1978] 2 All E.R. 89 (1977) 121 S.J. 605 [1978] Ch. 406 [1978] 2 W.L.R. 73
[1978] 2 All E.R. 89 (1977) 121 S.J. 605 **(Cite as: [1978] Ch. 406)**

20 Eq. 474 .

SUMMONS

On November 24, 1976, the first two defendants, Bernard Edwyn Daniels and his wife, Beryl G. Daniels, the directors and majority shareholders of the third defendant, Ideal Homes (Coventry) Ltd., ("the company") issued a summons under R.S.C., Ord. 18, r. 19 seeking an order, inter alia, to strike out the statement of claim in the action by the plaintiffs, Douglas Percy Daniels, Gordon Eric Daniels and Caroline Emma Soule, minority shareholders of the company, as disclosing no reasonable cause of action or otherwise as an abuse of the process of the court.

The facts are stated in the judgment.

*David Richards*  for the first two defendants.

*W. A. Blackburne*  for the plaintiffs.

The main submissions of counsel are sufficiently dealt with in the judgment (post, pp. 408F, 409A-B, 410G, 412H - 413A, F, 414E-H).

The additional cases cited in argument were in support of the propositions of law mentioned below:

Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474 supports the proposition that on the company's funds being misapplied it is the company and not minority shareholders who can maintain an action. Where majority shareholders' acts are not ultra vires the company, or do not deprive the minority of their rights, and there is no fraud the court will not interfere with the company's internal management at the instance of the minority: Campbell v. Australian Mutual Provident Society (1908) 24 T.L.R. 623 ; Dominion Cotton Mills Co. Ltd. v. Amyot [1912] A.C. 546 ; and Harris v. A. Harris Ltd., 1936 S.C. 183 . A director can**408** exercise his voting rights enabling the company to enter into a contract with himself if the contract is fair in its terms although it is voidable: North-West Trans-

portation Co. Ltd. v. Beatty (1887) 12 App.Cas. 589 .TEMPLEMAN J.

This is an application to strike out a statement of claim as disclosing no reasonable cause of action. The authorised share capital of the third defendant company, Ideal Homes (Coventry) Ltd., consists of 3,000 £1 ordinary shares and the three plaintiffs between them hold 1,348. They are, therefore, in a minority. The first two defendants, who are husband and wife, hold 1,651 shares and they are, therefore, in a majority. The first two defendants, according to the statement of claim, were, in October 1970, the only directors of the company.

The plaintiffs' complaint appears from paragraphs 3 and 4 of the statement of claim. Paragraph 3 alleges that in October 1970 the company sold certain land in Warwickshire to the second defendant for £4,250 on the instructions and by the direction of the directors, who were the first and second defendants. Paragraph 4 alleges that the price of £4,250 paid to the company by the second defendant was less than the current value of the land at the time of the sale, as the first and second defendants well knew or ought to have known. The particulars of that allegation are first that the first and second defendants purported to adopt a probate value made on the death, which took place on June 8, 1969, of the father of the plaintiffs and the first defendant; secondly, that "probate values being conservative in amount, are customarily less than the open market value obtainable as between a willing vendor and a willing purchaser"; thirdly, that in 1974 the land was sold by the second defendant for the sum of £120,000.

Putting it broadly, all the allegations will be denied by the defendants if the action proceeds. But it is common ground that for the purpose of this application I must proceed upon the basis that all the allegations in the statement of claim can be sustained.

Mr. Richards, for the first two defendants who bring this application to strike out, says there is no cause of action shown because the statement of

[1978] Ch. 406                                                                                                                                Page 3

[1978] Ch. 406 [1978] 2 W.L.R. 73 [1978] 2 All E.R. 89 (1977) 121 S.J. 605 [1978] Ch. 406 [1978] 2 W.L.R. 73
[1978] 2 All E.R. 89 (1977) 121 S.J. 605 **(Cite as: [1978] Ch. 406)**

claim does not allege fraud, and in the absence of fraud, minority shareholders are unable to maintain a claim on behalf of the company against a majority. For that proposition he referred first of all to the principles set out in Foss v. Harbottle (1843) 2 Hare 461 . That case established the general proposition that minority shareholders cannot maintain an action on behalf of the company, subject to certain exceptions. The exceptions are four in number, and only one of which is of possible application in the present case. The first exception is that a shareholder can sue in respect of some attack on his individual rights as a shareholder; secondly, he can sue if the company, for example, is purporting to do by ordinary resolution that which its own constitution requires to be done by special resolution; thirdly, if the company has done or proposes to do something which is ultra vires; and fourthly, if there is fraud and there is no other remedy. There must be a minority who are prevented from remedying the fraud or taking any proceedings because of the protection given to the fraudulent shareholders or directors by virtue of their majority.**409

Mr. Richards says, and it is conceded, that the statement of claim in its present form does not allege fraud. Mr. Blackburne, for the plaintiffs, says of course he is not alleging fraud because the plaintiffs do not really know what happened: all they know is what is set out in the statement of claim. There has been a sale at an undervalue and the second defendant has made a substantial profit; therefore, fraud is not pleaded. But, says Mr. Blackburne, when the authorities are considered, the rights of a minority are not limited to cases of fraud; they extend to any breach of duty. In the present case if the defendants sold at an undervalue then that was a breach of duty. As the plaintiffs cannot remedy the breach, save by a minority shareholders' action, they should be entitled to bring the action. Foss v. Harbottle, 2 Hare 461 , was a case in which there was no oppression by a majority.

The next case in point of time, to which I was referred, was Atwool v. Merryweather (1867) L.R. 5 Eq. 464n . The exception of fraud in Foss v. Harbottle was emphasised, the reason being, according to Page Wood V.-C., at p. 468:

"If I were to hold that no bill could be filed by shareholders to get rid of the transaction on the ground of the doctrine of Foss v. Harbottle, it would be simply impossible to set aside a fraud committed by a director under such circumstances, as the director obtaining so many shares by fraud would always be able to outvote everybody else." That was a case described as "simple fraud." In the next case, Clinch v. Financial Corporation (1868) L.R. 5 Eq. 450 , allegations were made of fraud and of acts which were said to be ultra vires. The charges of fraud were not sustained, but the minority shareholder was allowed to bring an action to restrain or correct an act which was ultra vires the company.

Then in Turquand v. Marshall (1869) L.R. 4 Ch.App. 376 , 386, Lord Hatherley L.C. in dealing with a loan to one of the directors said:

"There was no specific allegation of any impropriety in lending the money to him, nor was any specific relief prayed in this respect. It was within the powers of the deed to lend to a brother director, and however foolish the loan might have been, so long as it was within the powers of the directors, the court could not interfere and make them liable. They were entrusted with full powers of lending the money, and it was part of the business of the concern to trust people with money, and their trusting to an undue extent was not a matter with which they could be fixed, unless there was something more alleged, as, for instance, that it was done fraudulently and improperly and not merely by default of judgment. Whatever may have been the amount lent to anybody, however ridiculous and absurd their conduct might seem, it was the misfortune of the company that they chose such unwise directors; . . ."  So that even a foolish and negligent loan to a director, if made in good faith and within the powers of the directors, does not enable a minority shareholder to recover in an action.

Copr. © West 2009 No Claim to Orig. Govt. Works

[1978] Ch. 406                                                                                                                    Page 4

[1978] Ch. 406 [1978] 2 W.L.R. 73 [1978] 2 All E.R. 89 (1977) 121 S.J. 605 [1978] Ch. 406 [1978] 2 W.L.R. 73 [1978] 2 All E.R. 89 (1977) 121 S.J. 605 **(Cite as: [1978] Ch. 406)**

The next case, Gray v. Lewis (1873) L.R. 8 Ch.App. 1035 , is an**\*410** instance of fraud creating an exception to the rule in Foss v. Harbottle. For example, James L.J. said, at p. 1051:

"I think it is of the utmost importance to maintain the rule laid down in Mozley v. Alston (1847) 1 Ph. 790 and Foss v. Harbottle, 2 Hare 461 , to which, as I understand, the only exception is where the corporate body has got into the hands of directors and of the majority, which directors and majority are using their power for the purpose of doing something fraudulent against the minority, who are overwhelmed by them . . ."

In Menier v. Hooper's Telegraph Works (1874) L.R. 9 Ch.App. 350 , a minority shareholders' action was allowed where the majority intended to divide the assets of the company more or less between themselves to the exclusion of the minority. Mellish L.J. said, at p. 354:

"I am of opinion that although it may be quite true that the shareholders of a company may vote as they please, and for the purpose of their own interests, yet that the majority of shareholders cannot sell the assets of the company and keep the consideration, but must allow the minority to have their share of any consideration which may come to them."

In MacDougall v. Gardiner (1875) L.R. 20 Eq. 383 , although the actual decision was reversed, Malins V.-C. said that there had to he something at least bordering upon fraud to found a minority shareholders' action.

In Mason v. Harris (1879) 11 Ch.D. 97 , Jessel M.R., in an action to set aside a sale by a managing director to the company on the grounds of fraud, said, at p. 107:

"As a general rule the company must sue in respect of a claim of this nature, but general rules have their exceptions, and one exception to the rule requiring their company to be plaintiff is, that where

a fraud is committed by persons who can command a majority of votes, the minority can sue. The reason is plain, as unless such an exception were allowed it would be in the power of a majority to defraud the minority with impunity. If the majority were to make a fraudulent sale and put the money into their own pockets, would it be reasonable to say that the majority could confirm the sale."

In 1900 there was a case on which Mr. Blackburne relies of rather wider import. In Alexander v. Automatic Telephone Co. [1900] 2 Ch. 56 directors issued shares, and required some people who took up the shares to make payments in respect of those shares, but the directors did not themselves make payments on the shares which they had taken up,

"if directors require other applicants for shares to make payments on application and allotment, and issue their own shares for which they have subscribed the memorandum without requiring any such payments to be made, and without disclosing to the other shareholders this difference between their position and that of the directors, they commit a breach of duty, even though in so doing they act without fraud, and in the belief that they are doing nothing wrong."**\*411** A minority shareholders' action was allowed. Fraud was negatived and the basis for the action was given as "breach of duty." Lindley M.R. said, at p. 64:

"The directors, in fact, so managed matters as to place themselves in a better position as regards payment than the other shareholders, and they did so without informing the other shareholders of the fact. This, the plaintiffs contend, was a breach of duty on the part of the directors to those who applied for and took shares upon the faith that the directors were not obtaining advantages at their expense. It is no answer to the plaintiffs' case so put to appeal to the contracts alone, for the charge is that the directors were guilty of a breach of duty in procuring those contracts and in taking advantage of them so as to benefit themselves at the expense of the other shareholders." The Master of the Rolls said, at pp. 66-67:

Copr. © West 2009 No Claim to Orig. Govt. Works

[1978] Ch. 406                                                                          Page 5

[1978] Ch. 406 [1978] 2 W.L.R. 73 [1978] 2 All E.R. 89 (1977) 121 S.J. 605 [1978] Ch. 406 [1978] 2 W.L.R. 73
[1978] 2 All E.R. 89 (1977) 121 S.J. 605 **(Cite as: [1978] Ch. 406)**

"The court of chancery has always exacted from directors the observance of good faith towards their shareholders and towards those who take shares from the company and become co-adventurers with themselves and others who may join them. The maxim 'caveat emptor' has no application to such cases, and directors who so use their powers as to obtain benefits to themselves at the expense of the shareholders, without informing them of the fact, cannot retain those benefits and must account for them to the company, so that all the shareholders may participate in them." That was a case which falls within the first exception to Foss v. Harbottle 2 Hare 461 , in that the plaintiff shareholder could be said to be suing in respect of his individual rights as a shareholder to receive the same treatment as any other shareholder. But the Master of the Rolls also considered the directors to be in breach of duty to the company. He said [1900] 2 Ch. 56 , 69:

"The breach of duty to the company consists in depriving it of the use of the money which the directors ought to have paid up sooner than they did. I cannot regard the case as one of mere internal management which, according to Foss v. Harbottle and numerous other cases, the court leaves the shareholders to settle amongst themselves. It was ascertained and admitted at the trial that, when this action was commenced, the defendants held such a preponderance of shares that they could not be controlled by the other shareholders. Under these circumstances an action by some shareholders on behalf of themselves and the others against the defendants is in accordance with the authorities, and is unobjectionable in form: . . ." That was a case intermingled with the individual grievances of the shareholders in respect of their own rights, but contemplating an exception to Foss v. Harbottle going wider than fraud.

Shortly thereafter, in Burland v. Earle [1902] A.C. 83 , it was said that minority shareholders can sue in their own names, but must show that the acts complained of are either fraudulent or ultra vires. In

*412 particular, Lord Davey, who delivered the advice of the Judicial Committee, said, at p. 93:

"It is an elementary principle of the law relating to joint stock companies that the court will not interfere with the internal management of companies acting within their powers, and in fact has no jurisdiction to do so. Again, it is clear law that in order to redress a wrong done to the company or to recover moneys or damages alleged to be due to the company, the action should prima facie be brought by the company itself. These cardinal principles are laid down in the well-known cases of Foss v. Harbottle, 2 Hare 461 , and in Mozley v. Alston, 1 Ph. 790 , and in numerous later cases which it is unnecessary to cite. But an exception is made to the second rule, where the persons against whom the relief is sought themselves hold and control the majority of the shares in the company, and will not permit an action to be brought in the name of the company. In that case the courts allow the shareholders complaining to bring an action in their own names. This, however, is mere matter of procedure in order to give a remedy for a wrong which would otherwise escape redress, and it is obvious that in such an action the plaintiffs cannot have a larger right to relief than the company itself would have if it were plaintiff, and cannot complain of acts which are valid if done with the approval of the majority of the shareholders, or are capable of being confirmed by the majority. The cases in which the minority can maintain such an action are, therefore, confined to those in which the acts complained of are of a fraudulent character or beyond the powers of the company. A familiar example is where the majority are endeavouring directly or indirectly to appropriate to themselves money, property, or advantages which belong to the company, or in which the other shareholders are entitled to participate, . . ." The decision in this case turned on the fact that those against whom allegations were made were not, in fact, in control of the company.

Then in 1916 minority shareholders were allowed to sue, although fraud in the true sense of the word

was not sustained; fraud was pleaded but rejected. In Cook v. Deeks [1916] 1 A.C. 554 , directors obtained for themselves the benefit of a contract which might otherwise have gone to the company. Fraud was expressly negatived. Lord Buckmaster L.C. said, at p. 563:

"It is quite right to point out the importance of avoiding the establishment of rules as to directors' duties which would impose upon them burdens so heavy and responsibilities so great that men of good position would hesitate to accept the office. But, on the other hand, men who assume the complete control of a company's business must remember that they are not at liberty to sacrifice the interests which they are bound to protect, and, while ostensibly acting for the company, divert in their own favour business which should properly belong to the company they represent." Mr. Richards said that was really a case of constructive fraud, but express fraud having been negatived, it seems to me that it established that an**\*413** action will lie where, without fraud, directors in a majority, "divert in their own favour business which should properly belong to the company they represent."

Then in 1956 there was a case on which Mr. Richards very strongly relies and from which Mr. Blackburne asked me to differ. In Pavlides v. Jensen [1956] Ch. 565 , it was alleged that directors had been guilty of gross negligence in selling a valuable asset of the company at a price greatly below its true market value, and it was alleged that the directors knew or well ought to have known that it was below market value. Danckwerts J. struck out the statement of claim as disclosing no cause of action because no fraud was pleaded. The headnote says, at p. 566:

". . . since the sale of the asset in question was not beyond the powers of the company, and since there was no allegation of fraud on the part of the directors or appropriation of assets of the company by the majority shareholders in fraud of the minority, the action did not fall within the admitted exceptions to the rule in Foss v. Harbottle . . ." Danck-

werts J. said, at p. 576:

"On the facts of the present case, the sale of the company's mine was not beyond the powers of the company, and it is not alleged to be ultra vires. There is no allegation of fraud on the part of the directors or appropriation of assets of the company by the majority shareholders in fraud of the minority. It was open to the company, on the resolution of the majority of the shareholders, to sell the mine at a price decided by the company in that manner, and it was open to the company by a vote of the majority to decide that, if the directors by their negligence or error of judgment had sold the company's mine at an undervalue, proceedings should not be taken by the company against the directors."

Mr. Richards relies very strongly on this decision as showing that, whatever the exceptions to Foss v. Harbottle may be, mere gross negligence is not actionable, and he says all that is pleaded in the present case is gross negligence at the most. But in Pavlides v. Jensen [1956] 2 Ch. 565 no benefits accrued to the directors. Mr. Blackburne asks me to dissent from Pavlides v. Jensen but the decision seems to me at the moment to be in line with the authorities, in what is a restricted exception to the rule in Foss v. Harbottle, 2 Hare 461 .

In Birch v. Sullivan [1957] 1 W.L.R. 1247 the decision really went off on a point of pleading; moreover the judge was not satisfied that the dissenting shareholders could not put matters right by a meeting of the company. Finally I was referred to Heyting v. Dupont [1963] 1 W.L.R. 1192 ; [1964] 1 W.L.R. 843 . But that was only an instance of the court refusing on its own initiative to hear an action begun by minority shareholders where the Foss v. Harbottle exceptions did not come into play.

The authorities which deal with simple fraud on the one hand and gross negligence on the other do not cover the situation which arises where, without fraud, the directors and majority shareholders are guilty**\*414** of a breach of duty which they owe to the company, and that breach of duty not only

[1978] Ch. 406 [1978] 2 W.L.R. 73 [1978] 2 All E.R. 89 (1977) 121 S.J. 605 [1978] Ch. 406 [1978] 2 W.L.R. 73 [1978] 2 All E.R. 89 (1977) 121 S.J. 605 **(Cite as: [1978] Ch. 406)**

harms the company but benefits the directors. In that case it seems to me that different considerations apply. If minority shareholders can sue if there is fraud, I see no reason why they cannot sue where the action of the majority and the directors, though without fraud, confers some benefit on those directors and majority shareholders themselves. It would seem to me quite monstrous - particularly as fraud is so hard to plead and difficult to prove - if the confines of the exception to Foss v. Harbottle, 2 Hare 461 , were drawn so narrowly that directors could make a profit out of their negligence. Lord Hatherley L.C. in Turquand v. Marshall, L.R. 4 Ch.App. 376 , 386, opined that shareholders must put up with foolish or unwise directors. Danckwerts J. in Pavlides v. Jensen [1956] 1 Ch. 565 accepted that the forbearance of shareholders extends to directors who are "an animal set of lunatics." Examples, ancient and modern, abound. To put up with foolish directors is one thing; to put up with directors who are so foolish that they make a profit of £115,000 odd at the expense of the company is something entirely different. The principle which may be gleaned from Alexander v. Automatic Telephone Co. [1900] 2 Ch. 56 (directors benefiting themselves), from Cook v. Deeks [1916] 1 A.C. 554 (directors diverting business in their own favour) and from dicta in Pavlides v. Jensen [1956] 2 Ch. 565 (directors appropriating assets of the company) is that a minority shareholder who has no other remedy may sue where directors use their powers, intentionally or unintentionally, fraudulently or negligently, in a manner which benefits themselves at the expense of the company. This principle is not contrary to Turquand v. Marshall, L.R. 4 Ch.App. 376 , because in that case the powers of the directors were effectively wielded not by the director who benefited but by the majority of independent directors who were acting bona fide and did not benefit. I need not consider the wider proposition for which Mr. Blackburne against some formidable opposition from the authorities contends that any breach of duty may be made the subject of a minority shareholder's action.

I am certainly not prepared to say at this stage of the game that the action brought by the plaintiffs in the present instance is bound to fail. What the result of the action will be I know not, but if the statement of claim is right, and the husband and wife who control 60 per cent. of the shares were responsible for a sale by the company to the wife at an under-value, which they knew or ought to have known, then a remedy for the minority shareholders ought to lie.

Mr. Richards said that in any event the action does not lie against the husband but only against the wife who took the property, but at the present moment I do not know what the facts are, and the law on the consequences of the facts has not been expounded. It seems to me to be more convenient to allow the action to continue against both husband and wife. Mr. Blackburne has had a warning shot fired across his bows and he might succeed against one defendant and not against the other and would then have to consider the question of costs. But in the present state of affairs before discovery and further consideration I think the best**415** thing to do is to allow the action to take its normal course. The result is that I dismiss the present application.Summons dismissed with costs. Leave to appeal refused. (A. R. ) END OF DOCUMENT

Copr. © West 2009 No Claim to Orig. Govt. Works


**Tab 7**

Case No: A3/2005/0523
Case No: A3/2005/0524

**Neutral Citation Number: [2005] EWCA Civ 1612**
**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT**
**QUEEN'S BENCH DIVISION (COMMERCIAL COURT)**
**(MORISON J)**
**2004 Folio 103 and 2001 Folio 405**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: Wednesday, 21st December 2005

Before :

**LORD JUSTICE WARD**
**LADY JUSTICE ARDEN**
and
**LORD JUSTICE MOORE-BICK**
- - - - - - - - - - - - - - - - - - - - -
Between :
**DIAMANTIS DIAMANTIDES**          **Claimant**
**- and -**
**JP MORGAN CHASE BANK**
**and others**          **Defendants**
**and between:**
**JP MORGAN CHASE BANK**
**and others**          **Claimants**
**- and -**
**POLLUX HOLDING LIMITED**          **Defendant**

- - - - - - - - - - - - - - - - - - - - -
(Transcript of the Handed Down Judgment of
Smith Bernal WordWave Limited
190 Fleet Street, London EC4A 2AG
Tel No: 020 7421 4040  Fax No:  020 7831 8838
Official Shorthand Writers to the Court)
- - - - - - - - - - - - - - - - - - - - -
**Mr. Michael Briggs Q.C. and Mr. Anthony de Garr Robinson** (instructed by **CMS
Cameron McKenna**) for **Mr. Diamantides** and **Pollux Holding Ltd**
**Mr. Mark Hapgood Q.C. and Mr. Adrian Beltrami** (instructed by **Clifford Chance LLP**)
for **JP Morgan Chase Bank**
- - - - - - - - - - - - - - - - - - - - -

# Judgment

Lord Justice Moore-Bick:

1.    This is an appeal against an order of Morison J. made on 28th January 2005 striking out the claim form and particulars of claim in action 2004 Folio 103 and refusing permission to amend the particulars of claim in both actions with a view to consolidating the proceedings.

2.    The facts as I shall describe them for the purposes of this judgment are taken almost entirely from the proposed consolidated particulars of claim. For the purposes of this appeal the allegations set out in that document must be assumed to be true, although in many respects they are hotly contested. The claimant in the second action (2004 Folio 103), Mr. Diamantides, is a successful Greek shipowner and a wealthy man whose energies are directed to the management of his shipping business. The defendants in the second action and the claimants in the first action (2001 Folio 405) are all members of the JP Morgan Chase banking group and for the purposes of this appeal can be regarded as a single entity. I shall refer to them simply as "the Bank". As part of its business the Bank offers a comprehensive range of private banking facilities to wealthy individuals around the world. I shall refer to that part of its activities as the "private bank". The defendant in the first action (2001 Folio 405), Pollux Holding Ltd, is a Liberian company that was used by Mr. Diamantides as an investment vehicle from the latter part of 1996.

3.    In 1987 Mr. Diamantides met Mr. Evangelos Mellis who was then a senior executive in the Bank's Global Shipping Group. Later, Mr. Mellis became a Vice President of the private bank at its London office and sought to persuade Mr. Diamantides to become one of the Bank's clients for investment purposes. He assured Mr. Diamantides that the Bank would provide him with exceptional service in the way of looking after his interests and maximising his returns. Some time around the middle of 1990 Mr. Mellis managed to persuade Mr. Diamantides to enter into a relationship with the Bank. On 28th August 1990 he wrote to Mr. Diamantides in the following terms:

      "I am writing to let you know how pleased I am that we have established a relationship with you. We have been trying for a long time to get you in the bank; we finally succeeded and I am delighted! I am confident that you will find the experience worthwhile. We look forward to an everlasting relationship for our mutual benefit."

4.    The letter from Mr. Mellis to Mr. Diamantides is the only record, as far as I am aware, of the establishment of a relationship of any kind between Mr. Diamantides and the Bank. However, by the time it was written Mr. Diamantides had already provided a fund of US$5 million to the bank for the account of Ursa Navigation Inc. ("Ursa"), another Liberian company which he was then using as an investment vehicle. At around the same time as he made the funds available to Ursa he caused it to enter into a discretionary management agreement with the Bank under which the Bank was given absolute discretion to make use of the fund to acquire and manage a portfolio of investments on its behalf. That management agreement was contained in a letter from the Bank to Ursa dated 26th July 1990 which was counter-signed by Ursa on 2nd August 1990.

5.      From about August 1990 the Bank acquired a portfolio of investments in the name of Ursa using funds provided by Mr. Diamantides. Towards the end of the year Mr. Mellis introduced Mr. Diamantides to a Mr. Justin Atkinson, an employee of the Bank who, he said, would provide Mr. Diamantides with investment advice under his general supervision. Mr. Atkinson was not employed by the private bank but worked in a different part of the Bank as an institutional salesman selling emerging market investments. After that there was regular contact between Mr. Diamantides and Mr. Atkinson in the course of which Mr. Atkinson gave Mr. Diamantides investment advice which Mr. Diamantides invariably accepted and followed. All investments continued to be made in the name of Ursa. No one was surprised about that since it was, and no doubt still is, common practice among the Greek shipping community to make use of offshore corporate vehicles for investment purposes. Mr. Diamantides was the sole shareholder of Ursa and provided the funds for the investments made in its name. Insofar as Ursa made profits he enjoyed them and insofar as it suffered losses he suffered them. During this period Mr. Mellis and Mr. Atkinson regularly visited Mr. Diamantides in Piraeus. They also communicated with him frequently by telephone. Mr. Mellis often told Mr. Diamantides that he was a very important customer of the Bank.

6.      Mr. Mellis left the private bank in 1994 and appears to have had no further involvement with Mr. Diamantides or his affairs. He was replaced by a Mr. Ferrazzi who was in turn replaced by a Mr. Gager in 1996. At some time in 1996 Mr. Diamantides decided to rearrange his affairs. He caused the portfolio held by Ursa to be transferred to Pollux of which he was likewise the sole shareholder. No management agreement appears to have been executed between Pollux and the Bank, but in all other respects things continued exactly as before. Mr. Atkinson and Mr. Gager continued to meet Mr. Diamantides from time to time and to speak to him on the telephone, Mr. Atkinson continued to advise Mr. Diamantides on investments and to manage the portfolio which was now held by Pollux and Mr. Diamantides invariably accepted the advice he was given. It is to be inferred that it was agreed between all concerned that the relationship between the Bank and Pollux was to be governed by the terms of the original management agreement.

7.      During 1997 Mr. Diamantides substantially increased the amount invested in the portfolio using leveraged finance made available by the Bank. On the advice of the Bank some of the funds were invested in notes issued by the Bank which were linked to rouble denominated bonds issued by the Russian government. In particular, between February and April 1998 Pollux purchased from the Bank four notes of this kind for a total of a little over US$40 million, 70% of the purchase price of which was provided by the Bank. It also entered into four corresponding repurchase agreements which were the means by which the finance was to be repaid and an agreement known as a Global Master Repurchase Agreement which was expressed to govern the repurchase by the Bank of all the GKO-linked notes. These notes together with their corresponding repurchase agreements are said to have been an unsuitable form of investment for Mr. Diamantides and one which he should not have been advised to undertake.

8.      Unfortunately, in August 1998 the Russian government suspended trading in GKOs and shortly afterwards the rouble collapsed. As a result the value of the notes fell dramatically and the Bank called on Pollux to provide security in the form of margin

payments for its obligation under the repurchase agreements. A dispute arose between Pollux and the Bank which closed out Pollux's position at a very substantial loss. Pollux contends that in doing so the Bank acted in breach of the terms of the various contracts between them.

9.    On 7th December 1999 Pollux issued proceedings in New York in which it purported to rescind the notes and made a number of other claims in relation to them. Those proceedings have since been dismissed on the grounds of forum non conveniens.

10.   In April 2001 while issues of jurisdiction were still being contested in New York the Bank started proceedings against Pollux seeking a declaration that it was not liable in respect of any loss Pollux had suffered in connection with the 4 GKO-linked notes (action 2001 Folio 405). Those proceedings were stayed by agreement pending the resolution of the jurisdiction issues. In that action Pollux has served a counterclaim seeking damages for breach of duty on the part of the Bank as its investment adviser.

11.   On 6th February 2004 Mr. Diamantides started proceedings against the Bank in his own name in England (2004 Folio 103) alleging that he personally and not merely Ursa (or later Pollux) was a client of the Bank for investment purposes and therefore a person to whom the Bank owed duties of care at law and in equity as well as duties of a fiduciary nature.

12.   In paragraph 17 of his particulars of claim in the second action Mr. Diamantides made the following allegations:

> "In accordance with common practice within the Greek shipping community, Ursa was an offshore corporate vehicle which was used exclusively for Mr. Diamantides's investment interests. In substance, its interests were Mr. Diamantides's interests: it was wholly owned and controlled by him and had no separate interests of its own. Mr. Diamantides was Ursa's sole source of funding and all the funds that were invested in the Portfolio came from him; all the investment decisions were made by him; all of the profits or losses that were made, or suffered, in relation to the investments were enjoyed, or suffered, by him."

13.   Then in paragraph 18 he said:

> "At all material times from the inception of the Portfolio, it was agreed and/or understood between Mr. Diamantides on the one hand and Mr. Mellis, Mr. Atkinson, [and the Bank] on the other, that:
>
> 18.1   The Private Bank . . . . . would regularly review the Portfolio, select investments for the Portfolio and provide Mr. Diamantides with disinterested advice and recommendations regarding the management of the Portfolio . . . . . .
>
> . . . . . . . . . . . . . . . . .

18.3 For the purposes of these services, the Private Bank's client or customer was Mr. Diamantides (and not merely Ursa)."

14. In paragraph 86 of the particulars of claim one finds the following case set out in relation to damage:

"By reason of the wrongful conduct of which complaint is made in this action, Mr. Diamantides has suffered loss and damage. The precise amount of his loss and damage cannot be particularised now, not least because it may be affected by the recoveries made by Pollux in the Pollux proceedings [action 2004 Folio 405]."

Then, after setting out the amounts claimed, it continues:

"If and to the extent that the Defendants are liable to Pollux in respect of wrongdoing which is equivalent to the wrongdoing for which the Defendants are liable to Mr. Diamantides as pleaded above, Mr. Diamantides will not claim damages which are merely a reflection of the losses which Pollux is entitled to recover, in accordance with the principles discussed in *Johnson v Gore Wood & Co* [2002] 2 AC 1."

15. That statement of case, which is undated, was served on 28th May 2004. On 17th June 2004 the Bank issued an application to strike it out under CPR 3.4(2)(a) or (b) or in the exercise of the court's inherent jurisdiction on the grounds that it disclosed no cause of action. In substance only two points were put forward: that the primary facts pleaded were not sufficient to support the existence of a duty to Mr. Diamantides of the kind alleged, or, if they were, that on the facts alleged any loss he had suffered was purely reflective of the loss suffered by Pollux, to which similar duties were owed, and was therefore irrecoverable in accordance with the principles identified in *Johnson v Gore Wood* [2002] 2 A.C. 1. It may be that of the two the latter was regarded at the time as the Bank's primary point.

16. The response of those acting for Mr. Diamantides and Pollux was to issue an application to amend the particulars of claim in each action and to consolidate the two actions. To that end they produced a draft of a proposed consolidated particulars of claim which was used as the primary vehicle for argument when the matter came before the judge. On an application to strike out particulars of claim on the grounds that they disclose no cause of action the court will normally consider any proposed amendment since, if the existing case can be saved by a legitimate amendment, it is usually better to give permission to amend rather than strike out the claim and leave the claimant to start again. Not surprisingly, therefore, the judge considered the arguments by reference to the proposed amended and consolidated particulars of claim and we have done the same on this appeal.

17. As one would expect, the new statement of case follows very closely the lines of the two earlier documents which it replaces, but it departs from them in certain important respects. Since it is a consolidated pleading it is necessarily framed in a way that encompasses both claims, but for present purposes the main point of interest is what is

said about the relationship between them. The first indication of that is to be found in paragraph 1.4(1) which reads as follows:

> "It is Mr. Diamantides's and Pollux's *primary case* . . . . . that, for the purpose of the advisory and other services and actions referred to in paragraphs 11, 21 and 27 below, Mr. Diamantides was a customer or client of the Private Bank in his own right, that Mr. Atkinson's advice and recommendations were given to, accepted and relied on by, Mr. Diamantides acting in his own right and that, in relation to these services, these actions, this advice and these recommendations, Mr. Diamantides was owed duties in his own right. *Alternatively, should this primary case not be correct*, Mr. Diamantides's and Pollux's *secondary case* . . . . . is that, for the purpose of these services, Ursa (until 1996) and Pollux (from 1996) was the customer or client of the Private Bank, that Mr. Atkinson's advice and recommendations were given to, and relied on by Mr. Diamantides acting on behalf of Ursa (until 1996) and of Pollux (from 1996) and that, in relation to these services, this advice and these recommendations, Ursa (until 1996) and Pollux (from 1996) was owed duties. In this statement of case the phrases "Mr. Diamantides/Ursa" and "Mr. Diamantides/Pollux" are used to convey and to reflect these two alternative cases . . . . . " (emphasis added)

18.  Paragraph 18 of the earlier statement of case is now replaced by paragraph 21 which reads as follows:

> "At all material times from the inception of the Portfolio, it was agreed and/or understood between Mr. Diamantides/Ursa on the one hand and Mr. Mellis, Mr. Atkinson, [and the Bank] on the other, that:
>
> 21.1    The Private Bank . . . . . would regularly review the Portfolio, select investments for the Portfolio and provide Mr. Diamantides/Ursa with disinterested advice and recommendations regarding the management of the Portfolio
>
> . . . . . . . . . . . . . . . .
>
> 21.3    For the purposes of these services, the Private Bank's client or customer was Mr. Diamantides/Ursa."

19.  This may appear to be a minor alteration, but when properly understood in the context of paragraph 1.4(1) it represents a fundamental change in the nature of the case that Mr. Diamantides is seeking to advance. Whereas he was formerly contending that the Bank owed what have been called "advisory" duties to him as well as Ursa or Pollux, as the case may be, the effect of the new pleading is that the Bank owed such duties to him alone, whereas what have been called the "transactional" obligations arising out of the contracts between the Bank and the companies were owed to the companies

alone. Only if he is wrong about that do he and Pollux say that the Bank owed any advisory duties to the companies. Although Mr. Briggs Q.C. submitted that for the purposes of the application before the judge, and indeed the appeal, all that matters is whether the facts alleged in the particulars of claim are sufficient to disclose a cause of action on the part of Mr. Diamantides personally, I do not think that one can ignore the fact that it is part of his case that the relevant duties were owed only to him and not also to Ursa or Pollux. That is a critical aspect of the relationship that is said to have existed between him and the Bank and one that lies at the heart of his case.

20. C.P.R. Rule 3.4(2) under which the application was made provides as follows:

> "The court may strike out a statement of case if it appears to the court –
>
> (a) that the statement of case discloses no reasonable grounds for bringing or defending the claim; [or]
>
> (b) that the statement of case is an abuse of the court's process or is otherwise likely to obstruct the just disposal of the proceedings;"

21. Although, as Mr. Hapgood Q.C. pointed out, the application was formally made under both limbs of the rule as well as the inherent jurisdiction of the court, it was treated by both parties and the judge as in substance an application under paragraph (a) alone. Having said that, however, it is right to say that the expression "discloses no reasonable grounds for bringing the claim" is wide enough to encompass a case in which, although the statement of case discloses a cause of action, it is plain that the claim is bound to fail. That is reflected in the commentary at the end of paragraph 3.4.2 of *Civil Procedure 2005* in which the learned editors refer to the degree of overlap that exists between sub-paragraphs (a) and (b) of this rule and between rule 3.4(2) itself and Part 24. However, I would not expect the court to strike out a statement of case under rule 3.4(2) on those grounds save in the clearest case and it was not the basis on which the matter was argued before the judge or before this court.

22. Having said that, Morison J. certainly took a clear view of this case. He accepted Mr. Hapgood's submission that the allegation that Mr. Diamantides was a customer or client of the Bank in his personal capacity was quite unsupported by any allegation of primary fact and observed that the consolidated pleading was "impossibly vague" about the nature of the relationship said to exist between Mr. Diamantides and the Bank. He said in paragraphs 27 and 28:

> " . . . . . . This is a fanciful claim in my judgment; without factual basis and would be doomed to fail. I take a much more simple view of the case than Mr Briggs QC. The question is whether Mr Diamantides has a claim at all. That depends upon a credible case being advanced that Chase and he were in a contractual relationship: banker and customer. The facts pleaded show clearly that at all times Pollux was the customer and Mr Diamantides, the principal behind the company and sole shareholder and

controller was the voice for and asset provider to the company. Had Mr Diamantides wanted to trade in his own name and had, which I doubt, the Bank been willing to accept him as a private investor for trading in risky emerging market instruments, then he would have bought and sold instruments in his own name. Instead, and possibly necessarily, the Bank dealt with all transactions for and on behalf of the company, Pollux. Because Pollux is a company which carried on the business of investing for its sole shareholder's benefit, it did not have the protection afforded by the statutory scheme then in force to a 'private investor'. The discussion in *Johnson* as to reflective loss is not pertinent, in my judgment. Pollux has a cause of action against the Bank; if that claim fails because of some exclusionary clauses in contractual documents then that does not give Mr Diamantides a good claim against the Bank. If Pollux succeeds then Mr Diamantides own losses will be reflective of the losses for which Pollux is making its claims; if Pollux fails then the shareholder will bear the loss. And that reflects the reality of the position. As was pleaded in paragraph 20 of the Amended pleading, what Pollux gained, Mr Diamantides gained and conversely what it lost he lost.

28. I accept Mr Hapgood QC's submissions. In particular I think he rightly submitted this is an unprincipled attempt by an individual, who chose to invest through a corporate vehicle, to pierce the veil of his own company. That is not in law permissible: see *Trustor AB v Smallbone* [2001] 1 WLR 1177. The beginning and end of this case is that Pollux was the customer; Mr Diamantides was not. . . . . . . "

23. Mr. Briggs submitted that in reaching that conclusion the judge failed to observe one of the cardinal principles that apply when dealing with an application of this kind, namely, that all the primary facts alleged in the statement of case must be assumed to be true. Only if those facts clearly do not disclose a cause of action is it appropriate to strike it out. The judge undoubtedly took a robust approach to the case, but I do not think this criticism is justified. On several occasions he referred to the primary facts pleaded and to the inferences that could and could not properly be drawn from them and having posed in paragraph 27 the question whether a credible case was being advanced that Mr. Diamantides was in a contractual relationship with the Bank, he clearly set out to answer it by reference to the facts as pleaded. If he occasionally expressed himself in terms which might appear to be more appropriate to an application for summary judgment, I think that is to be explained by the fact that he regarded the claim by Mr. Diamantides as wholly artificial. Whether he was right about that is, of course, another matter.

24. In my view it is helpful to begin by identifying the allegations of primary fact that are said to support the existence of a cause of action on the part of Mr. Diamantides. For this purpose it is necessary to examine the individual allegations with some care and also to have regard to the statement of case as a whole. I say that because, whereas in a simple pleading it may be sufficient for a claimant simply to allege that he was a customer of the defendant bank, leaving further elucidation of the basis of that allegation to the service of further information, in a pleading such as the one before us, which in 162 paragraphs containing a wealth of detail occupies 107 closely typed pages, one can properly assume that all the primary facts said to support an allegation of that kind have been set out.

25. The following facts, all of which are clearly primary facts, are pleaded in the proposed consolidated statement of case:

   (i)     that Ursa and Pollux were wholly owned and controlled by Mr. Diamantides and acted exclusively as vehicles for his interests (paragraph 2.2);

   (ii)    that Mr. Diamantides met Mr. Mellis in 1987 and that after Mr. Mellis joined the private bank he sought to persuade Mr. Diamantides to become a customer or client of the private bank for investment purposes (paragraphs 4 and 5);

   (iii)   that Mr. Mellis told Mr. Diamantides that the private bank would provide him with exceptional service (paragraph 5);

   (iv)    that Mr. Diamantides understood that he was a customer or client of the Bank (paragraph 7);

   (v)     that between June and August 1990 Mr. Diamantides provided a fund of US$5 million for Ursa's account and caused Ursa to enter into a discretionary management agreement with the Bank contained in a letter of 26th July 1990 countersigned by Ursa on 2nd August 1990 (paragraph 8);

   (vi)    that Mr. Mellis wrote to Mr. Diamantides on 28th August 1990 to tell him how pleased he was to have established a relationship with him (paragraph 6);

   (vii)   that Mr. Mellis introduced Mr. Atkinson to Mr. Diamantides as someone who would give advice about investments under his supervision and that Mr. Diamantides received advice from Mr. Atkinson which he accepted without exercising his own judgment; that as a result a portfolio was generated in Ursa's name (paragraphs 15 and 19.2);

   (viii)  that Ursa was an offshore corporate vehicle which was used exclusively for Mr. Diamantides's investment interests (paragraph 20.1); and

   (ix)    that Mr. Mellis and other senior employees of the Bank frequently told Mr. Diamantides that he was a very important customer (paragraph 23 and 48).

26. Mr. Briggs also placed a good deal of weight on the following allegations which he submitted should be regarded in the same way:

   (i)     that in 1990 Mr. Mellis succeeded in his objective of persuading Mr. Diamantides to become a customer of the Bank (paragraph 6);

(ii)     that Mr. Diamantides began to make investments acting through Ursa (paragraph 9);

(iii)    that Mr. Diamantides thought that the Bank regarded him as its client and that the Bank knew that and intended that he should do so (paragraphs 21.3 and 22);

(iv)    that the Bank's client or customer was Mr. Diamantides (paragraph 21.3)

(v)     that at all material times from no later than 1st January 1997 the Bank was orally or impliedly engaged by Mr. Diamantides under contract to perform investment services (paragraphs 27 and 28); and

(vi)    that there was a special relationship of trust and confidence between the Bank and Mr. Diamantides (paragraph 27.4).

However, in the context of this pleading I think these are all properly to be regarded as secondary facts, that is, facts which to a greater or lesser degree represent inferences or conclusions drawn from other, primary, facts. For example, whether Mr. Diamantides was a client or customer of the Bank, as is alleged in paragraph 21.3, is a matter to be determined by reference to what passed between him and Mr. Mellis when the relationship was being formed or (if it is said that a different relationship developed over the course of time) subsequent exchanges between Mr. Diamantides and employees of the Bank. Similarly, whether Mr. Diamantides thought that the Bank regarded him as its client and whether the Bank knew that and intended that he should do so also  depends to a large extent on what passed between them.

27.     One of the main planks of Mr. Briggs's argument was that the Bank was courting Mr. Diamantides personally, not whatever company he might choose to use as the vehicle for making his investments, which is why Mr. Mellis wrote to him in the terms one sees in the letter of 28th August 1990 and why he was repeatedly assured that he was a very important customer. No doubt in one sense he was a very important customer, because the whole point of the exercise as far as the Bank was concerned was to acquire the opportunity to provide investment services in respect of the considerable private wealth which Mr. Diamantides was believed to command. That could only be done by approaching him personally and obtaining his confidence and approval, since, although the Bank probably assumed that any investments made would be made through an offshore company, it was obvious that any decisions that had to be made in relation to those investments would be made by Mr. Diamantides himself. I do not think that it necessarily follows, however, that either or both parties contemplated that the Bank would owe him personally the duties that it would ordinarily owe to a customer to the exclusion of the company. It would be unusual for an investment manager acquiring and managing a portfolio of investments under a formal management agreement not to owe duties of care and duties of a fiduciary nature to the other party to the agreement, whether or not it also owed duties of a similar nature to the person who was known to be taking decisions on behalf of that party. Having regard to the existence of the management agreement entered into between the Bank and Ursa at the beginning of the relationship, I think one is entitled to view with some scepticism, therefore, the suggestion that the Bank did not owe Ursa duties of a kind that would normally be owed to an investment client.

28.     Mr. Briggs drew our attention to a number of authorities in support of his submission that it is possible for a relationship of client and confidential adviser to arise between a solicitor or other professional adviser and the person who gives instructions on behalf of the client for whom the adviser is engaged to act. In *Groom v Crocker* [1939] 1 K.B. 194 Scott L.J. pointed out at page 222 that the relationship of solicitor and client may be established informally by conduct and I am prepared to accept that the same may be true of the relationship between investment manager and investor, but all that means is that a relationship of that kind between Mr. Diamantides and the Bank could have arisen without the need for any formal agreement, not that it actually did so. To determine whether such a relationship may have arisen it is necessary to examine the facts which are said to have given rise to it.

29.     The case of *Johnson v Gore, Wood & Co* [2002] 2 A.C. 1 is best known as the leading authority on the principles of reflective loss and abuse of process, but when the case was before this court ([1998] EWCA Civ 1763) there was considerable debate about a different point, namely, whether the claimant, Mr. Johnson, had a personal claim of any kind against the defendants. The judgment is reported at [1999] BCC 474.

30.     Mr. Johnson was an entrepreneur whose practice was to use single purpose companies which he owned and controlled to carry out individual business projects. He instructed a firm of solicitors, Gore Wood & Co. ("GW"), to act on behalf of one such company, Westway Homes Ltd ("WWH"), in connection with the exercise of an option which it had acquired to purchase a piece of land for development purposes. Mr. Johnson, whose business interests extended well beyond that particular project, said that he had also instructed GW to advise him personally in relation to four business ventures, one of which was the development project. A dispute arose between WWH and the vendor over the exercise of the option. GW gave certain advice about the likely course and outcome of any litigation knowing that, if Mr. Johnson decided to proceed with it he would have to fund it, that it would stretch his financial resources and that his other business interests would suffer as a result. In reliance on GW's advice Mr. Johnson instructed GW to commence proceedings on behalf of WWH against the vendor. Those proceedings did not take the course that GW had led Mr. Johnson to expect and although they were ultimately successful, by the time they were concluded the collapse of the property market had rendered the option worthless. As a result WWH brought an action for professional negligence against GW which was settled during the course of the trial. By that time Mr. Johnson had given notice that he considered that he had a personal claim against GW quite apart from that being made by WWH and a few months later he began proceedings against them in his personal capacity.

31.     In his statement of claim Mr. Johnson alleged that, in addition to the retainer by WWH, GW had also accepted a retainer from him personally in relation to a number of ventures of which the development project of WWH was only one. As far as one can tell, neither in his statement of claim nor in any of the further and better particulars did he set out the primary facts said to support the conclusion that he had retained GW on his own behalf rather than simply on behalf of WWH. Indeed, at one point he pleaded that he did not explicitly differentiate between the affairs of WWH and his personal affairs when giving instructions and that GW had not differentiated between them when giving their advice.

32. As was recognised both in this court and the court below, the essential question for decision was whether GW had accepted a retainer to advise Mr. Johnson personally as well as, and quite separately from, the retainer it had accepted to advise WWH. It was not suggested that it was impossible for it to have done so and the court, upholding the decision of Pumfrey J. below, held that it could not say that the facts pleaded were incapable of giving rise to the inference that GW had been retained to act on behalf of Mr. Johnson personally as well as on behalf of WWH.

33. The next case to which Mr. Briggs drew our attention was the recent decision of this court in *Ratiu v Conway* [2005] EWCA Civ 1302 (unreported, 14th November 2005). The defendant, Mr. Conway, had been retained to act as solicitor for a company, Regent House Properties Ltd ("Regent"), seeking to acquire a development property through a wholly-owned subsidiary, Pristbrook Ltd ("Pristbrook"). Pristbrook duly acquired the property which it subsequently resold. Mr. Conway also acted for Pristbrook in connection with the sale. Sometime later another property came on the market which both Regent and Mr. Conway were interested in acquiring. Regent wrote to the vendor's agents complaining that Mr. Conway had misused confidential information that he had acquired as solicitor for Regent when acting in relation to the earlier transactions. Mr. Conway considered that to be defamatory and brought proceedings against Regent and two individuals, Mr. Ratiu and Mr. Karmel. In the context of those proceedings the question arose whether Mr. Conway owed fiduciary duties to Regent; he said he did not because his client for the purposes of the earlier transaction was Pristbrook, not Regent. At the trial the judge directed the jury that although Mr. Conway had originally been instructed by Regent, his client for the purposes of the purchase and sale of the property was Pristbrook alone and that at the time of his attempt to purchase the second property he therefore owed no fiduciary duty to Regent.

34. This court held that that was wrong. Auld L.J., who gave the leading judgment with which Laws and Sedley L.JJ. agreed, pointed out that although a solicitor's fiduciary duty to his client is normally engendered by the retainer, it is distinct from the contractual obligations created by the retainer and arises out of the relationship of trust and confidence which comes into being as a result. It is therefore not necessarily confined to the terms of the contractual retainer: see paragraph 72. He concluded by saying in paragraphs 77-78

> "77. In short, I see strong jurisprudential support for the proposition that the answer to the question whether a fiduciary duty, which has its start in a solicitor/client relationship, may outlive it is highly fact-sensitive. Lord Millett's distinction between fiduciary duty and a duty of confidence in *Bolkiah* arose, as I have said in a much narrower focus and one that was primarily concerned with the extent of the latter duty.
>
> 78. There is, it seems to me, a powerful argument of principle, in this intensely personal context of considerations of trust, confidence and loyalty, for lifting the corporate veil where the facts require it to include those in or behind the company who are in

> reality the persons whose trust in and reliance upon the
> fiduciary may be confounded."

35.     The importance of this passage lies in the recognition that, in a case where a fiduciary relationship arises out of a contractual relationship, it does not matter whether the person to whom the duty is owed entered into the contract directly or through an agent or through a nominee company. What matters is whether a relationship of trust and confidence has come into being: see paragraph 80. As I understand it, Auld L.J. was seeking to emphasise in these passages that because a fiduciary relationship does not depend on the existence of contractual relations, there may be circumstances in which a duty of that kind may arise not only between the fiduciary and the client but also between the fiduciary and a third person who is closely connected with the client.

36.     Mr. Briggs relied on these decisions as supporting his submission that in the context of a case such as the present it is perfectly possible for the Bank to owe fiduciary duties to Mr. Diamantides from whom it received its instructions and whom it knew to be the person behind Ursa and Pollux. If the submission went no further than that, I would be inclined to agree, but that is only half the story. As I have already observed, it is Mr. Diamantides's case that advisory duties were owed to him and him alone, whereas what have been described as transactional obligations, that is, the obligations arising under the various contracts between the Bank and the companies relating to the purchase and management of the investments in the portfolio, were owed exclusively to the companies. This is a feature of the present case which distinguishes it from both *Johnson v Gore Wood* and *Ratiu v Conway*.

37.     Inevitably, therefore, one is driven back to the same question: if one assumes that all the primary facts alleged in the consolidated particulars of claim were established at trial, is it possible that the court would hold that the Bank owed duties of care to Mr. Diamantides in contract, at common law or in equity, duties of a fiduciary nature or statutory duties under the Financial Services Act 1986?

38.     In my view *Johnson v Gore Wood* is clearly distinguishable from the present case. In that case there was no doubt that Mr. Johnson had instructed GW to act on behalf of WWH; the only question was whether he had also instructed them to act for him personally. As GW knew, his personal interests were not limited to the WWH project and, given that they had acted for him in connection with other business ventures and were familiar with his personal financial position, it is understandable that he might have wished them to advise him personally on the wider implications of the WWH project. In the present case Mr. Diamantides expected the Bank to select and manage an investment portfolio, but he did not expect it to advise him in a more general way about his financial affairs. No doubt it had a duty to consider whether any particular investment was suitable for his purposes in the light of the instructions it had been given, but it was not expected to bring into the equation other aspects of his financial affairs. Moreover, since, as the Bank knew, Ursa and Pollux were nothing more than investment vehicles for Mr. Diamantides, any investment that was suitable for him was suitable for them and vice versa.

39.     *Ratiu v Conway* was concerned with the circumstances in which fiduciary duties of a kind that normally arise out of a contractual relationship may arise between persons who are not in contractual relations or may continue after the contract has ceased to regulate their relationship. However, in that case the relationship originated in

Regent's retainer of Mr. Conway and continued as a result of its use of Pristbrook as a nominee. Since Pristbrook was formally his client, it could not be suggested that Mr. Conway did not owe it fiduciary duties as well. Accordingly, although the case provides some support for Mr. Briggs insofar as it emphasises that fiduciary duties may arise without any formalities, it does not really provide much assistance in answering the question with which we have to grapple.

40. I think it is important to bear in mind why Mr. Diamantides seeks to divorce the advisory duties from the transactional obligations. He does so in an attempt to counter any suggestion that the loss he has suffered is merely reflective of the loss suffered by Pollux. However, unlike the position in *Johnson v Gore Wood*, he does not allege that the Bank owed him any duty in relation to matters falling outside the investment portfolio that it was creating and managing for Pollux. Nor does he allege that the various duties the Bank owed to him and Pollux, whether legal, equitable or fiduciary, were in aggregate any different from those that an investment manager would ordinarily owe to his client. In order to succeed, therefore, Mr. Diamantides must persuade the court that in his case these duties were divided between himself and Pollux, some being owed to him alone and others to Pollux alone. Moreover, contrary to Mr. Briggs's argument, this is not a case in which it is alleged that the nature of the developing relationship between the Bank and Mr. Diamantides gave rise to the duties on which he now seeks to base his claim. If it were, it would be necessary to identify the facts which are said to have resulted in a transfer to him personally of duties that were originally owed to Ursa. If his argument is to succeed, it must be on the basis that from the very outset any advisory duties the Bank owed were owed to him rather than the company.

41. It is not necessary on this occasion to decide whether it is possible to create a situation in which the duties normally owed by an investment manager to his client are divided in that way between the person giving the instructions and the company which purchases the investments and I am content for present purposes to assume that it is. However, it would be an unusual situation which could only arise as a result of special arrangements between the personal client, the investment manager and the company defining the scope of the relationships between them. In a case where it was envisaged (as would normally be the case) that investments would be purchased in reliance on the recommendation of the investment manager, it would require particular care in the structuring of those relationships to ensure that the manager was under no advisory duty of any kind to the person whom he knew was going to acquire them.

42. In the present case, however, there is nothing in the facts alleged by Mr. Diamantides to support the conclusion that any such arrangements were made or indeed that this case was in any respect out of the ordinary. All that is said is that the company was known to be his personal investment vehicle, that he was the natural person who gave instructions to the Bank and who relied on the advice it gave and that various members of the Bank's staff assured him from time to time that he was an important customer, as no doubt he was. It is accepted, however, that the agreement for the management of the portfolio, which in the ordinary way would bring about a relationship of a kind that could be expected to give rise to duties of care at law and in equity, as well as duties of a fiduciary nature, was made between the Bank and the company without containing any express modification of, or derogation from, the

duties to which such a relationship would ordinarily give rise. Nor is it suggested that the Bank dealt with Mr. Diamantides in a way that was any different from that in which it would have dealt with him if he had been receiving advice and giving instructions on behalf of the company.

43.      It has been said on many occasions that where the proceedings raise issues in a developing area of the law the action should be allowed to go to trial so that those issues can be determined in the light of all the facts. I have no doubt that that is right in a case where the facts set out in the statement of case enable one to see that the claim may succeed, if only as a result of an extension of existing principles. However, it does not absolve the court from deciding on an application of this kind whether the statement of case discloses reasonable grounds for bringing the claim. If the facts pleaded do not provide grounds for thinking that the claim might succeed despite any reasonably foreseeable extension of existing principles of law, I do not think that the case should be allowed to go to trial just in case something unexpected should occur. The judge described Mr. Diamantides's claim as fanciful because he considered it plain on the facts alleged in the statement of case that Pollux and not Mr. Diamantides was the customer. For my own part I prefer not to ask whether Mr. Diamantides was a customer of the Bank but whether the facts set out in the consolidated particulars of claim are capable of supporting the case he seeks to make. For the reasons given earlier I do not think they are. This is a case, therefore, in which the statement of case discloses no reasonable grounds for bringing the claim that he seeks to make and I am therefore satisfied that the judge was right to strike it out on this ground. I would therefore dismiss the appeal.

44.      This makes it unnecessary to consider the Bank's alternative argument that the loss suffered by Mr. Diamantides is entirely reflective of the loss suffered by Pollux and irrecoverable for that reason. It raises questions of some complexity which were attractively argued on both sides, but since they do not affect the outcome of the appeal, I do not think that it is appropriate to extend this judgment in order to discuss them.

**Lady Justice Arden:**

45.      I agree.

**Lord Justice Ward:**

46.      I also agree

**Tab 8**

# THE
# ALL ENGLAND
## LAW REPORTS

(INCORPORATING THE

**LAW TIMES REPORTS**

AND THE

**LAW JOURNAL REPORTS)**

OF CASES DECIDED IN

THE HOUSE OF LORDS      THE PRIVY COUNCIL

ALL DIVISIONS OF THE SUPREME COURT

AND

COURTS OF SPECIAL JURISDICTION

# 1950
## VOLUME 2

Consulting Editor :

### Sir ROLAND BURROWS, K.C.

*Recorder of Cambridge.*
*Managing Editor of Halsbury's Laws of England, Hailsham Edition.*

Consulting Editor for Chancery Cases :

### HAROLD CHRISTIE, ESQ., K.C.

*Bencher of Lincoln's Inn.*

Consulting Editor for Taxation Cases :

### CYRIL KING, ESQ., K.C.

*Bencher of the Middle Temple.*

General Editor :

### G. F. L. BRIDGMAN, ESQ.

*of the Middle Temple, Barrister-at-Law.*

*[For list of Reporters see overleaf]*

Published by

BUTTERWORTH & CO. (Publishers) LTD., 4, 5 & 6 BELL YARD,
TEMPLE BAR, LONDON, W.C.2.

## EDWARDS AND ANOTHER *v.* HALLIWELL AND OTHERS.

[COURT OF APPEAL (Sir Raymond Evershed, M.R., Asquith and Jenkins, L.JJ.), October 31, November 1, 2, 1950.]

*Trade Union—Action by member against union—Matter of substance, tinctured with oppression—Invasion of members' individual rights.*

Rule 19 of the rules of the defendant trade union provided: " The regular contributions of employed members shall be as per tables . . . A and no alteration to same shall be made until a ballot vote of the members has been taken and a two-thirds majority obtained." In December, 1943, a delegate meeting of the union, without taking any ballot, passed a resolution increasing the amount of the contributions of employed members. The plaintiffs, two members of the union, claimed against two members of the executive committee of the union and the union itself a declaration B that the alteration adopted at the delegate meeting was invalid.

HELD: (i) as the matter in question was not a mere irregularity in the internal management of the union, but was a matter of substance and tinctured with oppression, the court would grant the plaintiffs relief if it was proper to do so.

*Amalgamated Society of Engineers* v. *Jones* (1913) (29 T.L.R. 484), C *distinguished.*

(ii) it was implicit in the rule in *Foss* v. *Harbottle* (1843) (2 Hare 461) that the matter relied on as constituting the cause of action should be a cause of action properly belonging to the general body of members of the association in question as opposed to a cause of action which some individual member could assert in his own right. In the present case, the personal and individual rights of membership of the plaintiffs had been invaded and particular damage inflicted by the invalid alteration of the tables of contributions, and in such circumstances the rule in *Foss* v. *Harbottle* had no application to individual members who were suing, not in the right of the union, but in their own right to protect from invasion their individual rights as members, and, therefore, the plaintiffs were entitled to their declaration.

*Pender* v. *Lushington* (1877) (6 Ch.D. 70), *applied.*

*Per* JENKINS, L.J.: The rule in *Foss* v. *Harbottle* does not prevent an individual member suing if the matter in respect of which he is suing can validly be done, not by a simple majority of the members of the association, but, as in the present case, only by some special majority: *Cotter* v. *National Union of Seamen* ([1929] 2 Ch. 58), *applied* . . . I cannot regard the paying by the majority of the members of the increased rates without demur as equivalent to a ballot vote at which a two-thirds majority was obtained in favour of the alteration.

[AS TO THE AMENDMENT OF THE RULES OF A TRADE UNION, see HALSBURY, Hailsham Edn., Vol. 32, p. 494, para. 787; and FOR CASES, see DIGEST Vol. 43, p. 101, Nos. *1048-1052*, and Digest Supp.]

Cases referred to:

(1) *Foss* v. *Harbottle*, (1843), 2 Hare 461; 67 E.R. 189; 13 Digest 417, 1377.
(2) *Amalgamated Society of Engineers* v. *Jones*, (1913), 29 T.L.R. 484; Digest 101, *1050.*
(3) *Cotter* v. *National Union of Seamen*, [1929] 2 Ch. 58; 98 L.J.Ch. 52; 141 L.T. 178; Digest Supp.
(4) *Pender* v. *Lushington*, (1877), 6 Ch.D. 70; 46 L.J.Ch. 317; 9 Digest 572, *3800.*

APPEAL by the defendants from a judgment of VAISEY, J., dated July 28, 1950. The plaintiffs, two members of the Cricklewood branch of the defendant union, claimed a declaration on behalf of themselves and all other members of the branch that the alteration of the general rules of the union adopted

a delegate meeting in December, 1943, was invalid in so far as it purported to alter the amount of the regular contributions of employed members. The defendants were two members of the executive committee of the union sued as representatives of the committee and the union. VAISEY, J., granted the declaration. The facts appear in the judgment of ASQUITH, L.J.

*Pascoe Hayward, K.C.*, and *Lindner* for the defendants.

A *Milner Holland, K.C.*, and *Hesketh* for the plaintiffs.

SIR RAYMOND EVERSHED, M.R.: I will ask ASQUITH, L.J., to deliver the first judgment.

ASQUITH, L.J.: This is an appeal by the defendants from a judgment of VAISEY, J., whereby he made a declaration asked for by the plaintiffs in

B terms to which I will refer. The plaintiffs sue on behalf of themselves and all other members of the Cricklewood branch of the National Union of Vehicle Builders, a registered trade union. The defendants are sued on behalf of themselves and all other members of the executive committee of the union, and the union itself is joined as a defendant.

The main point in the appeal is whether VAISEY, J., has rightly construed

C r. 19 of the rules of the union. The defendants contend that, even if he did rightly construe that provision, the plaintiffs are precluded, for other reasons, from obtaining the relief which they have been awarded. The only relevant part of r. 19 is the first five lines, which are:

"The regular contributions of employed members shall be as per tables (pp. 115 and 116) and no alteration to same shall be made until a ballot

D vote of the members has been taken and a two-thirds majority obtained."

In December, 1943, a delegate meeting was held at which the delegates, without any ballot, let alone a ballot resulting in a two-thirds majority, purported to increase the regular contributions of employed members and also certain benefits payable to the members. The plaintiffs contend that that alteration in the

E contributions is a nullity because the condition precedent to its validity laid down in r. 19 had not been satisfied. They refused to pay the amount of the increase, and were threatened or actually visited with loss of their rights as union members, including that of eligibility for election to certain offices. In the action they claimed:

"A declaration that the alteration of the general rules of the National

F Union of Vehicle Builders adopted at a delegate meeting in December, 1943, is invalid in so far as it purports to alter the regular contributions of employed members."

[HIS LORDSHIP considered the rules of the union; held that, on construction of them, the alteration in December, 1943, of the rates of contribution was invalid, and continued:] The other point relied on by the defendants was that, even if they

G were wrong on the point of construction, the court either could not, or should not, grant the plaintiffs the relief which they claim. Under this head counsel for the defendants relied on the alleged principle that, when an action is brought by an individual in respect of a mere irregularity in a matter that is *intra vires* a trade union and concerns its internal management, the court will not as a rule intervene. For this purpose he conceded that a "mere irregularity" meant

H something not involving fraud, oppression or unfairness. I confess I should have thought the action complained of here was strongly tinctured, not, indeed, with fraud, but with "oppression" and "unfairness." Here were men who had a right not to have their contributions increased except after a ballot resulting in a two-thirds majority. This right was clearly violated. An unauthorised increase was sought to be extorted, and when they refused to pay, as they were entitled to do, severe penalties were imposed or threatened. To call this a mere informality or irregularity without any element of oppres-

sion or unfairness would be an abuse of language. When in circumstances such as I have described a remedy is sought by an individual, complaining of a particular act in breach of his rights and inflicting particular damage on him, it seems to me the principle of *Foss* v. *Harbottle* (1), which has been so strongly relied upon by the defendants, does not apply either by way of barring the remedy or supporting the objection that the action is wrongly constituted because the union is not a plaintiff. Nor, lastly, can I accept the submission that, if the action is maintainable at law, it should nevertheless be dismissed     A because the vast majority of members approved the action taken by the defendants. The answer to the defendants' argument under this head will, I hope, be presented more fully by my Lords who are much more familiar with this branch of the law than myself. I think the appeal should be dismissed.

JENKINS, L.J., stated the facts and continued: I will pass to the argu-     B ment based on the reluctance of the court to interfere with the domestic affairs of a company or association on the ground of mere irregularity in form in the conduct of those affairs, and the argument based on the more general proposition commonly called the rule in *Foss* v. *Harbottle* (1). As to the contention that, even though the purported alteration of the tables of contributions was invalid, the court should not interfere because the omission to hold a ballot     C and obtain a two-thirds majority as required by r. 19 was a mere irregularity in point of form, in my judgment, that argument can be shortly dismissed by saying that this was not a matter of form. It was a matter of substance. The relevant part of r. 19, I conceive, was designed to protect members against increases in the rates of contributions unless those increases were agreed to by a particular majority of members on a vote obtained in a particular way—     D that is to say, a two-thirds majority on a ballot vote. It seems to me that the executive committee's disregard of that express provision in the rules was a wrong done to each individual member on a point of substance. I say " on a point of substance," because it is *nihil ad rem* to point out that the increases in question were merely a matter of pence per week. In my judgment, this question should be viewed in precisely the same way as if the increase had been     E a matter of pounds, which might have made a substantial difference to the financial position of the members. In my judgment, the case cited on this part of the argument—*Amalgamated Society of Engineers* v. *Jones* (2)—has no bearing on the facts of the present case. In that case a meeting had been held and certain resolutions passed, and it was suggested that the mode of convening the meeting was irregular. The learned judge was able to hold that     F there had been no wrong done as a matter of substance, but that there had been a mere irregularity in procedure and he took the view that, in those circumstances, the court should not interfere. For the reasons I have endeavoured to state, I regard the present case as an entirely different one.

The rule in *Foss* v. *Harbottle* (1), as I understand it, comes to no more than this. First, the proper plaintiff in an action in respect of a wrong alleged to be     G done to a company or association of persons is *prima facie* the company or the association of persons itself. Secondly, where the alleged wrong is a transaction which might be made binding on the company or association and on all its members by a simple majority of the members, no individual member of the company is allowed to maintain an action in respect of that matter for the simple reason that, if a mere majority of the members of the company or     H association is in favour of what has been done, then *cadit quæstio*. No wrong had been done to the company or association and there is nothing in respect of which anyone can sue. If, on the other hand, a simple majority of members of the company or association is against what has been done, then there is no valid reason why the company or association itself should not sue. In my judgment, it is implicit in the rule that the matter relied on as constituting the cause of action should be a cause of action properly belonging to the general

When in circumstances
dividual, complaining of
irticular damage on him,
lich has been so strongly
· by way of barring the
· is wrongly constituted
I accept the submission
evertheless be dismissed
ie action taken by the
t under this head will, I
much more familiar with
il should be dismissed.

I will pass to the argu-
with the domestic affairs
regularity in form in the
he more general proposi-
. As to the contention
oles of contributions was
mission to hold a ballot
' was a mere irregularity
be shortly dismissed by
matter of substance. The
protect members against
increases were agreed to
ed in a particular way—
It seems to me that the
ision in the rules was a
substance. I say " on a
nt out that the increases
. In my judgment, this
s if the increase had been
tantial difference to the
, the case cited on this
gineers v. Jones (2)—has
case a meeting had been
gested that the mode of
lge was able to hold that
ance, but that there had
iew that, in those circum-
sons I have endeavoured
ent one.
, comes to no more than
· of a wrong alleged to be
na facie the company or
alleged wrong is a tran-
ny or association and on
·s, no individual member
espect of that matter for
imbers of the company or
cadit quæstio. No wrong
·e is nothing in respect of
ple majority of members
en done, then there is no
should not sue. In my
ied on as constituting the
belonging to the general

A

body of corporators or members of the company or association as opposed to a cause of action which some individual member can assert in his own right.

The cases falling within the general ambit of the rule are subject to certain exceptions. It has been noted in the course of argument that in cases where the act complained of is wholly *ultra vires* the company or association the rule has no application because there is no question of the transaction being confirmed by any majority. It has been further pointed out that where what has been done amounts to what is generally called in these cases a fraud on the minority and the wrongdoers are themselves in control of the company, the rule is relaxed in favour of the aggrieved minority who are allowed to bring what is known as a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue. Those exceptions are not directly in point in this case, but they show, especially the last one, that the rule is not an inflexible rule and it will be relaxed where necessary in the interests of justice.

There is a further exception which seems to me to touch this case directly. That is the exception noted by ROMER, J., in *Cotter* v. *National Union of Seamen* (3). He pointed out that the rule did not prevent an individual member from suing if the matter in respect of which he was suing was one which could validly be done or sanctioned, not by a simple majority of the members of the company or association, but only by some special majority, as, for instance, in the case of a limited company under the Companies Act, a special resolution duly passed as such. As ROMER, J., pointed out, the reason for that exception is clear, because otherwise, if the rule were applied in its full rigour, a company which, by its directors, had broken its own regulations by doing something without a special resolution which could only be done validly by a special resolution could assert that it alone was the proper plaintiff in any consequent action and the effect would be to allow a company acting in breach of its articles to do *de facto* by ordinary resolution that which according to its own regulations could only be done by special resolution. That exception exactly fits the present case inasmuch as here the act complained of is something which could only have been validly done, not by a simple majority, but by a two-thirds majority obtained on a ballot vote. In my judgment, therefore, the reliance on the rule in *Foss* v. *Harbottle* (1) in the present case may be regarded as misconceived on that ground alone.

I would go further. In my judgment, this is a case of a kind which is not even within the general ambit of the rule. It is not a case where what is complained of is a wrong done to the union, a matter in respect of which the cause of action would primarily and properly belong to the union. It is a case in which certain members of a trade union complain that the union, acting through the delegate meeting and the executive council in breach of the rules by which the union and every member of the union are bound, has invaded the individual rights of the complainant members, who are entitled to maintain themselves in full membership with all the rights and privileges appertaining to that status so long as they pay contributions in accordance with the tables of contributions as they stood before the purported alterations of 1943, unless and until the scale of contributions is validly altered by the prescribed majority obtained on a ballot vote. Those rights, these members claim, have been invaded. The gist of the case is that the personal and individual rights of membership of each of them have been invaded by a purported, but invalid, alteration of the tables of contributions. In those circumstances, it seems to me the rule in *Foss* v. *Harbottle* (1) has no application at all, for the individual members who are suing sue, not in the right of the union, but in their own right to protect from invasion their own individual rights as members.

I would be content so to hold as a matter of self-evident principle, but the

matter is not free from authority. It will, I think, be enough for the present purposes if I refer, briefly, to a passage in the judgment of Sir George Jessel, M.R., in *Pender* v. *Lushington* (4). There was a discussion in the course of the case whether the action was one which an individual shareholder could maintain and Sir George Jessel, M.R., said (6 Ch.D. 80):

> "But there is another ground on which the action may be maintained. This is an action by Mr. Pender for himself. He is a member of the company, and whether he votes with the majority or the minority he is entitled to have his vote recorded—an individual right in respect of which he has a right to sue. That has nothing to do with the question like that raised in *Foss* v. *Harbottle* (1) and that line of cases. He has a right to say, 'Whether I vote in the majority or minority, you shall record my vote, as that is a right of property belonging to my interest in this company, and if you refuse to record my vote I will institute legal proceedings against you to compel you.' What is the answer to such an action? It seems to me it can be maintained as a matter of substance, and that there is no technical difficulty in maintaining it."

In my judgment, precisely the same conclusions as are there expressed apply in the present case, and the rule in *Foss* v. *Harbottle* (1) affords no answer to the action. It was sought to show that this was not a matter affecting the individual rights of any particular member of the union because all were subject to the same alteration of the tables and, therefore, it was a matter which affected the general body of members as a whole. I do not agree. For one thing, the contributions to be paid by any individual member would depend on the particular category of membership to which he belonged, but, for another thing and more important, it seems to me that, although all the members are liable to pay the subscriptions appropriate to their respective categories, the right of each member to maintain himself in membership by paying his subscription—that is to say, by paying whatever subscription appropriate to his case is validly fixed and for the time being in force under the rules—is an individual right of his own which he himself is entitled to protect by an action on his own behalf.

It was pointed out in the course of the argument (though the matter was not fully developed) that the vast majority of members of the union had, in fact, paid without demur subscriptions at the new and invalid rate. It was further pointed out that those who had become entitled to benefits had taken benefits at the enhanced rate. It was further pointed out that in practice r. 19 (1) had never been resorted to for many years. Before Vaisey, J., these matters seem to have been put forward as amounting to such acquiescence as to make r. 19 (1) a dead letter which could no longer be enforced. That argument was not pressed before us, but these considerations were put as showing that the case was without substance. It was said that the fact that the vast majority of members had paid the new rate of subscriptions without demur demonstrated that the will of the union as a whole was in favour of the new subscriptions and consequently the action was without substance. I cannot agree. I cannot regard the mere paying by individual members of the increased rates without demur as equivalent to a ballot vote at which a two-thirds majority was obtained in favour of the alteration. In my judgment, the scale of contributions as fixed in the rules before the disputed alteration must stand unless and until altered in accordance with r. 19. It not having been so altered, the rates so fixed remain the only rates properly exigible, and no member is bound to pay any other rate except as a matter of individual consent. It may well be that in most cases it would be found, when the particular member's account was gone into, that he had by his conduct in paying the new rate of subscription expressed his individual consent to the alteration and thereby become bound, but I see no ground in principle or in authority

for holding that these individual assents arising from the conduct of individual members can have any binding effect at all on those members who say: " We are prepared to pay the contributions validly exigible under the rules and no more." Accordingly, I agree that the appeal fails and should be dismissed.

SIR RAYMOND EVERSHED, M.R.: I am entirely of the same opinion. On the question of the construction of the rules, the point was debated whether a delegate conference could validly by ordinary resolution of the conference revise r. 19 (1) by the abrogation or suspension of the words of prohibition on which the plaintiffs' action has been founded and then proceed by a further ordinary resolution to alter the rates of contribution payable, thereby avoiding any need to have a ballot or to obtain a two-thirds majority upon a ballot. I am not satisfied that, if a delegate conference made such an alteration or revision of r. 19 as a mere prelude to the alteration of the rates of contribution, such a procedure would successfully withstand challenge. If it is the desire of those responsible for the administration of the affairs of this union either to abrogate altogether the relevant prohibition in r. 19 or to make it inapplicable to an alteration of contribution rates by a delegate conference, I think prudence would demand that such a revision should receive the confirmation of the necessary two-thirds majority. Upon the *Foss* v. *Harbottle* (1) point, I should be guilty of repetition if I added anything to the reasons given by JENKINS, L.J., with which I find myself in entire agreement. The appeal fails and will be dismissed.

*Appeal dismissed with costs.*

Solicitors: *Rowley, Ashworth & Co.* (for the defendants); *Ernest Bevir & Son* (for the plaintiffs).

[*Reported by* F. GUTTMAN, ESQ., *Barrister-at-Law.*]

---

*Re* SCHAR (deceased). MIDLAND BANK EXECUTOR AND TRUSTEE CO., LTD. v. DAMER AND OTHERS.

[CHANCERY DIVISION (Vaisey, J.), November 7, 1950.]

*Will—Joint tenancy—Disclaimer—Release—Purported disclaimer by one joint tenant.*

By his will, dated Mar. 30, 1931, a testator, who died on Jan. 19, 1943, appointed a bank and two persons to be his executors and directed the payment of legacies and shares of his residuary estate to certain persons resident in Germany. By a codicil, dated May 31, 1940, he appointed F. and J. to be his executors with the bank in place of the persons appointed by the will, and declared that if, at the time of his death or at any time before his trustees had wound up his estate, legislation was in force in the United Kingdom by which some beneficiaries were deprived of the right to receive their benefits, then: " I give such benefits to my trustees absolutely with the request but without creating any trust that they will carry out the wishes contained in my said will or any codicil thereto when legislation permits them to do so." On Mar. 20, 1945, COHEN, J., held that, on the true construction of the will and codicil, the legacy and shares of residue thereby given to persons who survived the testator and were at his death enemies within the meaning of the Trading with the Enemy Act, 1939, were payable to the bank, F., and J. beneficially. On Nov. 19, 1945, the bank executed a deed in which the parties were described as the bank, of the one part, and F. and J. (" the beneficiaries "), of the other part. The deed, which was not executed by F. or J., recited the will and

**Tab 9**

C

## Foss v Harbottle

(1843) 2 Hare 461

1843

[461]*March*     4, 6, 7, 8, 25, 1843.

[See     *Hallows*     v.     *Fernie*, 1867-68, L. R. 3 Eq. 532; L. R. 3 Ch. 467;     *Hoole*     v.     *Great Western Railway Company*     , 1867, L. R. 3 Ch. 274;     *Seaton*     v.     *Grant*     , 1867, 36 L. J. Ch. 642;     *Clinch*     v.     *Financial Corporation*     , 1868, L. R. 5 Eq. 482; L. R. 4 Ch. 117;     *Atwool*     v.     *Merryweather*     , 1868, L. R. 5 Eq. 467, n.;     *Turquand*     v.     *Marshall*     , 1869, L. R. 4 Ch. 386;     *Gray*     v.     *Lewis*     (No. 1), 1869-73, L. R. 8 Eq. 541; L. R. 8 Ch. 1050;     *Pickering*     v.     *Stephenson*     , 1872, L. R. 14 Eq. 339;     *Menier*     v.     *Hooper's Telegraph Works*     , 1874, L. R. 9 Ch. 353;     *Ward*     v.     *Sittingbourne and Sheerness Railway Company*     , 1874, L. R. 9 Ch. 492, n.;     *Macdougall*     v.     *Gardiner*     (No. 1), 1875, L. R. 20 Eq. 393; L. R. 10 Ch. 606;     *Macdougall*     v.     *Gardiner*     (No. 2), 1875, 1 Ch. D. 13;     *Russell*     v.     *Wakefield Waterworks Company*     , 1875, L. R. 20 Eq. 480;     *Duckett*     v.     *Gover*     , 1877, 25 W. R. 554;     *Pender*     v.     *Lushington*     , 1877, 6 Ch. D. 80;     *Isle of Wight Railway Company*     v.     *Tahourdin*     , 1883, 25 Ch. D. 333;     *Studdert*     v.     *Grosvenor*     , 1886, 33 Ch. D. 535;     *La Compagnie de Mayville*     v.     *Whitley*     [1896], 1 Ch. 807;     *Tiessen*     v.     *Henderson*     [1899], 1 Ch. 866;     *Alexander*     v.     *Automatic Telephone Company*     [1900], 2 Ch. 69;

*Burland*     v.     *Earle*     [1902], A. C. 93;     *Punt*     v.     *Symons & Company Ltd.*     [1903], 2 Ch. 516.]

Bill by two of the proprietors of shares in a company incorporated by Act of Parliament, on behalf of themselves and all other the proprietors of shares except the Defendants,     **\*191**     against the five directors (three of whom had become bankrupt), and against a proprietor who was not a director, and the solicitor and architect of the company, charging the Defendants with concerting and effecting various fraudulent and illegal transactions, whereby the property of the company was misapplied, aliened and wasted; that there had ceased to be a sufficient number of qualified directors to constitute a board; that the company had no clerk or office; that in such circumstances the proprietors had no power to take the property out of the hands of the Defendants, or satisfy the liabilities or wind up the affairs of the company; praying that the Defendants might be decreed to make good to the company the losses and expenses occasioned by the acts complained of; and praying the appointment of a receiver to take and apply the property of the company in discharge of its liabilities, and secure the surplus: the Defendants demurred.

Held, that, upon the facts stated, the continued existence of a board of directors     *de facto*     must be intended; that the possibility of convening a general meeting of proprietors capable of controlling the acts of the existing board was not excluded by the allegations of the bill; that in such circumstances there was nothing to prevent the company from obtaining redress in its corporate character in respect of the matters complained of; that therefore the Plaintiffs could not sue in a form of pleading which assumed the practical dissolution of the corporation; and that the demurrers must be allowed.

When the relation of trustee and     *cestui que trust*     begins, as between the project-

ors of public companies and such companies.

Some forms prescribed for the government of a corporation may be imperative, and others directory only.

On argument of a demurrer, facts not averred in the bill, and which might possibly have been denied by plea, if they had been averred, intended against the pleader.

The bill was filed in October 1842 by Richard Foss and Edward Starkie Turton, on behalf of themselves and all other the shareholders or proprietors of shares in the company called "The Victoria Park Company," except such of the same shareholders or proprietors of shares as were Defendants thereto, against Thomas Harbottle, Joseph Adshead, Henry Byrom, John Westhead, Richard Bealey, Joseph Denison, Thomas Bunting and Richard Lane; and also against H. Rotton, E. Lloyd, T. Peet, J. Biggs and S. Brooks, the several assignees of Byrom, Adshead and Westhead, who had become bankrupts.

The bill stated, in effect, that in September 1835 certain persons conceived the design of associating for the purchase of about 180 acres of land, situated in the parish of Manchester, belonging to the Defendant, Joseph Denison, and others, and of enclosing and planting the same in an ornamental and park-like manner, and erecting houses thereon with attached gardens and pleasure-grounds, and selling, letting or otherwise disposing thereof; and the Defendants, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane, agreed to form a joint stock company, to consist of themselves and others, for the said purpose: that in October 1835    [462]    plans of the land, and a design for laying it out, were prepared; that, after the undertaking had been projected and agreed upon, Denison purchased a considerable portion of the said land of the other original owners with the object of reselling it at a profit, and Harbottle, Adshead, Byrom, Westhead, Bunting and Lane, and one P. Leicester, and several other persons, not members of the association, purchased the said land

in parcels of Denison and the other owners, so that at the time of passing the Act of Incorporation Harbottle, Adshead, Byrom, Westhead, Bunting and Lane owned more than half of the land in question, the remainder being the property of persons who were not shareholders: that Denison and the last-named five Defendants made considerable profits by reselling parts of the said land at increased chief rents before the Act was passed.

The bill stated that, between September 1835 and the beginning of 1836, various preliminary steps were taken for enabling the projectors of the said company to set it on foot: that in April 1836 advertisements, describing the objects of the proposed company and the probabilities of its profitable result, were published, in which it was proposed to form the association on the principle of a tontine: that the first eight    **\*192**    named Defendants and several other persons subscribed for shares in the proposed company, and, among others, the Plaintiff, Foss, subscribed for two shares, and the Plaintiff, Turton, for twelve shares of £100 each, and signed the contract, and paid the deposit of £5 per share: that a principal meeting of the subscribers called in May 1836 it was resolved that the report of the provisional committee should be received, and the various suggestions therein contained be adopted, subject to the approval of the directors, who were requested to complete such purchases of land, and also such other acts as they might    [463]    consider necessary for carrying the objects of the undertaking into effect; and it also resolved that Harbottle, Adshead, Byrom, Westhead and Bealey should be appointed directors, with power to do such acts as they might consider necessary or desirable for the interests of the company; and Westhead, W. Grant and J. Lees were appointed auditors, Lane architect, and Bunting solicitor: that, in order to avoid the responsibilities of an ordinary partnership, the Defendants Harbottle and others suggested to the subscribers the propriety of applying for an Act of Incorporation, which was accordingly done: that in compliance with such application, by an Act, intit-

Copr. © West 2009 No Claim to Orig. Govt. Works

uled "An Act for Establishing a Company for the Purpose of Laying Out and Maintaining an Ornamental Park within the Townships of Rusholme, Charlton-upon-Medlock and Moss Side, in the County of Lancaster," which received the Royal assent on the 5th of May 1837 (7 Will. 4), it was enacted that certain persons named in the Act, including Harbottle, Adshead, Bealey, Westhead, Bunting and Denison and others, and all and every such other persons or person, bodies or body politic, corporate or collegiate, as had already subscribed or should thereafter from time to time become subscribers or a subscriber to the said undertaking, and be duly admitted proprietors or a proprietor as thereinafter mentioned, and their respective successors, executors, administrators and assigns, should be and they were thereby united into a company for the purposes of the said Act, and should be and they were thereby declared to be one body politic and corporate by the name of "The Victoria Park Company," and by that name should have perpetual succession and a common seal, and by that name should and might sue and be sued, plead or be impleaded, at law or in equity, and should and might prefer and prosecute any bill or bills of indictment or information against any person or [464] persons who should commit any felony, misdemeaour, or other offence indictable or punishable by the laws of this realm, and should also have full power and authority to purchase and hold lands, tenements and hereditaments to them, and their successors and assigns, for the use of the said undertaking, in manner thereby directed. [The bill stated several other clauses of the Act. ] **\*193**

[465] The bill also stated the schedule annexed to the Act, whereby the different plots of the said land, numbered [466] from 1 to 37, were stated to have been purchased by the Victoria Park Company from the various persons whose [467] names were therein set forth, and including the following names:—"Mr. P. Leicester and others;" "Mr. Lacy and another;" "Mr. Lane" and "Mr. Adshead;"

that [468] the land so stated to be purchased of "P. Leicester and others" was at the time of passing of the Act vested partly in P. Leicester, and partly in Westhead, Bunting **\*194** and Byrom, and the land so stated to be purchased of "Mr. Lacy and another" was at the time of the passing of the Act vested partly in Mr. Lacey and partly in Lane.

The bill stated that the purchase and sale of the said land as aforesaid was the result of an arrangement fraudulently concerted and agreed upon between Harbottle, Adshead, Byrom, Westhead, Denison, Bunting and Lane, at or after the formation of the company was agreed upon, with the object of enabling themselves to derive a **\*195** profit or personal benefit from the establishment of the said company; and that the arrangement amongst the persons who were parties to the plan was that a certain number from amongst themselves should be appointed directors, and should purchase for the company the said plots of land from the persons in whom they were vested, at greatly increased and exorbitant prices: that it was with a view to carry the arrangement into effect that Harbottle, Adshead, Byrom and Westhead procured themselves to be appointed directors, and Denison procured himself to be appointed auditor: that accordingly, after the said plots of land had become vested in the several persons named in the schedule, and before the passing of the Act, the said directors, on behalf of the company, agreed to purchase the same from the persons named in the schedule at rents or prices greatly exceeding those at which the said persons had purchased the same: that after the Act was passed Harbottle, Adshead, Byrom, Westhead and Bealey continued to act as directors of the incorporated company in the same manner as before: that Adshead continued to act as director until the 18th of July 1839, Byrom until the 2d of December 1839, and [469] Westhead until the 2d of January 1840, at which dates respectively fiats in bankruptcy were issued against them, and they were respectively declared bankrupts, and ceased to be qualified to act as directors,

and their offices as directors became vacated.

The bill stated that upwards of 3000 shares of £100 in the capital of the company were subscribed for: that the principle of tontine was abandoned: that before 1840 calls were made, amounting, with the deposit, to £35 per share, the whole of which were not, however, paid by all the proprietors, but that a sum exceeding £35,000 in the whole was paid.

The bill stated that, after the passing of the Act, Harbottle, Adshead, Byrom, Westhead, Bunting and Lane, with the concurrence of Denison and of Bealey, proceeded to carry into execution the design which had been formed previously to the incorporation of the company, of fraudulently profiting and enabling the other persons who had purchased and then held the said land, to profit by the establishment of the company and at its expense; and that the said directors accordingly, on behalf of the company, purchased, or agreed to purchase, from themselves, Harbottle, Adshead, Byrom and Westhead, and from Bunting and Lane, and the other persons in whom the said land was vested, the same plots of land, for estates corresponding with those purchased by and granted to the said vendors, by the original owners thereof, charged with chief or fee-farm rents, greatly exceeding the rents payable to the persons from whom the said vendors had so purchased the same: that of some of such plots the conveyances were taken to the Victoria Park Company, by its corporate name; of others, to Harbottle, Adshead, Byrom, Westhead and Bealey, as directors in trust for the company; [470] and others rested in agreement only, without conveyance: that by these means the company took the land, charged not only with the chief rents reserved to the original landowners, but also with additional rents, reserved and payable to Harbottle, Adshead, Byrom, Westhead, Denison, Bunting, Lane and others: that, in further pursuance of the same fraudulent design, the said directors, after purchasing the said land for the company, applied about £27,000 of the monies in their hands, belonging to the company, in the purchase or redemption of the rents so reserved to themselves, Harbottle, Adshead, Byrom, Westhead, Denison, Bunting, Lane and others, leaving the land subject only to the chief rent reserved to the original landowners.

The bill stated that the plans of the park were contrived and designed by Lane, in concert with Denison, the directors and Bunting, so as to render the formation of the park the means of greatly increasing the value of certain parcels of land, partly belonging to Denison and partly to Lane, situated on the outside of the boundary line of the park, but between such boundary line and one of the lodges and entrance gates, called Oxford Lodge and Gate, erected on a small part of the same land purchased by the company; and through which entrance, and the land so permitted to be retained by Denison and Lane, one of the principal approaches to the park was made: that the said land so retained by Denison and Lane was essentially necessary to the establishment of the park, according to the plans prepared by Lane, and the same was virtually incorporated in the park, and houses erected thereon would enjoy **\*196** all the advantages of the park, and plots thereof were in consequence sold by Denison and Lane for building land at enhanced prices.

[471] The bill stated that, after the purchase of the land as aforesaid, the directors proceeded to carry into effect the design of converting the same into a park, and they accordingly erected lodges and gates, marked out with fences the different crescents, terraces, streets and ways; formed drains and sewers, and made roadways, and planted ornamental trees and shrubs; that they also caused to be erected in different parts of the park several houses and buildings, some of which only were completed; and that the directors alleged the monies expended in the roads, drains and sewers amounted to £12,000, and in the houses and buildings to £39,000, or thereabouts: that the said directors sold and let several plots of land, and also sold and let several of the houses and buildings, and received the rents and

Copr. © West 2009 No Claim to Orig. Govt. Works

purchase-money of the same.

The bill stated that Harbottle, Denison, Bunting and Lane did not pay up their calls, but some of them retained part, and others the whole thereof; Harbottle and Lane claiming to set off the amount of the calls against the chief rents of the lands which they sold to the company, Bunting claiming to set off the same against the chief rents, and the costs and charges due to him from the company; and Denison claiming to set off the amount of the calls against the rents payable to him out of the land which he sold to persons who resold the same to the company.

The bill stated that owing to the large sums retained out of the calls, the sums appropriated by the said directors to themselves, and paid to others in reduction of the increased chief rents, and payment of such rents, and owing to their having otherwise wasted and misapplied a considerable part of the monies belonging to the company, the funds of the company which came [472] to their hands shortly after its establishment were exhausted: that the said directors, with the privity, knowledge and concurrence of Denison, Bunting and Lane, borrowed large sums of money from their bankers upon the credit of the company: that, as a further means of raising money, the said directors, and Bunting and Lane, with the concurrence of Denison, drew, made and negotiated various bills of exchange and promissory notes; and that the said directors also caused several bonds to be executed under the corporate seal of the company for securing several sums of money to the obligees thereof: that by the middle or latter part of the year 1839 the directors, and Bunting and Lane, had come under very heavy liabilities; the chief rents payable by the company were greatly in arrear, and the board of directors, with the concurrence of Denison, Bunting and Lane, applied to the United Kingdom Life Assurance Company to advance the Victoria Park Company a large sum of money by way of mortgage of the lands and hereditaments comprised in the park; but the Assurance Company were advised

that the Victoria Park Company were, by the 90th section of their Act, precluded from borrowing money on mortgage, until one-half of their capital (namely £500,000) had been paid up, and on that ground declined to make the required loan: that the directors, finding it impossible to raise money by mortgage in a legitimate manner, resorted to several contrivances for the purpose of evading the provisions of the Act, and raising money on mortgage of the property of the company, by which means several large sums of money had been charged by way of mortgage or lien upon the same: that to effect such mortgages or charges, the directors procured the persons who had contracted to sells plots of land to the company, but had not executed conveyances, to convey the same, by the direction of the board, to some [473] other person or persons in mortgage, and afterwards to convey the equity of redemption to the directors in trust for the company: that the directors also conveyed some of the plots of land which had been conveyed to them in trust for the company to some other persons by way of mortgage, and stood possessed of the equity of redemption in trust for the company: that, for the same purpose, the board of directors caused the common seal of the company to be affixed to several conveyances of plots of land which had been conveyed to the company by their corporate name, and to the directors in trust for the company, whereby the said plots of land were expressed to be conveyed for a pretended valuable consideration to one or more of the said directors absolutely, and the said directors or director then conveyed the same to other persons on mortgage to secure sometimes **\*197** monies advanced to the said directors, and by them paid over to the board in satisfaction of the consideration monies expressed to be paid for the said prior conveyances under the common seal, sometimes antecedent debts in respect of monies borrowed by the board, and sometimes monies which had been advanced by the mortgagees upon the security of the bills and notes which had been made or discounted as aforesaid: that, in other cases, the said directors and Bunting deposited the title-deeds of parcels of the

Copr. © West 2009 No Claim to Orig. Govt. Works

land and buildings of the company with the holders of such bills and notes to secure the repayment of the monies due thereon, and in order to relieve the parties thereto: that, by the means aforesaid, the directors, with the concurrence of Denison, Bunting and Lane, mortgaged, charged or otherwise incumbered the greater part of the property of the company: that many of such mortgagees and incumbrancers had notice that the said board of directors had not power under the Act to mortgage or charge the property of the company, and that the          [474]          said mortgages, charges and incumbrances were fraudulent and void as against the company, but that the Defendants allege that some of the said incumbrances were so planned and contrived that the persons in whose favour they were created had not such notice.

That the said directors having exhausted every means which suggested themselves to them of raising money upon credit, or upon the security of the property and effects of the company, and being unable by those means to provide for the whole of the monies due to the holders of the said bills and notes, and the other persons to whom the said directors in the said transactions had become indebted as individuals, and to satisfy the debts which were due to the persons in whose favour the said mortgages and incumbrances had been improperly created, and in order to release themselves from the responsibility which they had personally incurred by taking conveyances or demises of parts of the said land to the said directors as individuals in trust for the company, containing covenants on their parts for payment of the reserved rents, the said directors resolved to convey and dispose of the property of the company, and they accordingly themselves executed and caused to be executed under the common seal of the company, divers conveyances, assignments and other assurances, whereby divers parts of the said lands and effects of the company were expressed to be conveyed or otherwise assured absolutely to the holders of some of the said bills and notes, and some of the said mortgagees and incumbrancers, in consideration of the

monies thereby purported to be secured; and also executed, and caused to be executed under the common seal of the company, divers conveyances and assurances of other parts of the said lands to the persons who sold the same to the company, in consideration          of          their          releasing          them from          [475]          the payment of the rents reserved and payable out of the said lands: that many of such conveyances had been executed by Harbottle, Adshead, Westhead and Bealey, and a few by Byrom, who had been induced to execute them by being threatened with suits for the reserved rents: that Harbottle, Adshead, Byrom, Westhead and Bealey threatened and intended to convey and assure the remaining parcels of land belonging to the company to the holders of others of the said bills and notes, and to others of the said mortgagees and incumbrancers and owners of the chief rents, in satisfaction and discharge of the said monies and rents due and to become due to them respectively.

The bill stated that, upon the bankruptcy of Byrom, Adshead and Westhead, their shares in the company became vested in the Defendants, their assignees, and that they (the bankrupts) had long since ceased to be, and were not, shareholders in the company: that the whole of the land resold by them was vested in some persons unknown to the Plaintiffs, but whose names the Defendants knew and refused to discover: that, upon the bankruptcy of Westhead, there ceased to be a sufficient number of directors of the company to constitute a board for transacting the business of the company in manner provided by the Act, and Harbottle and Bealey became the only remaining directors whose office had not become vacated, and no person or persons had been appointed to supply the vacancies in the board of directors occasioned by such bankruptcies, and consequently there never had been a properly constituted board of directors of the company since the bankruptcy of Westhead.

That Byrom, Adshead and Westhead, nevertheless, after their respective bankruptcies, executed the several          [476]          absolute

Copr. © West 2009 No Claim to Orig. Govt. Works

conveyances ond other assurances of the lands and property of the company, which were so executed for the purposes and in **\*198** manner aforesaid, after the directors had exhausted their means of raising money upon credit or upon the security of the property of the company.

That about the end of the year 1839, or commencement of the year 1840, the said directors discharged Brammell, the secretary of the company, and gave up the office taken by the company in Manchester, and transferred the whole or the greater part of the title-deeds, books and papers of the said company into the hands of Bunting; and from that time to the present the company had had no office of its own, but the affairs of the company had been principally conducted at the office of Bunting.

That the only parts of the land bought by the company which had not been conveyed away either absolutely or by way or mortgage, and the only part of the other property and effects of the company which had not been disposed of and made away with in manner aforesaid, remained vested in, and in the order and disposition of, Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting, in whose custody or power the greater part of the books, deeds and papers belonging to the company which had not been made away with remained: that by the fraudulent acts and proceedings in the premises to which Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting were parties, the property and effects of the said company had been and then were involved in almost inextricable difficulties, and if such property and effects were any longer allowed to remain in their order and disposition, the same would be in danger of being wholly dissipated and irretrievably [477] lost: that the said company were then largely indebted to their bankers and other persons who had *bonâ fide* advanced money to the company, and to the builders and other persons who had executed some of the works in the park, and provided materials for the same; while, in consequence of the property of the company having been wasted and improperly disposed of by the directors, there were at present no available funds which could be applied in satisfaction of the debts of the company, and that some of the creditors of the said company had obtained judgments in actions at law brought by them against the company for the amount of their debts, on which judgments interest was daily accumulating.

The bill stated that in the present circumstances of the company, and the board of directors thereof, the proprietors of shares had no power to take the property and effects of the company out of the hands of Harbottle, Adshead, Byron, Westhead, Bealey and Bunting, and they had no power to appoint directors to supply the vacancies in the board occasioned by the said bankruptcies, and the proprietors of shares in the company had no power to wind up, liquidate or settle the accounts, debts or affairs of the company, or to dissolve the company, nor had they any power to provide for and satisfy the existing engagements and liabilities of the company with a view to its continuance, and the prosecution of the undertaking for which it was established without the assistance of the Court: that if a proper person were appointed by the Court to take possession of and manage the property and effects of the company, and if the company were to be repaid the amount of all losses and expenses which it had sustained or incurred by reason of the fraudulent and improper acts and proceedings of the Defendants in the premises, and [478] which the Defendants, or any of them, were liable to make good to the said company, as thereinafter prayed; and if the company were decreed to take and have conveyed to them so much of the said land which was retained by Denison and Lane as aforesaid, upon paying or accounting to them for the fair value thereof at the time when the undertaking was first projected; and Denison and Lane were to pay or account to the said company for the price received by them for so much of the same land as had been sold by them, over and above what was the fair price for the same at the time the undertaking was first projected; and if the mortgages,

Copr. © West 2009 No Claim to Orig. Govt. Works

charges, incumbrances and liens, and the said conveyances and other assurances, by means of which the property and effects of the company had been improperly incumbered and disposed of, which could be redeemed or avoided, as against the persons claiming thereunder, were redeemed and set aside, and the property and effects of the company thereby affected were restored to it, and the Defendants, who had not become bankrupt, and who had not paid up, but ought to have paid up, into the joint stock capital of the company, the amounts of the several calls made by the directors on their respective shares, were to pay up the same, the lands, property and effects of the company would not only be            **\*199**            sufficient to satisfy the whole of its existing debts and liabilities, but leave a surplus, which would enable the company to proceed with, and either wholly or in part accomplish, the undertaking for which it was incorporated.

The bill stated that the Defendants concealed from the Plaintiffs, and the other shareholders in the company, who were not personally parties thereto, the several fraudulent and improper acts and proceedings of the said directors and the said other Defendants, and            [479]            the Plaintiffs and the other shareholders had only recently ascertained the particulars thereof, so far as they were therein stated, and they were unable to set forth the same more particularly, the Defendants having refused to make any discovery thereof, or to allow the Plaintiffs to inspect the books, accounts or papers of the company.

The bill charged that Harbottle and Bealey, and the estates of Adshead, Byrom and Westhead, in respect of that which occurred before their said bankruptcies, and Adshead, Byrom and Westhead, as to what occurred since their said bankruptcies, were liable to refund and make good to the company the amount of the losses and expenses which it had sustained in respect of the fraudulent and improper dealings of the said directors of the company with its lands and property: that Denison, Bunting and Lane had counselled and advised the directors in

their said proceedings, and had derived considerable personal benefit and advantage therefrom: that Denison, Bunting and Lane were all parties to the said fraudulent scheme planned and executed as aforesaid, by which the several plots or parcels of land in the park were purchased and resold to the said company at a profit and at a price considerably exceeding the real value of the same, and that Denison, Bunting and Lane had derived considerable profit from the increased price or chief rents made payable out of the several plots or parcels of land which were purchased and resold by them in manner aforesaid, and from the monies which were paid to them as a consideration for the reduction of the same chief rents as before mentioned.

The bill charged that several general meetings, and extraordinary general meetings, and other meetings of            [480]            the shareholders of the company, were duly convened and held at divers times, between the time when the company was first established and the year 1841, and particularly on or about the several days or times thereinafter mentioned (naming ten different dates, from July 1837 to December 1839), and that at such meetings false and delusive statements respecting the circumstances and prospects of the company were made by the directors to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings therein complained of was not disclosed.

The bill charged that, under the circumstances, Denison, Bunting and Lane, having participated in and personally benefited by and concealed from the other shareholders the several fraudulent and improper acts aforesaid, were all jointly and severally liable together, with the said directors, to make good to the company the amount of the losses and expenses which had been or might be incurred in consequence of such of the said wrongful and fraudulent acts and proceedings as they were parties or privies to: that Harbottle, Byrom, Adshead, Westhead and Bealey, respectively, had still some of the property and effects be-

longing to the company: that the said last-named Defendants had not paid up the calls due and payable on their respective shares: that the Plaintiffs had as yet paid only three of the calls on their shares, not having paid the remainder in consequence of learning that, owing to some misconduct of the directors, the affairs of the company were in difficulties, the cause of which difficulties the Plaintiffs had but lately, and with considerable difficulty, ascertained to have arisen from the proceedings aforesaid, but in all other respects the Plaintiffs had conformed to the provisions of the Act: that there were not any            [481] shareholders in the company who had not paid up the calls on their shares besides the Plaintiffs and the said Defendants: that the names and places of abode of the other persons who are not shareholders in the company, but are interested in or liable in respect of any of the said matters, were unknown to the Plaintiffs, and the Defendants ought to discover the same: that the number of shareholders in the company was so great, and their rights and liabilities were so subject to change and fluctuation, by death and otherwise, that it would be impossible to prosecute the suit with effect if they were all made parties thereto.  **\*200**

The bill charged that Bunting claimed a lien upon the documents in his possession belonging to the company for the costs of business done by him as the attorney of the company, but a great part of such business consisted of the fraudulent acts aforesaid; and that he had received out of the funds of the company divers large sums of money exceeding the amount properly due to him: that Bunting had deposited some of the deeds belonging to the company with certain bankers at Liverpool, and, among the rest, the contract executed by the Plaintiffs and the other shareholders before the Act was passed, as a security for the payment of a bill of exchange for £3000, to which Bunting was individually a party, but for which he untruly pretended that the company was responsible; and that the holders of such deeds threatened to sue the Plaintiffs for the said £3000, as parties to the contract, on the ground that

the capital was not paid up; and also that the said directors threatened to cause actions at law to be brought against the Plaintiffs, under the powers of the Act, in the name of Harbottle or Bealey, as the nominal Plaintiff on behalf of the company, for the amount of the unpaid calls on their shares.

[482]      The bill charged that Harbottle and Bealey were two directors of the company, but they respectively refused to use or allow either of their names to be used as the nominal Plaintiffs in this suit on behalf of the company; but that Harbottle was a necessary party, not only in respect of his liability, but also as a nominal Defendant on behalf of the company.

After various charges, recapitulating in terms the alleged title of the Plaintiffs to the relief and discovery sought by the prayer, the bill prayed that an account might be taken of all monies received by the Defendants, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison and Lane, or any of them, for the use of the company, or which but for their wilful default might have been received, and of the application thereof; also an account of the losses and expenses incurred in consequence of the said fraudulent and improper dealings of the Defendants with the monies, lands and property of the company which they or any of them were liable to make good, and that they might be respectively decreed to make good the same, including in particular the profits made by Harbottle, Denison, Bunting and Lane, by buying and reselling the said land, and the profits made by Denison and Lane out of the said land retained by them; and that Denison and Lane might be decreed to convey the residue of the said land to the company, upon payment of the fair value thereof at the time the undertaking was projected: that it might be declared that the said mortgages, charges, incumbrances and liens upon the lands and property created as aforesaid, so far as regards the Defendants who executed the same or were privy thereto, were created fraudulently and in violation of the provisions of the Act, and that Harbottle, Bealey, Den-

ison, Bunting and Lane might be decreed to make good to the company the principal [483] money and interest due and owing upon security of such of the mortgages, charges and liens as were still subsisting, with all costs sustained by the company in relation thereto; and that it might be declared that Harbottle, Adshead, Byrom, Westhead and Bealey, by executing the said conveyances and assurances of the lands and property of the company to the said mortgagees, holders of notes and bills and others, committed a fraudulent breach of trust, and that Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane might be decreed to make good to the company the purchase-money and rents paid by the company for such lands, and expended in building and improving the same, with interest and expenses; and that the monies so recovered from the Defendants might be applied in redeeming and repurchasing the said lands and restoring them to the company. And that inquiries might be directed to ascertain which of the mortgages and incumbrances, and of the conveyances and assurances, of the lands and property of the company could be avoided and set aside as against the persons claiming the benefit thereof, and that proceedings might be taken for avoiding them accordingly. And that an account might be taken of all the property and effects of the company, and the unpaid calls sued for and recovered, and that a sufficient part of such property might be applied in liquidating the existing debts and liabilities of the company, and the residue secured for its benefit. And that, for the purposes aforesaid, a receiver might be appointed to take possession of, recover and get in the lands, property and effects of the company, and for that purpose to sue in **\*201** the names of Harbottle and Bealey, or otherwise, as occasion might require; and that Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting might be decreed to deliver up to [484] such receiver the property, effects, deeds, muniments and documents belonging to the company. And that the same Defendants might be restrained by injunction from holding, receiving or intermeddling with the property and effects of the company, and from executing, or causing to be executed, under the common seal of the company, any deed or instrument conveying, assigning or disposing of the same. And that Harbottle, Denison, Bunting and Lane might be restrained from entering or distraining upon any of the said lands sold by them to or in trust for the company as aforesaid. And the Plaintiffs thereby offered to pay into Court the amount of the unpaid calls due from them to the company.

The Defendants, Harbottle, Adshead and Westhead, demurred to the bill, assigning for cause want of equity, want of parties and multifariousness; and suggesting that all the proprietors of shares in the company, the assignees of P. Leicester, and the owners of land named in the schedule to the Act, were necessary parties. The Defendant Bealey, the Defendant Denison and the Defendants Bunting and Lane also put in three several demurrers, assigning like causes.

Mr. Lowndes and Mr. Rolt, in support of the demurrers of Harbottle, Adshead and Westhead, and of Bunting and Lane.

Mr. Walker and Mr. Glasse, in support of the demurrers of Bealey and Denison.

Mr. James Russell, Mr. Roupell and Mr. Bartrum, for the bill.

[485] On the part of the Defendants it was contended that the suit complaining of injuries to the corporation was wholly informal in having only some of its individual members, and not the corporation itself, before the Court; that this defect would not be cured by adding the corporation as parties Defendants, for the Plaintiffs were not entitled to represent the corporate body, even as distinguished from the Defendants and for the purpose of impeaching the transactions complained of; and the Plaintiff's bill could not therefore be sustained.

It was further argued that the Plaintiffs, if they had any ground for impeaching the conduct of the De-

fendants, might have used the name of the corporation; and, in that case, it would have been open to the Defendants, or to the body of directors or proprietors assuming the government of the company, to have applied to the Court for the stay of proceedings, or to prevent the use of the corporate name; and, upon that application, the Court would have inquired into the alleged usurpation or abuse of authority, and determined whether the Plaintiff should be permitted to proceed. Or the suit might have been in the shape of an information by the Attorney-General to correct the alleged abuse of powers granted for public purposes. The statements of fact in the bill, it was also contended, did not support the general charges of fraud upon which the title to relief was founded. Several other points of equity, as applicable to the cases made against the several Defendants, and in respect of the suggested defects of parties, were also made, but the judgment did not turn on these points.

On the part of the Plaintiff, so far as related to the [486] point on which the decision proceeded, namely, their right to sustain the bill on behalf of themselves and the other shareholders against the Defendants, without regard to the corporate character of the body, it was argued that the company was not to be treated as an ordinary corporation; that it was in fact a mere partnership, having objects of private benefit, and that it must be governed by rules analogous to those which regulated partnerships or joint stock companies, consisting of numerous persons, but not incorporated. The Act of Incorporation was intended to be beneficial to the company, and to promote the undertaking, but not to extinguish any of the rights of the proprietors *inter se.* The directors were trustees for the Plaintiffs to the extent of their shares in the company; and the fact that the company had taken the form of a corporation would not be allowed to deprive the *cestui que trusts* of a remedy against their trustees for the abuse of their powers. The Act of Incorporation, moreover, expressly exempted the proprietors of the company, or persons dealing with the company,

from the necessity of adopting the form of proceeding applicable to a pure corporation; for the 74th section ( *supra* , p. 464, n.) enabled them to sue and be sued **\*202** in the name of the treasurer, or any one of the directors for the time being: the bill alleged that the two remaining directors had refused to institute the suit, and shewed, in fact, that it would be against their personal interest to do so, inasmuch as they were answerable in respect of the transactions in question; if the Plaintiffs could not, therefore, institute the suit themselves they would be remediless. The directors were made Defendants; and, under the 74th clause of the Act, any one of the directors might be made the [487] nominal representative of the company; the corporation was therefore distinctly represented in the suit. The present proceeding was, in fact, the only form in which the proprietors could now impeach the conduct of the body to whom their affairs had been intrusted. The 38th section expressly excluded any proprietor, not being a director, from interfering in the management of the business of the company on any pretence whatever. The extinction of the board of directors by the bankruptcy and consequent disqualification of three of them (sect. 67), and the want of any clerk or office, effectually prevented the fulfilment of the form which the 46th, 47th and 48th sections of the Act required, in order to the due convening of a general meeting of proprietors competent to secure the remaining property of the company, and provide for its due application.

The following cases were cited during the argument:— *The Charitable Corporation* v. *Sutton* (2 Atk. 400), *Attorney-General* v. *Jackson* (11 Ves. 365), *Adley* v. *The Whitstable Company* (17 Ves. 315; 2 M. & Sel. 53; 19 Ves. 304; 1 Mer. 107, S. C.), *Blackburn* v. *Jepson* (3 Swans. 138), *Hichens* v. *Congreve* (4 Russ. 562), *Blain* v. *Agar* (2 Sim. 289), *Richards* v. *Davies* (2 R. & M. 347), *Ranger* v. *Great Western Rail-*

*way Company* (1 Railway Cases, 1), *Seddon* v. *Connell* (10 Sim. 58, 79), *Preston* v. *Grand Collier Dock Company* (11 Sim. 327, S. C.; 2 Railway Cases, 335), *Attorney-General* v. *Wilson* (Cr. & Ph. 1), *Wallworth* v. *Holt* (4 Myl. & Cr. 619), *Bligh* v. *Brent* (2 Y: & Coll. 295; *per* Alderson, B.), 6 Viner. Ab. 306, tit. Corporation, U., Bacon, Ab. tit. Statute, I. 2.

[488]*March* 25. The Vice-Chancellor [Sir James Wigram]. The relief which the bill in this case seeks, as against the Defendants who have demurred, is founded on several alleged grounds of complaint; of these it is only necessary that I should mention two, for the consideration of those two grounds involves the principle upon which I think all the demurrers must be determined. One ground is that the directors of the Victoria Park Company, the Defendants Harbottle, Adshead, Byrom and Bealey, have, in their character of directors, purchased their own lands of themselves for the use of the company, and have paid for them, or rather taken to themselves out of the monies of the company a price exceeding the value of such lands: the other ground is that the Defendants have raised money in a manner not authorized by their powers under their Act of Incorporation; and especially that they have mortgaged or incumbered the lands and property of the company, and applied the monies thereby raised in effect, though circuitously, to pay the price of the land which they had so bought of themselves.

I do not now express any opinion upon the question whether, leaving out of view the special form in which the Plaintiffs have proceeded in the suit, the bill alleges a case in which a Court of Equity would say that the transactions in question are to be opened or dealt with in the manner which this bill seeks that they should be; but I certainly would not be understood by anything I said during the argument to do otherwise than express my cor-

dial concurrence in the doctrine laid down in the case of *Hichens* v. *Congreve* (4 Russ. 562) and other cases of that class. I take those cases to be in accordance with the principles of this Court, and to be founded on [489] justice and commonsense. Whether particular cases fall within the principle of *Hichens* v. *Congreve* is another question. In *Hichens* v. *Congreve* property was sold to a company by persons in a fiduciary character, the conveyance reciting that £25,000 had been paid for the purchase; the fact being that £10,000 only had been paid, £15,000 going into the hands of the persons to whom the purchase was entrusted. I should not be in the least degree disposed to limit the operation of that doctrine in any case in which a person projecting the formation of a company invited the public to join him in the project, on a representation that he had acquired property which was intended to be applied for the purposes of the company. I should strongly incline to hold that to be an invitation to the public to participate in the benefit of the property purchased, on the terms on which the projector had acquired it. The fiduciary **\*203** character of the projector would, in such a case, commence from the time when he first began to deal with the public, and would of course be controlled in equity by the representation he then made to the public. If persons, on the other hand, intending to form a company, should purchase land with a view to the formation of it, and state at once that they were the owners of such land, and proposed to sell it at a price fixed, for the purposes of the company about to be formed, the transaction, so far as the public are concerned, commencing with that statement, might not fall within the principle of *Hichens* v. *Congreve*. A party may have a clear right to say: "I begin the transaction at this time; I have purchased land, no matter how or from whom, or at what price; I am willing to sell it a certain price for a given purpose." It is not necessary that I should determine the effect of the transactions that are stated to have occurred in the present case. I make these observa-

tions only that I may not be supposed, from anything which fell from me during the argu- [490] -ment, to entertain the slightest hesitation with regard to the application, in a proper case, of the principles I have referred to. For the present purpose I shall assume that a case is stated entitling the company, as matters now stand, to complain of the transactions mentioned in the bill.

The Victoria Park Company is an incorporated body, and the conduct with which the Defendants are charged in this suit is an injury not to the Plaintiffs exclusively; it is an injury to the whole corporation by individuals whom the corporation entrusted with powers to be exercised only for the good of the corporation. And from the case of *The Attorney-General* v. *Wilson* (Cr. & Ph. 1) (without going further) it may be stated as undoubted law that a bill or information by a corporation will lie to be relieved in respect of injuries which the corporation has suffered at the hands of persons standing in the situation of the directors upon this record. This bill, however, differs from that in *The Attorney-General* v. *Wilson* in this—that, instead of the corporation being formally represented as Plaintiffs, the bill in this case is brought by two individual corporators, professedly on behalf of themselves and all the other members of the corporation, except those who committed the injuries complained of—the Plaintiffs assuming to themselves the right and power in that manner to sue on behalf of and represent the corporation itself.

It was not, nor could it successfully be, argued that it was a matter of course for any individual members of a corporation thus to assume to themselves the right of suing in the name of the corporation. In law the corporation and the aggregate members of the corporation are not the same thing for purposes like this; and the [491] only question can be whether the facts alleged in this case justify a departure from the rule which, *primâ facie*

, would require that the corporation should sue in its own name and in its corporate character, or in the name of someone whom the law has appointed to be its representative.

The demurrers are—first, of three of the directors of the company, who are also alleged to have sold lands to the corporation under the circumstances charged; secondly, of Bealey, also a director, alleged to have made himself amenable to the jurisdiction of the Court to remedy the alleged injuries, though he was not a seller of land; thirdly, of Denison, a seller of land, in like manner alleged to be implicated in the frauds charged, though he was not a director; fourthly, of Mr. Bunting, the solicitor, and Mr. Lane, the architect of the company. These gentlemen are neither directors nor sellers of lands, but all the frauds are alleged to have been committed with their privity, and they also are in this manner sought to be implicated in them. The most convenient course will be to consider the demurrer of the three against whom the strongest case is stated; and the consideration of that case will apply to the whole.

The first objection taken in the argument for the Defendants was that the individual members of the corporation cannot in any case sue in the form in which this bill is framed. During the argument I intimated an opinion, to which, upon further consideration, I fully adhere, that the rule was much too broadly stated on the part of the Defendants. I think there are cases in which a suit might properly be so framed. Corporations like this, of a private nature, are in truth little more than private partnerships; and in cases which may easily be suggested it would be too much to hold that a society [492] of private persons associated together in under- **\*204** takings, which, though certainly beneficial to the public, are nevertheless matters of private property, are to be deprived of their civil rights, *inter se* , because, in order to make their common objects more attainable, the Crown or the Legislature may have conferred upon them the benefit of a corporate

character. If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except that of a suit by individual corporators in their private characters, and asking in such character the protection of those rights to which in their corporate character they were entitled, I cannot but think that the principle so forcibly laid down by Lord Cottenham in *Wallworth* v. *Holt* (4 Myl. & Cr. 635; see also 17 Ves. 320, *per* Lord Eldon) and other cases would apply, and the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.

But, on the other hand, it must not be without reasons of a very urgent character that established rules of law and practice are to be departed from, rules which, though in a sense technical, are founded on general principles of justice and convenience; and the question is whether a case is stated in this bill entitling the Plaintiffs to sue in their private characters. [His Honor stated the substance of the Act, sections 1, 38, 39, 43, 46, 47, 48, 49, 67, 70, 114 and 129 ( *supra*, p. 464, n. *et seq.* ).] The result of these clauses is that the directors are made the governing body, subject to the superior control of the proprietors assembled in general meetings; and, as I understand the Act, the proprietors as assembled have power, due notice being given of the purposes of the meeting, to originate proceedings for any purpose within [493] the scope of the company's powers, as well as to control the directors in any Acts which they may have originated. There may possibly be some exceptions to this proposition, but such is the general effect of the provisions of the statute.

Now, that my opinion upon this case may be clearly understood, I will consider separately the two principal grounds of complaint to which I have adverted, with reference to a very marked distinction between them. The first ground of complaint is one which, though it might *primâ facie*

entitle the corporation to rescind the transactions complained of, does not absolutely and of necessity fall under the description of a void transaction. The corporation might elect to adopt those transactions, and hold the directors bound by them. In other words, the transactions admit of confirmation at the option of the corporation. The second ground of complaint may stand in a different position; I allude to the mortgaging in a manner not authorized by the powers of the Act. This, being beyond the powers of the corporation, may admit of no confirmation whilst any one dissenting voice is raised against it. This distinction is found in the case of *Preston* v. *The Grand Collier Dock Company* (11 Sim. 327, S. C.; 2 Railway Cases, 335).

On the first point it is only necessary to refer to the clauses of the Act to shew that, whilst the supreme governing body, the proprietors at a special general meeting assembled, retain the power of exercising the functions conferred upon them by the Act of Incorporation, it cannot be competent to individual corporators to sue in the manner proposed by the Plaintiffs on the present record. This in effect purports to be a suit by *cestui que trusts* complaining of a fraud committed or [494] alleged to have been committed by persons in a fiduciary character. The complaint is that those trustees have sold lands to themselves, ostensibly for the benefit of the *cestui que trusts.* The proposition I have advanced is that, although the Act should prove to be voidable, the *cestui que trusts* may elect to confirm it. Now, who are the *cestui que trusts* in this case? The corporation, in a sense, is undoubtedly the *cestui que trust;* but the majority of the proprietors at a special general meeting assembled, independently of any general rules of law upon the subject, by the very terms of the incorporation in the present case, has power to bind the whole body, and every individual corporator must be taken to have come into the corporation upon the terms of being liable to be so bound. How then can this Court act in a suit con-

stituted as this is, if it is to be assumed, for the purposes of the argument, that the powers of the body of the proprietors are still in existence, and may lawfully be exercised for a purpose like that I have suggested? Whilst the Court may be declaring the acts complained of to be void at the suit of the present Plaintiffs, who in fact may be the only proprietors who disapprove of them, the governing body of proprietors may **\*205** defeat the decree by lawfully resolving upon the confirmation of the very acts which are the subject of the suit. The very fact that the governing body of proprietors assembled at the special general meeting may so bind even a reluctant minority is decisive to shew that the frame of this suit cannot be sustained whilst that body retains its functions. In order then that this suit may be sustained it must be shewn either that there is no such power as I have supposed remaining in the proprietors, or, at least, that all means have been resorted to and found ineffectual to set that body in motion: this latter point is nowhere suggested in the bill: there is no suggestion that an attempt has been made by any proprietor to set the body of proprietors in [495] motion, or to procure a meeting to be convened for the purpose of revoking the acts complained of. The question then is whether this bill is so framed as of necessity to exclude the supposition that the supreme body of proprietors is now in a condition to confirm the transactions in question; or, if those transactions are to be impeached in a Court of Justice, whether the proprietors have not power to set the corporation in motion for the purpose of vindicating its own rights.

[His Honor recapitulated the history and present situation of the company, as it appeared upon the bill.]

I pause here to examine the difficulty which is supposed by the bill to oppose itself to the body of proprietors assembling and acting at an extraordinary general meeting. The 48th section of the Act says that a certain number of proprietors may call such a meeting by means of a notice to be ad-dressed to the board of directors, and left with the clerk or secretary, at the principal office of the company, one month before the time of meeting, or the board is not bound to notice it. The bill says that there is no board of directors properly constituted, no clerk, no principal office of the company, no power of electing more directors, and that, the appointment of the clerk being in the board of directors, no clerk can in fact now be appointed. I am certainly not prepared to go the whole length of the Plaintiff's argument founded upon the 48th section. I admit that the month required would probably be considered imperative; but is not the mode of service directory only? Could the board of directors *de facto*, for the time being, by neglecting to appoint a clerk or have a principal office, deprive the superior body, the body of proprietors, of the power which the Act gives that body over the board of directors? Would not a notice in substance, a notice for example such as the 129th sec- [496] -tion provides for in other cases, be a sufficient notice? Is not the particular form of notice which is pointed out by the 48th section a form of notice given only for the convenience of the proprietors and directors? And if an impediment should exist, and, *à fortiori*, if that impediment should exist by the misconduct of the board of directors, it would be difficult to contend with success that the powers of the corporation are to be paralyzed, because there is no clerk on whom service can be made. I require more cogent arguments than I have yet heard to satisfy me that the mode of service prescribed by the 48th section, if that were the only point in the case, is more than directory. The like observations will apply to the place of service; but, as to that, I think the case is relieved from difficulty by the fact that the business of the company is stated to be principally conducted at the office of the solicitors, for I am not aware that there is anything in the statute which attaches any peculiar character to the spot designated as the principal office. In substance, the board of directors *de facto*, whether qualified or not, carry on the business of the company at a given place, and under this Act of Parliament it is mani-

fest that service at that place would be deemed good service on the company.

If that difficulty were removed, and the Plaintiff should say that by the death or bankruptcy of directors, and the carelessness of proprietors (for that term must be added), the governing body has lost its power to act, I should repeat the inquiries I have before suggested, and ask whether, in such a case also, the 48th section is not directory, so far as it appears to require the refusal or neglect of the board of directors to call a general meeting, before the proprietors can by advertisement call such a meeting for themselves. Adverting to the undoubted powers conferred upon the proprietors to hold special general meetings without the consent and [497] against the will of the board of directors, and the permanent powers which the body of proprietors must of necessity have, I am yet to be persuaded that the existence of this corporation (for without a lawful governing body it cannot usefully or practically **\*206** continue) can be dependent upon the accidents which at any given moment may reduce the number of directors below three. The board of directors, as I have already observed, have no power to put a *veto* upon the will of any ten proprietors who may desire to call a special general meeting; and if ten proprietors cannot be found who are willing to call a special general meeting, the Plaintiffs can scarcely contend that this suit can be sustained. At all events what is there to prevent the corporators from suing in the name of the corporation? It cannot be contended that the body of proprietors have not sufficient interest in these questions to institute a suit in the name of the corporation. The latter observations, I am aware, are little more than another mode of putting the former questions which I have suggested. I am strongly inclined to think, if it were necessary to decide these points, it could not be successfully contended that the clauses of the Act of Parliament which are referred to are anything more than directory, if it be, indeed, impossible from accident to pursue the form directed by the Act. I attribute to the proprietors no

power which the Act does not give them: they have the power, without the consent and against the will of the directors, of calling a meeting, and of controlling their acts; and if by any inevitable accident the prescribed form of calling a meeting should become impracticable, there is still a mode of calling it, which, upon the general principles that govern the powers of corporations, I think would be held to be sufficient for the purpose.

It is not, however, upon such considerations that I [498] shall decide this case. The view of the case which has appeared to me conclusive is that the existence of a board of directors *de facto* is sufficiently apparent upon the statements in the bill. The bankruptcy of Westhead, the last of the three directors who became bankrupt, took place on the 2d of January 1840: the bill alleges that he thereupon ceased to be *qualified* to act as director, and his office became vacated; but it does not say that he ceased to *act* as a director; nor, although it is said that thenceforward there was no board "properly constituted," is it alleged that there was no board *de facto* exercising the functions of directors. These, and several other statements of the bill, are pregnant with the admission of the existence of a board *de facto.*

By whom was the company governed, and its affairs conducted, between the time of Westhead's bankruptcy and that of the filing of the bill in October 1842? What directors or managers of the business of the company have lent their sanction to the mortgages and other transactions complained of, as having taken place since January 1840, and by which the corporation is said or supposed to be, at least to some extent, legally bound? Whatever the bill may say of the *illegal* constitution of the board of directors, because the individual directors are not duly qualified, it does not anywhere suggest that there has not been during the whole period, and that there was not when the bill was filed, a board of directors *de facto*, acting in and carrying on the affairs of the corporation, and whose acting must have been ac-

quiesced in by the body of proprietors; at least, ever since the illegal constitution of the board of directors became known, and the acts in question were discovered. But if there has been or is a board *de facto*, their acts may be valid, although the persons so acting may not have been duly qualified. The 114th section (not stated in the bill) of the Act provides [499] that all acts, deeds and things done or executed at any meeting of the directors, by any person acting as a director of the said company, shall, notwith-standing it may afterwards be discovered that there was some defect or error in the appointment of such director, or that such director was disqualified, or being an *interim* director, was disap-proved of by an annual general meeting of propriet-ors, be as valid and effectual as if such person had been duly appointed and was qualified to be a dir-ector. The foundation upon which I consider the Plaintiffs can alone have a right to sue in the form of this bill must wholly fail, if there has been a gov-erning body of directors *de facto.*

There is no longer the impediment to convening a meeting of proprietors, who by their vote might dir-ect proceedings like the present to be taken in the name of the corporation or of a treasurer of the cor-poration (if that were necessary); or who, by reject-ing such a proposal, would, in effect, decide that the corporation was not aggrieved by the transac-tions in questions. Now, since the 2d of January 1840, there must have been three annual general meetings of the company held in July in every year, according to the provisions of the Act. These *207 annual general meetings can only be regulary called by the board of direct-ors. The bill does not suggest that the requisitions of the Act have not been complied with in this re-spect, either by omitting to call the meeting, or by calling it informally; but the bill, on the contrary, avers that several general meetings and extraordin-ary general meetings, and other meetings of the shareholders of the company, were duly convened and held at divers times between the time when the company was established and the year 1841; in-cluding, therefore, in this period of formality of

proceeding, as well as of capacity in constitution, an entire year after Westhead's bankruptcy.

[500]       Another statement of the bill leading to the same inference—the existence of an acting board—is that which avers that since the year 1839 down, in fact, to the time of filing the bill, that is, during these three years, the company has had no office of its own, but the affairs of the company have been principally conducted at the office of Mr. Bunting. Now this, as I must read it, is a direct ad-mission that the affairs of the company have been carried on by some persons. By whom then have they been carried on? The statute makes the board of directors the body by whom alone those affairs are to be ordered and conducted. There is no other person or set of persons empowered by the Act to conduct the affairs of the company; and there is no allegation in the bill that any persons, other than the board of directors originally appointed, have taken upon themselves that business. In the absence of any special allegation to the contrary I am bound to assume that the affairs of the company have been carried on by the body in whom alone the powers for that purpose were vested by the Act, namely, a board of directors.

Again the bill alleges that, since the bankruptcy of Westhead, the bankrupts have joined in executing the conveyances of the property of the company to mortgagees. It could only have been in the charac-ter of directors that they could confer any title by the conveyance; in that character the mortgagees would have required them to be parties, and it is in that character that I must assume they executed the deeds.

       If the case rested here, I must of necessity assume the existence of a board of directors, and in the absence of any allegation that the board *de facto*, in whose acting the company must, upon this bill, be taken to have acquiesced, have been applied to and have refused to ap-[501]       -point a clerk and treasurer (if that be necessary), or take such other steps as may be necessary for calling a special general meeting,

or had refused to call such special general meeting, the bill does not exclude every case which the pleader was bound to exclude in order to justify a suit on behalf of a corporation, in a form which assumes its practical dissolution. But the bill goes on to shew that special general meetings have been holden since January 1840. The bill, as I have before observed, states that several general meetings and extraordinary general meetings have been holden between the establishment of the company and the year 1841, not excluding the year 1840, which was during Westhead's disqualification, "and that at such meetings false and delusive statements respecting the circumstances and prospects of the company were made by the said directors of the company to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings herein complained of was not disclosed;" and the bill specifies some meetings in particular. Against the pleader I must intend that some such meetings may have been holden at a time when there was no board properly constituted, and no clerk or treasurer or principal office of the company, save such as appear by the bill to have existed; and if that were so, the whole of the case of the Plaintiffs, founded on the impracticability of calling a special general meeting, fails. Assuming then, as I am bound to do, the existence, for some time at least, of a state of things in which the company was governed by a board of directors *de facto*, some of the members of which were individually disqualified, and in which, notwithstanding the want of a clerk, treasurer or office, the powers of the proprietors were called into exercise at general meetings, the question is, when did that state of things cease to exist, so as to justify the extraordinary proceeding of the Plain-   [502]   -tiffs by this suit? The Plaintiffs have not stated by their bill any facts to shew that such was not the actual state of things at the time their bill was filed, and, in the absence of any statement to the contrary, I must intend that it was so. **\*208**

The case of *Preston* v. *The*

*Grand Collier Dock Company* was referred to as an example of a suit in the present form; but there the circumstances were in no respect parallel with the present: the object of that suit was to decide the rights or liabilities of one class of the members of the corporation against another, in respect of a matter in which the corporation itself had no power to vary the situation of either.

I have applied strictly the rule of making every intendment against the pleader in this case—that is, of intending everything to have been lawful and consistent with the constitution of the company, which is not expressly shewn on the bill to have been unlawful or inconsistent with that constitution. And I am bound to make this intendment, not only on the general rule, but also on the rules of pleading which require a Plaintiff to frame his case so distinctly and unambiguously, that the Defendant may not be embarrassed in determining on the form which his defence should assume. *Attorney-General* v. *Corporation of Norwich* (2 Myl. & Cr. 406). The bill, I cannot but observe, is framed with great care, and with more than ordinary professional skill and knowledge; but the averments do not exclude that which, *primâ facie*, must be taken to have been the case, that during the years 1840, 1841 and 1842 there was a governing body, that by such body the business of the company was carried on, that there was no insurmountable impediment to the   [503]   exercise of the powers of the proprietors assembled in general meetings to control the affairs of the company, and that such general meetings were actually held. The continued existence of a board *de facto* is not merely not excluded by the averments, but the statements in the bill of the acts which have been done suppose, and even require, the existence of such a board. Now, if the Plaintiff had alleged that there had been no board of directors *de facto*, and had on that ground impeached the transactions complained of, the Defendants might have met the case by plea, and thereby have defended themselves from answering the bill. If it should

be said that the Defendants might now have pleaded that there was a board of directors *de facto*, the answer is that they might then have been told that the fact sufficiently appeared upon the bill, and therefore they ought to have demurred. Uncertainty is a defect in pleading of which advantage may be taken by demurrer. If I were to overrule these demurrers, I might be depriving the Defendants of the power of so protecting themselves; and that because the Plaintiff has not chosen, with due precision, to put forward that fact, which, if alleged, might have been met by plea, but which, not being so alleged, leaves the bill open to demurrer.

I must further observe that, although the bill does, with great caution, attempt to meet every case which, it was supposed, might have been fatal to it upon demurrer, yet it is by allegations of the most general kind, and many of which cannot by possibility be true. It alleges the recent discovery of the acts complained of, but it gives no allegation whatsoever for the purpose of telling when or how such discovery was made, or what led to it. I am bound to give the Plaintiff, on a general demurrer, the benefit of the allegation that the matters complained of have been recently discovered, whatever the term "re- [504] -cently discovered" may mean; but when I look into the schedule to the Act I find that many of those matters must have been known at a very early period in the history of the company. I find also provisions of the Act requiring that books shall be kept in which all transactions shall be fully and fairly stated; and I do not find in the bill anything like a precise allegation that the production of those books would not have given the information, or that there have not been means of seeing those books at least at some time since 1835, or since the transactions in question took place, so that, in point of fact, many of the transactions might and may have been sooner known. These are observations upon which I do not found my judgment, but which I use as explaining why it is I have felt bound in favour of the Defendants to construe this bill with strictness.

The second point which relates to the charges and incumbrances alleged to have been illegally made on the property of the company is open to the reasoning which I have applied to the first point, upon the question whether, in the present case, individual members are at liberty to complain in the form adopted by this bill; for why should this anomalous form of suit be resorted to, if the powers of the corporation may be called into exercise? But this part of the case is of greater difficulty upon the merits. I follow, with entire assent, the opinion expressed by the Vice- **\*209** Chancellor in *Preston* v. *The Grand Collier Dock Company*, that if a transaction be void, and not merely voidable, the corporation cannot confirm it, so as to bind a dissenting minority of its members. But that will not dispose of this question. The case made with regard to these mortgages or incumbrances is, that they were executed in violation of the provisions of the Act. The mortgagees are not Defendants to the bill, nor does the bill seek to avoid the [505] security itself, if it could be avoided, on which I give no opinion. The bill prays inquiries with a view to proceedings being taken *aliunde* to set aside these transactions against the mortgagees. The object of this bill against the Defendants is to make them individually and personally responsible to the extent of the injury alleged to have been received by the corporation from the making of the mortgages. Whatever the case might be, if the object of the suit was to rescind these transactions, and the allegations in the bill shewed that justice could not be done to the shareholders without allowing two to sue on behalf of themselves and others, very different considerations arise in a case like the present, in which the consequences only of the alleged illegal Acts are sought to be visited personally upon the directors. The money forming the consideration for the mortgages was received, and was expended in, or partly in, the transactions which are the subject of the first ground of complaint. Upon this, one question appears to me to be, whether the company could confirm the former transactions, take the be-

nefit of the money that has been raised, and yet, as against the directors personally, complain of the acts which they have done, by means whereof the company obtains that benefit which I suppose to have been admitted and adopted by such confirmation. I think it would not be open to the company to do this; and my opinion already expressed on the first point is that the transactions which constitute the first ground of complaint may possibly be beneficial to the company, and may be so regarded by the proprietors, and admit of confirmation. I am of opinion that this question—the question of confirmation or avoidance—cannot properly be litigated upon this record, regard being had to the existing state and powers of the corporation, and that therefore that part of the bill which seeks to visit the directors personally with the consequences of the impeached mortgages and charges, the benefit of which [506] the company enjoys, is in the same predicament as that which relates to the other subjects of complaint. Both questions stand on the same ground, and, for the reasons which I stated in considering the former point, these demurrers must be allowed.

END OF DOCUMENT

**Tab 10**



[2002] 2 A.C. 1                                                                                              Page 1
[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C.
313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B.
29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R.
72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001)
98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000
Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

**Johnson v Gore Wood & Co (No.1)**

[2001] 2 W.L.R. 72
House of Lords

Lord Bingham of Cornhill, Lord Goff of Chieveley,
Lord Cooke of Thorndon, Lord Hutton, and Lord
Millett

2000 July 17, 19, 20; Dec 14

Company—Shareholder—Rights—Action by com-
pany for damages for breach of duty—Subsequent
action by majority shareholder in respect of personal
losses sustained—Whether losses recoverable where
not merely reflective of company's lossesDamages—
Contract—Breach—Measure of damages—Whether
damages for mental distress and anxiety recover-
ableEstoppel—Convention, by—Underlying assump-
tion—Validity of testPractice—Pleadings—Striking
out—Abuse of process—Company bringing action
against solicitors for damages for professional negli-
gence—Action compromised—Majority shareholder
subsequently bringing action in respect of personal
losses sustained—Whether question of abuse of
process to be judged broadly on merits

The plaintiff, a businessman, conducted his
affairs through a number of companies, including W
Ltd, in which he held all but two of the issued shares.
On behalf of W Ltd he instructed the defendants, a
firm of solicitors, who from time to time also acted
on behalf of himself personally and of others of his
companies, to act for W Ltd in connection with a
proposed purchase of land, which it planned to de-
velop. It had an option to purchase the land, and the
defendants were instructed to serve a notice exercis-
ing the option. Service of the notice was followed by
a dispute as to its validity and consequent proceed-
ings in the Chancery Division, where an order for
specific performance was made against the vendor.
By the time the conveyance was completed W Ltd
had suffered substantial loss because of the cost of
the Chancery proceedings, in which the vendor had
been legally aided, its inability to recover damages

and costs from the vendor, the collapse of the proper-
ty market and interest charges that it had incurred. In
January 1991 it started proceedings against the de-
fendants for professional negligence in connection
with the exercise of the option. Before the action
came to trial, solicitors representing W Ltd notified
solicitors acting for the defendants that the plaintiff
also had a personal claim against the defendants, aris-
ing out of the same matters, which he would pursue
in due course. Subsequently, a solicitor acting for the
plaintiff and a solicitor representing the defendants
discussed the plaintiff's personal claim on the tele-
phone and the plaintiff's solicitor explained that it had
been thought better to wait until the company's claim
had been concluded before dealing with the personal
claim. An overall settlement of W Ltd's claim and the
plaintiff's claim was discussed, as was a settlement of
the plaintiff's claim. W Ltd's proceedings were even-
tually compromised during the trial on payment to W
Ltd of a substantial proportion of the sum claimed by
it. In April 1993 the plaintiff issued a writ against the
defendants. In December 1997 the defendants applied
for the action to be struck out as an abuse of the
process of the court. They also sought determination
of preliminary issues as to whether they had owed the
plaintiff a duty of care and whether the damages
claimed by him were in principle recoverable on the
facts pleaded. The judge declined to strike out the
plaintiff's claim, holding that the defendants were
estopped by convention from contending that the
plaintiff's action was an abuse of process. He further
held that the heads of damage pleaded were not irre-
coverable as a matter of law in respect of the breach-
es alleged by the plaintiff. The Court of Appeal, on
appeal by the defendants, ordered that the judge's
order be set aside in so far as he had dismissed
**\*2** the defendants' application to strike out the
proceedings as an abuse of the process of the court
but not otherwise.

On appeal by the plaintiff and cross-appeal by the
defendants—(1)

allowing the appeal, that there was a public interest in
the finality of litigation and in a defendant not being

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

vexed twice in the same matter; but that whether an action was an abuse of process as offending against that public interest should be judged broadly on the merits taking account of all the public and private interests involved and all the facts of the case, the crucial question being whether the plaintiff was in all the circumstances misusing or abusing the process of the court; and that, in all the circumstances, the plaintiff's action was not abusive (post, pp 30H-31F, 32C-33A, 34C-G, 38F-G, 42D-F, 50H, 58G-60C).

.

Observations as to estoppel by convention (post, pp 33C-G, 38H-41C, 60H-61A).(2)

Dismissing the cross-appeal but varying the order of the Court of Appeal, that the plaintiff was in principle entitled to recover in respect of any loss that he had himself suffered that was not merely a reflection of the loss suffered by W Ltd; that, save for his claims in respect of the dimunition in value of his pension and of his majority shareholding in W Ltd in so far as they were merely a reflection of W Ltd's loss, the plaintiff's heads of claim in respect of quantifiable damage should not be struck out; that damages for breach of contract could not generally include damages for mental distress and anxiety; that (Lord Cooke of Thorndon dissenting) the plaintiff's claim for damages under that head should be struck out; and that his claim for aggravated damages should also be struck out (post, pp 35E-37A, 38C-D, 41E-42C, 48B-D, 50G, 55D-56B, 67C).

The following cases are referred to in their Lordships' opinions:

, HL(E)

**\*3**

The following additional cases were cited in argument:

;

**\*4**          ;          ;

APPEAL and CROSS-APPEAL from the Court of Appeal

This was an appeal by the plaintiff, William Henry John Johnson, by leave of the House of Lords (Lord Hope of Craighead, Lord Clyde and Lord Millett) given on 25 May 1999 and a cross-appeal by the defendants, Gore Wood & Co (a firm), by leave of the House of Lords (Lord Hope of Craighead, Lord Clyde and Lord Millett) given on 3 November 1999 from a judgment of the Court of Appeal (Nourse, Ward and Mantell LJJ) given on 12 November 1998.

By its judgment, the Court of Appeal had allowed an appeal by the defendants from an order of Pumfrey J dated 21 May 1998. The judge, on application by the defendants, had declined to strike out the plaintiff's claim against them. On preliminary issues ordered by Sir Richard Scott V-C sitting as an additional judge of the Queen's Bench Division, the judge had determined that (a) the facts and matters relied on by the plaintiff as constituting breaches of duty by the defendants were capable of constituting the breach of a contractual, tortious or fiduciary duty owed as a matter of law by the defendants to the plaintiff and (b) the heads of damage alleged in paragraphs 23 and 24 of the re-amended statement of claim were not irrecoverable as a matter of law as damages for the pleaded breaches alleged by the plaintiff. The Court of Appeal ordered that his judgment be set aside in so far as he had dismissed the defendants' application to strike out the proceedings as an abuse of the process of the court but not further or otherwise. It held that one head of damage, namely diminution in the value of the plaintiff's shareholding in Westway Homes Ltd, should be struck out of the re-amended statement of claim.

The facts are stated in the opinion of Lord Bingham of Cornhill.

*Roger ter Haar QC* and *Simon Howarth* for the plaintiff. The Court of Appeal correctly identified the underlying principle in all cases of abuse of process as that articulated by Lord Diplock in          . The Court of Appeal's decision is inconsistent with          . No "additional element" of

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

the type suggested in that case is present here, nor was any such additional element identified by the Court of Appeal. The Court of Appeal appears to have regarded it as being for the plaintiff to establish that special circumstances existed; the approach in      is to be preferred as being more consonant with justice and consistent with Lord Diplock's dicta in      and dicta in     , 590 and     , 425. May LJ in     , 387- **\*5** 388, in a dictum correctly stating the effect of the authorities, said that "it may in particular cases be sensible to advance cases separately". This was such a case. The Court of Appeal appears to have regarded the mere fact of "re"-litigation as sufficient to amount to abuse of process: compare     . In effect, this equated the case to one of issue estoppel, which it is not. With abuse of process, one is looking at much broader issues of justice; many cases involve a collateral attack on a previous decision. If necessary,      should be     . [Reference was also made to     .]

Further, the Court of Appeal gave no or inadequate consideration to the reasons put forward in the plaintiff's affidavit explaining the reasons for the course adopted. Its reference to full legal aid having been available "long before the trial" was incorrect. The plaintiff was obliged to have regard, and did have regard, to the interests of the other shareholders and creditors of the company in reaching his decision. The Court of Appeal was wrong to hold that the plaintiff was "in control throughout". His options were severely limited.

     It appears, although it is not entirely clear, that the Court of Appeal accepted that "most practitioners [in 1992] would not have thought the rule [in      at all". If that is so, then the pursuit of the personal claim separately from the company claim was not an abuse of process: see per Lord Kilbrandon in     , 590. Whilst the diligence or lack of diligence of a legal adviser may not be relevant in a true case of issue estoppel, it is relevant where the court is considering questions of abuse of process (as here) or exercise of its discretion. On the other hand, if the Court of Appeal took the view that most practitioners in 1992 would have thought that the rule in      applied, then the defendants could and should have taken the point then and it was

unconscionable for them to take it for the first time in December 1997. Moreover, the consequence will be that court time will not be saved by striking out this action as suggested by the Court of Appeal     , 114; on the contrary, it will now be occupied by further and more complicated litigation against the solicitors and counsel advising the plaintiff in respect of his personal claim in 1992. Further, in deciding whether the commencement of the present proceedings was an abuse of process the applicable principles are those applying in 1992, not those current in 1998; accordingly, the Court of Appeal was wrong to take into account, "the current reform of civil justice". In deciding whether the present proceedings constitute an abuse of process it is relevant to consider not only the plaintiff's conduct but also that of the defendants. The Court of Appeal's approach is contrary to recent comments made in     , where the guidance in      was     . The Court of Appeal in the present case appears to have considered that there were conflicting decisions of the court as to the proper approach to be adopted in the circumstances, comparing, at pp 113-114,      with     . The true rule, which both      and      support, is that where a case is **\*6** hopeless the court should accede to an application to strike out however late it is made because it is bound to save time and costs. If, however, the claim is arguable in law then a belated application to strike it out without a trial on the merits should only be entertained on receiving a valid explanation for the delay in making it. The Court of Appeal accepted, that the reason for the point not being taken earlier was that it had not been considered until Mr Steinfeld was instructed. The plaintiff also accepts that that is the explanation for the delay. It is a bad reason for failure to take such a point: see      and     , 219-220. There was accordingly no proper reason for the delay.

     In the circumstances, the present proceedings do not constitute an abuse of process. Applying the dictum of Lord Diplock in     , 536c, bringing them is not "manifestly unfair" to the defendants, because they settled the original company proceedings on the basis that the plaintiff's personal claim would be litigated or settled later. To allow this claim to be pursued would not "bring the administration of justice into disrepute among right-thinking people"

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

given that the defendants settled the company proceedings on the basis that they knew that the personal claim would be brought, that they obtained valuable concessions on the basis that it would he litigated or settled later and that both they and the plaintiff acted for a considerable time on a common assumption that it would be made and would be entertained by the court. If it is necessary for the plaintiff to show "special circumstances", these matters constitute them. The plaintiff is not the same party as the company, nor are his claims the same.

To apply the rule in          to a party in the plaintiff's position is a substantial and unnecessary extension of the law in so far as it applies to issue estoppel. So far as that doctrine is concerned, it is desirable that it should be clearly and unambiguously applied so that parties know where they stand and should not depend on questions as to whether an action "should" have been joined with another. In so far as wider considerations apply in respect of abuse of process, the mere fact that the plaintiff could more conveniently have joined in the earlier action against the defendant does not render the later claim an abuse of process: see          and          . In these circumstances the court is concerned with wider questions of justice and fairness than the strict ratio of          . In so far as the Court of Appeal extended the rule in          by treating this case as an instance of issue estoppel they were wrong to do so. In so far as they considered it to be a case of abuse of process going beyond          they failed to consider the matter in the round. Had they done so, they should have concluded that the significant differences between the company and the personal claims and the reason for proceeding first with the company claim justified (or excused) the course taken.

One of the main reasons for the rule in          is the prevention of the risk that different courts seized of different actions dealing with the same subject matter and raising the same issues will come to different conclusions. This would be unfair to the parties, particularly to an initially successful party who fails in a subsequent proceeding, and likely to     **\*7**     bring the administration of justice into disrepute. It is self-evident that where there is a settlement of the first action these dangers fall away. It is open to a party fearful of a second action following settlement of the first to negotiate terms of settlement that preclude his adversary from issuing further proceedings. To hold that the rule applies where there has been a compromise of the first action gives rise to practical problems. Is the rule to apply (and if so how) in a situation where two actions are started and one is settled by a prompt payment into court? There is no reason why the second action should be regarded as an abuse of process. The defendant is aware of both actions, has chosen to settle one and has thereby removed the risk of inconsistent results. No one could have contemplated in the instant case that as soon as the company action was settled the plaintiff's personal action should immediately have been struck out.

As to estoppel by convention, the judgment of the Court of Appeal confuses it with estoppel by representation, is contrary to previous binding authority and is illogical and contrary to principle. The defendants knew that another action was likely to be commenced and also knew that it would involve repetition of allegations made in the company action. An objection to a second action per se (i e, to its very existence rather than to the time when it was launched or the detail of the case made in it) would necessarily always be open to the defendant. Accordingly, such an objection could and should have been perceived at the time of the settlement agreement and the defendants could and should expressly have reserved their right to take it if they had wished to preserve such a right. There was unchallenged evidence that the plaintiff would not have agreed to the undertakings he gave in the settlement agreement if there had been any intimation that this point would be taken. Silence on the matter amounted to an undertaking not to take it. That the defendants not only kept silent but also obtained concessions in relation to the second action shows that the parties were proceeding on the assumption that a second action could be brought if commenced in time and properly constituted. Otherwise, the concessions extracted from the plaintiff make no sense.

The Court of Appeal appear to have misunderstood or misconstrued the meaning of "common assumption" in this context. They identified , at p 113, as the assumption on which the estoppel was based as being that if the rule in          did apply it would

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

not be raised. That formulation was not suggested by the plaintiff and he disputes its accuracy. "Assume" means "take as being true, for purpose of argument or action": see Concise Oxford English Dictionary, 7th ed (1982). In the present case, for the purpose of entering into the settlement agreement the parties took it as being true that the plaintiff could bring a second action against the defendants provided that it was brought within time and disclosed a reasonable cause of action. There could not have been any relevant assumption in relation to           because no one had spotted the point. The assumption must, therefore, be formulated in more general terms. The court should not inquire into the reasons why the assumption was made once it is satisfied that it existed and was relied on. If the Court of Appeal were correct, a distinction would be drawn between a case where the parties form their assumption because a point is overlooked and one where they notice the point but mistakenly believe that it is a bad one. In consequence of this distinction, an estoppel would arise in the latter case but not in the former.  **\*8**   Such a distinction is not logical or justifiable in principle. Further, it is not clear how any rule involving such a distinction would apply where party A misses the point entirely and party B spots the point but, thinking it a bad one, does not mention it to party A. The parties then proceed on the assumption that the point is not available but party B then changes his mind as to its merits. There ought to be an estoppel, because the important factor that suggests (as a matter of broad justice) the application of an estoppel would be present. The parties would both have acted in good faith on the basis that the point was not available. [Re f e r e n c e   w a s   m a d e   t o           ;           ;           and           .]

*Alan Steinfeld QC*   and   *Elizabeth Overy*   for the defendants. The Court of Appeal was correct to hold that the rule in           prima facie applies to these proceedings. In so far as the principle covers matters that might have been, but were not, brought forward, it is now well established that it depends not on a strict application of the doctrine of res judicata but on the public policy that requires that there should be an end to litigation and so treats actions falling within it as an abuse of process: see           , 296d. This case is concerned with that wider, public policy aspect of the           principle. The policy itself has assumed greater importance with the much greater stress now laid on case management under the           . It is not possible for the court properly to direct the parties how to manage the case unless both it and the parties know the full range of the issues that lie between the parties.

There are three vices in litigating or relitigating issues that have already been litigated or should have been, any one of which is sufficient to constitute an abuse of process. (i) It is a substantial waste of court time and is unfair to other litigants; to that extent the rule in           is founded in public policy. The courts should be wary of finding that the parties agreed that the rule should not apply. (ii) It subjects, or potentially subjects, the defendant to more than one set of proceedings, which is prima facie unfair. It substantially increases costs, as in the present case. (iii) In many cases, relitigation may constitute a collateral attack on the outcome of the previous proceedings. There are two objections to this: it offends against the principle that there should be an end of litigation, and it could result in conflicting decisions. Here, where the plaintiff takes the view that the amount recovered by the company in its proceedings was not enough to put it back on its feet, all three vices are present.

The fact that the roots of the principle lie in public policy offers guidance both on the question whether it should be applied in circumstances where it is contended that a party could and should have brought his case forward at an earlier stage but the factual situation differs from the precise situation outlined in           and on the question of the exercise of discretion. The question of prima facie application is ultimately whether to permit the claim to proceed would amount to a misuse of procedure in the way indicated by Lord Diplock in           **\*9**   , 536c. The existence of the wider           principle and its foundation in public policy were clearly recognised in           , 157F, 163b-e. [Reference was also made to           and           .]

          suggests that in the application of           a distinction is to be drawn between cases in which the narrower principle is relevant, where the principle applies unless there are special circumstances, and

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

those in which the wider principle is invoked, where it is for the person alleging abuse of process to establish that when all the circumstances are weighed there will be found to be an abuse. No sufficient warrant for such a distinction is to be found in any of the former authorities or was made in the present case. Public policy points clearly against relitigation and thus a prima facie abuse exists equally in any relitigation case. The need for a careful examination of all the circumstances was recognised in both                    and                  , but with no indication that something over and above the abuse normally resulting from relitigation had to be shown.                  involved consideration of the wider                principle and is not properly to be relied on in the way in which it was relied on in                     Auld LJ seems to suggest that the House of Lords in                  was dealing with issue estoppel in its strict form and not deciding anything in relation to the wider principle based on abuse of process. It is clear, however (see at pp 106b and 108g-h), that their Lordships were not drawing any distinction between cases in which the issue had actually been decided and those in which the relevant point might have been brought forward but was not. As               shows, that is the very distinction between the narrower and the wider aspects of the principle.               should, therefore, be overruled in so far as it requires a different approach to the two types of case. Any balancing process comes only at the stage of the exercise of discretion.

The Court of Appeal was correct to hold that the rule in                 applies to a privy of the claimant in the first action as it would to the claimant himself and that the plaintiff was a privy of Westway Homes Ltd ("WWH") for the purposes of the rule. As to privity generally, an abuse of process objection based on relitigation may be taken against a person who is a privy of the original claimant in the sense of having a common interest in the determination of the original action: see               ;               and               . There is no logical justification for distinguishing between the position of a privy in a case of estoppel under the narrower                principle and his position in a case of abuse of process under the wider principle. It follows that the general rule should be that in the latter case as in the former there is no need to show any special or exceptional circumstances before a privy may be bound. The real **\*10**        ques-

tion is who is a privy of the original party for these purposes. [Reference was made to                  .]

The plaintiff contended in the Court of Appeal that the application of the wider                principle to privies was an extension that could have dramatic and unfair consequences and so should not be made. If it is an extension at all, rather than a case not previously considered but plainly within the original rule, then it is an extension that ensures a consistent approach to all aspects of                . The difficulties identified by the plaintiff in the Court of Appeal all stem from a choice by two closely related parties bringing claims covering substantially the same issues to proceed independently. In such circumstances, the answer lies in proper case management. Both claims have in fact been put forward and it is for the parties and the court to manage the litigation in such a way that the court's process is not abused by exposing the defendants to relitigation. The argument does not show a basis for the House of Lords to determine that the                principle does not apply to a privy. The misuse of procedure test is satisfied.

As to privity specifically in this case, the test in                , 515f is correct. The essence of the plaintiff's case is that WWH was his alter ego. There is the closest possible identification between him and WWH, the original party. In substance they are one and the same for present purposes, and it is just that the plaintiff should be bound under the principle binding privies. Further, he relies on allegations that the defendants owed him duties in exactly the same terms as they did to WWH and were in breach of those duties in exactly the same way. The Court of Appeal                , 462f rightly said that those allegations encompass "practically the whole of the ground traversed for six weeks" in the company proceedings. The plaintiff is fairly and squarely covered by the approach of Stuart-Smith LJ in                , 254a-b. If the company action had gone on to judgment and been dismissed on a finding that the defendants had not been negligent, it is inconceivable that he would not have been estopped by that judgment in the same way as the plaintiff in the                case was so as to preclude his bringing his personal claim. He is therefore to be regarded as a privy of WWH not only as a matter of practical identity but also through his conduct in relation to the company proceedings.

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

The Court of Appeal was correct to hold that the rule in         was capable of applying in the situation where the first action was compromised rather than continued through to judgment and that the rule applied in the present case having regard (if necessary) to the stage the company proceedings had reached when they were compromised. The significance of the reference in         to adjudication is that adjudication is a final form of resolution after consideration of the merits. There is no reason in principle why a compromise should not have the same effect, given that it is equally a final form of resolution of the parties' disputes relating to the particular subject matter after consideration of the merits. There is no basis in public policy for distinguishing the two classes of case.

It is immaterial at what stage of the proceedings the compromise is reached. There is no basis on which the plaintiff can say that the trial of the **\*11**         company proceedings had not got far enough. In any event, the principle in         should apply where the action has gone beyond the stage at which the court would permit the claimant to discontinue and start again. That will be so where the claimant has opened his case (and a fortiori once, as here, he has closed his case on liability): see         ;         . The situation is then comparable with the primary         case, in which the court and the parties will have full awareness of the material issues on which the court is adjudicating. On any view, the company proceedings had gone far enough for         to apply.

The Court of Appeal was correct to determine that there were no special circumstances that required that the present action should not be struck out despite the prima facie application of the rule in         . As to the first special circumstance relied on by the plaintiff, namely, his reasons for not bringing his personal claim at the same time as the company claim, all his arguments stem ultimately from his and the company's lack of financial resources. Difficulties in funding litigation do not in themselves amount to special circumstances for the purposes of the         principle: see         . Any other approach would involve the risk that a claimant would pursue one head of claim after another as funding for each became available, whether from borrowing, legal aid, a contingency fee arrangement or even the fruits of success on previous heads. Such a process would clearly be oppressive to the defendant.

As to the second special circumstance relied on, namely, the defendants' conduct relating to the plaintiff's personal claim, essentially the matters of conduct amount to no more than that the defendants did not ask the plaintiff to join his claim with that of WWH in the company proceedings, contemplated but did not achieve settlement of the personal claim and did not raise the abuse point until late in the day. Complaint is also made that the defendants are not prepared to make concessions (i e, to admit liability) that would reduce the length of the trial. Save in so far as his conduct may found an estoppel argument, a potential defendant is under no obligation to advise a claimant how to make his claim so that a successful application to strike out on the ground of abuse of process may be avoided. Similarly, a defendant is not obliged to concede points not determined against him so that the claimant cannot be said to be relitigating those issues. The Court of Appeal rightly found that the delay was not a special circumstance.

As to the third special circumstance relied on, namely, the fact that the plaintiff was not warned by his legal advisers of the potential challenge to the personal claim, this should not be visited on the defendants as a special circumstance taking this case out of the         principle. The mischief of relitigation between the original parties or their privies is the same in either case.

The Court of Appeal was correct to determine that the defendants were not estopped by convention from alleging that the present action was an abuse of the process of the court. The difference on this point between the Court of Appeal and Pumfrey J arose not from any difference as to the applicable law but because on the facts the Court of Appeal held that the common assumption on the basis of which the parties had acted was more limited than Pumfrey J had found. The classic statement of the principle **\*12**         underlying estoppel by convention on the basis of which both Pumfrey J and the Court of Appeal proceeded is that of Lord Denning MR in         .

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

[Reference was also made to          .] It is an essential feature of the application of the principle that each party should be aware of the assumption made by the other and that they should conduct their dealings on the basis of those assumptions: see          and          . It is not sufficient that the assumption is common to both if they are not also both aware that it is common to both; in that sense, the assumption must be not only common but agreed. It is also an essential feature that the estoppel should arise on the basis of an assumption as to facts or law. It does not arise on the basis of a representation by one party to the other either as to fact or as to that party's future conduct: see          , p 351 and          The inquiry concerns not what a party will do but what a state of affairs is. In          , which led Pumfrey J to his conclusion, there was no departure from those principles. The argument addressed to the Court of Appeal related solely to the facts of the case: see p 565h. The case is no more than an illustration of the application of the principles to particular factual circumstances. To succeed in the present case on the footing of estoppel by convention on the basis of the circumstances of and surrounding the settlement of the company proceedings and the terms of that settlement, the plaintiff needs to show an agreed assumption that as and when he made his personal claim it would not be open to attack as an abuse of process on the basis of          . An agreed assumption that the defendants would not adopt a particular line of attack would not be sufficient. The agreed assumption found by Pumfrey J that "the personal claim would be made, and would be entertained by the court" appears to be an assumption as to the future conduct of the plaintiff and, if it is intended to extend to an assumption that the claim would be considered on its merits, as to the future conduct either of the court or of the defendants. It could not support the estoppel by convention that the judge found.

The Court of Appeal was correct to hold that the facts did not evidence a common assumption of the necessary nature. The fact that the defendants did nothing to indicate that they accepted that the threatened claim was or might be a good one or one capable of being maintained (i e, in this context, a claim that would not be vulnerable to a striking-out application on the ground of abuse of process) and that they would limit the nature of any defences or objections that they might have is fatal to the plaintiff's case. It is in fact inconceivable that there should have been an agreed assumption about possible lines of attack on the plaintiff's present claim at a time when there was no pleading in existence and in view of the fact that the claim as now formulated is very different from the claim then notified. If the plaintiff's personal claim had been statute-barred, there was nothing in the compromise or in the defendants' conduct to give rise to an estoppel that would have prevented them from taking a limitation point in the personal action when it was brought. There is no logical distinction between that and **\*13** any other defence or objection. The position is not affected by bringing into the equation the defendants' delay in making the striking-out application. It is true that when the claim was actually brought and pleaded they became able to assess to some degree whether or not it was an abuse of process. (The position became clearer after completion of service of the plaintiff's factual and expert evidence.) It cannot be said, however, that conduct consisting of nothing more than, on the one part, failure to make an application and, on the other, continuing with the action involves a communication between the parties of the fact that each is proceeding on the assumption that the action is not an abuse of process. Delay is to be considered, as it was by the Court of Appeal and Pumfrey J, in relation to the issues of special circumstances and the exercise of the striking-out power.

As to the possibility of an estoppel by representation, if the point is sought to be raised, there is nothing in the evidence to show any representation by the defendants to the plaintiff that they would conduct their defence of the action in any particular way or without taking any particular point.

There are no grounds for attacking the Court of Appeal's exercise of its discretion to strike out the plaintiff's claim as an abuse of process. Once the abuse of process has been shown, the court has a duty to put an end to it by striking the action out unless in the exercise of its discretion it concludes that its duty to do so is outweighed by other considerations. It "defies common sense" (see          , 1402), and would defeat the general public policy underlying          , to refuse to prevent an abuse of the court's process simply to punish the defendants for

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

their delay.            should be preferred to            . It shows that the decision in            should be confined to similarly exceptional cases.

"Special circumstances" cannot be resurrected at the discretion stage as contended for by the plaintiff. The points raised are explicit or implicit in the issues already considered and do not support an independent attack on the exercise of discretion. The present action is manifestly unfair to the defendants, who only some years after the settlement of the company proceedings became aware of the extent to which the plaintiff proposed to go over again issues extensively canvassed in the previous action. That could not have been foreseen from the sketchy details available at the end of November 1992. It would bring the administration of justice into disrepute to allow the plaintiff to do this simply because through his alter ego (and by his own choice) he did not recover as much in the company proceedings as he would have liked to. Alternatively, on any view the Court of Appeal was entitled to exercise its discretion as it did, having regard to the overall principle of            and cannot be said to have been plainly wrong.

As to delay, the prospect of a trial of at least eight weeks (the parties' current estimate), which ex hypothesi constitutes an abuse of process, has to be balanced against the time, effort and expense incurred in the progress of the litigation to date and the stress of the litigation on the plaintiff. His advisers are sufficiently compensated for their time and effort through their entitlement to costs. While the plaintiff has himself spent time on the action and has experienced stress, that is the consequence of his having persisted in an action that will be found to have been an abuse. When the balancing **\*14** exercise has been performed, it is a decision not to strike out the action that would be plainly wrong.

On the cross-appeal, the first five principles put forward by the Court of Appeal are correct. The fundamental principle is that, as a general rule, the company is the proper claimant in an action to recover loss that it has itself suffered: see            . A shareholder cannot in substance avoid that rule by bringing a personal claim to recover damages for loss in the value of his shares merely because the company in which he is interested has suffered damage,

even if the conduct of which he complains gave him personally, and not the company alone, a cause of action: see            , 222h-223a. He is suing for loss that simply reflects loss to the company. The            principle is, as the Court of Appeal            said, salutary. It ensures that loss to the company is recovered only by the company and that the proceeds of recovery are not diverted to the shareholders to the potential prejudice of creditors. It similarly ensures that the process of recovery is conducted only by the company and that the company's right to recover is not adversely affected by outside compromises with the shareholders to the potential prejudice of creditors. It applies to loss of benefits as a director as well as to loss of dividends. There is no exception to it by which a shareholder can recover in respect of reflective loss that the company itself has for any reason failed to recover: see            , at p 223e, and            , 471.

The loss claimed by the plaintiff as shareholder is entirely a reflection of WWH's loss, being referable to lack of available funds in WWH at a particular time and/or the compromise of the company proceedings for (it is alleged) a sum substantially less than the full amount of WWH's loss. The duties breach of which is alleged to have caused the plaintiff's loss are the same in content as those relied on in the company proceedings and are alleged to have been broken in the same way.

In any event, in accordance with general principles as to recoverability of damage a shareholder cannot recover for loss stemming from delayed payment of damages to him, a fortiori from delayed payment of damages to the company: see            . The essence of the claim to additional loss in such circumstances is that the claimant, having been deprived of financial resources to be expected from the company, has suffered a further loss resulting from his reflective loss. A claim by the company to consequential loss arising from deprivation of financial resources would be met by the general policy objection to recovery of damages for loss resulting from delayed payment and impecuniosity. A fortiori that policy constitutes a ground of objection to recovery of such damages by a shareholder whose right of recovery is only through the company, in accordance with            . It is essentially a policy limitation

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C.
313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B.
29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R.
72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001)
98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000
Independent, February 7, 2001 Official Transcript (Cite as: [2002] 2 A.C. 1)

based on the ground that one party is not to be taken to contemplate that a breach of duty will cause the other to suffer additional loss of which the immediate cause is his impecuniosity. [Reference was made to         ;         ;         ;         **\*15**                 ;                 and             .]

                is inconsistent with the above principles, and the Court of Appeal             was correct to hold that it should not be followed in this country. Although Hobhouse LJ in          expressed approval of         , he reached his conclusion for reasons that in no way depended on the correctness of anything in              . The Court of Appeal, at p 457c-f, also rightly approved the approach of Millett LJ in             . [Reference was also made to         ;         , 377-378; and         ]

      Damages for mental distress and anxiety in respect of a breach of duty causing purely economic loss in circumstances in which no physical injury was reasonably foreseeable as a consequence of the breach are not recoverable, and the plaintiff's claim to such damages accordingly fails. His mental distress and anxiety were the consequence of the financial position of WWH and are irrecoverable under the             principle: see         and         . [Reference was also made to         , 377f-378d.].

As to aggravated damages, the facts pleaded in the re-amended statement of claim make it clear that the plaintiff's complaint is not as to the manner in which the wrong was committed but as to the manner in which the claims have been defended. That does not constitute aggravation of the damage in circumstances such as the present. When aggravated damages are claimed on the basis of the manner of defence in defamation actions, it is because the defendant has pleaded justification and so by his defence has continued to repeat the wrong of which the claimant complains. No such case can be made out here.

*ter Haar QC*          in reply. It is important to look at the actual mischief that is said to have been caused by the alleged abuse of process.

      On the cross-appeal, the primary relationship was that between the defendants and the plaintiff rather than between him and the company. In so far as they acted on behalf of the company they did so in support of the plaintiff's business plans. As to the cost of the plaintiff's personal borrowings (loan capital and interest), bank interest and charges and mortgage charges and interest, these losses can be grouped together. In one sense they can be said to relate to the impecuniosity of the company, but that is an incomplete analysis. All the losses are the plaintiff's personal losses. To characterise them as losses arising out of a shortage of funds in the company gives inadequate weight to the facts that the plaintiff's personal wealth was substantially concentrated in the company; that if the company were to lose its only substantial asset he would be liable on the guarantees given by him to support it and that support of it in its litigation could only come from him personally in circumstances where his principal asset had been rendered worthless unless the litigation succeeded; and that, accordingly, his ability to         **\*16**            borrow to finance his personal expenditure and other investments was increasingly constrained: the longer the litigation continued, the more the need for it to succeed increased while his creditworthiness decreased.

As to diminution in value of the plaintiff's pension/majority shareholding in Westway Homes Ltd, this claim is primarily related to loss of pension rights. The plaintiff has suffered a loss that is separate from the company's and that would not have been recompensed even if the company had achieved a 100% recovery in its action.

As to loss of the 12.5% shareholding in Westway Homes Ltd, this loss is the plaintiff's and from its nature could not be the company's. Additional tax liability is again in its very nature a loss suffered by the plaintiff.

      The true ratio of         and         is in each case that no separate duty was owed to the shareholder. The decision in         is explicable on the basis that no actionable duty was owed to the shareholders in respect of the loss in question: see p 263.         is a good statement of the law. There is no difference between English law and the law in New Zealand. No English authority supports the defen-

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C.
313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B.
29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R.
72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001)
98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000
Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

dants' propositions. [Reference was made to ; and .]

In so far as the plaintiff has received indemnification for his losses as a result of the settlement of the company claim, credit will have to be given. The proper way to deal with this, as the judge observed, is to recognise the risks of double recovery and to ensure that appropriate directions are given so as to ensure that the true measure of loss is established.

As to damages for mental distress and anxiety and aggravated damages, the judge and the Court of Appeal were right to allow these heads of damage to proceed.

As to remoteness, this is essentially fact-driven and the facts should be found first.

*Steinfeld QC* replied on the cross-appeal.

Their Lordships took time for consideration. 14 December.LORD BINGHAM OF CORNHILL

My Lords, there are two parties before the House. The first is Mr Johnson, the plaintiff in the action, who appeals against a decision of the Court of Appeal dismissing the action as an abuse of the process of the court. The other is Gore Wood & Co, a firm of solicitors, who cross-appeal against a decision of the Court of Appeal, on a preliminary issue of law, that certain heads of damage pleaded by Mr Johnson should not be struck out as irrecoverable. Both appeal and cross-appeal raise questions of legal principle which your Lordships' House has not, in recent years, had occasion to consider.The facts

Mr Johnson is a businessman who conducted his business affairs through a number of companies. One of his businesses was property development, which he carried on through a company, Westway Homes Ltd ("WWH"), of **\*17** which he was managing director and holder of all but two of the issued shares. For all practical purposes WWH was the corporate embodiment of Mr Johnson.

Acting on behalf of WWH, Mr Johnson instructed Gore Wood & Co ("GW"), through a partner in the firm named Robert Wood, to act as solicitors for WWH in connection with a proposed purchase of land at Burlesdon in Hampshire from a Mr Moores. WWH planned to develop the land, but the project was one of some complexity, since the title of Mr Moores was to some extent doubtful and access to the land was dependent on acquisition of a strip of land owned by a third party. WWH had an option to purchase Mr Moores's land, and WWH instructed GW to serve a notice exercising this option.

Mr Johnson contends that from early April 1987, even before GW was formally instructed to act as solicitor for WWH, Mr Johnson engaged the firm, usually acting through Mr Wood, to advise him personally and act on behalf of certain of his companies in addition to WWH, as a result of which GW and in particular Mr Wood gained a detailed knowledge of his financial affairs and those of the companies concerned. He further contends that GW through Mr Wood knew and intended that advice given to him in connection with any business matter would or might be acted upon by him in relation to the conduct of his business affairs generally, including his personal financial affairs. Since the present proceedings have not progressed beyond determination of the preliminary issues giving rise to this appeal and cross-appeal there has been no detailed investigation of the facts, some of which are in dispute between the parties. But GW accepts that from time to time the firm acted on behalf of Mr Johnson personally and some of his companies other than WWH.

In February 1988 GW served notice exercising WWH's option on Mr Moores's solicitors. Mr Moores and the solicitors acting for him asserted that the notice had not been validly served since it had not been served upon Mr Moores personally. Having obtained the advice of counsel WWH instructed GW to issue proceedings against Mr Moores for specific performance of the contract created by the exercise of the option. This was done in March 1988. An alternative claim was made against Mr Moores's solicitors alleging breach of warranty of authority. GW continued to act for WWH in those proceedings until the end of November 1989. The proceedings came on for trial in the Chancery Division in January 1990, when an order for specific performance was made against Mr Moores and an inquiry into damages ordered. The

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

alternative claim against Mr Moores's solicitors was dismissed. Mr Moores had been legally aided from an early stage of the litigation and now, because of his mental condition, was acting through a guardian ad litem. He appealed against the judge's decision, but his appeal was dismissed by the Court of Appeal on 20 February 1991, although on different grounds.

For reasons outside the control of Mr Johnson or WWH there was further delay before the land was conveyed to WWH. It was April 1992, more than four years after the exercise of the option, before the conveyance was completed. By this time WWH had suffered substantial loss because of the cost of the Chancery proceedings, the inability of WWH to recover damages and costs from Mr Moores, who had no assets save for the balance of the purchase price of the Burlesdon land, the collapse of the property market **\*18** and the high interest charges borne by WWH. On 8 January 1991 WWH started proceedings for professional negligence against GW. In those proceedings GW admitted that it had owed WWH a duty to exercise reasonable care in connection with the exercise of the option, but denied that that duty had been broken or that the damages claimed were recoverable. WWH applied for summary judgment. This application succeeded at first instance but failed on appeal. WWH was now in serious financial difficulty.

WWH's action against GW came to trial before a deputy judge on 26 October 1992. The hearing was estimated to last 10 to 12 days. This estimate was greatly exceeded. In the sixth week of trial, the company's evidence on liability had been completed and Mr Wood was in the course of giving evidence for GW when the action was compromised upon payment by GW to WWH of £1,480,000, which represented a very substantial proportion of the sum claimed by WWH, and costs in the agreed sum of £320,000.

Mr Johnson claims that because he had retained GW to advise and act for him personally as well as for WWH, the firm owed him as well as WWH a duty of care in contract and tort in relation to the exercise of the option, the advice which Mr Johnson contends was given to him personally as well as to WWH concerning the prospects of success in and the likely du-

ration of the Chancery proceedings and the conduct of the Chancery proceedings. He claims that GW breached that duty and so caused him substantial loss. Whether GW owed Mr Johnson personally such a duty and whether (if so) it breached that duty will be live issues in this action if it proceeds. But for purposes of the issues now before the House, GW accepts that the facts pleaded by Mr Johnson are capable of supporting his case on these issues if established at trial.

Mr Johnson did not initiate proceedings to enforce any personal claims against GW at the time when WWH began its action against the firm. In an affidavit sworn on 6 March 1998 he deposed to his reasons for not doing so at that stage. His reasons were: (1) that he was in no position to bring a personal claim against GW until he was granted full legal aid in October 1992, his previous certificate having been limited; (2) that advancing his personal claims would have substantially delayed the progress and ultimate resolution of WWH's action against GW, which would have led to WWH going into liquidation before the trial of its action; (3) that the financial resources of both Mr Johnson and WWH had been exhausted by this litigation, said to have been caused by GW's negligence; (4) that joining the personal claim to WWH's claims would have led to an adjournment of the October 1992 trial date fixed for WWH's action; (5) that the more complicated nature of Mr Johnson's personal claims would have had an adverse effect on the costly and time-consuming work required to prepare WWH's case for trial; and (6) that the time which Mr Johnson could devote to the conduct of litigation was restricted by his need, from June 1991, to find new employment. GW does not deny that these were the reasons which led Mr Johnson not to proceed personally at that time, but does not accept that they provided valid or reasonable grounds for not doing so.

On 17 January 1991, well before WWH's action came to trial, solicitors representing that company notified the solicitors for GW that Mr Johnson had a personal claim against the firm which he would pursue in due course. No details of the claim were given. On 6 December 1991 solicitors **\*19** representing Mr Johnson informed GW that he had received a legal aid certificate to take proceed-

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

ings against the firm for damages for negligence. The letter, couched in general terms, contended that GW had owed a duty to Mr Johnson personally as well as to WWH. While making no admission, GW's insurers in January 1992 invited Mr Johnson's solicitors to give full details of the quantum of his personal claim. Mr Johnson's solicitors replied in February 1992, outlining certain heads of claim and giving estimates in round figures of claims approaching £2m. In October 1992, on the eve of trial of WWH's action against GW, Mr Johnson's solicitors wrote to GW's solicitors, referring to his legal aid certificate and giving notice that his personal claim would be pursued whether the company's claim culminated in judgment or settlement. Since a substantial payment into court had been made on behalf of GW, Mr Johnson and WWH expected a favourable outcome of the company's action. On 19 November 1992, when trial of the company's action against GW was well advanced, Mr Pugh (a solicitor representing Mr Johnson) spoke to Mrs MacLennan (the solicitor representing GW) on the telephone and discussed Mr Johnson's personal claim: Mr Pugh said that it had been thought better to wait until the company's claim had been concluded before dealing with the personal claim; Mrs MacLennan asked whether Mr Pugh would object to an overall settlement of the company's claim and Mr Johnson's personal claim; he said that he would have to take instructions but could not himself see any objections "provided the figures were all right." He gave her a rough idea of the heads of claim and the figures. Mr Johnson instructed Mr Pugh that he would not be adverse to an overall settlement provided it was reasonably satisfactory. Mrs MacLennan indicated that GW (or its insurers) also were not adverse to an overall settlement if the figures could be agreed. On 1 December 1992 Mr Pugh met Mrs MacLennan at court to try to negotiate a settlement of his personal claim. His attendance note of this meeting read:

"She mentioned an overall cap and said that she could not settle for more. I said that John Johnson's claim was a separate one and she said that so far as it was not related to the actual company's claim it might well be different. After some discussion it was agreed that so far as his claim as shareholder and only relating to a loss of dividends income and capital distribution there would be a cap at a figure to be agreed.

This would not affect all the other claims on the list as previously discussed. Mrs McClenan [sic] reiterated her previous view but said it would be a separate claim and it would really be a matter for separate negotiation in due course. A cap was agreed at £250,000 excluding interest and costs."

The settlement agreement made between WWH and GW on 2 December 1992 was signed by solicitors for both sides; the solicitors representing WWH also, for this purpose, represented Mr Johnson.

By the settlement agreement GW agreed to pay the sums already mentioned with no admission of liability, in full and final satisfaction of all claims of WWH against GW and vice versa. The sum of £1m which GW had paid into court was to be paid out to WWH's solicitors. WWH undertook that any of its liabilities personally guaranteed by Mr Johnson would be discharged out of the sums received under the settlement agreement, the object plainly being to limit the quantum of any claim which Mr Johnson **\*20** might thereafter make personally. Clause 3 of the settlement agreement provided:

"Mr Johnson undertakes that the amount of any claim made by him personally in any action against [GW] in respect of any losses suffered by him by reason of loss of income, dividends or capital distribution in respect of his position as a shareholder of [WWH] will not exceed £250,000 not including interest accruing in respect of any period after the date of this agreement nor costs. This undertaking does not limit any other of Mr Johnson's rights against [GW]." A confidentiality clause in the agreement contained an exception "In connection with any action which Mr Johnson may bring against [GW]."

Mr Johnson issued his writ in the present proceedings against GW on 7 April 1993. Over the next 4 1/2 years the parties pleaded and repleaded their respective cases. A payment into court was made by GW. Witness statements were exchanged. Mr Johnson served his accountancy evidence. On 20 November 1997 the action was fixed for trial in January 1999. On 3 December 1997 GW's solicitors inti-

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript (Cite as: [2002] 2 A.C. 1)

mated, for the first time, that it intended to apply to strike out the action as an abuse of the process of the court. Notice was also given that GW would seek the determination of preliminary issues whether it had owed Mr Johnson a duty of care and whether the damages which he claimed were in principle recoverable on the facts pleaded. On 25 February 1998 it was ordered that preliminary issues be tried, the second of which was:

"to what extent (if at all) on the basis of and assuming the truth of the facts pleaded as set out above are any of the heads of damage pleaded in paragraphs 23 and 24 of the re-amended statement of claim irrecoverable as a matter of law by [Mr Johnson] by way of damages for the pleaded breaches of the duties owed to him."

In paragraph 6 of his re-amended statement of claim Mr Johnson pleaded an implied term of his personal retainer of GW that it would exercise all due skill and care in execution of that retainer, and a like duty of care in tort. In paragraph 9 it was pleaded:

"Without prejudice to the generality of paragraph 6 above it was the duty of [GW], in carrying out its retainer on behalf of [Mr Johnson] in accordance with the implied term pleaded in the said paragraph, or alternatively in discharging its duty of care in tort owed to [Mr Johnson], to (a) exercise all due skill and care in connection with the exercise of the said option to purchase land and/or any further steps which were necessary to obtain possession of the land; (b) advise [Mr Johnson] fully and accurately of all developments in connection with the exercise of the said option which might affect the financial requirements and prospects of [WWH]; (c) advise [Mr Johnson] of the implications of such developments for his personal financial situation and other business projects, including his existing liabilities and new financial commitments contemplated; (d) advise and/or warn [Mr Johnson] fully and accurately of any delay or difficulty in exercising the said option to purchase land, which might adversely affect [Mr Johnson's] personal financial situation and other business projects, including his existing liabilities **\*21** and new financial commitments contemplated; (e) advise and/or warn

[Mr Johnson] fully and accurately of the implications of any advice given or steps taken by [GW] on behalf of [WWH] which might adversely affect [Mr Johnson's] personal financial situation and other business projects."

In paragraph 12 it was pleaded that GW had acted in breach of the terms pleaded in paragraphs 6 and 9 in connection with the exercise of WWH's option to purchase the Burlesdon land, and in paragraph 16 it was pleaded that between February 1988 and November 1989 GW had acted negligently or in breach of the implied terms of its retainer pleaded in paragraphs 6 and 9 in advising Mr Johnson from time to time as to the likely duration and outcome of the earlier proceedings against Moores. The claims for damages made by Mr Johnson in paragraphs 23 and 24 of his re-amended statement of claim are the subject of detailed consideration below.

The preliminary issues came for hearing at first instance before Pumfrey J who, in a careful judgment delivered on 21 May 1998, resolved them in favour of Mr Johnson. On the abuse issue he found that GW was estopped by convention from contending that the action was an abuse. Applying he concluded:

"that in reaching the settlement, [GW] and Mr Johnson did act on the common assumption that the personal claim would be made, and would be entertained by the court. I think that it is now unconscionable for [GW] to allege that the personal claim is an abuse of process in the light of ." He resolved the duty issue in favour of Mr Johnson. He concluded that the heads of damage claimed by Mr Johnson were not irrecoverable as a matter of law as damages for the breaches alleged by Mr Johnson.

GW appealed. In a judgment of the court (Nourse, Ward and Mantell LJJ) given on 12 November 1998, the Court of Appeal agreed with the judge that on the facts pleaded a duty of care had arguably been owed by GW to Mr Johnson. The Court of Appeal shared the judge's view on the difficulty of the damage issue but agreed with his conclusion that the pleaded heads of damage were arguably recoverable, save as to one

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C.
313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B.
29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R.
72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001)
98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000
Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

head of damage which it would have struck out.

The Court of Appeal held, differing from the judge, that there had been no estoppel by convention. But it also held that there had been an abuse under the rule in                . It said:

"Mr ter Haar submits that the rule has no application because different issues arise in the two sets of proceedings. In this action there are entirely new questions about the extent of the duty owed to the plaintiff personally and the losses he has suffered. On the other hand, there was in our view a substantial similarity, particularly as to whether or not [GW's] conduct as solicitors fell below the required standard in connection with the exercise of the option and the conduct of the Chancery litigation [against Mr Moores] as well as the overlapping loss suffered by the company. This encompasses practically the whole of the ground traversed for six weeks in the company action. In our judgment, narrowly to circumscribe the application of the rule would defeat its purpose. Mr Johnson was the alter ego of the company: he controlled the          **\*22**          company's decisions and through him the company's claim was brought. Within days after that writ was issued, he was intimating his personal claim. He could have brought it then. Although his legal aid was then limited in some way which is not clear to us, no explanation has been given for the delay in removing whatever limitations had been imposed and he had full cover by October, long before the trial. For reasons which appeared good to him, he preferred not to delay the company action but to pursue it vigorously before the company was forced into liquidation. That does not, in our judgment, excuse him from failing to launch his own claims. If he could have done so, he should have done so."          Abuse of process

The rule of law depends upon the existence and availability of courts and tribunals to which citizens may resort for the determination of differences between them which they cannot otherwise resolve. Litigants are not without scrupulous examination of all the circumstances to be denied the right to bring a genuine subject of litigation before the court:          , 590 per Lord Kilbrandon, giving the advice of the Judicial Committee;          , 425 per Lord Wilberforce, giving

the advice of the Judicial Committee). This does not however mean that the court must hear in full and rule on the merits of any claim or defence which a party to litigation may choose to put forward. For there is, as Lord Diplock said at the outset of his speech in          , 536, an

"inherent power which any court of justice must possess to prevent misuse of its procedure in a way which, although not inconsistent with the literal application of its procedural rules, would nevertheless be manifestly unfair to a party to litigation before it, or would otherwise bring the administration of justice into disrepute among right-thinking people. The circumstances in which abuse of process can arise are very varied; those which give rise to the instant appeal must surely be unique. It would, in my view, be most unwise if this House were to use this occasion to say anything that might be taken as limiting to fixed categories the kinds of circumstances in which the court has a duty (I disavow the word discretion) to exercise this salutary power." One manifestation of this power was to be found in          which empowered the court, at any stage of the proceedings, to strike out any pleading which disclosed no reasonable cause of action or defence, or which was scandalous, frivolous or vexatious, or which was otherwise an abuse of the process of the court. A similar power is now to be found in          .

GW contends that Mr Johnson has abused the process of the court by bringing an action against it in his own name and for his own benefit when such an action could and should have been brought, if at all, as part of or at the same time as the action brought against the firm by WWH. The allegations of negligence and breach of duty made against the firm by WWH in that action were, it is argued, essentially those upon which Mr Johnson now relies. The oral and documentary evidence relating to each **\*23**          action is substantially the same. To litigate these matters in separate actions on different occasions is, GW contends, to duplicate the cost and use of court time involved, to prolong the time before the matter is finally resolved, to subject GW to avoidable harassment and to mount a collateral attack on the outcome of the earlier action, settled by GW on the basis that liability was not admitted.

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

This form of abuse of process has in recent years been taken to be that described by Sir James Wigram V-C in                , 114-115:

"In trying this question, I believe I state the rule of the court correctly, when I say, that where a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdiction, the court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of res judicata applies, except in special cases, not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time."           Thus the abuse in question need not involve the reopening of a matter already decided in proceedings between the same parties, as where a party is estopped in law from seeking to relitigate a cause of action or an issue already decided in earlier proceedings, but, as Somervell LJ put it in           , 257, may cover

"issues or facts which are so clearly part of the subject-matter of the litigation and so clearly could have been raised that it would be an abuse of the process of the court to allow a new proceeding to be started in respect of them."

A series of cases, mostly in recent years, has explored this form of abuse. Reference need not be made to all of them. In the           case abuse was found where a claimant who had unsuccessfully sued a bank on one ground brought a further action against the same bank and another party on a different ground shortly thereafter. Giving the advice of the Judicial Committee of the Privy Council, Lord Kilbrandon said, at pp 589-590:

"The second question depends on the application of a doctrine of estoppel, namely res judicata. Their Lordships agree with the view expressed by McMullin J that the true doctrine in its narrower sense cannot be discerned in the present series of actions, since there has not been, in the decision in no 969, any formal repudiation of the pleas raised by the appellant in no 534. Nor was Choi Kee, a party to no 534, a party to no 969. But there is a wider sense in which the doctrine may be appealed to, so that it becomes an abuse of process to raise in subsequent proceedings matters which could and therefore should have been litigated in earlier proceedings."**\*24**

In           the Privy Council expressly endorsed Somervell LJ's reference to abuse of process and observed, at p 425:

"This is the true basis of the doctrine and it ought only to be applied when the facts are such as to amount to an abuse: otherwise there is a danger of a party being shut out from bringing forward a genuine subject of litigation." In           , in which           was not cited, the plaintiff sought to challenge in civil proceedings a decision in a criminal case against which he had not appealed on the ground which he sought to raise in the civil proceedings. The proceedings were struck out.

In           the appellant, who had failed in English proceedings to annul her marriage, had succeeded in doing so in Belgium on different grounds and sought recognition in England of the Belgian decree. Lord Hailsham of St Marylebone LC, at p 157, described the rule in           as "both a rule of public policy and an application of the law of res judicata" and said of it:

"           whatever           the           limits of           (which I regard as a sound rule in ordinary civil litigation) may ultimately turn out to be, I believe that it must apply to a case like the present, where the petitioner in the first proceedings not merely does not rely on the grounds then already in theory available to her, but deliberately conceals the real facts (on which she now relies) from the court in order to put forward a bogus case which is radically inconsistent with them."

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

involved an attempt to reopen issues which had been decided adversely to the appellant's contentions in rulings which, although not formally binding on her, had been given in sample cases selected from a group of claims of which hers had been one. The Court of Appeal held that it was not in the interests of justice to allow her to pursue her claim. Reliance was placed on              in which Kerr LJ said, at p 137:

"To take the authorities first, it is clear that an attempt to relitigate in another action issues which have been fully investigated and decided in a former action        *may*        constitute an abuse of process, quite apart from any question of        res judicata        or issue estoppel on the ground that the parties or their privies are the same. It would be wrong to attempt to categorise the situations in which such a conclusion would be appropriate."

In              the plaintiffs sued three defendants in England to enforce a judgment which they had obtained against those defendants in Ireland. The defendants pleaded in defence that the Irish judgment had been obtained by fraud. That was a contention which two of the defendants, but not the third (a Mr McLeod), had raised in Irish proceedings to set aside the judgment, but the allegation had been dismissed by Egan J. Summary judgment was given against the three defendants in England but Mr McLeod appealed against that judgment. The Court of Appeal held that Mr McLeod, like the other **\*25** defendants, was estopped from mounting what was in effect a collateral challenge to the decision of Egan J. It also held that Mr McLeod's defence was an abuse of process. Stuart-Smith LJ said, at p 255:

"The question is whether it would be in the interests of justice and public policy to allow the issue of fraud to be litigated again in this court, it having been tried and determined by Egan J in Ireland. In my judgment it would not; indeed, I think it would be a travesty of justice. Not only would the plaintiffs be required to relitigate matters which have twice been extensively investigated and decided in their favour in the natural

forum, but it would run the risk of inconsistent verdicts being reached, not only as between the English and Irish courts, but as between the defendants themselves. The Waites have not appealed Sir Peter Pain's judgment, and they were quite right not to do so. The plaintiffs will no doubt proceed to execute their judgment against them. What could be a greater source of injustice, if in years to come, when the issue is finally decided, a different decision is in Mr McLeod's case reached? Public policy requires that there should be an end of litigation and that a litigant should not be vexed more than once in the same cause."

was a case of issue estoppel. Tenants invited the court to construe the terms of a rent review provision in the sub-underlease under which they held premises. The provision had been construed in a sense adverse to them in earlier proceedings before Walton J, but they had been unable to challenge his decision on appeal. Later cases threw doubt on his construction. The question was whether the rules governing issue estoppel were subject to exceptions which would permit the matter to be reopened. The House held that they were. Lord Keith of Kinkel said, at p 109:

"In my opinion your Lordships should affirm it to be the law that there may be an exception to issue estoppel in the special circumstance that there has become available to a party further material relevant to the correct determination of a point involved in the earlier proceedings, whether or not that point was specifically raised and decided, being material which could not by reasonable diligence have been adduced in those proceedings. One of the purposes of estoppel being to work justice between the parties, it is open to courts to recognise that in special circumstances inflexible application of it may have the opposite result, as was observed by Lord Upjohn in the passage which I have quoted above from his speech in              , 947."              In the passage referred to Lord Upjohn had said:

"All estoppels are not odious but must be applied so as to work justice and not injustice and I think the principle of issue estoppel must be applied to the circumstances of the subsequent case with this overriding consideration in mind."

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript (Cite as: [2002] 2 A.C. 1)

arose out of a motor accident in which both the driver and his passenger were severely injured. The passenger sued the driver. The driver's insurers, without notice to the driver, made a third party claim against the Berkshire County Council, **\*26** claiming contribution as between joint tort-feasors but including no claim for the driver's own injuries. Not until after the expiry of the limitation period for bringing a personal claim did the driver learn of the third party claim against the county council. At trial, the passenger succeeded in full, damages being apportioned between the driver and the county council. The driver then sued the county council to recover damages for his own injuries. On the trial of preliminary issues, the judge held that the driver was prima facie estopped from bringing the action but that there were special circumstances which enabled the court to permit the action to be pursued. The county council successfully challenged that conclusion on appeal. Stuart-Smith LJ said, at p 298:

"There can be no doubt that the [driver's] personal injury claim could have been brought at the time of [the passenger's] action. It could have been included in the original third party notice issued against the council (                    ); it could have been started by a separate writ and consolidated with or ordered to be tried with [the passenger's] action:                    . The third party proceedings could have been amended at any time before trial and perhaps even during the trial to include such a claim, notwithstanding that it was statute-barred, since it arose out of the same or substantially the same facts as the cause of action in respect of which relief was already claimed, namely, contribution or indemnity in respect of [the passenger's] claim:                    . In my opinion, if it was to be pursued, it should have been so brought." Stuart-Smith LJ considered that the insurers' solicitors appeared to have been negligent but that the claim against the county council should be struck out unless there were special circumstances, and concluded that there were not. With his conclusions Mann and Nourse LJJ agreed. Since the driver's claim against the county council was held by the judge to be statute-barred, a claim against the solicitors may have offered the driver his

only hope of recovery.

The plaintiff in                    lived in the house of which her mother was tenant. She suffered from Down's syndrome and claimed in this action to have suffered personal injury caused by the negligence and breach of statutory duty of the borough council as housing authority. Her mother had previously made a similar claim which had been the subject of a consent order in the county court. The borough council applied to set aside a judgment entered in the plaintiff's favour in default of defence and to strike out the claim on the ground that the plaintiff's action was an abuse of the process of the court. Reliance was placed in particular on                    and                    . This argument was accepted by the judge, who held that the plaintiff's action should have been advanced at the same time as her mother's, the more so as the plaintiff was dependent on her mother. The plaintiff's appeal against this decision succeeded. Simon Brown LJ said, at pp 794-795:

"I therefore reject entirely the submission that                    justifies extending the                    principle—that an unlitigated monetary claim is barred if it could have been advanced and established in earlier proceedings (itself **\*27**                    to my mind an extended application of the res judicata doctrine)—to those not themselves party to the earlier proceedings.

"It follows from all this that in my judgment the doctrine of res judicata even in its widest sense has simply no application to the circumstances of the present case and that the judge erred in ruling to the contrary. One does not, therefore, reach the point of asking here whether special circumstances exist to exclude it; C's erstwhile solicitors' suggested negligence is, frankly, an irrelevance. Nor, in my judgment, does this case come within measurable distance of any other form of abuse of process based on public policy considerations analogous to those underlying the res judicata doctrine: see, for instance, the Court of Appeal's decision in                    .

"All that said, this judgment should not be taken as

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

any encouragement to lawyers or their clients to follow the course in fact adopted here. As the judge rightly recognised, in circumstances such as these, it is plainly in the public interest to have a single action in which the claims of all the affected members of the household are included rather than a multiplicity of actions ..."

was one of the flood of cases which arose out of losses in the Lloyd's insurance market. Mr Barrow was a member of an action group which had successfully sued a number of members' agents for negligent underwriting. Having substantially succeeded, but recovered only a proportion of the damages he had claimed, Mr Barrow issued fresh proceedings against his members' agent on a different ground. It was clear that this claim, even if made earlier, would not have been tried at the same time as the earlier action, since the scheduling of cases was the subject of detailed management by the Commercial Court. The members' agent contended that to bring this further claim, not raised at the time of the earlier proceedings, was an abuse. In the Court of Appeal it was said, at p 260:

"The rule in                  is very well known. It requires the parties, when a matter becomes the subject of litigation between them in a court of competent jurisdiction, to bring their whole case before the court so that all aspects of it may be finally decided (subject, of course, to any appeal) once and for all. In the absence of special circumstances, the parties cannot return to the court to advance arguments, claims or defences which they could have put forward for decision on the first occasion but failed to raise. The rule is not based on the doctrine of res judicata in a narrow sense, nor even on any strict doctrine of issue or cause of action estoppel. It is a rule of public policy based on the desirability, in the general interest as well as that of the parties themselves, that litigation should not drag on for ever and that a defendant should not be oppressed by successive suits when one would do. That is the abuse at which the rule is directed."

The rule was described, at p 263, as a salutary one, and the court suggested that its application should not be circumscribed by unnecessarily restrictive rules. On the facts it was held that the procedure adopted by Mr Barrow was not an abuse. The court also held that if, contrary to its opinion, the case did fall within the mischief at which      **\*28** was directed, there were special circumstances which justified non-application of the rule.

In                  , the plaintiff had sued administrative receivers of a company of which he had been managing director and principal shareholder in a 1990 action which culminated in a judgment adverse to him in 1993. There were other proceedings leading to other judgments, also given in 1993, relating to certain of the same issues: proceedings to disqualify the plaintiff as a director, in which findings adverse to him were made; and summonses issued in the liquidation of the company, when the court refused to allow issues which had been decided in the disqualification proceedings to be re-litigated. In 1994 the plaintiff issued a further writ making claims against the administrative receivers and others. His proceedings against the administrative receivers were struck out on the ground that these claims should have been raised, if at all, in the 1990 action. This decision was upheld by the Court of Appeal. Giving the leading judgment May LJ said, at pp 387-388:

"In my view, the use in this context of the phrase 'res judicata' is perhaps unhelpful, and this not only because it is Latin. We are not concerned with cases where a court has decided the matter; but rather cases where the court has not decided the matter, but where in a (usually late) succeeding action someone wants to bring a claim which should have been brought, if at all, in earlier concluded proceedings. If in all the circumstances the bringing of the claim in the succeeding action is an abuse, the court will strike it out unless there are special circumstances. To find that there are special circumstances may, for practical purposes, be the same thing as deciding that there is no abuse, as Sir Thomas Bingham MR came close to holding on the facts in          . The bringing of a claim which could have been brought in earlier proceedings may not be an abuse. It may in particular cases be sensible to advance cases separately. It depends on all the circumstances of each case. Once the court's consideration is directed clearly towards the question of abuse, it will be seen that the passage from Sir James Wigram V-C's judgment in                  is a full modern statement of

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C.
313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B.
29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R.
72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001)
98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000
Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

the law so long as it is not picked over semantically
as if it were a tax statute.

"The extent of any coincidence of causes of action,
facts or even the capacities in which parties are sued,
though relevant, will not necessarily determine the
outcome."          May LJ continued, at pp 388-
389:

"[Counsel for Mr Manson] submits that the kind of
abuse of process relied on by the first defendant in
this appeal is to be narrowly confined and precisely
defined so that legitimate claims are not stifled and so
that potential litigants know where they stand. Oth-
erwise they may be driven to include in one proceed-
ings related but distinct claims which might sensibly
be left for later consideration. The law should not
thus encourage premature litigation which may prove
unnecessary. He further submits that delay is the sub-
ject of the law of limitation and should not feature
additionally as an element of abuse.**\*29**

          "It is of course axiomatic that the court
will only strike out a claim as an abuse after most
careful consideration. But the court has to balance a
plaintiff's right to bring before the court genuine and
legitimate claims with a defendant's right to be pro-
tected from being harassed by multiple proceedings
where one should have sufficed. Abuse of process is
a concept which defies precise definition in the ab-
stract. In particular cases, the court has to decide
whether there is abuse sufficiently serious to justify
preventing the offending litigant from proceeding. In
cases such as the present, the abuse is sufficiently
defined in                          which itself is en-
capsulated in the proposition that the litigant could
and should have raised the matter in question in earli-
er concluded proceedings. Special circumstances may
negative or excuse what otherwise would be an
abuse. But there may in particular cases be elements
of abuse additional to the mere fact that the matter
could and should have been raised in the earlier pro-
ceedings."          May LJ added, at p
389:

"Mr Manson relies on special circumstances to nega-
tive or excuse the abuse. He says that the scope of the
1990 action was limited because he had legal ex-

penses insurance for that action which only covered
some of his claims and that the insurers were not pre-
pared to support the claims which he now wants to
bring. Although this may be an explanation, in my
view it does not excuse the abuse nor does it amount
to special circumstances. It is commonplace for liti-
gants to have difficulties in affording the cost of liti-
gation. But lack of means cannot stand as an excuse
for abuse of process."

          Last    in    this    series    of    cases
comes                          , a decision later in time than
the Court of Appeal's judgment in the present case
but given by two of the same Lords Justices. Mr Sed-
don had made an investment on the advice of an ac-
countant, Mr Hancock, which he had financed by
taking a mortgage loan from the Bradford and Bing-
ley Building Society. The investment failed. Mr Sed-
don claimed damages or an indemnity against Mr
Hancock, who admitted liability to indemnify Mr
Seddon to the extent of about 75% of Mr Seddon's
claim. Judgment was entered in Mr Seddon's favour
for this admitted sum and Mr Hancock was given
leave to defend as to the balance. Mr Seddon was
unable to enforce his judgment as Mr Hancock had
no money, and the residual claim was not pursued.
The building society then proceeded against Mr Sed-
don to enforce the debt owed to it under the mortgage
loan. Mr Seddon sought to join as third parties Mr
Hancock, in order to pursue the residual claim, and
two of his partners, Mr Seddon's contention being
that the advice tended to him had been given by the
firm to which Mr Hancock and his partners belonged.
An application to strike out the third party claim was
upheld by the judge and Mr Seddon appealed. In the
course of a judgment with which Nourse and Ward
LJJ agreed, Auld LJ said, at pp 1490-1491:

          "In my judgment, it is important to distin-
guish clearly between res judicata and abuse of
process not qualifying as res judicata, a distinction
delayed by the blurring of the two in the courts' sub-
sequent application of the above dictum [of Sir James
Wigram V-C in          **\*30**                          . The
former, in its cause of action estoppel form, is an
absolute bar to relitigation, and in its issue estoppel
form also, save in 'special cases' or 'special circums-
tances': see                          , 197-198, per Dip-
lock LJ, and                          . The latter, which

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

may arise where there is no cause of action or issue estoppel, is not subject to the same test, the task of the court being to draw the balance between the competing claims of one party to put his case before the court and of the other not to be unjustly hounded given the earlier history of the matter ...

"Thus, abuse of process may arise where there has been no earlier decision capable of amounting to res judicata (either or both because the parties or the issues are different) for example, where liability between new parties and/or determination of new issues should have been resolved in the earlier proceedings. It may also arise where there is such an inconsistency between the two that it would be unjust to permit the later one to continue."          Auld LJ continued, at pp 1492-1493:

"In my judgment mere 're'-litigation, in circumstances not giving rise to cause of action or issue estoppel, does not necessarily give rise to abuse of process. Equally, the maintenance of a second claim which could have been part of an earlier one, or which conflicts with an earlier one, should not, per se, be regarded as an abuse of process. Rules of such rigidity would be to deny its very concept and purpose. As Kerr LJ and Sir David Cairns emphasised in          , 137, 138-139 respectively, the courts should not attempt to define or categorise fully what may amount to an abuse of process; see also per Stuart-Smith LJ in          , 352. Sir Thomas Bingham MR underlined this in          , stating, at p 263b, that the doctrine should not be 'circumscribed by unnecessarily restrictive rules' since its purpose was the prevention of abuse and it should not endanger the maintenance of genuine claims; see also per Saville LJ, at p 266d-e.

"Some additional element is required, such as a collateral attack on a previous decision (see e g          ;          , per Kerr LJ and Sir David Cairns, at pp 137 and 139 respectively, and          ), some dishonesty (see e g per Stephenson LJ in          case, at p 139, and Potter LJ in          , 480 and 481; or successive actions amounting to unjust harassment (see e g          ...))."          The

Court of Appeal held that Mr Seddon's third party proceedings were not an abuse of process, and the appeal succeeded.

It may very well be, as has been convincingly argued (Watt, "The Danger and Deceit of the Rule in          : A new approach to successive civil actions arising from the same factual matter"          ), that what is now taken to be the rule in          has diverged from the ruling which Wigram V-C made, which was addressed to          **\*31**          res judicata. But          abuse of process, as now understood, although separate and distinct from cause of action estoppel and issue estoppel, has much in common with them. The underlying public interest is the same: that there should be finality in litigation and that a party should not be twice vexed in the same matter. This public interest is reinforced by the current emphasis on efficiency and economy in the conduct of litigation, in the interests of the parties and the public as a whole. The bringing of a claim or the raising of a defence in later proceedings may, without more, amount to abuse if the court is satisfied (the onus being on the party alleging abuse) that the claim or defence should have been raised in the earlier proceedings if it was to be raised at all. I would not accept that it is necessary, before abuse may be found, to identify any additional element such as a collateral attack on a previous decision or some dishonesty, but where those elements are present the later proceedings will be much more obviously abusive, and there will rarely be a finding of abuse unless the later proceeding involves what the court regards as unjust harassment of a party. It is, however, wrong to hold that because a matter could have been raised in earlier proceedings it should have been, so as to render the raising of it in later proceedings necessarily abusive. That is to adopt too dogmatic an approach to what should in my opinion be a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before. As one cannot comprehensively list all possible forms of abuse, so one cannot formulate any hard and fast rule to determine

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

whether, on given facts, abuse is to be found or not. Thus while I would accept that lack of funds would not ordinarily excuse a failure to raise in earlier proceedings an issue which could and should have been raised then, I would not regard it as necessarily irrelevant, particularly if it appears that the lack of funds has been caused by the party against whom it is sought to claim. While the result may often be the same, it is in my view preferable to ask whether in all the circumstances a party's conduct is an abuse than to ask whether the conduct is an abuse and then, if it is, to ask whether the abuse is excused or justified by special circumstances. Properly applied, and whatever the legitimacy of its descent, the rule has in my view a valuable part to play in protecting the interests of justice.

Mr ter Haar, for Mr Johnson, submitted (as the judge had held) that GW was estopped by convention from contending that the bringing of an action to enforce his personal claims was an abuse of process. In resisting GW's complaint of abuse, Mr ter Haar relied, as he did in the courts below, on three features of this case in particular. The first was the acute financial predicament in which Mr Johnson personally and WWH found themselves as a result, as Mr Johnson alleges, of GW's negligence. The burden of financing the continuing operation of WWH, and of its very expensive litigation against GW, fell on him. His means was stretched to the utmost. The only hope of financial salvation lay in an early and favourable outcome to the company's claim against GW. Mr Johnson did not have a full legal aid certificate to pursue a personal claim. In any event, the addition of a personal claim would have complicated and delayed the trial of the company's claim, which might well have jeopardised the company's **\*32** survival. Secondly, Mr ter Haar relied on the conduct of the parties after the settlement agreement was made (if, contrary to his earlier submission, there was no estoppel by convention). He pointed out that 4½ years elapsed from the issue of Mr Johnson's writ in this action before GW first intimated their intention to apply to strike out the proceedings as an abuse of the court's process, during which period pleadings and evidence were exchanged, considerable costs were incurred, a substantial payment into court was made and a trial date fixed. This procedural history, he submitted, was evidence of the expectation of the parties at the time when the company's action was settled, and was in itself ground for rejecting GW's application: , 5. Thirdly, Mr ter Haar submitted that, to the extent that issues litigated in the company's action were to be relitigated in this action, it was because GW had insisted on this and rejected the invitation of Mr Johnson to treat the evidence given in the earlier action as if given in this action.

Two subsidiary arguments were advanced by Mr ter Haar in the courts below and rejected by each. The first was that the rule in did not apply to Mr Johnson since he had not been the plaintiff in the first action against GW. In my judgment this argument was rightly rejected. A formulaic approach to application of the rule would be mistaken. WWH was the corporate embodiment of Mr Johnson. He made decisions and gave instructions on its behalf. If he had wished to include his personal claim in the company's action, or to issue proceedings in tandem with those of the company, he had power to do so. The correct approach is that formulated by Sir Robert Megarry V-C in where he said, at p 515:

"Second, it seems to me that the substratum of the doctrine is that a man ought not to be allowed to litigate a second time what has already been decided between himself and the other party to the litigation. This is in the interest both of the successful party and of the public. But I cannot see that this provides any basis for a successful defendant to say that the successful defence is a bar to the plaintiff suing some third party, or for that third party to say that the successful defence prevents the plaintiff from suing him, unless there is a sufficient degree of identity between the successful defendant and the third party. I do not say that one must be the alter ego of the other: but it does seem to me that, having due regard to the subject matter of the dispute, there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was party should be binding in proceedings to which the other is party. It is in that sense that I would regard the phrase 'privity of interest.' " On the present facts that test was clearly satisfied.

The second subsidiary argument was that the rule in did not apply to Mr Johnson

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C.
313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B.
29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R.
72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001)
98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000
Independent, February 7, 2001 Official Transcript (Cite as: [2002] 2 A.C. 1)

since the first action against GW had culminated in a compromise and not a judgment. This argument also was rightly rejected. An important purpose of the rule is to protect a defendant against the harassment necessarily involved in repeated actions concerning the same subject matter. A second action is not the less harassing because the defendant has been driven or thought it prudent to           *33           settle the first; often, indeed, that outcome would make a second action the more harassing.

On the estoppel by convention issue, Mr Steinfeld for GW submitted that the Court of Appeal had been right and the judge wrong. There had been no common understanding between the parties on the issue of abuse, a topic which had never been raised. There was nothing to suggest that GW had tacitly agreed to forgo any defence properly open to it. Mr Steinfeld further submitted that the present proceedings did amount to an abuse, as the Court of Appeal had rightly held. Mr Johnson could have advanced his personal claim at the same time as the company's claim and therefore should have done so. The consequence of his not doing so was to expose GW to the harassment of further proceedings canvassing many of the same issues as had been canvassed in the earlier action, with consequential waste of time and money and detriment to other court users. The facts relied on to excuse his earlier inaction were not accepted. He should have sought a full legal aid certificate earlier. He could not rely on lack of means. Any loss caused to Mr Johnson by GW's delay in applying to strike out could be compensated in costs.

          Neither party challenged the correctness in principle of Lord Denning MR's statement in           , 122 which, despite its familiarity, I quote:

"The doctrine of estoppel is one of the most flexible and useful in the armoury of the law. But it has become overloaded with cases. That is why I have not gone through them all in this judgment. It has evolved during the last 150 years in a sequence of separate developments: proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory estoppel. At the same time it has been sought to be limited by a series of maxims: estoppel is only a rule of evidence, estoppel cannot give

rise to a cause of action, estoppel cannot do away with the need for consideration, and so forth. All these can now be seen to merge into one general principle shorn of limitations. When the parties to a transaction proceed on the basis of an underlying assumption—either of fact or of law—whether due to misrepresentation or mistake makes no difference—on which they have conducted the dealings between them—neither of them will be allowed to go back on that assumption when it would be unfair or unjust to allow him to do so. If one of them does seek to go back on it, the courts will give the other such remedy as the equity of the case demands."           The question is whether the parties to the settlement of WWH's action (relevantly, Mr Johnson and GW) proceeded on the basis of an underlying assumption that a further proceeding by Mr Johnson would not be an abuse of process and whether, if they did, it would be unfair or unjust to allow GW to go back on that assumption. In my judgment both these conditions were met on the present facts. Mr Johnson was willing in principle to try to negotiate an overall settlement of his and the company's claims but this was not possible in the time available and it was GW's solicitor who said that the personal claim "would be a separate claim and it would really be a matter for separate negotiation in due course". It is noteworthy that Mr Johnson personally was party to the settlement agreement, and that the agreement           *34           contained terms designed to preclude (in one instance) and limit (in another) personal claims by him. Those provisions only made sense on the assumption that Mr Johnson was likely to make a personal claim. GW did not, of course, agree to forgo any defence the firm might have to Mr Johnson's claim if brought, and the documents show that GW's solicitor was alert to issues of remoteness and duplication. Had Mr Johnson delayed unduly before proceeding, a limitation defence would have become available. But an application to strike out for abuse of process is not a defence; it is an objection to an action being brought at all. The terms of the settlement agreement and the exchanges which preceded it in my view point strongly towards acceptance by both parties that it was open to Mr Johnson to issue proceedings to enforce a personal claim, which could then be tried or settled on its merits, and I consider that it would be unjust to permit GW to resile from that assumption.

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

If, contrary to my view, GW is not estopped by convention from seeking to strike out Mr Johnson's action, its failure to take action to strike out over a long period of time is potent evidence not only that the action was not seen as abusive at the time but also that, on the facts, it was not abusive. The indicia of true abuse are not so obscure that an experienced professional party, advised by leading counsel (not, at that stage, Mr Steinfeld), will fail to recognise them. It is accepted that Mr Johnson had reasons which he regarded as compelling to defer prosecution of his personal claim. If, as he contended, the urgency of obtaining an early and favourable decision in the company's action was itself a result of GW's breach of duty to the company and to him, it would seem to me wrong to stigmatise as abusive what was, in practical terms, unavoidable. I agree with GW that it would certainly have been preferable if the judge who tried the company's action, and thereby became familiar with much of the relevant detail and evidence, had been able at the same time or shortly thereafter to rule on the personal claim. That would have been efficient and economical. But there were reasons accepted at least implicitly by both parties at the time for not proceeding in that way, and GW could, if it wishes, limit the extent to which issues extensively canvassed in the earlier action are to be reopened. It is far-fetched to suggest that this action involves a collateral attack on GW's non-admission of liability in the first action when that action was settled by insurers on terms quite inconsistent with any realistic expectation that GW would not be found liable.

In my opinion, based on the facts of this case, the bringing of this action was not an abuse of process. The Court of Appeal adopted too mechanical an approach, giving little or no weight to the considerations which led Mr Johnson to act as he did and failing to weigh the overall balance of justice. I would allow Mr Johnson's appeal.The recoverability of the damages claimed by Mr Johnson

By its notice of cross-appeal GW challenged the Court of Appeal's ruling that all the heads of damage pleaded on behalf of Mr Johnson (with one exception) were or might be recoverable in principle if the pleaded facts were fully proved.

GW's first argument before the House, applicable to all save two of the pleaded heads of damage, was in principle very simple. It was that this damage, if suffered at all, had been suffered by WWH and Mr Johnson, **\*35** being for this purpose no more than a shareholder in the company, could not sue to recover its loss. As the Court of Appeal pointed out in                    , 210:

"A derivative action is an exception to the elementary principle that A cannot, as a general rule, bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C. C is the proper plaintiff because C is the party injured, and, therefore, the person in whom the cause of action is vested."       Here, it was argued, Mr Johnson was seeking to recover damage which had been suffered by WWH.

Mr Johnson's response was equally simple. It was accepted, for purposes of the application to strike out the damages claim, that GW owed a duty to him personally and was in breach of that duty. Therefore, subject to showing that the damage complained of was caused by GW's breach of duty and was not too remote, which depended on the facts established at trial and could not be determined on the pleadings, he was entitled in principle to recover any damage which he had himself suffered as a personal loss separate and distinct from any loss suffered by the company.

On this issue we were referred to a number of authorities       which       included
;                     ;                            ;
;                     ;                            ;
;              ;                  and

These authorities support the following propositions. (1) Where a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss suffered by the company. A claim will not lie by a shareholder to make good a loss which would be

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss. So much is clear from                    , particularly at pp 222-223,                              , particularly at pp 261-262,                    , particularly at pp 266 and 270-271,               and               ,     particularly at pp 726-729. (2) Where a company suffers loss but has no cause of action to sue to recover that loss, the shareholder in the company may sue in respect of it (if the shareholder has a cause of action to do so), even though the loss is a diminution in the value of the shareholding. This is supported by                              ,         195-196, and                      . (3) Where a company suffers loss caused by a breach of duty to it, and a shareholder suffers a loss separate and distinct from that suffered by the company caused by breach of a duty independently owed to the shareholder, each may sue to recover the loss caused to it by breach of the duty owed to it but neither may       **\*36**       recover loss caused to the other by breach of the duty owed to that other. I take this to be the effect of                   , at pp 195-196,                     , particularly at p 262,                , particularly at p 123,           and                 , particularly at p 726. I do not think the observations of Leggatt LJ in                   at p 435b and of the Court of Appeal of New Zealand in               at p 280, lines 25-35, can be reconciled with this statement of principle.

These principles do not resolve the crucial decision which a court must make on a strike-out application, whether on the facts pleaded a shareholder's claim is sustainable in principle, nor the decision which the trial court must make, whether on the facts proved the shareholder's claim should be upheld. On the one hand the court must respect the principle of company autonomy, ensure that the company's creditors are not prejudiced by the action of individual shareholders and ensure that a party does not recover compensation for a loss which another party has suffered. On the other, the court must be astute to ensure that the party who has in fact suffered loss is not arbitrarily denied fair compensation. The problem can be resolved only by close scrutiny of the pleadings at the strike-out stage and all the proven facts at the trial stage: the object is to ascertain whether the loss claimed appears to be or is one which would be made good if the company had enforced its full rights against the party responsible, and whether (to use the language of               , 223) the loss claimed is "merely a reflection of the loss suffered by the company". In some cases the answer will be clear, as where the shareholder claims the loss of dividend or a diminution in the value of a shareholding attributable solely to depletion of the company's assets, or a loss unrelated to the business of the company. In other cases, inevitably, a finer judgment will be called for. At the strike-out stage any reasonable doubt must be resolved in favour of the claimant.

I turn to consider the heads of claim now pleaded by Mr Johnson. (1) Collector Piece Video Ltd and Adfocus Ltd. The claim is for sums which Mr Johnson, acting on GW's advice, invested in these companies and lost. This claim is unobjectionable in principle, as Mr Steinfeld came close to accepting. (2) Cost of personal borrowings: loan capital and interest. The claim is for sums which Mr Johnson claims he was obliged to borrow at punitive rates of interest to fund his personal outgoings and those of his businesses. Both the ingredients and the quantum of this claim will call for close examination, among other things to be sure that it is not a disguised claim for loss of dividend, but it cannot at this stage be struck out as bad on its face. The same is true of Mr Johnson's claims for bank interest and charges and mortgage charges and interest (which will raise obvious questions of remoteness). (3) Diminution in value of Mr Johnson's pension and majority shareholding in WWH. In part this claim relates to payments which the company would have made into a pension fund for Mr Johnson: I think it plain that this claim is merely a reflection of the company's loss and I would strike it out. In part the claim relates to enhancement of the value of Mr Johnson's pension if the payments had been duly made. I do not regard this part of the claim as objectionable in principle. An alternative claim, based on the supposition that the company would not have made the pension payments, that its assets would thereby have been increased and that the value of Mr Johnson's shareholding would thereby have been enhanced,        **\*37** is also a reflection of the company's loss and

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

I would strike it out. (4) Loss of 12.5% of Mr Johnson's shareholding in WWH. Mr Johnson claims that he transferred these shares to a lender as security for a loan and that because of his lack of funds, caused by GW's breach of duty, he was unable to buy them back. This claim is not in my view objectionable in principle. (5) Additional tax liability. If proved, this is a personal loss and I would not strike it out.

The second limb of GW's argument on the cross-appeal was directed to Mr Johnson's claim for damages for mental distress and anxiety. This is a claim for general damages for

"the mental distress and anxiety which he has suffered as a result of the protracted litigation process to which he has been subjected, the extreme financial embarrassment in which he and his family have found themselves, and the deterioration in his family relationships, particularly with his wife and son, as a result of the matters complained of in the re-amended statement of claim."

Closely allied to this was a claim, pleaded at length, for aggravated damages "by reason of the fact that the manner of the commission of [GW's] tort was such as to injure his pride and dignity". GW contended that damages for mental distress and anxiety did not lie for breach of a commercial contract such as the present and that this was not a class of case in which aggravated damages were in principle recoverable. Mr ter Haar took issue with both these points.

The general rule laid down in                    was that damages for breach of contract could not include damages for mental distress. Cases decided over the last century established some inroads into that general rule: see, generally, *McGregor on Damages* , 16th ed (1997), paras 98-104. But the inroads have been limited and      *McGregor* describes as a useful summary a passage in              , 1445:

"A contract-breaker is not in general liable for any distress, frustration, anxiety, displeasure, vexation, tension or aggravation which his breach of contract may cause to the innocent party. This rule is not, I think, founded on the assumption that such reactions

are not foreseeable, which they surely are or may be, but on considerations of policy.

"But the rule is not absolute. Where the very object of a contract is to provide pleasure, relaxation, peace of mind or freedom from molestation, damages will be awarded if the fruit of the contract is not provided or if the contrary result is procured instead."

Your Lordships' House had occasion to touch on this question in                    , an unusual case in which the issue concerned the measure of compensation recoverable by a building owner against a contractor who had built a swimming pool which was 18 inches shallower at the deep end than the contract specified. Lord Lloyd of Berwick said, at p 374:

"                    established the general rule that in claims for breach of contract, the plaintiff cannot recover damages for his injured feelings. But the rule, like most rules, is subject to exceptions. One of the well established exceptions is when the object of the contract is                 **\*38** to afford pleasure, as, for example, where the plaintiff has booked a holiday with a tour operator. If the tour operator is in breach of contract by failing to provide what the contract called for, the plaintiff may recover damages for his disappointment: see              and              .

"This was, as I understand it, the principle which Judge Diamond applied in the present case. He took the view that the contract was one 'for the provision of a pleasurable amenity'. In the event, Mr Forsyth's pleasure was not so great as it would have been if the swimming pool had been 7 feet 6 inches deep. This was a view which the judge was entitled to take. If it involves a further inroad on the rule in              , then so be it. But I prefer to regard it as a logical application or adaptation of the existing exception to a new situation."

I do not regard this observation as throwing doubt on the applicability of              in a case such as the present. It is undoubtedly true that many breaches of contract cause intense frustration and

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript (Cite as: [2002] 2 A.C. 1)

anxiety to the innocent party. I am not, however, persuaded on the argument presented on this appeal that the general applicability of ⬜⬜⬜⬜⬜ should be further restricted.

I would strike out Mr Johnson's claim for damages for mental distress and anxiety. I would also strike out his claim for aggravated damages: I see nothing in the pleaded facts which would justify any award beyond the basic compensatory measure of damages.Conclusion

For these reasons I would allow Mr Johnson's appeal and dismiss GW's cross-appeal, save that I would strike out his claims (identified in (3) above) for pension payments and the enhanced value of his shareholding, and for damages for mental distress and anxiety and aggravated damages. I would order GW to pay Mr Johnson's costs before the Court of Appeal and the judge, and the costs of the appeal and the cross-appeal to this House.LORD GOFF OF CHIEVELEY My Lords,(1) The appeal(a) Abuse of process

On the question whether there was an abuse of process on the part of the plaintiff, my noble and learned friend, Lord Bingham of Cornhill, has reviewed the facts and the relevant authorities in lucid detail. I find myself to be in complete agreement with his analysis of the authorities, and with his conclusion that on the facts there was no abuse of process on the part of the plaintiff; and I do not propose to burden this opinion with a repetition of his reasoning. I only wish to add a few words on the separate question of estoppel, with regard to the nature of the estoppel on which the plaintiff could, if necessary, have relied.(b) Estoppel

The conclusion of the judge, and the contention of Mr ter Haar for the plaintiff, was that the relevant estoppel was estoppel by convention. **\*39** Reliance was placed in particular on a well known passage in the judgment of Lord Denning MR in ⬜⬜⬜⬜⬜, 122:

"The doctrine of estoppel is one of the most flexible and useful in the armoury of the law. But it has become overloaded with cases. That is why I have not

gone through them all in this judgment. It has evolved during the last 150 years in a sequence of separate developments: proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory estoppel. At the same time it has been sought to be limited by a series of maxims: estoppel is only a rule of evidence, estoppel cannot give rise to a cause of action, estoppel cannot do away with the need for consideration, and so forth. All these can now be seen to merge into one general principle shorn of limitations. When the parties to a transaction proceed on the basis of an underlying assumption—either of fact or of law—whether due to misrepresentation or mistake makes no difference—on which they have conducted the dealings between them—neither of them will be allowed to go back on that assumption when it would be unfair or unjust to allow him to do so. If one of them does seek to go back on it, the courts will give the other such remedy as the equity of the case demands."

This broad statement of law is most appealing. I yield to nobody in my admiration for Lord Denning; but it has to be said that his attempt in this passage to identify a common criterion for the existence of various forms of estoppel—he refers in particular to proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory estoppel—is characteristically bold; and that the criterion which he chooses, viz that the parties to a transaction should have proceeded on the basis of an underlying assumption, was previously thought to be relevant only in certain cases (for example, it was adopted by Oliver J in his important judgment in ⬜⬜⬜⬜⬜) and, in particular, in the case of estoppel by convention, a species of estoppel which Lord Denning does not mention. Furthermore, if he intended that his broad statement of principle should apply in the case of estoppel by convention, a further problem arises in that, in relation to that doctrine, it has been authoritatively stated in Spencer Bower & Turner, The Law Relating to Estoppel by Representation, in the scholarly and much admired third edition (1977) by Sir Alexander Turner, at pp 167-168, that:

"Just as the representation which supports an estoppel in pais must be a representation of *fact* ⬜⬜⬜⬜⬜, the assumed state

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript (Cite as: [2002] 2 A.C. 1)

of affairs which is the necessary foundation of an estoppel by convention must be an assumed state of facts presently in existence ... No case has gone so far as to support an estoppel by convention precluding a party from resiling from a promise or assurance, not effective as a matter of contract, as to future conduct or as to a state of affairs not yet in existence. And there is no reason to suppose that the doctrine will ever develop so far. To allow such an estoppel would amount to the abandonment of the doctrine of consideration, and to accord contractual effect to assurances as to the future for which no consideration has been given."          **\*40**

I myself suspect that this statement may be too categorical; but we cannot ignore the fact that it embodies a fundamental principle of our law of contract. The doctrine of consideration may not be very popular nowadays; but although its progeny, the doctrine of privity, has recently been abolished by statute, the doctrine of consideration still exists as part of our law.

I myself was the judge of first instance in                          . I remember the doctrine of estoppel by convention being urged upon me; but the case was concerned with the scope of a guarantee, which was a matter of law, and, in the light of the passage in          *Spencer Bower & Turner*          which I have just quoted, I hesitated to adopt the doctrine. Cautiously, and I still think wisely, I founded my conclusion on a broader basis of unconscionability. In the Court of Appeal, however, both Eveleigh and Brandon LJJ expressly founded the relevant parts of their judgments on the doctrine of estoppel by convention. They did so relying on the statement of principle from          *Spencer Bower & Turner*          which I have already cited, which limits the doctrine to cases where there has been an agreed assumption as to          *facts*          , but nevertheless applied that statement to a case where the agreed assumption (as to the scope of the guarantee) was one of law. If Lord Denning's statement of principle is to be read as applying to the case of estoppel by convention, he implicitly rejected the statement of the law in          *Spencer Bower & Turner*          , holding that there could be an estoppel whether the common underlying assumption was one of fact or of law.

I accept that in certain circumstances an estoppel may have the effect of enabling a party to enforce a cause of action which, without the estoppel, would not exist. Examples are given in my judgment in                          , 105-107. But in my opinion it is not enough for that purpose that the estoppel may be characterised as an estoppel by convention, or that it can be said to be founded upon a common assumption by the parties.

Against this background I am, despite my great admiration for Lord Denning, reluctant to proceed on the basis of estoppel by convention in the present case. The function of the estoppel is here said to be to preclude the defendant firm from contending that Mr Johnson, by personally advancing a separate claim to damages against the defendant firm instead of doing so at the same time as pursuing his company's claim, was abusing the process of the court. That, as I see it, must relate to a matter of law. It could, however, be appropriate subject matter for an estoppel by representation, whether in the form of promissory estoppel or of acquiescence, on account of which the firm is, by reason of its prior conduct, precluded from enforcing its strict legal rights against Mr Johnson (to claim that his personal proceedings against the firm constituted an abuse of the process of the court). Such an estoppel is not, as I understand it, based on a common underlying assumption so much as on a representation by the representor that he does not intend to rely upon his strict legal rights against the representee which is so acted on by the representee that it is inequitable for the representor thereafter to enforce those rights against him. This approach, as I see it, is consistent with the conclusion of my noble and learned friend, Lord Millett, who considers that the firm would be so precluded by virtue of its acquiescence in the manner in which Mr Johnson had conducted the          **\*41**          litigation hitherto. In the context of the present case, moreover, I can see no material difference between invoking promissory estoppel or acquiescence as the ground on which the defendant firm should be precluded from asserting that the plaintiff had abused the process of the court. The truth of the matter is that the defendant firm, by its conduct and in particular by participating in negotiations for settlement of the company's claim against it on the basis that Mr Johnson would thereaf-

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

ter be free to pursue his own personal claim against it, lulled Mr Johnson into a sense of security that he was free to pursue such a claim against the firm, without objection, in separate proceedings, with the effect that it became unconscionable for the firm to contend that his personal proceedings constituted an abuse of the process of the court. In the end, I am inclined to think that the many circumstances capable of giving rise to an estoppel cannot be accommodated within a single formula, and that it is unconscionability which provides the link between them.

For these reasons I would, like the remainder of your Lordships, allow the appeal; and I now turn to the cross-appeal of the defendant firm.(2) The cross-appeal

Here the question is whether certain heads of claim advanced by the plaintiff, Mr Johnson, against the defendant firm, should be struck out. The relevant heads of claim are usefully recorded in the opinion of my noble and learned friend, Lord Bingham of Cornhill. I do not propose to repeat them in this opinion. The Court of Appeal held that each of the heads of damage pleaded in paragraphs 23 and 24 of the re-amended statement of claim is recoverable as a matter of law by the plaintiff by way of damages for the breaches of duty pleaded by him, and so should not be struck out. It is against that decision that the defendant firm now cross-appeals to your Lordships' House.

   The principal ground on which it is said by the respondent firm that some of these heads of claim should be struck out is derived from the well-known case of                    . I agree with the analysis of that case, and of the other cases following upon it, set out in the opinion of my noble and learned friend, Lord Millett (which I have had the opportunity of reading in draft). I accordingly agree with his conclusion, post, p 126c-d that:

"On the assumption which we are bound to make for the purpose of this appeal, which is that the firm was in breach of a duty of care owed to Mr Johnson personally, he is in principle entitled to recover damages in respect of all heads of non-reflective consequential loss which are not too remote."

   On that basis I, like Lord Millett, agree with my noble and learned friend, Lord Bingham of Cornhill, that the heads of damage specified by him as items 1, 2, 4 and 5 are unobjectionable and should not be struck out. Item 3 relates to the diminution in value of the plaintiff's pension policy set up by the company and accruing to the benefit of the plaintiff as part of his remuneration in his capacity as director of the company. In so far as the claim relates to payments which the company would have made into a pension fund for the plaintiff, I agree that the claim is merely a reflection of the company's loss and should therefore be struck out. But in so far as it          **\*42**

      relates to enhancement of the value of his pension if the payments had been made, it is unobjectionable and should be allowed to stand.

   The second ground relates to the plaintiff's claims for general damages for mental distress, and for aggravated damages based on the fact that the manner of commission of the respondent firm's wrong was "such as to injure his pride and dignity". I agree with my noble and learned friend, Lord Bingham of Cornhill, that, as a matter of principle, damages on these grounds are not generally recoverable: see            ;            , 1445, per Bingham LJ;      *McGregor on Damages*      , paras 98-104. It is true that there has in recent years been a softening of this principle in certain respects (see      *McGregor on Damages*      and            ), but none of these developments has, so far as I can see, gone so far as to allow recovery on the broad grounds here pleaded. I also would therefore strike out these two heads of claim.

For these reasons, I agree with the order proposed by my noble and learned friend, Lord Bingham of Cornhill, as to the disposal of both the appeal and the cross-appeal. I also agree with the order proposed by him as to costs.LORD COOKE OF THORNDON

My Lords, having had the advantage of reading in draft the speech of my noble and learned friend, Lord Bingham of Cornhill, I agree with all that he says on the subject of abuse of process. The course adopted by the parties of settling Westway Homes Ltd's claim against Gore Wood & Co, but leaving open any per-

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

sonal claim by Mr Johnson against the same solicitors, subject to a cap on certain heads of damages and a n undertaking concerning personal guarantees, strikes me as a sensible one: the personal claim against the solicitors plainly involves different and more difficult issues. The belated raising by the defendants of the contention, more ingenious than realistic, that the settlement had the effect of preventing the personal claim seems to me closer to abuse of process than the plaintiff's conduct in pursuing the claim. The defendants are saved from that stigma by the acceptance of their contention by the Court of Appeal, but I agree that on this part of the case the appeal of the plaintiff must be allowed.

On the recoverability of personal damages, I have much more difficulty, for the following reasons. It will be convenient to deal first with the claim for quantifiable financial loss, secondly with the claim based on other forms of suffering.Damages for quantifiable financial loss

As the present is an action by one claiming to be a personal client against solicitors, not an action by a shareholder against a company and directors,                         , including the well known passage at pp 222-223, has only a limited bearing. The cash box illustration given by the Court of Appeal (Cumming-Bruce, Templeman and Brightman LJJ) is not helpful in this case because it does not envisage any loss except of the company's £100,000. It is by no means self-evident that, if the controlling shareholder had lost a valuable business opportunity for want of prompt access to the company's money, he would have been unable to recover damages for that loss caused by the                **\*43**                defendant's deceit and theft of the cash box. The court did give as a possible instance of a recoverable personal loss the cost caused to the shareholder in consequence of a fraudulent circular, such as the cost of attending a meeting; but this single specific example is not fully illuminating. Nothing that I am about to say involves any criticism of the decision in the

case or anything said in it. My point is simply that it was not concerned with the kind of issue arising in the present case and contains no observations about this kind of issue. The same applies to

.

I respectfully agree that the three numbered propositions set out in the speech of Lord Bingham are supported by the English authorities cited by him. But these authorities and the propositions are not comprehensive. Nor, as my noble and learned friend also indicates, do they resolve the crucial question arising on a strike-out application in a case such as the present. This is a case about solicitors' negligence. The English authorities cited include only one relating to the not uncommon situation of a solicitor acting both for a client personally and for a company controlled by the latter. This is                         . In that case the solicitor was negligent in failing initiate a timely application for statutory protection of the company's lease. The company negotiated with the landlord a new lease on terms less favourable than could have been obtained with the bargaining power of an extant application (loss A). The new lease also stipulated that the shareholder could not sell his shares without the landlord's consent (loss B). Against the solicitor Staughton J awarded the company loss A and the shareholder loss B. Although it flowed from the company's loss of bargaining power, loss B was not suffered by the company. So, too, in the present case Mr Johnson claims that at least the greater part of the losses for which he sues were not suffered by the company.

As the report of                         may not be readily available in England, it is as well to reproduce here the whole of the relevant passage in the judgment of the Court of Appeal delivered by Thomas J. I must not conceal that I was a member of the court of five on behalf of whom the judge spoke, although I confess to little independent recollection of the case. It was a case in which the defendants, firms of chartered accountants and solicitors, acted for the plaintiffs personally and in the course of doing so advised on channelling their assets into a company taking a lease of farm land. Naturally the defendants came to act for the company as well. By reason of alleged negligence on the part of the defendants the consent of the landlord's mortgagees was not obtained, nor was a caveat registered against the title. Consequently the land was lost and the company failed. The company's claim against the defendants was settled by the liquidator for a sum alleged by the plaintiffs to be totally inadequate. The Court of Appeal held that the personal claims should not be struck out before

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

trial. Thomas J said, at pp 280-281:

"We do not need to enter upon a close examination of the                              decision. It has attracted not insignificant and, at times, critical comment. See e g                          ; L S Sealy, 'Problems of Standing, Pleading and Proof in Corporate Litigation' (ed B G Pettet), p 1, esp pp 6-10; and          **\*44**          M J Sterling, 'The Theory and Policy of Shareholder Actions in Tort'          , esp pp 470-474. It may be accepted that the Court of Appeal was correct, however, in concluding that a member has no right to sue directly in respect of a breach of duty owed to the company or in respect of a tort committed against the company. Such claims can only be bought by the company itself or by a member in a derivative action u n d e r   a n   e x c e p t i o n   t o   t h e          rule in                       . But this is not necessarily to exclude a claim brought by a party, who may also be a member, to whom a separate duty is owed and who suffers a personal loss as a result of a breach of that duty. Where such a party, irrespective that he or she is a member, has personal rights and these rights are invaded, the rule in                          is irrelevant. Nor would the claim necessarily have the calamitous consequences predicted by counsel in respect of the concept of corporate personality and limited liability. The loss arises not from a breach of duty owed to the company but from a breach of duty owed to the individuals. The individual is simply suing to vindicate his own right or redress a wrong done to him or her giving rise to a personal loss.

"We consider, therefore, that it is certainly arguable that, where there is an independent duty owed to the plaintiff and a breach of that duty occurs, the resulting loss may be recovered by the plaintiff. The fact that the loss may also be suffered by the company does not mean that it is not also a personal loss to the individual. Indeed, the diminution in the value of Mr and Mrs Christensen's shares in the company is by definition a personal loss and not a corporate loss. The loss suffered by the company is the loss of the lease and the profit which would have been obtained from harvesting the potato crop. That loss is reflected in the diminution in the value of Mr and Mrs Christensen's shares. They can no longer realise their shares at the value they enjoyed prior to the alleged

default of their accountants and solicitors. (For a discussion of the policy issues which arise in considering these questions, see Sterling, at pp 474-491.)

"In circumstances of this kind the possibility that the company and the member may seek to hold the same party liable for the same loss may pose a difficulty. Double recovery, of course, cannot be permitted. The problem does not arise in this case, however, as the company has chosen to settle its claim. Peat Marwick and McCaw Lewis accepted a compromise in the knowledge that Mr and Mrs Christensen's claim was outstanding. It may well be, as was acknowledged by Mr Pidgeon in the course of argument, that an allowance will need to be made for the amount already paid to the liquidator in settlement of the company's claim.

"It is to be acknowledged, however, that the problem of double recovery may well arise in other cases. No doubt, such a possibility is most likely with smaller private companies where the interrelationship between the company, the directors and the shareholders may give rise to independent duties on the part of the professional advisers involved. But the situation where one defendant owes a duty to two persons who suffer a common loss is not unknown in the law, and it will need to be examined in this context. It may be found that there is no necessary reason why the company's loss should take precedence over the loss of the individuals who are owed a separate d u t y   o f   c a r e .   T o   m e e t   t h e   p r o b l e m   o f double          **\*45**          recovery in such circumstances it will be necessary to evolve principles to determine which party or parties will be able to seek or obtain recovery. A stay of one proceeding may be required. Judgment, with a stay of execution against one or other of the parties, may be in order. An obligation to account in whole or in part may be appropriate. The interest of creditors who may benefit if one party recovers and not the other may require consideration. As the problem of double recovery does not arise in this case, however, it is preferable to leave an examination of these issues to a case where that problem is squarely in point.

"Essentially, Mr and Mrs Christensen are alleging that as a result of Peat Marwick and McCaw Lewis's breach of duty owed to them personally they suffered

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

a personal loss, that is, a reduction in the value of their assets. Their assets in this case had been channelled into their company. Thus, it is arguable that the diminution in the value of their shareholding is the measure of that loss. It may well be that when the evidence is heard it will be apparent that Mr and Mrs Christensen's claim is inflated, but that is a matter for the trial.

"We are not prepared to hold at this stage that they do not have an arguable case to recover damages for the breach of an acknowledged duty."

When that passage is read as a whole, two features will be noted. It will be seen not only that the whole passage is throughout guarded and provisional, but also that the court recognised both that double recovery cannot be permitted and that the interests of creditors may require consideration. In this field, if a client is suing his own solicitor, it would appear that only the problems of double recovery or prejudice to the company's creditors would justify denying or limiting the right to recover personal damages which, on ordinary principles of foreseeability, would otherwise arise. One other observation should be made about the passage in Thomas J's judgment. Although he did mention that        had not gone without criticism, he did not find it necessary to examine that case closely. I would repeat that in no way am I criticising it. On the contrary I accept it to the full.

The next closest of the English reported cases cited is                , 435. In that case (arising from the activities of Mr Leeson) a United Kingdom company was suing the auditors of its Singapore subsidiary; the auditors were also responsible for supplying audit information for the group accounts. On a pre-trial appeal, Leggatt LJ stated the law in terms which, albeit briefer, are much the same as those of Thomas J in                 which case was cited by Leggatt LJ.

         is more distant from the present case on the facts. It was a suit for infringement of patents in which some of the lost profits for which the plaintiff company claimed damages were suffered by subsidiary companies in which it held all the shares. The

decision was that, when a shareholder has a cause of action but his company has none, he can recover damages measured by the reduction in value of his shareholding; but that the plaintiff must prove the amount of his own loss and that it cannot be assumed that        ***46***        this is the same as the loss suffered by the company. Such relevance as the case has lies in the reasoning of Hobhouse LJ in the Court of Appeal. At p 474 he described        as "a good illustration of the application of the relevant principles". After an extensive quotation from the judgment in that case, he added, at p 475:

"There is no reason to suppose that this case would have been differently decided in England. The decision helpfully illustrates that, provided that the plaintiff can establish a personal cause of action and can prove a personal loss caused by the defendant's actionable wrong, then the fact that the loss is felt by the plaintiff in the form of the loss of the value of the plaintiff's shares in a company is no answer to the plaintiff's claim. (In that case, as in the present case, no question of remoteness arose.)"

Thus        does not appear to have caused problems for English judges hitherto, and I would hope that this position might continue. But it is necessary to add some further discussion of principle, as on the facts the present case is not on all fours with that case or any of the others cited in argument.

Assuming that this is a fairly typical case of a man carrying on business wholly or partly through a company or companies controlled by him, the first question at a trial will be whether Gore Wood & Co owed duties to Mr Johnson personally as well as to Westway Homes Ltd. Such personal duties could arise from a contract of retainer or in tort because of the closeness of relations ("proximity"), or from both sources concurrently.        finally established in English law the legitimacy of recognising that professional advisers may owe to the same client a duty to exercise reasonable care and skill derived from both contract and tort law. Conceivably the rules as to remoteness or the measure of damages could produce different consequences; but in the interests of justice and the clarity of the law this should obviously be avoided unless forced upon the courts. The duty in such a case is most simply seen as a civil law obliga-

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

tion to conform to professional standards. In the argument it was not suggested that for the purposes of this appeal there is any material difference.

Although more elaborately pleaded here, the duty owed to the personal claimant would be to exercise reasonable care and professional skill in handling the legal side of his affairs and those of his relevant company. In this case it would include the elementary responsibility of exercising efficiently the company's option to purchase Mr Moores's land, on the basis that the risk of personal loss to Mr Johnson from a questionable exercise of the option was reasonably foreseeable by Gore Wood & Co. The duty was one of taking reasonable steps to safeguard his interests, not one of indemnity. Subject to that important qualification, there is some analogy with a contract of insurance When a solicitor is acting for both a shareholder personally and his company, the essence of the personal relationship is that the individual looks to the solicitor for care to provide personal financial protection.

That brings the discussion to what is perhaps the crucial point in this case. The required degree of personal protection will extend, I think, to protection against the operation of rules of law that might foreseeably restrict the **\*47** individual's right to recover damages if no duty were owed to him personally by the solicitor. In cases of the present class, two such rules may be relevant among other factors. One may be called the rule in                    , using that as a shorthand to convey that a shareholder in a company has as such no right to recover from a third party damages for breach of the latter's duty to the company. The other may be called the rule in                    , using that as shorthand for the proposition in                    , per Lord Brandon of Oakbrook at p 425: "There is no such thing as a cause of action in damages for late payment of damages. The only remedy which the law affords for delay in paying damages is the discretionary award of interest pursuant to statute."

But for the solicitor's duty owed to the individual client, such restrictions could result in inability on the part of the latter to recover damages caused to him by the solicitor's negligence. Thus in the present case, whereas the option should have been exercised in a

unquestionable manner in February 1988, it was not until more than four years later that the land was belatedly conveyed to Westway Homes Ltd, and not until a further period of about eight months had elapsed that the company obtained a monetary settlement of its claim against the solicitors.

Mr Johnson alleges (inter alia) that in the meantime the property market had collapsed, the development project had ceased to be financially advantageous, and he had incurred very high interest charges for personal borrowings. To the extent that he can establish at a trial that the delay in the obtaining by the company of the land or monetary compensation was caused or materially contributed to by negligence on the part of the defendant solicitors, there would appear to be no sound reason for denying him personal relief for any damages  foreseeably caused to him personally by the delay: provided always that double recovery is not sanctioned and the interests of the company's creditors are protected.

While double recovery has to be avoided, at this pre-trial stage I would not rule out the possibility that, on the close scrutiny at trial spoken of by Lord Bingham, it will be found that the ultimate agreed payment to the company was not intended to and did not in fact adequately compensate Mr Johnson for the company's want of title to the land in early 1988. It may be chiefly a matter of the timing. The rule in                    would not exclude the plaintiff's personal claim; he is not claiming damages for delay in paying damages to him. Rather he is claiming damages for the fact that his company did not have the land in 1988—a claim outside the provenance and the purview of the rule in                    .

Thus the true scope of the settlement in 1992 is one of the matters requiring examination. In the instant case the settlement covered a very large part of the company's claim. It may well have been a reasonable settlement, reached after having due regard to the interests of the company's creditors, who could not successfully claim that more should have been recovered. There may nevertheless be some possibility that, in addition to any other right to personal damages that he may have against the solicitors, Mr Johnson could be heard to say against them that in any event he should be compensated for his company not

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C.
313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B.
29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R.
72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001)
98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000
Independent, February 7, 2001 Official Transcript (Cite as: [2002] 2 A.C. 1)

having recovered fully. Such a possibility may be more significant in a case like        where the shareholder has opposed and complains of the        **\*48**        inadequacy of the company's settlement; but I do not think that it can be ignored in the present case at this stage.

In a company winding up the liquidator may be liable to the company for negligence on his part in making a compromise: see ;        . Accordingly I think that in cases within that principle the court should avoid sanctioning not only double recovery, but also any real prospect of double recovery. As this aspect was not explored in argument, it need not now be explored further.

Apart from the question of any shortfall in the company's recovery, I think that Mr Johnson could have a good personal claim against the solicitors for compensation on the basis already stated, that is to say on the basis that the damages claimed by him were not suffered by the company. Accordingly I agree with Lord Bingham that the claimed heads of damages numbered in his speech 1, 2, 4 and 5 should not be struck out before trial, and that the same applies to the part of head 3 relating to the enhancement of the value of Mr Johnson's pension if the payments had been duly made. I am rather less clear that the remaining parts of head 3 should be struck out. Certainly, however, these claims relating to lost payments into a pension fund or retention of corresponding amounts in the company's assets look very much like claims for double recovery. As the other members of your Lordships' Appellate Committee are in no doubt that they should be struck out, I am content to concur in that conclusion.

In short, agreeing that at the strike-out stage any reasonable doubt must be resolved in favour of the claimant, I think it safer to avoid fine distinctions, especially before trial; and, with the very limited exceptions just mentioned, to leave all the extant claims in this case of complicated facts open for examination at trial. The open questions would include remoteness. And I would add one other cautionary remark. The trial judge would have to consider, not only issues of double recovery by Mr Johnson and the company, but also any issue of overlapping among Mr Johnson's

claims themselves.Damages for general suffering

In                 , Bingham LJ said, at p 1445:

"A contract-breaker is not in general liable for any distress, frustration, anxiety, displeasure, vexation, tension or aggravation which his breach of contract may cause to the innocent party. This rule is not, I think, founded on the assumption that such reactions are not foreseeable, which they surely are or may be, but on considerations of policy.

"But the rule is not absolute. Where the very object of a contract is to provide pleasure, relaxation, peace of mind or freedom from molestation, damages will be awarded if the fruit of the contract is not provided or if the contrary result is procured instead. If the law did not cater for this exceptional category of case it would be defective. A contract to survey the condition of a house for a prospective purchaser does not, however, fall within this exceptional category.

"In cases not falling within this exceptional category, damages are in my view recoverable for physical inconvenience and discomfort caused by the breach and mental suffering directly related to that inconvenience and        **\*49** discomfort. If those effects are foreseeably suffered during a period when defects are repaired I am prepared to accept that they sound in damages even though the cost of the repairs is not recoverable as such. But I also agree that awards should be restrained, and that the awards in this case far exceeded a reasonable award for the injury shown to have been suffered. I agree with the figures which Ralph Gibson LJ proposes to substitute."

I regard that as an authoritative statement of the present law of England regarding commercial contracts. The exceptional category is not confined, in my view, to contracts to provide pleasure and the like. For example, breaches of contracts for status such as membership of a trade union or a club may carry damages for injured feelings; but it is unnecessary to go into that area further, as I accept that, if there was a contract between Mr Johnson and Gore Wood & Co, it is to be classified in English law as

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

commercial in the sense that damages for mere distress are not available. Contract-breaking is treated as an incident of commercial life which players in the game are expected to meet with fortitude. For present purposes it may be assumed that the same principle applies in so far as the claim is grounded in tort: see      , 826, per Purchas LJ. A fuller discussion of these various matters can be found in           (a stage of the litigation not under consideration by the Privy Council in      ).

But that does not quite dispose of Mr Johnson's claim for non-quantifiable damage. He alleges extreme financial embarrassment; it is said that from a state of some prosperity he was reduced to subsistence on social security benefit. He also alleges deterioration in his family relationships, particularly with his wife and son. Although the pleader has treated them as mental distress, such consequences are in truth significantly more than mental distress. They are more akin to the physical inconvenience and discomfort referred to in Bingham LJ's third paragraph. In my opinion the common law would be defective and stray too far from reality, humanity and justice if it remorselessly shut out even a restrained award under these heads. Hence I would leave the claim in this part of the case standing also, although only on the footing that damages could not be awarded merely for injured feelings, nor could aggravated damages be awarded merely on that account.

     English case law has fluctuated as to the recoverability of damages in contract for mental distress, as is detailed in McGregor on Damages (1997), paras 98-106. See also Dr Harvey McGregor's preface at pp vii-viii. But it has been established since Victorian times that, by contrast with mere mental distress, damages are recoverable for substantial inconvenience and discomfort. Thus in        , a court including Cockburn CJ and Blackburn and Mellor JJ upheld an award to a husband and wife for the inconvenience of having to walk home with young children four or five miles late on a drizzling night, although the wife's catching of a cold was found too remote. That case was applied by Barry J in        in awarding damages against solicitors for the inconvenience to the plaintiff of having to live in an overcrowded house. Such authorities are treated in    **\*50** *McGregor on Damages*, paras 93 to 96, as surviving the recent restriction of damages for mental distress. The third paragraph already quoted from Bingham LJ in      , 1445 is largely supported by them. The line may not always be easy to draw, and it is particularly difficult before trial to assess the weight of the claims in the present case. But both a changed way of life because of poverty and damaged family relationships can be grievous forms of non-pecuniary harm. I am respectfully unable to agree that they should be ruled out of the law's purview.

     Before parting with the case I would say something about         . In severely confining damages for wrongful dismissal, your Lordships' House of those days appears to have seen the relationship of employer and employee as no more than an ordinary commercial one. This is a world away from the concept now, and in        the House accepted that there is an implied obligation of mutual trust and confidence, and that an employer is under an implied obligation that he will not, without reasonable and proper cause, conduct his business in a manner likely to destroy or seriously damage that relationship. Damages for financial loss, including impaired employment prospects, caused by harm to reputation could be recovered. It is true that       was distinguished on the ground that it related to injury to feelings caused by the manner of termination of the relationship, which question did not arise in      : see per Lord Nicholls of Birkenhead, at p 38, and Lord Steyn, at p 51. But the philosophy is altogether different, as is the philosophy embodied in modern employment legislation. Again, as Lord Bingham has pointed out,       was not applied in      .       has not uniformly been followed in the Commonwealth: see        , a judgment of Linden J (the author of *Canadian Tort Law*, now in its sixth edition). The decision was reversed on other grounds, but Linden J's statements of principle were substantially accepted:      . According to that authority, an employee wrongfully dismissed may recover damages for mental distress in some circumstances. To the same effect is      , which contains an instructive survey of the authorities by Gallen J. I take leave to doubt the permanence of

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

in English law. But it is not a question arising in the present case either; I make these observations only to avoid being identified with any approbation of            .

For the reasons already given, I would allow Mr Johnson's appeal and would dismiss the cross-appeal except as to the two claims identified by Lord Bingham of Cornhill in his head 3 and as to aggravated damages. In the result the one point on which I differ concerns the claims for damages for financial embarrassment and injury to family relationships: those I would permit to go to trial. I concur in the order for costs proposed by Lord Bingham.LORD HUTTON

　　My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Bingham of Cornhill. I am in full agreement with his speech on the subject of abuse of process and I wish to confine my observations to the issue whether the damages claimed by        **\*51**

　　Mr Johnson are recoverable as a matter of law. The case advanced by Mr Johnson is that he instructed a firm of solicitors, Gore Wood & Co ("GW"), to advise him personally as to the conduct of his businesses, including the business of property development which he carried on through a company Westway Homes Ltd ("WWH") of which he was the managing director and in which he held the entire shareholding with the exception of two shares, and that acting on behalf of WWH he also instructed GW to advise that company. He contends that in advising him as to the business affairs of the company, GW owed him a duty of care in contract and tort and in breach of that duty caused him very substantial financial loss. The question whether the damages claimed are recoverable comes before the House as a preliminary issue and is to be approached on the basis that the facts pleaded by Mr Johnson are capable of establishing a breach of a duty owed to him which caused him loss.

　　I consider it to be clear that where a shareholder is personally owed a duty of care by a defendant and a breach of that duty causes him loss, he is not debarred from recovering damages because the defendant owed a separate and similar duty of care to the company, provided that the loss suffered by the shareholder is separate and distinct from the loss suf-

fered by the company. This principle was recently stated in the judgment in the Court of Appeal delivered by Sir Christopher Slade in             , 932-933, that a claimant is entitled to recover damages where:

"(a) the plaintiff can establish that the defendant's conduct has constituted a breach of some legal duty owed to him personally (whether under the law of contract, torts, trusts or any other branch of the law) and (b) on its assessment of the facts, the court is satisfied that such breach of duty has caused him personal loss, separate and distinct from any loss that may have been occasioned to any corporate body in which he may be financially interested. I further conclude that, if these two conditions are satisfied, the mere fact that the defendant's conduct may also have given rise to a cause of action at the suit of a company in which the plaintiff is financially interested (whether directly as a shareholder or indirectly as, for example, a beneficiary under a trust) will not deprive the plaintiff of his cause of action; in such a case, a plea of double jeopardy will not avail the defendant."

　　But a more difficult question arises where the shareholder claims a loss which is not separate and distinct from the loss suffered by the company but his loss flows from loss suffered by the company. In           , the claimants sued the directors of the company alleging that they had issued a circular to the shareholders containing a fraudulent misrepresentation concerning the true value of certain assets, and the court stated, at pp 222-223:

　　"But what [a shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only 'loss' is through the company, in the diminution in the value of the net assets of the company, in which        **\*52**         he has (say) a 3% shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves, his right of participation, are not directly affected by the

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company."       I shall call this statement "the     principle".

In     , the Court of Appeal of New Zealand decided that where a plaintiff alleges a breach of duty owed to him personally by accountants and solicitors he is entitled to recover damages notwithstanding that his loss flows from loss suffered by a company in which he is a shareholder through a similar breach of duty owed to the company. In that case two shareholders claimed damages for the diminution in the value of their shareholding in a company caused by the negligence of their accountants and solicitors. In delivering the judgment of the court, after setting out part of the above passage in the judgment in     Thomas J stated, at p 280:

"It may be accepted that the Court of Appeal was correct, however, in concluding that a member has no right to sue directly in respect of a breach of duty owed to the company or in respect of a tort committed against the company. Such claims can only be bought by the company itself or by a member in a derivative action under an exception to the rule in    . But this is not necessarily to exclude a claim brought by a party, who may also be a member, to whom a separate duty is owed and who suffers a personal loss as a result of a breach of that duty. Where such a party, irrespective that he or she is a member, has personal rights and these rights are invaded, the rule in     is irrelevant. Nor would the claim necessarily have the calamitous consequences predicted by counsel in respect of the concept of corporate personality and limited liability. The loss arises not from a breach of the duty owed to the company but from a breach of duty owed to the individuals. The individuals is simply suing to vindicate his own right or redress a wrong done to him or her giving rise to a personal loss."

"We consider, therefore, that it is certainly arguable that, where there is an independent duty owed to the plaintiff and a breach of that duty occurs, the resulting loss may be recovered by the plaintiff. The fact that the loss may also be suffered by the company does not mean that it is not also a personal loss to the individual. Indeed, the diminution in the value of Mr and Mrs Christensen's shares in the company is by definition a personal loss and not a corporate loss."

The approach taken by the Court of Appeal of New Zealand has been approved in a number of judgments of the Court of Appeal. In     the plaintiff, a company holding shares in a subsidiary company, claimed damages against the defendants, a firm of accountants, in respect of loss it suffered through loss sustained by its subsidiary, BFS, on the ground that the defendants were in breach of duties of care owed both to the plaintiff and to the subsidiary in carrying out an   **\*53**   audit of the subsidiary's accounts. The defendants applied to set aside service of the writ in reliance on the     principle. The defendants' application was rejected by the Court of Appeal and Leggatt LJ stated , at p 435:

"[       decides that a shareholder in a company has no independent right of action based on an allegation of diminution in the value of his shares occasioned by damage to the company. Mr Kentridge seeks to rely on it as authority for the proposition that where a company may have a cause of action for damage caused to it by a tortfeasor, a person who enjoys an independent right of action against the tortfeasor cannot sue him, at least in so far as his damages are measured by a diminution in the value of the company's shares. But in my judgment that is a misapplication of the principle. If C & LS are in breach of a duty of care owed to Barings in respect of audit information supplied to them and the breach causes damage, Barings cannot be disentitled from suing merely because the damages for which C & LS are said to be liable to Barings would or might include damages for which they are said to be liable to BFS. For C & LS are also in breach of a different duty, whether contractual or tortious, owed to BFS. Whereas complications might arise if these claims were made in separate actions, any risk of double jeopardy or of double recovery, such as were envisaged by the New Zealand Court of Appeal in    , 280-281, can be avoided if both claims are made in the same action. It may be, for instance, that C & LS are not liable to Barings for

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

loss of the value of the shares in either BFS or any company which has a cause of action against C & LS for such loss.

"The present case differs from the            case because here the person in the position of shareholder, namely Barings, has a right of action independent of the company, BFS. On the other hand, unlike the situation in [            , BFS does have a right of action itself. As that case shows, there is no legal principle that a holding company is unable to recover damages for loss in the value of its subsidiaries, resulting directly from a breach of duty owed to it, as distinct from a duty owed (or not owed as the case may be) to the subsidiaries."

In            the plaintiff was entitled to damages for infringement of patent rights held by it and sought to recover damages for losses suffered by subsidiary companies in which it held all the shares, and which themselves had no cause of action, and the defendant contended that the claim was barred by the            principle. That argument was rejected by the Court of Appeal and Hobhouse LJ cited the judgment of the Court of Appeal of New Zealand in            and stated , at p 475:

"There is no reason to suppose that this case would have been differently decided in England. The decision helpfully illustrates that, provided the plaintiff can establish a personal cause of action and can prove a personal loss caused by the defendant's actionable wrong, then the fact that the loss is felt by the plaintiff in the form of the loss of the **\*54** value of the plaintiff's shares in a company is no answer to the plaintiff's claim. (In that case, as in the present case, no question of remoteness arose.)"

The judgments in            and            are difficult to reconcile, and it is also difficult to reconcile the judgment in            with the judgment in the former case because the ground on which Leggatt LJ sought to distinguish it, namely, that in            the shareholders did not have an individual right of action, is invalid, the court in            stating, at p 222, that the defendants owed the shareholders a duty to give sound advice.            can be distinguished from

on the ground that the companies in which the plaintiff held shares did not themselves have a cause of action against the defendant. But I consider that the ruling in            that the shareholders could not recover damages cannot be explained on the ground of causation, which was the explanation advanced by Hobhouse LJ, at p 471; I think, in agreement with the Court of Appeal of New Zealand in            that the shareholders can be regarded as suffering a loss caused by breach of duty of the defendant notwithstanding that their loss is reflective of loss suffered by the company. Therefore I consider that the issue to be decided is whether this House should follow the reasoning set out in            or the reasoning set out in            .

My Lords, I consider, with respect, that part of the reasoning in            is open to criticism. In my opinion the view of the Court of Appeal of New Zealand that the loss suffered by a shareholder through the diminution in the value of his shareholding is a personal loss is a more realistic assessment than the view of the Court of Appeal in            that the shareholder's loss is merely a reflection of the loss suffered by the company and that the shareholder suffers no personal loss. This view has been criticised in an article by Mr M J Sterling on "The Theory and Policy of Shareholder Actions in Tort"            , 470, 471:

"The description of the Court of Appeal is not wrong, in that the value of a share is related to the present and expected future levels of dividend of the company and the right to receive dividends is a right of participation in the company, but it is suspiciously limited because a share is commonly treated as a piece of personal property. The fact that a share is valuable because it is a right of participation in a company does not preclude one as a matter of logic from regarding it as a piece of property ...

"The Court of Appeal gave no reason for preferring their description of a share to one which includes its nature as an item of personal property but some good reason is surely necessary to justify exclusion of this obvious characteristic. It is therefore suggested that, if necessary, a share can be regarded as a piece of personal property and a shareholder could be allowed to sue for injury to it."

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

In my respectful opinion there is force in this criticism. However, even if this criticism be accepted, there remains the need to ensure that there is no double recovery and that creditors and the other shareholders of the company are protected. It was this need which was emphasised by      **\*55**      Millett LJ in              , 730, as the reason why the principle in              should be followed:

"If this action were allowed to proceed and the plaintiff were to recover for the lost value of his shareholding from the first defendant, this would reduce his ability to meet any judgment which might thereafter be obtained by the liquidators, or by any of the old companies which were not in liquidation, to the prejudice of their creditors. The plaintiff would have obtained by a judgment of the court the very same extraction of value from the old companies at the expense of their creditors that the first defendant is alleged to have obtained by fraud and deceit."

In              the court considered that the problem of double recovery did not arise in that case as the defendants had settled the company's claim with the knowledge that the plaintiffs' claim was outstanding. But the court recognised that double recovery cannot be permitted and that the interests of the creditors of a company must be protected. In my opinion the resolution of the conflict between              and              narrows down to the issue whether, as held in the former case, the shareholder is debarred from bringing to trial an action claiming loss where such loss is merely reflective of loss suffered by the company, or whether the shareholder is entitled to proceed to trial on such a claim, it being a matter for the trial judge, if the plaintiff establishes his claim, to ensure that there is no double recovery and that creditors and other shareholders of the company do not suffer loss, which was the course which Pumfrey J held should be followed.

My Lords, whilst in a case such as              there may be merit in permitting an individual shareholder to sue, the decision in              has stood in England for almost 20 years and, whilst the decision

has sometimes been distinguished on inadequate grounds, it has been regarded as establishing a clear principle which the Court of Appeal has followed in other cases. I further consider that the principle has the advantage that, rather than leaving the protection of creditors and other shareholders of the company to be given by the trial judge in the complexities of a trial to determine the validity of the claim made by the plaintiff against the defendant, where conflicts of interest may arise between directors and some shareholders, or between the liquidator and some shareholders, the principle ensures at the outset of proceedings that where the loss suffered by the plaintiff is sustained because of loss to the coffers of the company, there will be no double recovery at the expense of the defendant nor loss to creditors of the company and other shareholders. Therefore whilst I think that this House should uphold the              principle, I also consider that it is important to emphasise that the principle does not apply where the loss suffered by the shareholder is separate and distinct from the loss suffered by the company.

The five heads of claim pleaded by Mr Johnson have been set out in the speech of my noble and learned friend, Lord Bingham of Cornhill. I consider that the losses claimed in heads 1, 2, 4 and 5 are separate and distinct from loss sustained by WWH and that those heads of claim should not be struck out. In respect of head 3 I am also in agreement with the opinion of Lord Bingham that because it is not a separate and distinct loss, Mr Johnson cannot claim in respect of the moneys which WWH would have paid into a      **\*56**      pension fund for him if those moneys had been available to it, and that that part of the claim should be struck out, but that Mr Johnson can claim in respect of enhancement of the value of the pension if the payments had been made.

For the reasons given by Lord Bingham I would strike out Mr Johnson's claims for damages for mental distress and anxiety and for aggravated damages. Accordingly, I would allow Mr Johnson's appeal and dismiss GW's cross-appeal, save that I would strike out his claim in head 3 for pension payments (or, in the alternative, for the increase in the value of his shareholding if those pension payments had not been made), and for damages for mental distress and anxiety and for aggravated damages. I would concur in

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

the order for costs proposed by Lord Bingham.LORD MILLETT

My Lords, my noble and learned friend, Lord Bingham of Cornhill, has recounted the facts and I need not set them out again at any length. The appellant, Mr Johnson, is an entrepreneur who carried on business through a number of companies which he owned and controlled. One of them was Westway Homes Ltd ("the company"). Mr Johnson was its managing director and virtually only shareholder. The respondent firm ("the firm") is a firm of solicitors. Mr Johnson was in the habit of instructing the firm from time to time to act for him in connection with his personal affairs as well as for his various companies.

In 1988 the company held a valuable option to buy land for development. Mr Johnson instructed the firm to exercise the option on the company's behalf. The firm accepted his instructions and served the appropriate notice, but failed to do so in a manner which was incapable of challenge by the vendor. The vendor claimed that the option had not been validly exercised, and the company was obliged to bring proceedings for specific performance against him in the Chancery Division ("the Chancery proceedings"). These were not straightforward, and although the company was ultimately successful it was unable to obtain title to the land until April 1992, that is to say more than four years after it had exercised the option. It was awarded damages and costs against the vendor, but these proved to be irrecoverable.

The firm's failure to deal with the option in a manner which put its exercise beyond dispute caused the company substantial loss. As well as having to bear the costs of the Chancery proceedings, it sustained heavy financial loss as a result of the delay in obtaining title to the land. This loss was of two kinds. First, until the company established its title, it was unable to offer the land as security for its borrowings and so obtain a reduction in the very high interest charges it was paying. Secondly, delay in obtaining title to the land caused a corresponding delay in the commencement and completion of the development and thus in the time when the company could hope to realise any profit from the venture. As it happens, the delay frustrated the development altogether, for the collapse in the property market which took place dur-

ing the currency of the Chancery proceedings made the venture unprofitable. But this was obviously not foreseeable in 1988, or Mr Johnson would not have caused the company to exercise the option and the vendor would not have resisted its claim to have done so.

In January 1991 the company brought proceedings against the firm for professional negligence. The firm admitted that it had been retained by the company to exercise the option and that it had owed the company a duty of   **\*57**   care in doing so. But it denied both liability and quantum. The action came on for trial in October 1992 and was estimated to last 10 to 12 days. In December 1992, after the trial had already lasted for six weeks and evidence was still being given on behalf of the firm, the case was settled upon payment by the firm of £1,480,000 and£320,000 towards the company's costs. The sum of£1,480,000 represented the greater part of the damages claimed.

Mr Johnson has always claimed that the firm's negligence in the manner in which it exercised the option also caused substantial financial loss to him personally. In April 1993 he brought his own proceedings against the firm. This can have come as no surprise. Mr Johnson had made no secret of his intention to bring such a claim. He had indicated as much in January 1991, well before the company's action came to trial, and his solicitors had been in correspondence with the firm's insurers during 1991-92. On the eve of the trial his solicitors told those representing the firm that his personal claim would be pursued whether the current proceedings resulted in judgment or settlement. During the settlement negotiations in December 1992 the parties' respective solicitors discussed the possibility of an overall settlement of both Mr Johnson's personal claim and the company's claim, but the paucity of information to enable his personal claim to be quantified made this impossible. It was left that it was a separate claim which would be a matter for separate negotiation in due course. In agreeing the terms on which the company's claim was settled, Mr Johnson submitted to having most of his personal claim capped at £250,000 excluding interest and costs, and the company agreed to apply the settlement moneys in the discharge of liabilities of the company in respect of which Mr Johnson had given

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

personal guarantees. This was designed to avoid the possibility of double recovery in respect of these liabilities if Mr Johnson brought his own proceedings and was successful.

For the next 4 1/2 years the proceedings brought by Mr Johnson followed the normal course. The parties served and amended their pleadings and exchanged witness statements. Mr Johnson served expert evidence. The firm made a payment into court. A trial date was obtained. But then came a sudden change of tack. The firm instructed fresh leading counsel. In December 1997 the firm's solicitors indicated, for the first time, that it intended to apply inter alia for an order to strike the action out as an abuse of the process of the court. In February 1998 the court ordered the trial of two preliminary issues: (i) whether the proceedings should be struck out as an abuse of the process of the court; and (ii) to what extent (if at all) and assuming the truth of the facts pleaded the heads of damages pleaded in paragraphs 23 and 24 of the re-amended statement of claim were irrecoverable by Mr Johnson as a matter of law by way of damages for the pleaded breaches of duty owed to him.

Mr Johnson pleaded his claim in both contract and tort, and alleged that he had retained the firm to act for him personally as well as for the company in connection with the exercise of the company's option. He alleged that the firm had acted negligently in the manner in which it caused the option to be exercised, and that it had from time to time negligently and with unwarranted optimism advised him personally as to the likely duration and outcome of the Chancery proceedings.

On the first question, the judge (Pumfrey J) found that the proceedings might well have been an abuse of the process of the court, but that in the **\*58** light of the circumstances in which the company's action had been settled the firm was estopped by convention from contending that they were. Both parties had acted on the common assumption that Mr Johnson would bring his own proceedings and that these would be entertained by the court. On the second question he ruled that none of the heads of damage pleaded was irrecoverable in law.

The Court of Appeal (Nourse, Ward and Mantell LJJ) allowed the firm's appeal. It held that there was no excuse for Mr Johnson's failure to launch his own claims when the company brought its action. "If he could have done so", Mantell LJ said, "he should have done so". It held that there was no estoppel by convention; the parties shared a common assumption that Mr Johnson would bring his own proceedings, but they made no assumption one way or the other whether the court would entertain them; they never thought about the matter. On the second question the court differed from the judge on the authorities, which it agreed were in an unsatisfactory state, but held that, with only one exception, the pleaded heads of damage were arguably recoverable. Both parties now appeal to the House. Mr Johnson appeals on the first question; the firm cross-appeals on the second.Mr Johnson's appeal: abuse of process

In describing the proceedings brought by Mr Johnson as an abuse of the process of the court, the Court of Appeal was seeking to apply the well known principle which Sir James Wigram V-C formulated in          , 114-115:

"... I believe I state the rule of the court correctly, when I say, that where a given matter becomes the subject of litigation in, *and of adjudication by,* a court of competent jurisdiction, the court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. *The plea of res judicata applies,* except in special cases, not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time." (My emphasis.)          As the passages which I have emphasised indicate, Sir James Wigram V-C did not consider that he was laying down a new principle, but rather that he was explaining the true extent of the existing plea of res

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript (**Cite as: [2002] 2 A.C. 1**)

judicata. Thus he was careful to limit what he was saying to cases which had proceeded to judgment, and not, as in the present case, to an out-of-court settlement. Later decisions have doubted the correctness of treating the principle as an application of the doctrine of res judicata, while describing it as an extension of the doctrine or analogous to it. In                , Sir Thomas Bingham MR explained that it is not based on the doctrine in a narrow sense, nor on the strict doctrines of issue or cause of action estoppel. As May LJ observed in                , 387, it is not concerned with cases where a court has decided the **\*59** matter, but rather cases where the court has not decided the matter. But these various defences are all designed to serve the same purpose: to bring finality to litigation and avoid the oppression of subjecting a defendant unnecessarily to successive actions. While the exact relationship between the principle expounded by Sir James Wigram V-C and the defences of res judicata and cause of action and issue estoppel may be obscure, I am inclined to regard it as primarily an ancillary and salutary principle necessary to protect the integrity of those defences and prevent them from being deliberately or inadvertently circumvented.

In one respect, however, the principle goes further than the strict doctrine of res judicata or the formulation adopted by Sir James Wigram V-C, for I agree that it is capable of applying even where the first action concluded in a settlement. Here it is necessary to protect the integrity of the settlement and to prevent the defendant from being misled into believing that he was achieving a complete settlement of the matter in dispute when an unsuspected part remained outstanding.

However this may be, the difference to which I have drawn attention is of critical importance. It is one thing to refuse to allow a party to relitigate a question which has already been decided; it is quite another to deny him the opportunity of litigating for the first time a question which has not previously been adjudicated upon. This latter (though not the former) is prima facie a denial of the citizen's right of access to the court conferred by the common law and guaranteed by                of the                . While, therefore, the doctrine of res judicata in all its

branches may properly be regarded as a rule of substantive law, applicable in all save exceptional circumstances, the doctrine now under consideration can be no more than a procedural rule based on the need to protect the process of the court from abuse and the defendant from oppression. In                , 425 Lord Wilberforce, giving the advice of the Judicial Committee of the Privy Council, explained that the true basis of the rule in                is abuse of process and observed that it "ought only to be applied when the facts are such as to amount to an abuse: otherwise there is a danger of a party being shut out from bringing forward a genuine subject of litigation". There is, therefore, only one question to be considered in the present case: whether it was oppressive or otherwise an abuse of the process of the court for Mr Johnson to bring his own proceedings against the firm when he could have brought them as part of or at the same time as the company's action. This question must be determined as at the time when Mr Johnson brought the present proceedings and in the light of everything that had then happened. There is, of course, no doubt that Mr Johnson *could* have brought his action as part of or at the same time as the company's action. But it does not at all follow that he *should* have done so or that his failure to do so renders the present action oppressive to the firm or an abuse of the process of the court. As May LJ observed in                , 387, it may in a particular case be sensible to advance claims separately. In so far as the so-called rule in                suggests that there is a presumption against the bringing of successive actions, I consider that it is a distortion of the true position. The burden should **\*60** always rest upon the defendant to establish that it is oppressive or an abuse of process for him to be subjected to the second action.

The rule in                cannot sensibly be extended to the case where the defendants are different. There is then no question of double vexation. It may be reasonable and sensible for a plaintiff to proceed against A first, if that is a relatively simple claim, in order to use the proceeds to finance a more complex claim against B. On the other hand, it would I think normally be regarded as oppressive or an abuse of process for a plaintiff to pursue his claims against a single defendant separately in order to use

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

the proceeds of the first action to finance the second, at least where the issues largely overlap so as to form, in Sir James Wigram V-C's words, at p 115, "the same subject of litigation".

Particular care, however, needs to be taken where the plaintiff in the second action is not the same as the plaintiff in the first, but his privy. Such situations are many and various, and it would be unwise to lay down any general rule. The principle is, no doubt, capable in theory of applying to a privy; but it is likely in practice to be easier for him to rebut the charge that his proceedings are oppressive or constitute an abuse of process than it would be for the original plaintiff to do so.

Mr Johnson conceded that he and the company are privies. He was in a position to decide when to pursue the two claims and whether to pursue them together or separately, and that is enough for present purposes. But Mr Johnson and the company are different legal persons, each with its own creditors, and that is a fact of critical significance. Mr Johnson's personal claims raised difficult issues not present in the company's action: (i) did he retain the firm to act for him personally? (ii) should the firm have foreseen that failure to exercise the option properly would cause loss to Mr Johnson personally as well as to the company? (iii) which if any of his personal losses were recoverable (the issues in the cross-appeal)? (iv) quantum. It was not in the company's interest for his personal claims to be joined with its own much simpler claim, or for its case to be delayed until Mr Johnson's own case was ready for trial. Had the company been in liquidation and its action brought by the liquidator, he would have been well advised to insist on separate trials and to object to any delay in the trial of the company's action.

In these circumstances I am satisfied that Mr Johnson, who was bound to have regard to the interests of the company and its creditors, was entitled to defer the bringing of his own claims until after the company's claim had been resolved. Even if he had chosen to join the two claims in the same writ, it would have been both possible and appropriate for separate trials to be held of (i) liability (ii) quantum (company) (iii) Mr Johnson's title to sue and (iv) quantum (Mr Johnson); and for (iii) and (iv) to be held over until after

(i) and (ii) had been determined. Even as things are, there is no real question of double vexation. The firm was always liable to be sued by two different plaintiffs each with its own cause of action and its own heads of loss. The only area of overlap is in relation to the standard of care which the firm observed. Given that Mr Johnson and the company are privies, neither of them could reopen an adverse judgment on this, being bound by issue estoppel; while the parties could make their own arrangements in the event of a settlement.

Accordingly, I would reject the firm's contention that it was an abuse of process for Mr Johnson to bring his action after the company's claim had **\*61** been resolved. Even if this were not the case, however, I agree with the trial judge that it would be unconscionable for the firm to raise the issue after the way in which it handled the negotiations for the settlement of the company's action. I would not myself put it on the ground of estoppel by convention. Like the Court of Appeal, I have some difficulty in discerning a common assumption in regard to a matter about which neither party thought at all. This is not to say that estoppel has no part to play in this field. I would regard it as operating in the opposite way. Given that Mr Johnson was entitled to defer the bringing of his own proceedings until after the company's claims had been resolved, it would have been unconscionable for him to have stood by without disclosing his intentions and knowingly allowed the firm to settle the company's action in the belief that it was dealing finally with all liability arising from its alleged negligence in the exercise of the option. To bring his own claim in such circumstances would, in my opinion, amount to an abuse of the process of the court. But nothing like this took place.

This makes it unnecessary to deal with Mr Johnson's submission that it is too late for the firm to raise the issue. If necessary, however, I should have regarded the delay as fatal. Indeed, I should have regarded it as more than delay; I think it amounted to acquiescence. There is no proper analogy with the case which discloses no cause of action. Although it is obviously desirable to apply to strike out a claim which is doomed to fail at the earliest opportunity, there is no point in proceeding with a trial which serves no use-

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

ful purpose. Even if the point is taken at the trial itself, it is a matter for the trial judge to decide whether to hear the evidence and adjudicate on the facts before deciding whether they give rise to liability, or to assume that the plaintiff will establish his allegations and decide whether, as a matter of law, they give rise to liability.

But the premise in the present case is that Mr Johnson has a good cause of action which he should have brought earlier if at all. I do not consider that a defendant should be permitted to raise such an objection as late as this. A defendant ought to know whether the proceedings against him are oppressive. It is not a question which calls for nice judgment. If he defends on the merits, this should be taken as acquiescence. It might well be otherwise if the ground on which the proceedings are alleged to be an abuse of process were different. But in a case of the present kind the court is not so much protecting its own process as the interests of the defendant.

Accordingly, I would allow Mr Johnson's appeal on the first question. The firm's cross-appeal: recoverable heads of damage

    A company is a legal entity separate and distinct from its shareholders. It has its own assets and liabilities and its own creditors. The company's property belongs to the company and not to its shareholders. If the company has a cause of action, this is a legal chose in action which represents part of its assets. Accordingly, where a company suffers loss as a result of an actionable wrong done to it, the cause of action is vested in the company and the company alone can sue. No action lies at the suit of a shareholder suing as such, though exceptionally he may be permitted to bring a derivative action in right of the company and recover damages on its behalf: see          , 210. Correspondingly, of course, a company's shares are the        **\*62**        property of the shareholder and not of the company, and if he suffers loss as a result of an actionable wrong done to him, then prima facie he alone can sue and the company cannot. On the other hand, although a share is an identifiable piece of property which belongs to the shareholder and has an ascertainable value, it also represents a proportionate part of the company's net assets, and if these are depleted the dimi-

nution in its assets will be reflected in the diminution in the value of the shares. The correspondence may not be exact, especially in the case of a company whose shares are publicly traded, since their value depends on market sentiment. But in the case of a small private company like this company, the correspondence is exact.

    This causes no difficulty where the company has a cause of action and the shareholder has none; or where the shareholder has a cause of action and the c o m p a n y  h a s  n o n e ,  a s  i n  ,          ,  and          . Where the company suffers loss as a result of a wrong to the shareholder but has no cause of action in respect of its loss, the shareholder can sue and recover damages for his own loss, whether of a capital or income nature, measured by the diminution in the value of his shareholding. He must, of course, show that he has an independent cause of action of his own and that he has suffered personal loss caused by the defendant's actionable wrong. Since the company itself has no cause of action in respect of its loss, its assets are not depleted by the recovery of damages by the shareholder.

    The position is, however, different where the company suffers loss caused by the breach of a duty owed both to the company and to the shareholder. In such a case the shareholder's loss, in so far as this is measured by the diminution in value of his shareholding or the loss of dividends, merely reflects the loss suffered by the company in respect of which the company has its own cause of action. If the shareholder is allowed to recover in respect of such loss, then either there will be double recovery at the expense of the defendant or the shareholder will recover at the expense of the company and its creditors and other shareholders. Neither course can be permitted. This is a matter of principle; there is no discretion involved. Justice to the defendant requires the exclusion of one claim or the other; protection of the interests of the company's creditors requires that it is the company which is allowed to recover to the exclusion of the shareholder. These principles have been established in a number of cases, though they have not always been faithfully observed. The position was explained in a well known passage in          , 222-223:

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

"But what [the shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only 'loss' is through the company, in the diminution of the value of the net assets of the company, in which he has (say) a 3% shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. *63 The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the defendant does not affect the shares; it merely enables the defendant to rob the company. A simple illustration will prove the logic of this approach. Suppose that the sole asset of a company is a cash box containing £100,000. The company has an issued share capital of 100 shares, of which 99 are held by the plaintiff. The plaintiff holds the key of the cash box. The defendant by a fraudulent misrepresentation persuades the plaintiff to part with the key. The defendant then robs the company of all its money. The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets; and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching £100,000 to nil. There are two wrongs, the deceit practised on the plaintiff and the robbery of the company. But the deceit on the plaintiff causes the plaintiff no loss which is separate and distinct from the loss to the company. The deceit was merely a step in the robbery. The plaintiff obviously cannot recover personally some £100,000 damages in addition to the £100,000 damages recoverable by the company." It is indeed obvious that (on the given facts, where no consequential losses are stated to have arisen) the defendant cannot be made liable for more than £100,000 in total. It is equally obvious, however, that if the damages were recoverable by the shareholder instead of by the company, this would achieve the same extraction of the company's capital to the prejudice of the creditors of the company as the defendant's misappropriation had done.

It has sometimes been suggested (see, for example,                     , 266g-i) that               is authority only for the proposition that a shareholder cannot recover for the company's loss, and is confined to the case where the defendant is not in breach of any duty owed to the shareholder personally. That is not correct. The example of the safe-deposit box makes this clear. It is the whole point of the somewhat strained business of the key. The only reason for this is to demonstrate that the principle applies even where the loss is caused by a wrong actionable at the suit of the shareholder personally.

              was followed in                     , where the facts bore some resemblance to the illustration in the earlier case. The defendant was a 50% shareholder and the sole director of a group of companies ("the old companies"). The plaintiff, who was the other 50% shareholder, alleged that, in breach of fiduciary duty, the defendant had misappropriated the assets of the old companies by purchasing them at an undervalue and transferring them to other companies in his sole ownership. The plaintiff, who could have brought a derivative action on behalf of the old companies, chose instead to bring a personal action, claiming that he had been deprived of the opportunity to sell his shares in the old companies at their proper value and had suffered personal loss. The Court of Appeal set aside an earlier grant of leave to appeal from the judge's order striking out the plaintiff's action. *64

The plaintiff sought to distinguish                     by arguing that the defendant was in breach of a duty owed to him personally. But, as I pointed out, that was not the problem. The problem was that the only conduct relied upon as constituting a breach of that duty was the misappropriation of assets belonging to the old companies, so that the only loss suffered by the plaintiff consisted of the diminution in the value of his shareholding which reflected the depletion of the assets of the old companies. The old companies had their own cause of action to recover their loss, and the plaintiff's own loss would be fully remedied by the restitution to the companies of the value of the misappropriated assets. It was not alleged that the plaintiff had been induced

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

or compelled to dispose of his shares in the companies; he still had them. If he were allowed to recover for the diminution in their value, and the companies for the depletion of their assets, there would be double recovery. Moreover, if the action were allowed to proceed and the plaintiff were to recover for the lost value of his shares, the defendant's ability to meet any judgment which the old companies or their liquidators might obtain against him would be impaired to the prejudice of their creditors. The plaintiff would have obtained by a judgment of the court the very same extraction of value from the old companies at the expense of their creditors as the defendant was alleged to have obtained by fraud.

        was a case on the other side of the line. In the course of a contested take-over bid, the directors of the target company who owned a majority of the company's voting shares were alleged, in breach of their duties both to the company and to its shareholders, to have accepted proposals which would reduce the value of the company's assets and hence of its shares and induce the shareholders to accept the lower of two rival offers. The Court of Appeal granted the shareholders injunctive relief. It observed that the decision of the directors, if implemented, would cause loss in two directions. First, the company would suffer loss to the extent that the value of its assets would be depreciated. That loss would be borne exclusively by the company. It was not a loss in respect of which the shareholders could recover, even if the market value of their shares fell in consequence. The other loss would be to the pockets of the shareholders because they were deprived of the opportunity of accepting the higher offer. That loss would be suffered exclusively by the shareholders. It was not a loss to the coffers of the company, which would remain totally unaffected. That could readily be demonstrated. If, as a result of the decision of the board which was impugned, the take-over went through and the entire shareholding in the company became vested in one bidder at a lower price than was available from the other, the recovery of damages by the company would not compensate the former shareholders for their loss. Only a direct action by those shareholders in their own right, and not in right of the company, could provide the necessary compensation.

        In        a company and its principal shareholder brought an action in negligence against a firm of solicitors, alleging that, as a result of the firm's failure to advise an application for a new tenancy under the      , the company had been obliged to accept a new lease on terms less favourable than those it would have obtained under the Act. In addition, the **\*65** principal shareholder was obliged to agree that he would not sell his controlling interest in the company without the landlord's consent. The judge (Staughton J) distinguished        on the ground that the shareholder was not seeking to recover a sum which merely reflected the loss suffered by the company but his own independent loss because his shares were less easily saleable and therefore had a lesser market value. This is capable of being misunderstood, but was correct on the facts, since the shareholder's claim was rightly limited to the loss arising from the requirement to obtain the landlord's consent to any sale of the shares. This was additional to and did not reflect the loss suffered by the company as a result of the terms of the new lease. The shareholder made no claim on his own account in respect of the diminution in the value of his shares due to this.

        In        a parent company, brought an action in negligence against the auditors of a wholly-owned subsidiary. Leggatt LJ correctly distinguished both       , where the shareholder had no independent cause of action of his own, and       , where the company had none. Here each of them had its own cause of action. But he stated, at p 435b-e, that if the shareholder suffered loss as a result of a breach of duty on the part of the defendant owed to it, it could not be disentitled from suing merely because the damages claimed would or might include damages for which the defendant was liable to the company. There was, he said, no legal principle which debarred a holding company from recovering damages for loss in the value of its subsidiaries resulting directly from the breach of a duty owed to the holding company as distinct from a duty owed to the subsidiaries. I do not accept this as correct.

        In         the company carried on the business of potato-farming on tenanted land. The landlord defaulted on a mortgage of the land and the

Copr. © West 2009 No Claim to Orig. Govt. Works

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

mortgagee entered into possession and exercised its power of sale. Access to the standing crop was refused and the company was unable to harvest it, with disastrous financial consequences. The company went into liquidation and receivership, and the receiver and the liquidator brought proceedings for negligence against the company's professional advisers. The action was settled. The shareholders, who had guaranteed the company's debts, opposed the settlement, alleging that the sums offered by way of settlement were totally inadequate. In due course they brought their own proceedings, alleging that the defendants owed duties of care to them personally. They claimed damages representing the diminution in the value of their shareholdings arising from the defendants' negligence. The judge held that such damages reflected the company's loss and could not be recovered by the shareholders. The Court of Appeal of New Zealand allowed the shareholders' appeal.

In giving the judgment of the court, Thomas J distinguished                                   on the ground that it did not necessarily exclude a claim brought by a shareholder to whom a separate duty was owed and who suffered his own personal loss as a result of that breach of duty. So far, of course, this is correct:              and              are just such cases. The judge         **\*66**         observed that the fact that the loss was also suffered by the company did not mean that it was not also a personal loss suffered by the shareholder. "Indeed," he added, at p 280:

"the diminution in the value of Mr and Mrs Christensen's shares in the company is by definition a personal loss and not a corporate loss. The loss suffered by the company is the loss of the lease and the profit which would have been obtained from harvesting the potato crop. That loss is reflected in the diminution in the value of Mr and Mrs Christensen's shares. They can no longer realise their shares at the value they enjoyed prior to the alleged default of their accountants and solicitors."              I cannot accept this reasoning as representing the position in English law. It is of course correct that the diminution in the value of the plaintiffs' shares was by definition a personal loss and not the company's loss, but that is not the point. The point is that it merely reflected the diminution of the company's assets. The test is not whether the

company could have made a claim in respect of the loss in question; the question is whether, treating the company and the shareholder as one for this purpose, the shareholder's loss is franked by that of the company. If so, such reflected loss is recoverable by the company and not by the shareholders.

Thomas J acknowledged that double recovery could not be permitted, but thought that the problem did not arise where the company had settled its claim. He considered that it would be sufficient to make an allowance for the amount paid to the liquidator. With respect, I cannot accept this either. As Hobhouse LJ observed in                         , 471, if the company chooses not to exercise its remedy, the loss to the shareholder is caused by the company's decision not to pursue its remedy and not by the defendant's wrongdoing. By a parity of reasoning, the same applies if the company settles for less than it might have done. Shareholders (and creditors) who are aggrieved by the liquidator's proposals are not without a remedy; they can have recourse to the Companies Court, or sue the liquidator for negligence.

But there is more to it than causation. The disallowance of the shareholder's claim in respect of reflective loss is driven by policy considerations. In my opinion, these preclude the shareholder from going behind the settlement of the company's claim. If he were allowed to do so then, if the company's action were brought by its directors, they would be placed in a position where their interest conflicted with their duty; while if it were brought by the liquidator, it would make it difficult for him to settle the action and would effectively take the conduct of the litigation out of his hands. The present case is a fortiori; Mr Johnson cannot be permitted to challenge in one capacity the adequacy of the terms he agreed in another.

Reflective loss extends beyond the diminution of the value of the shares; it extends to the loss of dividends (specifically mentioned in             ) and all other payments which the shareholder might have obtained from the company if it had not been deprived of its funds. All transactions or putative transactions between the company and its shareholders must be disregarded. Payment to the one diminishes the assets of the other. In economic terms,

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C.
313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B.
29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R.
72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001)
98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000
Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

the shareholder has two pockets, and cannot hold the defendant liable for his inability to transfer money from one pocket to the other. In principle, the *67 company and the shareholder cannot together recover more than the shareholder would have recovered if he had carried on business in his own name instead of through the medium of a company. On the other hand, he is entitled (subject to the rules on remoteness of damage) to recover in respect of a loss which he has sustained by reason of his inability to have recourse to the company's funds and which the company would not have sustained itself.

The same applies to other payments which the company would have made if it had had the necessary funds even if the plaintiff would have received them qua employee and not qua shareholder and even if he would have had a legal claim to be paid. His loss is still an indirect and reflective loss which is included in the company's claim. The plaintiff's primary claim lies against the company, and the existence of the liability does not increase the total recoverable by the company, for this already includes the amount necessary to enable the company to meet it.

On the assumption which we are bound to make for the purpose of this appeal, which is that the firm was in breach of a duty of care owed to Mr Johnson personally, he is in principle entitled to recover damages in respect of all heads of non-reflective consequential loss which are not too remote. Mr Johnson's principal complaint is that the firm negligently failed to exercise the company's option in a manner which would be incontestable. Even if this constituted a breach of a duty owed to Mr Johnson personally as well as to the company, there was a single breach which made it impossible for the company to establish that it had exercised the option without litigation. In the event this delayed by four years the commencement of the development by the company and the time when the company could raise money at normal commercial rates of interest on the security of the land and commence the proposed development. Damages in respect of these heads of damage are recoverable by the company, and in so far as they are reflected in the diminution in the value of Mr Johnson's shares in the company are not recoverable by him.

There is a subsidiary complaint, that the firm

represented both to the company and to Mr Johnson personally that the Chancery proceedings were certain of success and that judgment would be obtained within a relatively short time. These are separate representations which may be separately sued upon by each representee. In so far as Mr Johnson relied upon the representation made to him and suffered a separate and distinct loss qua representee and not merely qua shareholder or potential recipient of money from the company, he is entitled to recover.

Lord Bingham has identified the various heads of financial loss alleged in the statement of claim. I agree with his analysis and do not wish to add anything except in relation to Mr Johnson's pension. Mr Johnson claims that, but for its lack of funds resulting from the firm's failure to exercise the option properly, the company would have continued to make contributions to Mr Johnson's pension scheme. For the reasons I have endeavoured to state, Mr Johnson cannot recover the amount of the contributions which the company would have made if it had had the necessary funds; this merely reflects the company's loss and is included in its own claim. Nor can Mr Johnson claim interest in respect of the lost contributions for the same reason. But Mr Johnson's claim in respect of the enhancement of his pension is a different matter. The problem here is one of remoteness of damage, not *68 reflective loss, for the loss (or strictly the net loss) is one which the company could not have sustained itself. Had Mr Johnson carried on business in his own name instead of through the medium of the company, then (subject only to the question of remoteness) he would have been entitled to recover a sum representing the lost increase in the value of his pension after giving credit for the amount saved in respect of the contributions and interest. Such loss is separate and distinct from the loss suffered by the company, and while Mr Johnson's claim to recover it faces obvious difficulties it should not be struck out at this stage. But if he does establish his claim, he will have to give credit for the contributions which would have been required, whether by the company (reflective loss) or by himself (which he has saved), together with interest thereon.

For the reasons given by Lord Bingham, I too would strike out Mr Johnson's claims to damages for mental

[2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript [2002] 2 A.C. 1 [2001] 2 W.L.R. 72 [2001] 1 All E.R. 481 [2001] C.P.L.R. 49 [2001] B.C.C. 820 [2001] 1 B.C.L.C. 313 [2001] P.N.L.R. 18 (2001) 98(1) L.S.G. 24 (2001) 98(8) L.S.G. 46 (2000) 150 N.L.J. 1889 (2001) 145 S.J.L.B. 29 Times, December 22, 2000 Independent, February 7, 2001 Official Transcript **(Cite as: [2002] 2 A.C. 1)**

distress and anxiety and aggravated damages.

Accordingly, I would dismiss the cross-appeal while varying the order of the Court of Appeal in the manner proposed.Appeal allowed. Cross-appeal dismissed save that paragraphs 8 (except last sentence), 10 and 13 of schedule of loss served pursuant to order of 16 October 1998 and paragraph 24 of re-amended statement of claim of 31 March 1994 be struck out. Defendants to pay plaintiff's costs in House of Lords and below, to include costs of appeal and cross-appeal. (M G )
END OF DOCUMENT

Copr. © West 2009 No Claim to Orig. Govt. Works

**Tab 11**



C

**MacDougall v Gardiner**

[1874 M. 200.]

Court of Appeal

James, Mellish, and Baggallay L.

1875 Nov. 5, 8, 12

Practice—Bill against Directors of Company—Shareholder's Suit on behalf—Authority of Chairman of Meeting—Motion for Adjournment—Mode of taking Votes.

The articles of association of a company gave power to the chairman at any general meeting of the company, with the consent of the meeting, to adjourn the meeting, and also provided for taking a poll if demanded by five shareholders. At a general meeting of the company the adjournment of the meeting was moved, and, on being put, was declared by the chairman, who was one of the directors, to be carried. A poll was duly demanded, but the chairman ruled that there could not be a poll on the question of adjournment, and left the room. One of the shareholders filed a bill on behalf of *14 himself and all other shareholders except the directors, against the directors and the company, stating these facts, and alleging that the course taken at the meeting was taken in collusion with the directors, with a view of stifling discussion, and that the directors were intending to carry out certain measures injurious to the company without submitting the terms to a general meeting; and praying for a declaration that the conduct of the chairman was illegal and improper, and for an injunction to restrain the directors from carrying out the proposed arrangements without submitting them to the shareholders for their approval:—

on demurrer (reversing the decision of *Malins*, V.C.), that the bill could not be sustained, inasmuch as it violated the rule laid down in Mozley v. Alston and Foss v.

Harbottle , and asked the interference of the Court in the internal management of the company.

Whether, on a motion for the adjournment of a meeting of shareholders, the votes ought to be taken according to the number of shareholders or of the shares they represent, *quaere* .

THIS was an appeal from a decision of Vice-Chancellor *Malins* overruling a demurrer to the bill .

The bill was filed by *Alexander William MacDougall* , on behalf of himself and all other shareholders in the Emma Silver Mining Company, Limited, except the directors, against the directors and the company.

The bill, after stating that the company was incorporated in November, 1871, for the purpose of working a mine in the United States of America, called the *Emma Silver Mine* , set out several of the articles of association, amongst which were those numbered 40 and 42, which provided for summoning special general meetings, and 45, which enabled any member to propose and introduce at a general meeting any subject relating to the affairs of the company of which he had given a certain notice, and also the following articles:—

49. The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place; but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

50. At any general meeting, unless a poll be demanded by at least five members, a declaration by the chairman that a resolution *15 has been carried, and an entry to that effect in the book of the proceedings of the company, shall be sufficient evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

51. If a poll be demanded by five or more members, it shall be taken in such manner as the chairman shall direct, and the result of such poll shall be deemed to be the resolution of the company in general meeting. In the case of an equality of votes at any general meeting, the chairman of the meeting shall be entitled to a second or casting vote.

53. Every member shall have one vote for every share held by him.

57. Votes may be given personally or by proxy.

The bill also, after stating that the Plaintiff became a shareholder in 1874, and was, when the bill was filed, the registered holder of 1750 shares in the company, alleged various fraudulent transactions on the part of the promoters and the company, and that the Plaintiff and other members of the company believed that the present directors were interested in these matters adversely to the company, and therefore desired to have some person elected a director who would endeavour to obtain a full investigation of these matters.

The allegations contained in the bill on this subject are stated at greater length in the previous report.

According to the statements in the bill the Plaintiff and his friends being unsuccessful in their efforts, in September, 1874, signed a requisition calling on the directors to summon an extraordinary general meeting for the purpose of requesting the chairman, Colonel *Gardiner*, to resign his directorship, and to appoint another director in his place. This requisition was signed by shareholders holding more than one-fifth of the capital of the company. And accordingly, on the 6th of October, 1874, the directors issued a notice convening a special general meeting for the 14th of October.

The Plaintiff received proxies authorizing him to vote at the special meeting from shareholders holding 15,000 shares, while the directors did not receive proxies to an extent reaching one-half of the number of shares represented by the Plaintiff. **\*16**

Previously to the meeting, the directors sent stamped proxies round to each of the shareholders, empowering Mr. *Hutton*, one of the directors, to vote for them at the meeting and at any adjournment.

Although the Plaintiff and his party had such a majority if all the votes were properly polled, the Defendants filled the room with persons holding one or two shares each, who, on a shew of hands, would give the Defendants the majority of votes.

The Plaintiff prepared several resolutions for the purpose of proposing them at the meeting, the two first of which were as follows:—

1. That in the opinion of this meeting it is not consistent with the best interests of the company that Mr. *Robert May Gardiner* should remain a director of the company, and that he accordingly be requested to resign his office.

2. That the said Mr. *Robert May Gardiner* not being present to meet the shareholders of this company, after the requisition calling this meeting (first lodged on the 8th of September last), and signed by … shareholders, he is now removed from the office of director, and that Mr. … be appointed a director in his stead.

The meeting took place on the 14th of October, 1874. Colonel *Gardiner* was absent in *America*, and Mr. *Hutton* was in the chair. He addressed the members, and urged an adjournment of the meeting, partly on the ground that a petition to wind up the company had been presented by a shareholder, and that it was expedient to postpone the discussion of the matters before the meeting until after the petition had been disposed of. The Plaintiff proposed the first resolution, and it was discussed by the chairman. Various trivial objections were taken to it, such as that it ought to have embraced the appointment of a new director as well as a request to *Gardiner* to resign. On that ground Mr. *Hutton* refused to put the first resolution to the meeting, although Mr.

Copr. © West 2009 No Claim to Orig. Govt. Works

*Burnand*, the only other director present, openly dissented from that view. In the midst of the discussion which followed, and after the Plaintiff had pointed out that if the resolution were passed he would follow it up by others, copies of which the chairman held in his hand, a member proposed the adjournment of the **\*17** meeting for a month. This proposal was seconded, and the chairman then put the resolution to the meeting, and declared it to be carried.

The 25th, 26th, and 27th paragraphs of the bill contained in substance the following allegations:—

25. The friends of the directors voted in favour of the resolution, while the Plaintiff and the shareholders acting with him voted against it; and the chairman declared, on the shew of hands, that the resolution had been carried. Five members of the company then present, including the Plaintiff, demanded a poll; but the chairman refused to grant one, on the alleged ground that a poll could not be taken on the question whether the meeting should be adjourned or not, at once left the chair, declaring the meeting adjourned, and immediately left the room; but the demand for the poll was duly signed and handed in.

26. There was no ground under the articles of the company, or otherwise, for holding that a poll could not be taken upon whether the meeting of the company should be adjourned or not, especially when by the motion for adjournment the question before the meeting was, whether certain important matters should then be discussed and voted, or whether they should be postponed for a long or indefinite time. Mr. *Hutton*, however, had, in order to stifle the discussion, and to prevent the matters being voted upon to consider which the meeting was called, in collusion with the other directors, or some of them, determined to carry a vote of adjournment by shew of hands and then to refuse a poll on that question, so as to prevent the proxies given to the Plaintiff and his supporters from being used in support of the resolutions which he was about to bring forward, and which would un-

doubtedly have been passed but for the conduct of the Defendants.

27. After the poll had been refused several of the members of the company, including the directors, left the room, but a large number still remained, who voted the Plaintiff into the chair, when the Plaintiff's resolutions were passed, the name of Charles Henry Dunhill, M.D., of *York*, a duly qualified shareholder in the company, having been first added to the second resolution, he having been proposed and seconded and duly elected as a director of the said company in the place of Colonel *Gardiner*. **\*18**

The 28th paragraph of the bill set out a letter by the Plaintiff giving notice to the directors of the passing of the resolutions after Mr. *Hutton* had left the chair, and the allegations concluded as follows:— "29.

In this state of things the Plaintiff and the other shareholders in the company believe, and it is the fact, that the Defendants, the directors of the said company, are about to conclude some arrangements with the persons against whom the company has claims, such as the original vendors of the said mining property to the company, or the promoters of the said company, and others, for the purpose of settling those claims to the great injury of the company and the shareholders therein, and without first submitting those terms to the shareholders of the said company; and the Plaintiff apprehends, and the fact is, that the proposed compromises will at once be carried through unless the Defendants are restrained from so doing by the order of this Honourable Court. The danger is in fact so imminent, that it is impossible for the Plaintiff and those acting with him to call another meeting for the purpose of removing all the directors of the company from their office, or for any other purpose which might effectually stop the said compromises, in time to prevent their being carried out; and even if such another meeting could be convened in time, the Defendants, by the same proceeding as they adopted at the meeting of the 14th day of October, would be

Copr. © West 2009 No Claim to Orig. Govt. Works

again able to break up and would succeed in breaking up the said meeting by improperly deciding that it was adjourned by a mere shew of hands held up by a few friends or nominees of the said directors who are interested in putting an end to all further investigation into the aforesaid matters."

The bill prayed for a declaration that the refusal to grant a poll on the question whether the meeting should be adjourned at the meeting of the 14th of October was illegal and improper, and for an injunction to restrain the directors from concluding any arrangements with respect to legal proceedings commenced or to be commenced against the vendors of the property to the company, or with any other persons, until such arrangement, if proposed, should have been submitted to the shareholders in the company, and should have been approved of by them; and for a **\*19** declaration that *Gardiner* had ceased to be a director, and might be restrained from acting as such director, or that a meeting of the shareholders should be summoned for the purpose of submitting the Plaintiff's resolutions to them.

At the time the bill was filed a petition to wind up the company was pending, and until it was heard, in April, all proceedings in the suit were stayed. The petition having been dismissed, Colonel *Gardiner* demurred.

The Vice-Chancellor overruled the demurrer, and from this decision the demurring Defendant appealed.

*Higgins*, Q.C., and *Wintle*, for the Appellant:—

The bill is demurrable on two grounds. In the first place, the bill ought to have been in the name of the company. This rule has been established by Mozley v. Alston, Foss v. Harbottle, and was followed in Gray v. Lewis. If such a bill is filed, and the majority of shareholders disapprove of it, they may bring the litigation to an end by passing a resolution to that effect, and the Court will then order the bill to be taken off the file: Exeter and Crediton Railway Company v. Buller. The only exceptions to this rule are stated by Mr. Justice *Lindley* in his work on the Law of Partnership. One exception is where some fraud has been committed by the directors in the name of the company, or where the company is attempting to do something ultrà vires : Clinch v. Financial Corporation. The other exception is where the course attempted to be pursued by the company is injurious to one particular class only of the shareholders, as in Atwool v. Merryweather. And even in that case, if the matter complained of by the minority is within the legitimate power of the majority the Court will not interfere. For the Court will not interfere with the internal management of the company: Bailey v. Birkenhead, Lancashire, and Cheshire Junction Railway Company. The present bill comes within neither of these exceptions.

In the second place, there is nothing in the allegations in the bill to shew a title to relief. The only thing complained of is the **\*20** ruling of the chairman as to the adjournment of the meeting. If the Court will go into that question, we contend that the ruling was quite right. The adjournment is to be made "with the consent of the meeting," and that must mean with the consent of those present at the meeting: Reg. v. Vestry of St. Pancras ; Reg. v. Hedger. A poll means a reference of the question to the whole of the constituency, which would be absurd in such a case, for the meeting would have to be adjourned for the purpose of taking it: Reg. v. Cooper. It is also clear that where the votes are taken at a meeting, the votes are to be counted by number of shareholders and not by number of shares; for the 51st clause of the articles says that in case of equality the chairman is to have a "second, or casting vote," which would not apply to the case of the chairman having a number of votes according to his shares. Again, according to the Plaintiff's own shewing it was impossible for him to have carried

Copr. © West 2009 No Claim to Orig. Govt. Works

his resolutions at that meeting, for he only gave notice of a resolution requesting Colonel *Gardiner* to resign, not of a resolution removing him from his office; and as Colonel *Gardiner* was not present, nothing could be done.

[MELLISH, L.J.:—In a late case in bankruptcy, Ex parte Till, a doubt was suggested as to the mode of voting for the adjournment of a meeting of creditors, but it was not necessary to decide the question.]

*Glasse*, Q.C., and *Robinson*, Q.C., for the Plaintiff:—

We admit the rule laid down by Mozley v. Alston, but we contend that this bill falls within the exceptions to the rule. In the first place, the Plaintiff complains that he and those who act with him, although really in the majority, are overborne by the collusive conduct of the directors and their friends. The Defendants are, in fact, acting *ultrà vires*. It is exactly similar to Atwool v. Merryweather. If the Plaintiff is in a minority, the bill comes within the other exception illustrated by Menier v. Hooper's Telegraph Works, where it was held that where the **\*21** majority are acting oppressively to the minority, one shareholder who is injured may file a bill on behalf of himself and others. In this case some of the members have been denied their rights by the directors who control the company, for it is clearly a right of the members to have a poll if they demand it: Campbell v. Maund. In fact the meeting was adjourned, but we say it was done illegally, and we have, therefore, a right to file a bill in the name of the shareholders, on the ground that it is to be taken for granted that the shareholders do not approve of an illegal act: Williams v. Salmond. The chairman, as we contend, acted in distinct violation of the 51st article. We do not say that the poll should have been taken of the whole body of shareholders, but a poll should have been taken in the room of those present by themselves and their prox-

ies, reckoning by shares and not by heads.

Therefore, if the Court is against us on the frame of the suit, we ask for leave to amend by making the company a co-Plaintiff instead of a Defendant. Since the commencement of the argument on the appeal the Plaintiff has been elected a director, and the old directors have resigned; and so far he has obtained the object of the suit. But it is necessary to obtain the opinion of the Court as to the power of the chairman to adjourn the meeting without a poll. JAMES, L.J.:—

I am of opinion that this demurrer ought to be allowed. I think it is of the utmost importance in all these companies that the rule which is well known in this Court as the rule in Mozley v. Alston and Lord v. Copper Miners' Company and Foss v. Harbottle should be always adhered to; that is to say, that nothing connected with internal disputes between the shareholders is to be made the subject of a bill by some one shareholder on behalf of himself and others, unless there be something illegal, oppressive, or fraudulent—unless there is something *ultrà vires* on the part of **\*22** the company *quâ* company, or on the part of the majority of the company, so that they are not fit persons to determine it; but that every litigation must be in the name of the company, if the company really desire it. Because there may be a great many wrongs committed in a company—there may be claims against directors, there may be claims against officers, there may be claims against debtors, there may be a variety of things which a company may well be entitled to complain of, but which, as a matter of good sense, they do not think it right to make the subject of litigation; and it is the company, as a company, which has to determine whether it will make anything that is wrong to the company a subject-matter of litigation, or whether it will take steps itself to prevent the wrong from being done. If the majority of the company really are in favour of any particular shareholder who has been interfered with improperly, by misconduct of

a director, by misconduct of a chairman, by miscarriage of a meeting or of certain shareholders at a particular date—if the company think that any shareholder has anything which ought to be made the subject of complaint, there is never any difficulty whatever arising from the apparent possession of the seal by the directors, or from any such cause, in filing a bill in the name of the company, if the majority of the company desire it to be filed. Any one of the shareholders might have filed his bill in the name of the company, and then if the directors had said, "You are not the company; the majority do not act with you, but with us"—the Court would, as it has done in other cases, have taken the means of ascertaining which party it is, the Plaintiff's or Defendant's, which really represents the majority of the company.

Everything in this bill, as far as I can see, if it is wrong is a wrong to the company, because every meeting that is called must be for some purpose or other—it must be for the purpose of doing or undoing something which is supposed to accrue for the benefit of the company. Whether it ought to have been done, or ought not to have been done, depends upon whether it is for the good of the company it should have been done, or for the good of the company it should not have been done; and, putting aside all illegality on the part of the majority, it is for the company to determine whether it is for the good of the company that the        ***23***        thing should be done, or should not be done, or left unnoticed. I cannot conceive that there is any equity on the part of a shareholder, on behalf of himself and the minority, to say, "True it is that the majority have a right to determine everything connected with the management of the company, but then we have a right—and every individual has a right—to have a meeting held in strict form in accordance with the articles." Has a particular individual the right to have it for the purpose of using his power of eloquence to induce the others to listen to him and to take his view? That is an equity which I have never yet heard of in this Court, and I have never known it insisted upon before; that is to say, that

this Court is to entertain a bill for the purpose of enabling one particular member of the company to have an opportunity of expressing his opinions vivâ voce at a meeting of the shareholders. If so, I do not know why we should not go further, and say, not only must the meeting be held, but the shareholders must stay there to listen to him and to be convinced by him. The truth is, that is only part of the machinery and means by which the internal management is carried on. The whole question comes back to a question of internal management; that is to say, whether the meeting ought or ought not to be held in a particular way, whether the directors ought or ought not to have sanctioned certain proceedings which they are about to sanction, whether one director ought or ought not to be removed, and whether another director ought or ought not to have been appointed. If there is some one managing the affairs of the company who ought not to manage them, and if they are being managed in a way in which they ought not to be managed, the company are the proper persons to complain of that. It seems to me, therefore, that the thing is perfectly plain and obvious, and when the Master of the Rolls had the case before him he immediately pointed it out, and said, "You have the wrong Plaintiff here—the Plaintiff must be the company." From the first opening of this case before us, I have never had any doubt in my own mind that this was a bill which, if it was to be sustained at all, could only be sustained by the company.

But then the Plaintiff says, "Give us leave to amend." It is rather late to ask for leave to amend when the amendments might        ***24***        have been obtained from the Master of the Rolls before any costs had been incurred. But the question is, is there anything substantial in this case on which we should give leave to amend on the part of the company? I can see nothing. I do not think we ought to give leave to amend for the purpose merely of getting a declaration as to what the proper mode of dealing with the adjournment was, because that would be simply to give a declaration without any relief. The company cannot file a bill saying, "Tell

us the meaning of the Rules, and what is to be done under them." They must find that out for themselves in the best way they can. We do not sit here to express an opinion on something which may lead to no practical result. I am not aware that there could be any practical result following upon a declaration obtained by the company as to the particular mode in which the meeting ought to have been adjourned, or in what particular way the meetings in future should be adjourned. If there is any doubt about it, if they cannot satisfy themselves as to the way of doing it out of doors, they must call a meeting and make it clear what is the mode in which they wish and propose to have it done.

Then, as to the rest of the relief prayed, that the directors were not to do something without the consent of the shareholders. Of course they cannot do so, and the shareholders can always call meetings if they please. Then, as to the part of the prayer which asks that somebody else shall be restrained from acting, that is in truth given up—it is admitted at the Bar that these resolutions could not have been properly put at the meeting.

It seems to me, therefore, that upon the allegations of this bill there really is no relief which the company can ask for and which we could give the company. We happen to know that the party of the Plaintiff is now in full possession of the company, and the company will, no doubt, do what is right according to his view.

The demurrer must be allowed, with the usual consequences, and without leave to amend.MELLISH, L.J.:—

I am of the same opinion. I think it is a matter of considerable importance rightly to determine this question, whether a suit ought to be brought in the name of the company or in the name **\*25** of one of the shareholders on behalf of the others. It is not at all a technical question, but it may make a very serious difference in the management of the affairs of the company. The difference is this:—Looking to the nature of these companies,

looking at the way in which their articles are formed, and that they are not all lawyers who attend these meetings, nothing can be more likely than that there should be something more or less irregular done at them—some directors may have been irregularly appointed, some directors as irregularly turned out, or something or other may have been done which ought not to have been done according to the proper construction of the articles. Now, if that gives a right to every member of the company to file a bill to have the question decided, then if there happens to be one cantankerous member, or one member who loves litigation, everything of this kind will be litigated; whereas, if the bill must be filed in the name of the company, then, unless there is a majority who really wish for litigation, the litigation will not go on. Therefore, holding that such suits must be brought in the name of the company does certainly greatly tend to stop litigation.

In my opinion, if the thing complained of is a thing which in substance the majority of the company are entitled to do, or if something has been done irregularly which the majority of the company are entitled to do regularly, or if something has been done illegally which the majority of the company are entitled to do legally, there can be no use in having a litigation about it, the ultimate end of which is only that a meeting has to be called, and then ultimately the majority gets its wishes. Is it not better that the rule should be adhered to that if it is a thing which the majority are the masters of, the majority in substance shall be entitled to have their will followed? If it is a matter of that nature, it only comes to this, that the majority are the only persons who can complain that a thing which they are entitled to do has been done irregularly; and that, as I understand it, is what has been decided by the cases of     Mozley v. Alston     and     Foss v. Harbottle     . In my opinion that is the rule that is to be maintained. Of course if the majority are abusing their powers, and are depriving the minority of their rights, that is an entirely different **\*26** thing, and there the minority are entitled to come before this Court to maintain their rights;

but if what is complained of is simply that something which the majority are entitled to do has been done or undone irregularly, then I think it is quite right that nobody should have a right to set that aside, or to institute a suit in Chancery about it, except the company itself.  BAGGALLAY, J.A.:—

The matters complained of by this bill, and in respect of which relief is sought, are two in number—the one the refusal of the chairman at the meeting on the 14th of October to grant a poll, and the other that certain arrangements are in contemplation by the directors which may have a prejudicial effect upon the shareholders generally. As regards the first of these two matters, a declaration is asked that the refusal to grant a poll was illegal, and two alternative forms of relief are prayed consequent upon such declaration—the one that the resolutions which were passed at the meeting held under the presidency of the Plaintiff after the original chairman had retired were valid and binding; the other that a meeting should be called under the direction of the Court for the purpose of having those resolutions submitted to the meeting so called.

Now, as regards the former of those two alternatives, I think it was very wisely and properly abandoned in the course of the argument, because one of two things is clear—either that the second meeting of the 14th of October was a continuation of the former one, or an original and independent meeting; if it was a continuation of the former one, the only proper proceedings which could have been taken would have been to have treated the declaration of the former chairman that the meeting was adjourned as a nullity, and to have directed a poll to be taken on the subject of adjournment; if, on the other hand, it is regarded as an original meeting, it was not summoned in manner provided by the articles, and the resolution passed could not be binding. The other alternative form of relief seems to me to be such as this Court is not in the habit of granting, namely, to direct a meeting to be called in order that at that meeting certain resolutions should

be submitted. I am not prepared to say that a case for calling a meeting may not arise,          **\*27**

particularly when the Court desires to have for its own information the views of the shareholders. Meetings have been directed even where the company is not in course of liquidation, but such a course of proceeding is not usual, and certainly I am not aware that any such case has ever occurred when the calling of a meeting is within the power of the shareholders themselves.

Then if you get rid of these two alternative forms of relief, what becomes of the first paragraph of the prayer, which merely asks a declaration that the view taken by the chairman was illegal and improper, and asks a declaration to that effect with no consequential relief? I apprehend that it is not the practice of the Court to make declarations of so utterly useless a character as is there asked.

But that leaves the second paragraph of the prayer to be considered. Now that is based upon an assumed intention on the part of the directors to enter into certain arrangements which may be prejudicial to the shareholders. But what is the real fact? If you turn to the articles you will find that there the fullest possible powers are given to the directors not only to manage the affairs of the company, but to commence, prosecute, continue or discontinue, any litigation that is pending, and it is proposed to ask the Court to make a declaration that those articles are to be overborne by a further rule or declaration of the Court that the directors are not to act without the shareholders' consent, and that a restriction which the shareholders have themselves waived is to be supplemented by the order of the Court. It appears to me, therefore, that not in respect of any one of the several species of relief asked by this bill could relief be given by whomsoever the bill is filed.

I entirely concur in the views expressed by the Lords Justices, that as far as regards the constitution of this suit, even if the allegations formed the subject-matter for a suit in this Court, the proper parties are not Plaintiffs. I entirely concur in the

views expressed by them, and in the reasons as-
signed. I should certainly have been disposed to
have assented to the proposition to give leave to
amend the bill had I thought that by amendment of
the bill a fair case for the intervention of this Court
could        **\*28**         have been made, but being
perfectly satisfied, for the reasons I have just men-
tioned, that the allegations of the bill, apart from
the parties who may happen to be Plaintiffs, are not
such as this Court could act upon, I am of opinion
that it would be most idle to give leave to amend.
END OF DOCUMENT

Copr. © West 2009 No Claim to Orig. Govt. Works

**Tab 12**



[1956] Ch. 565                                              Page 1

[1956] Ch. 565 [1956] 3 W.L.R. 224 [1956] 2 All E.R. 518 (1956) 100 S.J. 452 [1956] Ch. 565 [1956] 3 W.L.R. 224
[1956] 2 All E.R. 518 (1956) 100 S.J. 452 **(Cite as: [1956] Ch. 565)**

**C**

**Pavlides v Jensen**

[1950 P. 1662.]; [1956] 3 W.L.R. 224

Chancery Division

Danckwerts J.

1956 May 3, 4, 14.

Company—Shareholder—Rights against company or directors—Sale of asset—Sale at under-value—Allegation of negligence—Action by minority shareholder—Sale intra vires—No allegations of fraud or oppression—Whether action maintainable.

A minority shareholder of a company sought to bring an action on behalf of himself and all other shareholders, save three who**\*566** were directors of the company, against these directors and the company for damages for negligence on the allegation that the directors had been guilty of gross negligence in effecting a sale of a valuable asset of the company at a price greatly below its true market value. The company was controlled by another company, the majority voting power of which was controlled by the same directors.

On an application by the defendants under R.S.C., Ord. 25, r. 2 , for determination of the question whether on the facts alleged by the plaintiff the action was maintainable:-

that since the sale of the asset in question was not beyond the powers of the company, and since there was no allegation of fraud on the part of the directors or appropriation of the assets of the company by the majority shareholders in fraud of the minority, the action did not fall within the admitted exceptions to the rule in Foss v. Harbottle (1843) 2 Hare 461 , and that, accordingly, it was not maintainable.

Observations of Lord Davey in Burland v. Earle [1902] A.C. 83 , 93 applied.

Observations of Jessel M.R. in Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474 , 480, 482 considered.

Semble, that it is admissible in certain cases to go behind the apparent ownership of shares in order to discover whether a company is in fact controlled by wrongdoers - as, for instance, in the case where the shares were held by mere nominees bound to vote as the owners required them to vote.

ADJOURNED SUMMONS.

The plaintiff, Sir Paul George Pavlides, was the holder of 1,980 deferred shares in the capital of the defendant company, Tunnel Asbestos Cement Co. Ltd. (the company). The company was incorporated in 1935 under the Companies Act, 1929 , as a company limited by shares. The capital of the company (certain redeemable preference shares having all been redeemed) consisted of 600,000 ordinary shares of 10 shillings each and 600,000 deferred shares of one shilling each all of which had been issued and paid up in full or credited as paid up in full. The deferred shareholders had, after the payment of a dividend of 5 per cent. to the ordinary shareholders, an equal interest with the ordinary shareholders in the profits of the company. But by article 74 of the company's articles the holders of the deferred shares were not entitled to receive notices of or to attend or vote in person or by proxy at any general meeting of the company. 578,000 of the ordinary shares and the greater part of the deferred shares were held by another company, Tunnel Portland Cement Co. Ltd.

The personal defendants Niels Max Jensen, William Thomas Charles Cave and James Asher Mackintosh were directors both of the company and also of Tunnel Portland Cement Co. Ltd.**\*567**

On June 19, 1950, the plaintiff on behalf of himself and all other shareholders in the company except the defendant directors issued a writ against the

[1956] Ch. 565

[1956] Ch. 565 [1956] 3 W.L.R. 224 [1956] 2 All E.R. 518 (1956) 100 S.J. 452 [1956] Ch. 565 [1956] 3 W.L.R. 224 [1956] 2 All E.R. 518 (1956) 100 S.J. 452 **(Cite as: [1956] Ch. 565)**

Page 2

first three defendants and the company for damages for negligence.

The complaint of the plaintiff related to a sale of an asbestos mine in Cyprus, which was acquired by the company (according to the statement of claim) in 1936 for about £142,000 and was resold in 1947 for about £182,000 to Cyprus Asbestos Mines Ltd., in which the company held 25 per cent. of the issued capital. This sale was carried through by the defendant directors, and was not submitted to the approval of the company in general meeting.

By the re-amended statement of claim the plaintiff alleged that the conduct of the defendant directors in effecting the sale was grossly negligent, in that it was a sale at a gross undervalue as the defendant directors well knew or ought to have known the true value of the mine (according to the plaintiff's allegations) having been "somewhere in the neighbourhood of £1,000,000."

The plaintiff claimed that he was entitled to the assistance of the court in the manner of this action because (1) he was unable to requisition or attend a general meeting of the company under its articles and (2) the alleged delinquent directors were in a position to control the company and so prevent the company from taking any action against them. The method of control alleged by the plaintiff in this respect was stated in para. 11 of the re-amended statement of claim as follows: "in that (i) at all material times a majority of the ordinary shares of the defendant company (which shares alone have at such times carried the right to vote at general meetings of the company) have been and still are held by the Tunnel Portland Cement Co. Ltd. and (ii) at all material times the three personal defendants have been directors of that company (the defendant Jensen being the chairman of the directors thereof) and together able as such to command a majority of votes at all meetings of the board thereof except between the 13th day of April, 1953, and 31st day of December, 1954. The three personal defendants were and are thus in a position to control the exercise of the majority voting power attached to the

said shares so held by Tunnel Portland Cement Co. Ltd."

The allegations of misfeasance were denied by the defendants, who applied under R.S.C., Ord. 25, r. 2, for the determination before the trial of the action of the following point of law:**\*568** "Whether on the facts alleged in the re-amended statement of claim the plaintiff was and is entitled to institute or maintain this action."

*Charles Russell Q.C.* and *Kenneth Mackinnon* for the applicants. There is no reported decision in support of the proposition which the plaintiff must establish in order to succeed in this action, namely, that a minority shareholders' action is permissible whenever a minority disagrees with a majority on the question whether property of the company has been sold at an undervalue. On the authorities the plaintiff, in order to maintain his action, must show that the sale of the company's mine was either ultra vires the company or illegal, or that the transaction involved fraud on the part of the directors or fraudulent oppression of a minority. If it were otherwise it would be impossible for the domestic management of a company to be carried on, for a minority of the shareholders would be able to thwart the wishes of the majority upon every transaction and proceeding of the company with which it disagreed: see the following textbooks and authorities: Buckley on the Companies Acts, 12th ed., pp. 168-169; Gore-Browne, Handbook on Joint Stock Companies, 41st ed., pp. 382-386; Palmer's Company Law, 19th ed., p. 230; Palmer's Company Precedents, 16th ed., vol. 1, pp. 1037-1039; Halsbury's Laws of England, 3rd ed., vol. 6, pp. 418-420; Burland v. Earle ; Atwool v. Merryweather ; Gray v. Lewis ; Menier v. Hooper's Telegraph Works ; Russell v. Wakefield Waterworks Co. ; MacDougall v. Gardiner ; Mason v. Harris ; Spokes v. Grosvenor Hotel Co. ; Campbell v. Australian Mutual Provident Society ; Normandy v. Ind, Coope & Co. Ltd. ; Dominion Cotton Mills Co. Ltd. v. Amyot ; Cook v. Deeks ; Foster v. Foster ; British America Nickel Corporation v. O'Brien ; Edwards v. Halliwell.

[1956] Ch. 565 [1956] 3 W.L.R. 224 [1956] 2 All E.R. 518 (1956) 100 S.J. 452 [1956] Ch. 565 [1956] 3 W.L.R. 224
[1956] 2 All E.R. 518 (1956) 100 S.J. 452 **(Cite as: [1956] Ch. 565)**

In the present case there is no question of ultra vires, illegality, fraud or fraudulent oppression, nor has there been any attempt**569** to do anything pursuant to an ordinary resolution, which can only be done by way of a special resolution, nor are the alleged wrongdoers the holders of a majority of the shares in the defendant company. If proceedings such as the present action were maintainable it would open the door wide for polite blackmailing actions by minority shareholders who disagreed on certain questions of company policy. It is for the company in general meeting to decide, for example, whether directors should be sued in circumstances such as these, always excepting cases which involve an element of fraud. The present case must be considered as though the transaction in question had been previously agreed upon in general meeting. A minority shareholder could not sue in the absence of fraud. Similarly if the transaction was ratified subsequently. In both cases the answer to the present statement of claim would be that the company acted intra vires.

The plaintiff must have brought these proceedings on the assumption that if a general meeting of the company had been held to determine whether the defendant directors should be sued the meeting would have voted against taking such action. The plaintiff, however, must show that that is something of which in law he can complain. But in these circumstances, in order validly to bring a minority shareholders' action it must be certain that a majority vote would be cast against bringing proceedings because the alleged wrongdoers are themselves the majority. The defendant directors, however, are not shareholders of the company; the shares are held by another company of which the defendants merely happen also to be among the directors.

The present proceedings are not within the admitted exceptions to the rule in Foss v. Harbottle and the action should be dismissed under R.S.C., Ord. 25, r. 3 .

Raymond Walton for the respondent, the plaintiff. The plaintiff, by his statement of claim, alleges that the personal defendants have been guilty of gross negligence. The rule in Foss v. Harbottle is not disputed, but the admitted exceptions to it of fraud, illegality and ultra vires are not by any means exhaustive, and it is submitted that a minority shareholder's action will lie whenever the facts of the case warrant it. Strong reliance is placed on the observations of Jessel M.R. in Russell v. Wakefield Waterworks Co. In Edwards v. Halliwell Jenkins L.J. treats the rule in Foss v. Harbottle as by no means an inflexible rule but one which may be modified in the**570** interests of justice. It is true that there appears to be only one reported decision in which a minority shareholder's action succeeded where neither fraud, illegality nor ultra vires was invoked, but that case, Alexander v. Automatic Telephone Co., carries added weight as an authority since charges of fraud were originally preferred against the directors but were later abandoned.

In the present case the plaintiff alleges that the directors were guilty of a very grave breach of duty in selling property of the company at much below its market value. Alexander's case supports the proposition that in such circumstances it is not necessary to find fraud in order validly to bring an action where there is no other means of obtaining redress for a serious injury done to the company. The question might be asked: why, if the above proposition be good in law, is there to be found no decision in the reports of a case of gross negligence by directors as an exception to the rule in Foss v. Harbottle? The answer lies in the fact that before 1929 it was common form to insert in articles of association a clause absolving directors from the consequences of negligence. The law was altered in this respect by the Companies Act, 1929 , in what is now section 205 of the Act of 1948. The law would be reduced to absurdity if a minority shareholder could only bring an action where a question of fraud, illegality or ultra vires was involved. Let it be supposed that a set of amiable lunatics obtained 51 per cent. of the shares of a company and thereupon deliberately but with the highest motives sold the company's products at greatly below cost price.

Copr. © West 2009 No Claim to Orig. Govt. Works

[1956] Ch. 565                                                                                    Page 4

[1956] Ch. 565 [1956] 3 W.L.R. 224 [1956] 2 All E.R. 518 (1956) 100 S.J. 452 [1956] Ch. 565 [1956] 3 W.L.R. 224
[1956] 2 All E.R. 518 (1956) 100 S.J. 452 **(Cite as: [1956] Ch. 565)**

[DANCKWERTS J. An example might be a body of rabid teetotallers who obtained a controlling interest in a brewery company.]

Yes. It is submitted that in such circumstances a minority shareholder could bring an action for the injury done to the company.

The transaction complained of in the present case was not capable of being for the benefit of the company and a minority cannot be bound by it. Reliance is placed on the observations of Bowen L.J. in Hutton v. West Cork Railway Co. as showing that a minority are only bound to submit to the wishes of the majority where it can be shown that the acts complained of are reasonably incidental to the carrying on of business for the company's benefit.**571**

It was contended for the personal defendants that they are not shareholders of the company and that therefore ipso facto they cannot control it. But the defendants have a controlling interest in Tunnel Portland Cement Co., which holds a majority of the shares in the company. The correct date for ascertaining control is the date of the issue of the writ in the action, for otherwise there might thereafter be a change of control which would affect the action. True, the control of the defendants is a precarious control, since it could be interfered with by Tunnel Portland Cement Co. taking certain actions, for example, removing the defendants from the board of directors. But all control is precarious; until there is interference there is de facto control.

The present action, if successful, would not open the door to all polite actions of blackmail, as was suggested, since the plaintiff must first prove negligence. [Reference was also made to Shuttleworth v. Cox Brothers & Co. (Maidenhead) Ltd. and Baillie v. Oriental Telephone and Electric Co. Ltd. ]

*Russell Q.C.* in reply. There may be sound business reasons why a company should wish to dispose of some of its property for so much less than its true market value; it may in the circumstances be a perfectly reasonable business transaction. Such a

transaction would be intra vires the company. In the present case it is not suggested that what was done was ultra vires or a fraud on a minority. The observations of Jessel M.R. in Russell v. Wakefield Waterworks Co. and of Jenkins L.J. in Edwards v. Halliwell are obiter. Baillie v. Oriental Telephone and Electric Co. Ltd. does not assist the plaintiff because in that case the acts complained of were illegal and ultra vires. The statements in paragraph 5 on p. 169 of Buckley cannot be supported on the authorities. If the exceptions to the rule in Foss v. Harbottle be further extended the rule itself will cease to have any operation. [Reference was also made to Greenhalgh v. Arderne Cinemas Ltd. ]

*Cur. adv. vult.*

May 14. DANCKWERTS J.

read the following judgment. This is an application under R.S.C., Ord. 25, r. 2 , for the determination of the following point of law: "Whether on the facts alleged in the re-amended statement of claim the plaintiff was**572** and is entitled to institute or maintain this action." [His Lordship stated the facts and continued:] The allegations of negligence or misfeasance are denied by the defendants, but the defendants have asked for the decision of the point of law in this case with the object of determining the action and avoiding the expense of the trial. I have to deal with this application on the footing that the allegations in the statement of claim are true. It is agreed that I ought not to allow myself to be affected either by the smallness of the plaintiff's apparent stake in the fortunes of the company or by any scepticism that I may feel as to the alleged magnitude of the defendants' delinquency.

It is contended on behalf of the defendants that the matters in respect of which the plaintiff complains, and in particular the question whether proceedings should be taken against the directors, is a matter of internal management of the company, with which, on the principle stated in Foss v. Harbottle, the court normally will not interfere. It is contended further on behalf of the defendants that the present

[1956] Ch. 565                                                                                                          Page 5

[1956] Ch. 565 [1956] 3 W.L.R. 224 [1956] 2 All E.R. 518 (1956) 100 S.J. 452 [1956] Ch. 565 [1956] 3 W.L.R. 224
[1956] 2 All E.R. 518 (1956) 100 S.J. 452 (**Cite as: [1956] Ch. 565**)

case - based on negligence of directors - is not within the few recognized exceptions to the above-mentioned rule, namely, cases of ultra vires, illegality, or fraud (including fraudulent oppression of a minority by the majority of the shareholders). Further, it is said, the case is not a case where the control of the voting power is in the hands of the directors of the company whose actions are impugned; for they are not the shareholders; the shares are held by another company of which the defendant directors merely happen also to be among the directors.

For the plaintiff, it is contended that the above-mentioned exceptions are not exhaustive, and the court will grant relief wherever justice requires on any ground, and particularly where an otherwise helpless minority shareholder is in need of assistance by the court. As regards control, it is contended that, except for an immaterial period, the defendant directors, being a majority of the directors of Portland Tunnel Cement Co. Ltd. (the holders of the vast bulk of the shares of the company) were in a position to stifle any attempt to institute proceedings in the name of the company against them.

A number of textbooks and a very large number of decisions were cited to me, partly, of course, with the negative object of eliminating any precedent for the present action. In Buckley on the Companies Acts, 12th ed., pp. 168-169, the position is stated as follows: "1. If an act, which might be done with the approval*573 of a majority, be done irregularly and without such approval, then the majority are the only persons who can complain, and the court will not entertain the complaint except at the instance of the majority, and in a proceeding in which the corporation is plaintiff. 2. In any proceeding brought to redress a wrong done to the corporation or to recover property of the corporation, or to enforce rights of the corporation, the corporation is the only proper plaintiff. Except that if (see rule 3 , infra) an individual corporator sues the corporation to prevent it from doing something ultra vires, e.g., to restrain it from carrying out an agreement with a third

party, and joins that third party as a defendant, then as a necessary incident to the first part of the relief claimed, the court will go on to direct the repayment of money, or restoration of property paid or disposed of under the agreement. 3. A single shareholder suing on behalf of himself and others, or suing alone and not on behalf, may make the company a defendant and may restrain the company and directors from doing an act which is illegal, or criminal, or ultra vires the corporation, and which a majority are consequently unable to affirm. A stranger who is not specially damaged cannot sue, neither, semble, can a shareholder, who has with knowledge received and retains part of the proceeds of the ultra vires act, except to restrain future ultra vires dealings. If, however, a majority are opposed to the illegal act, quaere whether the company should not be made, or at any rate joined, as plaintiff. 4. If the act complained of be not ultra vires, but be of a fraudulent character or a wrong done to the corporation, of which therefore the corporation alone upon the principles already stated can complain, yet if the alleged wrongdoers be themselves the majority, or turn the scale of the majority, then the minority may sue by one shareholder on behalf of himself and others. So also, semble, if a bare majority are purporting to do or authorize something inconsistent with the articles, though not ultra vires. Semble, one of the majority should be joined as a defendant. 5. The above are general rules strictly adhered to, but not inflexible, and any case in which the claims of justice require that an action in which the company is not plaintiff should be entertained may be made an exception. But if the case is one in which the company ought to sue, then (subject to rule 6 ) the shareholder must exhaust all reasonable means of obtaining the institution of an action by the company before suing himself. But if the case be one of class 4, it is idle to say*574 that a meeting ought to be called in which the alleged wrongdoers should not vote, for that would be trying the question of fraud as a preliminary step for ascertaining the frame of the action in which it is to be tried." I need not read rules 6 and 7 , which follow. Subject to the doubts which I am about to

[1956] Ch. 565 [1956] 3 W.L.R. 224 [1956] 2 All E.R. 518 (1956) 100 S.J. 452 [1956] Ch. 565 [1956] 3 W.L.R. 224 [1956] 2 All E.R. 518 (1956) 100 S.J. 452 (**Cite as: [1956] Ch. 565**)

mention, this passage seems to me to be a fair statement of the law on this subject.

Now, the phrases in the passage which I have quoted most favourable to the plaintiff in the present case are the reference to "a wrong done to the corporation," as well as cases of fraud and ultra vires, and the statement that the general rules stated are not inflexible and any case in which the claims of justice require that an action in which the company is not plaintiff should be entertained may be made an exception. It would appear that these are based on statements by Sir George Jessel M.R. in Russell v. Wakefield Waterworks Co. In that case Sir George Jessel M.R. said of the rule in Foss v. Harbottle : "that is not a universal rule; that is, it is a rule subject to exceptions, and the exceptions depend very much on the necessity of the case; that is, the necessity for the court doing justice."   Later Sir George Jessel M.R. said (after referring to Atwool v. Merryweather : "As I have said before, the rule is a general one, but it does not apply to a case where the interests of justice require the rule to be dispensed with. I do not intend by the observations I have made in any way to restrain the generality of the terms made use of by the learned judge who decided the case of Foss v. Harbottle." These sound very general words, but judicial expressions must be read in the context in which they occur. In Russell v. Wakefield Waterworks Co. a shareholder in an incorporated company filed his bill on behalf of himself and all other shareholders against the directors and the promoters of a Bill in Parliament for a rival purpose, alleging an illegal payment of the company's money to such promoters to buy off their opposition and praying that it might be replaced. On a demurrer, Sir George Jessel M.R. held that the action was not maintainable on the allegations made, as (though the word "corrupt" was used) there was no allegation that the payments were fraudulent or ultra vires. He gave leave to amend the bill, but it is plain that he regarded the demurrer as final, unless the bill should be amended to raise a claim of fraud or ultra vires,**575** both of which are, of course, recognized exceptions in

which an action can be brought by a shareholder. It is, therefore, doubtful whether Sir George Jessel's observations should be applied to any wider field than such recognized exceptions to the rule in Foss v. Harbottle.

The wide expressions used in Buckley on the Companies Acts and by Sir George Jessel M.R. in the above-mentioned case are not supported by the statement of the law by Lord Davey in the Privy Council case of Burland v. Earle, where he says: "It is an elementary principle of the law relating to joint stock companies that the court will not interfere with the internal management of companies acting within their powers, and in fact has no jurisdiction to do so. Again, it is clear law that in order to redress a wrong done to the company or to recover moneys or damages alleged to be due to the company, the action should prima facie be brought by the company itself. These cardinal principles are laid down in the well-known cases of Foss v Harbottle and Mozley v. Alston, and in numerous later case which it is unnecessary to cite. But an exception is made to the second rule, where the persons against whom the relief is sought themselves hold and control the majority of the shares in the company, and will not permit an action to be brought in the name of the company. In that case the courts allow the shareholders complaining to bring an action in their own names. This, however, is mere matter of procedure in order to give a remedy for a wrong which would otherwise escape redress, and it is obvious that in such an action the plaintiffs cannot have a larger right to relief than the company itself would have if it were plaintiff, and cannot complain of acts which are valid if done with the approval of the majority of the shareholders, or are capable of being confirmed by the majority. The cases in which the minority can maintain such an action are, therefore, confined to those in which the acts complained of are of a fraudulent character or beyond the powers of the company. A familiar example is where the majority are endeavouring directly or indirectly to appropriate to themselves money, property, or advantages which belong to the company,

[1956] Ch. 565                                                                                                    Page 7

[1956] Ch. 565 [1956] 3 W.L.R. 224 [1956] 2 All E.R. 518 (1956) 100 S.J. 452 [1956] Ch. 565 [1956] 3 W.L.R. 224
[1956] 2 All E.R. 518 (1956) 100 S.J. 452 **(Cite as: [1956] Ch. 565)**

or in which the other shareholders are entitled to participate, as was alleged in the case of Menier v. Hooper's Telegraph Works."*576

These observations, indeed, indicate how the principles involved may easily be misstated. Lord Davey refers to an action by shareholders (instead of the company) being allowed "in order to give a remedy for a wrong done which would otherwise escape redress." But he points out that this is purely a matter of procedure, and he expressly confines the cases in which such proceedings can be brought to those in which the acts complained of are of a fraudulent character (in which he includes appropriation by a majority in fraud of the minority of the shareholders) or beyond the powers of the company. Where the act complained of is within the powers of the company and the intention of the majority of the shareholders, in other cases than these exceptions the action is not maintainable. Lord Davey adds that, "Unless otherwise provided by the regulations of the company, a shareholder is not debarred from voting or using his voting power to carry a resolution by the circumstance of his having a particular interest in the subject-matter of the vote."

On the facts of the present case, the sale of the company's mine was not beyond the powers of the company, and it is not alleged to be ultra vires. There is no allegation of fraud on the part of the directors or appropriation of assets of the company by the majority shareholders in fraud of the minority. It was open to the company, on the resolution of a majority of the shareholders, to sell the mine at a price decided by the company in that manner, and it was open to the company by a vote of the majority to decide that, if the directors by their negligence or error of judgment had sold the company's mine at an undervalue, proceedings should not be taken by the company against the directors. Applying, therefore, the principles as stated by Lord Davey, it is impossible to see how the present action can be maintained.

I have examined again all of the large number of

authorities which were cited to me in the course of the arguments. Though there are to be found, in one or two instances, observations which at first sight might justify a more liberal view of the extent of minority shareholders' rights, when taken out of their context, I do not think any of the authorities justify any conclusion other than that which I have reached.

That really disposes of the matter, and it is not really necessary to consider whether, on the allegations contained in the re-amended statement of claim, the defendant directors can be said to have such control of the company as to require (in any *577 appropriate case) the allowance of an action by a minority shareholder. The defendant directors are not in fact the holders of the shares, the voting power of which would settle the company's decision. I think that it must be admissible in certain cases to go behind the apparent ownership of shares in order to discover whether a company is in fact controlled by wrongdoers - as, for instance, in the case where the shares were held by mere nominees, bound to vote as the owners required them to vote. In the present case, the shares are held by a company of which the defendant directors were, for the greater part of the material period, not only directors, but sufficient in number to out-vote the other directors, of the shareholding company. In this manner, it is said they could prevent the shareholding company passing any resolution which might result in proceedings being taken in the name of the company which is alleged to have been injured against them. I suppose the shareholders of the shareholding company could in general meeting decide differently and disagree with the decision of the directors of that company. I am not satisfied that the defendant directors are in such control of the company as is necessary to justify an action by a minority shareholder, but I need not decide this question.

In the result, I reach the conclusion that on the facts alleged in the re-amended statement of claim the action is not maintainable by the plaintiff; and I

ought to dismiss the action under R.S.C., Ord. 25, r.
3 .Order accordingly. (J. A. G. )
END OF DOCUMENT

**Tab 13**

C

**Pender v Lushington**

[1877 P. 35.]

Chancery Division

Jessel M.R.

1877 March 2

Company—Member—Transfer of Shares to increase Voting Power—General Meeting—Rejection of Votes—Action against Directors—Injunction—Name of Company, Right to use.

Where the articles of association of a limited company provided that the company should not be affected with notice of any trust, and contained provisions that every member should be entitled to one vote at a general meeting for every ten shares, but should not be entitled to more than 100 votes in all, and that no member should vote at any general meeting unless he had been possessed of his shares for three months previously thereto:—

that, according to the articles, a member of the company was person whose name was on the register of shareholders; that the register was the only evidence by which the rights of members to vote at a general meeting could be ascertained; and that at a general meeting no votes of shareholders properly qualified and whose names had been three months on the register should be rejected on the ground that their shares had been transferred to them by other shareholders for the purpose of increasing their own voting power, or with an object alleged to be adverse to the interests of the company, or on the ground that the holders were not beneficial owners of the shares.

An action was brought by a shareholder whose vote was rejected, on behalf of himself and all others who had voted with him, naming the company as co-Plaintiff, against the directors, for an injunction to restrain them from acting on the footing of the votes being bad:—

that the Plaintiffs were entitled to an injunction:

also, that till a meeting should be called to decide whether or not the company's name should be used as Plaintiff, the company's name should remain on the record.

THE *Direct United States Cable Company, Limited*, was a company registered under the Companies Act, 1862, with a memorandum and articles of association.

By the 2nd article the register of shareholders was directed "to be kept pursuant to the terms of the Companies Act, 1862 ."

By the 19th article it was provided that "the company shall not be affected with notice of any trust," also that "the executors of a deceased member shall be the only persons recognised by the company as having any title to his share." **\*71**

The following articles related to the provisions for voting at general meetings:— Article 56: "

No member holding less than ten shares is entitled to a vote, and every member holding at least that number of shares shall have one vote for every complete number of ten shares, with the limit that no shareholder shall be entitled to more than 100 votes in all." Article 58: "

If two or more persons are jointly entitled to vote in respect of any share or shares, the member whose name stands first on the register of members as one of the holders of such share or shares, and no other, shall be entitled to vote in respect of the same." Article 59: "

No member shall be entitled to vote in respect of any share that he has acquired by transfer at any meeting held after the expiration of three months from the registration of the company unless he has

Copr. © West 2009 No Claim to Orig. Govt. Works

been possessed of the shares in respect of which he claims to vote for at least three months previously to the time of holding the meeting at which he proposes to vote."

Subsequent articles contained provisions for giving votes by proxy.

The Plaintiff, *John Pender* , was the registered holder of 1000 shares in the company. He was also chairman of the Globe Telegraph and Trust Company, Limited, which was formed in 1873 for the purpose of acquiring telegraphic shares and property, and which was worked in connection with the Anglo-American Telegraph Company.

On the 2nd of February, 1877, an extraordinary general meeting of the company was held pursuant to notice, at which *Pender* moved a resolution in these terms:

"That it is expedient to put an end to the present antagonism of this company towards the *Anglo-American Telegraph Company* and its connections, and to work this company's cable in friendly alliance with their lines; and that a committee of shareholders be appointed to be named by the meeting to confer with the directors as to the best method of giving effect to this resolution, and to report to the shareholders thereon at such time as the meeting shall appoint."

This resolution was seconded and put to the meeting, whereupon **\*72** an amendment thereto was moved by Mr. *Bramwell* , a shareholder of the company, which having been seconded was put to the meeting by the chairman, and declared to be carried by a large majority.

A poll was then demanded by Mr. *Pender* , and the meeting was adjourned to the 5th of February. Meanwhile the votes and the proxies, which had been duly lodged at the office, were examined by the scrutineers.

At the adjourned meeting it appeared from the report of the scrutineers that according to the number of votes recorded there would have been a majority of forty against the amendment, but the chairman ruled out 649 votes, and declared the amendment carried by a majority of 609. Mr. *Pender* then moved a second resolution, and the votes were again taken, and it would have been carried, but the chairman ruled out the same votes as before, and it was accordingly lost.

The grounds on which the chairman ruled out these votes were that they were given in respect of shares which had been transferred by certain large shareholders in the Direct United States Cable Company, who were also shareholders in the Globe Telegraph and Trust Company, and whose voting power was by Article 56 limited to 100 votes, to their own nominees who had no beneficial interest in the *Direct United States Cable Company* , and with the object of increasing the voting powers of the transferors and of furthering the views of the *Globe Telegraph and Trust Company* . These shares had been duly transferred to their present holders three months before the meeting was held, according to Article 59, and the names of the holders were on the register.

An action was then brought by *Pender* (on behalf of himself and all other the shareholders in the Direct United States Cable Company, Limited, who voted against the amendment to the first resolution, and in favour of the second resolution, at the said meetings) and the said *Direct United States Cable Company* , as Plaintiffs, and *E. H. Lushington* and others, the directors of the same company, as Defendants.

A motion was now made on behalf of the Plaintiffs to restrain the Defendants from ruling out the 649 votes, and acting contrary to the second resolution, until the hearing of the action.**\*73**

A summons was also taken out by the Defendants to strike out the name of the company as Plaintiffs, inasmuch as it had been used without the authority of the directors or of a general meeting.

Copr. © West 2009 No Claim to Orig. Govt. Works

*Fry* , Q.C., *Davey* , Q.C., and *H. B. Buckley* , in support of the motion:—

The Plaintiff and those whom he represents are entitled to an injunction to restrain the rejection of the votes representing the 649 shares standing in the names of the Plaintiff and the shareholders in the *Globe Company* . They were clearly registered members of the company, and entitled to vote, having held their shares for three months before the general meeting was held. The fact that some of them were trustees for other persons, or that they ere shareholders in a rival company, is immaterial, as the chairman had no right to inquire into the question whether they were beneficial owners, or whether they exercised their right of voting in the interest of another company.

In the case of In re Stranton Iron and Steel Company , where the holders of 1000 fully paid-up shares made nine transfers of 100 shares each to as many nominees of their own, in order that they might secure full voting power at a meeting of the company, and the directors refused to register the transfers, Vice-Chancellor *Bacon* held that the directors had no right to refuse to register them for the purpose of excluding the transferees from the exercise of their legal rights.

With regard to the form of the action, the directors have taken out a summons to strike out the name of the company, on the ground that it has been used without the authority of the directors or of a general meeting. This case, however, does not fall within the principle of MacDougall v. Merryweather or Foss v. Harbottle . We submit that it comes within the exception referred to in Foss v. Harbottle , that when no action could otherwise brought, the shareholders must have a right to bring an action in the name of the company. Here the chairman acted improperly in the rejection of the votes, and, according to the principles **\*74** laid down in many cases, the action is properly framed: Atwool v. Merryweather ; Russell v. Wakefield Waterworks Company ; East Pant Du United Lead Mining Company v. Merryweather ; Exeter and Crediton Railway Company v. Buller .

*Chitty* , Q.C., and *W. G. Harrison* , for the Defendants:—

When it is clear that shares have been transferred to persons who have no beneficial interest in the company, and for the purpose of creating votes, and to be used in the interests of a rival company, you may then go behind the register: Ex parte Bugg ; Budd's Case ; Cox's Case .

Here the votes tendered, which were ruled out by the chairman, were given in respect of shares transferred by shareholders, who were also shareholders in the *Globe Company* , to their own nominees. By Article 56, the right of voting of each shareholder was limited to 100 votes. By transferring their shares to the present holders, the transferors virtually annulled that article, and increased their own voting power by the votes of persons who had no interest in the company. The chairman, therefore, was justified in rejecting them.

On the question raised by the summons, the name of the company cannot properly be used without the consent of a general meeting. The Defendants would not object to such a meeting being held, but the Court cannot in the meantime grant the injunction with the name of the company remaining improperly on the record.JESSEL, M.R.:—

This is a motion by Mr. *J. Pender* , on behalf of himself and all shareholders who voted with him against an amendment, and the *Direct United States Cable Company, Limited* , as Plaintiffs, against E. H. Lushington and other gentlemen as Defendants, in substance to obtain the opinion of the Court that certain votes at a general meeting on behalf of the Plaintiff were improperly rejected by **\*75** the chairman. That is the substance of the case, though there are other technical questions to which I must also refer.

In all cases of this kind, where men exercise their rights of property, they exercise their rights from some motive adequate or inadequate, and I have always considered the law to be that those who have

Copr. © West 2009 No Claim to Orig. Govt. Works

the rights of property are entitled to exercise them, whatever their motives may be for such exercise—that is as regards a Court of Law as distinguished from a court of morality or conscience, if such a court exists. I put to Mr. *Harrison* , as a crucial test, whether, if a landlord had six tenants whose rent was in arrear, and three of them voted in a way he approved of for a member of Parliament, and three did not, the Court could restrain the landlord from distraining on the three who did not, because he did not at the same time distrain on the three who did. He admitted at once that whatever the motive might be, even if it could be proved that the landlord had distrained on them for that reason, that I could not prevent him from distraining because they had not paid their rent. I cannot deprive him of his property, although he may not make use of that right of property in a way I might altogether approve. That is really the question, because if these shareholders have a right of property, then I think all the arguments which have been addressed to me as to the motives which induced them to exercise it are entirely beside the question.

I am confirmed in that view by the case of Menier v. Hooper's Telegraph Works , where Lord Justice *Mellish* observes: "I am of opinion that, although it may be quite true that the shareholders of a company may vote as they please, and for the purpose of their own interests, yet that the majority of shareholders cannot sell the assets of the company and keep the consideration." In other words, he admits that a man may be actuated in giving his vote by interests entirely adverse to the interests of the company as a whole. He may think it more for his particular interest that a certain course may be taken which may be in the opinion of others very adverse to the interests of the company as a whole, but he cannot be restrained from giving his vote in what way he pleases because he is influenced by that motive. There is, if I may say so, no obligation on a shareholder of a company to **\*76** give his vote merely with a view to what other persons may consider the interests of the company at large. He has a right, if he thinks fit, to give his vote from motives or promptings of what he considers his own individual interest.

This being so, the arguments which have been addressed to me as to whether or not the object for which the votes were given would bring about the ruin of the company, or whether or not the motive was an improper one which induced these gentlemen to give their votes, or whether or not their conduct shews a want of appreciation of the principles on which this company was founded, appear to me to be wholly irrelevant. Therefore I do not intend to enter into the question as to what the objects of the company were, or what was the mode in which it was proposed to carry out those objects. I am only bound to decide whether or not these people were entitled to vote. To that question I am now going to address myself.

It is admitted that the votes tendered were the votes of persons on the register of shareholders, and it is admitted that they had been possessed of those shares for at least three months previously to the time of holding the general meeting, which is what is required by the 59th article. That being so, their votes were rejected on this ground: It was said that the persons who gave the votes were trustees for other persons, and that these other persons, the *cestuis que trust* of those trustees, were also either holders in their own name or as *cestuis que trust* of other shares, amounting in the whole to more than 1000 shares, so that if all the shares to which the persons were entitled had been registered in one name, that person could not have given more than 100 votes, the 56th section of the articles saying, that every member holding at least ten shares shall have one vote for every complete number of ten shares, with this limit, that no shareholder shall be entitled to more than 100 votes in all.

Now the argument is, that the words "every member" mean, not a man registered on the list of shareholders, but any person beneficially entitled to shares, because if not carried to that extent I do not understand the argument at all. If it means that a man may hold 1000 shares beneficially, or that a

man may disunite his shares, then there is no reason why he should be disqualified **\*77** because he has one share in his own name or ten shares in his own name. Therefore the argument must go the whole length that any one man entitled beneficially to more than 1000 shares is not entitled to put them in the name of two or more persons as trustees for him, so as to allow those two or more persons to exercise the power of voting under the articles. It must go to that extent. But, taking even the restricted view, and reading the words "every member" to mean only a person whose name is on the register, then it means this, that any man whose name is registered as a holder of shares cannot, if he is the cestui que trust of other shares, give together with his trustee more votes than if all the shares were registered in his own name. Those are the propositions with which I must deal.

The first observation which strikes one is that these are votes at general meetings. How are you to ascertain who is to vote? That is pointed out by the articles of association. First, who are to be summoned to attend the general meetings? You find by Article 48 that notice is to be given to "the members hereinafter mentioned." What does the word "members" mean in that article? The definition clause, like many other definition clauses, is one which defines nothing. It says: "Member means member for the time being of the company," that is, member means member. But then one must remember that the word "member" has a meaning in the Companies Act , and it means *primâ facie* a registered shareholder or stockholder, and that must be the meaning here, because how else are you to give him notice at all? You can only give him notice by referring to the register which, under Article 2, is "to be kept pursuant to the terms of the Companies Act, 1862 ." So that a member is a man who is on the register.

[His Lordship then reviewed the several articles of association, which shewed that a member of this company meant a person whose name was on the register of shareholders, and that the title of any

member to vote could only be found out by reference to the register. His Lordship then continued:—]

It appears to me that it is plain from reading these articles alone that the articles meant to refer to a registered member, but I think it is made, if possible, plainer—though I doubt whether it could be made plainer when you come to consider that it would not **\*78** be possible to work the company in any other way, for how else could the company hold meetings or demand a poll, or have the votes taken by the scrutineers?—but if possible it is made plainer by the 19th article, which says: "The executors and administrators of a deceased member shall be the only persons recognised by the company as having any title to his share," and also provides that "the company shall not be affected by notice of any trust." And the 30th section of the Companies Act, 1862 , says: "No notice of any trust express, implied, or constructive, shall be entered on the register, or be receivable by the Registrar in the case of companies under this Act, and registered in *England* or *Ireland* ." It comes, therefore, to this, that the register of shareholders, on which there can be no notice of a trust, furnishes the only means of ascertaining whether you have a lawful meeting or a lawful demand for a poll, or of enabling the scrutineers to strike out votes.

The result appears to me to be manifest, that the company has no right whatever to enter into the question of the beneficial ownership of the shares. Any such suggestion is quite inadmissible, and therefore it is clear that the chairman had no right to inquire who was the beneficial owner of the shares, and the votes in question ought to have been admitted as good votes independently of any inquiry as to whether the parties tendering them were or were not, and to what extent, trustees for other persons beneficially entitled to the shares.

I now come to the subordinate question, not very material in the view I take of the case, namely, whether you have the right Plaintiffs here. The Plaintiffs may be described as three, though they

are really two. There is, first, Mr. *Pender* himself, on behalf of himself; next, as the representative of the class of shareholders who voted with him, whose votes I hold to have been improperly rejected; and, next, there is the *Direct United States Cable Company* . It is said that the company ought not to have been made Plaintiffs.

The reasons given were reasons of some singularity, but there is no doubt of this, that under the articles the directors are the custodians of the seal of the company, and the directors, who in fact are Defendants, have certainly not given any authority to the **\*79** solicitor for the Plaintiffs on this record to institute this suit in the name of the company as Plaintiffs. It is equally clear, if I am right in the conclusion to which I have come as to the impropriety of the decision of the chairman in rejecting these votes, that it is a case in which the company might properly sue as Plaintiffs to restrain the directors from carrying out a resolution which had not been properly carried, and then comes the question whether I ought or ought not to allow the company now to remain as Plaintiffs.

The first point to be considered is this: Supposing there was no objection to the right of a general meeting to direct an action to be brought, could I, even in that case, allow the company to sue? I think I could. In that case the general meeting, having a right to direct an action to be brought, would act by the majority of the members. The majority wish their rights to be protected. A meeting could be called, and, if the Court was satisfied that the majority would direct an action to be brought, the company's name would not be taken away. In the meantime the Court must act. It being decided that the company is a proper Plaintiff, that the grievance is one of which the company could complain, that the majority of the company are of that opinion, and that there is no time to call a formal meeting, what is the Court to do? Is it to refuse justice altogether, and say, it being a case for an injunction, that the directors are to have for several weeks (for the articles require three weeks' notice at least of a

general meeting) the power of destroying the property and rights of the company altogether.

Such a course in cases of injunction would be equivalent to saying that there shall be no justice at all administered. It would be an absolute denial of justice, and it appears to me that the Court of Appeal, in the case of MacDougall v. Gardiner , have deliberately adopted that view of the matter, as I read the following observations of Lord Justice *James* : "Any one of the shareholders might have filed his bill in the name of the company, and then, if the directors had said, 'You are not the company; the majority do not act with you, but with us,' the Court would, as it has done in other cases, have taken the means of ascertaining which party **\*80** it is, the Plaintiff's or the Defendant's, which really represents the majority of the company." I suppose he means that the Court may direct a meeting to be called. But what is the Court to do in the meantime, if it is satisfied that a real majority decided in favour of bringing an action? Surely it must do something in the meantime, and it follows, I think, from that portion of the judgment, that in the meantime the Court ought to grant the injunction to keep things *in statu quo* . It may be said that there is no such majority now, but it is nothing to me that the majority is changed. Therefore, while the Court directs a meeting to be called, or gives the shareholders facilities for calling a meeting, it acts in the meantime on the assumption that the majority of the former meeting have not changed their minds. Even if that is not the true meaning of the judgment, and it is not quite so explicit as I could have wished for my guidance, then the only other alternative is that it is a case in which it would be impossible for relief to be obtained by the company bringing an action, and it must be within the exception pointed out in Foss v. Harbottle , that the shareholders must have a right to institute an action in the name of one or more, because otherwise it would be impossible to maintain an action at all. Therefore on that view this is a perfectly good action.

But, acting on the first view, which appears to me to be the correct one, I think I ought not on this summons to take away the name of the company, but to let the summons stand over, leaving either party to call a meeting to decide whether the company's name is to be used or not. In the meantime, whether this is an action in the name of the shareholders or in the name of the company, in either case I think there should be an injunction.

[His Lordship then adverted to a point raised in argument, whether, according to the true construction of the articles, there was not absolute power in the directors for a period of five years to do what they pleased without the control of the company, and considered that they had no such power as to prevent an action being brought against them. He then continued:—]

But there is another ground on which the action may be maintained. This is an action by Mr. *Pender* for himself. He is a **\*81** member of the company, and whether he votes with the majority or the minority he is entitled to have his vote recorded—an individual right in respect of which he has a right to sue. That has nothing to do with the question like that raised in Foss v. Harbottle and that line of cases. He has a right to say, "Whether I vote in the majority or minority, you shall record my vote, as that is a right of property belonging to my interest in this company, and if you refuse to record my vote I will institute legal proceedings against you to compel you." What is the answer to such an action? It seems to me it can be maintained as a matter of substan ce, and that there is no technical difficulty in maintaining it.

Then it is said that there are several rights. No doubt they are rights of suing in a distinct character. I turn to Rules of Court, 1875, Order XVI., rule 1 , and I find this: "All persons may be joined as Plaintiffs in whom the right to any relief claimed is alleged to exist, whether jointly, severally, or in the alternative." It seems to me that this ground of defence must necessarily fail.

The only other point was as to the resolutions themselves. I am not going to give any opinion as to what the effect of the resolutions may be when passed. The only point on which I am asked to decide is to say they ought to have been passed, in other words, that there was a majority for them, and to restrain the Defendants until further order from acting in contravention of them. It follows that, whether or not any reasons can be adduced at the trial to lead me to decide that the injunction shall be further continued, at the present moment it is my duty to say that the resolutions, being on the face of them quite legal, and having been passed by a majority, ought to be obeyed by the directors. I only grant that until further order. The majority in this case, as in other cases, may change their minds; and therefore it is suggested that the following words should be introduced into the order I am about to make: "Until some other resolution shall be passed by a general meeting;" so that my injunction may go no further than the present opinion of the majority warrants. I object to that modification. I think the applicants are entitled to the order they **\*82** ask, which is subject to further order. The summons will stand over till the trial or further order, with liberty to either party to call a meeting.

END OF DOCUMENT

**Tab 14**

C

### Percival v Wright

[1901 P. 1375.]

Chancery Division

Swinfen Eady J.

1902 June 20, 21, 23.

Company—Directors—Fiduciary Position—Purchase of Shares—Negotiations for Sale of Undertaking—Obligation to Disclose.

The directors of a company are not trustees for individual shareholders, and may purchase their shares without disclosing pending negotiations for the sale of the company's undertaking.

WITNESS ACTION.

This was an action to set aside a sale of shares in a limited company, on the ground that the purchasers, being directors, ought to have informed their vendor shareholders of certain pending negotiations for the sale of the company's undertaking.

In and prior to October, 1900, the plaintiffs were the joint registered owners of 253 shares of 10l. each (with 9l. 8s. paid up) in a colliery company called Nixon's Navigation Company, Limited.

The objects of the company, as defined by the memorandum of association, included the disposal by sale of all or any of the property of the company. The board of directors were empowered to exercise all powers not declared to be exercisable by general meetings; but no sale of the company's collieries could be made without the sanction of a special resolution.

The shares of the company, which were in few hands and **\*422** were transferable only with the approval of the board of directors, had no market price and were not quoted on the Stock Exchange.

On October 8, 1900, the plaintiffs' solicitors wrote to the secretary of the company asking if he knew of any one disposed to purchase shares.

On October 15, 1900, in answer to the secretary's inquiry as to what price they were prepared to accept, the plaintiffs' solicitors wrote stating that the plaintiffs would be disposed to entertain offers of 12l. 5s. per share. This price was based on a valuation which the plaintiffs had obtained from independent valuers some months previously.

On October 17, 1900, the chairman of the company wrote to the plaintiffs' solicitors stating that their letter of October 15 had been handed to him, and that he would take the shares at 12l. 5s.

On October 20, 1900, the plaintiffs' solicitors having taken a fresh valuation, replied that the plaintiffs were prepared to accept 12l. 10s. per share.

On October 22, 1900, the chairman wrote accepting that offer, and stating that the shares would be divided into three lots.

On October 24, 1900, the chairman wrote stating that eighty-five shares were to be transferred to himself and eighty-four shares apiece to two other named directors.

The transfers having been approved by the board, the transaction was completed.

The plaintiffs subsequently discovered that, prior to and during their own negotiations for sale, the chairman and the board were being approached by one Holden with a view to the purchase of the entire undertaking of the company, which Holden wished to resell at a profit to a new company. Various prices were successively suggested by Holden, all of which represented considerably over 12l. 10s. per share; but no firm offer was ever made which the board could lay before the shareholders, and the negotiations ultimately proved abortive. The Court

was not in fact satisfied on the evidence that the board ever intended to sell.**423**

The plaintiffs brought this action against the chairman and the two other purchasing directors, asking to have the sale set aside on the ground that the defendants as directors ought to have disclosed the negotiations with Holden when treating for the purchase of the plaintiffs' shares.

*Eve, K.C.* , and *Vaughan Hawkins* , for the plaintiffs. There is no suggestion of unfair dealing or purchase at an undervalue; but the defendants as directors were in a fiduciary position towards the plaintiffs, and ought to have disclosed the negotiations for sale of the undertaking, in which case the plaintiffs would have retained their shares, on the chance of that sale going through.

The primâ facie obligation of directors purchasing shares to disclose all information as to the shares is, no doubt, tacitly released as to information acquired in the ordinary course of management. The defendants, for instance, would not have been bound to disclose a large casual profit, the discovery of a new vein, or the prospect of a good dividend. But that release did not relieve them from disclosing the special information acquired during their negotiations for the sale of the entire undertaking. At the commencement of those negotiations they became trustees for sale for the benefit of the company and the shareholders, and could not purchase the interest of an ultimate beneficiary without disclosing those negotiations: Fox v. Mackreth ; Ex parte Lacey .

[SWINFEN EADY J. Assuming that directors are, in a sense, trustees for the company, are they trustees for individual shareholders?]

They are trustees both for the company and for the shareholders who are the real beneficiaries. No question of privity can arise in the case of trusts: Lindley on Companies, 5th ed. p. 364; Buckley on Companies, 8th ed. p. 560; York and North Midland Ry. Co. v. Hudson ; Ferguson v. Wilson ;

Wilson v. Lord Bury ; In re German Mining Co. **424**

Now, "a share in a company, like a share in a partnership, is a definite proportion of the joint estate, after it has been turned into money, and applied as far as may be necessary in payment of the joint debts": Lindley on Companies, 5th ed. p. 449; Watson v. Spratley .   The undertaking of the company is, therefore, merely the sum of the shares. No doubt at law it belongs to the company, but in equity it belongs to the shareholders, and the directors as trustees for sale of the undertaking cannot purchase the interest of a beneficiary without giving him full information. In this respect the shareholders inter se are in the same position as partners, or shareholders in an unincorporated company. If managing partners employ an agent to sell their business, he cannot purchase the share of a sleeping partner without disclosing the fact of his employment. Incorporation cannot affect this broad equitable principle. It does not alter the rights of the shareholders inter se, though it affects their relations to the external world.

In the present case the plaintiffs knew that the directors were managing the business, but not that they were negotiating a sale of the undertaking, and the non-disclosure of the latter fact entitles them to set aside the sale of their shares.

*Hon. E. C. Macnaghten, K.C.* , and *Mark Romer* , for the defendants. Even if the directors were trustees for sale of the undertaking, they were not trustees for sale of the plaintiffs' shares. The suggested equity has never been applied between a director and a shareholder, although a director purchasing shares must always purchase from a shareholder. The company is a legal entity quite distinct from the shareholders: Salomon v. Salomon & Co. ; so that a sale by a mortgagee to a company in which he is a shareholder is neither in form or substance a sale to himself: Farrar v. Farrars, Limited ; and a sale by a company to a shareholder cannot be impeached on the ground that the resolution authorizing that sale was carried by the votes of that share-

holder: North Western Transportation Co. v. Beatty . The principle underlying these decisions is quite inconsistent with the plaintiffs' contention.

*Eve, K.C.* , in reply.**\*425** SWINFEN EADY J.

The position of the directors of a company has often been considered and explained by many eminent equity judges. In Great Eastern Ry. Co. v. Turner Lord Selborne L.C. points out the twofold position which directors fill. He says: "The directors are the mere trustees or agents of the company—trustees of the company's money and property—agents in the transactions which they enter into on behalf of the company." In In re Forest of Dean Coal Mining Co. Jessel M.R. says: "Again, directors are called trustees. They are no doubt trustees of assets which have come into their hands, or which are under their control, but they are not trustees of a debt due to the company. The company is the creditor, and, as I said before, they are only the managing partners." Again, in In re Lands Allotment Co. , Lindley L.J. says:

"Although directors are not properly speaking trustees, yet they have always been considered and treated as trustees of money which comes to their hands or which is actually under their control; and ever since joint stock companies were invented directors have been held liable to make good moneys which they have misapplied upon the same footing as if they were trustees, and it has always been held that they are not entitled to the benefit of the old Statute of Limitations because they have committed breaches of trust, and are in respect of such moneys to be treated as trustees."

It was from this point of view that York and North Midland Ry. Co. v. Hudson and Parker v. McKenna were decided. Directors must dispose of their company's shares on the best terms obtainable, and must not allot them to themselves or their friends at a lower price in order to obtain a personal benefit. They must act bonâ fide for the interests of the company.

The plaintiffs' contention in the present case goes far beyond this. It is urged that the directors hold a fiduciary position as trustees for the individual shareholders, and that, where negotiations for sale of the undertaking are on foot, they are **\*426** in the position of trustees for sale. The plaintiffs admitted that this fiduciary position did not stand in the way of any dealing between a director and a shareholder before the question of sale of the undertaking had arisen, but contended that as soon as that question arose the position was altered. No authority was cited for that proposition, and I am unable to adopt the view that any line should be drawn at that point. It is contended that a shareholder knows that the directors are managing the business of the company in the ordinary course of management, and impliedly releases them from any obligation to disclose any information so acquired. That is to say, a director purchasing shares need not disclose a large casual profit, the discovery of a new vein, or the prospect of a good dividend in the immediate future, and similarly a director selling shares need not disclose losses, these being merely incidents in the ordinary course of management. But it is urged that, as soon as negotiations for the sale of the undertaking are on foot, the position is altered. Why? The true rule is that a shareholder is fixed with knowledge of all the directors' powers, and has no more reason to assume that they are not negotiating a sale of the undertaking than to assume that they are not exercising any other power. It was strenuously urged that, though incorporation affected the relations of the shareholders to the external world, the company thereby becoming a distinct entity, the position of the shareholders inter se was not affected, and was the same as that of partners or shareholders in an unincorporated company. I am unable to adopt that view. I am therefore of opinion that the purchasing directors were under no obligation to disclose to their vendor shareholders the negotiations which ultimately proved abortive. The contrary view would place directors in a most invidious position, as they could not buy or sell shares without disclosing negotiations, a premature disclosure of which might well be against the best in-

terests of the company. I am of opinion that direct-
ors are not in that position.

There is no question of unfair dealing in this case.
The directors did not approach the shareholders
with the view **\*427** of obtaining their shares. The
shareholders approached the directors, and named
the price at which they were desirous of selling.
The plaintiffs' case wholly fails, and must be dis-
missed with costs.(G. R. A.)

END OF DOCUMENT

Copr. © West 2009 No Claim to Orig. Govt. Works