# Tab 15

# Prudential Assurance Co Ltd v Newman Industries Ltd and others (No 2)

COURT OF APPEAL, CIVIL DIVISION

CUMMING-BRUCE, TEMPLEMAN AND BRIGHTMAN LJJ

23–27, 30, 31 MARCH, 1–3, 6–9, 13–15, 28–30 APRIL, 1, 5, 6, 11–15, 18–22 MAY, 2–5, 10, 11, 22 JUNE, 27, 28, 30, 31 JULY, 5 OCTOBER 1981

*Company – Minority shareholder – Representative action – Jurisdiction of court – Action by minority shareholder against defendants not having voting control of company – Defendants able by reason of position in company to ensure company itself would not bring action – Action alleging defendants induced company by fraud to enter into transaction against company's interests – Circumstances in which question whether minority shareholder entitled to bring derivative action should be determined as a preliminary issue.*

*Company – Minority shareholder – Personal action – Action by minority shareholder against person causing damage to company and loss of profits – Whether personal action by shareholder against wrongdoer misconceived.*

B and L were directors of two companies, Newman and TPG, and in the case of Newman B was the chairman and chief executive and L the vice-chairman responsible to the board for negotiations. B and TPG were shareholders in Newman but did not hold a majority of the shares. TPG had interests in several other companies. B and L also held all the shares of a company which held a substantial shareholding in TPG. By the beginning of 1975 TPG was in serious financial difficulties, was indebted to banks for loans in the sum of about £1m, had insufficient investment income to meet its running costs and interest on the bank loans and had no other source from which to borrow. In view of TPG's difficulties, B and L decided, without the authority or knowledge of the Newman board, that Newman should purchase certain of TPG's assets for some £216,000. When that payment failed to alleviate TPG's difficulties, B conceived a plan to sell TPG's assets (except its shareholding in Newman and another asset) to Newman and drew up a document for the Newman board explaining the plan. The plan involved Newman acquiring TPG's assets in consideration for Newman assuming all TPG's liabilities and paying to TPG a balance for the assets of £325,000. That figure was arrived at by a valuation of the assets carried out by a member of Newman's auditors on the instructions of B and L and on misleading information supplied by B and L. The true net market value of TPG's assets was substantially less than £325,000. By deceit B and L induced the Newman board, with the exception of one director, to accept the valuation as a basis for negotiating the transaction, and to accept the transaction as being in Newman's interests. The majority of the board were hostile to the conduct of the dissenting director who wished to have the merits of the transaction independently investigated. By an agreement dated 3 June 1975 signed by L purporting to act on behalf of the Newman board, but without the board's authorisation, Newman agreed to carry out the transaction for the net consideration from Newman of £325,000. In accordance with Stock Exchange regulations the agreement was made conditional on its approval by the members of Newman in general meeting. A circular, drafted by Newman's solicitors with the assistance of B and L, and signed by B as chairman, was distributed on 21 June to Newman's shareholders explaining the transaction. It was accompanied by a notice convening a general meeting of Newman on 8 July to consider, inter alia, a resolution approving the agreement. The circular recommended that shareholders vote in favour of the resolution. On 8 July, before voting on the resolution took place, the general meeting was adjourned to 29 July to obtain a report by merchant bankers on the merits of the transaction. The merchant bankers were unable to complete their report by 29 July and B refused a further postponement of the general meeting. Accordingly, at a duly convened general meeting of Newman held on 29 July the resolution approving the

a   agreement of 3 June was put to the shareholders and was passed on a poll by a small majority.

The plaintiff, which was a minority shareholder of Newman, brought an action against B, L and TPG seeking, inter alia, (i) on behalf of itself and all other Newman shareholders (except B and TPG), equitable damages against B and L, in favour of Newman, for breach of the defendants' fiduciary duty to Newman (the derivative claim), (ii) on behalf of itself alone, common law damages for conspiracy against B and L (the b   direct personal claim), and (iii) as the representative of the Newman shareholders as at 29 July 1975 (except B and TPG), declarations against B and L that the circular was misleading and tricky and damages for conspiracy (the direct representative claim). The allegations in the statement of claim that the circular was deliberately tricky and misleading and that B and L had conspired to procure its distribution to secure approval of the agreement by the Newman shareholders although the agreement was not in c   Newman's interests, were common to all the claims. At the trial the defendants applied to have determined as a preliminary issue the question whether the plaintiff, as a minority shareholder of Newman, was entitled to maintain the derivative claim against the defendants. The judge ([1980] 2 All ER 841) dismissed the application, and, after hearing the action, went on to hold that B and L had conspired to injure Newman to the advantage of TPG, thereby causing the shareholders of Newman damage, and that the d   minority claim should be allowed to proceed because the evidence showed that there was no real possibility that the question whether Newman itself should bring proceedings against B, L and TPG would be put fairly to Newman's shareholders or even that the transaction with TPG would be fully investigated. B and L appealed.

**Held** – The appeal would be allowed in part for the following reasons—

e   (1) Although the proper plaintiff in an action in respect of a wrong done to a company was prima facie the company itself, exceptionally a minority shareholder could bring a derivative action where the wrong done to the company amounted to fraud and the wrongdoers were themselves in control of the company and thus able to prevent the company from suing; but when such an action was brought by a minority shareholder the question whether in fact the company was controlled by the alleged wrongdoers f   should first be determined before the derivative action itself was allowed to proceed. Accordingly, the judge had been in error in dismissing the defendants' application for the determination as a preliminary issue of the question whether the plaintiff was entitled to maintain the derivative claim against the defendants. However, since the action had in fact been heard and determined and since Newman intended to accept the order made in its favour, the question whether the plaintiff was entitled to bring the g   derivative action was no longer relevant (see p 357 j, p 358 a b, p 364 d to h and p 365 f to p 366 a, post); *Foss v Harbottle* (1843) 2 Hare 461, *East Pant Du United Lead Mining Co Ltd v Merryweather* (1864) 2 Hem & M 254, *Atwool v Merryweather* (1867) LR 5 Eq 464 and *Gray v Lewis* (1873) LR 8 Ch App 1035 considered.

(2) The findings against B and L of conspiracy and fraudulent conduct were only substantiated by the evidence to the extent that it had been proved that they had h   dishonestly concealed the original payment of £216,000 to TPG from the directors and shareholders of Newman in order to obtain the Newman board's acceptance of the later plan to sell TPG's assets to Newman for £325,000. Furthermore, having concealed the payment of £216,000 from the Newman board at the time, B and L were necessarily forced to conceal it later from Newman's auditor when he valued TPG's assets and from Newman's shareholders at the general meeting. Because of the concealment the auditor j   had overvalued TPG's assets by £45,000 and to that extent Newman had suffered a foreseeable loss of £45,000. Accordingly, since Newman had suffered foreseeable loss as the result of B and L's dishonest concealment, a cause of action in fraud was established even if B and C had not deliberately intended to cause the loss (see p 374 f g and p 375 b to f, post).

Per curiam. (1) It is doubtful whether it is practical to decide exceptions to the rule that a member of a company cannot maintain an action on behalf of the company for a wrong done to the company merely on the basis of whether the justice of the case

requires an exception to be made, since that may involve a full trial before the test can be applied. On the other hand, the right to bring a derivative action should not be decided **a** as a preliminary issue on the hypothesis that all allegations in the statement of claim of 'fraud' and 'control of the company' are facts, as in the trial of a preliminary point of law. The plaintiff should at least be required to establish a prima facie case that (a) the company is entitled to the relief claimed and (b) the action falls within the proper boundaries of the rule restricting members' actions on behalf of the company (see p 366 **b** *a* to *c*, post).

(2) Since a shareholder's shares are merely the right to participate in the company on the terms of the articles of association, which right remains unaffected by a wrong done to the company, a personal claim by a shareholder against the wrongdoer on the grounds that the company has suffered a diminution of profits as a result of the wrong would be misconceived (see p 366 *h* to p 367 *b*, post).

Decision of Vinelott J [1980] 2 All ER 841 reversed in part. **c**

**Notes**
For the rule that the company is the proper plaintiff in an action in respect of a wrong done to it and for the exceptions thereto, see 7 Halsbury's Laws (4th edn) paras 767–772, and for cases on the subject, see 9 Digest (Reissue) 747–753, 4434–4483.

**Cases referred to in judgment** **d**
*Atwool v Merryweather* (1867) LR 5 Eq 464n, 37 LJ Ch 35, 9 Digest (Reissue) 686, 4079.
*Baillie v Oriental Telephone and Electric Co Ltd* [1915] 1 Ch 503, CA, 9 Digest (Reissue) 482, 2872.
*Clinch v Financial Corp* (1868) LR 5 Eq 450; affd with variation LR 4 Ch App 117, LC and LJJ, 9 Digest (Reissue) 748, 4449.
*Cotter v National Union of Seamen* [1929] 2 Ch 58, [1929] All ER Rep 342, CA, 45 Digest **e** (Repl) 549, 1273.
*East Pant Du United Lead Mining Co Ltd v Merryweather* (1864) 2 Hem & M 254, 71 ER 460, 9 Digest (Reissue) 628, 3750.
*Edwards v Halliwell* [1950] 2 All ER 1064, CA, 45 Digest (Repl) 545, 1231.
*Foss v Harbottle* (1843) 2 Hare 461, 67 ER 189, 9 Digest (Reissue) 689, 4094.
*Gray v Lewis, Parker v Lewis* (1873) LR 8 Ch App 1035, LJJ, 9 Digest (Reissue) 678, 4046. **f**
*Heyting v Dupont* [1963] 3 All ER 97, [1963] 1 WLR 1192; affd [1964] 2 All ER 273, [1964] 1 WLR 843, CA, 9 Digest (Reissue) 752, 4481.
*Mozley v Alston* (1847) 1 Ph 790, 41 ER 833, LC, 9 Digest (Reissue) 747, 4440.
*Russell v Wakefield Waterworks Co* (1875) LR 20 Eq 474, 10 Digest (Reissue) 1363, 8755.

**Cases also cited** **g**
*Cockburn v Thompson* (1809) 16 Ves Jr 321, 33 ER 1005, LC.
*Wallworth v Holt* (1841) 4 My & Cr 619, 41 ER 238, LC.

**Appeal**
The second defendant, Alan Frank Bartlett, and the third defendant, John Knox Laughton, appealed against the decision of Vinelott J ([1980] 2 All ER 841, [1981] Ch **h** 257) whereby he held that the plaintiffs, the Prudential Assurance Co Ltd (the Prudential), the first defendants, Newman Industries Ltd (Newman), in which Prudential were a minority shareholder, and other shareholders in Newman, were entitled to damages from Mr Bartlett and Mr Laughton for conspiracy and breach of fiduciary duty and that the fourth defendants, Thomas Poole and Gladstone China Ltd (TPG), were liable to make good any loss suffered by Newman as a result of the breach of fiduciary duty by Mr Bartlett and Mr Laughton. The facts are set out in the judgment of Vinelott J in the **j** court below (see [1980] 2 All ER 841 at 845, 850–852).

Mr Bartlett and Mr Laughton appeared in person.
*Leonard Caplan QC, Peter Curry QC* and *Philip Heslop* for the Prudential.
*Robert Reid QC* and *David Hodge* for Newman.
TPG were not represented.

*Cur adv vult*

27, 28, 30, 31 July. **CUMMING-BRUCE, TEMPLEMAN** and **BRIGHTMAN LJJ**
a by turns read the judgment of the court. Their Lordships stated that the great length of
their judgment had caused them to consider whether it would be sensible to hand down
a typed or printed version, as an alternative to the many hours in court which would
inevitably be spent on delivering their judgment. They rejected that expedient for two
reasons: first, the appellants had been found guilty by the trial judge of a civil conspiracy
in circumstances which, subject to stricter procedures, could equally well have led to
b their conviction on a charge of criminal conspiracy, and in such circumstances their
Lordships thought that whichever way the verdict might go they should express their
conclusions orally in open court, and, second, the delay which would be caused by typing
or printing and then proof-reading a written judgment suitable for handing down would
postpone judgment over the Long Vacation. When men's reputations were at stake,
their Lordships did not think it was right to impose an avoidable two months' delay.
c Their Lordships then reviewed the position of the first defendants, Newman Industries
Ltd (Newman), and the fourth defendants, Thomas Poole and Gladstone China Ltd
(TPG), as at 31 March 1973, the events which occurred after 31 March 1973 and the
nature of the proceedings, and continued as follows:

*The law*
d     As we have indicated, when, on 9 January 1976, the writ was issued, the plaintiffs, the
Prudential Assurance Co Ltd (the Prudential), sued only in their personal capacity and
sought only to establish that the June agreement had not been duly approved at a valid
meeting. When the writ was first amended in red on 8 March 1976 the title of the
plaintiffs was altered so as to indicate that they were suing on behalf of Newman, using
the time-honoured formula for this purpose: 'On behalf of themselves and all other
e shareholders, etc . . .' The writ was also amended by adding the third defendant, Mr
Laughton, and TPG as defendants. The writ was expanded by claiming as against TPG
rescission of the agreement and damages; and also, as against the second defendant, Mr
Bartlett, and the third defendant, Mr Laughton, damages for breach of duty and damages
for conspiracy.
    As we have already related, it was a matter of debate in the court below whether the
f action as reconstituted was exclusively a 'derivative' action for an injury allegedly done
to Newman, as counsel for Mr Bartlett and Mr Laughton assumed, or was additionally a
'personal' action for injury allegedly done to the plaintiffs and other shareholders.
Whether the action as then constituted and the claim as then formulated could properly
be regarded as pursuing both derivative and personal remedies is not a matter which we
need to consider.
g     A derivative action is an exception to the elementary principle that A cannot, as a
general rule, bring an action against B to recover damages or secure other relief on behalf
of C for an injury done by B to C. C is the proper plaintiff because C is the party injured,
and therefore the person in whom the cause of action is vested. This is sometimes
referred to as the rule in *Foss v Harbottle* (1843) 2 Hare 461, 67 ER 189 when applied to
corporations, but it has a wider scope and is fundamental to any rational system of
h jurisprudence. The rule in *Foss v Harbottle* also embraces a related principle, that an
individual shareholder cannot bring an action in the courts to complain of an irregularity
(as distinct from an illegality) in the conduct of the company's internal affairs provided
that the irregularity is one which can be cured by a vote of the company in general
meeting. We are not concerned with this aspect of the rule.
    The classic definition of the rule in *Foss v Harbottle* is stated in the judgment of Jenkins
j LJ in *Edwards v Halliwell* [1950] 2 All ER 1064 at 1066–1067 as follows. (1) The proper
plaintiff in an action in respect of a wrong alleged to be done to a corporation is, prima
facie, the corporation. (2) Where the alleged wrong is a transaction which might be
made binding on the corporation and on all its members by a simple majority of the
members, no individual member of the corporation is allowed to maintain an action in
respect of that matter because, if the majority confirms the transaction, cadit quaestio; or,
if the majority challenges the transaction, there is no valid reason why the company
should not sue. (3) There is no room for the operation of the rule if the alleged wrong

is ultra vires the corporation, because the majority of members cannot confirm the transaction. (4) There is also no room for the operation of the rule if the transaction complained of could be validly done or sanctioned only by a special resolution or the like, because a simple majority cannot confirm a transaction which requires the concurrence of a greater majority. (5) There is an exception to the rule where what has been done amounts to fraud and the wrongdoers are themselves in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue.

By their summons issued on 10 May 1979 Mr Bartlett and Mr Laughton invoked the rule in *Foss v Harbottle*. After some two and a half days of argument the judge (on 18 June 1979) dismissed the summons, not on the ground that the plaintiffs were entitled to bring a derivative action but on the ground that it was more convenient to decide that issue after the action had been tried. For reasons which we explain later we have no doubt whatever that that was a wrong decision.

Although not a party to the summons of 10 May, Newman supported it. Newman were represented by leading counsel, who made a forceful statement on day 1 to the effect that, although the action was brought for the benefit of Newman, 'it is the concern of the board that the company shall not be killed by kindness'. He added that not only was it the view of the board that the action was one which they did not wish to pursue on behalf of the company but that it was quite contrary to the interests of the company that the transaction should now be the subject of any rescission or criticism. He said: 'I am therefore concerned . . . that this action . . . shall not proceed; a fortiori . . . it should be disposed of as quickly as possible.' This protest was repeated at the close of the plaintiffs' case on day 34, when counsel formally withdrew in order to avoid needless expense. This is what counsel then told the court:

> 'My clients, Newman Industries Ltd, are necessary formal parties to this action, but they are neither prosecuting it as a corporate entity nor now defending it in a combative role. The circumstances of the case . . . as far as my researches go are unique. They are unique from the company's point of view in this particular material respect in that, although the action is framed in part as a minority shareholders' action, there is in fact no shareholding or board control vested in the personal defendants. Indeed, as regards the Newman board Mr Laughton has not been a director since before the commencement of this action, and Mr Bartlett, although holding such office, has at all material times been but one only of a number of directors comprising the present Newman board. As I indicated briefly to your Lordship at the commencement of this trial, my learned junior and I were at pains to defend it by decision of the independent board, that is to say Mr Bartlett taking no part in that decision. The independent board, so I have it, was motivated by the desire and wish that your Lordship might be afforded every assistance which a substantial public quoted company might be expected to render a court concerned with its affairs . . . The independent board itself has throughout maintained the view that, whilst it was powerless to prevent the Prudential from pursuing the action, it was not one it, the independent board, wished to adopt on Newman's behalf, nor had it been approached by any shareholder requesting that it should. It has been and in fact remains the view of the independent board that any advantage to the company which this action could procure for it is vastly outweighed by harm being inflicted on it by the action continuing with the consequent adverse publicity and other side effects.'

Observe what was being said on behalf of Newman to the judge: 'any advantage to the company which this action could procure is *vastly outweighed* by harm being inflicted on it . . .' This was an apparently responsible statement made by eminent leading counsel on the instructions of persons said to be the independent members of the board. The judge does not refer to this statement in his judgment; he does not say that he did not believe it; he does not say that he regarded the independent members of the board as

acting under the influence of Mr Bartlett. He does not seem to have asked himself the all-important question: 'Ought I to be trying a derivative action?'

The assertion by Newman's counsel that the independent board 'was powerless to prevent Prudential from pursuing the action' may have been based on the supposition that Prudential had on the facts alleged in the statement of claim a personal cause of action for damages against Mr Bartlett and Mr Laughton independently of Newman's cause of action for damages. This supposition, if it existed, was erroneous for reasons which we explain later. It would have been open to Newman to have issued their own summons before the trial in order to test the right of Prudential to pursue a derivative action, and to have supported it with evidence proving the objectiveness of the board's view and explaining the potential injury to Newman which would be caused by the proceedings.

At the end of the day the judge found that a fraud had been committed by Mr Bartlett and Mr Laughton against Newman. The judge then addressed his mind to the question whether the right of a shareholder to sue in a case of fraud extended beyond a case of voting control by the wrongdoers. It was not pleaded, and could not be alleged, that Mr Bartlett and Mr Laughton had voting control. The conclusion reached by the judge was that a shareholder was entitled to prosecute an action on behalf of the company if 'the interests of justice do require that a minority action should be permitted'; and that this was established in the instant case because the judge was satisfied on the evidence as a whole—

> 'that there was no way in which the Prudential could have ensured that the question whether proceedings should be brought by Newman would be fairly put to the shareholders or even that a full investigation would be made into all the circumstances surrounding the transaction, including in particular Mr Cooper's valuation.'

(See [1980] 2 All ER 841 at 877, [1981] Ch 257 at 327.)

In widening the scope of the accepted exception to the rule in Foss v Harbottle by holding that a derivative action can be maintained whenever the interests of justice so require, the judge drew attention to references to 'the justice of the case' which appear in some of the reported authorities on this topic: Russell v Wakefield Waterworks Co (1875) LR 20 Eq 474 at 480, Cotter v National Union of Seamen [1929] 2 Ch 58 at 69, Edwards v Halliwell [1950] 2 All ER 1064 at 1067 and Heyting v Dupont [1964] 2 All ER 273 at 279, [1964] 1 WLR 843 at 851; to which may be added Baillie v Oriental Telephone and Electric Co Ltd [1915] 1 Ch 503 at 518.

We turn now to certain of the authorities, starting with Foss v Harbottle itself. This case was decided in 1843 by the Court of Chancery. It came before Wigram V-C on demurrer. The facts are narrated in that report at intimidating length, and can be summarised as follows. The company concerned was the Victoria Park Co, which had been incorporated by Act of Parliament in 1837 to develop certain plots of land. There were eight promoters, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane. The directors were the first five of these gentlemen.

Lane was the architect and Bunting the solicitor. Foss and Turton were the complaining shareholders. They filed a bill on behalf of themselves and all other shareholders in the company (except the defendants) against the eight promoters, including the assignees of three of them who had become bankrupt. It was alleged that the plots had been bought by the company in pursuance of an arrangement fraudulently concocted between seven of the promoters to enable them to derive a personal benefit from the establishment of the company and the sale to it of the plots at exhorbitant prices. It was further alleged that—

> 'the Defendants concealed from the Plaintiffs ... the several fraudulent and improper acts of the ... Defendants, and the Plaintiffs ... had only recently ascertained the particulars thereof ... and they were unable to set forth the same more particularly, the Defendants having refused to make any discovery thereof, or to allow the Plaintiffs to inspect the books, accounts or papers of the company ...

and that at [general meetings of the company] false and delusive statements
respecting the circumstances and prospects of the company were made by the  *a*
directors to the proprietors who attended such meetings, and the truth of the several
fraudulent and improper acts and proceedings therein complained of was not
disclosed.'

(See 2 Hare 461 at 478–480, 67 ER 189 at 198.)

The bill charged that, in the circumstances, the defendants were jointly and severally
liable to make good to the company the losses incurred in consequence of the wrongful  *b*
and fraudulent acts and proceedings to which they were parties or privies. The
defendants (except Byrom, who took no part) demurred to the bill on the ground that the
corporation was not before the court, and that the defect could not be cured by making
the corporation a defendant because the plaintiffs were not entitled to represent the
corporation.

For the purposes of the application Wigram V-C made the assumption that the  *c*
company was entitled, as matters then stood, to complain of the transactions mentioned
in the bill. He continued (2 Hare 461 at 490–492, 67 ER 189 at 202–203):

'... the bill in this case is brought by two individual corporators, professedly on
behalf of themselves and all the other members of the corporation, except those
who committed the injuries complained of—the Plaintiffs assuming to themselves  *d*
the right and power in that manner to sue on behalf of and represent the corporation
itself. It was not, nor could it successfully be, argued that it was a matter of course
for any individual members of a corporation thus to assume to themselves the right
of suing in the name of the corporation. In law, the corporation, and the aggregate
members of the corporation, are not the same thing for purposes like this; and the
only question can be, whether the facts alleged in this case justify a departure from  *e*
the rule which *primâ facie* would require that the corporation should sue in its own
name and in its corporate character, or in the name of some one whom the law has
appointed to be its representative ... If a case should arise of injury to a corporation
by some of its members, for which no adequate remedy remained, except that of a
suit by individual corporators in their private characters, and asking in such
character the protection of those rights to which in their corporate character they  *f*
were entitled, I cannot but think that the principle so forcibly laid down by Lord
Cottenham in *Wallworth* v. *Holt* ((1841) 4 My & Cr 619 at 635, 41 ER 238 at 244)
and other cases, would apply, and the claims of justice would be found superior to
any difficulties arising out of technical rules respecting the mode in which
corporations are required to sue. But, on the other hand, it must not be without
reasons of a very urgent character that established rules of law and practice are to be  *g*
departed from, rules which, though in a sense technical, are founded on general
principles of justice and convenience; and the question is whether a case is stated in
this bill, entitling the Plaintiffs to sue in their private characters.'

Wigram V-C then proceeded to answer this question in the negative, for the reasons
indicated in the following extracts from his judgment (2 Hare 461 at 492–493, 67 ER  *h*
189 at 203):

'... the directors are made the governing body, subject to the superior control of
the proprietors assembled in general meetings; and, as I understand the Act, the
proprietors so assembled have power, due notice being given of the purposes of the
meeting, to originate proceedings for any purpose within the scope of the company's
powers, as well as to control the directors in any Acts which they may have  *j*
originated ... The first ground of complaint is one which, though it might *primâ
facie* entitle the corporation to rescind the transactions complained of, does not
absolutely and of necessity fall under the description of a void transaction. The
corporation might elect to adopt those transactions, and hold the directors bound by
them. In other words, the transactions admit of confirmation at the option of the
corporation.'

Wigram V-C then considered the second ground of complaint (which we need not deal with) and continued (2 Hare 461 at 493–495, 67 ER 189 at 203–204):

'... whilst the supreme governing body, the proprietors at a special general meeting assembled, retain the power of exercising the functions conferred upon them by the Act of Incorporation, it cannot be competent to individual corporators to sue in the manner proposed by the Plaintiffs on the present record ... the majority of the proprietors at a special general meeting assembled, independently of any general rules of law upon the subject, by the very terms of the incorporation in the present case, has power to bind the whole body, and every individual corporator must be taken to have come into the corporation upon the terms of being liable to be so bound. How then can this Court act in a suit constituted as this is, if it is to be assumed, for the purposes of the argument, that the powers of the body of the proprietors are still in existence, and may lawfully be exercised for a purpose like that I have suggested? Whilst the Court may be declaring the acts complained of to be void at the suit of the present Plaintiffs, who in fact may be the only proprietors who disapprove of them, the governing body of proprietors may defeat the decree by lawfully resolving upon the confirmation of the very acts which are the subject of the suit. The very fact that the governing body of proprietors assembled at the special general meeting may so bind even a reluctant minority is decisive to shew that the frame of this suit cannot be sustained whilst that body retains its functions. In order then that this suit may be sustained, it must be shewn either that there is no such power as I have supposed remaining in the proprietors, or, at least, that all means have been resorted to and found ineffectual to set that body in motion: this latter point is nowhere suggested in the bill: there is no suggestion that an attempt has been made by any proprietor to set the body of proprietors in motion, or to procure a meeting to be convened for the purpose of revoking the acts complained of. The question then is whether this bill is so framed as of necessity to exclude the supposition that the supreme body of proprietors is now in a condition to confirm the transactions in question; or, if those transactions are to be impeached in a Court of Justice, whether the proprietors have not power to set the corporation in motion for the purpose of vindicating its own rights.'

These questions were answered against the plaintiffs.

The next case which falls for consideration related to the fraudulent promotion of some worthless lead mines. There were in fact two actions. It is important to observe that in the first action there was a motion to strike out, but no such motion in the second action, which proceeded to trial. The first action is reported as *East Pant Du United Lead Mining Co Ltd v Merryweather* (1864) 2 Hem & M 254, 71 ER 460. It was alleged that Merryweather, a director of the company, acting in concert with one of his co-directors, Whitworth, had fraudulently sold the mines to the company for £4,000 cash, which they shared between themselves, and 600 shares, to be allotted to Merryweather. In June 1864 a bill was filled in the name of the company against Merryweather to set aside the sale. In August the defendant moved to strike out the bill by way of demurrer. The court adjourned the application in order to allow an opportunity for a general meeting to be held. The meeting was held in October. A resolution was proposed for adopting the proceedings and continuing the action. Whitworth proposed an amendment to stay the action and refer the dispute to arbitration. The amendment was put to the vote, and a poll was taken. Out of 668 votes cast 324 were against the stay and 344 were in favour of the latter, but of the latter 78 votes were cast by Merryweather and 28 votes by Whitworth; if Merryweather had not voted, the motion would have been supported by only 266 votes and would have been lost. It was argued by counsel for the company (2 Hem & M 254 at 257, 71 ER 460 at 462):

'If a minority of a company were allowed to file a bill in the company's name, charging fraud against some of the majority, and alleging that those persons were not to be considered as shareholders or entitled to vote, and thus endeavouring to

turn their minority into a majority so as to acquire the right to use the name of the
company, any company's affairs might be made the subject of litigation upon    *a*
allegations of fraud which might be entirely false; and yet, as this could not be
proved till the hearing, irremediable mischief might be done in the meantime.'

Page Wood V-C acceded to the motion, expressing his reasons as follows (2 Hem & M 254
at 261, 71 ER 460 at 463):

> 'Then comes the question, has the company now sanctioned the suit?  To decide    *b*
> that it has done so would be to discard Mr. Merryweather's votes, and to do that
> would in effect be to decide now on this application the question at issue in the
> suit.  But if I assume, as upon this motion I must assume, that Mr. Merryweather
> was entitled to the 600 shares which he actually holds in the company, the further
> question occurs, has he a right to vote in respect of such shares upon a question in
> which he is personally interested?  Now, as to the managment of the company by    *c*
> the board, no director is entitled to vote as a director in respect of any contract in
> which he is interested; but the case is different when he acts as one of the whole
> body of shareholders.  The shareholders of one company may have dealings with
> interests in other companies, and therefore it would be manifestly unfair to prevent
> an individual shareholder from voting as a shareholder in the affairs of the
> company.  At a general meeting, therefore, Mr. Merryweather's votes must be held    *d*
> to be good so long as he continues to hold his shares.  Further than this the Court
> cannot be asked now to give an opinion, for to do so would be to decide the very
> question at issue in the cause.'

A shareholder then began another action in December, suing on behalf of himself and
all other shareholders (except Merryweather and Whitworth) against Merryweather,
Whitworth and the company.  This is reported as *Atwool v Merryweather* in a footnote to    *e*
*Clinch v Financial Corp* (1868) LR 5 Eq 450 at 464 and more fully in 37 LJ Ch 35.  On this
occasion the defendant did not move to strike out the bill.  The action was fought to a
finish.  Page Wood V-C held, first, that the contract was a complete fraud and, second
that there was not such a defect in the constitution of the suit as would be fatal according
to the authority of *Foss v Harbottle*.  Page Wood V-C referred to the fact that there was
plainly a majority of shareholders, independent of those implicated in the fraud, who    *f*
supported the bill.

The principles which seem to emerge from these two cases are (i) that, if the defendant
against whom fraud is alleged applies to strike out the action in limine, it will not be
assumed that he was guilty of fraud so as to disentitle him from casting his votes at a
general meeting against the action, but (ii) that, if the action is in fact fought to a
conclusion, and the court finds the defendant guilty of fraud, it will in those    *g*
circumstances discount the votes of those implicated in the fraud in reaching a conclusion
whether the plaintiff is authorised to sue on the company's behalf.  What the two cases
leave open is the question in what circumstances the alleged delinquent, or the company,
can halt the proceedings in limine.

Vinelott J placed considerable reliance on this case in widening the accepted exception
to the rule in *Foss v Harbottle*.  He said ([1980] 2 All ER 841 at 871, [1981] Ch 257 at 320):    *h*

> '... *Atwool v Merryweather* shows that the court has jurisdiction to entertain a
> claim by a minority shareholder and to make an order in favour of the defendant
> company even where the other defendants, alone or together with the plaintiffs, do
> not have a majority of votes in general meeting and where the other shareholders
> are not parties.  If that is so, then as I see it, the exception can only be found on a    *j*
> general jurisdiction of the court to make an order for recovery of property or
> damages in favour of a defendant company against co-defendants where the
> jurisdiction is invoked by a minority shareholder.'

