# Tab 17

Dockets.Justia.com


**Salomon v Salomon & Co Ltd**

House of Lords

Lord Halsbury, Lord Watson, Lord Herschell, Lord
Macnaghten, Lord Morris, and Lord Davey L.C.

1896 Nov. 16.

Company—Private Company—One Man Compa-
ny—Limited Liability—Winding—up—Fraud upon
Creditors—Liability to indemnify Company in re-
spect of Debts—Rescission— .

It is not contrary to the true intent and meaning of
the    for a trader, in order to limit his liability and
obtain the preference of a debenture-holder over oth-
er creditors, to sell his business to a limited company
consisting only of himself and six members of his
own family, the business being then solvent, all the
terms of sale being known to and approved by the
shareholders, and all the requirements of the Act be-
ing complied with.

A trader sold a solvent business to a limited company
with a nomina capital of 40,000 shares of 1l. each,
the company consisting only of the vendor, his wife,
a daughter and four sons, who subscribed for one
share each, all the terms of sale being known to and
approved by the shareholders.**\*23** In part payment
of the purchase-money debentures forming a floating
security were issued to the vendor. Twenty thousand
shares were also issued to him and were paid for out
of the purchase-money. These shares gave the vendor
the power of outvoting the six other shareholders. No
shares other than these 20,007 were ever issued. All
the requirements of the    were complied with. The
vendor was appointed managing director, bad times
came, the company was wound up, and after satisfy-
ing the debentures there was not enough to pay the
ordinary creditors: —

that the proceedings were not contrary to the true
intent and meaning of the ; that the company was
duly formed and registered and was not the mere
"alias" or agent of or trustee for the vendor; that he
was not liable to indemnify the company against the

creditors' claims; that there was no fraud upon credi-
tors or shareholders; and that the company (or the
liquidator suing in the name of the company) was not
entitled to rescission of the contract for purchase.

The decisions of Vaughan Williams J. and the Court
of Appeal ( .

THE following statement of the facts material to this
report is taken from the judgment of Lord Watson: —

The appellant, Aron Salomon, for many years carried
on business, on his own account, as a leather mer-
chant and wholesale boot manufacturer. With the
design of transferring his business to a joint stock
company, which was to consist exclusively of him-
self and members of his own family, he, on July 20,
1892, entered into a preliminary agreement with one
Adolph Anholt, as trustee for the future company,
settling the terms upon which the transfer was to be
made by him, one of its conditions being that part
payment might be made to him in debentures of the
company. A memorandum of association was then
executed by the appellant, his wife, a daughter, and
four sons, each of them subscribing for one share, in
which the leading object for which the company was
formed was stated to be the adoption and carrying
into effect, with such modifications (if any) as might
be agreed on, of the provisional agreement of July 20.
The memorandum was registered on July 28, 1892;
and the effect of registration, if otherwise valid, was
to incorporate the company, under the name of "Aron
Salomon and Company, Limited," with liability li-
mited by shares, and having a nominal capital of
40,000l., divided into 40,000 shares of 1l. each. The
company adopted**\*24** the agreement of July 20, sub-
ject to certain modifications which are not material;
and an agreement to that effect was executed between
them and the appellant on August 2, 1892. Within a
month or two after that date the whole stipulations of
the agreement were fulfilled by both parties. In terms
thereof, 100 debentures, for 100l. each, were issued
to the appellant, who, upon the security of these doc-
uments, obtained an advance of 5000l. from Edmund
Broderip. In February 1893 the original debentures
were returned to the company and cancelled; and in
lieu thereof, with the consent of the appellant as
beneficial owner, fresh debentures to the same

amount were issued to Mr. Broderip, in order to secure the repayment of his loan, with interest at 8 per cent.

In September 1892 the appellant applied for and obtained an allotment of 20,000 shares; and from that date until an order was made for its compulsory liquidation, the share register of the company remained unaltered, 20,001 shares being held by the appellant, and six shares by his wife and family. It was all along the intention of these persons to retain the business in their own hands, and not to permit any outsider to acquire an interest in it.

Default having been made in the payment of interest upon his debentures, Mr. Broderip, in September 1893, instituted an action in order to enforce his security against the assets of the company. Thereafter a liquidation order was made, and a liquidator appointed, at the instance of unsecured creditors of the company. It has now been ascertained that, if the amount realised from the assets of the company were, in the first place, applied in extinction of Mr. Broderip's debt and interest, there would remain a balance of about 1055l., which is claimed by the appellant as beneficial owner of the debentures. In the event of his claim being sustained there will be no funds left for payment of the unsecured creditors, whose debts amount to 7733l. 8s. 3d.

The liquidator lodged a defence, in name of the company, to the debenture suit, in which he counter-claimed against the appellant (who was made a party to the counter-claim), (1.) to have the agreements of July 20 and August 2, 1892 rescinded,**\*25** (2.) to have the debentures already mentioned delivered up and cancelled, (3.) judgment against the appellant for all sums paid by the company to the appellant under these agreements, and (4.) a lien for these sums upon the business and assets. The averments made in support of these claims were to the effect that the price paid by the company exceeded the real value of the business and assets by upwards of 8200l.; that the arrangements made by the appellant for the formation of the company were a fraud upon the creditors of the company; that no board of directors of the company was ever appointed, and that in any case such board consisted entirely of the appellant, and there never was an independent board. The action came on for trial on the counter-claim before Vaughan Williams J., when the liquidator was examined as a witness on behalf of the company, whilst evidence was given for the appellant by himself, and by his son, Emanuel Salomon, one of the members of the company, who had been employed in the business for nearly twenty years.

The evidence shews that, before its transfer to the new company, the business had been prosperous, and had yielded to the appellant annual profits sufficient to maintain himself and his family, and to add to his capital. It also shews that at the date of transfer the business was perfectly solvent. The liquidator, whose testimony was chiefly directed toward proving that the price paid by the company was excessive, admitted on cross-examination that the business, when transferred to the company, was in a sound condition, and that there was a substantial surplus. No evidence was led tending to support the allegation that no board of directors was ever appointed, or that the board consisted entirely of the appellant. The non-success and ultimate insolvency of the business, after it came into the hands of the company, was attributed by the witness Emanuel Salomon to a succession of strikes in the boot trade, and there is not a tittle of evidence tending to modify or contradict his statement. It also appears from the evidence that all the members of the company were fully cognisant of the terms of the agreements of July 20 and August 2, 1892, and that they were willing to accept and did accept these terms.**\*26**

At the close of the argument Vaughan Williams J. announced that he was not prepared to grant the relief craved by the company. He at the same time suggested that a different remedy might be open to the company; and, on the motion of their counsel, he allowed the counter-claim to be amended. In conformity with the suggestion thus made by the Bench, a new and alternative claim was added for a declaration that the company or the liquidator was entitled (1.) to be indemnified by the appellant against the whole of the company's unsecured debts, namely, 7733l. 8s. 3d.; (2.) to judgment against the appellant for that sum; and (3.) to a lien for that amount upon all sums which might be payable to the appellant by the company in respect of his debentures or otherwise until the judgment was satisfied. There were also added averments to the effect that the company was formed by the appellant, and that the debentures for 10,000l. were issued in order that he might carry on the business, and take all the profits without risk to himself;

Copr. © West 2009 No Claim to Orig. Govt. Works

and also that the company was the "mere nominee and agent" of the appellant.

Vaughan Williams J. made an order for a declaration in the terms of the new and alternative counter-claim above stated, without making any order on the original counter-claim.

Both parties having appealed, the Court of Appeal (Lindley, Lopes and Kay L.JJ.) being of opinion that the formation of the company, the agreement of August 1892, and the issue of debentures to the appellant pursuant to such agreement, were a mere scheme to enable him to carry on business in the name of the company with limited liability contrary to the true intent and meaning of the , and further to enable him to obtain a preference over other creditors of the company by procuring a first charge on the assets of the company by means of such debentures, dismissed the appeal with costs, and declined to make any order on the original counter-claim.

Against this order the appellant appealed, and the company brought a cross-appeal against so much of it as declined to make any order upon the original counter-claim. Broderip having been paid off was no party to this appeal or cross-appeal.*27

June 15, 22, 29. *Cohen Q.C.* and *Buckley Q.C.* (*McCall Q.C.* and *Muri Mackenzie* with them), for the appellant in the original appeal. The view of Vaughan Williams J. that the company was the mere alias or agent of the appellant so as to make him liable to indemnify the company against creditors, was not adopted by the Court of Appeal, who seem to have considered the company as the appellant's trustee. There is no evidence in favour of either view. The sale of the business was bonâ fide: the business was genuine and solvent, with a substantial surplus. All the circumstances were known to and approved by the shareholders. All the requirements of the , were strictly complied with: the purpose was lawful, the proceedings were regular. How could the registrar refuse to register such a company? What objection is it that the vendor desires to convert his unlimited into a limited liability? That is the prime object of turning a private business into a limited company, practised every day by banks and other great firms. And what difference to creditors could it make whether the debentures were held by the vendor or by strangers? Whoever held them had the preference over creditors

- that is the future creditors - all the old creditors having been paid off by the vendor. There was no misrepresentation of fact, and no one was misled: where is "the fraud upon creditors" spoken of in the Court of Appeal? The creditors were under no obligation to trust the company; they might, if they had desired, have found out who held the shares, and in what proportion, and who held the debentures. There is not a word in , or any other section of the , forbidding or even pointing against such a company so formed and for such objects. Then, if the company was a real company, fulfilling all the requirements of the Legislature, it must be treated as a company, as an entity, consisting indeed of certain corporators, but a distinct and independent corporation. The Court of Appeal seem to treat the company sometimes as substantial and sometimes as shadowy and unreal: it must be one or the other, it cannot be both. A Court cannot impose conditions not imposed by the Legislature, and say that the shareholders must not be related*28 to each other, or that they must hold more than one share each. There is nothing to prevent one shareholder or all the shareholders holding the shares in trust for some one person. What is prohibited is the entry of a trust on the register: . If all the shares were held in trust that would not make the company a trustee. The authorities relied upon below (which all turn upon some one being deceived or defrauded) do not touch the present case and do not support the judgment below.

[They referred to ; ; ; ; ; ; ]

As to the cross-appeal, there being no fraud, misrepresentation or deceit, not even any failure of consideration, there is no ground for rescission. Moreover, the company's assets having been sold the company is not in a position to ask for it.

*Farwell Q.C.* and *H. S. Theobald* , for the respondents. The question is one of fact rather than law, and the true inferences from the facts are these: The appellant incorporated the company to carry on his business without risk to himself and at his creditors' expense. The business was decaying when the company was formed, and though carried on as before, nay with more (borrowed) money, it failed very soon after the sale. To get an advantage over creditors the vendor took debentures and concealed the fact from them. The purchase-money was exorbitant, the price dictated solely by the vendor, and there was no inde-

pendent person acting for the company. Though incorporated under the Acts the company never had an independent existence: it was in fact the appellant under another name; he was the managing director, the other directors being his sons and under his control. The shareholders other than himself were his own family, and his vast preponderance of shares made him absolute master.**29** He could pass any resolution, and he would receive all the profits - if any. Whether therefore the company is considered as his agent, or his nominee or his trustee, matters little. The business was solely his, conducted solely for him and by him, and the company was a mere sham and fraud, in effect entirely contrary to the intent and meaning of the . The liquidator is therefore entitled to counter-claim against him for an indemnity. As to the cross-appeal and the claim for rescission the decision in and the observations of Lord Cairns are precisely applicable and conclusive in favour of rescission. See also .

[LORD WATSON referred to , following . ]

[They also referred to ; . ]

The House took time for consideration. Nov. 16. LORD HALSBURY L.C.

My Lords, the important question in this case, I am not certain it is not the only question, is whether the respondent company was a company at all - whether in truth that artificial creation of the Legislature had been validly constituted in this instance; and in order to determine that question it is necessary to look at what the statute itself has determined in that respect. I have no right to add to the requirements of the statute, nor to take from the requirements thus enacted. The sole guide must be the statute itself.

Now, that there were seven actual living persons who held shares in the company has not been doubted. As to the proportionate amounts held by each I will deal presently; but it is important to observe that this first condition of the statute is satisfied, and it follows as a consequence that it would not**30** be competent to any one - and certainly not to these persons themselves - to deny that they were shareholders.

I must pause here to point out that the statute enacts nothing as to the extent or degree of interest which may be held by each of the seven, or as to the proportion of interest or influence possessed by one or the majority of the share-holders over the others. One share is enough. Still less is it possible to contend that the motive of becoming shareholders or of making them shareholders is a field of inquiry which the statute itself recognises as legitimate. If they are shareholders, they are shareholders for all purposes; and even if the statute was silent as to the recognition of trusts, I should be prepared to hold that if six of them were the cestuis que trust of the seventh, whatever might be their rights inter se, the statute would have made them shareholders to all intents and purposes with their respective rights and liabilities, and, dealing with them in their relation to the company, the only relations which I believe the law would sanction would be that they were corporators of the corporate body.

I am simply here dealing with the provisions of the statute, and it seems to me to be essential to the artificial creation that the law should recognise only that artificial existence - quite apart from the motives or conduct of individual corporators. In saying this, I do not at all mean to suggest that if it could be established that this provision of the statute to which I am adverting had not been complied with, you could not go behind the certificate of incorporation to shew that a fraud had been committed upon the officer entrusted with the duty of giving the certificate, and that by some proceeding in the nature of scire facias you could not prove the fact that the company had no real legal existence. But short of such proof it seems to me impossible to dispute that once the company is legally incorporated it must be treated like any other independent person with its rights and liabilities appropriate to itself, and that the motives of those who took part in the promotion of the company are absolutely irrelevant in discussing what those rights and liabilities are.

I will for the sake of argument assume the proposition that**31** the Court of Appeal lays down - that the formation of the company was a mere scheme to enable Aron Salomon to carry on business in the name of the company. I am wholly unable to follow the proposition that this was contrary to the true intent and meaning of the . I can only find the true intent and meaning of the Act from the Act itself; and the Act appears to me to give a company a legal existence with, as I have said, rights and liabilities of its own, whatever may have been the ideas or schemes of

Copr. © West 2009 No Claim to Orig. Govt. Works

those who brought it into existence.

I observe that the learned judge (Vaughan Williams J.) held that the business was Mr. Salomon's business, and no one else's, and that he chose to employ as agent a limited company; and he proceeded to argue that he was employing that limited company as agent, and that he was bound to indemnify that agent (the company). I confess it seems to me that that very learned judge becomes involved by this argument in a very singular contradiction. Either the limited company was a legal entity or it was not. If it was, the business belonged to it and not to Mr. Salomon. If it was not, there was no person and no thing to be an agent at all; and it is impossible to say at the same time that there is a company and there is not.

Lindley L.J., on the other hand, affirms that there were seven members of the company; but he says it is manifest that six of them were members simply in order to enable the seventh himself to carry on business with limited liability. The object of the whole arrangement is to do the very thing which the Legislature intended not to be done.

It is obvious to inquire where is that intention of the Legislature manifested in the statute. Even if we were at liberty to insert words to manifest that intention, I should have great difficulty in ascertaining what the exact intention thus imputed to the Legislature is, or was. In this particular case it is the members of one family that represent all the shares; but if the supposed intention is not limited to so narrow a proposition as this, that the seven shareholders must not be members of one family, to what extent may influence or authority or intentional purchase of a majority among the shareholders be carried so as *32 to bring it within the supposed prohibition? It is, of course, easy to say that it was contrary to the intention of the Legislature - a proposition which, by reason of its generality, is difficult to bring to the test; but when one seeks to put as an affirmative proposition what the thing is which the Legislature has prohibited, there is, as it appears to me, an insuperable difficulty in the way of those who seek to insert by construction such a prohibition into the statute.

As one mode of testing the proposition, it would be pertinent to ask whether two or three, or indeed all seven, may constitute the whole of the shareholders? Whether they must be all independent of each other

in the sense of each having an independent beneficial interest? And this is a question that cannot be answered by the reply that it is a matter of degree. If the Legislature intended to prohibit something, you ought to know what that something is. All it has said is that one share is sufficient to constitute a shareholder, though the shares may be 100,000 in number. Where am I to get from the statute itself a limitation of that provision that that shareholder must be an independent and beneficially interested person?

