# Tab 18B

Dockets.Justia.com

A    *Harbottle*, 2 Hare 461 and which was concerned with avoiding the Scylla and Charybdis, on the one hand of having a preliminary issue which effectively requires one to try the whole action where the rule serves no useful purpose, and on the other side of the strait, of assuming that everything that the plaintiffs allege is necessarily correct as a matter of fact, which is of course the technique the court adopts when it has what was called a strict demurrer. The Court of Appeal, it seems to me, has

B    laid down a halfway house for this very special type of case, one in which the legal issues in this particular case are sufficiently well defined for the parties to be able to argue them. Further, I am satisfied that they will determine the result of the action completely if answered in one particular way—not if answered in the other way, but that is seldom obtainable.

C    As regards the factual issue which I have sought to outline, that is to say the independence of Wren Trust Ltd., in my judgment that lies within a sufficiently small compass and is sufficiently independent of what I take to be the issues in the action itself for it to fall outside the lines of authority that Mr. Potts has cited and whose validity inside their scope is unchallenged. I do not propose to analyse the evidence in relation to the independence or otherwise of Wren Trust Ltd., it would

D    be both impracticable and undesirable for me to do so not having had the benefit of submissions from Mr. Potts in relation to the evidence that is at present before the court. I therefore confine my observations exclusively to the question whether the existence of that issue of fact is a fatal obstacle to the adoption of the procedure which has in fact been chosen by the two defendants who have moved these motions before

E    me, and to that extent I am not satisfied that there is any such fatal objection. Although, therefore, I view with mounting apprehension the escalation of authority which seems inevitably attendant on the difficult questions that arise in this case, I have reached the firm conclusion that it would not be right for me to stop these applications at this stage, and I so rule.

F
                                            *Order accordingly.*
                                            *Costs reserved.*

The hearing of the motions to strike out was then continued.

*Potts Q.C.* continuing on the main case. The cases cited so far have

G    all been concerned with ultra vires, or internal management; none of them has dealt with fraud on a minority. *Atwool v. Merryweather* (1867) L.R. 5 Eq. 464n clearly shows that where a contract entered into by the company is void, different considerations apply. [Reference was made to *MacDougall v. Gardiner* (1875) L.R. 20 Eq. 383 and (1875) 1 Ch.D. 13; *Menier v. Hooper's Telegraph Works* (1874) L.R. 9 Ch.App. 350 and *Mason v. Harris* (1879) 11 Ch.D. 97, 101.]

H    There is no case, relating to a fraud on a minority, which indicates that the court can go beyond seeing whether the wrongdoers are in control, or is concerned to see what other, independent shareholders think. In *Mason v. Harris* (1879) 11 Ch.D. 97 there were a number of

such independent shareholders. [Reference was made to *Studdert v.* A
*Grosvenor* (1886) 33 Ch.D. 528; *Pickering v. Stephenson* (1872) L.R. 14
Eq. 322; *Cullerne v. London and Suburban General Permanent Building
Society* (1890) 25 Q.B.D. 485; *Burland v. Earle* [1902] A.C. 83;
*Yorkshire Miners' Association v. Howden* [1905] A.C. 256, 263 and
*Taylor v. National Union of Mineworkers (Derbyshire Area)* [1985]
B.C.L.C. 237, 241, 246, 247, 254, 255.]

An individual shareholder has locus standi to bring proceedings on B
behalf of the company, to recover assets, where there has been
misappropriation, or an ultra vires transaction, and not merely a right to
seek an injunction to restrain such matters.

[At this point on 14 November the plaintiff sought leave to appeal on
the ruling given as to procedure. Knox J. refused leave, and the case
was then adjourned for an application for leave to be made to the Court C
of Appeal. The Court of Appeal refused leave and the hearing was
resumed on 17 November.]

*Potts Q.C.* continuing. The rule in *Foss v. Harbottle,* 2 Hare 461
does not prevent an individual shareholder from seeking an order for
repayment and has no impact where the claim is based on ultra vires.
The board cannot release a claim maintained by an individual shareholder
for repayment to the company. A valid release could only be made by D
way of special resolution at a general meeting of the company: *Buckley
on the Companies Acts,* 14th ed. (1981), vol. 1, p. 988. [Reference was
made to *Yorkshire Miners' Association v. Howden* [1905] A.C. 256, 263;
*Dominion Cotton Mills v. Amyot* [1912] A.C. 546 and *Pickering v.
Stephenson,* L.R. 14 Eq. 322.]

Two quite separate principles exist: in the case of ultra vires E
transactions, the question who is in control is irrelevant; but in the case
of fraud on a minority it is clearly very relevant. In the former case
release is impossible. The argument that directors can release any cause
of action could logically apply just as well to prospective transactions, as
to past ones. [Reference was made to *Towers v. African Tug Co.* [1904]
2 Ch. 558, 564, 566, 567, 569; *Baillie v. Oriental Telephone and Electric
Co. Ltd.* [1915] 1 Ch. 503, 510, 511, 518; *Cotter v. National Union of* F
*Seamen* [1929] 2 Ch. 58, 67–70, 72, 86, 99, 100, 107, 110; *Edwards v.
Halliwell* [1950] 2 All E.R. 1064; *Pavlides v. Jensen* [1956] Ch. 565, 567,
568, 572–574; *Birch v. Sullivan* [1957] 1 W.L.R. 1247, 1250; *Heyting v.
Dupont* [1963] 1 W.L.R. 1192 and [1964] 1 W.L.R. 843 and *Australian
Coal & Shale Employees' Federation v. Smith* (1937) 38 S.R.(N.S.W.)
48, 53–57, 60.]

In *Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373, 390 there was no G
suggestion whatever that there was any need for a secondary counting of
heads amongst the independent shareholders. [Reference was made to
*Daniels v. Daniels* [1978] Ch. 406; *Estmanco (Kilner House) Ltd. v.
Greater London Council* [1982] 1 W.L.R. 2, 15, 16; *Devlin v. Slough
Estates Ltd.* [1983] B.C.L.C. 497, 502, 503 and *Viscount of the Royal
Court of Jersey v. Shelton* [1986] 1 W.L.R. 985.]                        H

In English law any provision purporting to release a director from his
obligations would be void. Criticism of Vinelott J.'s judgment in
*Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2)* [1982]

A   Ch. 204 presupposes that the facts alleged by the plaintiffs in that case fall within the exception to the rule in *Foss v. Harbottle,* 2 Hare 461 based on fraud on a minority. That was the only issue on which they could have been relying and on that point—a preliminary issue would have been within a small company, since there was no control by the wrongdoers. If a writ had not already been issued and some shareholders wished to stop the proceedings they would have to show that the

B   company had no cause of action. The company in general meeting would require a special resolution to overrule the board's decision not to issue. The question of release is irrelevant in the context of ultra vires.

   *In re Hellenic & General Trust Ltd.* [1976] 1 W.L.R. 123 provides a common sense test; a meeting of the class affected was required to "enable them to consult together." By analogy the shareholders of Wren

C   Trust Ltd. should be allowed to consult together, to clarify the company's position, and establish their independence or otherwise. [Reference was made to *Buckley on the Companies Acts,* 14th ed., vol. 1, p. 199. *Mason v. Harris* (1879) 1 Ch.D. 97, 107, 109; *Gower, Modern Company Law,* 4th ed. (1979), p. 653 (footnotes).]

   The sole question for the court is whether the plaintiff has sufficiently demonstrated that he can put the company in motion; the idea of a

D   "counting of heads" amongst the minority is specifically reflected in *Russell v. Wakefield Waterworks Co.,* L.R. 20 Eq. 474, 482. [Reference was made to articles by Wedderburn on "Shareholders' Rights and the rule in Foss v. Harbottle." [1957] C.L.J. 194 and [1958] C.L.J. 93; *In re Halt Garage (1964) Ltd.* [1982] 3 All E.R. 1016, 1023, 1028, 1032.] In the present case the payments to the directors were not made under

E   board resolution, a purported resolution, and no services were rendered by the associated companies.

   The payments have not even been characterised in the accounts as being "remuneration." Only actual liabilities should count for the purpose of testing the propriety of the payments. The payments to associated companies appear to constitute "sham" payments. *In re Lee, Behrens & Co. Ltd.* [1932] 2 Ch. 46, where a pension granted to the

F   widow of a company director was held to be void, and the widow was not entitled to prove for it in a winding up, is a useful guide in considering whether something is a breach of a director's fiduciary duty or is a proper exercise of fiduciary power. The transactions complained of, or some of them, had the effect of reducing the company's net assets, by giving financial assistance in the purchase of its own shares, in

G   contravention of section 42 of the Companies Act 1981. [Reference was made to section 87(4)(c) of the Companies Act 1980.] Breach of section 42 is a criminal offence; it cannot be described as a 'technicality.' The 1982 accounts were not even in existence at the time the payments complained of were made. These transactions are pivotal to this case since it was only by their means that the directors gained "control." As a matter of law directors cannot act informally. The court cannot

H   presume that "unlabelled" payments to directors were by way of remuneration for services. It is clear that the fourth defendant was a party to the transactions complained of. It is also clear that Wren Trust Ltd. participated. Prima facie they were not "disinterested." On the

footing of establishing a prima facie case, the proceedings are in a    A
"shambles," because if the burden of proof rests upon a party, that
party should be entitled to address the court first.

