# Tab 18C

Dockets.Justia.com

A    paragraph (c) above liabilities includes any amount retained as
     reasonably necessary for the purpose of providing for any liability
     or loss which is either likely to be incurred or certain to be incurred
     but uncertain as to amount or as to the date on which it will arise."

     There was some discussion in argument why this circuitous definition of
     "liabilities" was adopted in preference to the apparently identical
B    definition of "liabilities" in section 42(11) which only applies for the
     limited purposes of section 42(7). It appears that the difference between
     the two subsections (8) and (11) in relation to net assets resides in the
     different definitions to which they lead as regards "net assets" rather
     than "liabilities," but I am not directly concerned with that, there being
     no doubt but that section 42(7), which only applies to public companies,
     is irrelevant to the company here.
C         The question which therefore emerges is whether the admitted
     payments to the associated companies of £33,000 plus V.A.T. thereon
     were payments of amounts retained as reasonably necessary for the
     purpose of providing for a liability likely to be incurred, that is to say
     the remuneration of the relevant executive director. The time at which
     this has to be assessed is early August. That was after the end of the
D    financial year in relation to which it is claimed that the remuneration
     was paid (viz. that ending 30 June 1982) so that the general financial
     picture of the result of the previous year's activities would be available
     but well before the accounts for that year were drawn up, let alone
     approved by the directors, an event which in relation to the first edition
     of these accounts did not occur until November 1982. I find that a prima
     facie case of infringement of section 42 of the Companies Act 1981 is
E    established primarily because it does not seem to me to be shown that
     these were amounts retained as reasonably necessary for the purpose of
     providing for the liability likely to be incurred of paying directors'
     remuneration. I say no more than that because I am not deciding the
     point.
          On that footing there is no doubt that the claim is one in respect of
     an ultra vires transaction, for it is conceded that a transaction in breach
F    of section 42 of the Companies Act 1981 is ultra vires as well as illegal
     and not capable of ratification.

     (4) *Claims in relation to directors' expenses*

          I do not consider that there is an ultra vires claim established prima
     facie here. My reasons are similar to those in relation to direct
G    remuneration, the first category, and as to quantum I regard the report
     as rebutting a prima facie case in relation to matters arising before the
     date of the report, for in this instance, unlike the claims under section
     42 of the Companies Act 1981, the report does seem to me to state a
     definite opinion which is based on wide experience and which I am
     content to adopt for the purposes of a prima facie view. For that limited
     purpose I would also be prepared to regard the report as a general
H    guide, even as regards expenses incurred after the time covered by the
     report itself.
          The question now arises, more especially in relation to claims under
     section 42 of the Companies Act 1981 whether the plaintiffs have

established a prima facie case that the action falls within the proper
boundaries of the exceptions to the rule in *Foss v. Harbottle*, 2 Hare
461. The same question would arise if the view I have expressed
regarding the other three categories of claim is wrong.

In my judgment the arguments addressed to me on this aspect of the
case raise two questions of law and one of mixed law and fact before an
answer that the action does not fall within the proper boundaries of the
exception to the rule in *Foss v. Harbottle* could be given. The questions
of law can be formulated as follows.

(1) Is a minority shareholder always entitled as of right to bring and
prosecute an action for the company to recover money paid away in the
course of a transaction which was ultra vires the company or is the
prosecution of such an action susceptible of coming within the rule in
*Foss v. Harbottle* so that there can be circumstances in which the court
will not allow it to continue.

(2) If the latter view is the correct one in relation to those categories
of claims based on ultra vires transactions, and also in all cases of
minority shareholders' actions to recover money for the company in
respect of acts which constitute a fraud on the minority, will the court
pay regard to the views of the majority of shareholders who are
independent of the defendants to the action on the question whether the
action should proceed?

This process of ascertaining the views of the shareholders who are
independent of the defendants to the action was described by Mr. Potts
as a secondary counting of heads, an expression which did not much
commend itself to Mr. Aldous but goes some way towards explaining
what is involved. In terms of the present case the question is whether
the court should have regard to the views of Wren Trust, Georgian
Investments and Sir Reginald Sheffield, who do not want the action to
continue, or is it conclusive that the defendants have voting control so
that if the plaintiffs show a prima facie case of fraud on the minority
they have a right to prosecute to the end an action for the company to
recover in respect of the loss it has suffered, regardless of the views of
the rest of the minority. Another way of putting the question is to ask
whether if a minority has been the victim of a fraud entitling the
company in which they are shareholders to financial redress, the majority
within that minority can prevent the minority within that minority from
prosecuting the action for redress. The usual reason in practice for
wanting to abandon such an action is that there is far more to lose
financially by prosecuting the right to redress than by abandoning or not
pursuing it, and that view will be reinforced in the minds of those who
wish to abandon the claim if their opinion is that it is a bad claim
anyway.

The third question which arises is whether in this case Wren Trust
should be treated as independent, if the views of an independent
majority are relevant? That is a question of fact. But it involves a
question of law, namely what constitutes independence for this purpose?

Upon the first question of law which arises, in my judgment the
solution is to be found by a correct analysis of the rights which the
minority shareholder is seeking to exercise or enforce in relation to

A   the result of an ultra vires transaction. There was no dispute before me
but that any individual shareholder, be he in a minority or not, has a
personal right to apply to the court to restrain a threatened action which
if carried out would be ultra vires. Neither the right to object to such an
action nor the shareholder's locus standi to bring proceedings admits of
any doubt. The rule in *Foss v. Harbottle* poses no obstacle, because
neither of the two bases for the rule is applicable, that is to say the

B   matter is not, by definition, a mere question of internal management nor
is the transaction capable of ratification by or on behalf of the company.
I was referred to two general statements of the rule. The first is in
*Burland v. Earle* [1902] A.C. 83, where Lord Davey said, at p. 93:

> "It is an elementary principle of the law relating to joint stock
> companies that the court will not interfere with the internal
C     > management of companies acting within their powers, and in fact
> has no jurisdiction to do so. Again, it is clear law that in order to
> redress a wrong done to the company or to recover moneys or
> damages alleged to be due to the company, the action should prima
> facie be brought by the company itself. These cardinal principles are
> laid down in the well known cases of *Foss v. Harbottle*, 2 Hare 461
> and *Mozley v. Alston* (1847) 1 Ph. 790, and in numerous later cases
D     > which it is unnecessary to cite. But an exception is made to the
> second rule, where the persons against whom the relief is sought
> themselves hold and control the majority of the shares in the
> company, and will not permit an action to be brought in the name
> of the company. In that case the courts allow the shareholders
> complaining to bring an action in their own names. This, however,
E     > is mere matter of procedure in order to give a remedy for a wrong
> which would otherwise escape redress, and it is obvious that in such
> an action the plaintiffs cannot have a larger right to relief than the
> company itself would have if it were plaintiff, and cannot complain
> of acts which are valid if done with the approval of the majority of
> the shareholders, or are capable of being confirmed by the majority.
> The cases in which the minority can maintain such an action are,
F     > therefore, confined to those in which the acts complained of are of
> a fraudulent character or beyond the powers of the company. A
> familiar example is where the majority are endeavouring directly or
> indirectly to appropriate to themselves money, property, or
> advantages which belong to the company, or in which the other
> shareholders are entitled to participate, as was alleged in the case of
G     > *Menier v. Hooper's Telegraph Works* (1874) L.R. 9 Ch.App. 350. It
> should be added that no mere informality or irregularity which can
> be remedied by the majority will entitle the minority to sue, if the
> act when done regularly would be within the powers of the company
> and the intention of the majority of the shareholders is clear. This
> may be illustrated by the judgment of Mellish L.J. in *MacDougall
> v. Gardiner* (1875) 1 Ch.D. 13, 25.

H      "There is yet a third principle which is important for the decision
> of this case. Unless otherwise provided by the regulations of the
> company, a shareholder is not debarred from voting or using his
> voting power to carry a resolution by the circumstance of his having

a particular interest in the subject matter of the vote. This is shown
by the case before this board of the *North-West Transportation Co.
Ltd. v. Beatty* (1887) 12 App.Cas. 589. In that case the resolution of
a general meeting to purchase a vessel at the vendor's price was
held to be valid, notwithstanding that the vendor himself held the
majority of the shares in the company, and the resolution was
carried by his votes against the minority who complained."