We doubt whether *Atwool v Merryweather* goes so far in support of the judge's
conclusion.  It was not a case in which the company or the delinquents sought to stop the
action in limine.  The action had been fought to a conclusion, the liability of the

defendant directors had been established, and nothing therefore remained except for the
company to reap the benefit of the judgment. The court could hardly deny the right of
the plaintiff to an order in favour of the company to give effect to its proved rights, in the
face of a resolution which, excluding the votes of the proven fraudsters, was a majority
resolution:

> '. . . having it plainly before me that there was a majority of the shareholders,
> independent of those implicated in the fraud, supporting the bill, it would be idle
> to go through the circuitous course of saying that leave must be obtained to file a bill
> for the company, and *pro formâ* have a totally different litigation.'

(See Page Wood V-C in *Atwool v Merryweather* (1867) LR 5 Eq 464 at 468.)

There is a clear distinction to be drawn between the application of the rule in *Foss v
Harbottle* when it is sought to stay proceedings in limine and its application when
nothing remains but to enforce a judgment in a derivative action which has been
permitted to proceed.

A simple application of the first aspect of the rule in *Foss v Harbottle* is to be found in
*Gray v Lewis* (1873) LR 8 Ch App 1035. The facts, shortly stated, were as follows.
Charles Lafitte & Co Ltd (the company) was incorporated in December 1865 to purchase
the right to extend to this country the business of Charles Lafitte & Co of Paris (the
partnership). The plaintiff Gray subscribed for shares. The company never acquired
anything from the partnership, and was ordered to be wound up in November 1866.
Shortly thereafter Gray filed a bill on behalf of himself and all other shareholders in the
company, against the company, its directors, its liquidator and the National Bank,
alleging that the assets of the company had been misapplied by the National Bank and by
the directors of the company, and seeking an order that the bank and the directors of the
company might be declared liable to make 'good to the shareholders of the company' the
loss sustained 'by the shareholders'. Mallins V-C made a decree declaring that the bank
and the directors were liable to replace the money, and directed that the amount found
due should be paid into court. The National Bank, and Lewis and Henshaw, two of the
directors, appealed. The appeal of the National Bank was compromised with the
concurrence of the liquidator, on the basis (clearly unobjectionable) that the National
Bank should discharge the debts of the company. The appeal by Lewis and Henshaw
came before the Court of Appeal in Chancery, and was allowed. The reasons were put
trenchantly by James LJ, with whom Mellish LJ agreed, in these words (at 1050–1051):

> 'The bill should not have been filed by a shareholder on behalf of himself and all
> other the [sic] shareholders. It is very important, in order to avoid oppressive
> litigation, to adhere to the rule laid down in *Mozley v. Alston* ((1847) 1 Ph 790, 41 ER
> 833) and *Foss v. Harbottle*, which cases have always been considered as settling the
> law of this Court, that where there is a corporate body capable of filing a bill for
> itself to recover property either from its directors or officers, or from any other
> person, that corporate body is the proper Plaintiff, and the only proper Plaintiff.
> One object of incorporating bodies of this kind was, in my opinion, to avoid the
> multiplicity of suits which might have arisen where one shareholder was allowed to
> file a bill on behalf of himself and a great number of other shareholders. The
> shareholder who first filed a bill might dismiss it, and if he was a poor man the
> Defendant would be unable to obtain his costs, then another shareholder might file
> a bill, and so on. It was also stated to us in the course of the argument that even after
> the Plaintiff had dismissed his bill against a particular Defendant a fresh bill might
> be filed against the Defendant so dismissed. Therefore there might be as many bills
> as there are shareholders multiplied into the number of Defendants. The result
> would be fearful, and I think the Defendant has a right to have the case made against
> him by the real body who are entitled to complain of what he has done. Now in this
> case I am of opinion that the only person—if you may call it a person—having a
> right to complain was the incorporated society called *Charles Lafitte & Co*. In its
> corporate character it was liable to be sued, and was entitled to sue; and if the
> company sued in its corporate character, the Defendant might allege a release or a

compromise by the company in its corporate character—a defence which would not be open in a suit where a Plaintiff is suing on behalf of himself and other shareholders. I think it is of the utmost importance to maintain the rule laid down in *Mozley* v. *Alston* and *Foss* v. *Harbottle*, to which, as I understand, the only exception is where the corporate body has got into the hands of directors and of the majority, which directors and majority are using their powers for the purpose of doing something fraudulent against the minority, who are overwhelmed by them, as in *Atwool* v. *Merryweather*, where Vice-Chancellor *Wood*, under those circumstances, sustained a bill by a shareholder on behalf of himself and others, and there it was after an attempt had been made to obtain a proper authority from the corporate body itself in public meeting assembled.'

This case highlights what the rule in *Foss v Harbottle* is primarily concerned with, namely: is a plaintiff shareholder entitled to prosecute an action on behalf of the company for a wrong done to it, or ought the action to be struck out on the footing that it is for the company and not for a shareholder to sue? That is what *Foss v Harbottle* itself was about, and what the first *East Pant Du* case was about. The second *East Pant Du* case (*Atwool v Merryweather*) raised a related but different question, namely, if at the end of the day fraud is proved, are the circumstances such that the company is capable of condoning the fraud? Clearly not, if the fraud will only be confirmed by a majority by the use of the fraudsters' own voting power.

It is commonly said that an exception to the rule in *Foss v Harbottle* arises if the corporation is 'controlled' by persons implicated in the fraud complained of, who will not permit the name of the company to be used as plaintiffs in the suit: see *Russell v Wakefield Waterworks Co* (1875) LR 20 Eq 474 at 482. But this proposition leaves two questions at large. First, what is meant by 'control', which embraces a broad spectrum extending from an overall absolute majority of votes at one end to a majority of votes at the other end made up of those likely to be cast by the delinquent himself plus those voting with him as a result of influence or apathy. Second, what course is to be taken by the court if, as happened in *Foss v Harbottle*, in the *East Pant Du* case and in the instant case, but did *not* happen in *Atwool v Merryweather*, the court is confronted by a motion on the part of the delinquent or by the company seeking to strike out the action? For at the time of the application the existence of the fraud is unproved. It is at this point that a dilemma emerges. If, on such an application, the plaintiff can require the court to assume as a fact every allegation in the statement of claim, as in a true demurrer, the plaintiff will frequently be able to outmanoeuvre the primary purpose of the rule in *Foss v Harbottle* by alleging fraud and 'control' by the fraudster. If on the other hand the plaintiff has to prove fraud and 'control' before he can establish his title to prosecute his action, then the action may need to be fought to a conclusion before the court can decide whether or not the plaintiff should be permitted to prosecute it. In the latter case the purpose of the rule in *Foss v Harbottle* disappears. Either the fraud has not been proved, so cadit quaestio; or the fraud has been proved and the delinquent is accountable unless there is a valid decision of the board or a valid decision of the company in general meeting, reached without impropriety or unfairness, to condone the fraud.

We think that this brief look at the authorities is sufficient for present purposes. For it so happens that this court cannot properly on his appeal decide the scope of the exception to the rule in *Foss v Harbottle*. The reason is this. The judge permitted the action by the Prudential on behalf of Newman to proceed, and there was no appeal from that decision. In the result he found that Newman were entitled as against Mr Bartlett and Mr Laughton to damages for conspiracy and breach of fiduciary duty, and he directed an inquiry as to damages, subject to a stay in case of an appeal. Thereafter Newman had three choices, subject to the operation of the stay. First, they might do nothing. In this case the Prudential would be entitled, if they so desired, to issue a summons to proceed with the inquiry. Second, Newman might decide for some proper reason, assuming that a proper reason might exist, and duly resolve at a proper board or general meeting, to proceed no further with the claim against Mr Bartlett and Mr Laughton. In this event, assuming that the resolution of the board or of the company in

general meeting was in all respects proper, the Prudential would be unable to proceed with the inquiry because a valid release could be pleaded by Mr Bartlett and Mr Laughton. Third, Newman might adopt the order which the Prudential had obtained on their behalf and pursue the inquiry accordingly. This would occasion no procedural problem nor even any special procedural step. Any party, plaintiff or defendant, can issue a summons to proceed on an order. It would not be necessary for Newman to apply to be made a plaintiff, or to start a fresh action and rely on the principle of res judicata, as was suggested at one time in the course of the argument. The order has been made. Newman are a party to the action. Newman can enforce the order. If this course were adopted, the rule in *Foss v Harbottle* is irrelevant. The rule has no room to operate where the company itself is proceeding with an action, or to enforce a judgment, pursuant to a valid board or company resolution.

Newman by their counsel, acting (as we must assume) on due authority conferred by the company, stated before us that if the finding of fraud stood they would accept the benefit of the order made in their favour. That is the end of *Foss v Harbottle* so far as this appeal is concerned. It is plainly impossible for Mr Bartlett or Mr Laughton to prevent the board of Newman instructing their solicitors to proceed with the inquiry, and recovering from Mr Bartlett and Mr Laughton what may be certified to be due.

It was in the light of these considerations that we declined to hear any argument from counsel for the Prudential on the topic of *Foss v Harbottle*. However desirable it might be in the public interest that we should express our conclusions on the judge's analysis of the rule in *Foss v Harbottle* and what he saw as the exception to it, it was necessary for us to bear in mind that the rule had ceased to be of the slightest relevance to the case. It would have been a grave injustice to all parties to increase the already horrendous costs of this litigation by allowing time for argument on an interesting but irrelevant point. Such consideration of the law as appears in this judgment is, apart from a few submissions made by Mr Bartlett, merely a reflection of our own thoughts without the benefit of sustained argument.

In the result it would be improper for us to express any concluded view on the proper scope of the exception or exceptions to the rule in *Foss v Harbottle*. We desire however to say two things. First, as we have already said, we have no doubt whatever that the judge erred in dismissing the summons of 10 May 1979. He ought to have determined as a preliminary issue whether the plaintiffs were entitled to sue on behalf of Newman by bringing a derivative action. It cannot have been right to have subjected the company to a 30-day action (as it was then estimated to be) in order to enable him to decide whether the plaintiffs were entitled in law to subject the company to a 30-day action. Such an approach defeats the whole purpose of the rule in *Foss v Harbottle* and sanctions the very mischief that the rule is designed to prevent. By the time a derivative action is concluded, the rule in *Foss v Harbottle* can have little, if any, role to play. Either the wrong is proved, thereby establishing conclusively the rights of the company, or the wrong is not proved, so cadit quaestio. In the present case a board, of which all the directors save one were disinterested, with the benefit of the Schroder–Harman report, had reached the conclusion before the start of the action that the prosecution of the action was likely to do more harm than good. That might prove a sound or an unsound assessment, but it was the commercial assessment of an apparently independent board. Obviously the board would not have expected at that stage to be as well informed about the affairs of the company as it might be after 36 days of evidence in court and an intense examination of some 60 files of documents. But the board clearly doubted whether there were sufficient reasons for supposing that the company would at the end of the day be in a position to count its blessings, and clearly feared, as counsel said, that it might be killed by kindness. Whether in the events which have happened Newman (more exactly the disinterested body of shareholders) will feel that it has all been well worth while, or must lick their wounds and render no thanks to those who have interfered in their affairs, is not a question which we can answer. But we think it is within the bounds of possibility that, if the preliminary issue had been argued, a judge might have reached the considered view that the prosecution of this great action should be left to the decision of

the board or of a specially convened meeting of the shareholders, albeit less well informed than a judge after a 72-day action.

So much for the summons of 10 May. The second observation which we wish to make is merely a comment on the judge's decision that there is an exception to the rule in *Foss v Harbottle* whenever the justice of the case so requires. We are not convinced that this is a practical test, particularly if it involves a full-dress trial before the test is applied. On the other hand we do not think that the right to bring a derivative action should be decided as a preliminary issue on the hypothesis that all the allegations in the statement of claim of 'fraud' and 'control' are facts, as they would be on the trial of a preliminary point of law. In our view, whatever may be the properly defined boundaries of the exception to the rule, the plaintiff ought at least to be required before proceeding with his action to establish a prima facie case (i) that the company is entitled to the relief claimed and (ii) that the action falls within the proper boundaries of the exception to the rule in *Foss v Harbottle*. On the latter issue it may well be right for the judge trying the preliminary issue to grant a sufficient adjournment to enable a meeting of shareholders to be convened by the board, so that he can reach a conclusion in the light of the conduct of, and proceedings at, that meeting.

We turn to the personal action. In the statement of claim, as amended on day 12, the plaintiffs pleaded that Mr Bartlett and Mr Laughton—

> 'in breach . . . of their obligation to the shareholders . . . conspired together to benefit TPG at the expense of . . . the shareholders [and that] in furtherance of such conspiracy and in breach of . . . their obligation to the shareholders . . . the defendants Bartlett and Laughton procured the circular to be . . . distributed . . . well knowing and intending it to be misleading and tricky [and] by reason of the foregoing the defendants Bartlett and Laughton are in breach of . . . their obligation to the shareholders.'

In the amended prayer the plaintiffs in their personal capacity as a shareholder in Newman claimed damages for conspiracy against Mr Bartlett and Mr Laughton and a declaration to the like effect on behalf of all other shareholders who had suffered damages and were on the register on 29 July 1975 (the date of the adjourned extraordinary general meeting). Counsel for the Prudential agreed before us that no facts are relied on in support of the personal claim which are not relied on in support of the derivative claim.

The judge upheld the Prudential's personal claim, and also the representative claim with which it was linked. He began with the proposition, which accorded with his findings, that Newman had been induced by fraud to approve an agreement under which Newman paid more (he thought about £445,000 more) than the value of the assets acquired and thus £445,0000 more than it needed to pay; therefore Newman's indebtedness to their bankers immediately after the transaction (about £5m) was £445,000 more than it would have been but for the fraud; therefore the fraud caused a reduction in net profits, which must have affected the quoted price of Newman shares; therefore the plaintiffs suffered some damage in consequence of the conspiracy and that was sufficient to complete the cause of action, the quantum of damages being left to an inquiry.

In our judgment the personal claim is misconceived. It is of course correct, as the judge found and Mr Bartlett did not dispute, that he and Mr Laughton, in advising the shareholders to support the resolution approving the agreement, owed the shareholders a duty to give such advice in good faith and not fraudulently. It is also correct that, if directors convene a meeting on the basis of a fraudulent circular, a shareholder will have a right of action to recover any loss which he has been personally caused in consequence of the fraudulent circular; this might include the expense of attending the meeting. But what he cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only 'loss' is through the company, in the diminution in the value of the net assets of the company, in which he has (say) a 3% shareholding.

The plaintiff's shares are merely a right of participation in the company on the terms of

*a* the articles of association. The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unincumbered property. The deceit practised on the plaintiff does not affect the shares; it merely enables the defendant to rob the company. A simple illustration will prove the logic of this approach. Suppose that the sole asset of a company is a cash box containing £100,000. The company has an issued share capital of 100 shares, of

*b* which 99 are held by the plaintiff. The plaintiff holds the key of the cash box. The defendant by a fraudulent misrepresentation persuades the plaintiff to part with the key. The defendant then robs the company of all its money. The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching £100,000 to nil. There are two wrongs, the

*c* deceit practised on the plaintiff and the robbery of the company. But the deceit on the plaintiff causes the plaintiff no loss which is separate and distinct from the loss to the company. The deceit was merely a step in the robbery. The plaintiff obviously cannot recover personally some £100,000 damages in addition to the £100,000 damages recoverable by the company.

Counsel for the Prudential sought to answer this objection by agreeing that there

*d* cannot be double recovery from the defendant, but suggesting that the personal action will lie if the company's remedy is for some reason not pursued. But how can the failure of the company to pursue its remedy against the robber entitle the shareholder to recover for himself? What happens if the robbery takes place in year 1, the shareholder sues in year 2, and the company makes up its mind in year 3 to pursue its remedy? Is the shareholder's action stayed, if still on foot? Supposing judgment has already been

*e* recovered by the shareholder and satisfied, what then?

A personal action could have the most unexpected consequences. If a company with assets of £500m and an issued share capital of £50m were defrauded of £½m the effect on dividends and share prices would not be discernible. If a company with assets of £10m were defrauded, there would be no effect on share prices until the fraud was discovered; if it were first reported that the company had been defrauded of £½m and

*f* subsequently reported that the company had discovered oil in property acquired by the company as part of the fraud and later still reported that the initial loss to the company could not have exceeded £50,000, the effect on share prices would be bewildering and the effect on dividends would either be negligible or beneficial.

The plaintiffs in this action were never concerned to recover in the personal action. The plaintiffs were only interested in the personal action as a means of circumventing the

*g* rule in *Foss v Harbottle*. The plaintiffs succeeded. A personal action would subvert the rule in *Foss v Harbottle* and that rule is not merely a tiresome procedural obstacle placed in the path of a shareholder by a legalistic judiciary. The rule is the consequence of the fact that a corporation is a separate legal entity. Other consequences are limited liability and limited rights. The company is liable for its contracts and torts; the shareholder has no such liability. The company acquires causes of action for breaches of

*h* contract and for torts which damage the company. No cause of action vests in the shareholder. When the shareholder acquires a share he accepts the fact that the value of his investment follows the fortunes of the company and that he can only exercise his influence over the fortunes of the company by the exercise of his voting rights in general meeting. The law confers on him the right to ensure that the company observes the limitations of its memorandum of association and the right to ensure that other

*j* shareholders observe the rule, imposed on them by the articles of association. If it is right that the law has conferred or should in certain restricted circumstances confer further rights on a shareholder the scope and consequences of such further rights require careful consideration. In this case it is neither necessary nor desirable to draw any general conclusions.

The rule in *Foss v Harbottle* is founded on principle but it also operates fairly by preserving the rights of the majority. We were invited to give judicial approval to the public spirit of the plaintiffs who, it was said, are pioneering a method of controlling

companies in the public interest without involving regulation by a statutory body. In
our view the voluntary regulation of companies is a matter for the City. The compulsory  *a*
regulation of companies is a matter for Parliament. We decline to draw general
conclusions from the exceptional circumstances of the present case. But the results of the
present action give food for thought. The judge thought it possible that Newman had
suffered damage amounting to £440,000 by the fraud of Mr Bartlett and Mr
Laughton. Counsel for Newman submitted in the court below that damage to Newman
by the prosecution of the action exceeded the benefits liable to be derived from the  *b*
action. The costs of the proceedings at the end of the trial were said in newspaper reports
to be in the region of £¾m. If the judge's order is upheld and if the damages suffered by
Newman are assessed at £440,000 and the costs at £750,000 then those damages and
about 95% of the costs will fall on TPG pursuant to the judge's order except in so far as
they are recovered from Mr Bartlett and Mr Laughton. If Newman recover any damages
they must indemnify the Prudential thereout against the difference between the costs of  *c*
the Prudential paid by TPG and (with small exceptions) the costs of the Prudential on a
common fund basis. Part of Newman's costs must be borne by Newman in any event.
Part of the Prudential's costs must be borne by the Prudential in any event.

If this appeal succeeds the burden of the costs on the Prudential will be enormous.
The innocent shareholders of Newman, TPG and the Prudential may well wonder,
whether this appeal succeeds or not, if there is not something to be said after all for the  *d*
old-fashioned rule in *Foss v Harbottle*.

[After reviewing Vinelott J's judgment in detail, their Lordships concluded:]

*Conclusions*
    The problems involved in this case were caused by the fact that the Prudential were
the wrong plaintiffs.  *e*
    If, indeed, Mr Bartlett and Mr Laughton defrauded Newman then the proper plaintiff
was Newman. In an action by Newman against Mr Bartlett and Mr Laughton for
defrauding the company, and against TPG for enjoying the fruits of the fraud, the
circular would be largely evidential. The principal frauds pleaded would have been
frauds practised on the directors and practised on Mr Cooper of Deloitte & Co, who were
Newman's auditors. Each fraudulent representation or fraudulent concealment would  *f*
have been pleaded with particularity.
    Furthermore, in an action by Newman against Mr Bartlett and Mr Laughton all the
documents necessary to enable Newman to plead their case and to make sensible
discovery would have been in the possession of Newman at the outset. Newman would
have known which documents held by TPG were relevant to be discovered. Newman
would then have been in a position to determine which of the discovered documents  *g*
were sufficiently important to produce to the court.
    Counsel for the Prudential frankly admitted that the Prudential pleaded and relied on
the circular because that was the only document revealed to the Prudential as a
shareholder and the only document on which the Prudential could make out a case on
the pleadings prior to discovery. Counsel also frankly admitted that conspiracy was only
pleaded because the Prudential thought that a direct action could not succeed in the  *h*
absence of a plea of conspiracy. The direct action was only pleaded because it was feared
that the derivative action might be defeated by the rule in *Foss v Harbottle* (1843) 2 Hare
461, 67 ER 189.
    In these circumstances discovery was a shambles, there was no proper selection of
documents to be used at the trial because no one knew what to select and what to discard,
and the pleadings were never adequately clarified or timeously amended. The  *j*
complications and obscurities of the statement of claim and the reliance on the circular
and the enormous weight of the discovered documents made it impossible for the
defendants adequately to prepare for the trial or to foresee the course or length of the trial
or to cope with the many trials of strength with regard to their recollection and probity.
    The obscurities and confusion of the pleadings, the mass of documentary evidence, the
fact that the Prudential, not being the proper plaintiffs, had no knowledge of what had
gone on inside Newman and the assumed need to prove conspiracy led to the Prudential

submitting that every Newman and TPG document and every act or omission by Mr

*a*  Bartlett or Mr Laughton was a badge of fraud, and to submit that Mr Cooper's valuation was only explicable by cunning on the part of Mr Laughton and incompetence on the part of Mr Cooper, and that the directors of Newman were bemused and the advisers of Newman blinded.

The task of the judge was made very difficult because the pleadings of the Prudential were concentrated on the circular for tactical reasons connected with the personal action;

*b*  the statement of claim was vague and obscure; the real issues were buried under general assertions of trickiness. The defendants' advisers, no doubt overwhelmed by the number of ingenious accusations of fraud which emerged, were not able adequately to assist the judge by defining those accusations which were material and sounded in damages, those accusations which were relevant but which did not give rise to any damage, and those accusations which were wholly irrelevant save as to credit.

*c*  As the case proceeded and the nature of the Prudential's accusations were gradually disclosed, it is not surprising that the judge decided to intervene and himself to ask questions in order to clarify the evidence being given by the witnesses. But we must criticise some of the interventions of the judge. When Mr Murray was giving evidence, some of the interventions appeared only capable of being answered in a way which would confirm the views already formed by the judge. In the case of the evidence of Mr

*d*  Bartlett and Mr Cooper some of the judge's interventions indicated that he had already formed a hostile view of the explanations that the witnesses were trying to give. Experienced counsel represented the Prudential and Mr Bartlett. The judge should have allowed counsel for Mr Bartlett and Mr Laughton to elucidate from his witnesses the evidence that they were trying to give, without interruption save in so far as it was necessary for clarification. And it was for counsel for Mr Bartlett and Mr Laughton and

*e*  counsel for the Prudential to make their points in cross-examination. It is not appropriate for leading questions to be put from the Bench.

The judge found a conspiracy which had never been pleaded, and fraudulent conduct which had never been particularised. The Prudential, in this court, attempted to overwhelm us with thirty or more accusations of fraud, but in the end fell back on six claims which they submitted had been pleaded and found proven. Of those six the

*f*  second was abandoned in the course of the submissions of counsel for the Prudential.

The first claim concerns the commercial reasons. Those reasons must be read in the context of the information furnished by the circular with regard to the size of the minority shareholdings which were to be acquired in associated companies, the activities and trading results of the principal associated companies and the management influence said to have been obtained by the vendors TPG through those minority shareholdings.

*g*  So read, the commercial reasons informed the Newman shareholders that Newman would benefit from a development and expansion of Newman's international trade which would result from a partnership between Newman and the associated companies secured by the acquisition of TPG's minority shareholdings. In effect, Mr Bartlett was imparting to the Newman shareholders his belief that he could influence the management of the affairs of Newman and the associated companies for the benefit of all

*h*  concerned. So he believed. Therefore to this limited extent the circular was not misleading or tricky to the knowledge of Mr Bartlett and Mr Laughton. But it does not follow, because there were valid commercial reasons for the transaction, that Mr Bartlett and Mr Laughton, as directors of Newman, recommended the transaction to the Newman shareholders in the bona fide belief that it was a transaction into which Newman ought to enter. On this aspect we express our conclusion later.

*j*  The second claim was abandoned.

The third claim was that the circular was tricky and misleading in concealing that the attributed values of quoted associated companies were much higher than their current stock market values. The argument is that appendix 3 of the circular ought to have included a comparison between the stock market price and Mr Cooper's value of each quoted shareholding in Metropole, Dover, Agar Cross and Clough.

The exact charge against counsel for Mr Bartlett and Mr Laughton is still not spelled out. The claim may mean that Mr Bartlett and Mr Laughton believed that Mr Cooper's

value exceeded a fair value for Newman to pay. It may mean that Mr Bartlett and Mr Laughton knew and believed that it was excessive for Newman to pay a price significantly in excess of the stock market price. It may mean that Mr Bartlett and Mr Laughton believed that Mr Cooper's value represented a fair price for Newman to pay but realised that nevertheless the shareholders of Newman ought to have an opportunity of comparing the Stock Exchange price with Mr Cooper's value. Whichever charge is made we consider that it has not been proved.

There is no evidence that Mr Bartlett or Mr Laughton thought that the value of the shares of Clough, Dover, Agar Cross and Metropole suggested in Mr Laughton's letter to Mr Cooper of 11 April 1975 was excessive for Newman to pay. There is no evidence that they were afraid of revealing Stock Exchange prices. Mr Bartlett gave evidence that he did not believe that Stock Exchange prices were a reliable guide to the value of the shareholdings, carrying with them the opportunities and potentialities for which they had been purchased and which Newman acquired from TPG. Neither Mr Cooper nor Schroders appear to have taken the view that Stock Exchange prices were a reliable guide. It was impossible for Mr Bartlett to explain to the shareholders in the circular that Clough was a buy or sell situation together with the reasons. It was impossible to reveal to the shareholders the plans of Mr Laughton and Mr Bartlett with regard to Dover, Metropole and Agar Cross.

The fourth claim was that the circular was tricky and misleading in the indication that the £100,000 SMC loan was worth its face value. The evidence is that Mr Bartlett and Mr Laughton believed that the loan was worth the S Newman Ltd shares and that the S Newman Ltd shares were worth more than £100,000.

The fifth claim is that the circular was tricky and misleading in the indication that the £30,000 Abbott debt was worth its face value. The evidence is that Mr Bartlett and Mr Laughton believed the Abbott loan to be worth £30,000 and that TPG were willing to give Newman a guarantee of payment of principal and interest. It did not occur to Mr Cooper to reduce the value of the debt because of the terms of the payment or the rate of interest. That being so, it is not permissible to infer that Mr Bartlett or Mr Laughton considered that the value of the loan ought to be reduced and fraudulently concealed their belief.

The sixth claim is that the circular was tricky and misleading in that it concealed the January agreements. We have already indicated that there was ample evidence to justify the finding of the judge that the January agreements, and the payments thereunder, were dishonestly concealed from the directors of Newman (to the extent that we have indicated) and from the shareholders of Newman with the object, inter alia, of facilitating the acceptance of the proposals set forth in the strategy document, and that this dishonest concealment involved and included a misleading statement in the circular of the origin and purpose of the payment of £216,000 by Newman to TPG.

As Mr Angus Murray, a director of Newman, made plain in his evidence, he was always puzzled because it was difficult, in discussions with Mr Bartlett, to discover whether, as he spoke, he was wearing a Newman or a TPG hat. TPG were a dealing and investment holding company. Newman were a trading company. If TPG identified and developed a commercial opportunity, the moment might come when it would be sensible, in the interests of the companies, for Newman to take over the TPG interest in a particular company. Hence Mr Bartlett's proposals for 'restructure' of Newman and TPG interests in associated companies in early December 1974. And in their development of opportunities by improving the management of associates TPG introduced into their associated companies those directors of Newman who were most suited to bring TPG's plans to fruition. Further, the TPG holding in Newman shares, and the option held by Newman over shares of TPG, had the double effect that TPG had a financial interest in the success of Newman and Newman could use TPG's shareholding to protect Newman from a take over by a third party at a time when their shares were unduly depressed on the market as a consequence of the general financial climate which had nothing to do with the profitability or assets of Newman. The period at the end of 1974, when TPG were in serious liquidity trouble, coincided with the occasion when Mr Bartlett genuinely regarded Newman as needing strengthening through diversification as Newman's

existing manufacturing activities showed signs of contraction. Mr Bartlett and Mr

a Laughton were optimists, and Mr Bartlett was always eager to impress his personal commercial judgment on his colleagues on the Newman board. He met his match in Mr Angus Murray, who was concerned about the administrative capacity and organisation in Newman, worried about the risk of muddle through the close relationship of Newman and TPG, and rightly cautious about the risk of overstretching Newman's resources. He knew very little about the TPG shareholdings, or about the reasons of Mr Laughton in

b selecting them. In this his position was vastly different from that of Mr Bartlett, Mr Laughton, Mr Bush and Mr Baldwin, and from officials such as Mr Gollop who understood the opportunities presented to Newman when the chance for stepping into TPG's shoes presented itself to Newman in February 1975. The first serious Newman boardroom conflict was manifested on 2 January 1975. The evidence proves that Mr Bartlett, with Mr Laughton's support, then used every weapon available to carry the

c board with him as far as he could. He kept Mr Murray in the dark and proceeded to enter into the January agreements and to arrange payments of the consideration to TPG which in the event amounted to £216,000, knowing full well that Mr Murray would have tried to prevent it had he known what was happening. Once embarked on this course Mr Bartlett and Mr Laughton could or would not disclose to Mr Murray and the Newman board as a board what they had done, and Mr Bartlett ended by confusing the

d history of the £216,000 to Mr Fryer of the Stock Exchange and misrepresenting it to the shareholders on 8 July.

But these deceptions of Mr Murray and of the shareholders at the extraordinary general meeting were not because they believed that the net consideration of £325,000 to £350,000 was too high. We are satisfied that throughout Mr Bartlett believed that his original figure was about right and was content to rely on his expectation that Deloittes,

e would, after their independent investigation, arrive at much the same conclusion.

The judge accepted the plaintiffs' submission that Mr Bartlett and Mr Laughton must have known, and did know, that £325,000 to £350,000 was much too much. So he never had to consider the question whether the explanation of the facts lay in an attempt by Mr Bartlett, with Mr Laughton's concurrence, to keep Mr Murray in the dark and thus carry the rest of the board with him.

f So what the judge would have found about this explanation must remain unknown. But we are ourselves satisfied that this is the inference that should be drawn from the evidence of primary fact about the concealment of the January agreements and the advance payments of £216,000 made pursuant thereto.