My Lords, I find all through the judgment of the Court of Appeal a repetition of the same proposition to which I have already adverted - that the business was the business of Aron Salomon, and that the company is variously described as a myth and a fiction. Lopes L.J. says: "The Act contemplated the incorporation of seven independent bonâ fide members, who had a mind and a will of their own, and were not the mere puppets of an individual who, adopting the machinery of the Act, carried on his old business in the same way as before, when he was a sole trader." The words "seven independent bonâ fide members with a mind and will of their own, and not the puppets of an individual," are by construction to be read into the Act. Lopes L.J. also said that the company was a mere nominis umbra. Kay L.J. says:

"The statutes were intended to allow seven or more persons, bonâ fide associated for the purpose of trade, to limit their liability under certain conditions and to become a corporation. But they were not intended to legalise a pretended association for the purpose of *33 enabling an individual to carry on his own business with limited liability in the name of a joint stock company."

My Lords, the learned judges appear to me not to have been absolutely certain in their own minds whether to treat the company as a real thing or not. If it was a real thing; if it had a legal existence, and if consequently the law attributed to it certain rights and liabilities in its constitution as a company, it appears to me to follow as a consequence that it is impossible to deny the validity of the transactions into which it has entered.

Vaughan Williams J. appears to me to have disposed of the argument that the company (which for this purpose he assumed to be a legal entity) was defrauded into the purchase of Aron Salomon's business

because, assuming that the price paid for the business was an exorbitant one, as to which I am myself not satisfied, but assuming that it was, the learned judge most cogently observes that when all the shareholders are perfectly cognisant of the conditions under which the company is formed and the conditions of the purchase, it is impossible to contend that the company is being defrauded.

The proposition laid down in , (I quote the headnote), is that "Persons who purchase property and then create a company to purchase from them the property they possess, stand in a fiduciary position towards that company, and must faithfully state to the company the facts which apply to the property, and would influence the company in deciding on the reasonableness of acquiring it." But if every member of the company - every shareholder - knows exactly what is the true state of the facts (which for this purpose must be assumed to be the case here), Vaughan Williams J.'s conclusion seems to me to be inevitable that no case of fraud upon the company could here be established. If there was no fraud and no agency, and if the company was a real one and not a fiction or a myth, every one of the grounds upon which it is sought to support the judgment is disposed of.

My Lords, the truth is that the learned judges have never allowed in their own minds the proposition that the company*34 has a real existence. Then have been struck by what they have considered the inexpediency of permitting one man to be in influence and authority the whole company; and, assuming that such a thing could not have been intended by the Legislature, they have sought various grounds upon which they might insert into the Act some prohibition of such a result. Whether such a result be right or wrong, politic or impolitic, I say, with the utmost deference to the learned judges, that we have nothing to do with that question if this company has been duly constituted by law; and, whatever may be the motives of those who constitute it, I must decline to insert into that Act of Parliament limitations which are not to be found there.

I have dealt with this matter upon the narrow hypothesis propounded by the learned judges below; but it is, I think, only justice to the appellant to say that I see nothing whatever to justify the imputations which are implied in some of the observations made by more than one of the learned judges. The appellant, in

my opinion, is not shewn to have done or to have intended to do anything dishonest or unworthy, but to have suffered a great misfortune without any fault of his own.

The result is that I move your Lordships that the judgment appealed from be reversed, but as this is a pauper case, I regret to say it can only be with such costs in this House as are appropriate to that condition of things, and that the cross-appeal be dismissed with costs to the same extent.LORD WATSON.

My Lords, this appeal raises some questions of practical importance, depending upon the construction of the Companies Acts, which do not appear to have been settled by previous decisions. As I am not prepared to accept without reservation all the conclusions of fact which found favour with the Courts below, I shall, before adverting to the law, state what I conceive to be the material facts established by the evidence before us. [His Lordship stated the facts above set out.]

The allegations of the company, in so far as they have any relation to the amended claim, their pith consisting in the averments*35 made on amendment, were meant to convey a charge of fraud; and it is unfortunate that they are framed in such loose and general terms. A relevant charge of fraud ought to disclose facts necessitating the inference that a fraud was perpetrated upon some person specified. Whether it was a fraud upon the company and its members, or upon persons who had dealings with the company, is not indicated, although there may be very different considerations applicable to those two cases. The res gestæ which might imply that it was the appellant, and not the company, who actually carried on its business, are not set forth. Any person who holds a preponderating share in the stock of a limited company has necessarily the intention of taking the lion's share of its profits without any risk beyond loss of the money which he has paid for, or is liable to pay upon his shares; and the fact of his acquiring and holding debentures secured upon the assets of the company does not diminish the risk of that loss. What is meant by the assertion that the company "was the mere nominee or agent" of the appellant I cannot gather from the record; and I am not sure that I understand precisely in what sense it was interpreted by the learned judges whose decisions we have to consider.

Copr. © West 2009 No Claim to Orig. Govt. Works

No additional proof was led after the amendment of the counter-claim. The oral testimony has very little, if any, bearing upon the second claim; and any material facts relating to the fraudulent objects which the appellant is said to have had in view, and the alleged position of the company as his nominee or agent, must be mere matter of inference derived from the agreements of July 20 and August 2, 1892, the memorandum and articles of association, and the minute-book of the company.

On rehearing the case Vaughan Williams J., without disposing of the original claim, gave the company decree of indemnity in terms of their amended claim. I do not profess my ability to follow accurately the whole chain of reasoning by which the learned judge arrived at that conclusion; but he appears to have proceeded mainly upon the ground that the appellant was in truth the company, the other members being either his trustees or mere "dummies," and consequently that**36** the appellant carried on what was truly his own business under cover of the name of the company, which was nothing more than an alias for Aron Salomon. On appeal from his decision, the Court of Appeal, consisting of Lindley, Lopes, and Kay L.JJ., made an order finding it unnecessary to deal with the original claim, and dismissing the appeal in so far as it related to the amended claim. The ratio upon which that affirmance proceeded, as embodied in the order, was: "This Court being of opinion that the formation of the company, the agreement of August, 1892, and the issue of debentures to Aron Salomon pursuant to such agreement, were a mere scheme to enable him to carry on business in the name of the company, with limited liability, contrary to the true intent and meaning of the , and further to enable him to obtain a preference over other creditors of the company by procuring a first charge on the assets of the company by means of such debentures." The opinions delivered by the Lords Justices are strictly in keeping with the reasons assigned in their order. Lindley L.J., observing "that the incorporation of the company cannot be disputed," refers to the scheme for the formation of the company, and says : "the object of the whole arrangement is to do the very thing which the Legislature intended not to be done"; and he adds that "Mr. Salomon's scheme is a device to defraud creditors."

Assuming that the company was well incorporated in terms of the Act of 1862, an assumption upon which

the decisions appealed from appear to me to throw considerable doubt, I think it expedient, before considering the amended claim, to deal with the original claim for rescission, which was strongly pressed upon us by counsel for the company, under their cross-appeal. Upon that branch of the case there does not appear to me to be much room for doubt. With this exception, that the word "exorbitant" appears to me to be too strong an epithet, I entirely agree with Vaughan Williams J. when he says: "I do not think that where you have a private company, and all the shareholders in the company are perfectly cognisant of the conditions under which the company is formed, and the conditions**37** of purchase by the company, you can possibly say that purchasing at an exorbitant price (and I have no doubt whatever that the purchase here was at an exorbitant price) is a fraud upon those shareholders or upon the company." The learned judge goes on to say that the circumstances might have amounted to fraud if there had been an intention on the part of the original shareholders "to allot further shares at a later period to future allottees." Upon that point I do not find it necessary to express any opinion, because it is not raised by the facts of the case, and, in any view, these considerations are of no relevancy in a question as to rescission between the company and the appellant.

Mr. Farwell argued that the agreement of August 2 ought to be set aside upon the principle followed by this House in  In that case the vendor, who got up the company, with the view of selling his adventure to it, attracted shareholders by a prospectus which was essentially false. The directors, who were virtually his nominees, purchased from him without being aware of the real facts; and on their assurance that, in so far as they knew, all was right, the shareholders sanctioned the transaction. The fraud by which the company and its shareholders had been misled was directly traceable to the vendor; and it was set aside at the instance of the liquidator, the Lord Chancellor (Earl Cairns) expressing a doubt whether, even in those circumstances, the remedy was not too late after a liquidation order. But in this case the agreement of July 20 was, in the full knowledge of the facts, approved and adopted by the company itself, if there was a company, and by all the shareholders who ever were, or were likely to be, members of the company. In my opinion, therefore,  has no application, and the original claim of the liquidator is not maintainable.

Copr. © West 2009 No Claim to Orig. Govt. Works

The Lords Justices of Appeal, in disposing of the amended claim, have expressly found that the formation of the company, with limited liability, and the issue of 10,000l. worth of its debentures to the appellant, were "contrary to the true intent**38** and meaning of the ." I have had great difficulty in endeavouring to interpret that finding. I am unable to comprehend how a company, which has been formed contrary to the true intent and meaning of a statute, and (in the language of Lindley L.J.) does the very thing which the Legislature intended not to be done, can yet be held to have been legally incorporated in terms of the statute. "Intention of the Legislature" is a common but very slippery phrase, which, popularly understood, may signify anything from intention embodied in positive enactment to speculative opinion as to what the Legislature probably would have meant, although there has been an omission to enact it. In a Court of Law or Equity, what the Legislature intended to be done or not to be done can only be legitimately ascertained from that which it has chosen to enact, either in express words or by reasonable and necessary implication. Accordingly, if the words "intent and meaning," as they occur in the finding of the Appeal Court, are used in their proper legal sense, it follows, in my opinion, that the company has not been well incorporated; that, there being no legal corporation, there can be no liquidation under the Companies Acts, and that the counter-claim preferred by its liquidator must fail. In that case its creditors would not be left without a remedy, because its members, as joint traders without limitation of their liability, would be jointly and severally responsible for the debts incurred by them in the name of the company.

The provisions of the Act of 1862 which seem to me to have any bearing upon this point lie within a very narrow compass. provides that any seven or more persons, associated for a lawful purpose, such as the manufacture and sale of boots, may, by subscribing their names to a memorandum of association and otherwise complying with the provisions of the Act in respect of registration, form a company with or without limited liability; and , which prescribes the essentials of the memorandum in the case of a company limited by shares, inter alia, enacts that "no subscriber shall take less than one share." The first of these enactments does not require that the persons subscribing shall not be related to each other; and the second**39** plainly imports that the holding of a single share affords a sufficient qualification for mem-

bership; and I can find no other rule laid down or even suggested in the Act. Nor does the statute, either expressly or by implication, impose any limit upon the number of shares which a single member may subscribe for or take by allotment. At the date of registration all the requirements of the Act had been complied with; and, as matters then stood, there does not appear to have been any room for the pleas now advanced by the liquidator. The company was still free to modify or reject the agreement of July 20; and the fraud of which the appellant has been held guilty by the Court of Appeal, though it may have existed in animo, had not been carried into execution by the acceptance of the agreement, the issue of debentures to the appellant in terms of it, and by his receiving an allotment of shares which increased his interest in the company to of its actual capital. I have already intimated my opinion that the acceptance of the agreement is binding on the company; and neither that acceptance, nor the preponderating share of the appellant, nor his payment in debentures, being forbidden by the Act, I do not think that any one of these things could subsequently render the registration of the company invalid. But I am willing to assume that proceedings which are permitted by the Act may be so used by the members of a limited company as to constitute a fraud upon others, to whom they in consequence incur personal liability. In this case the fraud is found to have been committed by the appellant against the creditors of the company; but it is clear that if so, though he may have been its originator and the only person who took benefit from it, he could not have done any one of those things, which taken together are said to constitute his fraud, without the consent and privity of the other shareholders. It seems doubtful whether a liquidator as representing and in the name of the company can sue its members for redress against a fraud which was committed by the company itself and by all its shareholders. However, I do not think it necessary to dwell upon that point, because I am not satisfied that the charge of fraud against creditors has any foundation in fact.**40**

The memorandum of association gave notice that the main object for which the company was formed was to adopt and carry into effect, with or without modifications, the agreement of July, 1892, in terms of which the debentures for 10,000l. were subsequently given to the appellant in part payment of the price. By the articles of association (art. 62 (e)) the directors were empowered to issue mortgage or other debentures or bonds for any debts due, or to become

due, from the company; and it is not alleged or proved that there way any failure to comply with or the other clauses ( of the Act) which relate to the protection of creditors. The unpaid creditors of the company, whose unfortunate position has been attributed to the fraud of the appellant, if they had thought fit to avail themselves of the means of protecting their interests which the Act provides, could have informed themselves of the terms of purchase by the company, of the issue of debentures to the appellant, and of the amount of shares held by each member. In my opinion, the statute casts upon them the duty of making inquiry in regard to these matters. Whatever may be the moral duty of a limited company and its shareholders, when the trade of the company is not thriving, the law does not lay any obligation upon them to warn those members of the public who deal with them on credit that they run the risk of not being paid. One of the learned judges asserts, and I see no reason to question the accuracy of his statement, that creditors never think of examining the register of debentures. But the apathy of a creditor cannot justify an imputation of fraud against a limited company or its members, who have provided all the means of information which the Act of 1862 requires; and, in my opinion, a creditor who will not take the trouble to use the means which the statute provides for enabling him to protect himself must bear the consequences of his own negligence.

For these reasons I have come to the conclusion that the orders appealed from ought to be reversed, with costs to the appellant here and in both Courts below. His costs in this House must, of course, be taxed in accordance with the rule applicable to pauper litigants. **\*41** LORD HERSCHELL.

My Lords, by an order of the High Court, which was affirmed by the Court of Appeal, it was declared that the respondent company, or the liquidator of that company was entitled to be indemnified by the appellant against the sum of 7733l. 8s. 3d., and it was ordered that the respondent company should recover that sum against the appellant.

On July 28, 1892, the respondent company was incorporated with a capital of 40,000l. divided into 40,000 shares of 1l. each. One of the objects for which the company was incorporated was to carry out an agreement, with such modifications therein as might be agreed to, of July 20, 1892, which had been

entered into between the appellant and a trustee for a company intended to be formed, for the acquisition by the company of the business then carried on by the appellant. The company was, in fact, formed for the purpose of taking over the appellant's business of leather merchant and boot manufacturer, which he had carried on for many years. The business had been a prosperous one, and, as the learned judge who tried the action found, was solvent at the time when the company was incorporated. The memorandum of association of the company was subscribed by the appellant, his wife and daughter, and his four sons, each subscribing for one share. The appellant afterwards had 20,000 shares allotted to him. For these he paid 1l. per share out of the purchase-money which by agreement he was to receive for the transfer of his business to the company. The company afterwards became insolvent and went into liquidation.

In an action brought by a debenture-holder on behalf of himself and all the other debenture-holders, including the appellant, the respondent company set up by way of counter-claim that the company was formed by Aron Salomon, and the debentures were issued in order that he might carry on the said business, and take all the profits without risk to himself; that the company was the mere nominee and agent of Aron Salomon; and that the company or the liquidator thereof was entitled to be indemnified by Aron Salomon against all the debts owing by the company to creditors other than Aron Salomon. This counter-claim was not in the pleading as**\*42** originally delivered; it was inserted by way of amendment at the suggestion of Vaughan Williams J., before whom the action came on for trial. The learned judge thought the liquidator entitled to the relief asked for, and made the order complained of. He was of opinion that the company was only an "alias" for Salomon; that, the intention being that he should take the profits without running the risk of the debts, the company was merely an agent for him, and, having incurred liabilities at his instance, was, like any other agent under such circumstances, entitled to be indemnified by him against them. On appeal the judgment of Vaughan Williams J. was affirmed by the Court of Appeal, that Court"being of opinion that the formation of the company, the agreement of August, 1892, and the issue of debentures to Aron Salomon pursuant to such agreement were a mere scheme to enable him to carry on business in the name of the company with limited liability contrary to the true intent and meaning of the , and further to enable him to

obtain a preference over other creditors of the company by procuring a first charge on the assets of the company by means of such debentures."

The learned judges in the Court of Appeal dissented from the view taken by Vaughan Williams J., that the company was to be regarded as the agent of the appellant. They considered the relation between them to be that of trustee and cestui que trust; but this difference of view, of course, did not affect the conclusion that the right to the indemnity claimed had been established.