*Aldous Q.C.* in reply on the main case. The question whether there
was a contractual obligation to make the payments does not arise,
because they were clearly made to the associated companies for their
services; the issue is whether the payments made were fair and
reasonable for the work done. It is a familiar practice for companies to    B
be paid for services rendered by individual directors. There was a power
to pay any level of remuneration, and when paid out of divisible profits,
any level of remuneration is capable of being authorised. [Reference was
made to *In re George Newman & Co.* [1895] 1 Ch. 674 and *In re
Duomatic Ltd.* [1969] 2 Ch. 365; *North-West Transportation Co. Ltd. v.
Beatty* (1887) 12 App.Cas. 589 and *In re Hellenic & General Trust Ltd.*    C
[1976] 1 W.L.R. 123.]

In so far as the question is one of law, it is desirable that it should be
decided, since it is unlikely to arise at trial, and it may dispose of the
proceedings, if it is decided in the defendant's favour. The point of law
does not depend on disputed facts. The case proceeds on the basis of
whether a prima facie case is shown. Reliance is placed on *Williams*    D
*Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.* [1986] A.C. 368.
Confusion has been caused by the 19th century cases, because many of
them were decided on demurrer, because some of them combined
personal and derivative claims in the same action, and because in some
cases analogies were drawn with the law on partnerships or trusts or on
trade unions. The company itself is capable of ratifying or compromising
the claim or effectively resolving not to sue, so as to bind all    E
shareholders: there is no reason why it should not be able to stop
proceedings brought on its behalf of majority shareholders, who can be
in no better position than the company itself. Potts Q.C. contends that
the minority shareholder has a personal right to sue on the company's
behalf, once he has established the company is in the control of the
wrongdoers! [Reference was made to *Gower, Modern Company Law,*    F
4th ed. (1979), p. 651, para. (iii).]

It is said that even if the board is independent, and 99 per cent. of
the shares were to be held by "outsiders," the remaining one per cent.
could bring a derivative action; if that were so it would have far
reaching consequences, since it would enable a trade rival to buy single
share in order to maintain a derivative action for wholly improper
reasons. The Court of Appeal in *Prudential Assurance Co. Ltd. v.*    G
*Newman Industries Ltd. (No. 2)* [1982] Ch. 204 clearly contemplated
that the views of independent shareholders should be consulted: see
[1981] Ch. 323 *per* Vinelott J. [Reference was made to *Burland v. Earle*
[1902] A.C. 83; *Sinclair v. Brougham* [1914] A.C. 398, 414, to 418, 433,
440, 452; *Palmer's Company Law,* 23rd ed. (1982) p. 848; *Buckley on
the Companies Acts,* 14th ed., vol. 1, pp. 898, 992; *Hogg v. Cramphorn*    H
*Ltd.* [1967] Ch. 254; *Bamford v. Bamford* [1970] Ch. 212; *Gower,
Modern Company Law,* 4th ed., pp. 147, 148, 643 and *Wallersteiner v.
Moir (No. 2)* [1975] Q.B. 373; 404.]

A    It does not follow that because a derivative action is not demurrable that the plaintiff can maintain it; it may still be an abuse of process, where the claim has in fact been released. The statement of claim might appear sound on its face, but the objections arising from the split nature of the claim, between "personal" and "derivative," might only come to the surface on the defence. [Reference was made to *Taylor v. National Union of Mineworkers (Derbyshire Area)* [1985] B.C.L.C. 237, 241–245.]

B    In demurrer cases, the claim will be struck out where the complaint is ratifiable. [Reference was made to *Mozley v. Alston* (1847) 1 Ph. 790; *Lord v. Governor and Company of Copper Miners* (1848) 2 Ph. 740; *Bagshaw v. Eastern Union Railway Co.* (1849) 7 Hare 114; *Salomons v. Laing* (1850) 12 Beav. 377; *Clinch v. Financial Corporation* (1868) L.R. 5 Eq. 450; *Gray v. Lewis,* L.R. 8 Eq. 526; L.R. 8 Ch.App. 1035;

C    *Russell v. Wakefield Waterworks Co.,* L.R. 20 Eq. 474; *Atwool v. Merryweather* (1867) L.R. 5 Eq. 464n: *Simpson v. Westminster Palace Hotel Co.* (1860) 8 H.L.Cas. 712; *Davidson v. Tulloch* (1860) 3 Macq. 783; *Orr v. Glasgow, Airdrie and Monklands Junction Railway Co.* (1860) 3 Macq. 799; *Gregory v. Patchett* (1864) 33 Beav. 595; *Pickering v. Stephenson* (1872) L.R. 14 Eq. 322; *Hoole v. Great Western Railway Co.* (1867) L.R. 3 Ch.App. 262; *MacDougall v. Gardiner,* L.R. 20 Eq.

D    383; *Mason v. Harris,* 11 Ch.D. 97; *Cullerne v. London and Suburban General Permanent Building Society,* 25 Q.B.D. 485; *Yorkshire Miners Association v. Howden* [1905] A.C. 256; *Dominion Cotton Mills Co. Ltd. v. Amyot* [1912] A.C. 546: *Burt v. British Nation Life Assurance Association* (1855) 4 De G. & J. 158: *Towers v. African Tug Co.* [1904] 1 Ch. 558 and *Baillie v. Oriental Telephone and Electric Co. Ltd.* [1915]

E    1 Ch. 503.] *Cotter v. National Union of Seamen* [1929] 2 Ch. 58; *Edwards v. Halliwell* [1950] 2 All E.R. 1064; *Pavlides v. Jensen* [1956] Ch. 565; *Birch v. Sullivan* [1957] 1 W.L.R. 1247; *Heyting v. Dupont* [1964] 1 W.L.R. 843 and *Daniels v. Daniels* [1978] Ch. 406) *Turquand v. Marshall* (1869) L.R. 4 Ch.App. 326.]

F    To sum up: (i) None of the payments were in fact ultra vires in the true sense, since they fell within the provisions of paragraph 3 of the memorandum of association; (ii) None of the payments were in breach of duty, and all of them should be regarded as being made for individual services rendered by the directors; (iii) None were unreasonable in amount, and all were approved by all directors; (iv) Save for relatively small amounts they were disclosed in the company's accounts, and were approved by the shareholders; (v) There is no evidence to impugn the votes cast, since third parties, including Wren Trust, voted in favour;

G    (vi) There was no breach of section 42 of the Companies Act 1981; all payments were subsequently included in the accounts as being for directors' services, and were ratified in general meeting by the shareholders. The payments were in line with the emoluments paid in previous and subsequent years. There is no ground for any allegations of fraud. It would be wrong to allow the action to proceed.

H    *Oliver Q.C.* in reply. The arguments advanced by Mr. Aldous are adopted. It is not only desirable, but important that the court should decide the points of law arising. [Reference was made to *Russian Commercial and Industrial Bank v. Comptoir D'Escompte de Mulhouse*