The other general statement is in *Prudential Assurance Co. Ltd. v.
Newman Industries Ltd. (No. 2)* [1982] Ch. 204, 210 where a slightly
condensed version of a passage from Jenkins L.J.'s judgment in *Edwards
v. Halliwell* [1950] 2 All E.R. 1064, 1066 reads:

"The classic definition of the rule in *Foss v. Harbottle* is stated in
the judgment of Jenkins L.J. in *Edwards v. Halliwell* [1950] 2 All
E.R. 1064 as follows. (1) The proper plaintiff in an action in respect
of a wrong alleged to be done to a corporation is, prima facie, the
corporation. (2) Where the alleged wrong is a transaction which
might be made binding on the corporation and on all its members
by a simple majority of the members, no individual member of the
corporation is allowed to maintain an action in respect of that
matter because, if the majority confirms the transaction, cadit
quaestio; or, if the majority challenges the transaction, there is no
valid reason why the company should not sue. (3) There is no room
for the operation of the rule if the alleged wrong is ultra vires the
corporation, because the majority of members cannot confirm the
transaction. (4) There is also no room for the operation of the rule
if the transaction complained of could be validly done or sanctioned
only by a special resolution or the like, because a simple majority
cannot confirm a transaction which requires the concurrence of a
greater majority. (5) There is an exception to the rule where what
has been done amounts to fraud and the wrongdoers are themselves
in control of the company. In this case the rule is relaxed in favour
of the aggrieved minority, who are allowed to bring a minority
shareholders' action on behalf of themselves and all others. The
reason for this is that, if they were denied that right, their grievance
could never reach the court because the wrongdoers themselves,
being in control, would not allow the company to sue."

I was also referred by both sides to two articles by Mr. Wedderburn on
"Shareholders' rights and the rule in *Foss v. Harbottle*" [1957] C.L.J.
194, and [1958] C.L.J. 93, to which I should like to acknowledge my
indebtedness.

I should also say at this stage that I have not in this judgment used
the expressions "derivative" or "corporate" actions, terms which are
often used to describe certain categories of minority shareholders'
actions. There seemed to me to be a risk of apparent prejudging of
issues by the use of such terminology.

The difficulty arises in this case when one considers not the restraint
of an illegal or ultra vires transaction but the recovery on behalf of the
company of money or property which the company is entitled to claim
as the result of the ultra vires transaction. The submissions made to me

A were as follows: Mr. Aldous, with Mr. Oliver's support, drew a distinction on behalf of the fourth and ninth defendants between those cases, on the one hand, where individual shareholders, despite the rule in *Foss v. Harbottle*, can bring a personal or representative action to enforce contractual rights that the memorandum and articles be observed, such rights not being removable by simple majority votes, and, on the other hand, those cases where what is sought to be done is to bring an

B action in respect of loss already sustained by a company where the right of action is vested in the company, and an individual shareholder has, it is submitted, *no personal right of action at all but can start an action on behalf of the company if, but only if, he can bring himself within one or other of two well established exceptions to the rule in Foss v. Harbottle.* These are (1) Where the loss is attributable to an illegal or ultra vires

C act, and (2) Where the transaction complained of constitutes a fraud on the minority shareholders.

They further submitted that even where there is a right to start an action to enforce a right of the company because one or other of the exceptions to the rule in *Foss v. Harbottle* is applicable, a company acting either through an independent board of directors or pursuant to a resolution passed by a majority of independent shareholders can always

D compromise or waive the cause of action vested in it so long as the decision in question to compromise or waive is taken by the persons concerned bona fide and for reasons genuinely believed to be in the best interests of the company. If such a decision is taken any action started on behalf of the company by a minority shareholder should not be allowed to proceed.

E Mr. Potts, on the other hand, drew a distinction between those cases where the minority shareholder on behalf of the company was seeking to rescind a transaction carried out ultra vires and those where, without seeking to rescind the ultra vires transaction, the minority shareholder was seeking to recover damages or other compensation on behalf of the company. In the former Mr. Potts submitted the minority shareholder was entirely outside the rule in *Foss v. Harbottle* and had an indefeasible

F right to bring and prosecute the proceedings. There was, he submitted, no difference in principle between his right to bring such proceedings for *recission and recoupment and his right to restrain a threatened ultra vires transaction:* both were personal rights vested in the individual shareholder which it was entirely within his power to bring or not. He also added that in cases where the plaintiffs rely on ultra vires

G transactions it is not necessary to prove that the defendants have control of the company.

This latter point I can dispose of at once by accepting it. By itself, it does not advance the matter much. Mr. Potts did not contend that it was never possible for a company validly to abandon, compromise or decide temporarily not to pursue a right of action for damages vested in it as a result of an ultra vires transaction effected on its behalf, but he

H submitted that the arguments advanced by the defendants involved denying the ultra vires doctrine altogether and that exactly the same wrong was involved in relation to a past ultra vires transaction as in relation to a prospective one, so that if the defendants' arguments based

on a company's ability to release its cause of action in respect of a past    A
ultra vires transaction were well founded, the same arguments would
apply to a prospective ultra vires transaction, where it is common
ground the minority shareholder has a right of action which the company
cannot control.

Treating the matter as a question of principle for the moment, when
a minority shareholder seeks to enforce a right of the company to claim
compensation for a past ultra vires transaction there are two quite         B
separate rights involved. First, there is the minority shareholder's right
to bring proceedings at all and secondly, there is the right of recovery
which belongs to the company but is permitted to be asserted on its
behalf by the minority shareholder. The passage I have quoted from
Lord Davey's speech in *Burland v. Earle* [1902] A.C. 83, 93 makes it
clear that the bringing of an action in the name of the company is mere    C
matter of procedure in order to give a remedy for a wrong which would
otherwise escape redress. That is an echo of what was said in one of the
two cases often cited as the foundation for these doctrines, namely
*Mozley v. Alston* (1847) 1 Ph. 790, 801, where Lord Cottenham L.C.
said of a bill alleging that a large majority of the shareholders were of
the same opinion as the plaintiffs:                                         D

> "to allow, under such circumstances, a bill to be filed by some
> shareholders on behalf of themselves and others, would be to admit
> a form of pleading which was originally introduced on the ground of
> necessity alone, to a case in which no such necessity exists."

True it is the Court of Appeal in *Prudential Assurance Co. Ltd. v.*
*Newman Industries Ltd. (No. 2)* [1982] Ch. 204, 221 said that they were   E
not convinced that it was a practical test to adopt to hold, as Vinelott J.
had done at first instance, that there was an exception to the rule in
*Foss v. Harbottle* wherever the justice of the case so requires. But the
fact that such a yardstick would or might be unsatisfactory because it
does not give a practical guide to the limits of the rule and its exceptions
does not detract from the fact that the whole doctrine whereby a           F
minority shareholder is permitted to assert claims on behalf of the
company is rooted in a procedural expedient and adopted to prevent a
wrong going without redress. Where what is sought is compensation for
the company for loss caused by ultra vires transactions the wrong, in my
judgment, is a wrong to the company, which has the substantive right to
redress. Where the minority shareholder is seeking to prevent an ultra     G
vires transaction or otherwise seeking to enforce his personal substantive
rights, the wrong which needs redress is the minority shareholder's
wrong.

The peculiar status of the minority shareholder in such actions is also
illustrated by the judgments in the Court of Appeal in *Towers v. African*
*Tug Co.* [1904] 1 Ch. 558, where a company had declared and paid
illegally a dividend out of capital and two shareholders who had            H
themselves received their portion of the illegal dividend were held to be
disentitled to bring an action on behalf of the company for repayment
by the directors. Vaughan Williams L.J. said, at p. 566:

A      "In that state of things, what ought to be done with this action?
There is no doubt that the payment of this interim dividend was an
ultra vires payment. I start with the assumption one is bound to
make, that if an act is done by a company which is ultra vires, no
confirmation by shareholders—not even by every member of the
company—can convert that which was ultra vires into something
intra vires: it always must be ultra vires. As is pointed out in one or
B      two of the cases, the result of that is that if the company are
plaintiffs, no amount of acquiescence or resolutions by the
shareholders can form an answer to the action by the company for
the reinstatement of things in the position in which they would have
been but for the ultra vires act complained of. But, to my mind, it
is a different thing where the action is brought by a shareholder on
C      behalf of himself and other shareholders. I am assuming this case to
be one of those in which the facts have been such that an individual
shareholder ought to be able to sue in a representative action for
the purpose of preventing acts being done in reference to the
company in which the shareholders are interested, and which might
damnify the company by reason of those acts being ultra vires. I
assume that an action not only to prevent ultra vires acts in the
D      future but also to remedy acts that have been done ultra vires is an
action which can be brought in the form in which this action is
brought. But although that is so, my own opinion is that this is a
kind of action which has to be brought by a plaintiff personally. It is
an action which he cannot bring unless he has an interest; it is an
action which a stranger could not bring."