Turning from the Prudential's claims as submitted in this court to the issues, the first issue is whether Mr Bartlett and Mr Laughton genuinely believed that it was in

g Newman's interest to accept the proposals contained in the strategy document. The evidence establishes that the transaction recommended in the strategy document, namely the purchase by Newman of the undertaking of TPG with certain exceptions, was a gamble from the start. In our judgment Mr Angus Murray was quite right in 1975 in urging that it was not a gamble which Newman ought to take. The question, however, is whether Mr Bartlett and Mr Laughton genuinely believed that it was a gamble which

h it was in the interests of Newman to take or whether they merely put forward the strategy document because TPG needed to be rescued from a gamble which had failed. If Mr Bartlett and Mr Laughton urged Newman to gamble on the strategy document transaction not because they believed Newman should take the gamble but only because they could see no other way of rescuing TPG, then Mr Bartlett and Mr Laughton were fraudulent; it would matter not that they hoped the gamble would succeed and were

j content for the price to be assessed by an independent valuer. If, on the other hand, they believed that the strategy document recommendation was for the benefit of Newman because it represented a golden opportunity for Newman to reap the benefit of TPG's initiative at a fair price, then they were not fraudulent.

Quite rightly, counsel for the Prudential emphasised, both here and below, the financial difficulties which faced TPG. It does not follow that Mr Bartlett and Mr Laughton were guilty of fraud or breach of duty because the transaction benefited TPG more than Newman, or even that it was inspired as a rescue operation for TPG. If a

conflict of interest and duty arises because a transaction is proposed between two companies, and directors of one company are also directors of the other company, there are two, and only two, possible legal views on the legal viability of the transaction. Either the transaction is one which the directors can properly propose to each company *despite* their conflict of interest and duty or it is one which they cannot properly propose *because of* their conflict of interest and duty. The second view is basically correct in the case of overlapping trusteeships. The first view is rightly accepted as correct in the present case.

If, as we must assume, the transaction could properly go ahead despite the conflict of interest and duty, then Mr Bartlett and Mr Laughton were entitled to propose the transaction in order to benefit TPG; and similarly they were entitled to propose the transaction in order to benefit Newman. Indeed, they were not entitled to propose the transaction except for the purpose of benefiting both Newman and TPG.

The court cannot and will not enter into an inquiry in order to discover whether the transaction would benefit one company more than the other, or whether Mr Bartlett and Mr Laughton believed it would. If such an inquiry were relevant, it would mean that the court would have to hold such a transaction void unless the transaction would be, or was thought to be, of equal benefit (whatever that might mean) to each company. Such an inquiry would be quite impracticable. It also follows that the transaction is capable of being upheld although initiated as a rescue operation for TPG. Every contract of sale must be initiated either by the vendor or by the purchaser. If a sale is legally viable between a particular vendor and a particular purchaser, the existence and nature and weight of the pressures affecting the initiator may explain the existence of a fraud but do not justify an inference of fraud.

The judge's findings that there was a conspiracy to benefit TPG at the expense of Newman appear to indicate that he believed that the strategy document was not bona fide propounded by Mr Bartlett and Mr Laughton in the interests of Newman. But this and other indications in the judgment to the like effect are contradicted by the judge's comment that Mr Bartlett—

'may well have believed that it would be for the ultimate benefit of Newman that it should be placed in relation to the network of associated companies in the central position which was originally to have been occupied by TPG.'

(See [1980] 2 All ER 841 at 879, [1981] Ch 257 at 330.)

We need not resolve these contradictions in the judgment because we do not consider that a dishonest motive on the part of Mr Bartlett and Mr Laughton in urging the adoption of the recommendations contained in the strategy document can now sound in damages.

Even if the recommendation by Mr Bartlett and Mr Laughton that Newman should gamble on the strategy document proposal was not bona fide made in the interests of Newman, in the result Newman did gamble, and gambled successfully. For obvious reasons Newman decided to keep the fruits of the gamble rather than demand repayment of the stake and hand over the fruits. If a punter is induced by fraud to bet on a horse and the horse loses, then the punter can recover his stake from the fraudster. But if the horse wins, then the punter cannot both keep his winnings and claim back his stake. In the present case Newman decided to keep their winnings. It is true that the purchase of the SMC shares shows a loss against the value attributed to the SMC shares by Mr Cooper, but the transaction offered by TPG and accepted by Newman was one transaction in which Newman gambled £1·5m and obtained advantages which they have elected to keep. If Newman were induced to purchase the TPG assets by fraud, then Newman, on discovering the fraud, could rescind the contract of purchase and claim damages, or, alternatively, claim damages for the fraud without rescission. But Newman, having abandoned the remedy of rescission because the gamble paid off, have suffered no damage as a result of that fraud.

The second issue is whether Mr Bartlett and Mr Laughton believed that £350,000 was a fair price for Newman to pay for the acquisition of TPG's undertaking. The net

consideration of £350,000 was based on assets worth £1·5m subject to liabilities of

*a* £1,150,000. If Mr Bartlett and Mr Laughton thought that the assets were not worth £1·5m but were only worth, for example, £1·3m, then irrespective of any fraud involved in inducing Newman to gamble at all, Mr Bartlett and Mr Laughton were guilty of fraud in advising Newman to pay a price which to the knowledge of Mr Bartlett and Mr Laughton exceeded the price which Newman should be advised to pay. The fact that the gamble succeeded and that Newman intend to keep their winnings is irrelevant.

*b* Newman, on this hypothesis, lost £200,000 because they paid £200,000 more than Mr Bartlett and Mr Laughton knew to be a fair price for Newman to acquire the assets.

In our judgment, however, there was no, or no sufficient, evidence from which the judge could properly find that Mr Bartlett and Mr Laughton did not genuinely believe that the assets were worth £1·5m subject to an independent valuation.

There was no challenge to Mr Bartlett's explanation of the origin of the figure of

*c* £350,000 in the strategy document or in the origin of the pro forma balance sheet. There was no, or no sufficient, evidence to support the theory of a conspiracy to procure a persuadable accountant instead of a non-persuadable merchant banker to act as valuer and then to persuade the valuer to accept inflated values for the SMC shares, the SMC loan and the Abbott loan, which were not capable of being inflated. There is no evidence that Mr Laughton did not genuinely believe in the values he put forward in his letter

*d* dated 11 April 1975. All the events which we have chronicled and all the contemporaneous written evidence go to show that Mr Bartlett and Mr Laughton were confident rather than crooked and that Mr Laughton's disappointment when Mr Cooper first put forward a net consideration of less than £350,000 was genuine. The theory that Mr Laughton then overpersuaded Mr Cooper over the telephone is not supported by any evidence and was contradicted by Mr Cooper. The theory that Mr Cooper was

*e* overpersuaded was then fortified by the theory that Mr Cooper was not competent.

The third issue is whether Mr Bartlett or Mr Laughton made false representations to, or knowingly concealed facts from, Mr Cooper which might have influenced his valuation.

There is no, or no sufficient, evidence of any false representations to, or deliberate concealment from, Mr Cooper in relation to any matter other than the January

*f* agreements and the payments thereunder. Again the plaintiffs' theories are unsupported by the contemporaneous evidence. We have dealt fully with the facts and inferences which are relevant to the January agreements and to the payments thereunder. [Their Lordships' discussion thereof occurs in portions of their judgment not reproduced in this report.]

It must now be accepted that the January agreements and the payments thereunder

*g* were dishonestly concealed from the board of Newman to the extent indicated. They were not disclosed to Mr Cooper. They should have been disclosed to Mr Cooper because by accepting and retaining £215,950 in advance under the January agreements TPG was adhering to the prices specified in the January agreements. Thus Mr Bartlett should have mentioned the January agreements in the body of the strategy document, should have mentioned the January agreements to the board and should have told Mr Cooper the

*h* facts concerning the January agreements and the payments. The January agreements and the payments should have been disclosed also because Mr Laughton, who had agreed on behalf of TPG to sell 800,000 Dover shares for £146,000 and to sell the Metropole shares for £85,000, had written to Mr Cooper on 11 April 1975 saying that 832,000 Dover shares were worth £240,000 and that the Metropole shares were worth £350,000. The last payment of the instalments of the aggregate sum of £215,950 was

*j* made after Mr Cooper had been instructed. Mr Laughton should have told Mr Cooper that £215,950 had been paid in advance when he was putting forward his arguments that £75,000 should be included in Mr Cooper's valuation under the heading of interest. When Mr Cooper later found out about the payment of £215,950 he was allowed to believe that the payments had been made on account of the strategy document transaction. Then Mr Bartlett lied about the origin and purpose of the payments in advance to the shareholders at the extraordinary general meeting. He did that in order

to conceal the existence of the January agreements, but there was no point in concealing the January agreements unless they were thought to be relevant or possibly relevant to the strategy document proposals and to the value of the assets. If Mr Bartlett had been truthful at the extraordinary general meeting then at the very least there would, or might, have been a demand for Mr Cooper to reconsider his valuation in the light of the January agreements and the payments thereunder. When the circular was prepared Mr Bartlett knew that the January agreements were material because in evidence he said that the position was that, if the strategy document proposals had not been accepted by the shareholders, then the January agreements would have been put forward. When the circular was prepared Mr Bartlett and Mr Laughton must have known that the statement that £216,000 was an advance payment for the strategy document transaction was at best a half truth. They were originally payments on account of the January agreements and those payments had never been formally ratified and continued as payments on account of the strategy document proposal. If the circular had been revised so as to disclose the January agreements and the payments, then Mr Cooper, as a member of Deloittes considering and playing a prominent part in the production of the circular, would have had at least an opportunity to inquire about the January agreements and to reconsider his valuation in the light of those agreements.

The judge appears to have found that Mr Bartlett and Mr Laughton dishonestly concealed the January agreements and the payments thereunder from Mr Cooper, because in his judgment Vinelott J said:

'Mr Cooper was not told of the sale in January of the shares in Metropole to Newman at the price of £85,000. He agreed that if he had known of this sale he would have found it impossible to attribute any value to the shares of Metropole except the agreed £85,000.'

The judge made a similar comment about the Dover shares.

It is unsatisfactory that because the statement of claim was directed wholly to the circular, Mr Bartlett and Mr Laughton were not directly accused, and the judge did not directly hold that Mr Bartlett and Mr Laughton dishonestly concealed the January agreements and the payments thereunder from Mr Cooper. But we consider that the dishonest concealment from the board and the shareholders (amply proved) necessarily involved dishonest concealment from Mr Cooper, even if Mr Bartlett and Mr Laughton did not appreciate wholly or at all the significance to Mr Cooper of the January agreements in connection with value. Mr Bartlett's untrue statements to the shareholders at the extraordinary general meeting and his acquiescence in misleading Mr Cooper and in the form of the circular support the inference that from start to finish Mr Bartlett and Mr Laughton were dishonest in concealing the agreements from everybody concerned, namely the board, Mr Cooper and the shareholders. Although the statement of claim was directed in terms solely to the circular, Mr Bartlett and Mr Laughton must have appreciated, once the statement of claim raised the issue of the January agreements, that they were accused of concealing the January agreements and the payments thereunder at all times from 7 January 1975 until completion of the sale in July 1975, including concealment from Mr Cooper. Mr Bartlett gave evidence to explain why the January agreements and the payments thereunder were not disclosed and that explanation was not accepted by the judge.

It is not possible to be certain whether and to what extent Mr Cooper's valuation would have been affected by a disclosure of the January agreements and payments. It was only after some tendentious cross-examination by counsel for the Prudential and some forceful intervention by the judge that Mr Cooper was persuaded to reach the conclusion which the learned judge had already reached, and to make the remarks on which the judge relies in his judgment.

Nevertheless we think that Mr Cooper must have been impressed, and ought to have been impressed, by the fact that TPG had accepted the prices specified in the January agreements as fair and reasonable values for the Dover and Metropole shares, provided that the £215,950 was paid by instalments beginning in January. And £215,950 was

paid in advance by Newman and accepted by TPG between January and April 1975. Had
a Mr Cooper known the facts he would have valued the Dover shares at £150,000, ie the
January price of £146,000 for 800,000 Dover shares adjusted for the fact that Mr Cooper
was valuing 832,000 shares. He would have valued the Metropole shares at £85,000, the
January price, instead of £100,000. This would have reduced the net consideration by
£45,000, originally from £225,000 to £180,000.

On this basis the damage caused to Newman by the dishonest concealment of the
b January agreements and the payments thereunder from Cooper was £45,000. The
damages are not affected by the fact that Newman have accepted the transaction from
TPG and have kept their winnings instead of reclaiming their stake.

In the result we consider that the evidence, the statement of claim and the judgment
of Vinelott J establish Newman's entitlement to damages for dishonest concealment of
the January agreements. That concealment caused foreseeable loss to Newman of
c £45,000. Where such dishonest concealment causes foreseeable loss, a cause of action in
fraud is established, even though the defendants did not deliberately intend to cause the
loss. This fraud having been established, we do not consider that the uncertain character
of the pleadings requires this court to relieve Mr Bartlett or Mr Laughton from the
consequences of that fraud.

No amount of further evidence by Mr Laughton or any other witness could explain
d away the admitted fact that TPG had accepted £215,950 as advance consideration under
the January agreements, that Mr Angus Murray and Mr Cooper knew nothing of the
January agreements or the payments thereunder and that Mr Barltett, with the
acquiescence and knowledge of Mr Laughton, lied to the shareholders about the nature
of the payments.

The issue of fraud in connection with the January agreements was clearly raised by the
e pleadings, albeit that the express allegation was directed to the circular. The dishonest
concealment of the January agreements was, we think, clearly established by the
evidence. We have commented adversely on the manner in which the whole action was
clouded by the pleadings and the presentation of the case, but we do not consider that
these defects enable Mr Bartlett and Mr Laughton to escape from the consequences of the
one relevant fraud which was pleaded, proved, argued and decided.

f We wish to hear argument in due course about costs in the court below and in this
court. TPG may wish to ask this court to review the order for costs against them made
by the judge. We also wish to hear argument about the Prudential's costs and their
possible responsibility for Newman's costs in the light of the Prudential's responsibility
for pleading the personal action and thereby prevailing on the judge to hear the derivative
action despite the protests of Newman. We also wish to hear argument whether the
g enormous costs incurred by the Prudential as a result of their own pleadings and
presentation of the case ought to be visited on Mr Bartlett and Mr Laughton. We also
wish to hear argument whether in the exceptional circumstances of the present case Mr
Bartlett and Mr Laughton are entitled to be relieved by the Prudential in respect of the
costs, or part of the costs, which were incurred by Mr Bartlett and Mr Laughton
themselves in repelling the indiscriminate attacks which were made on them in a case in
h which the dishonesty which alone founds our finding of damages was never clearly
pleaded. We may have to consider whether it was practicable for the defendants to
consider paying something into court, if they were so minded (not £450,000, but
perhaps £45,000 or thereabouts) and so save themselves the risk of paying lawyers' costs
due to one side or the other of £½m or more. At present we know nothing about the
costs of this lamentable litigation, and we wish to know about the figure involved on all
j sides as costs in the High Court and this court. We expect all parties to present those
figures when we hear the argument about costs on the date arranged for restoring the
appeal in order to settle the order of the court, and to decide on the proper orders for
costs. We wish to hear argument whether the £45,000 should be paid by TPG, who
benefited from the fraud, or by Mr Bartlett and Mr Laughton.

We would add this. The Prudential have painted Mr Bartlett and Mr Laughton as
crooks, deliberately milking Newman of vast sums of money for their own benefit. This

very serious allegation, persisted in to the end in this court, has not been proved. Mr Bartlett and Mr Laughton have successfully established that that case was based on a series of misunderstandings. The Prudential have proved that in order to win the boardroom battle in January, and to carry through a transaction which has proved to be advantageous to Newman, Mr Bartlett and Mr Laughton kept Mr Angus Murray in the dark about the January agreements and the advance payments made thereunder. Once embarked on this course of concealment they could not, or would not, make a belated disclosure of the matters they had concealed, and so were led into two further concealments, from Mr Cooper and ultimately from the shareholders. It was foreseeable that as a consequence of the non-disclosure to Mr Cooper his valuation would be too high, and, although £45,000 is not a great amount in relation to £1·5m, it is significant enough to escape the description of minimal.

We are sorry that Mr Laughton was not here to hear this court pronounce that all but one of the serious allegations made against him were not proved.

Before we rise we would say one thing. It is proposed to restore the case in order to determine the form of the order and to hear the submissions of the parties about costs, and the date that is provisionally arranged is 2 October. It is difficult to predict how long the submissions of the parties will be. There are five parties concerned and the submissions may be fairly long. Mr Bartlett and Mr Laughton in the court below evidently spent a small fortune on their own costs and we know nothing about their present financial position; but if it is practicable for them, they may think that there would be great advantage in their instructing their solicitors again to instruct counsel, who are already familiar with the case, in order to argue those questions of costs which Mr Bartlett and Mr Laughton wish to submit, and also to make any submissions which are appropriate on how the liability for the £45,000 should fall as between TPG, who enjoyed the cash consideration from the purchase, and the two personal defendants. Whether it will be practicable for Mr Bartlett and Mr Laughton to dig again into their pockets for the purpose of legal representation on the order for costs we do not know. As we have said, we do not know what the figures are. It may be that the figures altogether might run into not five figures but six. So that if it is practicable for the two gentlemen we have mentioned to make a further investment (whether it would be properly described as commercial judgment or a gamble we know not) that might be to their advantage.

*Hearing adjourned*

Solicitors: *C F Whitehorn* (for the Prudential); *Macfarlanes* (for Newman).

5 October. The hearing was resumed.

*Judith Jackson* for Mr Bartlett and Mr Laughton.
*Leonard Caplan QC, Peter Curry QC* and *Philip Heslop* for the Prudential.
*Robert Reid QC* and *David Hodge* for Newman.
*Jules Sher QC* and *Charles Turnbull* for TPG.

Counsel announced that the parties had agreed the terms of a settlement, and by consent an order was made.

*Appeal allowed in part. Respondent's notice dismissed. Order of Vinelott J varied to extent stated in judgment of Court of Appeal. Leave granted to TPG to appeal from judgment of Vinelott J in terms of amended notice of appeal. On basis that all parties had agreed terms of settlement on all matters (including any party's rights to damages, costs or any other relief) no further order made. All further proceedings stayed.*

Solicitors: *Simmons & Simmons* (for Mr Bartlett); *C F Whitehorn* (for the Prudential); *Macfarlanes* (for Newman); *Hopkins, Fuller* (for TPG).

Henrietta Steinberg   Barrister.

**Tab 16**


[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

**C**

### Rolled Steel Products (Holdings) Ltd v British Steel Corp

[1975 R. No. 1350][1976 R. No. 4871]; [1985] 2 W.L.R. 908

Court of Appeal

Lawton, Slade, and Browne-Wilkinson L.JJ.

1984 March 12, 13, 14, 19, 20, 21, 27, 28, 29; April 2, 3, 4; June 11

Company—Powers—Memorandum of association—Object clause—Power to provide security for such companies as seem expedient—Guarantee and debenture executed for purpose unconnected with company's business pursuant to resolution of inquorate meeting—Debenture holder having notice—Debenture holder appointing receiver and receiving assets—Whether power to provide security independent object or ancillary power—Whether guarantee and debenture intra vires—Whether enforceable by debenture holder—Whether receiver and debenture holder constructive trustees of assets received

The plaintiff company, which was in the business of importing and selling steel and of which S. was one of the two directors and the majority shareholder, owed £400,000 to S. Ltd., a company owned by S. A company controlled by the defendant **\*247** corporation, C. Ltd., was owed over £800,000 by S. Ltd., a debt personally guaranteed by S. Both C. Ltd. and the defendant corporation, doubtful that S. Ltd. and S. had sufficient assets to satisfy the debt, instead of pursuing remedies against them, put forward proposals whereby C. Ltd. would lend the plaintiff the money to repay S. Ltd., S. Ltd. in turn would use that money to repay part of its debt to C. Ltd. and the plaintiff would guarantee S. Ltd.'s liabilities to C. Ltd. On 22 January 1969 the plaintiff, which by clause 3 (K) of its memorandum of association had

power to give guarantees or become security for such persons, firms or companies "as may seem expedient," passed a resolution approving the proposals at a board meeting at which S. did not declare any personal interest, as he was required to do by the articles of association if he was to be counted in the quorum of two directors. Pursuant to the resolution, the plaintiff accepted the loan from C. Ltd. and executed a guarantee of S. Ltd.'s indebtedness to C. Ltd. and a debenture over all its assets in favour of C. Ltd. Subsequently, the sums secured by the debenture having been demanded and not paid, C. Ltd. appointed the second defendant receiver and manager, and the sums secured with interest were paid to the defendant corporation as successor to C. Ltd.

In an action against, inter alia, the defendant corporation and the receiver, the plaintiff sought to recover the sums paid out by the receiver, alleging that the guarantee and the debenture, and consequently the appointment of the receiver were void. The judge held that, although the resolution of 22 January 1969 was not formally valid because of the lack of quorum of directors resulting from S.'s failure to declare his interest, C. Ltd. was entitled, in reliance on the rule in *Royal British Bank v. Turquand (1856) 6 E. & B. 327*, to assume that it had been properly passed, a point not taken until counsel's closing address and the subject of an amendment allowed by the judge when giving judgment; but the judge found that the guarantee and, to the extent of the sum guaranteed, the debenture were executed to the knowledge of C. Ltd. for a purpose other than those authorised by the plaintiff's memorandum of association and that, accordingly, the plaintiff was entitled to have them set aside and require the defendants to repay the sum guaranteed.

On appeal by the defendants and cross-appeal by the plaintiff: -

dismissing the appeal and allowing the cross-ap-

peal,(1)

that a defence based on the rule in Royal British Bank v. Turquand (1856) 6 E. & B. 327 was a plea of mixed fact and law which required to be pleaded and it was far too late to allow the defendants to do so by the time of judgment; and that, accordingly, as the resolution of 22 January 1969 had not been and could not be assumed to have been duly passed, the plaintiff was entitled to disclaim the guarantee and the debenture as having been made without its authority (post, pp. 285B-C, 286F-G, 310E-F).(2)

That, although as a matter of construction the power, accorded by clause 3 (K) of the plaintiff's memorandum of association, to give guarantees and become security was a mere power ancillary to the objects of the plaintiff and not an independent object, the execution of the guarantee and the debenture were within the plaintiff's corporate capacity and, **\*248** thus, not ultra vires the plaintiff; but that it was beyond the authority of the directors to enter into the guarantee and, to the extent of the guarantee, the debenture in furtherance of purposes not authorised by the plaintiff's memorandum of association; and that, as C. Ltd. and the defendant corporation knew of that lack of authority, they could acquire no rights under those transactions (post, pp. 289D-F, 297D-F, 307B-E, 309E).

In re David Payne & Co. Ltd. [1904] 2 Ch. 608, C.A. and Introductions Ltd. v. National Provincial Bank Ltd. [1970] Ch. 199, C.A. applied.

Dictum of Pennycuick J. in Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62, 69 approved.

Dictum of Eve J. in In re Lee, Behrens and Co. Ltd. [1932] 2 Ch. 46, 51 disapproved. (3)

That, further, the directors of the plaintiff were acting in breach of the plaintiff's articles of association and their fiduciary duties to the plaintiff in purporting to authorise and in executing the guarantee and the debenture; and that, as the defendant corporation and the receiver had notice of that breach when they received assets of the plaintiff, they were accountable therefor to the plaintiff as constructive trustees (post, pp. 298F-G, 307E, 309E).

Belmont Finance Corporation Ltd. v. Williams Furniture Ltd. (No. 2) [1980] 1 All E.R. 393, C.A. applied. (4)

That, accordingly, the plaintiff was entitled to declarations that the guarantee and the debenture were not deeds of the plaintiff and that the purported appointment of the receiver was void; but that the plaintiff was under an obligation to repay the sum borrowed from C. Ltd. and could not seek redress against the defendants on the basis that such sum had been improperly paid to the defendant corporation, though the defendant corporation was not entitled to retain the interest thereon paid to it by the receiver (post, pp. 299F-G, 300C-E, 307E-F, 310E-F).

Reversion Fund and Insurance Co. Ltd. v. Maison Cosway Ltd. [1913] 1 K.B. 364, C.A. applied.

*Per* Slade and Browne-Wilkinson L.JJ. If confusion is to be avoided, it seems highly desirable that, as a matter of terminology, the phrase "ultra vires" in the context of company law should for the future be rigidly confined to describing acts which are beyond the corporate capacity of a company (post, pp. 297B-C, 303A).

*Per* Lawton L.J. When counsel raises an objection to a question or line of questioning, the trial judge should rule on it at once, and, if he does not, counsel should ask him to do so. If a line of questioning is stopped because it does not relate to an issue on the pleadings, counsel should at once consider whether to amend. If he decides to do so he should apply forthwith and the judge should at once

Copr. © West 2009 No Claim to Orig. Govt. Works

[1986] Ch. 246                                                                 Page 3

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

give a ruling (post, pp. 309H - 310B).

*Per* Slade L.J. (i) The rule in Royal British Bank v. Turquand, 6 E. & B. 327 only applies in favour of persons dealing with the company in good faith. Furthermore, even if they do not have actual knowledge that an irregularity has occurred they will be precluded from relying on the rule if the circumstances were such as to put them on inquiry which they failed duly to make. The very nature of a proposed transaction may put a person on inquiry, even if he has no special relationship with the company (post, pp. 284B-C, E-F, 285A).**\*249**

A. L. Underwood Ltd. v. Bank of Liverpool [1924] 1 K.B. 775, C.A., and dictum of Lord Simonds in Morris v. Kanssen [1946] A.C. 459, 475, H.L.(E.) applied.

(ii) If an act is beyond the corporate capacity of a company it cannot be ratified. However, as a general principle any act falling within the letter of the express or implied powers of a company conferred by its memorandum, even though done for a purpose not authorised by the memorandum, will bind the company if it is done with the unanimous consents of all the shareholders or is subsequently ratified by such consents though not where it would constitute a fraud on its creditors (post, p. 296E-G).

Decision of Vinelott J. [1982] Ch. 478; [1982] 3 W.L.R. 715; [1982] 3 All E.R. 1057 reversed in part.

The following cases are referred to in the judgments:

Ashbury Railway Carriage and Iron Co. Ltd. v. Riche (1875) L.R. 7 H.L. 653, H.L.(E.).

Attorney-General's Reference (No. 2 of 1982) [1984] Q.B. 624; [1984] 2 W.L.R. 447; [1984] 2 All E.R. 216, C.A.

Belmont Finance Corporation Ltd. v. Williams Furniture Ltd. (No. 2) [1980] 1 All E.R. 393, C.A.

Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62; [1969] 3 W.L.R. 122; [1969] 2 All E.R. 1185

Cotman v. Brougham [1918] A.C. 514, H.L.(E.).

Halt Garage (1964) Ltd., In re [1982] 3 All E.R. 1016

Hampshire Land Co., In re [1896] 2 Ch. 743

Horsley & Weight Ltd., In re [1982] Ch. 442; [1982] 3 W.L.R. 431; [1982] 3 All E.R. 1045, C.A.

Introductions Ltd. v. National Provincial Bank Ltd. [1968] 2 All E.R. 1221 ; [1970] Ch. 199; [1969] 2 W.L.R. 791; [1969] 1 All E.R. 887, C.A.

Lee, Behrens and Co. Ltd., In re [1932] 2 Ch. 46

Mahony v. East Holyford Mining Co. Ltd. (1875) L.R. 7 H.L. 869, H.L.(I. )

Morris v. Kanssen [1946] A.C. 459; [1946] 1 All E.R. 586, H.L.(E.).

Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd. [1983] Ch. 258; [1983] 3 W.L.R. 492; [1983] 2 All E.R. 563, C.A. .

Payne (David) & Co. Ltd., In re [1904] 2 Ch. 608 , Buckley J. and C.A.

Reversion Fund and Insurance Co. Ltd. v. Maison Cosway Ltd. [1913] 1 K.B. 364, C.A. .

Royal British Bank v. Turquand (1856) 6 E. & B. 327

Salomon v. A. Salomon & Co. Ltd. [1897] A.C. 22, H.L.(E.)

Smith (Howard) Ltd. v. Ampol Petroleum Ltd. [1974] A.C. 821; [1974] 2 W.L.R. 689; [1974] 1 All E.R. 1126, P.C. .

Somerset, In re [1894] 1 Ch. 231, C.A. .

Transvaal Lands Co. v. New Belgium (Transvaal) Land and Development Co. [1914] 2 Ch. 488, C.A.

Underwood (A. L.) Ltd. v. Bank of Liverpool [1924] 1 K.B. 775, C.A. .

York Corporation v. Henry Leetham and Sons Ltd. [1924] 1 Ch. 557

The following additional cases were cited in argument:

Anglo-Overseas Agencies Ltd. v. Green [1961] 1 Q.B. 1; [1960] 3 W.L.R. 561; [1960] 3 All E.R. 244

Attorney-General for Canada v. Standard Trust Co. of New York [1911] A.C. 498, P.C. .

**\*250** Baker (G. L.) Ltd. v. Medway Building and Supplies Ltd. [1958] 1 W.L.R. 1216; [1958] 3 All E.R. 540, C.A. .

Bamford v. Bamford [1970] Ch. 212; [1969] 2 W.L.R. 1107; [1969] 1 All E.R. 969, C.A. .

Duomatic Ltd., In re [1969] 2 Ch. 365; [1969] 2 W.L.R. 114; [1969] 1 All E.R. 161

E.B.M. Co. Ltd. v. Dominion Bank [1937] 3 All E.R. 555, P.C. .

Express Engineering Works Ltd., In re [1920] 1 Ch. 466, C.A. .

Fine Industrial Commodities Ltd., In re [1956] Ch. 256; [1955] 3 W.L.R. 940; [1955] 3 All E.R. 707

Hely-Hutchinson v. Brayhead Ltd. [1968] 1 Q.B. 549; [1967] 3 W.L.R. 1408; [1967] 3 All E.R. 98, C.A. .

Holder v. Holder [1968] Ch. 353; [1968] 2 W.L.R. 237; [1968] 1 All E.R. 665, C.A. .

Home and Colonial Insurance Co. Ltd., In re [1930] 1 Ch. 102

Ideal Bedding Co. Ltd. v. Holland [1907] 2 Ch. 157

Imperial Mercantile Credit Association (Liquidators of) v. Coleman (1873) L.R. 6 H.L. 189, H.L.(E.) .

Johnson (B.) & Co. (Builders) Ltd., In re [1955] Ch. 634; [1955] 3 W.L.R. 269; [1955] 2 All E.R. 775, C.A. .

Land Credit Co. of Ireland, In re, Ex parte Overend, Gurney & Co. (1869) L.R. 4 Ch.App 460

Newman (George) & Co., In re [1895] 1 Ch. 674, C.A. .

Parker and Cooper Ltd. v. Reading [1926] Ch. 975

Rolls-Royce Ltd., In re [1974] 1 W.L.R. 1584; [1974] 3 All E.R. 646

V.G.M. Holdings Ltd., In re [1942] Ch. 235; [1942] 1 All E.R. 224, C.A. .