It is to be observed that both Courts treated the company as a legal entity distinct from Salomon and the then members who composed it, and therefore as a validly constituted corporation. This is, indeed, necessarily involved in the judgment which declared that the company was entitled to certain rights as against Salomon. Under these circumstances, I am at a loss to understand what is meant by saying that A. Salomon & Co., Limited, is but an "alias" for A. Salomon. It is not another name for the same person; the company is ex hypothesi a distinct legal persona. As little am I able to adopt the view**43** that the company was the agent of Salomon to carry on his business for him. In a popular sense, a company may in every case be said to carry on business for and on behalf of its shareholders; but this certainly does not in point of law constitute the relation of principal and agent between them or render the shareholders liable to indemnify the company against the debts which it incurs. Here, it is true, Salomon owned all the shares except six, so that if the business were profitable he would be entitled, substantially, to the whole of the profits. The other shareholders, too, are said to have been "dummies," the nominees of Salomon. But when once it is conceded that they were individual members of the company distinct from Salomon, and sufficiently so to bring into existence in conjunction with him a validly constituted corporation, I am unable to see how the facts to which I have just referred can affect the legal position of the company, or give it rights as against its members which it would not otherwise possess.

The Court of Appeal based their judgment on the proposition that the formation of the company and all that followed on it were a mere scheme to enable the appellant to carry on business in the name of the company, with limited liability, contrary to the true intent and meaning of the . The conclusion which they drew from this premiss was, that the company was a trustee and Salomon their cestui que trust. I cannot think that the conclusion follows even if the premiss be sound. It seems to me that the logical result would be that the company had not been validly constituted, and therefore had no legal existence. But, apart from this, it is necessary to examine the proposition on which the Court have rested their judgment, as its effect would be far reaching. Many industrial and banking concerns of the highest standing and credit have, in recent years, been, to use a common expression, converted into joint stock companies, and often into what are called "private" companies, where the whole of the shares are held by the former partners. It appears to me that all these might be pronounced "schemes to enable" them "to carry on business in the name of the company, with limited liability," in the very sense in which those words are used in**44** the judgment of the Court of Appeal. The profits of the concern carried on by the company will go to the persons whose business it was before the transfer, and in the same proportions as before, the only difference being that the liability of those who take the profits will no longer be unlimited. The very object of the creation of the company and the transfer to it of the business is, that whereas the liability of the partners for debts incurred was without limit, the liability of the members for the debts incurred by the company shall be limited. In no other respect is it intended that there shall be any difference: the conduct of the business and the division of the profits are intended to be the same as before. If the judgment of the Court of Appeal be pushed to its logical conclusion, all these companies must, I think, be held to be trustees for the partners who transferred the business to them, and those partners must be declared liable without limit to discharge the debts of the company. For this is the effect of the judgment as regards the respondent company. The position of the members of a company is just the same whether they are declared liable to pay the debts incurred by the company, or by way of indemnity to furnish the company with the means of paying them. I do not think the learned judges in the Court below have contemplated the application of their judgment to such cases as I have been considering; but I can see no solid distinction between those cases and the present one.

It is said that the respondent company is a "one man" company, and that in this respect it differs from such companies as those to which I have alluded. But it

has often happened that a business transferred to a joint stock company has been the property of three or four persons only, and that the other subscribers of the memorandum have been clerks or other persons who possessed little or no interest in the concern. I am unable to see how it can be lawful for three or four or six persons to form a company for the purpose of employing their capital in trading, with the benefit of limited liability, and not for one person to do so, provided, in each case, the requirements of the statute have been complied with and the company has been validly constituted. How does it concern the creditor*45 whether the capital of the company is owned by seven persons in equal shares, with the right to an equal share of the profits, or whether it is almost entirely owned by one person, who practically takes the whole of the profits? The creditor has notice that he is dealing with a company the liability of the members of which is limited, and the register of shareholders informs him how the shares are held, and that they are substantially in the hands of one person, if this be the fact. The creditors in the present case gave credit to and contracted with a limited company; the effect of the decision is to give them the benefit, as regards one of the shareholders, of unlimited liability. I have said that the liability of persons carrying on business can only be limited provided the requirements of the statute be complied with; and this leads naturally to the inquiry, What are those requirements?

The Court of Appeal has declared that the formation of the respondent company and the agreement to take over the business of the appellant were a scheme "contrary to the true intent and meaning of the ." I know of no means of ascertaining what is the intent and meaning of the   except by examining its provisions and finding what regulations it has imposed as a condition of trading with limited liability. The memorandum must state the amount of the capital of the company and the number of shares into which it is divided, and no subscriber is to take less than one share. The shares may, however, be of as small a nominal value as those who form the company please: the statute prescribes no minimum; and though there must be seven shareholders, it is enough if each of them holds one share, however small its denomination. The Legislature, therefore, clearly sanctions a scheme by which all the shares except six are owned by a single individual, and these six are of a value little more than nominal.

It was said that in the present case the six shareholders other than the appellant were mere dummies, his nominees, and held their shares in trust for him. I will assume that this was so. In my opinion, it makes no difference. The statute forbids the entry in the register of any trust; and it certainly*46 contains no enactment that each of the seven persons subscribing the memorandum must be beneficially entitled to the share or shares for which he subscribes. The persons who subscribe the memorandum, or who have agreed to become members of the company and whose names are on the register, are alone regarded as, and in fact are, the shareholders. They are subject to all the liability which attaches to the holding of the share. They can be compelled to make any payment which the ownership of a share involves. Whether they are beneficial owners or bare trustees is a matter with which neither the company nor creditors have anything to do: it concerns only them and their cestuis que trust if they have any. If, then, in the present case all the requirements of the statute were complied with, and a company was effectually constituted, and this is the hypothesis of the judgment appealed from, what warrant is there for saying that what was done was contrary to the true intent and meaning of the ?

It may be that a company constituted like that under consideration was not in the contemplation of the Legislature at the time when the Act authorizing limited liability was passed; that if what is possible under the enactments as they stand had been foreseen a minimum sum would have been fixed as the least denomination of share permissible; and that it would have been made a condition that each of the seven persons should have a substantial interest in the company. But we have to interpret the law, not to make it; and it must be remembered that no one need trust a limited liability company unless he so please, and that before he does so he can ascertain, if he so please, what is the capital of the company and how it is held.

I have hitherto made no reference to the debentures which the appellant received in part-payment of the purchase-money of the business which he transferred to the company. These are referred to in the judgment as part of the scheme which is pronounced contrary to the true intent and meaning of the . But if apart from this the conclusion that the appellant is bound to indemnify the company against its debts cannot be

Copr. © West 2009 No Claim to Orig. Govt. Works

sustained, I do not see how the circumstance*47 that he received these debentures can avail the respondent company. The issue of debentures to the vendor of a business as part of the price is certainly open to great abuse, and has often worked grave mischief. It may well be that some check should be placed upon the practice, and that, at all events, ample notice to all who may have dealings with the company should be secured. But as the law at present stands, there is certainly nothing unlawful in the creation of such debentures. For these reasons I have come to the conclusion that the appeal should be allowed.

It was contended on behalf of the company that the agreement between them and the appellant ought, at all events, to be set aside on the ground of fraud. In my opinion, no such case has been made out, and I do not think the respondent company are entitled to any such relief.LORD MACNAGHTEN.

My Lords, I cannot help thinking that the appellant, Aron Salomon, has been dealt with somewhat hardly in this case.

Mr. Salomon, who is now suing as a pauper, was a wealthy man in July, 1892. He was a boot and shoe manufacturer trading on his own sole account under the firm of "A. Salomon & Co.," in High Street, Whitechapel, where he had extensive warehouses and a large establishment. He had been in the trade over thirty years. He had lived in the same neighbourhood all along, and for many years past he had occupied the same premises. So far things had gone very well with him. Beginning with little or no capital, he had gradually built up a thriving business, and he was undoubtedly in good credit and repute.

It is impossible to say exactly what the value of the business was. But there was a substantial surplus of assets over liabilities. And it seems to me to be pretty clear that if Mr. Salomon had been minded to dispose of his business in the market as a going concern he might fairly have counted upon retiring with at least 10,000l. in his pocket.

Mr. Salomon, however, did not want to part with the business. He had a wife and a family consisting of five sons and a*48 daughter. Four of the sons were working with their father. The eldest, who was about thirty years of age, was practically the manager. But the sons were not partners: they were only servants.

Not unnaturally, perhaps, they were dissatisfied with their position. They kept pressing their father to give them a share in the concern. "They troubled me," says Mr. Salomon, "all the while." So at length Mr. Salomon did what hundreds of others have done under similar circumstances. He turned his business into a limited company. He wanted, he says, to extend the business and make provision for his family. In those words, I think, he fairly describes the principal motives which influenced his action.

All the usual formalities were gone through; all the requirements of the , were duly observed. There was a contract with a trustee in the usual form for the sale of the business to a company about to be formed. There was a memorandum of association duly signed and registered, stating that the company was formed to carry that contract into effect, and fixing the capital at 40,000l. in 40,000 shares of 1l. each. There were articles of association providing the usual machinery for conducting the business. The first directors were to be nominated by the majority of the subscribers to the memorandum of association. The directors, when appointed, were authorized to exercise all such powers of the company as were not by statute or by the articles required to be exercised in general meeting; and there was express power to borrow on debentures, with the limitation that the borrowing was not to exceed 10,000l. without the sanction of a general meeting.

The company was intended from the first to be a private company; it remained a private company to the end. No prospectus was issued; no invitation to take shares was ever addressed to the public.

The subscribers to the memorandum were Mr. Salomon, his wife, and five of his children who were grown up. The subscribers met and appointed Mr. Salomon and his two elder sons directors. The directors then proceeded to carry out the proposed transfer. By an agreement dated August 2, 1892, the company adopted the preliminary contract, and in accordance*49 with it the business was taken over by the company as from June 1, 1892. The price fixed by the contract was duly paid. The price on paper was extravagant. It amounted to over 39,000l. - a sum which represented the sanguine expectations of a fond owner rather than anything that can be called a businesslike or reasonable estimate of value. That, no doubt, is a circumstance which at first sight calls for

Copr. © West 2009 No Claim to Orig. Govt. Works

observation; but when the facts of the case and the position of the parties are considered, it is difficult to see what bearing it has on the question before your Lordships. The purchase-money was paid in this way: as money came in, sums amounting in all to 30,000l. were paid to Mr. Salomon, and then immediately returned to the company in exchange for fully-paid shares. The sum of 10,000l. was paid in debentures for the like amount. The balance, with the exception of about 100l. which Mr. Salomon seems to have received and retained, went in discharge of the debts and liabilities of the business at the time of the transfer, which were thus entirely wiped off. In the result, therefore, Mr. Salomon received for his business about 100l. in cash, 10,000l. in debentures, and half the nominal capital of the company in fully paid shares for what they were worth. No other shares were issued except the seven shares taken by the subscribers to the memorandum, who, of course, knew all the circumstances, and had therefore no ground for complaint on the score of overvaluation.

The company had a brief career: it fell upon evil days. Shortly after it was started there seems to have come a period of great depression in the boot and shoe trade. There were strikes of workmen too; and in view of that danger contracts with public bodies, which were the principal source of Mr. Salomon's profit, were split up and divided between different firms. The attempts made to push the business on behalf of the new company crammed its warehouses with unsaleable stock. Mr. Salomon seems to have done what he could: both he and his wife lent the company money; and then he got his debentures cancelled and reissued to a Mr. Broderip, who advanced him 5000l., which he immediately handed over to the company on loan. The temporary relief only hastened*50 ruin. Mr. Broderip's interest was not paid when it became due. He took proceedings at once and got a receiver appointed. Then, of course, came liquidation and a forced sale of the company's assets. They realized enough to pay Mr. Broderip, but not enough to pay the debentures in full; and the unsecured creditors were consequently left out in the cold.

In this state of things the liquidator met Mr. Broderip's claim by a counter-claim, to which he made Mr. Salomon a defendant. He disputed the validity of the debentures on the ground of fraud. On the same ground he claimed rescission of the agreement for the transfer of the business, cancellation of the deben-

tures, and repayment by Mr. Salomon of the balance of the purchase-money. In the alternative, he claimed payment of 20,000l. on Mr. Salomon's shares, alleging that nothing had been paid on them.

When the trial came on before Vaughan Williams J., the validity of Mr. Broderip's claim was admitted, and it was not disputed that the 20,000 shares were fully paid up. The case presented by the liquidator broke down completely; but the learned judge suggested that the company had a right of indemnity against Mr. Salomon. The signatories of the memorandum of association were, he said, mere nominees of Mr. Salomon - mere dummies. The company was Mr. Salomon in another form. He used the name of the company as an alias. He employed the company as his agent; so the company, he thought, was entitled to indemnity against its principal. The counter-claim was accordingly amended to raise this point; and on the amendment being made the learned judge pronounced an order in accordance with the view he had expressed.

The order of the learned judge appears to me to be founded on a misconception of the scope and effect of the Companies Act, 1862. In order to form a company limited by shares, the Act requires that a memorandum of association should be signed by seven persons, who are each to take one share at least. If those conditions are complied with, what can it matter whether the signatories are relations or strangers? There is nothing in the Act requiring that the subscribers to the memorandum should be independent or unconnected, or*51 that they or any one of them should take a substantial interest in the undertaking, or that they should have a mind and will of their own, as one of the learned Lords Justices seems to think, or that there should be anything like a balance of power in the constitution of the company. In almost every company that is formed the statutory number is eked out by clerks or friends, who sign their names at the request of the promoter or promoters without intending to take any further part or interest in the matter.

When the memorandum is duly signed and registered, though there be only seven shares taken, the subscribers are a body corporate "capable forthwith," to use the words of the enactment, "of exercising all the functions of an incorporated company." Those are strong words. The company attains maturity on its birth. There is no period of minority - no interval of

incapacity. I cannot understand how a body corporate thus made "capable" by statute can lose its individuality by issuing the bulk of its capital to one person, whether he be a subscriber to the memorandum or not. The company is at law a different person altogether from the subscribers to the memorandum; and, though it may be that after incorporation the business is precisely the same as it was before, and the same persons are managers, and the same hands receive the profits, the company is not in law the agent of the subscribers or trustee for them. Nor are the subscribers as members liable, in any shape or form, except to the extent and in the manner provided by the Act. That is, I think, the declared intention of the enactment. If the view of the learned judge were sound, it would follow that no common law partnership could register as a company limited by shares without remaining subject to unlimited liability.

Mr. Salomon appealed; but his appeal was dismissed with costs, though the Appellate Court did not entirely accept the view of the Court below. The decision of the Court of Appeal proceeds on a declaration of opinion embodied in the order which has been already read.

I must say that I, too, have great difficulty in understanding this declaration. If it only means that Mr. Salomon availed**\*52** himself to the full of the advantages offered by the Act of 1862, what is there wrong in that? Leave out the words "contrary to the true intent and meaning of the ," and bear in mind that "the creditors of the company" are not the creditors of Mr. Salomon, and the declaration is perfectly innocent: it has no sting in it.

In an early case, which in some of its aspects is not unlike the present, the owners of a colliery (to quote the language of Giffard L.J. in the Court of Appeal) "went on working the colliery not very successfully, and then determined to form a limited company in order to avoid incurring further personal liability." "It was," adds the Lord Justice, "the policy of the to enable this to be done." And so he reversed the decision of Malins V.-C., who had expressed an opinion that if the laws of the country sanctioned such a proceeding they were "in a most lamentable state," and had fixed the former owners with liability for the amount of the shares they took in exchange for their property:

Among the principal reasons which induce persons to

form private companies, as is stated very clearly by Mr. Palmer in his treatise on the subject, are the desire to avoid the risk of bankruptcy, and the increased facility afforded for borrowing money. By means of a private company, as Mr. Palmer observes, a trade can be carried on with limited liability, and without exposing the persons interested in it in the event ot failure to the harsh provisions of the bankruptcy law. A company, too, can raise money on debentures, which an ordinary trader cannot do. Any member of a company, acting in good faith, is as much entitled to take and hold the company's debentures as any outside creditor. Every creditor is entitled to get and to hold the best security the law allows him to take.