[1925] A.C. 112, and *Banco de Bilbao v. Sancha* [1938] 2 K.B. 176.]   A
Where the court embarks on a prolonged and thorough examination of
facts and law cross examination and discovery could be ordered if
appropriate. [Reference was made to *Pickering v. Stephenson,* L.R. 14
Eq. 322 and *Peel v. London and North Western Railway Co.* [1907] 1
Ch. 5, 11, 12, 20.] Cases in the 19th century tend to confuse ultra vires
with breach of trust. There is no case which decides that where the
majority of independent shareholders oppose the action it should be   B
allowed to continue, and the reverse is suggested by *Taylor v. National
Union of Mineworkers (Derbyshire Area)* [1985] B.C.L.C. 237. The
opposite is consistent with common sense and principle. The question as
to what to do after an ultra vires act has been committed is one of
internal management, not of ratification. Every shareholder should be
regarded as independent unless at the meeting at which his vote was   C
exercised, there was reason to regard it as tainted. The precise ambit of
the principle is not clear; a personal interest does not disqualify, but
there is a duty to vote bona fide for the benefit of the company as a
whole. [Reference was made to *Lindley on Partnership,* 15th ed. (1984),
478.] There is an overriding duty to consider the views of the minority
and the power of the majority to bind them is based on bona fides.   D
[Reference was made to *Menier v. Hooper's Telegraph Works* (1874)
L.R. 9 Ch.App. 350, 353, 354; *Pender v. Lushington* (1877) 6 Ch.D. 70,
75, 76; *North-West Transportation Co. Ltd. v. Beatty* (1887) 12 App.Cas.
589, 593, 594; *Wall v. London and Northern Assets Corporation* [1898] 2
Ch. 469, 474, 480; *Allen v. Gold Reefs of West Africa Ltd.* [1900] 1 Ch.
656, 667, 670, 678, 679; *Brown v. British Abrasive Wheel Co. Ltd.*
[1919] 1 Ch. 290, 295; *Sidebottom v. Kershaw, Leese & Co. Ltd.* [1920]   E
1 Ch. 154, 170; *Shuttleworth v. Cox Brothers & Co. (Maidenhead) Ltd.*
[1927] 2 K.B. 9, 18; *Greenhalgh v. Arderne Cinemas Ltd.* [1951] Ch.
286; *Clemens v. Clemens Bros. Ltd.* [1976] 2 All E.R. 268 and *Estmanco
(Kilner House) Ltd. v. Greater London Council* [1982] 1 W.L.R. 2.] It is
clear that the exercise of votes is subject to equitable considerations, not
confined to special resolutions; a personal interest does not disqualify a   F
shareholder from voting. The court tolerates a conflict of interest up to a
certain degree; the boundaries are essentially evidential. It does appear
that where the defendants cast votes against proceedings where a prima
facie case exists, a presumption is raised against the votes having been
properly cast, i.e. that the court will not tolerate them. Beyond that in
each case the court will look for credible evidence as to the motives for
voting. The mere fact the votes were cast against proceedings does not   G
vitiate them unless the shareholders' motives were unreasonable. Nor is
it necessarily fatal that a person who is not a defendant and who votes
against proceedings may have some association with the defendants,
other than as a shareholder, but in such a case the court will be
conscious of the possibility of conflict and will embark on an investigation
as to his motives. In so far as the test propounded by Mr. Potts, citing   H
*In re Hellenic & General Trust Ltd.* [1976] 1 W.L.R. 123, deviates from
the test described above it is inappropriate. If fraud was to be pleaded it
should have been pleaded with the highest degree of particularity.

A   *Potts Q.C.* in rejoinder on cases cited, Neither *Hogg v. Cramphorn Ltd.* [1967] Ch. 254, nor *Bamford v. Bamford* [1970] Ch. 212 was concerned with fraud on a minority. Breach of duty is not the same as fraud on a minority.

19 December. KNOX J. read the following judgment. I have before
B   me two notices of motion. The first is on behalf of the ninth defendant for an order pursuant to R.S.C., Ord. 18, r. 19, or under the inherent jurisdiction of the court that this action be struck out as being frivolous or vexatious or an abuse of the process of the court on the grounds that being purportedly brought by the plaintiffs on behalf of the ninth defendant the plaintiffs are in fact not entitled to bring or continue the same. The second is on behalf of the fourth defendant for an order in
C   similar terms, with an alternative ground, "alternatively that [the action] is obviously unsustainable against the fourth defendant." I have earlier ruled that the procedure thus adopted is not so defective that the application should in any event fail.

In the course of giving that ruling I expressed the view that the task for the court was to seek to follow the guidance given by the Court of Appeal in *Prudential Assurance Co. Ltd. v. Newman Industries Ltd.*
D   *(No. 2)* [1982] Ch. 204, 221, where the following passage from the judgment of the court appears:

"In our view, whatever may be the properly defined boundaries of the exception to [the rule in *Foss v. Harbottle* (1843) 2 Hare 461] the plaintiff ought at least to be required before proceeding with his action to establish a prima facie case (i) that the company is entitled
E   to the relief claimed, and (ii) that the action falls within the proper boundaries of the exception to the rule in *Foss v. Harbottle.*"

That I now proceed to attempt to assess.

Much of the factual background to these proceedings is not in issue and the dispute is far more concerned with the mental element in what was done and the manner in which it was done than with what
F   happened.

The present voting position among the single class of ordinary shareholders is as follows. The three plaintiffs, Nora Smith, Lucienne Crane and Lord Rathcavan, are the holders of 13,400, 1,000 and 4,000 shares respectively in the ninth defendant, Film Finances Ltd. ("the company") out of the issued share capital of 155,100 fully paid shares.
G   Together they therefore hold 18,400 shares which is 11·86 per cent. of the voting rights. The defendants against whom claims are made in the statement of claim are between them the holders of 97,000 shares, i.e. 62·54 per cent. of the voting rights. These defendants fall into three groups. The first, second and third defendants, William Alan Croft, Richard Martin Francis Soames and David Alexander Korda ("the executive directors"), form one group. It is against them primarily that
H   charges are brought. The fifth, sixth, seventh and eighth defendants, Mannergrand Services Ltd. ("Mannergrand"), Cushingham Ltd. ("Cushingham"), Bellwedge Ltd. ("Bellwedge") and Brindeel Ltd. ("Brindeel"), form the second group. I shall refer to them together as "the associated

companies." They are controlled or closely associated with one or more    A
of the executive directors, Mannergrand with Mr. Croft, Cushingham
with Mr. Soames, Bellwedge with Mr. Korda and Brindeel with all three
of the executive directors. Finally there is the fourth defendant, Michael
Lewis Carr. He is the chairman and a non-executive director of the
company. He is a director of Wren Trust Ltd. and nominated by it to
the board of the company. That leaves 39,700 shares unaccounted for
which fall into the following groups:                                      B

(i) 4,000 are held by Messel Nominees Ltd., a company whose shares
are owned by another company, Defester Ltd., the shares in which are
owned by Stephen Richard Hill and Peter Welsford, both of whom have
been active in promoting the plaintiffs' claims. The votes attached to
these shares are clearly in the plaintiffs' camp, bringing up their voting
strength to 22,400 or 14·44 per cent. of the whole.                        C

(ii) Two other shareholders, Georgian Investments Ltd., who hold
2,000 shares, and Sir Reginald Sheffield, who owns 50 shares, are not
under the control of or closely associated with the defendants against
whom claims are made and have unequivocally stated their opposition to
the further prosecution of this action. They account for 1·32 per cent. of
the voting rights.

(iii) Film Finances Pension Fund holds 2,950 shares or 1·9 per cent.   D
of the voting rights. It is common ground that it is under the control of
Mr. Soames and Mr. Korda and is to be treated for present purposes as
on a par with the executive directors so far as voting is concerned.

(iv) Wren Trust Ltd. ("Wren Trust") holds 30,500 shares, i.e. 19·66
per cent. of the votes in the company. This company is a wholly owned
subsidiary of Gresham Trust Plc., which is a member of the Eagle Star    E
Group of companies. Wren Trust is thus owned and controlled by a
large outside financial institution. One of the issues canvassed before me
has been whether it should be regarded for the purposes of this
application as independent or disinterested so far as the question
whether or not these proceedings should continue is concerned. The
boards of Wren Trust and of Gresham Trust Plc. have both expressed
the view that the proceedings should not continue.                        F

(v) Finally there are two holders of 100 shares each who have not
committed themselves. This shareholding is so small as not to be of
practical significance.

The following conclusions can be drawn from these shareholdings:
(1) The executive directors with the associated companies have overall
voting control. (2) If one excludes the votes of the executive directors,   G
the associated companies and Film Finances Pension Fund, then the
votes of Georgian Investments Ltd., Sir Reginald Sheffield and Wren
Trust totalling 32,550 (or almost 20·99 per cent. of the whole)
comfortably exceed those of the plaintiffs and the Messel Nominees,
totalling 22,400 (14·44 per cent. of the whole) but not so comfortably as
to give a 75 per cent. majority of the votes excluding those mentioned
above. The majority is in fact about 59·24 per cent. Such a majority can    H
carry an ordinary but not a special resolution. (3) If the votes of Wren
Trust are excluded as well as those of the executive directors, the
associated companies and Film Finance Pensions Fund, then the plaintiffs

A    and Messel Nominees with 22,400 votes have a very large majority over
Georgian Investments Ltd. and Sir Reginald Sheffield, with 2,050 votes.
That majority would be one of 91·62 per cent. and sufficient to pass
either an ordinary or a special resolution.

The factual background is as follows. It will be appreciated that I am
not making findings of fact at the end of an action and I am therefore
limiting this account of the facts to that which seems to me necessary to
B    explain the reason for my decision on the questions I have to answer
and which appear from the quotation at the outset of this judgment
from the Court of Appeal decision in *Prudential Assurance Co. Ltd. v.
Newman Industries Ltd. (No. 2)* [1982] Ch. 204.

The company was incorporated on 24 February 1950 with an initial
paid up capital of £7,500. Throughout its history its trade has been the
C    unusual one (it appears its only significant competitors are overseas
companies) of guaranteeing the completion of films on time and within
budget. It is obvious that this is a specialised business requiring for its
successful operation both wide contacts in the film making world and
skill and experience in the production of films. It is also a business
which requires a very small number of highly skilled personnel. The
number of executives has not exceeded ten. It is the absolute antithesis
D    of mass production.