E      Stirling L.J. said, at p. 569:

       "It is proved beyond all contradiction by documents under the hand
of Mr. Towers that he was perfectly well aware of the circumstances
in which the dividend was paid. It is true that Mr. Wedlake was not
in the same position as Mr. Towers; but I think, having regard to
the admissions which he made by not denying the allegation in the
F      counterclaim—that he received his dividend 'with full notice of all
the facts relating thereto'—and to the fact of his having submitted
to judgment against himself on that footing, and also having regard
to the high probabilities of the case, that, inasmuch as he did not
choose to go into the box and deny it, we ought to assume that he,
like his partner Mr. Towers, knew the circumstances in which the
G      dividend was declared.
       "Now the action is one by the plaintiffs on behalf of themselves
and all other shareholders against the company; originally all the
shareholders were not made parties, but the other shareholders
were afterwards, at their own request, made defendants, so that
now we have here all the shareholders of the company. I think this
is a form of action which in certain circumstances may be maintained.
H      That a shareholder who had received a dividend, without knowing
anything of the illegality of it, might maintain such an action I do
not doubt. Whether in some circumstances a shareholder so suing
ought not to return what he had received in respect of dividend is

another question. Why is it that this form of action is allowed?    A
Prima facie the proper plaintiff, where it is sought to bring back the
property of the company into its own coffers, is the company itself.
But there are exceptions to that rule; and what is the reason of the
exceptions? Sir George Jessel M.R. in the case which has been
referred to of *Russell v. Wakefield Waterworks Co.* (1875) L.R. 20
Eq. 474, 480, says this: 'The exceptions turn very much on the
necessity of the case; that is, the necessity for the court doing    B
justice.' "

Cozens-Hardy L.J. said, at p. 571:

"An action in respect of or arising out of an ultra vires transaction
ought properly to be brought by the company; but it has long been
well established that there are cases in which such an action may be    C
maintained by a shareholder suing on behalf of himself and all other
shareholders against the company as defendants. I will not pause to
consider under what particular circumstances such an action may be
maintained, but I assume that this is one of those cases in which
such an action may be maintained—I mean in point of form. But I
think it is equally clear that the action cannot be maintained by a
common informer. A plaintiff in an action in this form must be a    D
person who is really interested. When you get that fact clearly
established it seems to me impossible to avoid taking the next
step—that all personal objections against the individual plaintiff
must be gone into and considered before relief can be granted."

That decision illustrates the dual nature of the rights involved. The    E
minority shareholder's locus standi as someone with a real interest
greater than that of a common informer is defeasible by showing a
personal disability to sue such as was present in *Towers v. African Tug
Co.* But as Lord Davey said in *Burland v. Earle* [1902] A.C. 83, 93 the
plaintiffs cannot have a larger right to relief than the company itself
would have if it were plaintiff. And from that it follows in my judgment
that if there is a valid reason why the company should not sue it will    F
equally prevent the minority shareholder from suing on its behalf. He is
therefore liable to be defeated on two points, first by any ground
preventing him from exercising his procedural remedy, and secondly by
any ground preventing the company from exercising its substantive right.
Conversely, however, he is able to assert a cause of action which arose
before he became a shareholder because it is the company's and not his    G
substantive right that is being enforced: *Seaton v. Grant* (1867) L.R. 2
Ch.App. 459.

Where ultra vires transactions are involved the number of grounds
upon which the company can be debarred from suing is limited. In
particular it was not argued that ratification of the ultra vires transaction,
by however large a majority of shareholders, could prevent the company
from suing. There is, however, a clear difference in principle between    H
ratifying what has been invalidly done in the past and abandoning,
compromising or not pursuing rights of action arising out of a past ultra
vires transaction, and I see no reason in principle why in appropriate

A  circumstances the latter should not intervene to prevent the prosecution of a suit on behalf of the company in relation to such rights of action.

Conversely I am not persuaded of the validity of the criterion suggested by Mr. Potts for separating actions brought by minority shareholders to recover property for the company into those where it is sought to rescind the relevant ultra vires transaction or otherwise have it set aside, on the one hand, and those where that transaction is not
B  sought to be set aside but damages or other compensation is claimed, on the other hand. The former according to Mr. Potts' argument fall entirely outside the rule in *Foss v. Harbottle*, while the latter are, he accepts, within its potential ambit. This distinction in my judgment places too much emphasis on the nature of the remedy sought rather than the substantive right and the legal person in whom it is beneficially
C  vested.

So much for the principles which seem to me to apply to the first legal question which falls for determination. Is there any authority which precludes me from giving effect to the view which I have expressed? I was referred to a very large number of authorities and I see no useful purpose in going through them all. There are certain discernible categories.
D  (1) One category is where articles of association require a particular type of majority such as a special resolution and it has been held that a simple majority incapable of constituting such a majority cannot achieve indirectly what it is forbidden to achieve directly. An example is *Baillie v. Oriental Telephone and Electric Co. Ltd.* [1915] 1 Ch. 503, 511 where in the course of argument in relation to a submission by counsel that "If
E  the majority wish an action to be brought and it is found that the special resolutions were improperly obtained, then they would be nullified," Swinfen Eady L.J. said: "It might be opposed by a bare majority, with the result that a bare majority might supersede the necessity for a special resolution."

In his judgment he said, at p. 518:

F     "It was then contended that the plaintiff is not entitled to sue. The plaintiff's counsel urged that if this as a special resolution was invalidly passed, how is it to be impeached if the plaintiff cannot sue; how can the question of illegality be raised? Suppose he called a meeting and the majority of the shareholders were to say 'We are content with the present position, and we will not raise any question,' can it be said that by a side wind, as it were, not being
G     able to pass a valid special resolution, they could pass an invalid one and then by a bare majority say we will not allow any proceedings to be taken? In my opinion they cannot do that."

That type of case is concerned with preventing the indirect achievement of an unlawful object which raises different considerations from the recovery of compensation for past illegalities.
H  (2) Another category consists of cases on demurrer, mostly in the middle and last part of the 19th century but including *Birch v. Sullivan* [1957] 1 W.L.R. 1247, although that case was concerned with misfeasance rather than ultra vires. Cases on demurrer are necessarily concerned

with the locus standi of the plaintiff to bring the proceedings in question      A
rather than the question whether a properly constituted action should be
allowed to proceed. The cases principally relied on by Mr. Potts in this
category included *Foss v. Harbottle,* 2 Hare 461 itself, where there were
in fact two complaints made by the plaintiffs, one based on improper
intra vires acts and the other on ultra vires activities described by
Wigram V.-C., at p. 493, as mortgaging in a manner not authorised by
the powers of the Act, and of which he said,                                     B

> "This, being beyond the powers of the corporation, may admit of
> no confirmation whilst any one dissenting voice is raised against it."

The first complaint is the context for the very famous statement of basic
principle which has given the name of the case to the rule which has
been applied on innumerable subsequent occasions.                                C

Mr. Potts relied on this decision as supporting his submission that
where there is no claim for rescission of an ultra vires transaction a
minority shareholder may be debarred from bringing an action on behalf
of the company and that Wigram V.-C. did not deal with what his
position would have been had such a claim been made. I accept that
submission which seems to me substantiated by the passage, 2 Hare 461,
504, 505:                                                                        D

> "The case made with regard to these mortgages or incumbrances is,
> that they were executed in violation of the provisions of the Act.
> The mortgagees are not defendants to the bill, nor does the bill
> seek to avoid the security itself, if it could be avoided, on which I
> give no opinion. The bill prays inquiries with a view to proceedings
> being taken aliunde to set aside these transactions against the       E
> mortgagees. The object of this bill against the defendants is to make
> them individually and personally responsible to the extent of the
> injury alleged to have been received by the corporation, from the
> making of the mortgages. Whatever the case might be, if the object
> of the suit was to rescind these transactions, and the allegations in
> the bill showed that justice could not be done to the shareholders
> without allowing two to sue on behalf of themselves and others,       F
> very different considerations arise in a case like the present, in
> which the consequences only of the alleged illegal acts are sought to
> be visited personally upon the directors. The money forming the
> consideration for the mortgages was received, and was expended in,
> or partly in, the transactions which are the subject of the first
> ground of complaint. Upon this, one question appears to me to be,     G
> whether the company could confirm the former transactions, take
> the benefit of the money that has been raised, and yet, as against
> the directors personally, complain of the acts which they have done,
> by means whereof the company obtains that benefit which I suppose
> to have been admitted and adopted by such confirmation. I think it
> would not be open to the company to do this; and my opinion
> already expressed on the first point is, that the transactions which  H
> constitute the first ground of complaint may possibly be beneficial to
> the company, and may be so regarded by the proprietors, and admit
> of confirmation. I am of opinion that this question,—the question of

A confirmation or avoidance,—cannot properly be litigated upon this record, regard being had to the existing state and powers of the corporation, and that therefore that part of the bill which seeks to visit the directors personally with the consequences of the impeached mortgages and charges, the benefit of which the company enjoys, is in the same predicament as that which relates to the other subjects of complaint. Both questions stand on the same ground, and, for

B the reasons which I stated in considering the former point, these demurrers must be allowed."