**APPEAL AND CROSS-APPEAL from Vinelott J.**

The plaintiff, Rolled Steel Products (Holdings) Ltd., in two consolidated actions claimed against the defendants, British Steel Corporation, Mr. Vivian Rupert Vaughan Cooper, the trustee in bankruptcy of Mr. Alexander Ilytch Shenkman, Mr. Ilya Michael Shenkman and, after the death of the latter, his personal representatives, Mrs. Olga Shenkman and Mr. Gregory Alexander Shenkman, inter alia, against the first and second defendants, declarations that a guarantee made between the plaintiff and Colvilles Ltd. and a debenture granted by the plaintiff to Colvilles Ltd. and the purported appointment by the first defendant of the second defendant as receiver and manager of the property purportedly charged by the debenture were void; repayment to the plaintiff of all money realised from the property charged, with interest; alternatively, damages for trespass and conversion.

By order of 23 March 1983 Vinelott J., having granted leave to the first and second defendants to amend their defence to allege that they were entitled to rely on the ostensible authority of the plaintiff's directors to enter into and to execute the guarantee and debenture and having refused leave to the first and second defendants to amend their defence to rely on an allegation that the granting of the guarantee and debenture had been approved by all the plaintiff's shareholders, ordered, inter alia, that (1) the guarantee executed by the plaintiff on 22 January 1969 be set aside; and (2) the first and second defendants were jointly and severally liable to replace and pay to the plaintiff £383,084.77, being the principal amount received by the first defendant in discharge of the          **\*251** guarantee out of the proceeds of sale of the plaintiff's assets realised by the second defendant, and interest and other amounts in accordance with accounts and inquiries directed.

The first and second defendants appealed by notice dated 25 April 1983 on the grounds, inter alia, that (1) the judge erred in holding that the guarantee and to the extent of the guarantee the debenture were

Copr. © West 2009 No Claim to Orig. Govt. Works

ultra vires the plaintiff (in the sense of being beyond the powers of the company as a matter of corporate capacity); (2) the judge ought to have held that the execution of the guarantee was intra vires the plaintiff whatever the state of mind of the directors of the plaintiff when they procured its execution on behalf of the plaintiff; (3) the judge erred in holding that it was not open to the first and second defendants to rely, in support of the defence that the guarantee was duly executed by and was binding on the plaintiff, on the contention that the granting of the guarantee had been approved by all the shareholders in the plaintiff prior to the execution thereof; (4) the judge was wrong and/or exercised his discretion on wrong principles and/or materially misdirected himself in ruling, and in delaying his ruling until final judgment, that the first and second defendants should not have leave to amend their defence to enable them to rely on the contention in (3); (5) alternatively, if the judge was correct in holding that whether or not the guarantee was ultra vires the plaintiff depended on the state of mind of the directors, the judge ought to have held, on the evidence, that the plaintiff had failed to prove that the guarantee was executed otherwise than for the purposes of and in the interests of the plaintiff; and (6) in the further alternative, if the judge was correct in holding that whether or not the guarantee was ultra vires the plaintiff depended on the state of mind of the directors and that the guarantee was not executed for the purposes of or in the interests of the plaintiff, the judge was wrong in holding that the first defendant and Colvilles Ltd. either knew or had notice that the guarantee was not executed for the purposes of or in the interests of the plaintiff.

By notice dated 10 June 1983 the plaintiff cross-appealed, contending, inter alia, that (1) the judge ought to have refused the first and second defendants leave to amend their defence so as to plead that they were entitled to rely on the ostensible authority of the directors of the plaintiff to enter into and to execute the guarantee and debenture; and (2) even if the judge was right in allowing such amendment, he erred in holding that in the circumstances the

first and second defendants were entitled to assume that Mr. Shenkman had declared his interest.

By respondent's notice of 6 March 1984 the plaintiff gave notice of its intention to contend that the judgment should be affirmed on the additional ground that, whether or not clause 3(K) of the plaintiff's memorandum of association was on its true construction an object or a power, the giving of the guarantee and to the extent of the sum secured thereby the execution of the agreement and the debenture were each ultra vires in the narrow sense used by the judge on the ground that those transactions could not objectively have seemed expedient within the meaning of clause 3(K).**\*252**

By respondents' notice to the cross-appeal, dated 7 March 1984, the first and second defendants gave notice of their intention to contend that the guarantee and debenture were binding on the plaintiff notwithstanding Mr. Shenkman's interest therein on additional grounds.

The third, fifth and sixth defendants took no part in the appeal.

The facts are stated in the judgment of Slade L.J.

*Allan Heyman Q.C.* and *Thomas Stockdale* for the first and second defendants. The guarantee was intra vires the plaintiff company as a matter of corporate capacity because the provisions of clause 3(K) of its memorandum of association, read together with the closing words of the clause, set out an independent object which the plaintiff was capable of carrying on as such; and the execution of the guarantee fell within that provision.

An express provision in the objects clause of a company may be (i) a substantive object, that is a provision which delineates an activity which the company is authorised to carry on as an independent activity on its own, or (ii) an ancillary power. The category into which an express provision falls is a matter of construction of the company's memorandum of association: see     In re Horsley

[1986] Ch. 246                                                    Page 6

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

& Weight Ltd. [1982] Ch. 442 , 448, 449. It is accepted that intra vires and misfeasance are not mutually exclusive. [Reference was made to Parker and Cooper Ltd. v. Reading [1926] Ch. 975 , 983.]

If the memorandum of association contains a "separate objects clause", that is a provision to the effect that none of the objects mentioned in any sub-clause is to be considered as subsidiary to the objects mentioned in another sub-clause, full effect will be given to it: see Cotman v. Brougham [1918] A.C. 514 , 521, 522 and Anglo-Overseas Agencies Ltd. v. Green [1961] 1 Q.B. 1 . However, there are two exceptions: (i) where the subject matter of the sub-clause is of its nature incapable of constituting a substantive object, and (ii) where, though the subject matter of the sub-clause is capable of constituting a substantive object, the memorandum of association expressly or by implication provides that the sub-clause is to be an ancillary power only: see Introductions Ltd. v. National Provincial Bank Ltd. [1968] 2 All E.R. 1221 , 1225 and, an appeal, [1970] Ch. 199 .

If a company has as an object the granting of guarantees, the motive of the directors in granting a guarantee is irrelevant and, even though granted for a purpose in no way connected with the company's business, a guarantee would be intra vires.

If, contrary to the foregoing argument, the provisions of sub-clause (K) constituted an ancillary power rather than a substantive object, the guarantee was nevertheless intra vires the company as a matter of corporate capacity. That is so, because where a company is carrying on an intra vires business and does an act within the scope of an ancillary power expressed in its memorandum, as did the plaintiff, that act is intra vires the company whatever the state of mind of the directors concerned: see In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016 , 1029-1034 and Ashbury Railway Carriage and Iron Co. Ltd. v. Riche (1875) L.R. 7 H.L. 653 . *253

Even if such an act has to be done in furtherance of the business which the company is carrying on to be intra vires, the guarantee in the present case was connected with the plaintiff's business, since, taking an all round commercial view, it was being given for the benefit of the plaintiff because without Mr. Shenkman the plaintiff company would have been useless. [Reference was made to York Corporation v. Henry Leetham and Sons Ltd. [1924] 1 Ch. 557 ; Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62 and In re David Payne & Co. Ltd. [1904] 2 Ch. 608 .]

The guarantee was valid and binding on the plaintiff because the granting of the guarantee had been approved by all the shareholders prior to its execution.

[BROWNE-WILKINSON L.J. The necessary factual basis of this point involves matters which have not been pleaded.]

The defendants are appealing against the judge's refusal to allow an amendment to rectify that.

[LAWTON L.J. In the absence of Mr. Morritt the court cannot possibly decide whether or not the amendment should have been allowed. However, there is a prima facie case for allowing the amendment and counsel may continue until the court can hear Mr. Morritt.]

A company is bound, in a matter which is intra vires, by the unanimous assent of its members: see Salomon v. A. Salomon & Co. Ltd. [1897] A.C. 22 , 56-57; In re Horsley & Weight Ltd. [1982] Ch. 442 , 453-455, 456 and Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd. [1983] Ch. 258 , 268-269, 280-282, 288-291.

The assent need not be given at a meeting, or on one occasion, it can be given on separate occasions.

It is not necessary for the transaction to which assent is given to be for the benefit of the company.

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

Even if what is done is, strictly, not commercially justified, it is not misfeasance if it is done with the consent of all the shareholders where they are the only persons affected by it. Even if it is not for the benefit of the company it will bind the company unless it constitutes a fraud or a sham: see Attorney-General for Canada v. Standard Trust Co. of New York [1911] A.C. 498 and In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016 . [Reference was also made to In re Express Engineering Works Ltd. [1920] 1 Ch. 466 ; In re B. Johnson & Co. (Builders) Ltd. [1955] Ch. 634 ; In re Home and Colonial Insurance Co. Ltd. [1930] 1 Ch. 102 and Halsbury's Laws of England, 4th ed., vol. 18 (1977) , para 359 .]

[ *Andrew Morritt Q.C.* for the plaintiff addressed the court on the question of whether the judge should have given the defendants leave to amend to enable them to raise the issue of ratification by the shareholders, making reference to Salomon v. A. Salomon & Co. Ltd. [1897] A.C. 22 , 36-37, 49 and Attorney-General for Canada v. Standard Trust Co. of New York [1911] A.C. 498 , 504, 505. *Heyman Q.C.* replied on that issue; and the court adjudged that such leave had been rightly refused.]

*Andrew Morritt Q.C.* and *Charles Aldous* for the plaintiff. Assuming that, on the facts, there was misfeasance by the directors of the plaintiff ***254** company and that the first defendant knew, or ought to have known, of it, then the first defendant was liable to account for the money paid to it as a recipient of the company's money with notice: See Howard Smith Ltd. v. Ampol Petroleum Ltd. [1974] A.C. 821 , 834 and Belmont Finance Corporation Ltd. v. Williams Furniture Ltd. (No. 2) [1980] 1 All E.R. 393 , 410.

The judge found that there was misfeasance by the directors in breach of their duties and the first defendant knew. A defence that it could escape liability because it reasonably believed that the share-

holders had consented is not open to the first defendant on the facts.

Though that is sufficient to dispose of the defendants' appeal, it would be financially better for the plaintiff to succeed on the issue raised by the cross-appeal and to establish that the judge ought to have refused to allow the defendants to rely on the rule in Royal British Bank v. Turquand (1856) 6 E. & B. 327 or that the judge was wrong in holding that the rule applied.

The question is whether the giving of the guarantee was ultra vires the company in the sense of being beyond its corporate capacity, i.e. "ultra vires in the narrow sense" in the judge's description. Ultra vires "in the wider sense" contemplates an abuse of powers which could include something done by directors in excess of their powers.

On the construction of clause 3(K) of the plaintiff's memorandum of association, even if clause 3(K) is a substantive object, the instant transaction did not come within it, though it is accepted that the cases do seem to go so far as saying that separate objects clauses have to be treated in isolation from surrounding objects, which is very unsatisfactory. In any event one cannot construe clause 3(K) as a substantive object since, however one looks at it, it is plainly an ancillary power. The use of the words "as may seem expedient" require criteria by which expediency can be determined; expediency can only be tested by reference to the business of the company; and that construction is confirmed by other words of clause 3(K). Given that it is a power, and one which on express terms it has to be seen to be expedient to exercise, it is subject to the limitation that it must be exercised for the purposes of the business of the company, though that limitation might not add anything in view of the expediency provision. What matters is the reason for exercising the power. [Reference was made to In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016 .] When one looks at the motive for giving the guarantee in the present case it is clear that it was not something which the plaintiff

[1986] Ch. 246                                                                                                    Page 8

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

company ought to have been doing. It was a device used to transfer the liability of Scottish Steel to the plaintiff and could not have "seemed expedient" or been a genuine exercise in good faith of the plaintiff's powers.

An act which is ultra vires in the narrow sense is one which the company is incapable of performing, and to ascertain whether an act is in that category, one has to examine the memorandum and articles of association. At the other extreme one has an abuse of power where the company is capable of performing the act but is not entitled to do so in the manner or for the purpose it does, and it is in the latter case that motive becomes all important.**\*255**

In Introductions Ltd. v. National Provincial Bank Ltd. [1970] Ch. 199 it is not clear whether the implied limitation referred to was a limitation on corporate capacity or on the manner and purpose of exercise. The former would also give rise to an act ultra vires in its proper sense, whereas the latter would have the same effect as a limitation on any fiduciary power. In re David Payne & Co. Ltd. [1904] 2 Ch. 608 appears to be a case of abuse of powers and not of ultra vires in the narrow sense.

Abuses of power of the present nature are not capable of being ratified by the members of the company. That result is reached by way of three separate principles. First, given the rule in Foss v. Harbottle that a majority cannot act in fraud of the minority, a fortiori the majority cannot act in fraud of a liquidator, and, that being so, all the shareholders must be precluded from so acting where the minority is being bought off with ill-gotten gains.

Secondly, if one takes the limitation referred to in the Introductions case [1970] Ch. 199 as being a limitation on the manner or purpose of exercise, it is a power given to the company to be exercised for the company's purposes and that limitation binds the members just as much as the directors. It is a limitation on the corporate power.

The cases suggest that there is a category of acts which are not capable of ratification: see In re George Newman & Co. [1895] 1 Ch. 674, 684-685; Salomon v. A. Salomon & Co. Ltd. [1897] A.C. 22, 23, 33, 36, 39, 47, 49, 54; Attorney-General for Canada v. Standard Trust Co. of New York [1911] A.C. 498, 504; In re Express Engineering Works Ltd. [1920] 1 Ch. 466, 471 and Parker and Cooper Ltd. v. Reading [1926] Ch. 975, 984.

Thirdly, section 205 of the Companies Act 1948 precludes a company from having provisions in its articles which exempt a director from any liability for breach of trust. If all the members of the plaintiff company had attended for the purpose of altering the articles to authorise the directors to give the guarantee without any liability arising for breach of trust that action would have been void because of section 205. They cannot be in a better position where they have acted informally.

Though the shareholders could compromise with a director and decide not to sue him for misfeasance, that would not be binding on a liquidator. His decision whether to sue a director cannot be pre-empted. [Reference was made to In re V.G.M. Holdings Ltd. [1942] 2 Ch. 235 and In re Duomatic Ltd. [1969] 2 Ch. 365, 370.] In Bamford v. Bamford [1970] Ch. 212 the power was conferred by the articles: there was no question of corporate capacity or as to exercise of the power. Also it was a power to be exercised for the purposes of the members rather than a power to carry on the company's business. The dishonesty, if it existed, existed vis-à-vis the members themselves.

Obiter dicta in In re Horsley & Weight Ltd. [1982] Ch. 442, 453, 454, 456 support the proposition that a transaction must have been honest to be capable of ratification by the members. In Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd. [1983] Ch. 258, 268 the point was clearly

[1986] Ch. 246

Page 9

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

made that there was no allegation of bad faith, so the case is not in any sense authority for the present contention. **\*256**

Accordingly, there is a category of misfeasance which is not capable of being ratified or adopted by the shareholders, namely, transactions which are not honest, and where a transaction puts a company's solvency in doubt it is not one which the shareholders can adopt so as to preclude a liquidator from making claims against some of them. Consequently, that category is one which can be described as acts ultra vires in the wider sense.

In summary, the guarantee was (1) ultra vires in the narrow sense because it did not and could not "seem expedient" or (2) ultra vires in the narrow sense, if the provision for giving guarantees is a power, because it must be read subject to the express limitation of expediency and the implied limitation that it can only be used for the purposes of the company, or (3) ultra vires in the wider sense because the provision for giving guarantees was not exercised for the benefit of the company and would, therefore, be voidable and depend on the knowledge and good faith of the third party.

        [BROWNE-WILKINSON L.J. Your second category was put forward as the first argument in In re David Payne & Co. Ltd. [1904] 2 Ch. 608 and rejected at p. 611.]

That is right. It does seem to put abuse of power into the third category but is not consistent with principle, and, in any event, in the present case it is academic.

        The nature of the defence under the rule in Turquand's case, 6 E. & B. 327, is that an outsider dealing with a company is entitled to assume that a document purporting to have been executed by the company has been duly executed, unless he is put on inquiry as to whether it has been so executed: see Transvaal Lands Co. v. New Belgium (Transvaal) Land and Development Co. [1914] 2 Ch. 488 and Morris v. Kanssen

[1946] A.C. 459 .

        The judge should never have allowed the defendants to amend their defence to take this point, and to find against the plaintiff on it without the plaintiff having any opportunity to test the defendants' reliance on the rule during the evidence was quite wrong. The Turquand defence plainly raises issues of fact not raised by the pleadings.

        But, even having allowed the defendants to take the Turquand's case point, the judge should have found that the nature of the transaction was such as to put the defendant corporation on inquiry as to whether it was properly authorised by the company because generally a director is not authorised to benefit himself at the expense of the company.

        As to outsiders being put on inquiry, see A. L. Underwood Ltd. v. Bank of Liverpool [1924] 1 K.B. 775 and E.B.M. Co. Ltd. v. Dominion Bank [1937] 3 All E.R. 555 .

        By section 199(1) of the Companies Act 1948 a director is required to declare the nature of his interest in a contract or arrangement and under the express terms of the section that has to be done at a formal meeting of the company, presumably so that evidence of the declaration is preserved in the company's minutes book: see also Liquidators of Imperial Mercantile Credit Association v. Coleman (1873) L.R. 6 H.L. 189 . **\*257**

        The consequence of the Turquand defence not succeeding would be that the guarantee and the debenture would not be acts of the company and, together with the purported appointment of the receiver, would go, so that there would be no liability on the guarantee and no entitlement to realise property on the debenture. The liquidator would recover the additional sum of £401,448 and the interest paid to the defendant corporation for the creditors and the corporation would rank as an un-

[1986] Ch. 246                                                                                          Page 10

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R.
908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

secured creditor. Also, as the receiver would have been acting without any authority, his £50,000 expenses and remuneration should be repaid.

The question has been raised of whether at this late stage the defendants should be allowed to contend that the plaintiff's relief should be limited in some way so as to prevent any money going to the contributors.

The difficulty about applying the principle established by In re V.G.M. Holdings Ltd. [1942] Ch. 235 - to the effect that a defaulting director-or-shareholder is not bound to pay back the amount which would come to him as beneficiary on a distribution - is that this matter was never raised by the pleadings on the basis of which Mr. Shenkman's trustee in bankruptcy took no part in the present proceedings but agreed to abide by the judgment.

*Heyman Q.C.* in reply. Whether the transactions were ultra vires or intra vires the plaintiff company is a matter of law. There is only one legitimate use of the expressions "ultra vires" and "intra vires" and that is to describe transactions which are outside or within a company's capacity. There is no reported case before the present one in which the terms "ultra vires in the narrow sense" and "ultra vires in the wider sense" have been used. When a transaction is outside the corporate capacity of a company, it is void and a nullity and the state of mind of a third party is totally irrelevant. If the transaction is capable of binding the company by reference to the state of mind of a third party, it can only be voidable and, in consequence, cannot be ultra vires.

The heresy that capacity can depend on motive stems from In re David Payne & Co. Ltd. [1904] 2 Ch. 608 being treated as a capacity case, whereas it is an abuse of powers case. The propriety of the purpose is only relevant to the issue of whether there has been an abuse of power and is not relevant to the question whether the power exists at all: see Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62, 68-69.

This existence of section 9 of the European Communities Act 1972 is totally irrelevant.

The question whether the guarantee was within the plaintiff's corporate capacity depends on clause 3(K) and lending and the giving of guarantees are capable of being substantive objects. Further, on a proper construction of the sub-clause, the concept of expediency does not relate to the giving of guarantees, nor does the reference to "customers." [Reference was made to In re Horsley & Weight Ltd. [1982] Ch. 442, 445.] But, even if expedience is material and the reference to customers is to be extended to the giving of guarantees, it does not matter, if clause 3(K) is a substantive object, nor is the state of mind of the directors relevant. **\*258**

Clause 3(K) is indistinguishable from the provision in the David Payne case [1904] 2 Ch. 608, 609 where the borrowing was held to be intra vires though for an improper purpose. That decision has been accepted for 80 years and is binding on the court.

[BROWNE-WILKINSON L.J. How do you reconcile In re David Payne & Co. Ltd. with Introductions Ltd. v. National Provincial Bank Ltd. [1970] Ch. 199 ?]

No criticism was made of the David Payne case in Introductions Ltd. v. National Provincial Bank Ltd. and in the latter case the court was dealing with a power which could not stand on its own in the context of a company carrying on ultra vires business and nothing else.

If, contrary to the defendants' first submission, the provision in clause 3(K) is a mere power, the granting of the guarantee was a genuine exercise of that power. It is a misapprehension that a company owes a duty to its creditors otherwise than to ensure that there is no illegal distribution of capital: see In re Horsley & Weight Ltd. [1982] Ch. 442, 453.

[1986] Ch. 246                                                                                    Page 11

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 (**Cite as: [1986] Ch. 246**)

As to whether there was in fact an abuse of power, the guarantee was given in an effort to save the whole commercial set up in which the plaintiff was involved, and it is sufficient that it was given in good faith no matter how misguided it might appear.

As to whether the defendant corporation was on notice as to abuse of power, there is no reason why it should not rely on the fact that the plaintiff had the advice of competent lawyers.

On the issue of when as a matter of law a transaction is capable of being made binding by the unanimous consent of all the shareholders, the only limitations are that the transaction must be intra vires the company and there must be no fraud or dishonesty on the part of the shareholders in giving their assent: see Attorney-General's Reference (No. 2 of 1982) [1984] Q.B. 624, 640. Otherwise, there would not be a valid consent. Accordingly, if shareholders act honestly in ratifying a transaction they can bind the company even if the directors acted in bad faith: see Bamford v. Bamford [1970] Ch. 212, 237-238, 241-242.

Furthermore, even if the transaction in question is not in the interests of the company, it still binds the company if the shareholders were acting honestly. It is not dishonest to make a speculative decision which is outside the bounds of reasonable commercial judgment or if the company is of doubtful solvency but there is a genuine belief that all might be well.

Acceptance of the plaintiff's point in relation to section 205 of the Companies Act 1948 would result in Salomon v. A. Salomon & Co. Ltd. [1897] A.C. 22; In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016; Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd. [1983] Ch. 258; Bamford v. Bamford [1970] Ch. 212; In re Duomatic Ltd. [1969] 2 Ch. 365 and In re Horsley & Weight Ltd. [1982] Ch. 442 all being wrong.

Dealing next with the question of interest, as the remedy is an equitable one, the relief is a matter of discretion. It would be grossly unfair if the trustee-shareholders, having - with full knowledge - consented to the transactions or, at the very least, stood by and allowed **\*259** them to take place, were to receive a sum in excess of the £½ million and almost £1 million more if the plaintiff succeeds on the cross-appeal. [Reference was made to Holder v. Holder [1968] Ch. 353, 394, 399, 405-406.] The creditors will not get any of the interest: see In re Fine Industrial Commodities Ltd. [1956] Ch. 256 and In re Rolls-Royce Ltd. [1974] 1 W.L.R. 1584.]

Since the liquidator must distribute to all the shareholders rateably, Mr. Shenkman would receive a substantial amount which would be most unjust as no one should profit by their own misfeasance.

If the relief is not restricted, the defendant corporation will be in a worse position than if the guarantee had been set aside on the ground of fraud because where there is fraud the relief is restricted to sufficient to repay the defrauded creditors: see Ideal Bedding Co. Ltd. v. Holland [1907] 2 Ch. 157, 172.

[An application by the defendants, opposed by the plaintiff, for leave to amend the notice of appeal to include the limitation of relief, was allowed by the court.]

Turning to the Turquand's case, 6 E. & B. 327, point and section 199 of the Companies Act 1948, Hely-Hutchinson v. Brayhead Ltd. [1968] 1 Q.B. 549 shows that a failure to disclose under section 199 would not make the guarantee and debenture void but merely voidable and deals with the questions of whether restitution is possible if it is avoided and whether it should stand if it is not. [Reference was made to G. L. Baker Ltd. v. Medway Building and Supplies Ltd. [1958] 1 W.L.R. 1216; Mahony v. East Holyford Mining Co. Ltd. (1875) L.R. 7 H.L. 869; Royal British Bank v. Tur-

[1986] Ch. 246                                                                                    Page 12

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

quand, 6 E. & B. 327 ; Gore-Brown on Companies, 43rd ed. (1984) , para. 5-2 ; In re Land Credit Co. of Ireland, Ex parte Overend, Gurney & Co.(1869) L.R. 4. Ch. App. 460 and Morris v. Kanssen [1946] A.C. 459 .]

[LAWTON L.J. In Morris v. Kanssen, at pp. 474-476, Lord Simonds stated the rule in Turquand's case and said that a director could not take advantage of the rule because he ought to have been put on inquiry. Applied to the present case, that means there is a question of mixed fact and law as to whether in the circumstances the defendant corporation ought to have been put on inquiry.]

The facts are such that the defendant corporation had no means of knowing what was done at the board meeting apart from the passing of the resolutions and on the basis of the rule in Turquand's case it was entitled to presume that everything was in order.

It is not accepted that, if there was not a proper quorum and there was no ratification by the shareholders, the guarantee and debenture were void.

Coming back to the question of relief, the court has a wide discretion in relation to a beneficiary who has instigated or consented to a breach of trust: see *Snell's Principles of Equity,* 28th ed. (1982), pp. 292-293 and section 62 of the Trustee Act 1925 . The two directors of the plaintiff company were in the position of trustees, and the trustee-shareholders and Mr. Shenkman in the position of beneficiaries. Mr. Shenkman, who both instigated and was a full party to any breach of trust, should not be entitled to take anything from the fund remaining when the creditors **\*260** and the liquidator's costs have been discharged and. so, his share should revert to the defendant corporation. So far as the trustee-shareholders are concerned, if they assented to the transactions, they too should not receive anything.

[BROWNE-WILKINSON L.J. Can the court decide such matters when they have not been raised by the pleadings and the parties are not present?]

Yes: see In re Somerset [1894] 1 Ch. 231 .

In any event, the plaintiff cannot have interest on money to which it was not entitled, and, if both the guarantee and the debenture were void, one still has the position that the defendant corporation lent £401,000 to the plaintiff. No interest can run on that.

*Morritt Q.C.* on matters raised by the reply. It is clear from A.L. Underwood Ltd. v. Bank of Liverpool [1924] 1 K.B. 775 , which is binding on the court, that, as a matter of general principle, an outsider dealing with a company can be under a duty to inquire as to the authority of the directors because of the nature of the proposed transaction. In E.B.M. Co. Ltd. v. Dominion Bank [1937] 3 All E.R. 555 , which must be regarded as persuasive authority, there was no question as to the bank being under any duty. The passage cited from *Gore-Brown on Companies* is a contradiction in terms and no authority is given for it. [Reference was made to Morris v. Kanssen [1946] A.C. 459 .]

If an act is not authorised by a company it is not the company's act, but it is not necessarily accurate to refer to it as being void. The resolution of an inquorate board does not bind the company but, if the rule in Turquand's case provides a good defence, the company is not able to claim that the transaction was not duly passed. The distinction is between transactions which bind a principal and those which do not. The use of the word "void" does not help in making that distinction.

Turning to the question of whether the plaintiff's relief should be limited in some way so as to pay only creditors and the liquidator's costs, the liquidator has a fiduciary responsibility for all those interested in the assets of the company be they creditors or

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

contributors and he has no right or discretion to prejudice their rights without their consent. One of the assets of the company is its claim in the present action which includes not only capital but also income. It is an equitable claim which can only be reduced on equitable principles and not on some notion of fairness or unfairness.

Assuming that there is a surplus for the contributors and that 49 per cent. of the shares are held by the trustees, those shareholders are not parties to the action and they have not been found to have consented to the transactions. The defendants are seeking to raise indirectly an issue which they have been refused leave to amend to plead.

As for Holder v. Holder [1968] Ch. 353 , it is made clear, at p. 394, that the whole matter depended on the circumstances of the case, whereas the circumstances in the present case have not been investigated and are not at all clear.

*Cur. adv. vult.* 11 June. The following judgments were handed down. **\*261** SLADE L.J.

This is an appeal by British Steel Corporation and Mr. Vivian Rupert Vaughan Cooper, who were two of the defendants in two consolidated actions, from an order of Vinelott J. made on 23 March 1983. There is also a cross-appeal from the order by Rolled Steel Products (Holdings) Ltd. which was the plaintiff in the action.

The appeal and cross-appeal raise important questions of principle concerning, inter alia, the capacity and powers of companies incorporated under the Companies Acts and the powers and authority of their directors. Section 9(1) of the European Communities Act 1972 , which may be important when such questions nowadays fall to be considered as between a company and persons dealing with it in good faith, had not become law when the transactions in issue in the present case were effected. For the purposes of this present judgment that subsection therefore requires no further atten-

tion.

The trial of these consolidated actions lasted for about 19 days and ended on or about 7 April 1981. Judgment was given by Vinelott J. on 2 December 1981. There then followed a number of disputes concerning the detailed terms required to give effect to this judgment. The matter having been brought back to the judge for the resolution of these disputes, he delivered a further judgment for this purpose on 23 March 1983, following which the order now under appeal was drawn up.

The judgment of 2 December 1981 (some parts of which are now reported [1982] Ch. 478 ) occupies nearly 100 pages of transcript and sets out very carefully and comprehensively the long and involved history of this case. Since various important findings of fact are challenged, I cannot avoid a similar, if briefer, recital of this history.

The plaintiff, Rolled Steel Products (Holdings) Ltd., which is now in liquidation, was a company which had been incorporated in 1954 under the Companies Act 1948 and had carried on the business of importing and selling steel in the United Kingdom. Its main customers were motor manufacturers. At all material times Mr. Alexander Ilytch Shenkman ("Mr. Shenkman") held 51 per cent. of the issued share capital, the remaining 49 per cent. being held by the trustees of a settlement made by Mr. Shenkman for the benefit of his children ("the trustee-shareholders"). Its directors were Mr. Shenkman and his father, Mr. Ilya Michael Shenkman. The trustee-shareholders were Mr. Wills, who was a former business associate of Mr. Shenkman, the senior trustee, Mr. Hibbert, a senior employee of British Petroleum, and Mr. Perkins, a retired solicitor.

Clause 3 of the memorandum of association of the plaintiff company listed a number of objects, including:

"(A) To carry on business as exporters and import-

[1986] Ch. 246                                                                     Page 14

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R.
908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

ers of, and manufacturers of, and dealers in, and buying and selling agents for, iron, steel, copper, bronze, aluminium, lead, tin, zinc, antimony and other metal goods of all descriptions and home and foreign and dominion and colonial goods, merchandise and produce of all descriptions. ...

"(K) To lend and advance money or give credit to such persons, firms, or companies and on such terms as may seem expedient, and in particular to customers of and others having dealings with the          **\*262**          company, and to give guarantees or become security for any such persons, firms, or companies."