If, however, the declaration of the Court of Appeal means that Mr. Salomon acted fraudulently or dishonestly, I must say I can find nothing in the evidence to support such an imputation. The purpose for which Mr. Salomon and the other**\*53** subscribers to the memorandum were associated was "lawful." The fact that Mr. Salomon raised 5000l. for the company on debentures that belonged to him seems to me strong evidence of his good faith and of his confidence in the company. The unsecured creditors of A. Salomon and Company, Limited, may be entitled to sympathy, but they have only themselves to blame for their misfortunes. They trusted the company, I suppose, because they had long dealt with Mr. Salomon, and he had always paid his way; but they had full notice that they were no longer dealing with an individual, and they must be taken to have been cognisant of the memorandum and of the articles of association. For such a catastrophe as has occurred in this case some would blame the law that allows the creation of a floating charge. But a floating charge is too convenient a form of security to be lightly abolished. I have long thought, and I believe some of your Lordships also think, that the ordinary trade creditors of a trading company ought to have a preferential claim on the assets in liquidation in respect of debts incurred within a certain limited time before the winding-up. But that is not the law at present. Everybody knows that when there is a winding-up debenture-holders generally step in and sweep off everything; and a great scandal it is.

It has become the fashion to call companies of this class "one man companies." That is a taking nickname, but it does not help one much in the way of argument. If it is intended to convey the meaning that

Copr. © West 2009 No Claim to Orig. Govt. Works

a company which is under the absolute control of one person is not a company legally incorporated, although the requirements of the Act of 1862 may have been complied with, it is inaccurate and misleading: if it merely means that there is a predominant partner possessing an overwhelming influence and entitled practically to the whole of the profits, there is nothing in that that I can see contrary to the true intention of the Act of 1862, or against public policy, or detrimental to the interests of creditors. If the shares are fully paid up, it cannot matter whether they are in the hands of one or many. If the shares are not fully paid, it is as easy to gauge the solvency of an individual as to estimate the financial ability of a crowd.**\*54** One argument was addressed to your Lordships which ought perhaps to be noticed, although it was not the ground of decision in either of the Courts below. It was argued that the agreement for the transfer of the business to the company ought to be set aside, because there was no independent board of directors, and the property was transferred at an overvalue. There are, it seems to me, two answers to that argument. In the first place, the directors did just what they were authorized to do by the memorandum of association. There was no fraud or misrepresentation, and there was nobody deceived. In the second place, the company have put it out of their power to restore the property which was transferred to them. It was said that the assets were sold by an order made in the presence of Mr. Salomon, though not with his consent, which declared that the sale was to be without prejudice to the rights claimed by the company by their counter-claim. I cannot see what difference that makes. The reservation in the order seems to me to be simply nugatory.

I am of opinion that the appeal ought to be allowed, and the counter-claim of the company dismissed with costs, both here and below,

LORD MORRIS. My Lords, I quite concur in the judgment which has been announced, and in the reasons which have been so fully given for it.LORD DAVEY.

My Lords, it is possible, and (I think) probable, that the conclusion to which I feel constrained to come in this case may not have been contemplated by the Legislature, and may be due to some defect in the machinery of the Act. But, after all, the intention of the Legislature must be collected from the language

of its enactments; and I do not see my way to holding that if there are seven registered members the association is not a company formed in compliance with the provisions of the Act and capable of carrying on business with limited liability, either because the bulk of the shares are held by some only, or even one of the members, and the others are what is called "dummies," holding, it may be, only one share**\*55** of 1l. each, or because there are less than seven persons who are beneficially entitled to the shares.

I think that this result follows from the absence of any provision fixing a minimum nominal amount of a share - the provision in s. 8 that no subscriber shall take less than one share, and the provision in that no notice of any trust shall be entered on the register. With regard to the latter provision, it would, in my opinion, be impossible to work the machinery of the Act on any other principle, and to attempt to do so would lead only to confusion and uncertainty. The learned counsel for the respondents (wisely, as I think) did not lay any stress on the members, other than the appellant, being trustees for him of their shares. Their argument was that they were "dummies," and did not hold a substantial interest in the company, i.e., what a jury would say is a substantial interest. In the language of some of the judges in the Court below, any jury, if asked the question, would say the business was Aron Salomon's and no one else's.

It was not argued in this case that there was no association of seven persons to be registered, and the registration therefore operated nothing, or that the so-called company was a sham and might be disregarded; and, indeed, it would have been difficult for the learned counsel for the respondents, appearing, as they did, at your Lordships' Bar for the company, who had been permitted to litigate in the Courts below as actors (on their counter-claim), to contend that their clients were nonexistent. I do not say that such an argument ought to or would prevail; I only observe that, having regard to the decisions, it is not certain that , making the certificate of the registrar conclusive evidence that all the requisitions of the Act in respect of registration had been complied with, would be an answer to it.

We start, then, with the assumption that the respondents have a corporate existence with power to sue and be sued, to incur debts and be wound up, and to

Copr. © West 2009 No Claim to Orig. Govt. Works

act as agents or as trustees, and I suppose, therefore, to hold property. Both the Courts below have, however, held that the appellant is liable to indemnify the company against all its debts and liabilities.**\*56** Vaughan Williams J. held that the company was an "alias" for the appellant, who carried on his business through the company as his agent, and that he was bound to indemnify his own agent; and he arrived at this conclusion on the ground that the other members of the company had no substantial interest in it, and the business in substance was the appellant's. The Court of Appeal thought the relation of the company to the appellant was that of trustee to cestui que trust.

The ground on which the learned judges seem to have chiefly relied was that it was an attempt by an individual to carry on his business with limited liability, which was forbidden by the Act and unlawful. I observe, in passing, that nothing turns upon there being only one person interested. The argument would have been just as good if there had been six members holding the bulk of the shares and one member with a very small interest, say, one share. I am at a loss to see how in either view taken in the Courts below the conclusion follows from the premises, or in what way the company became an agent or trustee for the appellant, except in the sense in which every company may loosely and inaccurately be said to be an agent for earning profits for its members, or a trustee of its profits for the members amongst whom they are to be divided. There was certainly no express trust for the appellant; and an implied or constructive trust can only be raised by virtue of some equity. I took the liberty of asking the learned counsel what the equity was, but got no answer. By an "alias" is usually understood a second name for one individual; but here, as one of your Lordships has already observed, we have, ex hypothesi, a duly formed legal persona, with corporate attributes and capable of incurring legal liabilities. Nor do I think it legitimate to inquire whether the interest of any member is substantial when the Act has declared that no member need hold more than one share, and has not prescribed any minimum amount of a share. If, as was said in the Court of Appeal, the company was formed for an unlawful purpose, or in order to achieve an object not permitted by the provisions of the Act, the appropriate remedy (if any) would seem to be to set aside the certificate of incorporation, or to treat the company as a**\*57** nullity, or, if the appellant has committed a fraud or misdemeanour (which I do not think he has), he may be proceeded against civilly or criminally;

but how either of those states of circumstances creates the relation of cestui que trust and trustee, or principal and agent, between the appellant and respondents, is not apparent to my understanding.

I am, therefore, of opinion that the order appealed from cannot be supported on the grounds stated by the learned judges.

But Mr. Farwell also relied on the alternative relief claimed by his pleadings, which was quite open to him here, namely, that the contract for purchase of the appellant's business ought to be set aside for fraud. The fraud seems to consist in the alleged exorbitance of the price and the fact that there was no independent board of directors with whom the appellant could contract. I am of opinion that the fraud was not made out. I do not think the price of the appellant's business (which seems to have been a genuine one, and for some time a prosperous business) was so excessive as to afford grounds for rescission; and as regards the cash portion of the price, it must be observed that, as the appellant held the bulk of the shares, or (the respondents say) was the only shareholder, the money required for the payment of it came from himself in the form either of calls on his shares or profits which would otherwise be divisible. Nor was the absence of any independent board material in a case like the present. I think it an inevitable inference from the circumstances of the case that every member of the company assented to the purchase, and the company is bound in a matter intra vires by the unanimous agreement of its members. In fact, it is impossible to say who was defrauded.

Mr. Farwell relied on some dicta in , a case which is often quoted and not infrequently misunderstood. Of course, Lord Cairns' observations were directed only to a case such as he had before him, where it was attempted to bind a large body of shareholders by a contract which purported to have been made between the vendor and**\*58** directors before the shares were offered for subscription; whereas it appeared that the directors were only the nominees of the vendor, who had accepted his bidding and exercised no judgment of their own. It has nothing to do with the present case. That a company may contract with the holder of the bulk of its shares, and such contract will be binding though carried by the votes of that shareholder, was decided in .

For these reasons, I am of opinion that the appellant's appeal should be allowed and the cross-appeal should be dismissed. I agree to the proposed order as to costs.Order of the Court of Appeal reversed and cross-appeal dismissed with costs here and below; the costs in this House to be taxed in the manner usual when the appellant sues in formâ pauperis; cause remitted to the Chancery Division. Lords' Journals, November 16, 1896.

END OF DOCUMENT

**Tab 18A**

in accordance with the policy that I take to be underlying that procedure,   A
as well as the modern policy of the courts towards plaintiffs who are
guilty of delay. Accordingly, I allow the appeal from the master's
decision, and dismiss the originating summons.

*Order accordingly.*

Solicitors: *Holman Fenwick & Willan; Thomas Cooper & Stibbard.*   B

[Reported by IAN SAXTON, ESQ., Barrister-at-Law]

C

---

SMITH AND OTHERS v. CROFT AND OTHERS (No. 2)   D

[1985 S. No. 637]

1986   Oct. 29, 30, 31;                        Knox J.
      Nov. 3, 4, 5, 6, 7, 10, 11,
          13, 14, 17, 18, 19, 20, 21;
      Dec. 19                              E

*Company—Shareholder—Rights against company or directors—Mino-*
*rity shareholders' action—Minority shareholders alleging ultra*
*vires acts by company and directors—Majority of independent*
*minority shareholders not wishing to pursue action—Whether*
*minority shareholders' action to be struck out—Whether striking*
*out procedure appropriate—R.S.C., Ord. 18, r. 19*

F

F. Ltd. was a company engaged in the specialised business
of guaranteeing the completion of films on time and within their
budget. The articles of association provided that a director
should be remunerated for his services at the rate of £150 per
annum, the chairman receiving an additional £100 per annum,
but the rate of remuneration could be increased by an ordinary
resolution. The directors were also empowered to appoint one
or more of their number to be holders of an executive office,   G
and any director appointed to such office was to receive such
additional remuneration by way of salary, lump sum, commission
or participation in profits as the directors might determine.
During the course of 1982 the appointed executive directors and
companies with which they were associated acquired sufficient
shares in F. Ltd. to give them overall voting control. The shares
were bought by means of payments made to three of the   H
associated companies in August 1982 of £33,000 each, part of
which was then lent to the fourth to discharge a bank loan
taken out for the purpose of obtaining cash to buy shares in F.
Ltd. and the remainder was used for the purchase of shares by

A       the three associated companies. The plaintiffs, who held a minority of shares in F. Ltd., brought an action against F. Ltd., three executive directors and the chairman, a non-executive director, and four companies closely associated with one or other of the three executive directors, claiming that the directors had paid themselves excessive remuneration, that the payments in 1982 to the associated companies were contrary to section 42 of the Companies Act 1981[1] and that certain payments of

B       expenses to directors were excessive. The plaintiffs between them held 11·86 per cent. of the issued shares in F. Ltd.; the defendants between them held 62·54 per cent.; of the remaining shares 2·54 per cent. were held by a company which actively supported the plaintiffs, while 3·22 per cent. were held by persons or companies which, it was common ground, were to be treated as supporting the defendants. W. Ltd., a company not under the control of either the plaintiffs or the defendants, held

C       19·66 per cent. of the shares in F. Ltd. and was opposed to the continuance of the plaintiffs' action.

On a motion by the chairman and F. Ltd. to strike out the plaintiffs' action under R.S.C., Ord. 18, r. 19 or under the inherent jurisdiction as vexatious, frivolous or an abuse of process:—

*Held*, (1) that the defendants' application raised the issue

D       whether the plaintiffs could proceed with their minority shareholders' action and, although that raised difficult questions of law, the defendants, by invoking the procedure under R.S.C., Ord. 18, r. 9 rather than the procedure for determining a preliminary issue of law under R.S.C., Ord. 33, r. 3, had not adopted such an inherently defective procedure that the court should not proceed to determine the issues raised; and that since the effect of the court deciding those issues against the

E       plaintiffs would be determinative of the action, the court would entertain the application and consider whether prima facie the company was entitled to the relief claimed in the action and whether the action was within the exception to the rule in *Foss v. Harbottle* (post, pp. 135B–C, E–G, 138G—139B, 145C–F).

*Prudential Assurance Co. Ltd.* v. *Newman Industries Ltd.*

F       *(No. 2)* [1982] Ch. 204, C.A. and *Williams and Humbert Ltd.* v. *W. &. H. Trade Marks (Jersey) Ltd.* [1986] A.C. 368, H.L.(E.) considered.

(2) That although excessive remuneration paid to directors might be an abuse of power, where the power to decide remuneration was vested in the board, it could not be ultra vires the company; and that in view of the uncontradicted evidence about the specialised field in which the company

G       operated and the high levels of remuneration obtaining there it was more likely that the plaintiffs would fail than succeed on the issue of quantum; that likewise no prima facie case had been shown that the executive directors' expenses were excessive; and that, prima facie, the payments to associated companies were not ultra vires since payments at the request of an executive director to an outside entity were capable of being payments in respect of services rendered by the executive

H       director, save that there was a prima facie case of irregularity regarding certain payments not fully cured by subsequent adoption of the accounts at the annual general meetings at

[1] Companies Act 1981, s. 42: see post, p. 164B–D.

which those payments should have been disclosed; that since the  A
admitted payments of £33,000 to associated companies had not
been shown to be reasonably necessary for the purpose of
providing for amounts likely to be incurred by way of directors'
remuneration there was a prima facie case of infringement of
section 42 of the Companies Act 1981 (post, pp. 159F—160D,
163C—164A, 165C—166A).

*In re George Newman & Co.* [1895] 1 Ch. 674, C.A. and
*Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation*  B
[1986] Ch. 246, C.A. applied.

(3) That although a minority shareholder had locus standi to
bring an action on behalf of a company to recover property or
money transferred or paid away in an ultra vires transaction, he
did not have an indefeasible right to prosecute such an action
on the company's behalf; that it was proper to have regard to
the views of the independent shareholders, and their votes  C
should be disregarded only if the court was satisfied that they
would be cast in favour of the defendant directors in order to
support them rather than for the benefit of the company, or if
there was a substantial risk of that happening; that there was no
evidence to suggest that the votes of W. Ltd. would be cast
otherwise than for reasons genuinely thought to be for the
company's advantage; and that, accordingly, since the majority
of the independent shareholders' votes, including those of W.  D
Ltd., would be cast against allowing the action to proceed, the
statement of claim should be struck out (post, pp. 170A–D,
177B–C, 186E–F, 189C–E).

*Foss v. Harbottle* (1843) 2 Hare 461 considered.

The following cases are referred to in the judgment of 13 November ruling
that the defendants could proceed with their application to strike out:  E

*Foss v. Harbottle* (1843) 2 Hare 461
*Lawrance v. Lord Norreys* (1890) 15 App.Cas. 210, H.L.(E.)
*Prudential Assurance Co. Ltd. v. Newman Industries Ltd.* [1981] Ch. 229;
  [1980] 2 W.L.R. 339; [1979] 3 All E.R. 507
*Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2)* [1982]
  Ch. 204; [1982] 2 W.L.R. 31; [1982] 1 All E.R. 354, C.A.
*Smith v. Croft* [1986] 1 W.L.R. 580; [1986] 2 All E.R. 551  F
*Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373; [1975] 2 W.L.R. 389; [1975]
  1 All E.R. 849, C.A.
*Wenlock v. Moloney* [1965] 1 W.L.R. 1238; [1965] 2 All E.R. 871, C.A.
*Williams and Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.* [1986]
  A.C. 368; [1986] 2 W.L.R. 24; [1986] 1 All E.R. 129, H.L.(E.)
*Windsor Refrigerator Co. Ltd. v. Branch Nominees Ltd.* [1961] Ch. 375;
  [1961] 2 W.L.R. 196; [1961] 1 All E.R. 277, C.A.  G

The following additional cases were cited in argument on the question
whether the defendants should be permitted to proceed with their application:

*Bagshaw v. Eastern Union Railway Co.* (1849) 7 Hare 114
*Carter v. Commissioner of Police of the Metropolis* [1975] 1 W.L.R. 507;
  [1975] 2 All E.R. 33, C.A.  H
*City of London Corporation v. Horner* (1914) 111 L.T. 512, C.A.
*Daniels v. Daniels* [1978] Ch. 406; [1978] 2 W.L.R. 73; [1978] 2 All E.R. 89
*Electrical Development Co. of Ontario v. Attorney-General for Ontario*
  [1919] A.C. 687, P.C.