The founder of the business retired in 1959, and Robert Garrett
became chairman and managing director. He had for a number of years
a joint managing director, Bernard Smith, who died in 1977. The first
plaintiff is his widow. Mr. Soames, the second defendant, joined the
company as an employee in 1971, became a director in 1975 and
E    managing director in 1977 in place of Bernard Smith and Robert
Garrett, who continued as chairman. Mr. Croft, the first defendant, has
been a director since well before October 1979. He is a chartered
accountant and deals with the financial side of the business such as
investments. This is very important more especially as it is from the
income from premiums received by the company and invested that its
profit is largely derived. In this it resembles many insurance companies
F    which suffer underwriting losses but remain profitable because of their
invested income. A Mr. Aikin, a solicitor, became an executive director
in 1978 but resigned in September 1981 and Mr. Carr, the fourth
defendant, was appointed director in October 1979 as the nominee of
Wren Trust. Mr. Korda, the third defendant, became an executive
director in July 1981. He ceased to be an executive director in January
G    1985 when he became managing director of R.K.O. Film Group
International at a very large salary but remained a non-executive director
of the company. So from October 1979 until October 1982 Mr. Garrett
was chairman, the directors who were executives were Mr. Croft, Mr.
Soames and Mr. Aikin or Mr. Korda, there being a short period in 1981
when both were on the board, and Mr. Carr was a non-executive
director.

H    At the beginning of 1982 the executive directors only had shares
carrying about 20 per cent. of the voting rights and the associated
companies had none, but Mr. Aikin who had resigned by September
1981 had 7·5 per cent. of the voting rights. During the course of 1982

A

the executive directors and the associated companies acquired enough shares to give them, together with Wren Trust, overall voting control. Those acquisitions include transactions which the plaintiffs seek to impeach in these proceedings as having been effected by means of financial assistance from the company in breach of section 42 of the Companies Act 1981. Specifically Bellwedge bought 2,400 shares, Mannergrand bought 3,050 shares, as did Cushingham, and Brindeel bought 19,900. Bellwedge's purchase is not challenged in the statement of claim while those of Mannergrand, Cushingham and Brindeel are, but it was the latter that Mr. Potts, for the plaintiffs, placed in the forefront of his argument on section 42 of the Companies Act 1981.

B

The purchase of 19,900 shares by Brindeel with money borrowed from the bank, the fact that Brindeel was acquired by the executive directors on or about 11 June 1982 with a view to the purchase of the 19,900 shares, that each of Mannergrand, Cushingham and Bellwedge received £33,000 from the company in early August and lent £28,000 to Brindeel thereafter, and that these sums were used by Brindeel to discharge its bank indebtedness are all admitted. What is denied is that the payments by the company to those three associated companies constituted financial assistance within section 42(2) of the Companies Act 1981. The defendants contend that these payments were in satisfaction of anticipated liabilities by way of salary or bonus payable to the executive directors and that on that basis there was no reduction of the net assets of the company for the purposes of section 42(2). I shall return to this later.

C

D

By 1982 there had been dissension for some time on the board of the company between Mr. Garrett, the chairman, who had been involved with the company from very early days and who was by then 70 years or so old, and the executive directors who were younger and had adopted a policy of expanding the company's business overseas, a project to which Mr. Garrett was opposed. Matters came to a head in 1982, when the executive directors had completed their share purchases, which were not revealed in advance to Mr. Garrett, and Mr. Garrett was forced to resign as a director in October 1982 and received a £60,000 ex gratia payment. This caused a good deal of bitterness. One consequence was that Mr. Garrett consulted Mr. Hill to advise him about the executive directors' and Mr. Carr's activities, and Mr. Garrett provided Mr. Hill with a good deal of documentary material from the company's offices. This continued after Mr. Garrett's departure through Mr. Garrett's secretary, a Mrs. Byford, who clearly disapproved of the way Mr. Garrett was forced to resign and who continued, unbeknown to the executive directors for some time to provide Mr. Hill with documentary material from the company's offices.

E

F

G

Armed with this material Mr. Hill launched a sustained campaign of criticism of the conduct of the affairs of the company by the executive directors, and Mr. Carr in particular, at the amounts drawn out of the company by the executive directors and the associated companies. Here again there is no dispute about the amounts drawn out. I ignore sickness benefits, pension scheme payments and small fixed directors' fees. In other respects payments were made as follows:

H

| | 1980 | 1981 | 1982 | 1983 | 1984 |
|---|---|---|---|---|---|
| *Mr. Soames:* | £ | £ | £ | £ | £ |
| Salary | 42,000 | 50,000 | 53,333 | 67,500 | 70,000 |
| Bonus | 29,800 | 40,000 | 40,000 | 70,000 | 100,000 |
| Cushingham Ltd. | 15,000 | 18,500 | 61,000 | — | — |
| *Mr. Croft:* | | | | | |
| Salary | 8,500 | 15,000 | 15,000 | — | — |
| Bonus | 24,300 | 20,600 | 10,000 | — | — |
| (Connected Companies) | | | | | |
| Billsons & Co. | 5,650 | 15,150 | 15,150 | 15,150 | 55,150 |
| Mannergrand | | | | | |
|   Services Ltd. | 7,500 | 27,500 | 29,000 | 50,000 | 30,000 |
| *Mr. Korda:* | | | | | |
| Salary | — | 8,751 | — | — | — |
| Bonus | — | — | — | — | — |
| Bellwedge Ltd. | — | — | 76,169 | 93,750 | 131,867 |
| *Mr. Garrett:* | | | | | |
| Salary | 21,000 | 25,000 | 25,000 | 8,333 | — |
| Bonus | 51,000 | 70,750 | — | — | — |

The ex gratia payment of £60,000 mentioned above was also paid to him. Mr. Aikin's payments I need not detail. Finally in relation to Mr. Carr, there were payments of £1,500 made to Gresham Trust Plc. in the years 1980, 1981 and 1982 and £7,595 in 1983 and £5,028 in 1984.

Before the annual general meeting of the company called for 10 December 1982 Mr. Hill's solicitors wrote a letter dated 7 December 1982 to Mr. Carr:

"Strictly private and confidential. Re: Film Finances Ltd. We are writing to you in your capacity as chairman and nominee of a minority shareholder in the above company. We are instructed by Mr. S. R. Hill, F.C.A., who has been appointed to act as adviser to a number of minority shareholders in the company holding in total over 40 per cent. of the issued share capital, including the executors of Patrick Garrett for whom we also act.

"We understand that Mr. Hill informed you last week that: (1) The 1982 published accounts of the company are grossly misleading, indicating as they do a profit before tax of over £500,000 whereas compliance with current accounting standards and the usual statutory requirements would result in showing a loss of over £500,000. (2) The amounts proposed in the accounts as directors' remuneration are excessive, unreasonable and so out of all proportion as to cause very considerable doubt as to the collective bona fides of the executive directors. (3) There is firm evidence that the managing director of the company earlier this year approached a merchant bank (not your own of course) to seek advice on how to employ the company's funds to enable the executive directors to obtain 100 per cent. control of the company. It would appear that the advice given was based upon an incomplete explanation of the provisions of sections 42 to 44 of the Companies Act 1981, which sections also

impose criminal penalties for failure to comply with their provisions.   A

"We understand that Mr. Hill did not inform you of this aspect of item (3) above as he would have preferred to have told you this in person and shown to you the evidence. However, Mr. Hill did inform you that there is evidence that the executive directors have partially adopted this misleading advice in the current year, in that there are accounting irregularities in respect of items passing through the bank pass sheets not entered in the cash book of the company.   B (Mr. Hill, of course, only has detailed information up to mid-October when Mr. Garrett retired from chairmanship of the company.) In view of the prima facie evidence of fraud, the minority shareholders' group requires that further investigations be carried out to enable this evidence to be substantiated or refuted and the available remedies pursued if necessary. It would be   C preferable that you use your position as chairman of the company to effect this, as the alternatives would be a Department of Industry or fraud squad investigation which could result in very far-reaching consequences including exposure damaging to the company. (4) There is evidence of other financial irregularities that are not of such pressing importance as points (1) to (3) above and which may be regulated in due course following the full and early investigation   D that must be carried out into the affairs of the company. . . ."

At the annual general meeting of the company on 10 December 1982 at which the accounts for the year ending 30 June 1982, approved by the directors on 18 November 1982, were to be laid for approval, there were angry scenes and allegations of accounts incorrect by £1 million. Mr.   E Carr adjourned the meeting and forthwith instructed Messrs. Peat, Marwick Mitchell & Co. to investigate and report upon Mr. Hill's complaints. Initial instructions were by telephone but the formal instruction was in a letter from Mr. Soames dated 14 December 1982. It is addressed to Peat, Marwick Mitchell & Co. for the attention of Tom Allen, Esq. and reads:

"Dear Sirs, I write to confirm the board's instructions to you to   F carry out an investigation of the affairs of this company in respect of its accounting period to 30 June 1982, the following period and any preceding period or periods you may think necessary in relation to the allegations set out in points (1) to (4) inclusive of the letter from Wood Nash & Winters dated 7 December 1982 addressed to Michael Carr."—That letter is the one which I have just read.—"In   G view of the seriousness of the allegations you are requested to commence and complete the investigation as soon as possible and make a full report to the board at the earliest possible date.