The decision shows quite clearly that similar considerations are capable of applying to an action based on an ultra vires transaction as to a claim based on breach of duty so that the rule in *Foss v. Harbottle* can apply

C to the former. It is not in any way conclusive on the nature of the minority shareholder's right to bring proceedings in respect of compensation for an ultra vires transaction.

In *Salomons v. Laing* (1850) 12 Beav. 377 the side note reads:

"The directors of one incorporated railway company paid over its funds to another railway company, for purposes wholly unauthorised; and the latter received them with knowledge of the breach of trust.

D *Held*, on demurrer, that the second company were properly made parties to a suit to bring back the fund; and, secondly, that, in such a case, an individual shareholder in the first company might sue the second company 'on behalf' etc., without alleging that the corporation of which he was a member had refused to sue."

E The plaintiff's right to sue the directors and the South Coast Co., the first company referred to, was conceded and the only matters on which issue was joined on demurrer was whether the Portsmouth company, the second company referred to, could properly be joined as defendant and whether the plaintiff could sue them direct without proving that he had previously attempted to get the concurrence of the South Coast company to sue, both of which were answered in the affirmative. At its highest

F the case proves no more than that a minority shareholder has a locus standi to bring an action for recovery of property paid out of a company in an ultra vires transaction and is not obliged to prove that an unsuccessful attempt to get the company to sue has been made. Neither of these is disputed.

*Bagshaw v. Eastern Union Railway Co.* (1849) 7 Hare 114 was

G another case on demurrer but, contrary to the side note, was concerned not only with a threatened ultra vires application of funds but also with a past misapplication. Here again though, in my judgment, all that was decided was the plaintiff's locus standi to sue in respect of both past and threatened ultra vires activities. Wigram V.-C. said, at p. 129:

"No majority of the shareholders, however large, could sanction the misapplication of this portion of the capital. A single dissenting

H voice would frustrate the wishes of the majority. Indeed, in strictness, even unanimity would not make the act lawful. This appears to me to take it out of the case of *Foss v. Harbottle*, 2 Hare 461 to which I was referred. That case does not, I apprehend, upon

this point, go further than this: that if the act, though it be the act      A
of the directors only, be one which a general meeting of the
company could sanction, a bill by some of the shareholders, on
behalf of themselves and others, to impeach that act, cannot be
sustained, because a general meeting of the company might
immediately confirm and give validity to the act of which the bill
complains."

                                                                         B

Mr. Potts submitted that the passage showed that the rule in *Foss v.
Harbottle* was not concerned with ultra vires transactions. That, in my
judgment, is far too wide a proposition. In *Foss v. Harbottle* itself, as
Mr. Potts rightly pointed out, Wigram V.-C. himself dealt in the same
way with claims based both on intra vires but improper transactions and
on ultra vires transactions. Certainly *Bagshaw's* case, 7 Hare 114 is     C
authority for the proposition that a minority shareholder can in
appropriate circumstances have a sufficient interest to bring an action for
relief with regard to past as well as future apprehended ultra vires
transactions. The fact that both past and future acts were involved might
well constitute appropriate circumstances.

*Russell v. Wakefield Waterworks Co.* (1875) L.R. 20 Eq. 474 was a
decision of Sir George Jessel M.R. that was concerned with recovery of    D
some £5,500 claimed by plaintiff minority shareholders to have been
paid out ultra vires to the promoters of a competing undertaking to
dissuade them from promoting a bill in Parliament in competition with
the company's undertaking. In terms the decision allowed a demurrer on
the grounds that ultra vires was inadequately pleaded and there was no
sufficient allegation that there was a reason preventing the company      E
itself from suing. Jessel M.R. also examined what he described as the
exceptions to the rule laid down in *Foss v. Harbottle*, and said, at
p. 480: "the exceptions depend very much on the necessity of the case,
that is the necessity for the court doing justice."

He identified two such exceptions. One he described, at p. 481, as
cases "in which an individual corporator sues the corporation to prevent
the corporation either commencing or continuing the doing of something    F
which is beyond the powers of the corporation." He went on to point
out that this may involve the joinder of a non-corporator who is a party
to the ultra vires transaction, and that in turn may lead to the action
embracing the recovery from that third party of money paid under such
an ultra vires agreement. He continued, at pp. 481–482:

"If the detainer or holder of the money or property, that is, the     G
second corporation or other person, is already a party, and a
necessary party, to the suit, it would be indeed a lame and halting
conclusion if the court were to say it could [not] do justice in a suit
so framed by ordering the money to be returned or the property
restored."—It is perfectly clear that the word "not" has dropped out
between "could" and "do." The judgment continues—"It is a
necessary incident to the first part of the relief which can be      H
obtained by individual corporators, and will do complete justice on
each side, and that has always been the practice of the court.
Therefore, in a case so framed there is no objection to a suit by an

A    individual corporator to recover from another corporator, or from any other persons being strangers to this corporation, the money or property so improperly obtained. But that is not the only case. Any other case in which the claims of justice require it is within the exception."

B    If anything that decision seems to me to assist the defendants, because in relation to the ultra vires aspect of the matter it emphasises the necessity of flexibility to attain justice rather than the imposition of hard and fast rules.

    In my judgment the above cases on demurrer establish that a minority shareholder can, as Mr. Potts argued, have a locus standi to bring an action to recover on behalf of a company property or money transferred or paid in an ultra vires transaction and that it is not a necessary averment that control is vested in individual defendants so as to prevent the company from bringing the proceedings. I am not persuaded that it follows from that that the minority shareholder necessarily has an individual and indefeasible right to prosecute that action on the company's behalf.

D    (3) A third category of case which I only mention to dispose of is made up of matters which the court concludes are mere matters of internal management. *MacDougall v. Gardiner* (1875) 1 Ch.D. 13 is an example. They are of no assistance to the present problem.

    (4) A further category are those cases where an individual member either of a company or a trade union has been held to be entitled to restrain illegal activity by the company or association to which he belongs. That in itself is not a subject of dispute. *Simpson v. Westminster Palace Hotel Co.* (1860) 8 H.L.Cas. 712 is House of Lords authority if it be needed. Of more help, however, are some modern trade union cases. Thus in *Edwards v. Halliwell* [1950] 2 All E.R. 1064, from which I have already cited the general statement by Jenkins L.J. quoted by the Court of Appeal in *Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2)* [1982] Ch. 204 there is what seems to me a revealing contrast in the treatment by Jenkins L.J., at p. 1067, on the one hand, of acts complained of which are wholly ultra vires the company and therefore incapable of confirmation by a majority so that they constitute exceptions to the general ambit of the rule in *Foss v. Harbottle*, 2 Hare 461 and, on the other hand, cases such as *Edwards v. Halliwell* [1950] 2 All E.R. 1064 itself as to which Jenkins L.J. said, at p. 1067:

G    "In my judgment, this is a case of a kind which is not even within the general ambit of the rule. It is not a case where what is complained of is a wrong done to the union, a matter in respect of which the cause of action would primarily and properly belong to the union. It is a case in which certain members of a trade union complain that the union, acting through the delegate meeting and the executive council in breach of the rules by which the union and every member of the union are bound, has invaded the individual rights of the complainant members, who are entitled to maintain themselves in full membership with all the rights and privileges appertaining to that status so long as they pay contributions in

accordance with the tables of contributions as they stood before the    A
purported alterations of 1943, unless and until the scale of
contributions is validly altered by the prescribed majority obtained
on a ballot vote. Those rights, these members claim, have been
invaded. The gist of the case is that the personal and individual
rights of membership of each of them have been invaded by a
purported, but invalid, alteration of the tables of contributions. In
those circumstances, it seems to me the rule in *Foss v. Harbottle* has    B
no application at all, for the individual members who are suing sue,
not in the right of the union, but in their own right to protect from
invasion their own individual rights as members."