"(L) To borrow or raise money in such manner as the company shall think fit, and in particular by the issue of debentures or debenture stock (perpetual or otherwise), and to secure the repayment of any money borrowed, raised, or owing, by mortgage, charge, or lien upon the whole or any part of the company's property or assets (whether present or future), including its uncalled capital, and also by a similar mortgage, charge, or lien to secure and guarantee the performance by the company of any obligation or liability it may undertake."          The objects clause ended with the words:

"It is hereby expressly declared that each sub-clause of this clause shall be construed independently of the other sub-clauses hereof, and that none of the objects mentioned in any sub-clause shall be deemed to be merely subsidiary to the objects mentioned in any other sub-clause."          The articles of association contained, inter alia, the following provisions:

"17. Provided that a director declares his interest in a contract or arrangement or proposed contract or arrangement with the company in manner provided by          section 199          of the Act he shall be counted in the quorum at any meeting of directors at which the same is considered and shall be entitled to vote as a director in respect thereof.

"18. (a) The quorum necessary for the transaction of the business of the directors may be fixed by the directors, and unless so fixed, shall, be two."

At all material times Mr. Shenkman owned the entire issued capital of another company, Scottish Steel Sheet Ltd. ("Scottish Steel"). In July 1961 the plaintiff company approached Colvilles Ltd. ("Colvilles"), a company engaged in the production of steel, with a proposal that Scottish Steel, which Mr. Shenkman had formed for the purpose, would act as sole distributor in southern England of coil and cut steel sheet produced by Colvilles. Mr. Shenkman further planned to develop a steel service centre which Scottish Steel would operate and Colvilles would supply with coil. The centre itself would supply the customers.

The plaintiff company acquired a leasehold site for the steel service centre at Rainham, Essex, but its erection at that site was not proceeded with. Instead, in 1964 the plaintiff acquired a leasehold site at Andover and began to build a new steel service centre there with moneys amounting to about £400,000 borrowed from Scottish Steel. Though the judge said that the sum owed by the plaintiff to Scottish Steel did not carry interest, it appears that it may have carried interest at five per cent. per annum. Meantime, the plaintiff retained the Rainham site.

Scottish Steel began to purchase coil and cut steel on credit from Colvilles. Its principal customer was Fords. The account of Scottish Steel with Colvilles fell more and more into arrears. In October 1966 Mr. Shenkman agreed to reduce and keep the sum owed by Scottish Steel to          **\*263**          below £400,000. In July 1967 Colvilles was renationalised and its shares were vested in British Steel Corporation. By November 1967 the indebtedness of Scottish Steel to Colvilles amounted to £820,000, of which £420,000 was overdue. In December 1967 Mr. Shenkman was told that the arrangement by which the sheet steel was sold through Scottish Steel would be ended and that Colvilles would in the future sell to Fords direct.

[1986] Ch. 246

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 (**Cite as: [1986] Ch. 246**)

Page 15

Once Scottish Steel lost the arrangement with Fords, it would have no income until the new steel service centre became operative; completion of the steel service centre was scheduled for July 1968 at the earliest. Mr. Shenkman was also told in December 1967 that he must take immediate steps to reduce the indebtedness of Scottish Steel to Colvilles to £400,000, and produce a programme for the elimination of the balance after a 60 days' credit period had expired.

By April 1968 Mr. Shenkman had still failed to reduce the debt. Colvilles accordingly reported the matter to the legal services department. Mr. Edwards, the head of that department, decided that the best solution for Colvilles and British Steel Corporation would be for Mr. Shenkman to execute an immediate and binding guarantee of the whole indebtedness of Scottish Steel, which by then amounted to about £860,000. On 2 May 1968 Mr. Shenkman entered into a guarantee of this nature. Fifteen days later, on 17 May 1968, Colvilles served on Scottish Steel a statutory demand pursuant to section 222 of the Companies Act 1948 for payment of the sum of £868,000, then claimed to be due from Scottish Steel.

The judge's findings as to the events between June and November 1968 are, I think, accurately and well summarised in [1982] Ch. 478, 482-483, which summary I gratefully adopt:

"By June 1968 British Steel Corporation doubted whether Mr. Shenkman's 51 per cent. interest in the plaintiff and his other assets were sufficient to meet the debt due from [Scottish Steel]. It was decided to offer Mr. Shenkman 14 days to agree to the voluntary liquidation of [Scottish Steel] or failing that a petition would be presented to wind up the company. A meeting was arranged for that purpose on 11 September but, between 3 and 11 September, it occurred to Mr. Hands, assistant to Mr. Edwards in the legal services department, that a solution would be to persuade Mr. Shenkman to procure the plaintiff to guarantee the debt due from [Scottish Steel]. The only significant asset of

[Scottish Steel] was the debt owed to it by the plaintiff and the plaintiff had sufficient assets to meet that debt. He wrote to Mr. Shenton of Lovell White & King, solicitors to the corporation, stating that he had it in mind to propose to Mr. Shenkman's advisers that the British Steel Corporation would agree to a liquidator of [Scottish Steel] not pressing the claim against the plaintiff if the plaintiff guaranteed the debt due from [Scottish Steel] to Colvilles. Mr. Shenton consulted with Mr. Arthur Figgis of counsel. He advised that the plaintiff had power to give a guarantee even for a larger sum than the debt owed by the plaintiff to [Scottish Steel]. He advised that the sum should not be so large as to make it plain that the plaintiff could not meet its obligations under the guarantee and pay its creditors 20s. in the **\*264** £. He added that he did not think the plaintiff's directors would be advised by their legal advisers to grant a guarantee considerably in excess of the plaintiff's debt to [Scottish Steel] and suggested it should be limited to £400,000." I pause to say two things. First, it is readily intelligible why those advising Colvilles should have been anxious to obtain a guarantee by the plaintiff of the indebtedness of Scottish Steel, since, while the plaintiff appeared to have a substantial surplus of assets over liabilities, Scottish Steel was known by them to be insolvent and the personal guarantee of Mr. Shenkman was known not to be nearly sufficient to cover the indebtedness. Secondly, as he explained in a note of 26 September 1968, the reason why Mr. Figgis recommended a limit of £400,000 being placed on the guarantee was that that appeared at the time to be the limit of the plaintiff's excess of assets over liabilities, on the basis of the information he had been given as to the value of the Rainham land. He added that he was concerned that British Steel Corporation should not be a party to inducing the plaintiff's directors to do that which, on the figures known to British Steel Corporation, would involve a breach of the duties of the plaintiff's directors.

I return to the summary in [1982] Ch. 478, 482-483:

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

"On 9 October 1968, Mr. Edwards wrote to Mr. Dyson of Montague Cox & Cardales, solicitors to Mr. Shenkman, stating that he could only advise Colvilles to refrain from taking immediate action if (1) there was a prompt payment of £100,000 both on 17 October and 17 November (which were sums claimed from Mr. Shenkman under his guarantee); (2) the plaintiff gave a guarantee of the full amount owing by [Scottish Steel] with a limit of liability of £400,000, payments to be made at a minimum of £50,000 a month starting on 17 December but on the basis that claims would also be made against Mr. Shenkman and, if he paid, the plaintiff would not be expected to pay as well; and (3) the appointment of a nominee of Colvilles to the board of the plaintiff within one week after, but not before, the giving of the guarantee by the plaintiff. There were a number of meetings and Mr. Dyson sought the advice of Mr. Balcombe Q.C. Mr. Dyson then informed Mr. Hands that Mr. Balcombe had advised that for the plaintiff to give a guarantee in excess of the sum owed to [Scottish Steel] would be an act of gross misfeasance on the part of the directors, that the plaintiff could properly give a guarantee in the sum owed to [Scottish Steel] provided it was given some consideration for payment under the guarantee and that Mr. Balcombe had expressed surprise at the appointment of a director nominated by the British Steel Corporation after the guarantee had been given.

"On 13 November 1968, Colvilles obtained summary judgment under Order 14 against Mr. Shenkman for £100,000 due on 17 October. It gave notice to Mr. Shenkman for the payment under his guarantee of the entire indebtedness of [Scottish Steel]. It also started bankruptcy proceedings against him and served a statutory demand on [Scottish Steel]."
**\*265**        On 28 November 1968, Messrs. Foster & Cranfield ("Fosters") wrote to Mr. Dyson advising that, if the Rainham land were to be sold, a price in the region of £850,000 could reasonably be anticipated and that if the sale proceeded by tender the plaintiff could expect to enter into a contract by 29 January 1969.

On 29 November 1968 Mr. Dyson had a meeting with Mr. Edwards, which was held at the office of Lovell, White & King "in order to keep up the pressure" (as Mr. Edwards recorded in a memorandum). The meeting saw the genesis of the proposals which were eventually implemented on 22 January 1969 and are now under attack. At the meeting, Mr. Dyson reported Fosters' advice and made it clear that Mr. Shenkman, for his part, wanted Colvilles paid entirely out of the proceeds. He explained that, while it might be two years before the assessment was made, he had advised that the sale might attract tax of as much as £200,000. He said that he himself would prefer that only £500,000 was paid over, since he "had in mind the possible risk of a subsequent claim by a liquidator that such a payment was a fraudulent preference, or perhaps even a misfeasance." The agreed note of the meeting records that Mr. Edwards commented:

"for his part British Steel Corporation would prefer that the debt to Colvilles were wholly discharged notwithstanding these possibilities, on the assumption that everything possible would be done to reduce the risks."        Mr. Dyson then said that there would be no difficulty in the plaintiff paying a part of the debt owed by Scottish Steel equal to the sum owed to Scottish Steel by the plaintiff. As regards the balance, Mr. Dyson went on to explain a scheme which he had in mind under which the trustee-shareholders would agree to the payment, on receipt of certain compensation. Later, at the same meeting, Mr. Edwards made new proposals, which are of great importance because they were subsequently implemented. These were that (a) a sum equal to the debt owed by the plaintiff to Scottish Steel should be lent to the plaintiff by Colvilles; (b) the plaintiff should use this sum in repaying the debt owed by it to Scottish Steel; (c) Scottish Steel should in turn use this sum to repay part of the debt owed by it to Colvilles; and (d) the plaintiff would guarantee the balance of the Scottish Steel debt to Colvilles. The agreed note of the meeting records that

[1986] Ch. 246                                                                Page 17

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

"it was left that Mr. Dyson will consider the proposal put forward by Mr. Edwards with his clients and with counsel to see how it can be implemented."                In this context the judge observed:

"it is to my mind quite clear that the purpose of consulting counsel was not to seek advice as to whether these proposals were or were not in the interests of the plaintiff. The question was whether a scheme could be devised and approved by counsel under which the trustees would be given something in exchange for agreeing a payment out of the assets of the plaintiff which it was not in the interests of the plaintiff to make."**\*266**          On the evidence, this inference seems to me irresistible.

During the course of December 1968 Mr. Dyson, who must have found himself in a difficult position in having as his clients both the trustee-shareholders and Mr. Shenkman, who was facing an imminent threat of bankruptcy, was busy trying to devise a scheme with the object of providing some compensation for the trustee-shareholders. Arrangements for offering the Rainham land for sale by tender were meantime put in hand. In a letter to Mr. Shenton of 5 December 1968 Mr. Dyson stressed that, whatever method was used to transfer the debt from Scottish Steel to the plaintiff, a transfer of the debt so far in excess of the amount owed by the plaintiff to Scottish Steel "inevitably has something of the characteristics of a misfeasance." He went on to point out that it was therefore "essential" that the trustee-shareholders should approve the transaction. He said that he and Mr. Shenkman must "reserve the right to have the benefit of the views of counsel on the scheme which we propose putting to the trustees."

In letters to Mr. Shenton of 19 December 1968 Mr. Dyson explained that any scheme involving the re-payment of Colvilles out of the proceeds of sale of the Rainham land would be complex and delicate and that, whatever method was adopted, the trustee-shareholders must approve what was to be done. He said that a scheme was at the moment before the

trustees for their consideration.

On 30 December Mr. Dyson wrote to Mr. Shenton to stress that no documents could be executed until

"all the interested persons at this end have given their consent, and the views of counsel have been obtained, if the present decision to seek such views is adhered to."

In the event counsel was not instructed by Mr. Dyson. Mr. Shenton replied on 1 January 1969, objecting that Mr. Dyson's clients had had

"since 29 November to consider and approve a system under which my clients' debt will be discharged from moneys which your clients say will be raised on the sale of the Rainham land," - and had also had since that date - "to consider the short term arrangements for security which were agreed to by you on 29 November."          He said that he hoped to tender engrossments of the necessary documents before the end of the week, that the return of the documents executed and completed would be required within 10 days thereafter and his clients would expect on or before that date an approved scheme under which payment would be made to them in full satisfaction of their debt, failing all of which the bankruptcy petition and the winding-up petition against Scottish Steel would be filed and presented forthwith.

Mr. Dyson replied on 2 January 1969 that "the senior trustee [Mr. Wills] has given me, this morning, his views on the scheme" and that the only outstanding problem was that one of the co-trustees was frequently out of the country.

On 3 January 1969 Mr. Dyson wrote to another of the trustee-shareholders, Mr. Perkins, a long letter setting out an outline scheme, which he said that Mr. Wills was prepared to approve, subject to his co-trustees' approval. The scheme in brief provided for the plaintiff to sell          **\*267**

its lease of the Andover factory for full

[1986] Ch. 246

Page 18

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

value and to be put into liquidation; it would be arranged that in the liquidation the trustees would get the proceeds of sale of the Andover lease and the shares of Scottish Steel, while Mr. Shenkman would get the benefit of the debt of £400,000 due from Scottish Steel to the plaintiff, against which would be set off a debt of £200,000 owed by him to Scottish Steel. One of the obstacles which Mr. Dyson said had to be surmounted was

"that the trustees, whose only concern can be their own trust fund, must somehow be properly compensated for an otherwise unwarrantable depreciation in the value of one of the trust assets."

On 6 January 1969 Mr. Dyson spoke to Mr. Maunsell of Lovell White and King and discussed, among other things, ways of possibly saving stamp duty on the debenture which the plaintiff was to give to Colvilles. Mr. Maunsell's note records that Mr. Dyson commented that the timetable envisaged was unreasonable

"since on the advice that he had received from Mr. Balcombe in conference, he was being asked to advise the company to do an act which was probably ultra vires the company and would constitute a misfeasance by its directors. He said, however, that in the circumstances, in order to avoid a very particular situation, he would be prepared to advise the directors and the company to do it, provided that the shareholders of the company consented to it."       Mr. Dyson then pointed out that one of the trustees was in Switzerland and that he could not guarantee that he would reply before the 16th. Also, on 6 January 1969 Mr. Shenton wrote to Mr. Dyson enclosing, inter alia, copies of a draft board resolution of the plaintiff authorising the transactions. He said that on completion he would require, inter alia, production of a certified copy of this resolution.

On 10 January 1969 Mr. Dyson told Mr. Maunsell that he had spoken to two of the three trustee-shareholders who were agreeable to proceeding. Figures of indebtedness as between Scottish Steel

and Colvilles (£784,532 15s. 4d.) and as between the plaintiff and Scottish Steel (£401,448) were finally agreed.

On 16 January 1969 the terms of a proposed agreement, guarantee and debenture were finally agreed. By then it had been agreed that the debenture should be signed and held in escrow until 17 February 1969 in the hope that by that date the sale of the Rainham land would have been achieved, the debenture would be unnecessary and stamp duty would be saved.

On 17 January 1969 Mr. Maunsell confirmed that Colvilles and British Steel Corporation had agreed to defer completion until 22 January.

On 21 January 1969 a meeting attended by Mr. Dyson, Mr. Hawkings and at least two of the trustee-shareholders, Mr. Wills and Mr. Perkins, took place. Mr. Dyson's evidence was that the meeting was called because the scheme outlined by him in earlier correspondence could not be put into operation in the time available. As to this meeting, the judge said:      **\*268**

"Mr. Dyson in his evidence said, and I accept, that he could not remember whether Mr. Shenkman or his father were there or whether Mr. Hibbert had then returned from Switzerland."       The judge went on to say that it is probable, although not certain, that Mr. Hibbert was present. This is not quite accurate because Mr. Dyson's evidence had been that Mr. Perkins and Mr. Hibbert were present at the meeting and that he "presumed" Mr. Wills had been there too. On the available evidence the probabilities certainly seem to point to all the three trustees having been there. For, in the telephone conversation of 22 January 1969, noted by Mr. Maunsell, Mr. Dyson told him that "the trustees had agreed to the arrangements provided that Mr. Shenkman gave him certain personal obligations secured on his shares."

On 22 January 1969 the plaintiff executed three documents, namely: (1) a guarantee ("the guaran-

[1986] Ch. 246

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

Page 19

tee") by which it was recited that Scottish Steel owed Colvilles the sum of £383,084 15s. 4d. and the plaintiff guaranteed to Colvilles the repayment by Scottish Steel of all moneys and liabilities then due or becoming due to Colvilles by Scottish Steel; (2) an agreement ("the agreement") by which it was recited that the plaintiff was indebted to Colvilles in the sum of £401,448 and the plaintiff had guaranteed the debt of £383,084 15s. 4d. due from Scottish Steel to Colvilles, and the plaintiff agreed that, unless it had before 17 February 1969 entered into a binding contract for the sale of the freehold interest in the Rainham land for a sum which, after discharging any existing charges, would leave the sum of £784,532 15s. 4d. (the aggregate of the debt due from the plaintiff and Scottish Steel to Colvilles) with interest and, unless all the sums due from the plaintiff and Scottish Steel to Colvilles had been paid before 1 March 1969, it would issue to Colvilles a debenture in the form of the agreed draft; and (3) a debenture ("the debenture") which created fixed and floating charges over all the assets of the plaintiff and was delivered to the plaintiff's solicitors on 22 January 1969 as an escrow. The agreement and the debenture provided for interest to be paid on the total sum of £784,532 15s. 4d. at one per cent. above bank rate for the time being.

The execution of these three documents had been preceded by a meeting of the board of directors of the plaintiff also held on 22 January 1969. It was attended by its only directors, Mr. Shenkman and his father, Mr. Ilya Shenkman. The minutes of this meeting record that it had been reported to the board that the plaintiff had agreed with Colvilles: (1) that "in consideration of Colvilles not demanding immediate repayment of all sums due to it from" Scottish Steel, the plaintiff would guarantee the liabilities of Scottish Steel to Colvilles; and (2) that Colvilles had agreed to advance £401,448 to the plaintiff (being a sum equal to the debt agreed to be owed by the plaintiff to Scottish Steel). The minutes record a resolution that the transactions reported to the board be approved and that the documents put before the board be approved and executed by the plaintiff, as to the guarantee and the agreement for delivering to Colvilles' solicitors on receipt of the advance, and as to the debenture to be held in escrow for delivery in the circumstances described in the agreement.**\*269**

As the judge found as a fact that under arrangements already made the proposed advance of £401,448 by Colvilles to the plaintiff could only be used to discharge the liability of the plaintiff to Scottish Steel, and in turn could only be used by Scottish Steel towards payment of the sum owed by Scottish Steel to Colvilles, the transactions proposed at the meeting of 22 January 1969, if approved, would thus clearly benefit Mr. Shenkman, if only because the loan of £401,448 would be used in a manner which would indirectly reduce his liability under his guarantee of 2 May 1968. However, the minutes of that meeting do not record any declaration by him of this guarantee pursuant to article 17 of the plaintiff's articles of association.

Also on 22 January 1969 an account was opened with the plaintiff's bankers, Midland Bank Ltd., for the benefit of the plaintiff and a banker's draft for £401,448 drawn on Colvilles was paid into that account. The sum was immediately transferred to an account with Midland Bank opened in the name of Scottish Steel. A banker's draft was then drawn on that account in favour of Colvilles' solicitors, to whom the guarantee and the agreement were also delivered.

On 23 Janaury 1969 Mr. Dyson wrote to Mr. Wills a long letter referring to the trustee-shareholders' decision to give their consent to the execution of the guarantee in exchange for an indemnity by Mr. Shenkman secured by a charge on his shares in the plaintiff. Mr. Dyson commented:

"It is quite obvious that the trustees must receive suitable compensation, but before knowing what is suitable we must establish precisely what it is that they have lost, and precisely the value of what it is

Copr. © West 2009 No Claim to Orig. Govt. Works

[1986] Ch. 246

Page 20

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

that they may come to receive in exchange."

From this letter of 23 January, the judge drew the following inference, which seems to me fully justified:

"It is, I think, clear from this letter that what was contemplated at the meeting on 21 January was that an indemnity in wide terms would be given by Mr. Shenkman to the trustees secured on his shares of the plaintiff and that it would continue in operation until some other arrangement could be made under which the trustees would be given compensation acceptable to them in recompense for the diminution in value of their shares in the plaintiff consequent on the giving of the guarantee or, if no such arrangement were made, until the excess of the amount paid by the plaintiff to Colvilles over the liability of the plaintiff to Scottish Steel had been made good by Scottish Steel or Mr. Shenkman or one of the Andover companies (the shares of which remained held by or by a company owned by Mr. Shenkman and his wife)."

It is also clear, however, that even the details of the proposed indemnity had not been worked out by 23 January, let alone the details of the possible longer term arrangements. In the events that happened, so far as the evidence shows, no indemnity was ever executed by Mr. Shenkman and no arrangements made for compensating the trustee-shareholders. **\*270**

By 17 February 1969 the Rainham land had still not been sold. The debenture was accordingly delivered on that date to Colvilles, which, under its terms, was entitled to give notice demanding immediate payment of the moneys thereby secured on or after 1 April 1969 and, if the moneys were not paid, to appoint a receiver. On 12 March 1969 Colvilles made a demand for payment on 1 April 1969 of the full amount secured by the debenture. Also on 12 March Colvilles issued a writ against Mr. Shenkman claiming the balance of the sum due under his guarantee. On 25 March 1969 it applied for summary judgment on this claim. On 2 April 1969 the sum secured by the debenture not having been paid,

Colvilles appointed Mr. Cooper receiver and manager of the plaintiff. He is the second defendant, and we have been told that for the purposes of the appeal he has been given an indemnity by British Steel Corporation.

On 16 March 1970 Scottish Steel went into compulsory liquidation. On 18 March 1970 Mr. Shenkman was adjudicated bankrupt. On 29 March 1970, by virtue of the Steel Companies (Vesting) Order 1970 (S.I. 1970 No. 430) British Steel Corporation succeeded to all the assets and obligations of Colvilles. During the receivership the Andover land was sold. In October 1972, after protracted efforts, the receiver sold the Rainham land for £1,025,000. On 29 October 1973 the plaintiff went into compulsory liquidation.

Between the date of his appointment and 31 December 1973, in full discharge of the moneys secured by the debenture (including interest), the receiver paid to British Steel Corporation sums totalling £1,005,347 and also accounted to the Inland Revenue for £92,731 in respect of tax deducted from interest paid to British Steel Corporation. The receiver retained the sum of £50,000 in respect of his fees and expenses as receiver and manager and then accounted to the liquidator of the plaintiff for the surplus of the moneys received by him, £47,778. This surplus is insufficient to meet the other unsecured liabilities of the plaintiff. The three sums of £1,005,347, £92,731 and £50,000 referred to above amount in the aggregate to £1,148,078. The pleadings

By a writ issued on 25 March 1975 and a statement of claim served on 31 December 1975, the plaintiff brought an action against British Steel Corporation, Mr. Cooper, the trustee in bankruptcy of Mr. Shenkman, and Mr. Ilya Shenkman, seeking, inter alia, (1) as against British Steel Corporation and Mr. Cooper, a declaration that the guarantee, the debenture and the purported appointment of Mr. Cooper as receiver and manager were in each case void and of no effect; (2) as against British Steel Corporation and Mr. Cooper, payment to the

[1986] Ch. 246                                                                                                              Page 21

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

plaintiff of the sum of £1,148,078 as money had and received to the use of the plaintiff with interest; (3) alternatively, as against all four defendants, a declaration that they were jointly and severally liable to repay to the plaintiff with interest the said sum of £1,148,078 "as moneys of the plaintiff which have been misapplied"; and (4) an order (a) in the case of British Steel Corporation, Mr. Cooper and Mr. Ilya Shenkman for payment; (b) in the case of Mr. Shenkman, leave to                    **\*271** prove in the bankruptcy for such sums as he might be declared liable to repay to the plaintiff.

Mr. Ilya Shenkman died in 1976. His personal representatives were added as fifth and sixth defendants by an order to carry on, but took no part in the proceedings.

On 11 December 1976 the plaintiff issued a writ against Mr. Shenkman's trustee in bankruptcy seeking similar relief. By an order dated 3 November 1977 the two actions were consolidated; it was further ordered that the statement of claim served on 31 December 1975 should stand as the statement of claim in the consolidated proceedings. Mr. Shenkman and his trustee in bankruptcy took no part in the proceedings before the judge, but the trustee agreed to be bound by any order that might be made.

Under the statement of claim the relief will be seen to be sought on three principal grounds. (1) Neither the guarantee nor the debenture is the deed of the plaintiff because it was not duly executed by the plaintiff. This point, which will be referred to in this judgment as "the no due authorisation point," is reflected particularly in paragraphs 8, 12 and 13 of the statement of claim. The basis of this submission as pleaded is that Mr. Shenkman was personally interested in the arrangements constituted by the transactions and documents of 22 January 1969 but, so it is said, at the board meeting of the plaintiff held on 22 January 1969 did not disclose his interest in the manner required by section 199 of the                    Companies Act 1948                    . Colvilles,

it is asserted, knew of these arrangements, of Mr. shenkman's personal interest therein and that the board meeting was attended by only two directors.

(2) If, contrary to the plaintiff's submission, the guarantee and the debenture were the deeds of the plaintiff, each of them was ultra vires and void. This point ("the ultra vires point") is reflected particularly in paragraphs 11 and 13 of the statement of claim. Paragraph 11 asserts:

"The said arrangements were made not for the purposes or benefit of [the plaintiff] but for the purposes or benefit of Mr. Shenkman and Colvilles and were not and could not have-seemed to be expedient in the interests of [the plaintiff]."

(3) If, contrary to the plaintiff's submission, the guarantee and the debenture were the deeds of the plaintiff and were intra vires the plaintiff, Mr. Shenkman and Mr. Ilya Shenkman were acting in bad faith and in breach of their duties as directors of the plaintiff in purporting, on behalf of the plaintiff, to borrow the sum of £401,448 and in authorising the execution by the plaintiff of the guarantee and the debenture. Colvilles and Mr. Cooper knew that the property purported to be charged by the debenture was the property of the plaintiff and knew, or ought to have known, that the sum of £401,488 had purportedly been borrowed, and the guarantee and debenture executed, not for the purposes or benefit of the plaintiff, but in bad faith and in breach of their duties as directors. In the circumstances, it is claimed, the sum of £1,148,978 represents moneys of the plaintiff which have been misapplied and the defendants, except Mr. Shenkman's trustee in bankruptcy, are liable in equity to replace them. This claim is embodied in paragraph 15            **\*272**            of the statement of claim. It will be seen that its essence is that in regard to the relevant transactions the two directors had been acting in breach of their fiduciary duties to the plaintiff and that British Steel Corporation and Mr. Cooper, having received the moneys with actual or constructive knowledge of this breach, took them as constructive trustees. I will call this "the construct-

Copr. © West 2009 No Claim to Orig. Govt. Works

[1986] Ch. 246                                                                                          Page 22

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R.
908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

ive trust point."

On 2 March 1976 British Steel Corporation and Mr. Cooper served a defence to this statement of claim which, as to the crucial allegations made by the plaintiff, amounted to little more than a traverse. They admitted that Colvilles knew that the board meeting of 22 January 1969 had been attended by only two directors, of whom Mr. Shenkman was one, but made no further admissions in regard to the "no due authorisation" point, and indeed affirmatively asserted (in paragraph 11) that the guarantee and debenture had been duly executed. As to the ultra vires point, they simply denied that those two documents had been executed ultra vires. Their answer to the constructive trust point, beyond an admission that Colvilles and Mr. Cooper knew that the property charged by the debenture was the property of the plaintiff, was likewise a simple traverse.

It is to be observed that the defence as pleaded did not contain any suggestion of two further pleas which have subsequently featured prominently in this case, namely, (1) the allegation that all the shareholders in the plaintiff (that is to say, Mr. Shenkman and the trustee-shareholders) consented to the granting of the guarantee and the debenture ("the shareholders' consent point"); and (2) the assertion that, even if the board resolutions of 22 January 1969 had not been duly passed in accordance with the articles of association of the plaintiff, nevertheless Colvilles was unaware of this and was entitled to assume that they had been duly passed ("the Turquand's case point).The course of the trial before Vinelott J.

On this state of the pleadings, the trial of the action began before Vinelott J. on 9 March 1981. I shall have to refer to the course of the trial in some detail, because this gives rise to two issues which, though they might be described as "pleading points," could both be of fundamental importance to the outcome of these proceedings.

On 9 March Mr. Morritt began his opening

on behalf of the plaintiff, which lasted for five days. On that first day he drew attention to the fact that the defence to the no due authorisation point was simply the allegation that the transactions had been approved, and properly approved, by the board at a meeting held on 22 January 1969. On 12 March he made it plain that he derived his understanding of the defendants' case from their pleadings, "because ... I have been told nothing else." On 13 March he observed that the Turquand's case point was not pleaded and was not in issue in the present case and that he had therefore ignored it. Neither the judge nor Mr. Heyman on behalf of the defendants expressed any dissent from this statement.

Also on 13 March Mr. Morritt pointed out once more that the only pleaded defence was that the transactions were properly approved at a properly constituted board meeting on 22 January 1969 and that the            ***273***            shareholders' consent point was not raised and was therefore not relevant. There then followed a discussion between the judge and Mr. Morritt as to the position that would arise if the shareholders' consent were relevant and as to the extent to which shareholders could ratify intra vires acts in the case of a company which was of doubtful solvency. But, at the end of this discussion on 13 March 1981 the judge said: The point is not an uninteresting one, but it does not arise because it is not pleaded." Mr. Heyman did not, at that time, assert the contrary.

That was how matters had been left when, on 13 March 1981, the judge began hearing the oral evidence. This extended over 12 working days. The plaintiff's first witness was Mr. Dyson, whose evidence was heard on 13, 16 and 17 March. During the course of cross-examining him on 16 March, Mr. Heyman asked him certain questions apparently designed to elicit the fact (if it was a fact) that the trustee-shareholders had given their consent in respect of the relevant resolutions of 22 January 1969 at a meeting held on 21 January 1969. In re-examination of this witness on 17 March 1981 Mr.

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

Morritt asked some questions as to the information which had been available to the trustee-shareholders on 21 January 1969, but explored this matter of consent no further than this.

Mr. Morritt then called Mr. Shenkman, whose evidence continued over 17, 18, 19, 20 and 23 March 1981. During the course of his cross-examination of Mr. Shenkman on 23 March, Mr. Heyman embarked on a similar line of questioning concerning the consent of the trustee-shareholders. On this occasion it evoked a strong protest from Mr. Morritt that he was being put in a very difficult position. He again pointed out that the shareholders' consent point had not been pleaded, and that it was not open to the defendants on their pleading. The judge, without ruling on the point, said that he was not going to bar this line of questioning. Mr. Morritt did not examine or re-examine Mr. Shenkman on this issue.