A  *Estmanco (Kilner House) Ltd. v. Greater London Council* [1982] 1 W.L.R.
      2; [1982] 1 All E.R. 437

   *Goodson v. Grierson* [1908] 1 K.B. 761, C.A.

   *Isaacs (M) and Sons Ltd. v. Cook* [1925] 2 K.B. 391

   *Morris v. Sanders Universal Products* [1954] 1 W.L.R. 67; [1954] 1 All E.R.
      47, C.A.

   *National Real Estate and Finance Co. Ltd. v. Hassan* [1939] 2 K.B. 61;
B     [1939] 2 All E.R. 154, C.A.

   *Nissan v. Attorney-General* [1970] A.C. 179; [1969] 2 W.L.R. 926; [1969] 1
      All E.R. 629, H.L.(E.)

   *Radstock Co-operative and Industrial Society Ltd. v. Norton-Radstock Urban
      District Council* [1968] Ch. 605; [1968] 2 W.L.R. 1214; [1968] 2 All
      E.R. 59, C.A.

   *Richards v. Naum* [1967] 1 Q.B. 620; [1966] 3 W.L.R. 1113; [1966] 3 All
      E.R. 812, C.A.

C  *Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation* [1986] Ch.
      246; [1985] 2 W.L.R. 908; [1985] 3 All E.R. 52, C.A.

   *Russell v. Wakefield Waterworks Co.* (1875) L.R. 20 Eq. 474

   *Salomons v. Laing* (1850) 12 Beav. 377

   *Tilling v. Whiteman* [1980] A.C. 1; [1979] 2 W.L.R. 401; [1979] 1 All E.R.
      737, H.L.(E.)

   *Western Steamship Co. Ltd. v. Amaral Sutherland & Co. Ltd.* [1914] 3 K.B.
D     55, C.A.


   The following cases are referred to in the judgment of 19 December:

   *Allen v. Gold Reefs of West Africa Ltd.* [1900] 1 Ch. 656, C.A.

   *Bagshaw v. Eastern Union Railway Co.* (1849) 7 Hare 114

   *Baillie v. Oriental Telephone and Electric Co. Ltd.* [1915] 1 Ch. 503, C.A.

   *Bamford v. Bamford* [1970] Ch. 212; [1969] 2 W.L.R. 1107; [1969] 1 All
E     E.R. 969, C.A.

   *Birch v. Sullivan* [1957] 1 W.L.R. 1247; [1958] 1 All E.R. 56

   *Brown v. British Abrasive Wheel Co. Ltd.* [1919] 1 Ch. 290

   *Burland v. Earle* [1902] A.C. 83, P.C.

   *Clinch v. Financial Corporation* (1868) L.R. 5 Eq. 450; L.R. 4 Ch.App. 117

   *Daniels v. Daniels* [1978] Ch. 406; [1978] 2 W.L.R. 73; [1978] 2 All E.R. 89

   *Edwards v. Halliwell* [1950] 2 All E.R. 1064, C.A.

F  *Estmanco (Kilner House) Ltd. v. Greater London Council* [1982] 1 W.L.R.
      2; [1982] 1 All E.R. 437

   *Foss v. Harbottle* (1843) 2 Hare 461

   *Gray v. Lewis* (1873) L.R. 8 Ch.App. 1035

   *Halt Garage (1964) Ltd., In re* [1982] 3 All E.R. 1016

   *Hellenic & General Trust Ltd., In re* [1976] 1 W.L.R. 123; [1975] 3 All E.R.
      382

G  *Hogg v. Cramphorn Ltd.* [1967] Ch. 254; [1966] 3 W.L.R. 995; [1966] 3 All
      E.R. 420

   *MacDougall v. Gardiner* (1875) 1 Ch.D. 13, C.A.

   *Mason v. Harris* (1879) 11 Ch.D. 97, Malins V.-C. and C.A.

   *Mozley v. Alston* (1847) 1 Ph. 790

   *Newman (George) & Co., In re* [1895] 1 Ch. 674, C.A.

   *Pavlides v. Jensen* [1956] Ch. 565; [1956] 3 W.L.R. 224; [1956] 2 All E.R.
H     518

   *Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2)* [1982]
      Ch. 204; [1982] 2 W.L.R. 31; [1982] 1 All E.R. 354, C.A.

   *Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation* [1986] Ch.
      246; [1985] 2 W.L.R. 908; [1985] 3 All E.R. 52, C.A.

*Russell v. Wakefield Waterworks Co.* (1875) L.R. 20 Eq. 474          A
*Salomons v. Laing* (1850) 12 Beav. 377
*Seaton v. Grant* (1867) L.R. 2 Ch.App. 459
*Sidebottom v. Kershaw, Leese & Co. Ltd.* [1920] 1 Ch. 154, C.A.
*Simpson v. Westminster Palace Hotel Co.* (1860) 8 H.L.Cas. 712, H.L.(E.)
*Smith v. Croft* [1986] 1 W.L.R. 580; [1986] 2 All E.R. 551
*Taylor v. National Union of Mineworkers (Derbyshire Area)* [1985] B.C.L.C.
          237
*Towers v. African Tug Co.* [1904] 1 Ch. 558, C.A.          B
*Viscount of the Royal Court of Jersey v. Shelton* [1986] 1 W.L.R. 985, P.C.
*Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373; [1975] 2 W.L.R. 389; [1975]
          1 All E.R. 849, C.A.

The following additional cases were cited in argument; some of them being
cited before the judgment of 13 November was delivered:          C

*Atwool v. Merryweather* (1867) L.R. 5 Eq. 464n
*Australian Coal & Shale Employees' Federation v. Smith* (1937) 38
          S.R.(N.S.W.) 48
*Banco de Bilbao v. Sancha* [1938] 2 K.B. 176
*Burt v. British Nation Life Assurance Association* (1859) 4 De G. & J. 158
*Clemens v. Clemens Bros. Ltd.* [1976] 2 All E.R. 268
*Cook v. Deeks* [1916] 1 A.C. 554, P.C.          D
*Cotter v. National Union of Seamen* [1929] 2 Ch. 58, C.A.
*Cullerne v. London and Suburban General Permanent Building Society*
          (1890) 25 Q.B.D. 485, C.A.
*Davidson v. Tulloch* (1860) 3 Macq. 783, H.L.(Sc.)
*Devlin v. Slough Estates Ltd.* [1983] B.C.L.C. 497
*Dominion Cotton Mills Co. Ltd. v. Amyot* [1912] A.C. 546, P.C.
*Duomatic Ltd., In re* [1969] 2 Ch. 365
*Electrical Development Co. of Ontario v. Attorney-General for Ontario*          E
          [1919] A.C. 687, P.C.
*Gray v. Lewis* (1869) L.R. 8 Eq. 526
*Greenhalgh v. Arderne Cinemas Ltd.* [1951] Ch. 286; [1950] 2 All E.R.
          1120, C.A.
*Gregory v. Patchett* (1864) 33 Beav. 595
*Heyting v. Dupont* [1963] 1 W.L.R. 1192; [1963] 3 All E.R. 97; [1964] 1
          W.L.R. 843; [1964] 2 All E.R. 273, C.A.          F
*Hichens v. Congreve* (1828) 4 Russ. 562
*Hoole v. Great Western Railway Co.* (1867) L.R. 3 Ch.App. 262
*Horsley & Weight Ltd., In re* [1982] Ch. 442; [1982] 3 W.L.R. 431; [1982] 3
          All E.R. 1045, C.A.
*Lee, Behrens & Co. Ltd., In re* [1932] 2 Ch. 46
*Lord v. Governor and Company of Copper Miners* (1848) 2 Ph. 740
*MacDougall v. Gardiner* (1875) L.R. 20 Eq. 383          G
*Menier v. Hooper's Telegraph Works* (1874) L.R. 9 Ch.App. 350
*Multinational Gas and Petrochemical Co. v. Multinational Gas and*
          *Petrochemical Services Ltd.* [1983] Ch. 258; [1983] 3 W.L.R. 492; [1983]
          2 All E.R. 563, C.A.
*North-West Transportation Co. Ltd. v. Beatty* (1887) 12 App.Cas. 589,
          H.L.(E.)
*Orr v. Glasgow, Airdrie and Monklands Junction Railway Co.* (1860) 3          H
          Macq. 799
*Peel v. London and North Western Railway Co.* [1907] 1 Ch. 5, C.A.
*Pender v. Lushington* (1877) 12 App.Cas. 70
*Pickering v. Stephenson* (1872) L.R. 14 Eq. 322

A      *Prudential Assurance Co. Ltd. v. Newman Industries Ltd.* [1981] Ch. 229;
        [1980] 2 W.L.R. 339; [1979] 3 All E.R. 507
        *Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2)* [1981]
           Ch. 257; [1980] 2 W.L.R. 339; [1979] 3 All E.R. 507
        *Radstock Co-operative and Industrial Society Ltd. v. Norton-Radstock Urban*
           *District Council* [1968] Ch. 605; [1968] 2 W.L.R. 1214; [1968] 2 All
           E.R. 59, C.A.

B      *Richards v. Naum* [1967] 1 Q.B. 620; [1966] 3 W.L.R. 1113; [1966] 3 All
           E.R. 812, C.A.
        *Russian Commercial and Industrial Bank v. Comptoir D'Escompte de*
           *Mulhouse* [1925] A.C. 112, H.L.(E.)
        *Shuttleworth v. Cox Brothers & Co. (Maidenhead) Ltd.* [1927] 2 K.B. 9,
           C.A.
        *Sinclair v. Brougham* [1914] A.C. 398, H.L.(E.)

C      *Smith & Fawcett Ltd., In re* [1942] Ch. 304; [1942] 1 All E.R. 542, C.A.
        *Spokes v. Grosvenor and West End Railway Terminus Hotel Co. Ltd.* [1897]
           2 Q.B. 124, C.A.
        *Studdert v. Grosvenor* (1886) 33 Ch.D. 528
        *Turquand v. Marshall* (1869) L.R. 4 Ch.App. 376
        *Wall v. London and Northern Assets Corporation* [1898] 2 Ch. 469, C.A.
        *Yorkshire Miners' Association v. Howden* [1905] A.C. 256, H.L.(E.)

D

MOTIONS

By a writ dated 7 February 1985, the plaintiffs, Nora Smith, Lucienne
Crane, and the Right Honourable Felim O'Neill, Baron Rathcavan, in a
specially endorsed writ claimed various sums of money to be paid by
various defendants to the company, Film Finances Ltd., the ninth
named defendant, upon whose behalf the plaintiffs claimed to sue, as
E    being minority shareholders of the company. Those claims were based
on allegations that the eighth defendant, Brindeel Ltd., an associated
company controlled by the company's executive directors, William Alan
Croft, Richard Martin Francis Soames and David Alexander Korda (the
first to third defendants) had purchased 19,900 shares in the company,
with money borrowed from a bank; that Brindeel Ltd. had been
acquired by the executive directors on or about 11 June 1982 with a
F    view to the purchase of the 19,900 shares; that each of three other
associated companies controlled by the executive directors, Mannergrand
Services Ltd., Cushingham Ltd., and Bellwedge Ltd. (the fifth to seventh
defendants), had received £33,000 from the company in early August
1982, and had lent £28,000 to Brindeel Ltd. thereafter, and that these
sums were used by Brindeel Ltd. to discharge its bank indebtedness. It
G    was alleged that the payments by the company to the associated
companies constituted financial assistance for the purchase of its shares
within the meaning of section 42(2) of the Companies Act 1981. The
writ claimed also a declaration that Brindeel Ltd. held the 19,900 shares
on constructive trust for the company absolutely, and an order for the
payment by Brindeel Ltd. to the company of £71,640, and for damages
for conspiracy. There was also a claim against the majority shareholders
H    and Michael Lewis Carr, the chairman and a non-executive director of
the company (the fourth defendant), for interest under section 35A of
the Supreme Court Act 1981, or under the court's inherent equitable
jurisdiction. Further and other relief and costs were also claimed.

By a notice of motion dated 24 February 1986 the company applied A
for an order pursuant to R.S.C., Ord. 18, r. 19 or under the court's
inherent jurisdiction, that the action be struck out as being frivolous,
vexatious or an abuse of process, on the grounds that the plaintiffs were
not in fact entitled to bring or to continue the same, and that the
plaintiffs do pay the defendants' costs of the action to be taxed. By a
further notice of motion, dated 17 March 1986 the fourth defendant
sought an order, pursuant to R.S.C., Ord. 18, r. 19 or the court's B
inherent jurisdiction, that the action be similarly struck out on the
grounds that the plaintiffs were not in fact entitled to bring the same, or
alternatively that the action was obviously unsustainable against him (the
fourth defendant), and that the plaintiffs do pay the defendant's costs of
the action to be taxed.

The facts are stated in the ruling of 13 November 1986 and in the C
judgment of 19 December 1986.

*Charles Aldous Q.C.* and *Caroline Hutton,* for the company. This
minority shareholders action is brought in respect of allegations of fraud
and breach of duty by directors, allegedly on behalf of all shareholders
other than the alleged wrongdoers. But it is strongly opposed by a D
majority of independent shareholders, and if the action goes ahead, the
company may be killed by kindness ending up a worthless company.
The action has already been before Walton J. (see *Smith v. Croft* [1986]
1 W.L.R. 580) on an application as to whether the plaintiffs should be
allowed to continue the action at the company's expense. It was there
held that it was clear from undisputed facts that the action had little
chance of success and was being prosecuted against the wishes of the E
majority of the independently held shares, and accordingly that it would
be unjust to grant the plaintiffs an indemnity for costs in bringing the
action. Where the company may be damaged, the court should reach a
determination as to the plaintiffs' right to bring this action, at an early
stage.

This is a derivative action; the plaintiffs have no independent cause F
of action of their own. Where minority shareholders seek to recover for
the benefit of the company sums paid away, and the defendants wish to
challenge their locus standi to bring proceedings, on the basis that the
rule in *Foss v. Harbottle* (1843) 2 Hare 461, prevents them from so
doing, the proper procedure is by way of an application for striking out.
It being an abuse of process for a person to bring an action for damages
suffered by another, similarly it is an abuse of process for a minority G
shareholder in the circumstances of this case to bring an action on behalf
of the company. A minority shareholder's right to sue on behalf of the
company presupposes that the company is being controlled by
wrongdoers. Where the company would be damaged by the conduct of
the action, the court should rule upon the plaintiffs' right, if any, at an
early stage. Where a majority of the independent shareholders are
sufficiently informed and oppose the bringing of proceedings, the court H
ought to accede to their views: see *Prudential Assurance Co. Ltd. v.
Newman Industries Ltd. (No. 2)* [1982] Ch. 204, 219, where the Court of
Appeal has given clearly considered views as to the appropriate

A    procedure. The grounds on which the defendants rely are essentially the
     same as those on which they relied before Walton J. [1986] 1 W.L.R.
     580. The plaintiffs are unable to show a sufficient case even if the
     company itself were the plaintiff, they cannot produce evidence of fraud,
     ultra vires or illegality. In any event the action is contrary to the wishes
     of the independent majority of the minority shareholders. [Reference
     was made to *Devlin v. Slough Estates Ltd.* [1983] B.C.L.C. 497]. It
B    would be totally illogical to demand the trial of a preliminary issue
     under R.S.C., Ord. 33, r. 3, which might necessitate hearing a very
     lengthy case in full, before being able to decide if there was a cause of
     action. Most of the relevant facts here are not in dispute, there being no
     real issue over the amounts paid to the directors, by way of salary,
     bonus or expenses.