"While the board's instructions are to investigate specific points referred to, it is not their intention to prevent or restrict you from extending the investigation where you believe it to be necessary in the cause of establishing the truth or in the event that other   H irregularities are revealed.

"I confirm that instructions have been given to all the executives and employees of the company and to its solicitors and auditors to

A    co-operate with you to the fullest extent and to give you such
     information as you may require."

That is signed on behalf of Film Finances Ltd. by Mr. Soames.

     Mr. Allen of Peat, Marwick Mitchell & Co. interviewed the
company's staff and directors, met Mr. Hill and his helper Mr. Welsford
twice, and had access to the company's books. His report ("the report")
B    was produced on 11 March 1983. It contains the following passage, after
having set out the circumstances of the investigation being instituted:

     "We have decided that it would be appropriate for us to submit a
     report at this stage, which addresses the matters set out above and
     summarises our comments in relation to the work we have so far
     carried out. The directors will then be in a position, having
C    considered this report and received any representations which
     shareholders think fit to make to them, to consider whether or not
     we should be asked to pursue any of the matters discussed, or any
     other matters."

The report is therefore not to be regarded as necessarily definitive. A
substantial part of the report was concerned with criticisms made by Mr.
D    Hill and set out in his solicitor's letter of 7 December 1982, which I have
read, concerning the accountancy deficiencies in the preparation of the
company's accounts. These criticisms were effectively rejected in the
report. No claims are made in this action about this and I pass over that
part of the report. [His Lordship read part of the report, headed
"Directors remuneration and allied matters" and continued:] Then there
are set out in tabular form figures for emoluments and payments to
E    connected firms or companies which correspond, so far as the figures are
concerned, with the figures in the statement of claim.

     Two things appear from the extract of the report quoted above. The
first is that it was Mr. Allen's view that the payments to Cushingham in
the years ending 30 June 1980, 1981, 1982 of £15,000, £18,500 and
£61,000 should have been disclosed as part of Mr. Soames' emoluments
F    because in the circumstances they did fall within the requirements of
section 196 of the Companies Act 1948. The inclusion in the note on
directors' salaries of the £61,000 for 1982 in the revised 1982 accounts
which were presented to and passed by the adjourned annual general
meeting on 30 March 1983 and the inclusion therein of the £18,500 for
1981 in the comparative figures in those accounts constitute a major
difference between those accounts and the original 1982 accounts which
G    were approved by the directors on 18 November 1982 and laid or
intended to be laid before the annual general meeting on 10 December
1982.

     The second is that if the only basis upon which the payments to
Mannergrand or Billsons and Bellwedge could be justified was that of
remuneration for acting as a director or in connection with the
management of the affairs of the company the same conclusion as that
H    reached regarding Cushingham would have applied. But Mr. Allen took
the view that these payments were for services rendered by the
organisations to which payments were made and were exempt from
disclosure under section 196 of the Companies Act 1948 because the

services could have been provided whether or not Mr. Croft and Mr.     A
Korda had been directors of the company. In relation to Mr. Korda
there is a later reference in the report to "the technicality that Mr.
Korda works for Bellwedge Ltd. which provides his services to the
company." The amounts involved are not limited to those mentioned for
the year ending 30 June 1982 with which the report was primarily
concerned but also so far as Mr. Croft is concerned £13,150 and £42,650
for the years ending 30 June 1981 and 1982.                           B

The report went on to deal with some matters which I need not
discuss because they are not in issue in this action, such as Mr. Carr's
consultancy fees paid to Gresham Trust Plc., the taxation treatment of
directors' emoluments, the relevance of dividend waivers and continued:

> "Mr. Carr, who became chairman of the company in October 1982,
> was previously a non-executive director and is now non-executive     C
> chairman. Mr. Soames and Mr. Korda are both engaged full time in
> working for the company (ignoring the technicality that Mr. Korda
> works for Bellwedge Ltd. which provides his services to the
> company). Mr. Croft is in practice as a chartered accountant, but
> spends at least two full days a week at the company's offices and we
> understand that he is available to the company at all times for such  D
> other time as is needed.

> "The company operates in an industry where the risks and
> rewards are high. The levels of remuneration, and standards of
> living, enjoyed by prominent people in the industry are often high
> in relation to those enjoyed by prominent people in many other
> industries. In their business relationships with companies in the
> industry, the directors are dealing with prominent people in the     E
> companies concerned.

> "It has been indicated to us that the time devoted by Mr.
> Garrett to the affairs of the company in recent years was substantially
> less than full time. However, Mr. Garrett had, in the past, been
> active in the company's affairs and continued to be identified with
> the company as a prominent member of the industry.                   F

> "In forming a view as to whether the level of emoluments and
> charges paid or payable to the directors and/or the connected
> companies is reasonable, there are no absolute yardsticks and, while
> members will no doubt want to form their own views they may wish
> to have regard to our general comments, as set out above.

> "The arrangements for the determination of the levels of           G
> remuneration, and the acceptance of charges from connected
> companies, would appear to have been conducted with very little
> formality. We understand that the present directors do not have
> service agreements. Mr. Garrett had a service agreement which was
> not due to expire until 31 March 1985; this was terminated on his
> resignation in October 1982. As a consequence of the termination
> of his service contract, the company made an ex gratia payment of    H
> £60,000 to Mr. Garrett and agreed to indemnify him against
> liabilities arising out of claims or proceedings brought against the
> company or himself relating to the term of his employment

A (excluding liability for taxes for which Mr. Garrett might be personally assessable).

"There is some reference in the minutes to agreed salary levels, but a substantial part of the total remuneration has been by way of bonus and, for the most part, it is not possible to point to specific memoranda or minutes of directors' meetings confirming the levels of remuneration and charges from connected companies.

B "The view has probably been taken that, because of the very few people involved, the frequent overseas travel which is necessary (making formal meetings difficult to arrange) and the ability of the directors to deal with matters on an informal basis, there is no need for formal confirmation of matters discussed informally between the directors. In any event, it can be argued that the approval of the company's accounts by the directors for submission to members constitutes implicit approval of all the amounts included in the accounts. This is not, however, a company in which all the shares are owned by the directors, nor is it a company in which all the directors have been, or have remained, in agreement with one another. In our view it is most important that there should be a proper record of directors' meetings and confirmation of approval by the directors of their remuneration, amounts payable to companies with which they are connected and other significant matters. We do not think that the lack of formal confirmations affects the validity of the charges accepted by the company but, not least in the directors' own interests, we strongly recommend that in future these matters should be properly recorded."

E Mr. Potts attacked the adequacy of the report, regarding payments thus dealt with, principally on the ground that Mr. Allen had failed entirely to address himself to the question of the characterisation of the disputed payments, and had not satisfied himself on the question whether there was or was not a contractual obligation on the company to the several associated companies, and whether the latter ever did actually render F any services to the company.

[His Lordship read part of the report dealing with the directors' expenses incurred in travelling and promoting the company, stated that, in relation to the impeached share transactions and the complaints made under section 42 of the Companies Act 1981, the report first of all set out the transfers in question, then stated that the transfers were G approved by a directors' meeting of 19 October 1982, that the payments for the three parcels of shares bought by Brindeel were made on 1 and 14 July and 7 September 1982 which was the date when the transfers were lodged for stamping with the Inland Revenue and that the approval of the accounts of the company, for submission to members by the directors, on 18 November 1982, effectively constituted implicit approval of all the items included in the accounts and the necessary formal H approval of various charges relating to the directors and connected companies might be said to be implicit in the approval by the directors of the accounts of the company. That part of the report also criticised the lack of formal procedures for the approval of expenditure but

concluded that the question of whether the payments made in August    A
1982 were properly made by the company depended on whether or not
the charges from the companies in question were proper charges for the
company to accept. His Lordship continued:] The report does not in
terms say that the charges made by the associated companies were
proper charges. That was in a sense left for shareholders to make up
their minds about in the light of the general considerations set out in the
earlier passage in the report which I have already quoted.                B

Here too Mr. Potts criticised the report on the following grounds.
The reliance on the accounts for the year ending 30 June 1982 was, he
submitted, misplaced, because those accounts, even in the first edition,
were not approved by the directors until 18 November 1982 and were
therefore not in existence in August 1982 when the three cheques for
£33,000 plus V.A.T. were signed in favour of the associated companies.   C
Everything hinged, he submitted, on whether there was at that date an
obligation to pay, a question which was assumed rather than decided in
the report. So far as the executive directors were concerned the only
liability of the company was under such service contracts as existed.