The boundary there seems to me very clearly drawn between suits in the
right of the union and suits to protect the individual rights of members.    C
The former are capable of coming within the rule in *Foss v. Harbottle*;
the latter are not.

(5) Another category is to be found where the constitution of a
corporation has been sought to be varied in a manner which is ultra
vires, e.g. by amalgamation. *Clinch v. Financial Corporation* (1868)
L.R. 5 Eq. 450, affirmed by the Court of Appeal at L.R. 4 Ch.App.
117, is an example of such a case, but the shareholder's right in such a    D
case was described by Lord Cairns L.C., at p. 122, as a right to bring a
suit to arrest a contract on the ground that it was in the eye of the court
beneficial to all the shareholders to do so. Similarly Wood V.-C., who
heard the case at first instance as well as in the Court of Appeal, said
that every shareholder is supposed to have a common interest with the
plaintiff in varying any arrangement that may have been entered into    E
ultra vires. The fact that even such ultra vires arrangements are capable
of being within the ambit of the rule in *Foss v. Harbottle* is shown very
clearly by *Gray v. Lewis* (1873) L.R. 8 Ch.App. 1035 chosen by the
court in *Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No.
2)* [1982] Ch. 204, 217–219, as a simple application of the first aspect of
the rule in *Foss v. Harbottle*, viz. that a company is the proper plaintiff    F
to sue for redress for moneys due to it.

I turn now to a modern case from which I have derived much
assistance. This is *Taylor v. National Union of Mineworkers (Derbyshire
Area)* [1985] B.C.L.C. 237. The headnote reads:

"In September 1984 the plaintiffs, who were members of the
Derbyshire Area of the National Union of Mineworkers (the    G
Derbyshire union), were successful in obtaining, inter alia, a
declaration that a strike called by their union (the Derbyshire
union) and the National Union of Mineworkers (N.U.M.) was
unlawful. The plaintiffs sought in the present proceedings by way of
summary judgment an order restraining the defendants, who were
the Derbyshire union and some of its officers, from using the funds
of the Derbyshire union for the purpose of a strike called by the    H
N.U.M. and the Derbyshire union, and requiring those defendants
who were officers of the Derbyshire union to restore to the union
funds which had been used for this purpose.

A     "*Held*—Injunction granted: summary judgment on the monetary claim refused. Where a member of a union commenced an action on behalf of the union, the union would be treated as being analogous to a company and the member's standing to bring the action would be determined on the same principles as those applicable to an action brought by a shareholder on behalf of a company. These principles did not prevent an individual member

B from maintaining an action on behalf of the union against its officers where it was clear that the officers had made an ultra vires application of the funds which could not be ratified by the members. In such an action by a member of the union against its officers for the ultra vires misapplication of the union's funds, the court could order the officers responsible to restore the funds as such

C misapplication would constitute a breach of fiduciary duty. On the facts, it was clear that the Derbyshire union's funds had been used to support the strike and there was no reasonably arguable case that this payment was authorised by the union's rules or could be ratified by the members of the union. Accordingly, as a matter of principle, the plaintiffs were entitled to the order which they sought. However,

D although the making of the payment could not be ratified by the members of the union, the members could resolve to take no action to remedy the wrong done to the union provided that such resolution was made in good faith and for the benefit of the union. As there was evidence to suggest that the members might so resolve, and as the circumstances in this case were otherwise exceptional, the court would not grant summary judgment on the monetary claims."

E
Then there is a statement that an injunction to prevent future misapplications was available to them. Vinelott J. said, at p. 241:

    "The first question is whether the plaintiffs are in a position to maintain an action against the individual defendants in effect on behalf of the Derbyshire union whose members have not been consulted on the question whether proceedings should be brought

F against the individual defendants. A great wealth of authority has been cited on this issue. The position, in my view, is not open to serious doubt."

He then proceeded to review the authorities, and said, at p. 246:

G     "The principles which emerge are, I think, clear. *Foss v. Harbottle* applies to a union but does not bar the right of an individual to maintain an action joining the union and its officers as defendants and claiming that a particular application by the officers was ultra vires and an injunction to restrain further application of the funds of the union for the same purposes and requiring the officers to make good the loss to the union. Being ultra vires the misapplication

H cannot be ratified by any majority of the members.

    "The central issue in this case is whether the payments, amounting to over £1·7 million, were misapplications of the funds of the union within the exception to the rule in *Foss v. Harbottle*."

He answered that question, after a review of the authorities and facts, at   A
p. 254:

> "If that is the right conclusion, then it seems to me that it must
> follow that any payment to a member on unofficial strike whether
> by way of weekly allowance or by way of intermittent payment or
> by meeting expenses directly or in any other way with a view to
> making good the wages lost by the member on unofficial strike must   B
> be equally impermissible. So also must payments to pickets be
> impermissible. . . . I find myself therefore driven to the conclusion,
> uncomfortable though it is, that once it is accepted that the
> payments in question were made, as they admittedly were made, to
> pickets and otherwise in furtherance of the strike or for the relief of
> miners on unofficial strike from hardship caused by the stoppage of
> work and wages, the conclusions that follow inevitably are first that   C
> the payments were beyond the powers of the union; second, that
> the two officers, the second and third defendants, who made or
> sanctioned the payments, are liable to reimburse the union; third,
> that the plaintiffs are entitled to maintain this action; and fourth,
> that the misapplication of the union's fund cannot now be ratified
> by any majority of the members, however large. Should I therefore,   D
> make the order which is sought?
>
> "I have come to the conclusion that I should not. My reasons
> are shortly as follows. Although the misapplication of the funds of a
> corporate body (I include for this purpose funds belonging to a
> union) cannot be ratified by any majority of the members, however
> large, it is open to a majority of the members, if they think it is
> right in the interests of the corporate body to do so, to resolve that   E
> no action should be taken to remedy the wrong done to the
> corporate body and such a resolution, if made in good faith and in
> what they considered to be for the benefit of the corporate body,
> will bind the minority. The majority of the members of a trading
> company, for instance, might properly take the view that the
> publicity, costs, and the inevitable loss, let us say, of the services of   F
> a managing director, who would be the defendant, would outweigh
> the benefit to the company of successfully prosecuting an action and
> might properly decide not to pursue it; although, of course, a
> contractual release of the right of action, as compared with a
> decision simply not to institute proceedings, would require to be
> supported by some consideration.
>
> "In the instant case there is an impressive body of evidence filed   G
> on behalf of the defendants which is designed to establish that the
> overwhelming majority of members approves the expenditure in
> question. It must, I think, follow that they would most probably
> oppose proceedings for the recovery of the moneys misapplied."

He then went on to deal with three particular reasons advanced by
counsel for the plaintiffs against a refusal to give summary judgment.   H
They are particular to the facts of that case and neither the reasons nor
the basis for Vinelott J.'s rejection of them is directly material to this
case. Vinelott J.'s conclusions were stated, at p. 256:

A        "In these circumstances I have come to the conclusion that the right course is not to make an order for summary judgment in the hope that the action will come on, if it does come on, after this dispute has been settled, and that the members will be able to work together in the future for their common benefit within the rules of the union. It will be said that this is a case where hard cases make bad law. My reply to that is that it sometimes happens that hard

B        cases make good law, because they compel a radical re-examination of principles which, rigidly applied, would lead to a result which would be felt widely to be unjust. In particular, the boundary between ratifying a misapplication of a union's funds and resolving to take no action to recover funds innocently misapplied may not be easy to draw in the case of a union and this aspect of the case may,

C        I think, merit further consideration when the union is properly represented."

That authority draws the distinction between impossibility of ratification and the possibility of not suing in respect of the consequences of ultra vires transactions very clearly and in my judgment lends strong support to the view in principle which I have expressed. Overall therefore, on

D        the authorities cited to me, I conclude that there is some support for and no absolute bar on that conclusion.

Another consideration which tends in the same direction is that the plaintiffs have applied for, and until Walton J. discharged the master's order obtained, the benefit of an indemnity as to costs in respect of the action. There was never any suggestion that the plaintiffs were enforcing

E        personal rights in respect of the claimed ultra vires transactions as opposed to the rights of the company. On the contrary, the whole basis of the decision on which reliance was placed—*Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373—was that the minority shareholder was acting for the benefit of the company rather than asserting an individual right.

Reliance was also placed by Mr. Aldous on *Viscount of the Royal Courts of Jersey v. Shelton* [1986] 1 W.L.R. 985 as supporting the

F        distinction between the impossibility of ratifying an ultra vires transaction and the possibility of a compromise or release of a right of action in respect of such a transaction. I accept Mr. Potts' submission that this authority is concerned with the rather different point how far articles of association can, outside this jurisdiction, which has a statutory prohibition, now contained in section 310 of the Companies Act 1985, confer an

G        immunity from suit on directors who participate in breaches of their fiduciary duty. That is not to say that I regard the distinction drawn by Mr. Aldous as an invalid one.