Mr. Heyman, without opening his case, began calling his witnesses later on 23 March 1981. Their evidence extended over 24, 25, 26, 30 and 31 March. The defendants' principal witness was Mr. Edwards. When, on 25 March, Mr. Heyman began to lead evidence from him relating to the consent of the trustee-shareholders, Mr. Morritt objected and did not thereafter cross-examine Mr. Edwards on this evidence.

By the time the evidence closed, no application had been made by the defendants to amend their pleadings in any respect and no intimation had been given that they intended to apply to amend their defence, so as to raise either the shareholders' consent point or the Turquand's case point. Mr. Morritt told us that, in view of what had occurred during the opening, his belief had been throughout the hearing of the evidence that the latter point was not going to be relied on by British Steel Corporation or Mr. Cooper.

On 31 March Mr. Heyman began his address on their behalf. During the course of it, he made it plain that, notwithstanding what had occurred during Mr. Morritt's opening, he did seek to rely on both the Turquand's case point (which, he submitted, did not require to be specifically pleaded) and the shareholders' consent point. On 1 and 2 **\*274** April Mr. Heyman continued his submissions. On the morning of 2 April, after some discussion and argument on the points, the judge ruled that both these points required to be pleaded and asked Mr. Heyman whether he was going to apply to amend the defence to which he replied that he was. At 2 p.m. that day Mr. Heyman handed in his two proposed amendments. The first, which constituted a proposed addition to paragraph 6 of the defence and raised the Turquand's case point, reads:

"If, which is denied, the resolutions passed at the board meeting of [the plaintiff] on 22 January 1969 were not validly passed these defendants are entitled to rely upon the ostensible authority of the directors of [the plaintiff] to enter into and to execute the guarantee and the debenture and upon the certified extract of the minutes of such board meeting signed by Mr. Shenkman." The second, which consisted of a proposed addition to paragraph 11 of the defence and raised the shareholders' consent point, reads:

"In support of such averment these defendants will rely upon the fact that the granting of the guarantee and the debenture had been approved by all the shareholders in [the plaintiff] prior to the execution thereof." The judge then proceeded to hear submissions from Mr. Heyman in support of his application for leave to amend and from Mr. Morritt in opposition to it. He eventually said that he was going to rule on the application on the following Monday morning, 6 April.

When 6 April came Mr. Morritt handed in a draft reply and draft request for further and better particulars which, he said, the plaintiff would like to put in if the defendants got leave to amend. In the event, the judge intimated that he did not intend at that stage to rule on the application for leave to

[1986] Ch. 246                                                                                                          Page 24

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

amend but would deal with it in his final judgment, giving reasons for his decision. Mr. Morritt's reply was:

"In that case I will treat the matter, both for the purpose of argument on law and fact, as though your Lordship has given leave to amend, although your Lordship has not in fact done so."        Matters were left thus when the argument concluded on 7 April 1981.   The judgment of Vinelott J. of 2 December 1981

On 2 December 1981 Vinelott J. gave his judgment and dealt with the principal issues that arose for his decision as follows.(1)As to the no due authorisation point

        The only board meeting of the plaintiff of which any evidence had been produced at the hearing before Vinelott J. was the purported board meeting of 22 January 1969 attended by only Mr. Shenkman and Mr. Ilya Shenkman. Furthermore, Mr. Shenkman's evidence was that there had been no meeting of the board before 22 January at which the desirability of the plaintiff giving a guarantee had been considered. The judge accepted this evidence. Although it was not admitted in their
**\*275**       defence, it was conceded on behalf of British Steel Corporation and Mr. Cooper at the trial that Mr. Shenkman was personally interested in the transactions of loan, guarantee and debenture. For the purposes of the no due authorisation point, the meeting of 22 January 1969 was thus the only relevant board meeting.

        At the trial Mr. Heyman's main argument in this context had been that the plaintiff had not proved that no declaration of Mr. Shenkman's interest had been made at the meeting of the directors in compliance with section 199 of the Companies Act 1948       . But Mr. Shenkman's evidence was that he had made no declaration of his interest at the meeting of 22 January 1969 or any earlier meeting; and the judge accepted this evidence without hesitation.

Mr. Heyman's alternative argument was that, even if no such express declaration was made at a formal meeting of the directors, the existence of Mr. Shenkman's guarantee must have been known to Mr. Ilya Shenkman and discussed between him and Mr. Shenkman on earlier occasions, and that in these circumstances no express declaration was necessary. The judge rejected this submission because he did not think there was any sufficient evidence that Mr. Ilya Shenkman did know that Mr. Shenkman had entered into a personal guarantee of the whole of Scottish Steel's debt to Colvilles.

It necessarily followed from these findings, though the judge did not expressly so state, that the resolution which the board of the plaintiff purported to pass on 22 January 1969 authorising the execution of the guarantee and the debenture had not been regularly passed in accordance with articles 17 and 18(a) of the articles of association of the plaintiff, because there had been no proper quorum of directors voting on the resolution inasmuch as Mr. Shenkman was not entitled to vote on it; it was not a formally valid resolution. It also followed that the plaintiff's claim that neither the guarantee nor the debenture was or is the deed of the company was prima facie well founded in law.

        The judge, in his judgment, then proceeded to refer to Mr. Heyman's application to amend the defence to plead the        Turquand's        case point. In this context, having pointed out that he had already ruled at the trial that an amendment was necessary to raise this point, he quoted the proposed amendment and said:

"It appears to me that, in so far as it is sought to rely upon the ostensible authority of the directors of the plaintiff, this amendment is far too wide. The question I have to decide is whether British Steel Corporation should be allowed to amend the defence to claim that Colvilles was entitled to rely upon the resolution as a formally valid resolution - that is, as a resolution passed at a properly constituted board of directors at which, Mr. Shenkman and Mr. Ilya Shenkman having been the only dir-

[1986] Ch. 246                                                                                    Page 25

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R.
908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

ectors present, a proper disclosure of Mr. Shenkman's interest had been made. I have found this a very difficult question, but after some hesitation I have come to the conclusion that I should allow an amendment in these terms."**\*276**

Inasmuch as the judge described the draft amendment as, in one respect at least, "far too wide," I do not understand him as having given leave to British Steel Corporation and Mr. Cooper to amend their defence in the terms proposed. I take his words as merely meaning (1) that he was giving leave to amend the defence to plead that Colvilles was entitled to rely on the resolution as a resolution passed at a properly constituted board of directors at which, Mr. Shenkman and Mr. Ilya Shenkman having been the only directors present, a proper disclosure of Mr. Shenkman's interest had been made and (2) that he was prepared to decide the case on the footing that such amendment had actually been made.

However, having described the proposed amendment as "far too wide," the amendment which the judge by inference permitted was in one respect itself a wider one than the draft, since it asserted that Colvilles was entitled to rely on the resolution as one passed at a properly constituted board, at which "a proper disclosure of Mr. Shenkman's interest had been made." This was, no doubt, in answer to a point which had been raised by Mr. Morritt in regard to the amendment proposed by British Steel Corporation, namely that "the certified extract of the minutes" of the board meeting, referred to in that proposed amendment, contained no mention of any declaration of interest, and therefore did not apparently comply with the articles of the plaintiff.

     The judge, by necessary implication, found that Colvilles knew of Mr. Shenkman's personal interest at the relevant time. However, having permitted amendment of the defence in the manner which I have described, he decided (by necessary implication though, I think, not in terms) that the defence based on the rule in Royal British Bank v. Turquand (1856) 6 E. & B. 327, embodied

in such amendment, wholly defeated the plaintiff's first claim based on the no due authorisation point.  (2)As to the ultra vires point and the constructive trust point

In his opening before the judge Mr. Morritt accepted that if the plaintiff's first claim failed there could be no objection to the advance by Colvilles to the plaintiff of the sum of £401,448 or the use of that money to discharge the debt owed by the plaintiff to Scottish Steel and that, on that footing, the debenture and, in consequence, the appointment of the receiver thereunder would be valid to the extent of that advance. The judge, in proceeding to consider the plaintiff's ultra vires and constructive trust points, therefore treated them as limited in the case of the debenture to the extent of the sum guaranteed. He thus proceeded on the footing that the loan of £401,448 and the debenture at least to the extent of that sum were a valid transaction or document.

     The judge, in setting out his conclusions, drew no specific distinction between the ultra vires point and the constructive trust point. Instead, he drew a rather different distinction between two types of ultra vires, namely, what he called "ultra vires in the narrow sense" and "ultra vires in the wider sense." After a careful review of the authorities relating to ultra vires, he expressed the opinion [1982] Ch. 478, 497 that, even **\*277** when the question in dispute relates to "the capacity of a company to enter into a given transaction," the phrase ultra vires may be used (a):

"in a narrow sense to describe a transaction which is outside the scope of the powers expressed in the memorandum of association of a company or which can be implied as reasonably incidental to the furtherance of the objects thereby authorised"
and (b) in a "wider sense" so as

"to describe a transaction which, although it falls within the scope of the powers of a company, express or implied, is entered into a furtherance of

[1986] Ch. 246

Page 26

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

some purpose which is not an authorised purpose" - that is to say, not a purpose authorised by the company's memorandum of association.

Vinelott J. went on to say, at p. 499, that a transaction which is ultra vires in the wider sense

"is incapable of being made binding on the company by the assent of all the members, [since] the members cannot authorise the use of the company's property for a purpose other than the purposes which the company is authorised to pursue by its memorandum of association." This, he suggested, is the reason why a transaction which is ultra vires in the "wider sense" is equated with one which is ultra vires in the narrow sense.

On the other hand, there is, he considered, at p. 499, a crucial difference between the two types of transaction, that is to say a transaction which is ultra vires in the narrow sense is altogether void and cannot confer rights on third parties; whereas

"a transaction which is ultra vires in the wider sense may confer rights on a third party who can show that he dealt with the company in good faith and for valuable consideration and did not have notice of the fact that the transaction, while ostensibly within the powers, express or implied, of the company, was entered into in furtherance of a purpose which was not an authorised purpose."

The judge regarded it as clear, at p. 500, that, notwithstanding the separate objects provision at the end of clause 3 of the plaintiff's memorandum of association, sub-clause (K) is "a power ancillary to and to be exercised when expedient in furtherance of the objects of the company and is not to be construed as an independent object."

Having decided that he was dealing with mere ancillary powers, not independent objects, the judge concluded, at p. 500, that the main questions which he had to consider in the context of ultra vires were whether the guarantee and, to the extent of the sum guaranteed, the debenture, were given by the plaintiff:

"in furtherance of the objects of the plaintiff, in the sense of its substantive objects or purposes, or for some purpose not authorised by the memorandum of association of the plaintiff; and" - if the latter was the case - "whether Colvilles and the British Steel Corporation had notice of that fact."*278

As to the first of these questions, the judge's conclusion on the evidence, at p. 503, was that, after Fosters' advice had been received at the end of November:

"everybody on the plaintiff's side proceeded on the footing that the transactions proposed would not only not be for the purposes or in the interests of the plaintiff, but would be positively injurious to it." He found the following facts, at p. 503:

"the conclusion is inescapable that of the directors of the plaintiff Mr. Shenkman at least knew that the proposals accepted on behalf of the plaintiff on 19 December and implemented on 22 January involved, to the extent of the guarantee of the liability of [Scottish Steel] in excess of the debt due from the plaintiff to [Scottish Steel] and to that extent the debenture, a gratuitous disposition on the part of the plaintiff which could not be justified as something done for the purposes or in the interests of the plaintiff." As to the second of these main questions, the judge's finding of fact on the evidence was, at p. 507:

"... Colvilles and the British Steel Corporation knew that the guarantee and, to the extent of the sum guaranteed, the debenture, were not entered into by the plaintiff for any purpose of the plaintiff but were a gratuitous disposition of the property of the plaintiff and were entered into by the plaintiff for the benefit of [Scottish Steel] and Mr. Shenkman personally."

[1986] Ch. 246                                                                                                        Page 27

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R.
908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

In relation to the receiver, the judge found as a fact, at p. 511, that, when Mr. Cooper took possession of the assets of the plaintiff as receiver, he had knowledge of facts from which it should have been apparent to him that the giving of the guarantee was ultra vires the plaintiff in the wider sense and also a breach of duty by the directors of the plaintiff.

Essentially, therefore, as I read his judgment, the judge found liability established against British Steel Corporation and Mr. Cooper because the plaintiff had acted ultra vires "in the wider sense" in regard to the relevant transactions and received the relevant assets of the plaintiff with knowledge that the relevant transactions were entered into in furtherance of purposes which were not authorised purposes of the plaintiff.(3)As to the shareholders' consent point

The judge concluded, at pp. 507-508, that it would not be right to allow the first two defendants to amend their defence to plead the shareholders' consent point. However, he went on to express the view, at pp. 508-509, that, even if the documents executed on 22 January 1969 had been executed with the consent of all the shareholders of the plaintiff, this consent, subject to one possible qualification, would not have provided any defence to the plaintiff's claim. The reason, in his opinion, at p. 509, stemmed from the general principle that "shareholders, even acting unanimously, cannot ratify or make binding on a company a **\*279** transaction which is ultra vires either in the narrow or in the wider sense." The judge accepted, at p. 509, that the doctrine of ultra vires will not prevent the shareholders of a company by unanimous agreement from disposing, as they please, of profits available for distribution to shareholders by way of dividend. However, he considered, at p. 510, that this qualification to the general rule was irrelevant on the facts, since on the evidence it appeared that the plaintiff did not have profits available for distribution to its shareholders equal to the amount of the guarantee of the indebtedness of Scottish Steel. (4)The judge's conclusion

The judge's ultimate conclusion [1982] Ch. 478 , 510 thus was that

"the guarantee and, to the extent of the sum guaranteed, the debenture were executed by the plaintiff to the knowledge of Colvilles for a purpose other than the purposes authorised by the memorandum of association of the plaintiff and the plaintiff is entitled to have the guarantee set aside and to require the British Steel Corporation to repay the sum guaranteed with interest."The issues on the appeal and the cross-appeal

British Steel Corporation and Mr. Cooper now appeal from this judgment, asking that the order made against them be wholly set aside and the action as against them be dismissed. The plaintiff cross-appeals, claiming, in effect, that in all the circumstances the judge should not have permitted the defendants to take the Turquand's case point, but that, even if he was right in doing so, it afforded them no defence in law on the evidence adduced at the trial.

Though a large number of subsidiary points have been raised and argued on both sides, I think that the principal issues that have fallen for decision on this appeal have resolved themselves to seven, namely: (1) the shareholders' consent point; (2) the judge's finding that, of the directors of the plaintiff, at least Mr. Shenkman had abused his powers in entering into the relevant transactions; (3) the judge's finding of knowledge of such abuse on the part of Colvilles, British Steel Corporation and Mr. Cooper; (4) the no due authorisation and Turquand's case points; (5) the ultra vires point; (6) the constructive trust point; and (7) the relief, if any, to be granted to the plaintiff. The first, second, third, fifth and sixth points are raised by the notice of appeal. The fourth is raised by the notice of cross-appeal. The last is raised by both notices. The shareholders' consent point

One of the grounds of appeal of British Steel Corporation and Mr. Cooper was that the judge erred in

[1986] Ch. 246                                                                                    Page 28

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

refusing them leave to amend their defence to raise the shareholders' consent point. At an early stage in his address to this court Mr. Morritt pointed out that a number of other issues would become relevant only if we considered that this contention was well founded. We therefore heard full argument from both sides at that stage on the submission that the judge erred in refusing the defendants leave to amend so as to take this point.**\*280**

At the conclusion of that argument we gave our decision that the amendment to paragraph 11 of the defence, which was requested towards the end of the trial, was rightly refused by the judge in the exercise of his discretion. We said that we would give our reasons when we came to give our judgment on the appeal as a whole.

For the following reasons, among others, I do not see how the exercise of the judge's discretion in refusing leave to amend to raise this point can be faulted. (1) In my opinion, it should at all material times have been obvious to the legal advisers of British Steel Corporation and Mr. Cooper that the point required pleading, if it was to be taken at all.

(2) These defendants have, in my opinion, given this court no sufficient justification or excuse for their failure to apply to make the amendment until the 17th day of the trial, after the evidence had closed.

(3) I am satisfied that if the point had been put in issue by an appropriate amendment, in examining or cross-examining a number of witnesses before the court, the plaintiff's counsel would have wished to explore a number of matters relevant to the consent of the trustee-shareholders, e.g., (a) had they in truth all been present at the meeting on 21 January 1969? (b) had the trustee who was previously abroad returned to this country? (c) were their alleged consents informed consents given with knowledge of all relevant facts? (d) how were the consents given? (e) if the consents were given subject to certain conditions, what precisely were those conditions and were they ever fulfilled? and (f)

what legal advice did they have? This list of relevant questions could be greatly expanded.

(4) In my opinion, having regard to the course and conduct of the trial, as outlined above, a substantial injustice would have been caused to the plaintiff if the amendment had been allowed when the application was at long last made on 2 April 1981. Up to that time, having clearly and specifically drawn attention to the point, the plaintiff's counsel had, in my opinion, been fully entitled to conduct the plaintiff's case on the footing that this was not a live issue in the proceedings. In conducting it, they were not obliged to cover the contingency that the defendants' counsel might see fit, at some undisclosed future time, to apply for the requisite leave, when they had given no intimation that they intended to make such application.The judge's findings against the directors of the plaintiff

I have already summarised the judge's ultimate findings of fact against the directors of the plaintiff and Mr. Shenkman in particular. In taking us through the judgment in considerable detail for the purpose of disputing these ultimate findings Mr. Heyman was able to point to scarcely any errors in the findings of primary fact. He submitted, however, that in making these ultimate findings of fact the judge had drawn entirely the wrong inferences. [His Lordship summarised the defendants' argument and reviewed the relevant facts and concluded that the judge was right in describing the grant of the guarantee as "gratuitous" and that the potential advantages to the plaintiff were minimal and continued:]**\*281**

In my judgment, however, it is not correct to judge the propriety of the transactions of 22 January 1969 from a solely objective point of view. In deciding whether they constituted an abuse of the directors' powers, the motives of Mr. Shenkman are of great importance: see for example, Howard Smith Ltd. v. Ampol Petroleum Ltd. [1974] A.C. 821 and In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016, 1032. I have been able to detect no suggestion in

[1986] Ch. 246      Page 29

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

the evidence that Mr. Shenkman considered that the prospects of future benefits from the Andover steel centre, or the need to buy time, or the need to save himself from bankruptcy, or any other factor, rendered the proposals which are ultimately implemented on 22 January 1969 beneficial from the point of view of the plaintiff (as opposed to Scottish Steel or Mr. Shenkman personally). On the contrary, as soon as the scheme was mooted, Mr. Shenkman's legal adviser, Mr. Dyson, fully realised that it "inevitably has something of the characteristics of a misfeasance" (as he had said in his letter to Mr. Shenton of 5 December 1968). But, he considered that this would not matter if the consent of the trustee-shareholders was obtained, whose consent, in the same letter, he described as "essential." During the succeeding weeks his efforts were directed to devising a scheme so that, as he put it in his letter to Mr. Perkins of 3 January 1969, the trustees should somehow be properly compensated for an "otherwise unwarrantable depreciation in the value of one of the trust assets." Mr. Shenkman's personal attitude was that he would agree with almost anything that British Steel Corporation proposed to remove the pressure on him so long as it was lawful. After various other schemes for compensating the trustee-shareholders had been mooted, the proposal which Mr. Dyson ultimately put to them was that they should be given a personal indemnity secured on Mr. Shenkman's personal shareholding in the plaintiff (the terms of which indemnity were never agreed) coupled with a hope that they would in due course be given some interest, unspecified, in the Andover steel centre. So far as the evidence shows, no further advice from counsel was sought by Mr. Shenkman or Mr. Dyson from Mr. Balcombe or any other counsel in regard to the proposals implemented on 22 January 1969. I infer that they were well aware that the advice was likely to be that, at least in default of the consent of the trustee-shareholders, these proposals would involve a gross misfeasance.

Thus, in my opinion, there was abundant evidence to justify the judge's finding of fact that at the material time everybody on the plaintiff's side proceeded on the footing that the transactions proposed would not only not be for the purposes or in the interests of the plaintiff, but would be positively injurious to it.

We were referred to a number of decisions which indicate that it is open to the shareholders in a company by unanimous agreement to consent to or ratify acts which would otherwise be a misfeasance on the part of the directors so as to validate them for all purposes, provided that such acts are within the company's corporate capacity and do not involve a fraud on the company's creditors; I will revert briefly to these authorites later in this judgment. However, since it is not open to the **\*282** defendants in the present case to assert that the consent of the trustee-shareholders was in fact obtained, this line of authority has no relevance in the present context.

For the reasons stated, I can see no grounds whatever for displacing the judge's finding that, of the directors of the plaintiff, at least Mr. Shenkman knew that the proposals implemented on 22 January 1969 involved, to the extent of the guarantee of the liability of Scottish Steel in excess of the debt due from the plaintiff to Scottish Steel and to that extent the debenture, a gratuitous disposition on the part of the plaintiff which could not be justified as something done for the purposes of or in the interests of the plaintiff. The judge's findings of fact against Colvilles, British Steel Corporation and Mr. Cooper

The judge, as I have said, also found as facts that Colvilles and British Steel Corporation knew that the guarantee and, to the extent of the sum guaranteed, the debenture were not entered into by the plaintiff for any purpose of the plaintiff but were a gratuitous disposition of the property of the plaintiff and were entered into by the plaintiff for the benefit of Scottish Steel and Mr. Shenkman personally. [His Lordship reviewed the argument and the evidence in relation to those findings and concluded:] I think there was abundant evidence to jus-

tify the judge's findings of fact as to the knowledge of Colvilles and British Steel Corporation. There has been no serious challenge to the judge's finding of knowledge against Mr. Cooper, on the footing that the last mentioned findings are justified and, in my opinion, that finding also must stand.The no due authorisation and Turquand's case points

Mr. Shenkman unquestionably had a personal interest in the proposed guarantee and debenture which fell for consideration at the board meeting of the plaintiff on 22 January 1969. Under article 17 of the plaintiff's articles of association he was entitled to vote as a director in regard to these transactions and to be counted in the quorum of two directors required by article 18(a), notwithstanding his personal interest, if, but only if he declared his interest "in manner provided by section 199 of the [Companies Act 1948]." The manner provided by that section is this. Under section 199(1) the director has to declare "the nature of his interest at a meeting of the directors of the company." Section 199(2), so far as material, provides:

"In the case of a proposed contract the declaration required by this section to be made by a director shall be made at the meeting of the directors at which the question of entering into the contract is first taken into consideration..."

The judge, as I have said, accepted the evidence of Mr. Shenkman that there had been no meeting of the board of the plaintiff before 22 January 1969 at which the desirability of the plaintiff giving a guarantee had been considered; and that he had made no declaration of his personal interest at the board meeting of 22 January 1969. I can see no grounds for challenging either of these findings of fact. Mr. Shenkman **\*283** and Mr. Ilya Shenkman were the only two directors present and voting at the last-mentioned board meeting. So far as this point may be relevant, the judge found that there was no sufficient evidence that Mr. Ilya Shenkman knew that Mr. Shenkman had entered into a personal guarantee of the whole of the Scottish

Steel debt to Colvilles, and I can see no grounds for disturbing that finding.

In these circumstances, on the facts as found by the judge, it is, in my opinion, clear that the no due authorisation point as pleaded in the statement of claim is well-founded in law, and the only averment pleaded in the unamended defence in answer to that point, namely that "the guarantee and the debenture were duly executed by the plaintiff," is not well founded in law.

The only remaining questions in this context are whether the judge was right by his judgment to give leave to amend the defence so as to plead that Colvilles was entitled to rely on the resolution as a resolution passed at a properly constituted board of directors at which, Mr. Shenkman and Mr. Ilya Shenkman having been the only directors present, a proper disclosure of Mr. Shenkman's interest had been made; and, if so, to decide that this amendment provided a complete answer in law to the claim against the defendants, in so far as that claim was founded on the no due authorisation point.

The possible relevance of the rule in Royal British Bank v. Turquand, 6 E. & B. 327 in the present context is obvious. The following statement of the rule, taken from Halsbury's Laws of England, 2nd ed., vol. V (1932), p. 423, was approved by the House of Lords in Morris v. Kanssen [1946] A.C. 459 (see *per* Lord Simonds at p. 474):

"persons contracting with a company and dealing in good faith may assume that acts within its constitution and powers have been properly and duly performed and are not bound to inquire whether acts of internal management have been regular."
Lord Simonds later pointed out the rationale of the rule, at p. 475: "The wheels of business will not go smoothly round unless it may be assumed that that is in order which appears to be in order."

However, section 9(1) of the

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 (Cite as: [1986] Ch. 246)

European Communities Act 1972 apart, persons dealing with a company registered under the Companies Acts must be taken not only to have read both the memorandum and articles of a company but to have understood them according to their proper meaning: see Palmer's Company Law, 23rd ed. (1982), vol. 1, para. 28-02 and the cases there cited.

Colvilles and British Steel Corporation, therefore, must be taken to have known that, under the articles of the plaintiff, a quorum of two was required for the transaction of the business of its directors and of the provisions of those articles relating to the declaration of a personal interest. They were well aware of the personal interest of Mr. Shenkman in the transactions proposed on 22 January 1969.

The signed minutes of the board meeting of that day, a copy which was subsequently supplied to Colvilles' solicitors (and indeed had been drafted by them), made no mention whatever of any declaration of a personal interest by Mr. Shenkman. Since Colvilles and its legal advisers **\*284** must be taken to have had knowledge of the relevant provisions of the plaintiff's articles, they must also be taken to have known that the resolution could not have been validly passed unless Mr. Shenkman had duly declared his personal interest at that board meeting or a previous board meeting.

If, therefore, the defendants are to be allowed both to take and succeed on the Turquand's case point, this must mean that, in the circumstances subsisting in late January 1969, they were as a matter of law entitled to assume (contrary to the fact and without further inquiry) that Mr. Shenkman had duly declared his personal interest either at the board meeting of 22 January 1969 or at some previous board meeting of the plaintiff.

This contention might well have been unanswerable if the rule in Turquand's case, 6 E. & B. 327 were an absolute and unqualified rule of law, applicable in all circumstances. But, as the statement of the rule quoted above indicates, it is not. It is a rule which only applies in favour of persons dealing with the company in good faith. If such persons have notice of the relevant irregularity, they cannot rely on the rule.

Thus, in Transvaal Lands Co. v. New Belgium (Transvaal) Land and Development Co. [1914] 2 Ch. 488 the plaintiff company's articles, while enabling a director to be interested as a member of another company with which the plaintiff company was contracting, required that the director should disclose the nature of his interest and should not vote in respect of any contract in respect of which he was concerned. The provisions of this article were not observed when a contract was entered into by the directors of the plaintiff company when they resolved to enter into a contract with the defendant company, which had full notice of this irregularity. The Court of Appeal held that the plaintiff company had the right to rescind the contract.

Furthermore, even if persons contracting with a company do not have actual knowledge that an irregularity has occurred, they will be precluded from relying on the rule if the circumstances were such as to put them on inquiry which they failed duly to make. As Lord Simonds in Morris v. Kanssen [1946] A.C. 459 pointed out, at p. 475:

"But the maxim has its proper limits. ... It is a rule designed for the protection of those who are entitled to assume, just because they cannot know, that the person with whom they deal has the authority which he claims. This is clearly shown by the fact that the rule cannot be invoked if the condition is no longer satisfied, that is, if he who would invoke it is put upon his inquiry. He cannot presume in his own favour that things are rightly done if inquiry that he ought to make would tell him that they were wrongly done."

Mr. Heyman submitted that Lord Simonds's

[1986] Ch. 246                                                                                    Page 32

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R.
908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

observation was confined to the particular facts of the case before him where the party seeking to take advantage of the rule was a director of the company and therefore under a duty to see that its transactions were effected in a regular manner: see p. 476. I do not, however, read Lord Simonds's statement of principle as confined in this manner. The decision of this court in A. L. Underwood Ltd. v. Bank of Liverpool [1924] 1 K.B. 775, which was cited in Morris v. Kanssen [1946] A.C. 459, in my opinion, illustrates that the very nature of a proposed transaction may put a person upon inquiry as to the authority of the directors of a company to effect it, even if he has no special relationship with the company. Whether in any given case the person dealing with the company is put on inquiry must depend on all the particular circumstances.

It follows, therefore, that, in my opinion, the judge was right in holding that the rule in Turquand's case, 6 E. & B. 327 is not a mere plea of law, which does not have to be pleaded. The plea asserting "entitlement to rely etc." is a plea of mixed fact and law. It may well be that, as Mr. Heyman submitted, once the point has been properly pleaded it shifts the onus of proof so that the presumption of regularity stands until rebutted: see Mahony v. East Holyford Mining Co. (1875) L.R. 7 H.L. 869. In my opinion, however, it was at very least incumbent on the defendants, if they wished to take the point, to plead in the alternative that, even if (which they denied) the resolution of 22 January 1969 had not been duly passed, they did not know of this irregularity and were entitled to rely on it as one which had been duly passed. This would have been a conventional plea by way of confession and avoidance, which would have put the plaintiff's legal advisers on notice that they had to adduce evidence, if they could, to show actual or constructive knowledge of the relevant facts on the part of Colvilles and British Steel Corporation or their legal advisers and to explore these matters, so far as possible, in cross-examination of the defendants' witnesses.

As matters stood, the plaintiff and its legal advisers had been given no such notice whatever, either by way of pleading or by way of less formal warning, that the Turquand's case point was going to be taken until 31 March 1981, after the evidence had been closed. When, on 2 April, there was full argument as to whether the amendment should be allowed, Mr. Morritt pointed out that he had not cross-examined Mr. Edwards on this line at all and that, if he had done so or if he had opened the point, the defendants might have been obliged to call Mr. Shenton and his assistant Mr. Hoare, which they did not do.

When he came to give judgment, the judge rejected as "fanciful" the possibility that, if the defence had been properly pleaded, the evidence might have taken a different course. Not only did he give the defendants leave to amend to raise the Turquand's case point, he also decided that it afforded a complete answer to the otherwise unanswerable no due authorisation point raised by the plaintiff. In so doing he made no specific finding of fact as to Colvilles' state of knowledge. But, I think that, by necessary implication, he found as a fact that Colvilles neither knew nor ought to have known that Mr. Shenkman had failed duly to declare his personal interest.

This court will always be slow to interfere with the exercise of his discretion by a trial judge in relation to the amendment of pleadings. For my part, however, with great respect to the judge, I feel no doubt that he erred in the exercise of his discretion in dealing with this point in the way in which he did. I am far from satisfied that Mr. Morritt's **\*286** complaints as to the handicaps in which the course of the proceedings had placed him in relation to the adduction of evidence were "fanciful." Though, for obvious reasons, these matters were never ventilated in evidence, I suspect, for example, that cross-examination of Mr. Edwards, as a well-trained lawyer, could well have elicited admissions sufficient to indicate that Colvilles and British Steel Corporation, through

their legal advisers, were sufficiently put on inquiry in the relevant sense as to whether Mr. Shenkman had duly declared his interest. If, therefore, the onus were to be regarded as falling on the plaintiff to establish that Colvilles and British Steel Corporation had actual or constructive knowledge of the breach of the articles of the plaintiff, I do not think that the plaintiff was given a fair and adequate opportunity to establish this.