C        The court is invited to find that there is no prima facie case, even for
     the company, on either fraud, ultra vires or illegality. [Reference was
     made to *Gower, Modern Company Law,* 4th ed. (1979), pp. 641 to 644.]
     A distinction must be drawn between a personal action and a derivative
     one; the former is to restrain ultra vires or illegal acts or to enforce
     entrenched rights of shareholders; the latter to recover money or
     property or damages on behalf of the company, whether in respect of
D    losses already sustained by reason of fraud or breach of duty, or in
     respect of ultra vires or illegal acts. There is no personal action to
     recover money or property already lost by reason of such matters. The
     principle is that where the wrongdoers are in control the court will not
     allow them to stifle the claim, whether based on fraud ultra vires or
     illegality, either by ratification, where the transaction is capable of being
E    ratified, or by resolving not to sue. Although ultra vires transactions
     cannot be ratified, the company through an independent board or by
     shareholders' resolution can compromise proceedings already brought,
     or resolve not to sue, subject always to one proviso, namely that the
     decision taken is for proper reasons in the best interests of the
     shareholders, or maybe the creditors, if the company is on the verge of
     insolvency. Where there is no independent board, then the decision can
F    be left to the shareholders. Where the compromise is bona fide in what
     the board considers to be in the best interests of the company, the
     compromise can bar individual shareholders from suing upon the same
     cause of action. Otherwise once litigation was begun it would have to be
     fought to a finish, unless every single shareholder were to agree to a
     compromise. If the company is under the control of an independent
G    board then no individual shareholder can bring a derivative action at all;
     if there is no independent board then the question must rest with the
     independent shareholders as a body. The only exception is where the
     decision taken is not in the best interests of the company but amounts to
     oppression of or discrimination against the minority; see *Viscount of the
     Royal Court of Jersey v. Shelton* [1986] 1 W.L.R. 985, P.C.; *Pennington's
     Company Law,* 5th ed. (1985), p. 731 and two articles by Mr.
H    Wedderburn on "Shareholders rights and the rule in *Foss v. Harbottle"*
     [1957] C.L.J. 194 and [1958] C.L.J. 93; *Burland v. Earle* [1902] A.C. 83.
     *Atwool v. Merryweather* (1867) L.R. 5 Eq. 464n seems to show that if
     the majority of the independent shareholders had not supported the

action in that case the court would have held the suit to be improperly    A
framed. The only limit on the power of compromise would be where it
would be a fraud on the minority or the creditors. The wrongdoers
cannot use their voting power to oppress the minority; see *Cook v.
Deeks* [1916] 1 A.C. 554, 557, 559–563; *Birch v. Sullivan* [1957] 1
W.L.R. 1247; *Prudential Assurance Co. Ltd. v. Newman Industries Ltd.
(No. 2)* [1981] Ch. 257, 267, 304, 308, 326 and [1982] Ch. 204, 210, 219,
C.A.; *Estmanco (Kilner House) Ltd. v. Greater London Council* [1982]    B
1 W.L.R. 2 and *Devlin v. Slough Estates Ltd.* [1983] B.C.L.C. 497.
There has been some confusion in the authorities between the personal
action, to recover personal loss, i.e. otherwise than through the company
or to enforce the articles of association, and the derivative action, to
recover damage caused to the company. In *Edwards v. Halliwell* [1950]
2 All E.R. 1064, 1065, although it concerns trade unions, the same    C
principles are applicable. The statements of the law in the *Prudential
Assurance v. Newman Industries* and in the *Estmanco* cases are of
general application, although in both cases what was in issue was
breaches of duty. In both those cases the company was the ultimate
master of its action. On the question whether a minority shareholder can
sue on the company's behalf, the onus of proof is not clear, but in the
present case it is contended it matters not where the onus lies, because    D
the evidence is overwhelming. It is necessary to see first in whom the
cause of action is vested: if it is in the company, then the case is subject
to wider considerations as to whether the minority shareholder can sue
on its behalf.

The right of a company, acting through an independent board of
directors or on a resolution of independent shareholders, to stop a    E
derivative action stems from basic principles, and not from the rigid
rules evolved in order to get round the rule in *Foss v. Harbottle,* 2 Hare
461. The basis of the rule is not confined to company law but is of wide
general application. It must be appreciated that a company is free to
decide whether or not to pursue a cause of action vested in it. Despite
the rule in *Foss v. Harbottle* individual shareholders are entitled to have
the company's memorandum and articles of association observed, under    F
which shareholders have entrenched rights. An action to recover loss
already sustained by the company, however it arises, is vested in the
company, and can only be brought by individual shareholders on the
company's behalf in certain circumstances. No personal action for such
loss can be brought by an individual shareholder, the derivative action
being a purely procedural device. The only circumstances in which an    G
individual shareholder can sue, on the company's behalf, are cases
where the company has failed or refused to do so, and where the loss
has been sustained by ultra vires or illegal acts, or otherwise by a fraud
on a minority. In each case the rationale behind the exception is because
the act cannot be ratified either wholly or by those directly implicated.
The rationale for both exceptions is that a shareholder is entitled to vote
according to his own vested interests, and to ratify, retrospectively,    H
matters complained of.

As a matter of general principle in company law, whether the
transaction complained of can be ratified or not, a company acting

A   through an independent board of directors, or pursuant to a resolution passed by a majority of independent shareholders can always compromise—or can waive the cause of action vested in it, provided only it does so for good practical reasons in what the board or the shareholders believe to be the company's best interests: see *Viscount of the Royal Court of Jersey v. Shelton* [1986] 1 W.L.R. 985. Such a compromise in waiver binds every shareholder, and defeats an action

B   already commenced. A plaintiff in a derivative action can be in no better position than the company itself; in the present case if a meeting were to be convened and a resolution passed by a majority of disinterested shareholders free from manipulation by the wrongdoers, then the present proceedings should be discontinued: it would plainly be wrong for the action to proceed. There is no prima facie case that the

C   company would succeed.

    Walton J. was right in saying that the present case is primarily concerned with remuneration of directors. Payments made to them were undoubtedly ultra vires. While a company has the capacity to pay a fair and reasonable level of remuneration, to pay directors an excessive amount might well be fraud on a minority. [Reference was made to *In re George Newman & Co.* [1895] 1 Ch. 674; *In re Halt Garage (1964)*

D   *Ltd.* [1982] 3 All E.R. 1016, 1023–1033, 1039; *In re Horsley & Weight Ltd.* [1892] Ch. 442, 445, 448, 450, 452, 454, 455 and *Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation* [1986] Ch. 246.] The articles give the directors power to fix their own remuneration, but a director's duty is nevertheless to act bona fide in what they consider to be in the interests of the company: *In re Smith & Fawcett Ltd.* [1942]

E   Ch. 304. The court will only interfere if no reasonable board of directors could have concluded that the level of remuneration was justified. *Palmer's Company Law,* 23rd ed. (1982), vol. 1, p. 851, paras. 64–66. No credible evidence as to the proper level in this field. Not only were the payments not ultra vires, they were in fact proper. Apart from a period in 1980–1981 all payments were disclosed at properly convened meetings. The following principles apply to voting:—(1) every shareholder

F   has a right to vote even though he has a direct personal interest, provided it is for the benefit of the general body of shareholders and not a fraud on creditors. (2) If validly authorised the act becomes the act of the company and no shareholder can therefore complain. (3) The onus of showing impropriety rests with the party attacking it. (4) To succeed the attacker must prove that no honest and intelligent person could have

G   thought that the level of remuneration paid to him was reasonable. (5) It is not the court's function to enter into the commercial field and to decide what is in the company's best interests. (6) The plaintiffs must be able to show a prima facie case. (7) The right of an interested shareholder to vote is in contrast to the case where there has been proven fraud or abuse of power, in which case the court will disregard their votes. [Reference was made to *North-West Transportation Co. Ltd.*

H   *v. Beatty* (1887) 12 App. Cas. 589; *Allen v. Gold Reefs of West Africa Ltd.* [1900] 1 Ch. 656; *Greenhalgh v. Arderne Cinemas Ltd.* [1951] Ch. 286 and *Dominion Cotton Mills Co. Ltd. v. Amyot* [1912] A.C. 546, 549, 551, 553.]

The only issue is whether the plaintiffs have shown a sufficient prima    A
facie case that the payments were so excessive as to be fraud, so that the
defendants, as shareholders, could not honestly have believed them to
be justified. [Reference was made to *Multinational Gas and Petrochemical
Co. v. Multinational Gas and Petrochemical Services Ltd.* [1983] Ch. 258
and *Gore-Browne on Companies,* 44th ed. (1986), vol. 2, para. 27.21.2.]
Unless a decision of the shareholders is unanimous, an individual
shareholder is entitled to complain of alleged fraud on a minority. Since    B
the level of remuneration was opposed not only by the defendants but
by Wren Trust Ltd., the plaintiffs would have to show mala fides or
manipulation in respect of disinterested votes. If they cannot show
either, then there is no logical reason to ascribe dishonesty to the
defendants, when disinterested shareholders who agree with them are
acting properly. [Reference was made to *In re Duomatic Ltd.* [1969] 2    C
Ch. 365; *Buckley on the Companies Acts,* 14th ed. (1981), vol. 2,
p. 1594.] Even if some of the payments for some technical reason were
not authorised at the time, they were subsequently ratified, which
operates retrospectively: *Halsbury's Laws of England,* 4th ed. (1973),
vol. 1, para. 768.

*David Oliver Q.C.* for the fourth defendant. The arguments advanced
by Mr. Aldous are adopted. It is fundamental that the court will not    D
interfere with the internal management of a company, in the absence of
mala fides: *Burland v. Earle* [1902] A.C. 83. It is a corollary of the
majority rule. Exceptions to this general rule are where the company is
proposing to do some illegal act: this is logical since however large the
majority it cannot authorise an illegal act, and the same applies in the
case of ultra vires acts. No amount of authorisation can confer a    E
capacity, which it does not possess. Once an ultra vires act has been
done, the position is different. It is inappropriate, in the absence of bad
faith, for the court to interfere in the decision as to what is to be done
about what has happened. In so far as *Pennington's Company Law,* 5th
ed. (1985) or Vinelott J. in the *Prudential Assurance v. Newman
Industries* case [1981] Ch. 229 suggests otherwise, it is not supportable
either on principle or on authority: the propositions there advanced are    F
not supported by either: see *Spokes v. Grosvenor and West End Railway
Terminus Hotel Co. Ltd.* [1897] 2 Q.B. 124, 126, 128 and *Salomons v.
Laing* (1850) 12 Beav. 377, 381 or *Edwards v. Halliwell* [1950] 2 All
E.R. 1064.

The real question is capable of a relatively simple formulation,
namely, when will the court oppose the wishes of the majority.    G
[Reference was made to *Clemens v. Clemens Bros. Ltd.* [1976] 2 All
E.R. 268.] There are situations where sectional interests will deprive the
votes cast of their validity. In this case the decision of Wren Trust Ltd.
and Gresham Trust Ltd. are devoid of any sectional interests being
merely for the protection of Wren's investment. Their votes are therefore
not vitiated. The decision should not rest those shareholders who are
not defendants in the action. [Reference was made to *Lawrance v. Lord*    H
*Norreys* (1890) 15 App.Cas. 210, 215. Vinelott J.'s judgment in
*Prudential Assurance Co. Ltd. v. Newman Industries Ltd.* [1981] Ch.
229, 307 was criticised in the Court of Appeal but it actually contains a

A    very sound analysis of the position: apart from his misreading of *Edwards v. Halliwell* [1950] 2 All E.R. 1064, and the justice of the case his judgment stands unblemished by the criticism. The plaintiffs' allegations of fraud etc. cannot be maintained. [Reference was made to *Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373.]

     *Robin Potts Q.C.* and *Daniel Serota* for the plaintiffs. The present applications are utterly misconceived. It is wholly inappropriate to

B    proceed by way of striking out under R.S.C., Ord. 18, r. 19, when what it is sought to contend is that the proceedings are suitable to be brought under the rule in *Foss v. Harbottle*, 2 Hare 461. The correct procedure, where a *Foss v. Harbottle* point is raised, is for the determination of an issue of law or fact. The Court of Appeal has specifically so stated in *Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2)* [1982]

C    Ch. 204. But no application has been made for trial of a preliminary issue. Such a trial is only available where there is a particular issue which can be precisely and readily defined, and which in isolation can effectively determine the action. That is not the position here. Virtually all the issues of fact or law arising in this case have been covered in argument by the defendants and there is no single issue that could determine the action. There has to be an order of court, deciding the

D    trial of a preliminary issue under R.S.C., Ord. 33, r. 3. In *Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2)* [1982] Ch. 204 the issue was one of law, and in a limited respect, one of fact, the issue of law being whether Prudential could proceed with their action where there was no allegation in the pleadings, of control by wrongdoers, the issue of fact was whether the wrongdoers were in fact in control, since

E    they were not in control so far as voting was concerned. The issue in the present case is quite different; it involves a counting of heads in two stages, stage 1 being to ascertain whether the wrongdoers are in control, and stage 2 a counting of heads amongst the majority. This gives rise to a plethora of issues, both legal and factual.

     The issues include the following: (i) Can a larger disinterested majority stop a smaller minority from suing on the company's behalf? (ii) If yes,

F    does the Wren Trust fulfil that position of disinterestedness? and (iii) What does the word "disinterested" or "independent" mean in law?

     The plaintiffs contend that any one shareholder is entitled either to an injunction restraining an ultra vires transaction, or to a declaration that a transaction, if not yet implemented, would be ultra vires, or, if already completed, was ultra vires, and, where already completed, that the

G    plaintiffs are entitled to make the wrongdoing directors liable to compensate the company, or to make restitution, in that they are accounting parties. A minority shareholder is also entitled to maintain an action for "rescission." The plaintiffs contend that the moneys paid away were not remuneration or fees for services rendered, but were simply improper withdrawals. Questions of fact are involved as to the nature of any obligation to make the payments in question and as to the

H    state of mind of the payer in making the payment. The minority shareholders' right to maintain such an action is an individual right, although the relief claimed is payment to the company. Here the plaintiffs seek to have the payments set aside; where wrongdoers are in

control, there should be no counting of heads as to the minority. The A court does not have any supervisory role, where the claim is by a minority shareholder and the wrongdoers are in control. It would not be appropriate to direct the trial of a preliminary issue, where the facts are in dispute. [Reference was made to *Western Steamship Co. Ltd. v. Amaral Sutherland & Co. Ltd.* [1914] 3 K.B. 55; *M. Isaacs and Sons Ltd. v. Cook* [1925] 2 K.B. 391; *National Real Estate and Finance Co. Ltd. v. Hassan* [1939] 2 K.B. 61 and *Morris v. Sanders Universal* B *Products* [1954] 1 W.L.R. 67, 73.] It is hotly disputed that Wren Trust Ltd. can be regarded as independent or disinterested, the court could not be satisfied on this point without cross examination and discovery.

It is undesirable to decide a point of law which involves underlying facts which are in dispute: *Windsor Refrigerator Co. Ltd. v. Branch Nominees Ltd.* [1961] Ch. 375; *Richards v. Naum* [1967] 1 Q.B. 620; C *Nissan v. Attorney-General* [1970] A.C. 179; *Tilling v. Whiteman* [1980] A.C. 1; *Radstock Co-operative and Industrial Society Ltd. v. Norton-Radstock Urban District Council* [1968] Ch. 605; *Lawrance v. Lord Norreys,* 15 App.Cas. 210 and *Wenlock v. Moloney* [1965] 1 W.L.R. 1238, 1242.]

Unless there is no doubt about the factual position, as set out in the affidavits, one should not be looking at the affidavits at all. [Reference D was made to *Goodson v. Grierson* [1908] 1 K.B. 761, 766 and *Williams & Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.* [1986] A.C. 368, 416, 434, 436, 441.] A striking out application is inappropriate unless it is going to determine the substantive issues. [Reference was made to *City of London Corporation v. Horner* (1914) 111 L.T. 512, 514 and *Electrical Development Co. of Ontario v. Attorney-General for Ontario* E [1919] A.C. 687.] In determining whether Wren Trust Ltd. is an independent shareholder it is essential to know the motives for their expressed opposition.