As to service contracts there is no dispute on the facts. Mr. Soames
had a service agreement dated 27 May 1975 which by clause (4) provided
for him to receive a fixed salary of £10,000 per annum with such bonuses  D
as the directors might determine with a proviso that in no event should
the said salary and bonus payable in any one year exceed £20,000. That
agreement has not been terminated. Various resolutions have been
passed by the board resolving that clause (4) of the service agreement
should be varied by increasing Mr. Soames' salary to figures in excess of
£20,000, or that his basic emoluments or salary should be increased to    E
figures in excess of £20,000. With effect from 1 July 1980 the operative
figure under the latest such resolution is £50,000. Mr. Korda too had a
letter dated 15 April 1981 setting out the terms of his employment as a
full-time executive of the company at a salary of £35,000 per annum. So
far as Mr. Croft is concerned there was no formal service contract but
there have from time to time been board resolutions increasing his
salary. The amounts paid to the executive directors and the associated   F
companies in respect of services rendered have at all material times
exceeded the amounts provided for by the relevant service agreement or
board resolution and the justification for this is claimed to reside in the
board's powers under the articles, and if necessary that of the company
in general meeting.

The relevant articles provide as follows. (I take the version exhibited  G
to Mr. Croft's affidavit of 9 January 1986 as more up to date than that
exhibited earlier by Mr. Hill. Only the numbering differs; the texts are
the same so far as relevant.) Article 10 reads:

> "The first sentence of clause 76 of Part I of Table 'A' shall be
> deemed to be deleted. Each of the directors shall be paid out of the
> funds of the company by way of remuneration for his services as a
> director, at the rate of £150 per annum and the chairman shall also   H
> be paid additional remuneration for his services as chairman at the
> rate of £100 per annum. Such rates of remuneration may be
> increased by an ordinary resolution of the company."

A   Article 18 reads:

> "(A) The directors may from time to time appoint one or more of their body to be holder of any executive office, including the office of chairman, deputy chairman, managing or joint managing director or manager, on such terms and for such period as they may determine. . . . (C) A director appointed to any such office as is mentioned in sub-paragraph (A) of this article shall receive in addition to any remuneration to which he is or may become entitled under clause 76 of Part I of Table A hereof such additional remuneration by way of salary, lump sum, commission or participation in profits as the directors may determine, and he or his dependants may receive from the company such pension or other gratuity benefit or retiring allowance as the directors shall think fit."

C

Article 76 of Table A provides:

> "The remuneration of the directors shall from time to time be determined by the company in general meeting. Such remuneration shall be deemed to accrue from day to day. The directors may also be paid all travelling, hotel and other expenses properly incurred by them in attending and returning from meetings of the directors or any committee of the directors or general meetings of the company or in connection with the business of the company."

I mention in passing that article 80 of Table A is not modified or excluded, and thus the business of the company is to be managed by the directors.

E      Purely as a matter of construction it is in my judgment clear that the exclusion of the first sentence in article 76 of Table A contained in article 10 relates only to remuneration for activity as a director and does not operate to exclude the residual power of the company in general meeting to approve remuneration for executive services. Even on that basis, however, the actual right to remuneration, over and above what any relevant service agreement provided in relation to services rendered in the year ending 30 June 1982, would not have arisen, on any view, before the directors' meeting approving the accounts for that year in October 1982, and therefore after August 1982 when the impeached payments to the associated companies were made. So if Mr. Potts is right in his submission that only actual liabilities counted for the purpose of testing the propriety of a payment by a company in relation to section 42 of the Companies Act 1981, a breach of the section would be established at least prima facie. I shall return to this later.

     Once the report was issued a revised version of the accounts for the year ending 30 June 1982 was prepared, and the annual general meeting, which had been adjourned on 10 December 1982 and once again later, was completed on 30 March 1983. At that meeting those accounts, as thus revised, were approved by a majority of the shareholders, but there is no undisputed evidence of how the majority was made up. There were many criticisms voiced at that meeting, mainly by Mr. Hill. In general terms they were principally directed either at accounting questions concerning the calculation of profits or at the level of

remuneration which the executive directors were receiving. There were A also criticisms, not only from Mr. Hill, of the payment of £61,000 to Cushingham Ltd. and its treatment in the accounts and in the report. It is not, however, now claimed in the action that any of the matters now complained of, regarding the year ending 30 June 1982, were not, at least in general terms, matters of which the ordinary shareholders were made aware, through the report and the revised accounts for that year.

In the last two years in which there are payments which are B impeached (the years ending 30 June 1983 and 1984) Mr. Soames received the whole of the payments made in connection with his services, and nothing was paid to Cushingham. On the other hand apart from the fixed director's fee of £150 and the relatively trivial payments for sickness insurance neither Mr. Croft nor Mr. Korda received salary or bonus, but Billsons and Mannergrand between them received £65,150 in C the first of those years and £85,150 in the second, while Bellwedge received £93,750 and £131,867 in those years respectively. There is no allegation that these sums were not revealed in the company's accounts for those years, and those accounts were passed at an annual general meeting of the company, as regards one year, with one dissentient voice (that of a representative of Messel Nominees) and, as regards the other, D without dissent.

During 1984 the company, in accordance with the relevant provision of the Companies Act 1981, purchased 44,900 issued shares, principally from members of the family of Mr. Garrett, who had died on Christmas Eve 1982, and the executive directors purchased other shareholdings from one or more of the vendors to the company totalling 12,350 shares at the same price of £9 per share. Other minority shareholders were E offered the same price but, save for a Mr. Travis who sold 4,000 shares in July 1984 to Mr. Soames and Mr. Korda, again at £9 per share, no further shares changed hands, leaving the voting position as I described it at the outset.

Over the years while the executive directors have had control of the management of the company the trend both of profits, net assets and F dividends have all followed a general upward course. In the year ending 30 June 1977 there was a loss before taxation of £237,257, net current assets of £6,439 and no dividend was declared, while for the year ending 30 June 1984 the accounts show group profit on ordinary activities before taxation of £1,244,185, net current assets of £4,090,518 and a dividend of £1·50 per share was declared. On any view the business has expanded and is very substantial. This has been reflected by the trend in G the price paid for shares in the company, which has risen from £3 in early 1982 to £9 in 1984. The plaintiffs' complaint is that the profits should have been larger still, if the executive directors had behaved with the same commercial enthusiasm so far as the company's earnings are concerned, but with greater legal and accountancy propriety and honesty so far as payments out by the company are concerned. H

The writ was issued on 7 February 1985 with the statement of claim endorsed upon it. The claims made in the very lengthy statement of claim can be placed in four categories.

A    (1) There are claims of excessive remuneration in the strict sense of excessive payments to the person direct who is alleged to be overpaid. For example, paragraph 32 of the statement of claim avers that Mr. Soames was paid £170,239 in respect of the year ending 30 June 1984 in addition to his fixed £150 under the articles, that these payments purported to be by way of salary and bonus, that it is not admitted that any of these sums were duly paid to him, save in so far as they were

B    authorised by his service agreement, and that at least to the extent to which £170,239 exceeded £93,543 (viz. what Mr. Soames was paid in the year ending 30 June 1982) that was in excess of a commercially fair, reasonable and proper remuneration. The conclusion is drawn that to the extent of not less than £76,696 there was an ultra vires gift by the company, that the executive directors and Mr. Carr, in procuring such

C    payments, did not act in good faith or for the benefit of the company, but with a view to benefiting Mr. Soames, were in breach of their fiduciary duties and guilty of a fraud upon the minority shareholders, that those breaches were dishonest and that the executive directors and Mr. Carr were guilty of a conspiracy in so acting.

(2) The second category of claims made relates to payments made to one or other of the associated companies or Billsons which are claimed

D    also to be in whole or in part payments not authorised by the board or otherwise and constituting an ultra vires gift by the company made otherwise than in good faith or for the benefit of the company but rather with a view to benefiting the executive director concerned and made in dishonest breach of fiduciary duties by way of fraud upon the minority shareholders and the product of conspiracy.

E    I take as an example a claim to a sum of £55,300 referred to in paragraph 31(iii) of the statement of claim. In relation to that it is pleaded by paragraph 31(i) that in respect of the financial year ending 30 June 1984 the executive directors and Mr. Carr procured the payment out of the company's funds of £85,150 to Mannergrand and/or Billson, that none of those payments was authorised by the company either by virtue of any resolution of its board of directors or otherwise, and that

F    in relation to those payments to the extent of not less than £55,300 they were received by Mannergrand and/or Billson purportedly in respect of services allegedly rendered to the company by Mannergrand and/or Billson during that financial year but that in reality the company received no consideration or benefit of any kind for any of those payments to that extent but they amounted in substance to a gift out of the funds of

G    the company and were ultra vires the company. That figure of £55,300, which is the part of the total of £85,150 paid out to Mannergrand and Billson, and is claimed to be thus vitiated, is arrived at by deducting from the total payments of £85,150 £29,850, which is what Mr. Croft received from the company in respect of the financial year ended 30 June 1983 and with regard to which the plaintiffs, while not admitting that they ever became payable to Mr. Croft except to the extent that a

H    fixed salary was payable to Mr. Croft in accordance with the resolutions of the board, the last of which was for Mr. Croft's existing salary to be increased to £15,000 per annum, nevertheless do not raise a claim of an ultra vires gift or make a claim for repayment to the company. Similar

claims are raised in relation to payments made to Bellwedge such as a    A
claim to £86,868 in respect of the financial year ending 30 June 1984,
being the excess over £45,000 described as the maximum total sum
which Bellwedge was properly entitled to receive in respect of that year
in respect of Mr. Korda's employment as a full-time executive of the
company.