Mr. Potts further submitted that there were three objections to any reliance on a release, or the equivalent of a release, of the claims against defendants in relation to ultra vires acts. The first was that the right in question was that of the minority shareholder and not of the

H        company, so that neither the board nor the shareholders in general meeting could release it. That I have already dealt with.

Secondly, assuming it to be legally possible, he submitted first that the board had no available power to do so, and that, in the circumstances

of the present case, is not in dispute; and secondly, that the company in    A
general meeting could only do so by special resolution. The reason for
this was that by article 80 of Table A which applies to the company the
management of the business of the company is given to the directors. It
followed that the shareholders could only pass a valid resolution about
the conduct of proceedings, which it is common ground is part of the
business of the company, by a resolution capable of altering the articles,
i.e. a special resolution. In support he cited the passage in *Buckley on*    B
*the Companies Acts,* 14th ed. (1981), vol. 1, p. 989, under the heading
"How far members may control directors:"

> "There is no provision in this Act corresponding with section 90 of
> the Companies Clauses Consolidation Act 1845, which provides that
> the exercise by the board of their powers shall be subject to the
> control of any general meeting specially convened for the purpose.    C
> And it appears now to be established that under an article in the
> present form, whatever effect is to be given to the words 'to such
> regulations, being not inconsistent with the aforesaid regulations or
> provisions, as may be prescribed by the company in general
> meeting', these words do not enable the shareholders, by resolution
> passed at a general meeting without altering the articles, to give    D
> directions to the directors as to how the company's affairs are to be
> managed, nor to overrule any decision come to by the directors in
> the conduct of its business, even as regards matters not expressly
> delegated to the directors by the articles."

Mr. Aldous countered this submission by drawing a distinction between
shareholders in general meeting seeking to compel directors to do that    E
which they declined to do and shareholders in general meeting authorising
or ratifying a matter which the directors considered to need their
authority or ratification. In the former case a special resolution is
needed: in the latter an ordinary resolution will suffice. In my judgment
that distinction is validly made and is supported by Buckley J.'s decision
in *Hogg v. Cramphorn Ltd.* [1967] Ch. 254. Buckley J. said, at p. 269:

> "Mr. Instone says, no doubt rightly, that the company in general    F
> meeting could not by ordinary resolution control the directors in the
> exercise of the powers under article 10. He goes on to say, with less
> justification, that what they could not ordain a majority could not
> ratify. There is, however, a great difference between controlling the
> directors' exercise of a power vested in them and approving a
> proposed exercise by the directors of such a power, especially where    G
> the proposed exercise of the power is of a kind which might be
> assailed if it had not the manifest approval of the majority. Had the
> majority of the company in general meeting approved the issue of
> the 5,707 shares before it was made, even with the purported
> special voting rights attached (assuming that such rights could have
> been so attached conformably with the articles), I do not think that    H
> any member could have complained of the issue being made; for in
> these circumstances, the criticism that the directors were by the
> issue of the shares attempting to deprive the majority of their
> constitutional rights would have ceased to have any force. It follows

A     that a majority in a general meeting of the company at which no votes were cast in respect of the 5,707 shares could ratify the issue of those shares. Before setting the allotment and issue of the 5,707 shares aside, therefore, I propose to allow the company an opportunity to decide in general meeting whether it approves or disapproves of the issue of these shares to the trustees."

B     That passage was cited with approval by Harman L.J. in *Bamford v. Bamford* [1970] Ch. 212, 240–241. In my judgment it would not be right in a case where the court declines to act on the views of the board as not sufficiently disinterested, to assume that the board was not merely disqualified but also opposed to a decision by the shareholders in general meeting. I see no difference in principle between directors referring a doubtful matter to shareholders in general meeting and the

C     court taking into account the views of shareholders in general meeting where the directors are effectively disqualified from speaking for the company. On this aspect of the matter I accept Mr. Potts' submission that the Court of Appeal in *Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2)* [1982] Ch. 204, did not deal at all with the question what sort of resolution would have been needed regarding the

D     non-prosecution of the action.

      Mr. Potts' third point was that in any event Wren Trust's views should not be taken into account. I propose to deal with that later.

      I turn now to the question whether it is right for the court to have regard to the views of the majority inside a minority which is, I assume for this purpose, in a position to bring an action to recover on behalf of the company in respect of breaches of duty by persons with overall

E     control.

      The fourth and ninth defendants claim that it is, the plaintiffs claim that it is not. On their view of the matter all that the court is concerned with, in cases where the exception to the rule in *Foss v. Harbottle*, 2 Hare 461 based on frauds on the minority applies, is the single question whether the defendants have control. The issue is highlighted by the conflicting interpretations placed by the parties on what the Court of

F     Appeal said in *Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2)* [1982] Ch. 204. Immediately after the formulation, at pp. 221–222, of the two matters which in the Court of Appeal's view a plaintiff ought at least to be required to show before proceeding with a minority shareholder's action there comes the following sentence:

G          "On the latter issue it may well be right for the judge trying the preliminary issue to grant a sufficient adjournment to enable a meeting of shareholders to be convened by the board, so that he can reach a conclusion in the light of the conduct of, and proceedings at, that meeting."

H     Mr. Potts submitted that the purpose of that adjournment was to enable the courts to discern whether the defendants had control. I reject that submission. In my judgment the concern of the Court of Appeal in making that statement was to secure for the benefit of a judge deciding whether to allow a minority shareholder's action on behalf of a company to go forward what was described, at p. 221, as the commercial

assessment whether the prosecution of the action was likely to do more  A
harm than good or, as it was put originally by counsel for Newman
Industries Ltd., kill the company by kindness. The whole tenor of the
Court of Appeal's judgment was directed at securing that a realistic
assessment of the practical desirability of the action going forward
should be made and should be made by the organ that has the power
and ability to take decisions on behalf of the company. Also the
question of control pure and simple hardly admitted of any doubt in that  B
particular case.

Mr. Potts submitted, in the alternative, that what the Court of
Appeal said was obiter. This I accept, but it was clearly a carefully
considered statement contrasting with the express acknowledgment that
they had had little argument on the proper boundaries of the exception
to the rule in *Foss v. Harbottle*, 2 Hare 461 and were therefore not  C
making any definitive statement on that subject, and I propose to follow
what I understand to be the true construction of this statement albeit
obiter, unless there is other authority binding on me the other way.

As to that Mr. Potts submitted that no reported authority held that
in a case falling within the fraud on a minority exception to the rule in
*Foss v. Harbottle* the court should go beyond seeing whether the
wrongdoers are in control and count heads to see what the other  D
shareholders, i.e. those other than the plaintiffs and the wrongdoers,
think should be done. I accept that in many reported cases the court has
not gone on to the second stage. *Mason v. Harris* (1879) 11 Ch.D. 97 is
one such case, and there are modern examples too, such as *Pavlides v.
Jensen* [1956] Ch. 565 and *Daniels v. Daniels* [1978] Ch. 406. But the
fact that such an investigation was not conducted is not conclusive that it  E
could not be conducted, more especially in the absence of any argument
on this precise point. An investigation for interlocutory purposes of the
propriety of the exercise of voting power in connection with the
proposed prosecution of a minority shareholder's action was conducted
by Sir Robert Megarry V.-C. in *Estmanco (Kilner House) Ltd. v.
Greater London Council* [1982] 1 W.L.R. 2. In that case he permitted
the action to proceed, but Mr. Aldous submitted that the careful  F
scrutiny to which the propriety of the shareholders' voting activities was
subjected is of itself an indication of the significance that the court in a
proper case will attach to it. This I accept.

Another indication in the same direction is Walton J.'s reaction in
the earlier proceedings in *Smith v. Croft* [1986] 1 W.L.R. 580 already
referred to. He said, at p. 591:
                                                                        G

"This is, of course, not an application to strike out the action on the
grounds that it cannot be justified as a minority shareholders'
action, but quite clearly the same kind of considerations apply. If
the majority of the independent shareholders do not wish the action
to be continued, clearly the court will not sanction its continuance
and certainly not at the expense of the company."
                                                                        H

I accept that this is only by way of obiter for that particular question
was not argued at that stage or before Walton J. but it represents the
reaction of a judge very experienced in this field. In my judgment the

A    word "control" was deliberately placed in inverted commas by the Court of Appeal in *Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2)* [1982] Ch. 204, 219 because it was recognised that voting control by the defendants was not necessarily the sole subject of investigation. Ultimately the question which has to be answered in order to determine whether the rule in *Foss. v. Harbottle* applies to prevent a minority shareholder seeking relief as plaintiff for the benefit of the company is

B    "Is the plaintiff being improperly prevented from bringing these proceedings on behalf of the company?" If it is an expression of the corporate will of the company by an appropriate independent organ that is preventing the plaintiff from prosecuting the action he is not improperly but properly prevented and so the answer to the question is "No." The appropriate independent organ will vary according to the

C    constitution of the company concerned and the identity of the defendants who will in most cases be disqualified from participating by voting in expressing the corporate will.