If, on the other hand, this onus is to be regarded as falling on the defendants, I do not see how it can be said that they have discharged it, since they called no evidence from Mr. Edwards, or anyone else, to the effect that they believed that the requisite declaration of interest by Mr. Shenkman had been made. The certified extract of the minutes of the board meeting of the plaintiff which was supplied to Colvilles suggested quite the contrary.

Mr. Heyman submitted that the judge was the best person to judge whether the allowance of the amendment at such a late stage in the trial would truly prejudice the plaintiff. He went on to submit that, if there had been real potential prejudice of this nature, the plaintiff's counsel could, and should, have "insisted" on an immediate ruling by the judge and, if the amendment had been allowed, could have sought an adjournment as far as necessary. He submitted that it would be unjust to the defendants to disallow the amendment at this stage, when it is too late for Mr. Edwards to be recalled to give further evidence on this point. However, in the light of the course of the trial which I have described, I think that the defendants' submission that it was incumbent on the plaintiff's counsel (not counsel who was seeking to take the Turquand's case point) to "insist" on an earlier ruling was, to put it at its lowest, a bold one. By the time that the judge came to give judgment it was, in my respectful opinion, far too late to allow the Turquand's case point to be taken by amendment. If the point was to be taken at all by the defendants' counsel, some warning of this should at very latest have been given during the

plaintiff's counsel's opening at the trial, before the start, rather than after the conclusion, of the hearing of the evidence.

It follows that, in my opinion, the plaintiff's cross-appeal succeeds, and there is no defence to the no due authorisation point. Neither the debenture nor the guarantee were the deeds of the plaintiff, which is entitled wholly to disclaim them as having been made without its authority and not duly executed. I will revert to the further consequences of this conclusion when I come to the question of relief.

The ultra vires point

For many years the phrase "ultra vires" has from time to time been used by company lawyers in two senses. Primarily it is used to describe **\*287** acts which are beyond the capacity of a company. As is pointed out by the editors of Gore-Browne on Companies, 43rd ed. (1977), para. 3-1, the phrase is also sometimes used to describe acts which are not beyond the capacity of the company but simply beyond the authority of either the board of directors or a majority of the shareholders.

In many instances the sense in which the phrase is being used is far from clear. However, I think it plain that paragraphs 11 and 13 of the statement of claim in this case, in alleging that each of the guarantee and the debenture were "ultra vires and void," were intended to allege that their execution was beyond the corporate capacity of the plaintiff on the grounds that they were executed not for the purposes or benefit of the plaintiff but for the purposes or benefit of Mr. Shenkman.

Subject to a point relating to the true construction of the words "as may seem expedient" in clause 3(K) of the memorandum of association there is no doubt that these two transactions fell within the letter of clause 3(K) and (L) of the memorandum. Accordingly, two important points of principle which arise in the present context may be expressed thus: Is a transaction which falls with-

[1986] Ch. 246                                                                                                    Page 34

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R.
908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

in the letter of the powers conferred on a company incorporated under the Companies Acts but is effected for a purpose not authorised by its memorandum of association properly to be regarded as being beyond the corporate capacity of the company? Apart from section 9(1) of the European Communities Act 1972, is such a transaction capable of conferring rights on a third party dealing with the company and, if so, in what circumstances?

The legal personality of a company incorporated under the Companies Acts exists only for the purpose of its incorporation, as defined in the objects clause, which have to be set out in its memorandum of association as required by section 2(1)(c) of the Companies Act 1948. It does not, however, follow that any act is beyond its capacity unless expressly authorised by its objects clause. Any such company is treated as having implied powers to do any act which is reasonably incidental to the attainment or pursuit of any of its express objects, unless such act is expressly prohibited by the memorandum: see In re Horsley & Weight Ltd. [1982] Ch. 442, 448 *per* Buckley L.J. Strictly, therefore, it is not essential for the memorandum to insert any reference at all to mere powers as distinct from objects. Indeed, in Cotman v. Brougham [1918] A.C. 514, 522-523 Lord Wrenbury deprecated the widespread practice of introducing what should properly be called mere powers in memoranda, as opposed to articles of association, though he confessed that, when a junior at the Bar, he himself had had to yield to it after "a vain struggle."

The statutory requirement that the objects of a company shall be specified in the memorandum marks one important difference between objects and powers. In my judgment, however, whether a particular transaction, carried out in purported exercise of an express or implied power contained in a company's memorandum of association, is within the capacity of the company must still depend on the true construction of that memorandum.

Correctly, therefore, in my opinion, Mr. Heyman's argument has focused attention in the present context on the wording of the **\*288** memorandum of the plaintiff. His first submission has been that the guarantee was intra vires the plaintiff as a matter of corporate capacity because the provisions of clause 3(K) of the plaintiff's memorandum, read together with the closing words of that clause, set out a separate independent object which the plaintiff was capable of carrying on as such, and that the execution of the guarantee fell within that provision.

If this submission as to the construction of clause 3(K) were well-founded, I think the suggested conclusion would follow and that, while the relevant transactions might have involved breaches of duty on the part of the directors of the plaintiff, there would be no possible question of their having been beyond its corporate capacity. For the recent decision of this court in In re Horsley & Weight Ltd. [1982] Ch. 442 has made clear, if this was not clear before:

"the doing of an act which is expressed" - by the company's memorandum - "to be, and is capable of being, an independent object of the company cannot be ultra vires, for it is by definition something which the company is formed to do and so must be intra vires." See *per* Buckley L.J. at p. 449, and also *per* Cumming-Bruce L.J. at p. 454 and *per* Templeman L.J. at p. 455. Furthermore, I think this decision also shows that this same principle applies whether or not the transaction in question is of a gratuitous nature:

"The objects of a company do not need to be commercial; they can be charitable or philanthropic; indeed, they can be whatever the original incorporators wish, provided that they are legal. Nor is there any reason why a company should not part with its funds gratuitously or for non-commercial reasons if to do so is within its declared objects."
See *per* Buckley L.J. at p. 450.

[1986] Ch. 246                                                                    Page 35

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

In the light of the observations of Buckley L.J. in that case, at p. 452, of Pennycuick J. in Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62, 69-71 and of Oliver J. in In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016, 1028-1030, the three tests of ultra vires suggested by Eve J. in an often cited passage in his judgment in In re Lee, Behrens and Co. Ltd. [1932] 2 Ch. 46, 51, should, in my opinion, now be recognised as being of no assistance, and indeed positively misleading, when the relevant question is whether a particular gratuitous transaction is within a company's corporate capacity. To this extent the tests should, I think, be finally laid to rest, though they may well be helpful in considering whether or not in any given case directors have abused the powers vested in them by the company.

The question whether clause 3(K) of the plaintiff's memorandum contains a separate independent object of the company is purely one of construction of that memorandum. The decision of the House of Lords in Cotman v. Brougham [1918] A.C. 514 requires that, in answering it, full force must be given, so far as possible, to the provision at the end of clause 3 of the memorandum, which directs that each sub-clause shall be construed independently of the other sub-clauses. I accept Mr. Heyman's **\*289** submission that clause 3(K) must be treated as containing a substantive object unless either (i) the subject matter of this sub-clause is by its nature incapable of constituting a substantive object (as was the power to borrow in Introductions Ltd. v. National Provincial Bank Ltd. [1970] Ch. 199) or (ii) the wording of the memorandum shows expressly or by implication that the sub-clause was intended merely to constitute an ancillary power only: see, for example, the observations of Buckley J. in the latter case at first instance [1968] 2 All E.R. 1221, 1224.

Mr. Heyman has submitted, and I agree, that there is no reason in principle why a company should not be formed for the specific purpose, inter alia, of giving guarantees whether gratuitous or otherwise, rather unusual though such an object might be.

Attention, however, has to be directed to the particular wording of clause 3(K). The authority to give guarantees and become security conferred by the second limb of the sub-clause is not an unrestricted authority. It is merely an authority to give guarantees or become security for "any such persons, firms or companies." The six words just quoted echo the words of the first limb of the sub-clause, which authorise the company to

"lend and advance money or give credit to such persons, firms, or companies and on such terms as may seem expedient, and in particular to customers of and others having dealings with the company." The phrase "as may seem expedient" necessarily implies that there is some criterion by which expediency is to be tested. The only possible criterion, in my opinion, can only mean "as may seem expedient for the furtherance of the objects of the company." The references in clause 3(K) to the giving of credit and to customers of and persons having dealings with the company make it additionally clear that the sub-clause in its context was intended to comprise merely a series of ancillary powers. It follows that, in my opinion, the powers to give guarantees and become security, which are the relevant powers in the present case, are not to be construed as independent objects of the plaintiff and the judge was right in so holding. Correspondingly, I think he was right to reject the defendants' argument that the relevant transactions were intra vires the plaintiff, in so far as that argument was based on the hypothesis that the powers conferred by clause 3(K) were independent objects of the plaintiff.

What, then, is the position if, as I have concluded, the power to give guarantees and to become security are to be regarded as mere powers ancillary to the objects of the plaintiff? Even on this footing, the plaintiff in executing the guarantee and the

[1986] Ch. 246                                                                    Page 36

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

debenture was performing acts of a nature which, at least seemingly, it was expressly authorised by clause 3(K) and (L) of its memorandum to perform. The particular exercises of these powers were, on the face of them, well capable of falling within the objects of the plaintiff.

The judge, as I have read his judgment, accepted that these transactions were capable of falling within the scope of the wording of the powers conferred on the plaintiff by its memorandum. Nevertheless, **\*290** he considered that there is a general principle of company law that a transaction, which ostensibly falls within the scope of the wording of a company's memorandum but is in fact entered into for some purpose not authorised by that memorandum, will be ultra vires the company in what he called the "wider sense" and will confer rights on another party only if he can show that he dealt with the company in good faith and did not have notice that the transaction was entered into for an unauthorised purpose [1982] Ch. 478 , 499. It was primarily on the basis of this principle that the judge ultimately held the defendants in the present case liable to restore the moneys which they had received.

As Lord Selborne said in Ashbury Railway Carriage and Iron Co. Ltd. v. Riche (1875) L.R. 7 H.L. 653 , 693:

"a statutory corporation, created by Act of Parliament for a particular purpose, is limited, as to all its powers, by the purposes of its incorporation as defined in that Act." Strict logic might therefore appear to require that any act purported to be done by a company in purported exercise of powers ancillary to its objects conferred on it by its memorandum of association, whether express or implied, (e.g., a power to borrow) would necessarily and in every case be beyond its capacity and therefore wholly void if such act was in fact performed for purposes other than those of its incorporation. However, the practical difficulties resulting from such a conclusion for persons dealing with a company carrying on a business authorised by its

memorandum would be intolerable. As Buckley J. put it, in regard to a power to borrow, in In re David Payne & Co. Ltd. [1904] 2 Ch. 608 , 613:

"A corporation, every time it wants to borrow, cannot be called upon by the lender to expose all its affairs, so that the lender can say, 'Before I lend you anything, I must investigate how you carry on your business, and I must know why you want the money, and how you apply it, and when you do have it I must see you apply it in the right way.' It is perfectly impossible to work out such a principle."

The David Payne decision, in my opinion, indicates the proper alternative approach. In that case, the company concerned had express power under its memorandum of association "to borrow and raise money for the purposes of the company's business." It borrowed money and issued a debenture to secure the loan. Its liquidator claimed that the debenture was ultra vires and void because there was evidence that the borrowing had not in fact been made for the purposes of the company's business. Buckley J. in his judgment considered the force of the phrase "for the purposes of the company's business." He asked the question, at p. 612:

"is it a condition attached to the exercise of the power that the money should be borrowed for the purposes of the business, or is that a matter to be determined as between the shareholders and the directors?" In the course of answering this question he said, at p. 612: **\*291**

"A corporation cannot do anything except for the purposes of its business, borrowing or anything else; everything else is beyond its power, and is ultra vires. So that the words 'for the purposes of the company's business' are a mere expression of that which would be involved if there were no such words." This passage has been frequently echoed in later cases and, perhaps not surprisingly, has on occasions been read as referring to the capacity of the company. However, I think that in using

[1986] Ch. 246                                                                                                              Page 37

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R.
908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

the phrase "ultra vires" in this particular context Buckley J. can only have meant "ultra vires the directors." This, in my opinion, is made clear by what followed. He accepted that, if the phrase "for the purpose of the company's business" was a condition attached to the exercise of the power, a loan would be ultra vires and void if the condition had not been complied with. He did not, however, regard it as such a condition: in his view it did no more than state the obvious. In these circumstances, his conclusion was, at p. 613:

"If this borrowing was made, as it appears to me at present it was made, for a purpose illegitimate so far as the borrowing company was concerned, that may very well be a matter on which rights may arise as between the shareholders and directors of that company. It may have been a wrongful act on the part of the directors. But I do not think that a person who lends to the company is by any words such as these required to investigate whether the money borrowed is borrowed for a proper purpose or an improper purpose. The borrowing being effected, and the money passing to the company, the subsequent application of the money is a matter in which the directors may have acted wrongly; but that does not affect the principal act, which is the borrowing of the money."            In these circumstances, he held, at p. 614, that the defendants:

"who have paid this money and taken this debenture without notice that the money was going to be applied as it was, are not affected by anything arising in regard to that."

The most relevant passages in the judgments of the      Court of Appeal in the David Payne case [1904] 2 Ch. 608      are cited in Vinelott J.'s judgment            [1982] Ch. 478 , 498 and I will not repeat them. Vaughan Williams and Cozens-Hardy L.JJ. expressly approved the manner in which Buckley J. had approached the problem. Vaughan Williams L.J. expressly, at p. 615, and the other members of the court implicitly rejected the borrower's first argu-

ment that, since the debenture was not issued to raise money for the purposes of the company, it was ultra vires altogether "in such a sense that nothing could make it right." All three members of the court considered that the plaintiff company could succeed if, but only if, it showed that, at the time of the loan, the lending company knew that the money was going to be applied by the borrowers for an improper purpose and that this had not been proved.

The one crucially important point to which      Buckley J. and the Court of Appeal in David Payne      did not expressly advert is the basis upon which the lenders would have lost their security if they had known of            **\*292** the improper purpose for which the moneys lent were going to be applied. The basis is, in my opinion, this. The directors of the borrowing company in fact had no authority from the company to take the loan and grant the debenture because these transactions were not effected for the purposes of the company. Nevertheless, as a general rule, a company incorporated under the Companies Acts holds out its directors as having ostensible authority to do on its behalf anything which its memorandum of association expressly or by implication gives the company the capacity to do. In      David Payne      the company's memorandum gave it the capacity to borrow. As a matter of construction of the company's memorandum, the court was not prepared to construe the words "for the purposes of the company's business" as limiting its corporate capacity but construed them simply as limiting the authority of the directors. In the absence of notice to the contrary, the lenders would thus have been entitled to assume, on the authority of the principle in      Turquand's case, 6 E. & B. 327      and on more general principles of the law of agency, that the directors of the borrowing company were acting properly and regularly in the internal management of its affairs and were borrowing for the purposes of the company's business: see, for example,      In re Hampshire Land Co. [1896] 2 Ch. 743 , a decision of Vaughan Williams J. which was cited in

the David Payne case [1904] 2 Ch. 608, and Bowstead on Agency, 14th ed. (1976), pp. 241-242 and the cases there cited. However, a party dealing with a company cannot rely on the ostensible authority of its directors to enter into a particular transaction if it knows they in fact have no such authority because it is being entered into for improper purposes. Neither the rule in Turquand's case nor more general principles of the law of agency will avail him in such circumstances: see Bowstead on Agency, 14th ed., p. 243. The various passages in the judgments in both courts in the David Payne case which refer to the extent of the lender's obligation, if any, to inquire as to the purposes for which the loan is to be used, in my opinion, are not directed at all to the corporate capacity of the borrowing company; they are directed to the right of the lender to rely on the ostensible authority of the borrower's directors.

In Introductions Ltd. v. National Provincial Bank Ltd. [1970] Ch. 199 the Court of Appeal again had to consider the validity of debentures granted by a company as security for a loan. The company under its memorandum of association had a general ancillary power to borrow money and to issue debentures to secure its repayment. But this power was not an independent object of the company. As Harman L.J. put it, at p. 210, "borrowing is not an end in itself and must be for some purpose of the company." The power was not expressed in terms to be exercisable only "for the purposes of the company" but, following the reasoning of Buckley J. in In re David Payne & Co. Ltd. [1904] 2 Ch. 608, 612, the court held that the words necessarily had to be implied. The company had borrowed money from a bank and granted debentures to secure the loan. But the only business carried on by it was that of pig-breeding which was a purpose not authorised by its memorandum of association. On the liquidation of the company a question arose as to the validity of the debentures. Harman L.J., who gave the leading judgment, after deciding that the power to borrow

conferred by the **\*293** memorandum was a mere ancillary power not an independent object, proceeded to cite, at p. 210, the following passage from the speech of Lord Parker of Waddington in Cotman v. Brougham [1918] A.C. 514, 521:

"A person who deals with a company is entitled to assume that a company can do everything which it is expressly authorised to do by its memorandum of association, and need not investigate the equities between the company and its shareholder."

This passage, it will be seen, closely echoes some of the language used by Buckley J. in his judgment in the David Payne case [1904] 2 Ch. 608 and is, I think, an expression of the rule in Turquand's case, 6 E. & B. 327 and the more general principles of agency to which I have already referred. Harman L.J. went on to say [1970] Ch. 199, 210:

"I would agree that, if the bank did not know what the purpose of the borrowing was, it need not inquire" - the emphasis is mine - "but it did know, and I can find nothing in Cotman v. Brougham to protect it notwithstanding that knowledge." The words "it need not inquire," in my opinion, make it clear that Harman L.J. did not regard the borrowing as having been beyond the capacity of the company. However, he then went on to point out that the David Payne decision [1904] 2 Ch. 608 shows that the protection afforded by the principle stated by Lord Parker affords no protection to a lender who knows that the money is intended to be misapplied. The absence of any express provision in the company's memorandum of association requiring the loan to be applied for the purposes of the company, in his judgment, did not improve the bank's position, since such a provision would fall to be implied anyway. He concluded, at p. 211:

"This borrowing was not for a legitimate purpose of the company: the bank knew it, and, therefore," - the emphasis is mine - "cannot rely on its deben-

[1986] Ch. 246                                                                                                    Page 39

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

tures."          As I read his judgment, therefore, Harman L.J. reached his decision that the bank could not rely on the debentures following the ratio of the         David Payne          decision, that is to say, not because they had been granted by the company in excess of its corporate capacity, but because the bank knew that the directors of the company, in purporting to grant them, had exceeded the authority conferred on them by the company by entering into the transaction for purposes other than the company's corporate purpose.

Russell L.J. [1970] Ch. 199          , 211, in a very short judgment, reached the same conclusion but by rather a different route from that of Harman L.J. As I read his judgment, his view was that the borrowing and execution of the debentures were ultra vires the company as a matter of corporate capacity because it was an implicit condition attached to the power to borrow contained in the company's memorandum that moneys should not be borrowed for use in an undertaking ultra vires the company. Since the sole undertaking of that company was the pig-breeding business, which was beyond the company's corporate capacity,          **\*294**          the loans taken for use in that business were likewise inevitably beyond its corporate capacity. I read Russell L.J.'s decision as being limited to the facts of that particular case and not in any way conflicting with my interpretation of the         David Payne          decision.

It follows that, in my opinion, the decisions of this court in         David Payne [1904] 2 Ch. 608          and         Introductions Ltd. [1970] Ch. 199          , on their true analysis, lend no support to the plaintiff's submission that the relevant transactions in the present case were beyond the corporate capacity of the plaintiff simply because they were effected for improper purposes not authorised by its memorandum of association. Nor does this argument derive any support from the powerful judgment of Pennycuick J. in         Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62          , where one finds the following statement of principle, at p. 69:

"Apart from authority, I should feel little doubt that where a company is carrying out the purposes expressed in its memorandum, and does an act within the scope of a power expressed in its memorandum, that act is an act within the powers of the company. The memorandum of a company sets out its objects and proclaims them to persons dealing with the company and it would be contrary to the whole function of a memorandum that objects unequivocally set out in it should be subject to some implied limitation by reference to the state of mind of the parties concerned.

"Where directors misapply the assets of their company, that may give rise to a claim based on breach of duty. Again, a claim may arise against the other party to the transaction, if he has notice that the transaction was effected in breach of duty. Further, in a proper case, the company concerned may be entitled to have the transaction set aside. But all that results from the ordinary law of agency and has not of itself anything to do with the corporate powers of the company."

Pennycuick J., having subsequently proceeded to review the authorities cited to him, apparently saw no reason to qualify this statement of the law and neither do I. I respectfully agree with it in its entirety and would regard the principles stated in the         David Payne case [1904] 2 Ch. 608          as giving effect to the "ordinary law of agency."

I also respectfully agree with the following observations made by Oliver J., after an extensive review of the authorities, in         In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016          , 1029-1030:

"I cannot help thinking, if I may respectfully say so, that there has been a certain confusion between the requirements for a valid exercise of the fiduciary powers of directors (which have nothing to do with the capacity of the com-

[1986] Ch. 246                                                                                                      Page 40

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R.
908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

pany but everything to do with the propriety of acts done within that capacity), the extent to which powers can be implied or limits be placed, as a matter of construction, on express powers, and the matters which the court will take into consideration at the suit of a minority shareholder in determining the extent to which his interests can be overridden by a majority vote. These three matters, as it seems to me, raise **\*295** questions which are logically quite distinct but which have sometimes been treated as if they demanded a single, universal answer leading to the conclusion that, because a power must not be abused, therefore, beyond the limit of propriety it does not exist."

My conclusions from these authorities on these questions of principle may be summarised as follows. (1) The basic rule is that a company incorporated under the Companies Acts only has the capacity to do those acts which fall within its objects as set out in its memorandum of association or are reasonably incidental to the attainment or pursuit of those objects. Ultimately, therefore, the question whether a particular transaction is within or outside its capacity must depend on the true construction of the memorandum.

(2) Nevertheless, if a particular act (such as each of the transactions of 22 January 1969 in the present case) is of a category which, on the true contruction of the company's memorandum, is capable of being performed as reasonably incidental to the attainment or pursuit of its objects, it will not be rendered ultra vires the company merely because in a particular instance its directors, in performing the act in its name, are in truth doing so for purposes other than those set out in its memorandum. Subject to any express restrictions on the relevant power which may be contained in the memorandum, the state of mind or knowledge of the persons managing the company's affairs or of the persons dealing with it is irrelevant in considering questions of corporate capacity.

(3) While due regard must be paid to any express conditions attached to or limitations on powers contained in a company's memorandum (e.g., a power to borrow only up to a specified amount), the court will not ordinarily construe a statement in a memorandum that a particular power is exercisable "for the purposes of the company" as a condition limiting the company's corporate capacity to exercise the power; it will regard it as simply imposing a limit on the authority of the directors: see the David Payne case [1904] 2 Ch. 608 .

(4) At least in default of the unanimous consent of all the shareholders (as to which see below), the directors of a company will not have actual authority from the company to exercise any express or implied power other than for the purposes of the company as set out in its memorandum of association.

(5) A company holds out its directors as having ostensible authority to bind the company to any transaction which falls within the powers expressly or impliedly conferred on it by its memorandum of association. Unless he is put on notice to the contrary, a person dealing in good faith with a company which is carrying on an intra vires business is entitled to assume that its directors are properly exercising such powers for the purposes of the company as set out in its memorandum. Correspondingly, such a person in such circumstances can hold the company to any transaction of this nature.

(6) If, however, a person dealing with a company is on notice that the directors are exercising the relevant power for purposes other than the purposes of the company, he cannot rely on the ostensible authority **\*296** of the directors and, on ordinary principles of agency, cannot hold the company to the transaction.

In the present case I construe the words "as may seem expedient" in clause 3(K) of the plaintiff's memorandum not as limiting the corporate capacity of the plaintiff but as simply imposing a limit on the authority of its directors. To adapt the wording of Harman L.J. in the Introductions

Ltd. case [1970] Ch. 199 following the David Payne decision [1904] 2 Ch. 608, the guarantee and pro tanto the debenture were not executed for a legitimate purpose of the plaintiff; Colvilles and British Steel Corporation knew it and, therefore, cannot rely on the guarantee and pro tanto the debenture. All this results from the ordinary law of agency, not from the corporate powers of the plaintiff. The relevant transactions in the present case, in my opinion, were not beyond its corporate capacity.

The judge [1982] Ch. 478, 499 explained that the reason why he regarded a transaction which is within the powers, express or implied, of a company but which is entered into for a purpose which is not authorised by its memorandum of association as equated with one which is ultra vires in the narrow sense is that "such a transaction like a transaction which is ultra vires in the narrow sense is incapable of being made binding on the company even by the assent of all the members." We have had the benefit of extensive argument as to the extent, if any, to which the assent of all the members of a company is capable of binding it to a transaction of this nature. Since the shareholders' consent point is not open to British Steel Corporation and Mr. Cooper on the facts of the present case, I wish to make only the following few, obiter, observations in the context of this argument.

First, if an act is beyond the corporate capacity of a company it is clear that it cannot be ratified. As against the company itself "an ultra vires agreement cannot become intra vires by means of estoppel, lapse of time, ratification, acquiescence, or delay": York Corporation v. Henry Leetham and Sons Ltd. [1924] 1 Ch. 557, 573 per Russell J. However, the clear general principle is that any act that falls within the corporate capacity of a company will bind it if it is done with the unanimous consents of all the shareholders or is subsequently ratified by such consents: see, for example, Salomon v. A. Sa-lomon & Co. Ltd. [1897] A.C. 22, 57 per Lord Davey; In re Horsley & Weight Ltd. [1982] Ch. 442, 454 per Buckley L.J. and Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd. [1983] Ch. 258. This last-mentioned principle certainly is not an unqualified one. In particular, it will not enable the shareholders of a company to bind the company itself to a transaction which constitutes a fraud on its creditors: see, for example, In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016, 1037, per Oliver J. But none of the authorities which have been cited to us have convinced me that a transaction which (i) falls within the letter of the express or implied powers of a company conferred by its memorandum, and (ii) does not involve a fraud on its creditors, and (iii) is assented to by all the shareholders, will not bind a fully solvent company merely because the intention of the directors, or the shareholders, is to effect a purpose not authorised by the memorandum. **297** The recent decision of this court in the Multinational case [1983] Ch. 258 seems to me to point to a contrary conclusion: see also Attorney-General's Reference (No. 2 of 1982) [1984] Q.B. 624, 640, per Kerr L.J. However, none of these matters relating to ratification, in my opinion, call for decision on this appeal. I have touched on them only because they weighed with the judge and have been covered fully in argument.

Whether or not in 1969 the consent or ratification of all the shareholders was incapable of rendering the transactions of 22 January 1969 binding the plaintiff, I myself think that the concept of ultra vires "in the wider sense" embodied by the judge in his judgment carries with it some risk of confusion. If confusion is to be avoided, it seems to me highly desirable that, as a matter of terminology, the phrase "ultra vires" in the context of company law should for the future be rigidly confined to describing acts which are beyond the corporate

[1986] Ch. 246                                                                                    Page 42

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

capacity of a company. Transactions entered into by a company such as those considered in the David Payne case [1904] 2 Ch. 608 and those under consideration in the present case cannot, in my opinion, be properly regarded as beyond its corporate capacity (and, therefore, ex hypothesi wholly void) if they are capable of conferring rights on a third party - albeit only on a third party who dealt with the company in good faith and without notice that they were being entered into in furtherance of improper purposes.

To sum up, my conclusions on the ultra vires point are these. The relevant transactions of 22 January 1969 were not beyond the corporate capacity of the plaintiff and thus were not ultra vires in the proper sense of that phrase. However, the entering into the guarantee and, to the extent of the sum guaranteed, the debenture was beyond the authority of the directors, because they were entered into in furtherance of purposes not authorised by the plaintiff's memorandum. Despite this lack of authority, they might have been capable of conferring rights on Colvilles if Colvilles had not known of this lack of authority. Colvilles, however, did have such knowledge and so acquired no rights under these transactions. Even if the no due authorisation point discussed earlier in this judgment were not open to the plaintiff, because Mr. Shenkman had duly declared his interest at the relevant board meeting, the plaintiff could disclaim these transactions, which its directors had carried out on its behalf, as being unauthorised, inasmuch as they were carried out for improper purposes. The practical relevance of the no due authorisation point discussed in an earlier section of this judgment is that it enables the plaintiff also to disclaim the borrowing of the £401,448 and the whole (as opposed to part only) of the security given by the debenture (as having been in each case entered into by the directors without its authority) and also to attack the validity of the receiver's appointment.

**The constructive trust point**

I now turn much more briefly to the constructive trust point. Buckley L.J. stated the relevant principle thus in Belmont Finance Corporation Ltd. v. Williams Furniture Ltd. (No. 2) [1980] 1 All E.R. 393 , 405 in a judgment with which Goff and Waller L.JJ. agreed:
**\*298**

"A limited company is of course not a trustee of its own funds: it is their beneficial owner; but in consequence of the fiduciary character of their duties the directors of a limited company are treated as if they were trustees of those funds of the company which are in their hands or under their control, and if they misapply them they commit a breach of trust (In re Lands Allotment Co. [1894] 1 Ch. 616 , 638 per Lindley and Kay L.JJ.). So, if the directors of a company in breach of their fiduciary duties misapply the funds of their company so that they come into the hands of some stranger to the trust who receives them with knowledge (actual or constructive) of the breach, he cannot conscientiously retain those funds against the company unless he has some better equity. He becomes a constructive trustee for the company of the misapplied funds. This is stated very clearly by Jessel M.R. in Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474 , 479, where he said: 'In this court the money of the company is a trust fund, because it is applicable only to the special purposes of the company in the hands of the agents of the company, and it is in that sense a trust fund applicable by them to those special purposes; and a person taking it from them with notice that it is being applied to other purposes cannot in this court say that he is not a constructive trustee.'"

The Belmont principle thus provides a legal route by which a company may recover its assets in a case where its directors have abused their fiduciary duties and a person receiving assets as a result of such abuse is on notice that they have been misapplied. The principle is not linked in any way to the capacity of the company; it

[1986] Ch. 246                                                        Page 43

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

is capable of applying whether or not the company had the capacity to do the acts in question.

Furthermore, the Belmont principle must, in my opinion, be equally capable of applying in a case where the relevant misapplication of the company's assets by the directors has consisted either of an application for purposes not authorised by its memorandum or an application in breach of the company's articles of association, e.g., pursuant to a board resolution passed at an inquorate meeting of the directors.

From the findings of fact of the judge, with which I see no reason to disagree for reasons already stated, I think it clear that (a) the directors of the plaintiff were acting in breach of the plaintiff's articles of association and of their fiduciary duties to the plaintiff in purporting to authorise and in executing the guarantee and debenture; (b) British Steel Corporation and Mr. Cooper had notice of these facts when they respectively received the relevant assets.

It must follow, in my opinion, that the constructive trust point is well founded and that the plaintiff is entitled to relief on this ground as well as on the additional grounds to which I have already referred.