The striking out procedure is wholly inappropriate, because the question is not plain and obvious: *Salomons v. Laing,* 12 Beav. 377; *Bagshaw v. Eastern Union Railway Co.* (1849) 7 Hare 114; *Russell v. Wakefield Waterworks Co.* (1875) L.R. 20 Eq. 474, 481, 482. [Reference F was also made to *W. E. Paterson, H. A. Ednie & H. A. J. Ford on Australian Company Law* (Butterworths) 33/12; *Hichens v. Congreve* (1828) 4 Russ. 562; *Mozley v. Alston* (1847) 1 Ph. 790, 798, 801; *Lord v. Governor and Company of Copper Miners* (1848) 2 Ph. 740, 747, 748, 751, 752.] In *Burt v. British Nation Life Assurance Association* (1859) 4 De G. & J. 158, 174, Knight Bruce L.J. contemplates the possibility of a G single shareholder bringing an action on behalf of himself and all other shareholders, although all the others were against it. [Reference was made to *Simpson v. Westminster Palace Hotel Co.* (1860) 8 H.L. Cas. 712, 714, 716–719; *Davidson v. Tulloch* (1860) 3 Macq. 783, 786, 789, 791, 796; *Orr v. Glasgow, Airdrie and Monklands Junction Railway Co.* (1860) 3 Macq. 799, 802; *Gregory v. Patchett* (1864) 33 Beav. 595, 597.] If something is ultra vires, an individual shareholder has an individual H right to sue for compensation, on behalf of the company: *Hoole v. Great Western Railway Co.* (1867) L.R. 3 Ch.App. 262, 266–268, 272, 274; *Clinch v. Financial Corporation* (1868) L.R. 5 Eq. 450, 469, 474, 482

A    and L.R. 4 Ch.App. 117, 120, 122; *Gray v. Lewis* (1869) L.R. 8 Eq.
     526, 534, 536, 539, 541 and (1873) L.R. 8 Ch.App. 1035, 1049, 1050,
     1051 and *Pickering v. Stephenson* (1872) L.R. 14 Eq. 322, 329, 331.

          *Aldous Q.C.* in reply on procedure. Pure question of law can be
     decided on motion. *Prudential Assurance Co. Ltd. v. Newman Industries
     Ltd. (No. 2)* [1982] Ch. 204 was not concerned with control, since the
     wrongdoers did not have voting control. The real issue was whether the
B    board was independent, or was being manipulated: could they safely be
     relied on to decide whether the action should go ahead? It cannot be
     right to argue that complex questions of law have to go to trial. The
     plaintiffs must show a prima facie case, otherwise the proceedings must
     be struck out. The court has to ask the same questions, whether the
     procedure is by striking out under R.S.C., Ord. 18, r. 19, or is by way
C    of trial of a preliminary issue under R.S.C., Ord. 33. [Reference was
     made to *Dominion Cotton Mills Co. Ltd. v. Amyot* [1912] A.C. 546 and
     *Carter v. Commissioner of Police of the Metropolis* [1975] 1 W.L.R.
     507].

          *Oliver Q.C.* in reply on procedure. Strong objection is taken to
     allegations of mala fides, which appears nowhere in any sworn evidence
     of the plaintiffs. Either the striking out procedure or the trial of a
D    preliminary issue would be appropriate. But striking out would be the
     better procedure. [Reference was made to *Russian Commercial and
     Industrial Bank v. Comptoir D'Escompte de Mulhouse* [1925] A.C. 112,
     119.]

          *Potts Q.C.* in rejoinder. There is a clear confusion between the ambit
     of R.S.C., Ord. 18, r. 19 and R.S.C., Ord. 33, the latter being a trial.
E    In the former case the burden of proof lies on the applicant (i.e. the
     defendant here). [Reference was made to *Daniels v. Daniels* [1978] Ch.
     406 and *Carter v. Commissioner of Police of the Metropolis* [1975] 1
     W.L.R. 507.]


          13 November 1986. KNOX J. I have to give a ruling in relation to
F    two motions that are before me. The first is a motion by the ninth
     defendant, Film Finances Ltd. ("the company") for an order pursuant to
     R.S.C., Ord. 18, r. 19, or under the inherent jurisdiction of the court
     that this action be struck out as being frivolous or vexatious or an abuse
     of the process of the court on the ground that, the proceedings being
     purportedly brought by the plaintiffs on behalf of the ninth defendant,
G    the plaintiffs are in fact not entitled to bring or continue the same.
     There is an application with regard to costs.

          The other notice of motion is one by the fourth defendant, Michael
     Lewis Carr, in terms very similar to the first motion, for an order
     pursuant to R.S.C., Ord. 18, r. 19 or under the inherent jurisdiction,
     that this action be struck out as being frivolous or vexatious or an abuse
     of the process of the court on the grounds that the proceedings being
H    purportedly brought by the plaintiffs on behalf of the ninth defendant,
     the plaintiffs are in fact not entitled to bring or continue the same, and
     then there is an additional ground: "alternatively that the same is
     obviously unsustainable against the fourth defendant." I am not

concerned, in relation to this ruling, with that second ground in the    A
second notice of motion.

The ruling which I have to make falls really into two parts. First, is
the procedure, which it will be seen has been adopted by those two
defendants, an application under R.S.C., Ord. 18, r. 19 and the inherent
jurisdiction, appropriate at all to this type of proceeding? Secondly, if
that question is answered in the affirmative, should these two applications
be dismissed because the questions raised thereby do not have plain and    B
obvious answers? It is not disputed but that difficult questions of law
arise. If the right test to apply is that the applications should be
dismissed unless the court is satisfied that the plaintiffs are bound to fail
in the action without going in detail into the legal issues raised, then it is
not disputed but that that test is not satisfied. It is common ground
between the parties, and those familiar with the complications of the    C
rule in *Foss v. Harbottle* (1843) 2 Hare 461 will not find this a matter of
surprise, that difficult questions do arise.

I have not heard full argument from the respondents to the notices
of motion, the plaintiffs in the action, on these issues of law, or on the
issue of fact which I will mention in a moment. In those circumstances I
do not propose to say anything about such preliminary views as I may
have formed regarding those issues, whether of law or of fact. The    D
action is one brought by the three plaintiffs, who are minority
shareholders in the company, in respect of payments that have been
made out of the company's funds and which, for a variety of reasons,
the plaintiffs claim were improperly paid, and should be recouped to the
company. The action has in fact been before the court already, and was
the subject of a decision by Walton J. on 27 January 1986: see *Smith*    E
*v. Croft* [1986] 1 W.L.R. 580. By that decision Walton J. discharged
some earlier orders that were made by Master Chamberlain. The first of
those earlier orders authorised the plaintiffs to bring these proceedings,
down to the conclusion of discovery and inspection of documents, on
terms that the company should indemnify the plaintiffs against the costs,
putting it shortly. The master's later order was ancillary to that earlier
one, and authorised the plaintiffs to have periodic taxation, and for a    F
payment to them of the proportion of the costs thereby certified by the
taxing master. Those orders were made on the authority of the Court of
Appeal's decision in *Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373.

On 3 July 1986 leave to appeal from Walton J.'s order was granted
by a single judge of the Court of Appeal, May L.J., who said:

"I think I had better direct that this appeal [should] not be heard    G
until after the application to strike out,"—which is the application
before me—"because if it is struck out then, as I have said, the
question does not arise, and this appeal falls naturally by the
wayside. To the extent that it is struck out [it] may affect the exercise
of the Court of Appeal's discretion if they come to the conclusion
that the judge below exercised his discretion wrongly so that they    H
have the opportunity of exercising their own."

It is, therefore, necessary that this application be disposed of, at least
unless there is some serious delay for external reasons, before the

A   appeal, which is pending in the Court of Appeal from that decision of Walton J., is heard.

The issues in the action need not be analysed in any detail for the purposes of this application, but it is desirable that I should state briefly what seem to me to be the issues that arise in the application to strike out, assuming of course that it proceeds. There are two issues of law and one of fact. The first issue of law can perhaps be stated in this way.

B   Are actions to recover money paid away ultra vires by a company altogether outside the rule in *Foss v. Harbottle*, 2 Hare 461, so that even one shareholder can bring such actions? I interpose to mention that it is not disputed but that actions to restrain threatened ultra vires acts do fall within that category of cases outside the rule in *Foss v. Harbottle.* But the issue that arises between the parties is how far that state of

C   affairs obtains in relation to past and completed transactions.

The second issue arises if the first is answered in the negative, and it can be stated in this way. Should the views of an independent majority of shareholders, on the question whether the action should proceed, prevail, if all the votes, either controlled or exercised or influenced by those accused of wrongdoing, are excluded from the computation, so that only independent votes are counted? If that question is answered in

D   the affirmative then a question of fact would appear to arise, namely whether the votes of one particular shareholder, Wren Trust Ltd., should be treated as being independent for the purposes of that exercise.

The procedure which has been sought to be followed by the two defendants who issued notices of motion, is based firmly, and indeed I think exclusively, on what fell from the Court of Appeal in *Prudential*

E   *Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2)* [1982] Ch. 204. I do not propose to read the very lengthy headnote in that case, which was also concerned with the rule in *Foss v. Harbottle*, but which was in fact concerned with a case where there was quite clearly no voting control. That is different from this case, where equally clearly the defendants in these proceedings do have voting control. Also it was a case where there was no allegation of ultra vires as such, as a principal

F   issue in the action. But the Court of Appeal, after an examination of what the rule in *Foss v. Harbottle* was about, said, at p. 219:

"It is commonly said that an exception to the rule in *Foss v. Harbottle* arises if the corporation is 'controlled' by persons implicated in the fraud complained of, who will not permit the name of the company to be used as plaintiffs in the suit: see *Russell*

G   *v. Wakefield Waterworks Co.* (1875) L.R. 20 Eq. 474, 482. But this proposition leaves two questions at large, first, what is meant by 'control,' which embraces a broad spectrum extending from an overall absolute majority of votes at one end, to a majority of votes at the other end, made up of those likely to be cast by the delinquent himself plus those voting with him as a result of influence or apathy. Secondly, what course is to be taken by the court if, as

H   happened in *Foss v. Harbottle*, in the *East Pant Du* case (1864) 2 Hem. & M. 254 and in the instant case, but did not happen in *Atwool v. Merryweather* (1867) L.R. 5 Eq. 464n, the court is confronted by a motion on the part of the delinquent or by the

company, seeking to strike out the action? For at the time of the A
application the existence of the fraud is unproved. It is at this point
that a dilemma emerges. If, upon such an application, the plaintiff
can require the court to assume as a fact every allegation in the
statement of claim, as in a true demurrer, the plaintiff will frequently
be able to outmanoeuvre the primary purpose of the rule in *Foss v.
Harbottle* by alleging fraud and 'control' by the fraudster. If on the
other hand the plaintiff has to prove fraud and 'control' before he B
can establish his title to prosecute his action, then the action may
need to be fought to a conclusion before the court can decide
whether or not the plaintiff should be permitted to prosecute it. In
the latter case the purpose of the rule in *Foss v. Harbottle*
disappears. Either the fraud has not been proved, so cadit quaestio;
or the fraud has been proved and the delinquent is accountable C
unless there is a valid decision of the board or a valid decision of
the company in general meeting, reached without impropriety or
unfairness, to condone the fraud.

    "We think that this brief look at the authorities is sufficient for
present purposes. For it so happens that this court cannot properly
on this appeal decide the scope of the exception to the rule in *Foss
v. Harbottle.*" D

And then the Court of Appeal goes on to explain the reason why that
was so, which is special to that case, and put quite briefly it was that the
company decided to adopt the action at the end of the day. Passing over
those two paragraphs I pick it up at p. 220:

    "It was in the light of these considerations that we declined to hear E
any argument from Mr. Caplan and Mr. Curry on the topic of *Foss
v. Harbottle.* However desirable it might be in the public interest
that we should express our conclusions on Vinelott J.'s analysis of
the rule in *Foss v. Harbottle* and what he saw as the exception to
it, it was necessary for us to bear in mind that the rule had ceased
to be of the slightest relevance to the case. It would have been a
grave injustice to all parties to increase the already horrendous costs F
of this litigation by allowing time for argument on an interesting but
irrelevant point. Such consideration of the law as appears in this
judgment is, apart from a few submissions made by Mr. Bartlett,
merely a reflection of our own thoughts without the benefit of
sustained argument.

    "In the result it would be improper for us to express any G
concluded view on the proper scope of the exception or exceptions
to the rule in *Foss v. Harbottle.* We desire, however, to say two
things. First, as we have already said, we have no doubt whatever
that Vinelott J. erred in dismissing the summons of 10 May 1979.
He ought to have determined as a preliminary issue whether the
plaintiffs were entitled to sue on behalf of Newman by bringing a
derivative action. It cannot have been right to have subjected the H
company to a 30-day action (as it was then estimated to be) in order
to enable him to decide whether the plaintiffs were entitled in law
to subject the company to a 30-day action. Such an approach

A

defeats the whole purpose of the rule in *Foss v. Harbottle* and sanctions the very mischief that the rule is designed to prevent. By the time a derivative action is concluded, the rule in *Foss v. Harbottle* can have little, if any, role to play. Either the wrong is proved, thereby establishing conclusively the rights of the company; or the wrong is not proved, so cadit quaesio. In the present case a board, of which all the directors save one were disinterested, with

B

the benefit of the Schroder-Harman report, had reached the conclusion before the start of the action that the prosecution of the action was likely to do more harm than good. That might prove a sound or unsound assessment, but it was the commercial assessment of an apparently independent board. Obviously the board would not have expected at that stage to be as well informed about the

C

affairs of the company as it might be after 36 days of evidence in court and an intense examination of some 60 files of documents. But the board clearly doubted whether there were sufficient reasons for supposing that the company would at the end of the day be in a position to count its blessings; and clearly feared, as counsel said, that it might be killed by kindness. Whether in the events which have happened Newman (more exactly the disinterested body of

D

shareholders) will feel that it has all been well worth while, or must lick its wounds and render no thanks to those who have interfered in its affairs, is not a question which we can answer. But we think it is within the bounds of possibility that if the preliminary issue had been argued, a judge might have reached the considered view that the prosecution of this great action should be left to the decision of

E

the board or of a specially convened meeting of the shareholders, albeit less well informed than a judge after a 72-day action.

"So much for the summons of 10 May. The second observation which we wish to make is merely a comment on Vinelott J.'s decision that there is an exception to the rule in *Foss v. Harbottle* whenever the justice of the case so requires. We are not convinced that this is a practical test, particularly if it involves a full-dress trial

F

before the test is applied. On the other hand we do not think that the right to bring a derivative action should be decided as a preliminary issue upon the hypothesis that all the allegations in the statement of claim of 'fraud' and 'control' are facts, as they would be on the trial of a preliminary point of law. In our view, whatever may be the properly defined boundaries of the exception to the rule, the plaintiff ought at least to be required before proceeding

G

with his action to establish a prima facie case (i) that the company is entitled to the relief claimed, and (ii) that the action falls within the proper boundaries of the exception to the rule in *Foss v. Harbottle.* On the latter issue it may well be right for the judge trying the preliminary issue to grant a sufficient adjournment to enable a meeting of shareholders to be convened by the board, so

H

that he can reach a conclusion in the light of the conduct of, and proceedings at, that meeting."

There is there, of course, a reference to the summons of 10 May, and it appears from the report of the decisions at first instance, the first of the

two, by Vinelott J., what the nature of that summons was. In the same A
case, *Prudential Assurance Co. Ltd. v. Newman Industries Ltd.* [1981]
Ch. 229, 233, one finds:

> "In those circumstances"—that is the circumstances that obtained at
> the beginning of the proceedings—"the second and third defendants
> took out a summons asking for an order, under R.S.C., Ord. 33,
> r. 3, that it be determined as a preliminary issue whether as a B
> matter of law the plaintiff was entitled to maintain the action
> against them. A similar application was made by T.P.G."

There is therefore, as it seems to me, no doubt but that Mr. Potts is
right in submitting that what was before the Court of Appeal was a
summons under R.S.C., Ord. 33. There was in fact no appeal on that
summons, but it was that summons that they were concerned with in C
making the references to preliminary issue so far as those proceedings
were concerned.

Mr. Potts further submitted that the fact that the onus of proof is
clearly cast, in that passage which I have read from the Court of
Appeal, on the plaintiffs of showing a prima facie case on those two
matters indicates that it was a reference to the procedure under R.S.C.,
Ord. 33, r. 3 rather than that under R.S.C., Ord. 18, r. 19 that the D
Court of Appeal had in mind. R.S.C., Ord. 18, r. 19 reads:

> "(1) The court may at any stage of the proceedings order to be
> struck out or amended any pleading or the indorsement of any writ
> in the action, or anything in any pleading or in the indorsement, on
> the ground that—(a) it discloses no reasonable cause of action . . .
> or (b) it is scandalous, frivolous or vexatious; or (c) it may E
> prejudice, embarrass or delay the fair trial of the action; or (d) it is
> otherwise an abuse of the process of the court; and may order the
> action to be stayed or dismissed or judgment to be entered
> accordingly, as the case may be. (2) No evidence shall be admissible
> on an application under paragraph (1)(a)." That is, that it discloses
> no reasonable cause of action or defence as the case may be. F

The whole of R.S.C., Ord. 33 is preceded by the heading "Place and
mode of trial" and rule 3, under a heading "Time, etc. of trial of
questions or issues," provides:

> "The court may order any question or issue arising in a cause or
> matter, whether of fact or law or partly of fact and partly of law,
> and whether raised by the pleadings or otherwise, to be tried G
> before, at or after the trial of the cause or matter, and may give
> directions as to the manner in which the question or issue shall be
> stated."