(3) The third category of claim is that based on infringements of
section 42 of the Companies Act 1981, more especially in relation to    B
Brindeel's purchase of 19,900 shares in the company.

(4) The fourth and last category of claim relates to expenses of the
executive directors in respect of which it is alleged that the sums in
question were not paid in respect of any expenses which the executive
director concerned had ever incurred in rendering any services to the
company. As regards those payments it is similarly alleged that they    C
were in substance gifts, either to the executive director concerned or
other persons, and therefore ultra vires the company and made by the
executive directors concerned in fraudulent breach of fiduciary duties
which constituted a fraud on the minority shareholders. Here again the
issue is not whether the payment was made, for that is conceded, but
whether it was a proper expense of the director concerned.

Finally as regards all the claims made the payments which it is sought    D
to impeach were all made out of profits available for distribution. There
is no question raised at any stage of an improper return of capital or
potential fraud on creditors.

There have been earlier proceedings in this court in this action.
Walton J. on 27 June 1986 discharged orders made the previous year by
Master Chamberlain, notably an order made on 28 March 1985 on an ex    E
parte application by the plaintiffs whereby he gave liberty to the
plaintiffs to continue the action until the conclusion of discovery and
inspection of documents, on terms that the company should pay the
plaintiffs' costs on a common fund basis down to that stage of the action
and indemnify the plaintiffs against any liability for costs down to that
stage. The decision of Walton J. is reported as *Smith v. Croft* [1986] 1
W.L.R. 580. It is primarily concerned with the costs aspects of the    F
matter with which I am not concerned but Walton J. observed of the
application before him, at p. 591:

> "This is, of course, not an application to strike out the action on the
> grounds that it cannot be justified as a minority shareholders'
> action, but quite clearly the same kind of considerations apply."

G
Similarly it is my view that there is a very large degree of overlap in the
material to be evaluated in the two applications.

Both parties agreed in submitting to me that I was not in any way
bound by Walton J.'s findings or his view of the matter in that decision,
but not surprisingly the plaintiffs submitted that Walton J.'s approach
was wrong and not one which I should follow, whereas the fourth and
ninth defendants invited me to reach similar conclusions to those which    H
he reached and for the same reasons. The situation is not simplified for
me by the facts that Walton J. refused leave to appeal, and May L.J.
subsequently gave leave to appeal on 3 July 1986, directing that the

A   appeal be not heard until the application to strike out, that is the application before me, was dealt with. It would be wrong for me to liken the Court of Appeal to the deep blue sea and even more wrong for me to liken Walton J. to the devil, but there is very clearly rather more scope than usual for any view I express to be in conflict with more authoritative ones. However, I have come to the conclusion that I should express my own views.

B   I adopt the same four-fold classification as that which I have used above in setting out the nature of the claims made by the plaintiffs in the statement of claim. I emphasise that, in assessing whether or not the plaintiffs have established a prima facie case that the company is entitled to the relief claimed, I am not deciding anything conclusively. In these circumstances it is undesirable for me to say more than is strictly

C   necessary to give my reasons for the view I have formed. In particular I propose to deal differently with the questions of law which are involved in the determination of the first question which I have to answer, namely whether the plaintiffs have established a prima facie case that the company is entitled to the relief claimed, from those which are involved in the determination of the second question which I have to answer, namely whether the plaintiffs have established a prima facie

D   case that the action falls within the proper boundaries of the exceptions to the rule in *Foss v. Harbottle*, 2 Hare 461. The former are bound to arise in the action if it proceeds and are in some cases dependent on findings of fact to be made in the action. The latter are unlikely to arise in the action, and in so far as questions of fact arise they are collateral to the issues in the action. I therefore propose only to give my prima

E   facie view with regard to the former, but to decide the latter, more especially as they were very fully argued by counsel on both sides.

I return to the four categories of claim.

(1) *Payments made to an executive director purportedly by way of remuneration*

F   No arguable ultra vires claim arises here in my view. I take as the fundamental rule in considering the scope of what is properly called ultra vires, by which I mean beyond the capacity of the company as opposed to that of its officers, the following passage in the judgment of Slade L.J. in *Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation* [1986] Ch. 246, 295:

G   "if a particular act . . . is of a category which, on the true construction of the company's memorandum, is *capable* of being performed as reasonably incidental to the attainment or pursuit of its objects, it will not be rendered ultra vires the company merely because in a particular instance its directors, in performing the act in its name, are in truth doing so for purposes other than those set out in its memorandum. Subject to any express restrictions on the

H   relevant power which may be contained in the memorandum, the state of mind or knowledge of the persons managing the company's affairs or of the persons dealing with it is irrelevant in considering questions of corporate capacity."

On that basis, whereas the excessive remuneration of a director may    A
well be an abuse of power where, as here, the power to decide on
remuneration is vested in the board, it cannot be ultra vires the
company. *In re George Newman & Co.* [1895] 1 Ch. 674 in my judgment
supports that view.

Secondly, my impression on the evidence as to quantum is that the
plaintiffs are more likely to fail than to succeed. In common with
Walton J. I find the uncontradicted evidence of the very special field in    B
which the company operates and the very high level of remuneration
which obtains in that field very much more impressive than the statistics
about general levels of professional remuneration which the plaintiffs
adduced. I therefore do not find a prima facie case that the company is
entitled to the relief claimed in this category of claim.

C

### (2) *Payments to associated companies or to Billson*

The question whether these transactions can properly be claimed to
be ultra vires is less clear cut than in relation to payments made to an
executive director purportedly by way of remuneration. But my prima
facie view is that the question should be answered similarly, that is to
say that this is not an ultra vires claim at all.

On this aspect, the defendants' case was primarily based on the    D
necessity for a proper characterisation of the payments made to the
associated company or Billson. The evidence of invoices having been
rendered by the company or firm for "services rendered," coupled with
the absence of proper board resolutions of the company authorising such
payments, and the absence of any evidence of a contractual link between
the company and the relevant associated company or Billson, showed, it    E
was argued, that there was no legal obligation whatever upon which the
impeached payments could be based. In addition they were not shown
in the company's accounts as directors' remuneration. Therefore they
did not pass the characterisation test and qualify as remuneration, so as
to be intra vires the company, whether or not proper as to quantum.
Mr. Potts relied on *In re Halt Garage (1964) Ltd.* [1982] 3 All E.R.
1016. That was a case where a liquidator of a company compulsorily    F
wound up challenged the validity of payments purportedly by way of
remuneration both to a husband and a wife, a Mr. and Mrs.
Charlesworth. The two of them were at all material times the only
shareholders and directors. The impeached drawings were mainly made
out of capital as opposed to profits and those in favour of the wife were
made when, because of illness, she took no active part at all in the    G
business. Oliver J. said in relation to the payments made to the husband,
at pp. 1038, 1039:

"I accept entirely the submissions of counsel for the liquidator that
a gratuitous payment out of the company's capital to a member,
qua member, is unlawful and cannot stand, even if authorised by all
the shareholders. What I find difficulty in accepting is that, assuming    H
a sum to be genuinely paid to a director-shareholder as remuneration
under an express power, it becomes an illegal return of capital to
him, qua member, if it does not satisfy some further test of being
paid for the benefit of the company as a corporate entity. If he

A    genuinely receives the money as a reward for his directorship, the
question whether the payment is beneficial to the company or not
cannot, as I see it, alter the capacity in which he receives it: see, for
instance, *Cyclists' Touring Club v. Hopkinson* [1910] 1 Ch. 179,
188. . . . What I think counsel's submission comes to is this, that
while the company has divisible profits remuneration may be paid
on any scale which the shareholders are prepared to sanction within
B    the limits of available profits, but that, as soon as there cease to be
divisible profits, it can only lawfully be paid on a scale which the
court, applying some objective standard of benefit to the company,
considers to be reasonable. But assuming that the sum is bona fide
voted to be paid as remuneration, it seems to me that the amount,
whether it be mean or generous, must be a matter of management
C    for the company to determine in accordance with its constitution
which expressly authorises payment for directors' services. Share-
holders are required to be honest but, as counsel for the respondents
suggests, there is no requirement that they must be wise and it is
not for the court to manage the company.