    Finally on this aspect of the matter I remain unconvinced that a just result is achieved by a single minority shareholder having the right to involve a company in an action for recovery of compensation for the company if all the other minority shareholders are for disinterested

D    reasons satisfied that the proceedings will be productive of more harm than good. If Mr. Potts' argument is well founded once control by the defendants is established the views of the rest of the minority as to the advisability of the prosecution of the suit are necessarily irrelevant. I find that hard to square with the concept of a form of pleading originally introduced on the ground of necessity alone in order to prevent a wrong

E    going without redress.

    I therefore conclude that it is proper to have regard to the views of independent shareholders. In this case it is common ground that there would be no useful purpose served by adjourning to enable a general meeting to be called. For all practical purposes it is quite clear how the votes would be cast, and that I described at the outset of this judgment. The questions therefore remain "What is the test of independence" and

F    "Does Wren Trust pass it?"

    Upon the former Mr. Potts submitted I should apply the test formulated in *In re Hellenic & General Trust Ltd.* [1976] 1 W.L.R. 123 by analogy. That decision was concerned with a scheme of arrangement and was accepted by Mr. Potts not to be direct authority, but he suggested that the passage in the judgment of Templeman J., at p. 125,

G    provides appropriate guidance. He said:

    "The question therefore is whether M.I.T. [Manchester Investment Trust Ltd.], a wholly owned subsidiary of Hambros, formed part of the same class as the other ordinary shareholders. What is an appropriate class must depend upon the circumstances but some general principles are to be found in the authorities. In *Sovereign Life Assurance Co. v. Dodd* [1892] 2 Q.B. 573, the Court of Appeal

H    held that for the purposes of an arrangement affecting the policyholders of an assurance company the holders of policies which had matured were creditors and were a different class from policyholders whose policies had not matured. Lord Esher M.R.

said, at p. 580: 'they must be divided into different classes . . .   A
because the creditors composing the different classes have different
interests; and, therefore, if we find a different state of facts existing
among different creditors which may differently affect their minds
and their judgment, they must be divided into different classes.'
Bowen L.J. said, at p. 583: 'It seems plain that we must give such a
meaning to the term "class" as will prevent the section being so
worked as to result in confiscation and injustice, and that it must be   B
confined to those persons whose rights are not so dissimilar as to
make it impossible for them to consult together with a view to their
common interest.' Vendors consulting together with a view to their
common interest in an offer made by a purchaser would look
askance at the presence among them of a wholly owned subsidiary
of the purchaser."                                                        C

Mr. Oliver, on the other hand, took me through a line of authority
regarding the efficacy of resolutions passed by or with the help of votes
whose validity was impugned. From *Allen v. Gold Reefs of West Africa
Ltd.* [1900] 1 Ch. 656 onwards there has been applied a test whether the
votes in question were exercised bona fide for the benefit of the
company as a whole. The generality of the test has led to differences of   D
judicial opinion on the result of applying it to a particular set of facts,
notably in that particular case. That is further illustrated by the different
results reached on not very dissimilar facts in *Brown v. British Abrasive
Wheel Co. Ltd.* [1919] 1 Ch. 290 and *Sidebottom v. Kershaw, Leese &
Co. Ltd.* [1920] 1 Ch. 154. In my judgment in this case votes should be
disregarded if, but only if, the court is satisfied either that the vote or its   E
equivalent is actually cast with a view to supporting the defendants
rather than securing benefit to the company, or that the situation of the
person whose vote is considered is such that there is a substantial risk of
that happening. The court should not substitute its own opinion but can,
and in my view should, assess whether the decision making process is
vitiated by being or being likely to be directed to an improper purpose.   F

In general terms I would seek to apply the test applied by the Court
of Appeal in *Allen v. Gold Reefs of West Africa Ltd.* [1900] 1 Ch. 656,
but it seems to me possible to formulate a more particular one in the
circumstances of this case. The analogy with schemes of arrangement
and *In re Hellenic & General Trust Ltd.* [1976] 1 W.L.R. 123, is a good
deal less compelling. Moreover the application of such a test as I have
indicated should prevent any risk of the danger that Mr. Potts relied   G
upon of the resolution which prevents proceedings being brought on
behalf of the company being itself treated as a fraud on the minority.

The question thus arises whether Wren Trust's decision, which is the
equivalent of a vote, passes the test or is vitiated by being directed to an
improper purpose. The evidence filed by the defendants on this issue
consist of two affidavits by Mr. Carr and two by Mr. Baldock, who is   H
the managing director of Gresham Trust Plc. and a director of Wren
Trust, its subsidiary. Mr. Baldock deposed in an affidavit sworn on 1
July 1985:

A

"(4) As a director of Gresham Trust and Wren Trust I am involved in making a number of investments in unquoted companies. I can say that, without doubt, the investment in Film Finances has been, both in terms of capital appreciation and income, a very successful investment. For the reasons set out in Mr. Carr's affidavit I am of the opinion that the remuneration which has been paid to Messrs. Soames, Korda and Croft is in all the circumstances reasonable.

B

"(5) The present litigation is a source of some considerable concern to Gresham Trust and Wren Trust in that it jeopardises a valuable investment. My reasons for so stating are that, as a professional investor, I am of the view that Mr. Soames represents the principal asset of the company. The present proceedings, purportedly brought on behalf of the company, are thus a personal attack on the company's principal asset. Whilst Mr. Soames has a substantial equity stake in the company he is not bound to the company by a long term service contract. There is therefore no reason why if Mr. Soames became so disenchanted with the present litigation he could not either set up business on his account in this country or seek alternative employment in the same industry in the United States of America. I have no doubt that in view of the record of the company he would have little difficulty in either obtaining the necessary finance to commence business on his own account or to find alternative employment in the United States of America at the same or a higher salary.

C

D

"(6) If Mr. Soames were to leave the company the effect upon the investment of all the minority shareholders in the company would in my opinion be catastrophic and, even if it were possible to replace Mr. Soames, then I verily believe that the remuneration which would have to be paid for an appropriate replacement would be at the same level or in excess of that which Mr. Soames is already receiving.

E

"(7) The statement of claim in these proceedings alleges that the proceedings are brought for the benefit of all shareholders. Wren Trust as a minority shareholder holding some 19·66 per cent. of the issued share capital of the company is of the view: (i) that the remuneration which has been paid to the executive directors is in all the circumstances reasonable; (ii) that the present proceedings are not for the benefit of the minority shareholders; and (iii) that if the present proceedings continue they will put in jeopardy the value of the investment of all the minority shareholders."

F

G

After the independence of Wren Trust had been challenged he swore a further affidavit on 18 March 1986 in which he said:

"(5) Wren Trust Ltd. is not a party to the present proceedings. However, it has been suggested that because the non-executive chairman of Film Finances Ltd., Mr. Carr, is a director of Wren Trust and Gresham Trust, Wren Trust cannot properly be said to be an independent shareholder. In this regard, the board of Gresham Trust and the board of Wren Trust have carefully considered the passage in the judgment of Walton J. . . . .

H

"(6) The directors of Gresham Trust and the directors of Wren    A
Trust have been advised that this Honourable Court would be
entitled to disregard the views of Gresham Trust and Wren Trust in
assessing whether a majority of the independent shareholders
considers that the proceedings are for the benefit of Film Finances
Ltd., if they are allowed their consideration of the merits of the
present proceedings to be influenced by the fact that Mr. Carr is a
defendant in the proceedings.                                      B

"(7) The directors of Gresham Trust and the directors of Wren
Trust (excluding in each case Mr. Carr) have carefully considered
the issues in the present action, the affidavits sworn herein and
the judgment of Walton J. For the reasons already set out in my
first affidavit . . . and in the affidavit of Mr. Carr . . . they have
concluded that the present proceedings are not only of no benefit to    C
Film Finances Ltd. but they put at risk the investment of Gresham
Trust and Wren Trust in Film Finances Ltd. Accordingly, the
directors of Gresham Trust and the directors of Wren Trust
(excluding in each case Mr. Carr) have resolved to support the
application by Film Finances Ltd. to strike out the present
proceedings, and any application which Mr. Carr may be advised to
make to strike out the present proceedings, and I have been    D
authorised to swear this affidavit in support of such applications."