The relief to be granted

Finally, I turn to consider the relief to be granted to the plaintiff. The judge, having found in favour of the plaintiff on the ultra vires and constructive trust points, ordered in effect that the guarantee be set **\*299** aside. He further ordered that British Steel Corporation and the receiver and, to the extent of the assets coming to their hands as personal representatives, the fifth and sixth defendants, were jointly and severally liable to pay to the plaintiff (a) the sum of £383,084.77 (being the principal amount received by British Steel Corporation in discharge of the guarantee out of the proceeds of sale of the plaintiff's assets realised by the receiver), and, in addition, (b) all interest paid by the receiver to British Steel Corporation under the terms of the agreement and the

debenture of 22 January 1969 in respect of the principal amount secured by the guarantee and (c) the amount for which the receiver accounted to the Inland Revenue in respect of tax deducted therefrom. In the exercise of his discretion he also ordered payment of interest on the above-mentioned sums and a number of accounts and inquiries. He also gave the plaintiff liberty to prove in Mr. Shenkman's bankruptcy for various sums payable under the order.

The details of the judge's order of 23 March 1983 were finally settled after his second judgment of that date.

One important matter which had to be dealt with in this judgment was the mode of calculation of the interest payable on the sums recoverable by the plaintiff. This interest element has proved to be very large in amount, particularly since the judge in effect ordered that, as to a major part of these sums, the plaintiff is entitled to compound interest. However, neither the defendants' notice of appeal nor the plaintiff's cross-appeal raises any issue of detail in regard to the form of the order relating to interest or otherwise. As to the form of the order, each of them raises just one major point of principle.

The plaintiff for its part seeks wider relief than that granted by the order on the footing that its no due authorisation point is to be accepted and the defendants' Turquand's case point is to be rejected. On this footing, the notice of cross-appeal seeks (1) a declaration that the guarantee, the debenture and the purported appointment of the receiver was and is in each case void and of no effect; and (2) payment to the plaintiff of the sum of £1,148,078.15 as money had and received to the use of the plaintiff with interest under the Law Reform (Miscellaneous Provisions) Act 1934 .

As to (1) my present view is that the appropriate form of relief is a declaration that each of the agreement, guarantee and debenture was not and is

[1986] Ch. 246                                                    Page 44

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

not the deed of the plaintiff and that the purported appointment of the receiver was and is void and of no effect. A declaration in this form would leave open the question whether the guarantee and debenture had effect to the extent of exposing the directors of the plaintiff who executed it to some personal liability to Colvilles.

As to (2) the manner in which the sum of £1,148,078.15 is arrived at appears from the last sentence in the opening section of this judgment. Mr. Morritt, however, submitted in effect that, if the plaintiff succeeded on the no due authorisation point the existing order should remain but there should be added to it, first, an order for payment to the plaintiff of an additional sum of £401,448 plus interest and, secondly, a declaration that British Steel Corporation is entitled to prove in the liquidation of **\*300** the plaintiff for this sum but without interest. He further submitted that the sum of £50,000 retained by the receiver should be repaid.

As at present advised, I do not think that an order in the form suggested by Mr. Morritt would do equity. The effect of my conclusion on the no due authorisation point is that the directors of the plaintiff, purporting to act on behalf of the plaintiff but without its authority, have borrowed a sum of £401,448 from Colvilles. This particular sum, however, was immediately applied by the directors of the plaintiff for the benefit of the plaintiff in discharging the plaintiff's liability to Scottish Steel. The result was that the aggregate liabilities of the plaintiff remained the same, save for the obligation to pay interest to Colvilles at a rate higher than that (if any) which had been agreed with Scottish Steel. A general principle of equity, as I understand it, is that, where, by an unauthorised act of an agent, the money of a third party is obtained and applied for the benefit of the principal, the principal is liable to restore such money to the extent that it has been so applied, even though the third party knew that the agent was not authorised to obtain or receive the money: see Bowstead on Agency, 14th ed., p. 330

and       Reversion Fund and Insurance Co. Ltd. v. Maison Cosway Ltd. [1913] 1 K.B. 364       . It seems to me, therefore, that the plaintiff was at all material times under an obligation to repay the £401,448 to Colvilles or British Steel Corporation and that the plaintiff cannot now seek redress against the defendants on the basis that the sum of £401,448 was improperly paid to British Steel Corporation.

However, as I understand the position, the receiver repaid to British Steel Corporation not only the capital sum of £401,448, but interest on this sum as provided by the agreement and debenture. I do not see how British Steel Corporation can justify the receipt and retention of this interest element if the agreement and debenture are not binding on the plaintiff. My present view, therefore, is that the judge's order should be varied so as to include an order for payment of this interest element, plus the £50,000 retained by the receiver in respect of fees and expenses, together with interest on those two respective sums, but not the sum of £401,448 itself.

I now turn to the point of principle raised by British Steel Corporation and the receiver as to the form of the order. If a surplus remains in the hands of the liquidator of the plaintiff after all its liabilities and the costs, charges and expenses of the liquidation have been discharged, that surplus will fall to be distributed among the shareholders of the plaintiff who, so far as the evidence shows, are still the trustee-shareholders and Mr. Shenkman. He, I understand, has now obtained his discharge from bankruptcy. Since Mr. Shenkman was an active participant in the relevant breaches of trust by the directors of the plaintiff and the trustee-shareholders, according to the defendants' submission, consented to those breaches of trust, Mr. Heyman submitted that it would be inequitable if there were any possibility of the order made by the court resulting in the receipt by Mr. Shenkman or the trustee-shareholders of any part of the assets repaid by British Steel Corporation and the receiver to the plaintiff pursuant to the order. He therefore sought,

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 (Cite as: [1986] Ch. 246)

and obtained from this court, leave to amend the notice of appeal by raising **\*301** a point not pleaded or argued in the court below. The submission is in effect that the order should place a limit on the liability of British Steel Corporation and the receiver so as to provide that the aggregate amount which falls to be paid by British Steel Corporation and the receiver to the plaintiff, including interest, is not to exceed a sum sufficient to enable the liquidator of the plaintiff to discharge in full the liabilities, costs, charges and expenses already mentioned.

This submission is based on the principle exemplified by the decision of this court in In re Somerset [1894] 1 Ch. 231 which deals with the position of beneficiaries who have instigated or consented to a breach of trust. At least in so far as it is directed against Mr. Shenkman, I have much sympathy with it. In the context of this litigation, he seems to me to have no merits whatever, except that the judge thought him an honest witness. However, in my view, it is impossible for this court to accede to the submission for these two reasons, if no others. First, for the reasons already given, British Steel Corporation and the receiver cannot on this appeal be heard to say that the trustee-shareholders did in fact consent to the transactions. Secondly, Mr. Shenkman's trustee in bankruptcy has a clear interest in this point. He elected to take no part in the proceedings in the court below and this court on the basis of, respectively, the pleadings and the notice of appeal in its original form, neither of which made any reference at all to the possibility of the defendants' liability being limited in this manner. In these circumstances, I do not think that by its order this court can properly place the suggested limit on such liability which might enure to the detriment of the trustee in bankruptcy and the creditors whom he represents.

Mr. Heyman requested that, even if this court did not feel able to restrict the defendants' liability, it should, after directing appropriate inquiries as to what is due to the creditors of the plaintiff in re-

spect of capital and interest and in respect of the costs, charges and expenses of the liquidation, direct an issue to be tried as between (1) British Steel Corporation and the receiver, (2) the trustee-shareholders, (3) Mr. Shenkman and (4) Mr. Shenkman's trustee in bankruptcy.

For my part, however, I do not think it could be right for this court to make such a direction in the absence of Mr. Shenkman and the trustee in bankruptcy, who have had no notice whatever that the point was going to be raised on this appeal or the trustee-shareholders who are not even parties to the proceedings. While I have in principle some sympathy with the point, the furthest that I feel the court can and should go to assist British Steel Corporation and the receiver is to add a proviso to the order to the effect that (i) the order for payment thereby made shall not prejudice or affect the respective rights (if any) of British Steel Corporation, Mr. Shenkman, Mr. Shenkman's trustee in bankruptcy or the other shareholders in the plaintiff as between themselves to participate in the moneys paid; (ii) the liquidator of the plaintiff shall not distribute any moneys so paid to Mr. Shenkman or his trustee in bankruptcy or the other shareholders in the plaintiff without giving, say, 21 days prior written notice to British Steel Corporation's solicitors of the intention to make such distribution. I should, perhaps, make it clear that, while British Steel Corporation and the receiver have not been **\*302** permitted to raise the shareholders' consent point on this appeal, there will, in my opinion, be nothing to prevent them from raising the point, for what it is worth, in the liquidation of the plaintiff or in any other proceedings.

The decision in the Reversion Fund case [1913] 1 K.B. 364 was not cited in the course of argument before this court. For this reason, if no other, I think the parties must be given the opportunity to present argument to us, if they wish to do so and think it will serve a useful purpose, as to the precise form of relief to be granted in the light of our conclusions on the substantive issues.

Copr. © West 2009 No Claim to Orig. Govt. Works

[1986] Ch. 246                                                                                   Page 46

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

Subject to this, I would (1) dismiss the appeal of British Steel Corporation and the receiver; (2) allow the cross-appeal of the plaintiff; (3) vary the judge's order so as to include (a) a declaration that each of the agreement, the guarantee and the debenture of 22 January 1969 was not and is not the deed of the plaintiff, (b) a declaration that the purported appointment of Mr. Cooper as receiver was and is void and of no effect, (c) an order for payment or repayment of (i) the interest element received by British Steel Corporation from the receiver in respect of the £401,448 (ii) the £50,000 received by the receiver and (iii) interest on these two last mentioned sums, and (d) a proviso of the nature which I have already indicated; and (4) in all other respects uphold the judge's order.BROWNE-WILKINSON L.J.

I have had the advantage of reading the judgment of Slade L.J., with which I agree. I add my own views only on the ultra vires and constructive trust points which, despite section 9 of the European Communities Act 1972, are still of some general importance.

The judge drew a distinction between two meanings of ultra vires which he called the "narrow sense" and the "wider sense." As I understand his judgment, he treated ultra vires in the narrow sense as covering any transaction outside the express or implied powers of a company stated in its memorandum of association and ultra vires in the wider sense as covering a transaction which, although within such powers, is entered into in furtherance of "some purpose which is not an authorised purpose": [1982] 1 Ch. 478, 497. Although it is not entirely clear, he appears to have treated transactions which are ultra vires in his narrow sense as being wholly void as opposed to those which are ultra vires in the wider sense, which are capable of conferring rights on third parties who have no notice of the invalidity: see p. 499. He then apparently held that the guarantee by the plaintiff was ultra vires in the wider sense and, since British Steel Corporation had notice of that fact, it was un-

enforceable by British Steel Corporation.

In my judgment, much of the confusion that has crept into the law flows from the use of the phrase "ultra vires" in different senses in different contexts. The reconciliation of the authorities can only be achieved if one first defines the sense in which one is using the words "ultra vires." Because the literal translation of the words is "beyond the powers," there are many cases in which the words have been applied to transactions which, although within the capacity of the company, are **\*303** carried out otherwise than through the correct exercise of the powers of the company by its officers: indeed, that is the sense in which the judge seems to have used the words in this case. For reasons which will appear, in my judgment, the use of the phrase "ultra vires" should be restricted to those cases where the transaction is beyond the capacity of the company and therefore wholly void.

A company, being an artificial person, has no capacity to do anything outside the objects specified in its memorandum of association. If the transaction is outside the objects, in law it is wholly void. But the objects of a company and the powers conferred on a company to carry out those objects are two different things: see Cotman v. Brougham [1918] A.C. 514 especially *per* Lord Parker of Waddington, at p. 520, and *per* Lord Wrenbury, at p. 522. If the concept that a company cannot do anything which is not authorised by law had been pursued with ruthless logic, the result might have been reached that a company could not (i.e., had no capacity to) do anything otherwise than in due exercise of its powers. But such ruthless logic has not been pursued and it is clear that a transaction falling within the objects of the company is capable of conferring rights on third parties even though the transaction was an abuse of the powers of the company: see, for example, In re David Payne & Co. Ltd. [1904] 2 Ch. 608. It is therefore established that a company has capacity to carry out a transaction which falls within its objects even

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

though carried out by the wrongful exercise of its powers.

In my judgment, for this purpose the position of a company is analogous to that of a human being who has fiduciary powers. If two trustees convey trust property in breach of trust, the conveyance is not void. As human beings they have the capacity to transfer the legal estate: their capacity to transfer flows from their status as human beings, not from the powers conferred on them as trustees. Even if their powers under the trust instrument did not authorise the conveyance, the legal estate will vest in the transferee. Beneficiaries under the trust would be entitled, if they learnt in time, to restrain the execution of such conveyance in excess of the powers of the trustees. If the beneficiaries only discovered the position after the conveyance, the transferee, if he took with notice, would be personally liable as a constructive trustee and the property conveyed could be recovered: but the conveyance would not be a nullity. So in the case of a limited company, if a transaction falls within the objects of the company (and is therefore within its capacity) it is effective to vest rights in a third party even if the transaction was carried out in excess or abuse of the powers of the company. If the members of the company learn of what is proposed in time, they will be able to restrain such transaction: but if they only discover the facts later, their remedy lies against those who have wrongly caused the company to act in excess or abuse of the company's powers. If a third party has received the company's property with notice of the excess or abuse of powers, such third party will be personally liable as a constructive trustee and the company will be able to recover the property: see Belmont Finance Corporation Ltd. v. Williams Furniture Ltd. (No. 2) [1980] 1 All E.R. 393 . **\*304**

However, the analogy between companies and trustees is not complete. As an artificial person, a company can only act by duly authorised agents. Apart from questions of ostensible authority, directors like any other agents can only bind the company

by acts done in accordance with the formal requirements of their agency, e.g., by resolution of the board at a properly constituted meeting. Acts done otherwise than in accordance with these formal requirements will not be the acts of the company. However, the principles of ostensible authority apply to the acts of directors acting as agents of the company and the rule in Turquand's case, 6 E. & B. 327 establishes that a third party dealing in good faith with directors is entitled to assume that the internal steps requisite for the formal validity of the directors' acts have been duly carried through. If, however, the third party has actual or constructive notice that such steps had not been taken, he will not be able to rely on any ostensible authority of the directors and their acts, being in excess of their actual authority, will not be the acts of the company.

The critical distinction is, therefore, between acts done in excess of the capacity of the company on the one hand and acts done in excess or abuse of the powers of the company on the other. If the transaction is beyond the capacity of the company it is in any event a nullity and wholly void: whether or not the third party had notice of the invalidity, property transferred or money paid under such a transaction will be recoverable from the third party. If, on the other hand, the transaction (although in excess or abuse of powers) is within the capacity of the company, the position of the third party depends upon whether or not he had notice that the transaction was in excess or abuse of the powers of the company. As between the shareholders and the directors, for most purposes it makes no practical difference whether the transaction is beyond the capacity of the company or merely in excess or abuse of its power: in either event the shareholders will be able to restrain the carrying out of the transaction or hold liable those who have carried it out. Only if the question of ratification by all the shareholders arises will it be material to consider whether the transaction is beyond the capacity of the company since it is established that, although all the shareholders can ratify a transaction within the com-

Copr. © West 2009 No Claim to Orig. Govt. Works

[1986] Ch. 246                                                                                                                                              Page 48

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

pany's capacity, they cannot ratify a transaction falling outside its objects.

In this judgment I therefore use the words "ultra vires" as covering only those transactions which the company has no capacity to carry out, i.e., those things the company cannot do at all as opposed to those things it cannot properly do.

The two badges of a transaction which is ultra vires in that sense are (1) that the transaction is wholly void and (consequentially) (2) that it is irrelevant whether or not the third party had notice. It is therefore in this sense that the transactions in In re David Payne & Co. Ltd. [1904] 2 Ch. 608 and Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62 were held not to be ultra vires. The distinction between the capacity of the company and abuse of powers was also drawn by Oliver J. in In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016 , 1034. I consider the reasoning of the decision in In re Lee, Behrens and Co. Ltd. [1932] 2 Ch. 46*305 to be wrong for the reasons given by Pennycuick J. in the Charterbridge case [1970] Ch. 62 : the decision itself can only be justified (if at all) on the footing that the widow who was granted a pension had notice of the impropriety of the grant. The only other case which, at first sight, is difficult to reconcile with my views is Introductions Ltd. v. National Provincial Bank Ltd. [1968] 2 All E.R. 1221 and [1970] Ch. 199 , which I will consider later.

For these reasons, in considering a claim based on ultra vires, the first step must be to determine what are the objects (as opposed to the powers) of a company. Not all activities mentioned in the objects clause are necessarily objects in the strict sense: some of them may only be capable of existing as, or on their true construction are, ancillary powers: see Cotman v. Brougham [1918] A.C. 514 and Introductions Ltd. v. National Provincial Bank Ltd. [1970] Ch. 199 . and this may be the position even if the memorandum of association contains the usual "separate

objects" clause; such a clause is not capable of elevating into an object of the company that which is in essence a power: see Introductions Ltd. v. National Provincial Bank Ltd.

If, on construction of the objects clause, the transactions fall within the objects (as opposed to the powers), it will not be ultra vires since the company has the capacity to enter into the transaction. If the objects clause contains provisions (whether objects or powers) which show that a transaction of the kind in question is within the capacity of the company, that transaction will not be ultra vires. Sometimes the drafting of the memorandum and articles may be such that they put third parties on notice of the fact that certain things can only properly be done subject to certain conditions being satisfied. If the third party is put on notice in this way, he will not be able to rely on any exercise of the power which he knew or ought to have discovered did not comply with such conditions. But a provision that a power can be exercised only "for the purposes of the company's business" does not require a third party to satisfy himself that the power is in fact being exercised for that purpose.

In my judgment, the propositions in the last two paragraphs accord with the decisions in In re David Payne & Co. Ltd. [1904] 2 Ch. 608 and Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62 . As Slade L.J. has pointed out, in the David Payne case the objects clause of the company stated expressly that the power to borrow was "for the purposes of the company's business," yet the borrowing (which was not in fact for the purpose of the company's business) was held not to be ultra vires. Buckley J., at p. 612, plainly treated the provision as a power, not an object. Vaughan Williams L.J. held, at p. 615, that the fact that the validity of the debenture depended on whether or not the lender had knowledge of the impropriety showed that the transaction was not ultra vires. Moreover, it was held that, knowledge being a necessary requirement to render the loan unenforceable, the lender was not

[1986] Ch. 246                                                                    Page 49

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

put on inquiry whether the money was being borrowed for the purposes of the company's business, notwithstanding that the power to borrow was expressly limited to borrowing for those purposes. That case, therefore, is clear authority for two propositions: (1) that where **\*306** there is a power to borrow for the purposes of the company's business (even if contained in the objects clause) and the borrowing is made otherwise than for those purposes the borrowing is not void as being ultra vires; and (2) a third party is not put on notice by an express requirement that the power is only exercisable for the purposes of the company's business.

The main difficulty in reconciling the authorities is *Introductions Ltd. v. National Provincial Bank Ltd. [1970] Ch. 199* . In my judgment, however, the decision in that case accords with the views I have expressed. The bank seeking to enforce the debenture had actual knowledge that the company was going to use the borrowed moneys for a purpose (pig breeding) which was wholly outside its main objects. The provision relating to borrowing in the memorandum of association was construed as being an ancillary power to borrow for the purposes of the company's business. Accordingly, the lender had actual notice of all the facts necessary to appreciate that the borrowing was in excess of the powers, i.e., an abuse of powers. It is to be noted that in the Court of Appeal judgments the transaction is nowhere categorised as ultra vires and void. Indeed, as Slade L.J. has pointed out, the Court of Appeal held that the liability of the bank depended on the fact that it had notice. Buckley J. at first instance *[1968] 2 All E.R. 1221* described the borrowing as being ultra vires: but, in my judgment, this was merely an unguarded use of language since he also regarded the bank's knowledge of the facts as being a crucial element rendering the debenture unenforceable: see p. 1225. In my judgment, the *Introductions* case is not a decision relating to ultra vires in the strict sense: it is an example of a case in which a third party has entered into a transaction with a company with ac-

tual notice that the transaction was an abuse of power and accordingly could not enforce the transaction against the company.

I summarise my conclusions as follows. (1) To be ultra vires a transaction has to be outside the capacity of the company, not merely in excess or abuse of the powers of the company. (2) The question whether a transaction is outside the capacity of the company depends solely upon whether, on the true construction of its memorandum of association, the transaction is capable of falling within the objects of the company as opposed to being a proper exercise of the powers of the company. (3) Notwithstanding the fact that the provision authorising the company to enter into the particular transaction is found in the objects clause and there is a provision requiring each paragraph to be construed as a separate object, such provision may be merely a power, and not an object, if either it is incapable of existing as a separate object or it can only be construed as a power ancillary to the other objects in the strict sense. (4) If a transaction falls within the objects, and therefore the capacity, of the company, it is not ultra vires the company and accordingly it is not absolutely void. (5) If a company enters into a transaction which is intra vires (as being within its capacity) but in excess or abuse of its powers, such transaction will be set aside at the instance of the shareholders. (6) A third party who has notice - actual or constructive - that a transaction, although intra vires the company, was entered into in excess or abuse of the powers of the company cannot **\*307** enforce such transaction against the company and will be accountable as constructive trustee for any money or property of the company received by the third party. (7) The fact that a power is expressly or impliedly limited so as to be exercisable only "for the purposes of the company's business" (or other words to that effect) does not put a third party on inquiry as to whether the power is being so exercised, i.e., such provision does not give him constructive notice of excess or abuse of such power.

[1986] Ch. 246                                                                                              Page 50

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

Applying those principles to the present case, in my judgment, no question of ultra vires arises. For the reasons given both by the judge and by Slade L.J. the provisions of clause 3(K) of the memorandum of association of the plaintiff do not constitute a separate object but can only be construed as a power. The plaintiff had the capacity to enter into the transactions involving the giving of guarantees and could properly have done so if they had been expedient in the interests of the plaintiff's business. If British Steel Corporation had known no more than that the plaintiff was purporting to give the guarantee as being expedient for the plaintiff's business, the transaction would have been unimpeachable as against British Steel Corporation.

But, as the judge and Slade L.J. have demonstrated, British Steel Corporation had actual knowledge of facts which showed that the giving of the guarantee and the debenture was an abuse of powers by the directors of the plaintiff since the transaction was not even considered to be for the benefit of the plaintiff. The borrowing by the plaintiff from Colvilles of the £401,448 was formally invalid since such borrowing was not approved by a quorate board meeting of the plaintiff and the defence based on the rule in Turquand's case, 6 E. & B. 327 was neither pleaded or established. British Steel Corporation had constructive knowledge of this formal invalidity. Accordingly, British Steel Corporation and the receiver are accountable as constructive trustees for all the moneys of the plaintiff received by them with such notice.

As to the relief to be granted, my views accord with those of Slade L.J. In particular, as at present advised, I agree with him that Reversion Fund and Insurance Co. Ltd. v. Maison Cosway Ltd. [1913] 1 K.B. 364 appears to establish that the plaintiff is not entitled to recover the principal of £401,448 since the sum borrowed was used to discharge the indebtedness of the plaintiff to Scottish Steel. However, the parties, if they wish, must have an opportunity to present further argument on the relief to be given.

Finally, I have not formed any view on the difficult problems which arise when shareholders consent to a transaction which, though intra vires, is an excess or abuse of the powers of the company. I therefore must not be taken to be either approving or disapproving the views on this point expressed by Slade L.J.LAWTON L.J.

Stripped of its legal complications, many of which were caused by the way the trial judge dealt with the defendants' applications to amend the pleadings, this case raises issues of fact. When the evidence is looked at in the round, there is revealed an unattractive story of a fairly common kind which shows how some business men **\*308** manipulate limited liability companies to avoid their financial liabilities and what other business men are driven to do in order to get paid what they are entitled to receive.

In the 1960s Mr. Shenkman was an entrepreneur. He had ideas for selling steel on a large scale but no capital with which to set up a suitable selling organisation. He did what many entrepreneurs do: he used other people's money. Unlike some entrepreneurs, he used no deception to get it. He did not need to do so (and, on the judge's findings, he probably did not want to do so) because of the way Colvilles, then an independent steel company, went about their business of producing and selling steel. They seem to have been more interested in selling their steel than in being paid the price for it. The result was that, by the beginning of 1968, they had sold and delivered to Mr. Shenkman's order a vast quantity of steel and were owed just under £800,000 for it. When they began to press for the debt to be paid they became aware of the legal problems.which faced them. Mr. Shenkman had operated behind a screen of small limited liability companies in which he and family interests controlled all the shares. The company which owed Colvilles this huge debt, Scottish Steel, had no assets. Mr. Shenkman himself had very few. What assets there were (and they were fairly substantial)

were in another company, the plaintiff, which had had no dealings with Colvilles but into which Mr. Shenkman had syphoned by way of a loan about £400,000 of Scottish Steel's money which that company should have paid to Colvilles in discharge of its debts. Mr. Shenkman owned 51 per cent. of the plaintiff's shares. The trustees of a settlement in favour of his children owned the remaining 49 per cent.

When in 1968 British Steel Corporation took over Colvilles under the nationalised legislation they were faced with a difficult debt collecting problem. By the late autumn of 1968 they had these options: they could make Mr. Shenkman bankrupt for defaulting on a personal guarantee which he had given on 2 May 1968 for Scottish Steel's debts. A bankruptcy order would have vested Mr. Shenkman's shares in the plaintiff in his trustee but, on the most optimistic assessment, less than about half of Scottish Steel's debts would be recovered. The second option was to put Scottish Steel into liquidation and get the liquidator to press the plaintiff to repay £400,000 which it had borrowed from Scottish Steel. Once again, the best which could have been attained was the repayment of this sum; and the chances of getting it were poor, as the only worthwhile asset the plaintiff had was some land at Rainham which had been valued at about £800,000 if sold over a longish period but which would almost certainly bring in much less if there were a forced sale. Anyway, a sale of any kind was sure to generate a substantial liability on the plaintiff for corporation tax arising from capital gains as the land had been bought for £8,000.

British Steel Corporation had to solve this problem: how could they link Mr. Shenkman and Scottish Steel's liabilities to the plaintiff's assets? Their own legal adviser, Mr. Edwards, considered the problem, as did their experienced solicitors and counsel instructed by them. All, of course, knew that in law the plaintiff was a separate legal entity from Mr. Shenkman and Scottish Steel and that those who directed the affairs **\*309** of

the plaintiff (and, as British Steel Corporation knew, they were Mr. Shenkman and his father) had to do so in the interests of the plaintiff and not of Mr. Shenkman himself or Scottish Steel. If they did not, any transactions carried out in breach of trust would be at least voidable and might be void if, on the correct construction of the plaintiff's memorandum of association, there were limitations on the powers of the plaintiff to borrow money or give guarantees.

The scheme which was devised to attach Mr. Shenkman and Scottish Steel's liabilities to the plaintiff's assets has been described in detail by Slade L.J. in his judgment. This scheme was designed to enable British Steel Corporation to strip the plaintiff of nearly all its assets and what was left over was likely to be successfully claimed by the Inland Revenue for corporation tax. Such a scheme, approved by the plaintiff's directors on 22 January 1969, could not possibly have been for the benefit of the plaintiff, and British Steel Corporation, through their advisers, knew that it was not. In my judgment, British Steel Corporation regarded the plaintiff as an alias for Mr. Shenkman. He owed them money under the guarantee he had given in May 1968. They felt justified in tearing away the plaintiff's corporate veil which hid him from his creditors. I have much sympathy for British Steel Corporation. They were being kept out of their money by the legal fiction that the plaintiff was not Mr. Shenkman. Unfortunately for them it is a legal fiction which has been recognised by the law for over a 100 years. It is said to have helped the growth of innumerable new businesses. The fact that limited liability has all too often enabled many to enrich themselves at the expense of those who have given credit to the companies they control is the price the business world has to pay for the potentiality for growth and convenience which goes with limited liability. In my judgment, British Steel Corporation will have to pay that price. What Mr. Shenkman and his father did on 22 January 1968 by giving the guarantee was a misfeasance and British Steel Corporation knew it was. The legal con-

[1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 [1986] Ch. 246 [1985] 2 W.L.R. 908 [1985] 3 All E.R. 52 (1984) 1 B.C.C. 99158 **(Cite as: [1986] Ch. 246)**

sequences of what happened are set out in Slade L.J.'s judgment with which I agree.

I wish, however, to add a comment about the pleading points which have had to be considered in this appeal. From the way they were raised by counsel and dealt with by the trial judge I was left with the impression that neither the judge nor defending counsel appreciated as fully as they should have done the need for precision and expedition when dealing with pleading points. My recent experience in this court shows that some counsel and judges are not giving pleadings the attention which they should. Pleadings are formal documents which have to be prepared at the beginning of litigation. They are essential for the fair trial of an action and the saving of time at trial. The saving of time keeps down the costs of litigation. A plaintiff is entitled to know what defences he has to meet and a defendant what claims are being made against him. If the parties do not know, unnecessary evidence may be got together and led or, even worse, necessary evidence may not be led. Pleadings regulate what questions may be asked of witnesses in cross-examination. When counsel raises an objection to a question or a line of questioning, as Mr. Morritt did on a number of occasions, the trial judge should rule on it at once. He should not regard the objection as a          **\*310**          critical commentary on what the other side is doing. If the judge does not rule, counsel should ask him to do so. If a line of questioning is stopped because it does not relate to an issue on the pleadings, counsel should at once consider whether his pleadings should be amended. If he decides that they should, he should forthwith apply for an amendment and should specify precisely what he wants and the judge should at once give a ruling on the application. The principles upon which amendments should be allowed are well known and are set out in the current edition of          *The Supreme Court Practice.*          Judicial insistence on precision in pleading should not take the courts back to the days when the successful taking of pleading points sometimes resulted in a denial of justice. The judge's powers of adjourning

and ordering the payment of costs thrown away should stop this happening.

With regret, I feel it necessary to make one more comment about the way the judge conducted this case. At the outset of this appeal Mr. Heyman invited our attention to the fact that submissions of counsel ended on 7 April 1982 but judgment was not delivered until 2 December 1982. He submitted that this long and, in my experience, unprecedented delay resulted in the judge making material findings which were not justified by the evidence. I am not satisfied that this was so. But the fact that responsible and experienced counsel, acting for a public corporation, felt it incumbent upon him to make this submission shows that long delays in delivering judgment can cause disquiet and suspicion amongst litigants who lose - and those who win may feel they have been deprived of justice far too long. Delays of this length should not occur unless there are compelling reasons why they should; and, if there are such reasons, it would be prudent of a judge to refer to them briefly. In this case, for all we know, there may have been such reasons. We have kept in mind that the parties had a most patient hearing and that the judge must have kept a very full note to deliver the judgment he did.

For these reasons and the reasons given in Slade L.J.'s judgment, I would dismiss this appeal, allow the cross-appeal and grant the relief suggested by Slade L.J.Appeal dismissed. Cross-appeal allowed. (C. N. )

END OF DOCUMENT