Mr. Aldous and Mr. Oliver have submitted to me that the proper
procedure in such a case as this, where minority shareholders are
seeking to bring an action to recover for the benefit of the company in H
which they are shareholders sums paid away and the defendants wish to
challenge that on the basis that the rule in *Foss v. Harbottle*, 2 Hare 461
prevents such a proceeding, is for there to be an application by way of

A    striking out, mainly on the ground that this is the appropriate relief in relation to a challenge to the locus standi of a plaintiff, and that it is the inevitable result if the application succeeds. Secondly they submit that the Court of Appeal has given clearly considered views of the procedure, which they submitted were not intended to refer to Ord. 33, r. 3. In reliance on that, they pointed to the reference to striking out in a passage which I have in fact read in *Prudential Assurance Co. Ltd. v.*

B    *Newman Industries Ltd. (No. 2)* [1982] Ch. 204, 219, the actual sentence being:

> "Secondly, what course is to be taken by the court if, as happened in *Foss v. Harbottle*, in the *East Pant Du* case, 2 Hem. & M., 254 and in the instant case, but did not happen in *Atwool v. Merryweather*, L.R. 5 Eq. 464n the court is confronted by a motion
>
C    > on the part of the delinquent or by the company, seeking to strike out the action?"

And at that point they submitted that the Court of Appeal was clearly contemplating what must at its lowest be a possible form of procedure. Equally they pointed to an earlier passage which I have not read but which is quite short, which shows the sort of procedure that the Court of

D    Appeal contemplated, at p. 212:

> "The assertion by Newman's counsel that the independent board 'was powerless to prevent the Prudential from pursuing the action' may have been based on the supposition that the plaintiffs had on the facts alleged in the statement of claim a personal cause of action for damages against Mr. Bartlett and Mr. Laughton independently

E    > of Newman's cause of action for damages. This supposition, if it existed, was erroneous for reasons which we explain later. It would have been open to Newman to have issued its own summons before the trial in order to test the right of the Prudential to pursue a derivative action, and to have supported it with evidence proving the objectiveness of the board's view and explaining the potential injury to Newman which would be caused by the proceedings."

F    That, they say, indicates the sort of procedure which the Court of Appeal envisaged as a possibility.

There has been a decision of the House of Lords, in connection with the interrelationship between R.S.C., Ord. 33, r. 3 and R.S.C., Ord. 18, r. 19. The decision is *Williams and Humbert Ltd. v. W. & H. Trade*

G    *Marks (Jersey) Ltd.* [1986] A.C. 368, and there is a passage in the speech of Lord Templeman, at p. 435:

> "In *Hubbuck & Sons Ltd. v. Wilkinson* [1899] 1 Q.B. 86 Sir Nathaniel Lindley M.R. pointed out the distinction between Ord. 18, r. 19 (then Ord. xxv, r. 4), which dealt with striking out and Ord. 33, r. 3 (then Ord. xxv, r. 2), which enables a point of law to be set down and argued as a preliminary issue. He said, at p. 91:

H    > 'Two courses are open to a defendant who wishes to raise the question whether, assuming a statement of claim to be proved, it entitles the plaintiff to relief. One method is to raise the question of law as directed by Ord. xxv, r. 2; the other is to apply to strike out

the statement of claim under Ord. xxv, r. 4. The first method is     A
appropriate to cases requiring argument and careful consideration.
The second and more summary procedure is only appropriate to
cases which are plain and obvious, so that any master or judge can
say at once that the statement of claim as it stands is insufficient,
even if proved, to entitle the plaintiff to what he asks.' The
observations of Lindley M.R. directed to striking out a statement of
claim apply equally to applications to strike out a defence or part of     B
a defence. There has been recently a difference of judicial approach
to the construction of Ord. 18, r. 19. In *McKay v. Essex Area
Health Authority* [1982] Q.B. 1166, the majority of the Court of
Appeal (Stephenson and Ackner L.JJ.) cited with approval the
observations of Sir Gordon Willmer in *Drummond-Jackson v.
British Medical Association* [1970] 1 W.L.R. 688, 700 where he said:     C
'The question whether a point is plain and obvious does not depend
upon the length of time it takes to argue. Rather the question is
whether, when the point has been argued, it has become plain and
obvious that there can be but one result.' On the other hand,
Griffiths L.J. dissented on the point in *McKay v. Essex Area Health
Authority* [1982] Q.B. 1166 and said, at p. 1191: 'If on an application
to strike out as disclosing no cause of action a judge realises that he     D
cannot brush aside the argument, and can only decide the question
after a prolonged and serious legal argument, he should refuse to
embark upon that argument and should dismiss the application
unless there is a real benefit to the parties in determining the point
at that stage. For example, where striking out the cause of action
will put an end to the litigation a judge may well be disposed to     E
embark on a substantial hearing because of the possibility of finally
disposing of the action. But even in such a case the judge must be
on his guard that the facts as they emerge at the trial may not make
it easier to resolve the legal question.' My Lords, if an application
to strike out involves a prolonged and serious argument the judge
should, as a general rule, decline to proceed with the argument
unless he not only harbours doubts about the soundness of the     F
pleading but, in addition, is satisfied that striking out will obviate
the necessity for a trial or will substantially reduce the burden of
preparing for trial or the burden of the trial itself. In the present
case, the general rule would seem to require a refusal by the judge
to embark on the problems of international law involved in the
present appeal, leaving those problems to be solved at the trial if     G
they become material. If at the trial the appellants were cleared of
any impropriety in their management of the affairs of the Rumasa
group, then the problems of international law would not arise.
Moreover, even if those problems did arise I do not believe that the
length of time, namely seven days, occupied by the judge in
deciding to strike out the pleadings would have been added to the
time required to decide other issues. But there are special     H
circumstances which, in my view, made it right for the judge to
proceed and to make the order which he made. If the appellants'
pleadings and particulars had not been struck out, the appellants

A would have proceeded to demand discovery before trial and to lead evidence at the trial, harassing to the plaintiffs and embarrassing to the court and designed to support the allegations and insinuations of oppression and bad faith on the part of the Spanish authorities which appear in the amended defences and particulars. These allegations are irrelevant to the trade marks action and the banks' action and are inadmissible as a matter of law and comity and were

B rightly disposed of at the first opportunity."

In my judgment it appears from what fell from Lord Templeman in that case, that even in the type of case where the issue in the preliminary application is one of the issues in the action, there may be circumstances which overall justify the use of Ord. 18, r. 19 where equally Ord. 33,

C r. 3 might serve. It depends in my judgment on the particular facts of the particular case.

A further point which was relied upon by Mr. Aldous and Mr. Oliver was that the parties were in this case armed and prepared both with leading counsel and a multitude of books to argue the issues which were clear to them some time before the proceedings came before me, and that it was only at the last moment that an objection to the form of

D procedure was made. I do not regard that as a determinant factor in any sense since either the point is a good one or it is not, and the lateness with which it was in fact taken does not impinge on that. On the other hand, it is capable of being relevant that the issues were sufficiently defined for the parties to prepare themselves, and that the matter was organised for trial by earlier applications on the notices of motion when

E the time of trial was estimated without doubts being raised as to the propriety of the procedure.

I am satisfied that the statements which I have read in the Court of Appeal as to the procedure to be adopted in these matters, although plainly obiter as was in fact conceded, should be regarded by me as a guide to be followed as faithfully as possible. In my judgment, as a matter of procedural law, either Ord. 18, r. 19 or Ord. 33, r. 3 is a

F potentially possible vehicle for such an application as is involved in the present case to decide whether a plaintiff minority shareholder has the necessary locus standi. But for present purposes it is sufficient for my decision to hold, as I do, that the procedure under Ord. 18, r, 19 is not of itself an impossible procedure which leads to an application, made under that rule or under the inherent jurisdiction, to be struck out as

G being evidently improper. It seems to me that although the Court of Appeal undoubtedly had Order 33 procedure before it in the form of the summons in relation to which they were discussing the propriety of what had happened below, their guidance was intended to be general in relation to minority shareholders' actions, and on that basis I find that the procedure is not inherently defective.

H That leads me to the second of the two issues with which I am faced, and that is the effect of the answer to the problems that are raised not being plain or obvious. Mr. Potts has relied on two separate lines of very well established authority, one on Ord. 18, r. 19, which is summarised conveniently at p. 305 of *The Supreme Court Practice 1985*

under the rubric "Exercise of powers under this rule," the note being   A
numbered 18/19/3, where the text reads:

> "It is only in plain and obvious cases that recourse should be had to
> the summary process under this rule . . . The summary procedure
> under this rule can only be adopted when it can be clearly seen that
> a claim or answer is on the face of it 'obviously unsustainable' . . .
> The summary remedy under this rule is only to be implied in plain   B
> and obvious cases when the action is one which cannot succeed or is
> in some way an abuse of the process or the case unarguable . . . It
> cannot be exercised by a minute and protracted examination of the
> documents and facts of the case, in order to see whether the
> plaintiff really has a cause of action . . ."

As a typical example of this type of authority he cited, along with other   C
cases, the decision in *Wenlock v. Moloney* [1965] 1 W.L.R. 1238, where
the headnote reads:

> "By his writ and statement of claim the plaintiff claimed damages
> against the three defendants for conspiring to oust him from the
> business of a company. His original statement of claim was a long,
> inartistic and wandering document to which the defendants refused   D
> to plead. He, accordingly, remodelled it and delivered a second
> statement of claim in which he alleged the conspiracy and set out
> four stages of the conspiracy at various times between January 1961
> and January 1964 as a result of which he alleged, inter alia, that he
> had been deprived of his shares and interest in the company. The
> defendants delivered defences denying the allegations made against
> them in the statement of claim, and sought further and better   E
> particulars of the statement of claim which the plaintiff gave. After
> the pleadings were closed the plaintiff issued a summons for
> directions in the ordinary way, but before it was heard the
> defendants applied to the master under R.S.C., Ord. 18, r. 19,
> alternatively under the inherent jurisdiction of the court, to strike
> out the pleadings and dismiss the action on the grounds that the
> pleadings disclosed no reasonable cause of action, were frivolous   F
> and vexatious, and an abuse of the process of the court. On the
> hearing of the applications to strike out, ten affidavits were filed,
> five by the defendants in support of the applications and five by the
> plaintiff in opposition thereto. The master read the affidavits, the
> documents exhibited thereto, and considered the issues of fact
> raised by the affidavits in a four-day hearing. There was no cross-   G
> examination on the affidavits or oral evidence. In his reserved
> judgment, which occupied 22 pages, the master held that the
> plaintiff's action was most unlikely to succeed and he, accordingly,
> struck out the pleadings and the action. The plaintiff appealed to
> the judge in chambers, who dismissed his appeal.
> "On appeal to the Court of Appeal, which refused to look at the
> affidavits:—   H
> "*Held*, allowing the appeal, that the trial by the master of issues
> of fact on affidavits to ascertain whether the plaintiff had a case was
> a usurpation of the functions of the trial judge and was a wholly

A    improper procedure . . . and that since the pleadings on their face
disclosed a reasonable cause of action and raised issues of fact
which required to be determined on oral evidence by a judge, the
action would not be struck out but would proceed to trial."

Danckwerts L.J. said, at p. 1243:

B    "The practice under R.S.C., Ord. 25, r. 4, and under the inherent
jurisdiction of the court was well settled. Under the rule it had to
appear on the face of the plaintiff's pleading that the action could
not succeed or was objectionable for some other reason. No
evidence could be filed. In the case of the inherent power of the
court to prevent abuse of its procedure by frivolous or vexatious
proceedings or proceedings which were shown to be an abuse of the
C    process of the court, an affidavit could be filed to show why the
action was objectionable. The commonest case was where a plaintiff
was seeking to bring an action on a point which had already been
decided or was obviously wholly imaginary. An example of that is
*Willis v. Earl Howe* [1893] 2 Ch. 545. But, as the procedure was of
a summary nature, the party was not to be deprived of his right to
have his case tried by a proper trial, unless the matter was clear."

D
And he went on to quote Lord Herschell in *Lawrance v. Lord Norreys*
(1890) 15 App.Cas. 210, 219 where he said:

"It cannot be doubted that the court has an inherent jurisdiction to
dismiss an action which is an abuse of the process of the court. It is
a jurisdiction which ought to be very sparingly exercised, and only
E    in very exceptional cases."

That was one line of authority on which Mr. Potts relied. The other line
of authority is concerned with the trial of preliminary issues, but Mr.
Potts relied on that as being equally applicable, and in that context I cite
again, as an example of the numerous cases that were cited, the decision
of *Windsor Refrigerator Co. Ltd. v. Branch Nominees Ltd.* [1961] Ch.
F    375. I need not read the headnote, but Lord Evershed M.R. summed up
the principle involved at the end of his judgment, saying, at p. 396:

"For the reasons that I have stated, I conclude that the answer to
this case is that on the assumptions of fact which I have indicated—
which can be determined only in the action—this instrument would
be capable of being a writing as contemplated by the debenture
G    taking effect on the date (28 February) when it was in fact,
according to the defendants, passed over to Greenwood after a
demand had been made by Inkin with the authority of the debenture
holders. I would, therefore, order accordingly, and set aside the
judgment of Cross J., though, as I say, I do not express any view
upon the matter with which he expressly dealt, namely, whether the
document took effect in the circumstances (or was capable of taking
H    effect) as a deed. I repeat what I said at the beginning, that the
course which this matter has taken emphasises, as clearly as any
case in my experience has emphasised, the extreme unwisdom—
save in very exceptional cases—of adopting this procedure of

preliminary issues. My experience has taught me (and this case A emphasises the teaching) that the shortest cut so attempted inevitably turns out to be the longest way round."

Harman L.J. said, at p. 396:

"I concur, and find myself doing so with particular heartiness with reference to the last observations my Lord has made. The number of conditions he has found it necessary to use to fence in the B expression of this court's opinion shows at once the undesirability of this kind of procedure. It is highly undesirable that the court should be constrained to tie itself in so many knots, and in the end merely say: 'Well, if this was thus, then that was so.' "

That highlights, in a typically trenchant way, the proposition that it is often profoundly unsatisfactory for a court to give a decision as a C preliminary matter in an action on an individual issue on various hypothetical bases of fact. The plain objection being that the hypothetical bases may prove not to be bases and illusory, and in those circumstances the decision of the court is so much air.

Both those lines of authority were distinguished by Mr. Aldous and Mr. Oliver on one single basis, and that is that they were without D exception concerned with the interlocutory disposal of an issue which was going to form part of the issues in the action, and they submit that that is a piecemeal way of carrying on which is inherently open to the objections both under the inherent jurisdiction and under Ord. 18, r. 19 where there has to be a very obvious case before the issues can in effect be short-circuited, and to the preliminary trial of issues on assumed facts under Ord. 33, r. 3. In the present case they submit we have a E fundamentally different situation, namely one where what has to be done is not to decide an issue in the action itself but an issue which the Court of Appeal has described in the way which I have read, namely whether a prima facie case on those two points has in fact been established by the plaintiff, and it is at least possible, and in many cases probable—and they would submit in this case near certain—that the issue there is not one which would occupy the court at the final trial of F the action.

They support their submissions by further submissions that it is plain from the passage which I read from Danckwerts L.J.'s decision in the *Windsor Refrigerator* case [1961] Ch. 375, 396, and indeed from many other passages, that questions of fact can be gone into under Ord. 18, r. 19, and in exceptional cases cross-examination can be permitted on G affidavits. In this particular case the principal affidavit on which the defendants rely in relation to the issue of fact which I have mentioned as the third of the potential issues in these applications is one sworn by Mr. Baldock and cross-examination was in fact offered during the course of the hearing on a number of different occasions but never applied for by Mr. Potts, and it would not be in accordance with the practice of this court to direct a cross-examination without an application for it. But my H conclusion is that it is the question stated by the Court of Appeal as a preliminary matter that has to be decided, that it is a special form of procedure concerned with giving sensible operation to the rule in *Foss v.*