"Counsel for the liquidator submits, however, that if this is right
it leads to the bizarre result that a meeting of stupid or deranged
D    but perfectly honest shareholders can, like Bowen L.J.'s lunatic
director, vote to themselves, qua directors, some perfectly outlandish
sum by way of remuneration and that in a subsequent winding up
the liquidator can do nothing to recover it. It seems to me that the
answer to this lies in the objective test which the court necessarily
applies. It assumes human beings to be rational and to apply
ordinary standards. In the postulated circumstances of a wholly
E    unreasonable payment, that might, no doubt, be prima facie
evidence of fraud, but it might also be evidence that what purported
to be remuneration was not remuneration at all but a dressed-up
gift to a shareholder out of capital, like the 'interest' payment in
[*Ridge Securities Ltd. v. Inland Revenue Commissioners* [1964] 1
W.L.R. 479] which bore no relation to the principal sums advanced.
F    "This, as it seems to me, is the real question in a case such as
the present. I do not think that in circumstances such as those in
the instant case the authorities compel the application to the express
power of a test of benefit to the company which, certainly construed
as Plowman J. held that it should be construed, would be largely
meaningless. The real test must, I think, be whether the transaction
G    in question was a genuine exercise of the power. The motive is
more important than the label. Those who deal with a limited
company do so on the basis that its affairs will be conducted in
accordance with its constitution, one of the express incidents of
which is that the directors may be paid remuneration. Subject to
that, they are entitled to have the capital kept intact. They have to
accept the shareholders' assessment of the scale of that remuneration,
H    but they are entitled to assume that, whether liberal or illiberal,
what is paid is genuinely remuneration and that the power is not
used as a cloak for making payments out of capital to the
shareholders as such."

His conclusion on the facts as regards Mr. Charlesworth was as     A
follows, at p. 1040:

> "Turning now to the facts of the instant case, it seems to me that
> the question which I have to determine is whether, on the evidence
> before me, I can say that the payments made to Mr. Charlesworth
> and to Mrs. Charlesworth were genuinely exercises of the company's
> power to pay remuneration . . ."                                  B

and he concluded that it was, and he said, at p. 1041:

> "But I do not think that, in the absence of evidence that the
> payments made were patently excessive or unreasonable, the court
> can or should engage on a minute examination of whether it would
> have been more appropriate or beneficial to the company to fix the
> remuneration at £$X$ rather than £$Y$, so long as it is satisfied that it     C
> was indeed drawn as remuneration. That is a matter left by the
> company's constitution to its members. In my judgment, a general
> meeting was competent to sanction the payments which he"—that is
> Mr. Charlesworth—"in fact drew and the claim in misfeasance
> against Mr. Charlesworth under this head must fail."

And he said, in connection with Mrs. Charlesworth, the wife, at p. 1042:     D

> "But of course what the company's articles authorise is the fixing of
> 'remuneration,' which I take to mean a reward for services rendered
> or to be rendered; and, whatever the terms of the resolutions
> passed and however described in the accounts or the company's
> books, the real question seems to me to be whether the payments
> really were 'directors' remuneration' or whether they were gratuitous     E
> distributions to a shareholder out of capital, dressed up as
> remuneration.
> "I do not think that it can be said that a director of a company
> cannot be rewarded as such merely because he is not active in the
> company's business."

and the rest of that paragraph was concerned with refuting that     F
proposition. Going on at the foot of the page, he said, at pp. 1042–1043:

> "The difficulty that I felt about this at first was that there is, in
> relation to the misfeasance claim, which is the only claim with
> which I am concerned, no allegation of fraud or mala fides in
> relation to these payments. The liquidator's case has been argued
> throughout on the footing that they were payments of remuneration     G
> but were also payments which could not be sanctioned by a general
> meeting because it was not for the benefit of the company to
> resolve on payments on this scale. For the reasons which I have
> endeavoured to state, I think that in circumstances such as exist in
> this case, where payments are made under the authority of a
> general meeting acting pursuant to an express power, the matter
> falls to be tested by reference to the genuineness and honesty of the     H
> transaction rather than by reference to some abstract standard of
> benefit. I do not, however, think that bona fides (in the sense of
> absence of fraudulent intention) and genuineness are necessarily the

A      same thing. It is not suggested here that there was any intent to defraud, but that cannot be conclusive. As Jessel M.R. remarked in *In re National Funds Assurance Co.* (1878) 10 Ch.D. 118, 128, to say that something is done bona fide is not the same thing as merely to say that the actor had no intention to commit a fraud. The real question is, were these payments genuinely director's remuneration? If your intention is to make a gift out of the capital of the company, B      you do not alter the nature of that by giving it another label and calling it 'remuneration'."

As a matter of fact he concluded that the payments to Mrs. Charlesworth were not genuine exercises of the power to remunerate at all. He said, at p. 1043:

C      "I find it really impossible on the facts to hold that the whole of these sums, amounting to £1,500 per annum, drawn during the years 1968–69 and 1969–70, can be treated as genuine director's remuneration in any real sense of the term."

On the question whether the plaintiffs establish a prima facie case that these payments are ultra vires the company my finding is that they do not. For the reasons already given I state my reasons shortly. First, I am D      far from convinced that payments at the request of an executive director to an outside entity such as one of the associated companies or Billson is not capable of being a payment in respect of services physically rendered by the executive director concerned within the meaning of the test quoted above from the judgment of Slade L.J. in *Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation* [1986] Ch. 246. Secondly, E      the fact that in some instances part only of a series of payments is attacked as ultra vires by the plaintiffs seems to me to lend strong support to this view. There are formidable difficulties in classifying any transaction as partly ultra vires. The analogy with the curate's egg seems to me compelling.

Thirdly, *In re Halt Garage (1964) Ltd.* [1982] 3 All E.R. 1016, was concerned with remuneration out of capital and not with the principle to F      be found in *In re George Newman & Co.* [1895] 1 Ch. 674, but in any event it is to be noted that the payments which were found to be ultra vires, those to Mrs. Charlesworth, were all ultra vires, and there could scarcely have been, on Oliver J.'s reasoning, a finding that payments to Mr. Charlesworth were partly ultra vires. Finally, if the payments to the associated companies are found to be shams, as Mr. Potts contends, the G      reality thus discovered is one of the executive directors drawing remuneration for themselves or at their direction, and although that is perfectly capable of being excessive and improper it is not in itself ultra vires. In short Mr. Potts' argument in my judgment places far too much weight on the label attached to the transaction for characterisation purposes.

H      As to quantum the same considerations apply as to the claims about direct remuneration, which I dealt with earlier, but there is no doubt but that the plaintiffs are on stronger ground in criticising the mechanics of what was done. In particular, as regards the payments to Cushingham in the years ending 30 June 1981 and 1982, I find there was a prima facie

case shown of irregularity not fully cured by the subsequent adoption of    A
the accounts by the annual general meeting, at which the accounts,
which should have disclosed those payments, were adopted.

(3) *Claims under section 42 of the Companies Act 1981*

Section 42 provides:

"(1) Subject to the following provisions of this section and sections    B
43 and 44 of this Act, where a person is acquiring or is proposing to
acquire any shares in a company it shall not be lawful for the
company or any of its subsidiaries to give financial assistance directly
or indirectly for the purpose of that acquisition before or at the
same time as the acquisition takes place. (2) Subject to the following
provisions of this section and sections 43 and 44 of this Act, where    C
a person has acquired any shares in a company and any liability has
been incurred (by that or any other person) for the purpose of that
acquisition it shall not be lawful for the company or any of its
subsidiaries to give any financial assistance directly or indirectly for
the purpose of reducing or discharging the liability so incurred."

It is in relation to the latter subsection that it is claimed that financial    D
assistance was given to Brindeel to the extent of the £28,000 loans made
by associated companies to it. Financial assistance is defined by
subsection (8):

"In this section 'financial assistance' means—(a) financial assistance
given by way of gift; . . . (d) any other financial assistance given by
a company the net assets of which are thereby reduced to a material
extent or which has no net assets. In this subsection 'net assets' has    E
the same meaning as it has for the purposes of the 1980 Act."

The references to the purposes of the Companies Act 1980 is something
of a trap for the unwary because it is a reference to the purposes of the
Act of 1980 as amended by the Act of 1981. Section 87(4) of the Act of
1980 as originally enacted and so far as relevant read:

"For the purposes of this Act—. . . (c) the net assets of a company    F
are the aggregate of its assets less the aggregate of its liabilities; and
in paragraph (c) above 'liabilities' includes any provision (within the
meaning of Schedule 8 to the 1948 Act) except to the extent that
that provision is taken into account in calculating the value of any
asset of the company."

But paragraph 62(b) of Schedule 3 to the Companies Act 1981 provided    G
for the substitution for the words from "(within the meaning of" to the
end of section 87(4) the words "for liabilities or charges (within the
meaning of paragraph 88 of Schedule 8 to the 1948 Act)." It will come
as no surprise that Schedule 8 to the Act of 1948 only acquired a
paragraph 88 at all by the operation of the Companies Act 1981, itself
(see section 1(2) and Schedule 1), but if one assembles all the pieces of    H
the jigsaw the result is I think as follows:

"For the purposes of this Act (c) the net assets of a company are
the aggregate of its assets less the aggregate of its liabilities and in