Then he exhibits minutes of the relevant board meetings. That in
relation to Wren Trust recorded that Mr. Scott, a solicitor, reported on
the present state of the proceedings which had been commenced by
three minority shareholders in Film Finances Ltd. where Wren Trust
Ltd. is a substantial minority shareholder, and then he refers to the    E
application before Walton J. and the possibility of an appeal. There
being no questions of a factual nature Mr. Carr then left the meeting,
and the minute then said:

"Mr. Scott explained to the meeting that in considering Film
Finances' application to dismiss the proceedings the court would
wish to have regard to the views of the independent shareholders.    F
In considering the merits of the proceedings and whether the board
considered that the prosecution of the proceedings was in the best
interests of Film Finances Ltd. the board must disregard the fact
that one of its number was the defendant in the proceedings. The
directors should only have regard to the effect of the present
proceedings upon its investment in Film Finances Ltd. If, for the
reasons set out in the affidavits already sworn by Mr. Carr and Mr.    G
Baldock, the board considered that there were good commercial
reasons why the proceedings were not in the best interests of Film
Finances Ltd., then it should resolve to support Film Finances'
application to dismiss the proceedings, and on the basis of Walton
J.'s judgment there was no reason why the court should not take
note of Wren Trust's view as to the merit of the proceedings."    H

And then the resolution is recorded.

An attempt was made on behalf of the plaintiffs to adduce evidence
to show that Mr. Baldock as well as Mr. Carr was personally interested

A  but that attempt was not persisted in or relied upon at the hearing
before me. I need not therefore take up time dealing with it. But the
fact that it was made and that repeated offers to tender Mr. Baldock for
cross-examination on this issue of the independence of Wren Trust were
not taken up is, in my judgment, some indication of the weakness of the
plaintiff's case on that issue.

B  Mr. Potts relied on evidence that showed that Wren Trust has been
described as an associate of the executive directors. I accept that there is
evidence that Wren Trust sided with the executive directors in the board
room tussle that resulted in Mr. Garrett's resignation as a director of the
company and could properly be described as associates in that context,
and that there is evidence that Gresham Trust itself was involved in the
share transactions leading up to Mr. Garrett's resignation. I nevertheless
C  remain firmly of the view that there is no sufficient evidence that in
relation to the present question whether these proceedings should
continue Wren Trust has reached its conclusion on any grounds other
than reasons genuinely thought to advance the company's interests. It is
not for me to say whether the decision itself is right or wrong. It is for
me to say whether the process by which it was reached can be impugned
D  and I hold that it cannot. Nor do I consider that in the circumstances
there is shown to have been a substantial risk of Wren Trust's vote
having been cast in order to support the defendants as opposed to
securing the benefit of the company.

That conclusion means that I accede to the fourth and ninth
defendants' motions and direct that the statement of claim be struck out.
Before parting with the case I should like to say a further word about
E  the procedure.

Mr. Potts at the end of his long and helpful addresses described the
procedure as a shambles. Without going to those lengths I do agree that
it had unsatisfactory features not least the length of time taken. The
order of speeches did not in the event match the onus of proof and
although I doubt whether in the course of his marathon Mr. Potts left
F  any ground uncovered, nevertheless that was another unsatisfactory
feature. It may very well be that the Court of Appeal will have an
opportunity of elaborating what was said in *Prudential Assurance Co.
Ltd. v. Newman Industries Ltd. (No. 2)* [1982] Ch. 204.

For my part I would say three things. First, I consider there may well
be a much stronger case for requiring a prospective plaintiff to have the
onus of establishing that his case falls within the exceptions to the rule
G  in *Foss v. Harbottle*, 2 Hare 461 or outside it altogether than there is for
putting the same onus upon him to show that the company would be
likely to succeed if it brought the action. Upon the latter it might well
be appropriate to apply the usual test under R.S.C., Ord. 18, r. 19 and
the inherent jurisdiction which puts the onus on the defendants to show
the case is effectively unarguable.

H  Secondly, I consider it would be highly desirable for applications in
respect of costs under *Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373
procedure to be made at the same time as the plaintiff establishes
whatever it is that he does have to establish. A great deal of expense

A

has been caused in this case by the piecemeal way in which the matter has proceeded.

Thirdly I believe that it would be helpful for there to be specific procedure laid down, whether by way of rules of court or practice direction I know not, for the initiation and prosecution of actions by minority shareholders to recover on behalf of a company.

B

*Statement of claim struck out as against fourth and ninth defendants with costs on standard basis.*
*Leave to appeal.*

*Solicitors: Gouldens; Herbert Smith & Co.; Harbottle & Lewis.*

C

T. C. C. B.

D

[CHANCERY DIVISION]

RIGNALL DEVELOPMENTS LTD. v. HALIL

E

[1986 R. No. 3142]

1987  Feb. 19;                                        Millett J.
       March 10

F

*Vendor and Purchaser—Defective title—Completion notice—Adverse entry in local land charges register—Condition of sale that purchaser deemed to have searched local land charges register—Whether vendor relieved of duty to make full and frank disclosure—Whether purchaser deemed to have notice of entry in register—Law of Property Act 1925 (15 & 16 Geo. 5, c. 20), s. 198(1)[1]*

G

The defendant was the freehold owner of a house let to a protected tenant and the defendant's predecessor in title had applied to the local authority for an improvement grant under the Housing Act 1974. The grant was approved and registered by the local authority in the register of local land charges and that encumbrance could be removed on payment pursuant to the provisions of the Act. At the time the defendant purchased the property, her solicitors knew that the charge had been registered. Subsequently the defendant decided to dispose of the property by sale at auction and it was a condition of the

H

contract that the purchaser was deemed to have made local

[1] Law of Property Act 1925, s. 198(1): see post, p. 199F–G.

**Tab 19**



# 2005

## ACTS

## &

## STATUTORY INSTRUMENTS

## &

## IMPERIAL LEGISLATION

## OF

## THE VIRGIN ISLANDS



I

**184C.** (1) Subject to subsection (3), the Court may, on the application of a member of a company, grant leave to that member to

    (a) bring proceedings in the name and on behalf of that company; or

    (b) intervene in proceedings to which the company is a party for the purpose of continuing, defending or discontinuing the proceedings on behalf of the company.

(2) Without limiting subsection (1), in determining whether to grant leave under that subsection, the Court must take the following matters into account

    (a) whether the member is acting in good faith;

    (b) whether the derivative action is in the interests of the company taking account of the views of the company's directors on commercial matters;

    (c) whether the proceedings are likely to succeed;

    (d) the costs of the proceedings in relation to the relief likely to be obtained; and

    (e) whether an alternative remedy to the derivative claim is available.

(3) Leave to bring or intervene in proceedings may be granted under subsection (1) only if the Court is satisfied that

    (a) the company does not intend to bring, diligently continue or defend, or discontinue the proceedings, as the case may be; or

    (b) it is in the interests of the company that the conduct of the proceedings should not be left

to the directors or to the determination of the shareholders or members as a whole.

(4) Unless the Court otherwise orders, not less than 28 days notice of an application for leave under subsection (1) must be served on the company and the company is entitled to appear and be heard at the hearing of the application.

(5) The Court may grant such interim relief as it considers appropriate pending the determination of an application under subsection (1).

(6) Except as provided in this section, a member is not entitled to bring or intervene in any proceedings in the name of or on behalf of a company.

Costs of derivative Action.

**184D.** (1) If the Court grants leave to a member to bring or intervene in proceedings under section 184C, it shall, on the application of the member, order that the whole of the reasonable costs of bringing or intervening in the proceedings must be met by the company unless the Court considers that it would be unjust or inequitable for the company to bear those costs.

(2) If the Court, on an application made by a member under subsection (1), considers that it would be unjust or inequitable for the company to bear the whole of the reasonable costs of bringing or intervening in the proceedings, it may order

(a) that the company bear such proportion of the costs as it considers to be reasonable; or

(b) that the company shall not bear any of the costs.

Powers of Court when leave granted under section 184C.

**184E.** The Court may, at any time after granting a member leave under section 184C, make any order it considers appropriate in relation to proceedings brought by the member or in which the member intervenes, including

(a) an order authorising the member or any other person to control the proceedings;

(b) an order giving directions for the conduct of the proceedings;

